# THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CAUSE NO. 4:00-CR-00260-2** |
| | **:** | **DEATH PENALTY CASE** |
| **vs.** | **:** | |
| | **:** | **Honorable Terry Means** |
| **JULIUS ROBINSON** | **:** | **United States District Judge** |

---

## MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

(Filed Electronically Under the Electronic Filing System Requirements)

---

MICHAEL B. CHARLTON, No. 04144800
Attorney at Law
Law Offices of Michael B. Charlton
P.O. Box 1964
El Prado, New Mexico 87529
Telephone: (505) 751-0515
Facimile: (505) 751-1133

MARIA E. STRATTON, No. 90986
Federal Public Defender
SEAN K. KENNEDY, No. 145632
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012
Telephone: (213) 894-5063
Facsimile: (213) 894-0081

## TABLE OF CONTENTS

TABLE OF AUTHORITIES    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv, v

INTRODUCTION    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    The Investigator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    The Mitigation Specialist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            1.    Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    Defense Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      C.    Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            1.    Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     I.    THE COURT SHOULD VACATE THE DEATH SENTENCE
          BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL FOR
          FAILURE TO INVESTIGATE AGGRAVATING EVIDENCE. . . . . . . . . . . . 17

      A.    Trial Counsel's Failure to Investigate the Abduction of Michael
          Williams was Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.    Even If the Allegations That Robinson Arranged to Have Michael Williams Abducted and Threatened Had Even Remotely Been True, Trial Counsel Failed to Take Readily and Easily Available Steps to Rebut the Effect of These Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    Trial Counsel's Ignorance of the Facts about the Abduction of Michael Williams Prejudiced the Defense. . . . . . . . . . . . . . . . . . . . . . . . 21

D.    The Court Should Vacate the Death Sentences Based on Ineffective Assistance of Counsel at the Penalty Phase for Failure to Investigate Mitigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      1.    Trial Counsel's Investigation and Presentation at the Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      2.    Trial Counsel Was Deficient For Failing to Investigate Robinson's Social History. . . . . . . . . . . . . . 28

            a.    Failure of the Northern District to Adopt a Plan That Would Insure High Quality Representation . . . . . . . . . . . . . . . . . . . . . 28

            b.    Defense Counsel Failed to Take the Necessary Steps to Comply with the ABA Guidelines. . . . . 28

            c.    Failure to Investigate Mental State . . . . . . . . . . . 29

      3.    Trial Counsel's Failure to Investigate Background and Social History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            a.    Social History . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                 i.    Julius as a Young Child and Teenager . . . 43

                 ii.    Pesticide Exposure . . . . . . . . . . . . . . . . . 51

      4.    Trial Counsel's Failure to Investigate Prejudiced the Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

II.     THE COURT SHOULD VACATE THE CONVICTIONS BECAUSE
THEY WERE OBTAINED IN VIOLATION OF EQUAL PROTECTION. . . . 88

    A.    Racial Discrimination Permeated the Entire Trial Against
Julius Robinson, Both in the Selection of His Jury and in the Decision
to Seek the Death Penalty Against Him. . . . . . . . . . . . . . . . . . . . . . . . . . 88

    B.    The Causal and Peremptory Strikes Against Black Jurors . . . . . . . . . . . 89

    C.    The Prosecutor's Strikes Violated Equal Protection . . . . . . . . . . . . . . . . 89

        1.    Pattern of Strikes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

        2.    Comparison of White Jurors Seated . . . . . . . . . . . . . . . . . . . . . . 91

        3.    The Peremptory Strike of Ms. Amarh . . . . . . . . . . . . . . . . . . . . . 93

        4.    The Peremptory Strike of Dorothy Jean Debose . . . . . . . . . . . . . 95

        5.    The Peremptory Strike of Charlene Boulet . . . . . . . . . . . . . . . . . 96

III.    THE FEDERAL DEATH PENALTY ACT, AS APPLIED IN TEXAS,
VIOLATES EQUAL PROTECTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

IV.    THE COURT SHOULD VACATE THE CONVICTIONS BECAUSE
ROBINSON RECEIVED INEFFECTIVE ASSISTANCE OF
APPELLATE COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

    A.    Defense Counsel's Failure to Raise the Batson Issue on
Appeal Was Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    B.    The Failure to Raise the Batson Issue Prejudiced
Robinson's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

V.     THE COURT SHOULD VACATE THE DEATH SENTENCES BECAUSE
THE PROSECUTION PURSUED FUNDAMENTALLY INCONSISTENT
THEORIES AT SERIATIM CAPITAL TRIALS. . . . . . . . . . . . . . . . . . . . . . . . 102

VI.    THE PROSECUTION KNOWINGLY USED FALSE AND
MISLEADING TESTIMONY TO SECURE ROBINSON'S
DEATH SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                    **PAGES**

Alcorta v. Texas,
    355 U.S. 28, 78 S. Ct. 103, 2 L.Ed.2d 9 (1957) .............................................................. 105

Arlington Heights v. Metropolitan Housing Development Corp.,
    429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) ..................................................... 98

Batson v. Kentucky,
    476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) ................................. 89, 90, 95, 97

Bradshaw v. Maryland,
    373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1983) .................................................. 105

Bradshaw v. Stumpf,
    __U.S.__, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005) .................................................. 104

California v. Brown,
    479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) .................................................. 25

Eddings v. Oklahoma,
    455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d (1982) ........................................................ 24

Georgia v. McCollum,
    505 U.S. 42, 112 S. Ct. 2348, 120 L. Ed. 2d 33 ............................................................ 89

Green v. Georgia,
    442 U.S. 95, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979) ......................................... 102, 103

Hamblin v. Mitchell,
    354 F.3d 482 (6th Cir. 2003) ........................................................................................... 2

Hernandez v. New York,
    500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 ........................................................ 90

Jacobs v. Scott,
    513 U.S. 1067, 115 S. Ct. 711, 130 L. Ed. 2d 618 (1995) .................................... 103, 104

Johnson v. California, __U.S.__,
    125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005) ................................................................... 90

Lockett v. Ohio,
    438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) .................................................. 24

McClesky v. Kemp,
    481 U.S. 279, 107 S. Ct. 1756, 1795 L. Ed. 2d 262 (1986) ........................................... 97

Miller-El  v. Crockwell,
        537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 93 (2003) .......................................... 89, 90

Miller-El v. Dretke,
        __U.S.__, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) ............................................... 90, 91

Napue v. Illinois,
        360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 1217 (1959) ...................................................... 105

Penry v. Lynaugh,
        492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) ............................................... 25

Purkett v. Elem,
        514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) ............................................... 90

Rompilla v. Beard,
         __U.S.__, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) ........................................... passim

Smith v. Murray,
        477 U.S. 527, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986) .................................................. 99

Smith v. Robbins,
        528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) ........................................ 99, 100

Strickland v. Washington,
        466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) .................................... 2, 54, 99

U.S. v. Robinson,
        367 F.3d 278 (5th Cir. 2004)  .................................................................................. 14, 24

Wiggins v. Smith,
        539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) .............................. 2, 25, 26, 87

Williams v. Taylor,
        529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) ............................. 2, 25, 26, 87

**FEDERAL STATUTES**

U.S.C. § 2255 ..................................................................................................... 1, 13, 107

**STATE STATUTES**

1 ABA Standards for Criminal Justice 4-4.1 ......................................................... 25

**THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **JULIUS ROBINSON** | : | **United States District Judge** |

---

**MOTION TO VACATE CONVICTION AND SENTENCE
AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255
AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

**(Filed Electronically Under the Electronic Filing System Requirements)**

---

Julius Robinson is a prisoner in the custody of the United States, under sentence of death, being held at the United States Penitentiary, Terre Haute, Indiana. He was convicted and sentenced to death in violation of the Constitution and laws of the United States, and therefore respectfully moves the Court to vacate, set aside or correct his conviction and sentence, pursuant to 28 U.S.C. § 2255. In support of his motion, Robinson states as follows:

**INTRODUCTION**

It is by now clear that attorney performance in a death penalty phase must be measured, at a minimum, by the Guidelines of the American Bar Association for the Appointment and Performance of Defense Counsel in Death Penalty Cases, hereinafter referred to as the "Guidelines."

1

The Guidelines have been published in various sources, including 31 Hofstra Law Review 913.

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) Williams v. Taylor,

529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), Wiggins v. Smith, 539 U.S. 510, 522,

123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) and Rompilla v. Beard, __U.S.__, 125 S.Ct. 2456, 162

L.Ed.2d 360 (2005).   The latest version of these guidelines, dated February 2003, are merely a

refinement of the earlier guidelines established in 1988, Hamblin v. Mitchell, 354 F.3d 482, 487-488

(6th Cir. 2003) (2003 guidelines "simply explain with greater detail than the 1989 Guidelines the

obligations of counsel to investigate mitigating evidence.").

> 1.1 (A) The objective of these Guidelines is to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction.
>
> (B) These Guidelines apply from the moment the client is taken into custody and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, post conviction review, clemency proceedings, and any connected litigation.

Guidelines, 1-1, at 919.  The commentators to the Guidelines make it clear in their History

of this section that the Guidelines are not aspirational; "[i]nstead, they embody the current consensus

about what is required to provide effective defense representation in capital cases." Guidelines, p.

920.   The language of  "high quality of legal representation" emphasizes that, "because of the

extraordinary complexity and demand of capital cases, a significantly greater degree of skill and

experience on the part of defense counsel is required than in a noncapital case."  Id., p. 921

**For the reasons set forth in the next 100 pages, it is clear that this standard was not met.**

**So that there is no mistake, defense counsel's pretrial preparation did not even come close to**

2

**the Standards of the ABA and the Supreme Court.**

The Commentary to the Guidelines set forth above makes it clear the lawyer's duty to his

client facing the death penalty is that he or she:

> . . .must fully investigate the relevant facts. Because counsel faces what are effectively two different trials - one regarding whether the defendant is guilty of a capital crime, and the other concerning whether the defendant should be sentenced to death - providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation. Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty. Counsel must promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case. Comprehensive pretrial investigation is a necessary prerequisite to enable counsel . . . to uncover facts that will make the client legally ineligible for the death penalty. At the same time, counsel must consciously work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress.

Id., Guidelines 1.1 (Commentary), at 925-926.

The Guidelines make it clear that for defense counsel to "assume the accuracy of whatever

information the client may initially offer or the prosecutor may choose or be compelled to disclose

is to render ineffective assistance of counsel." Id. at 926. A lawyer must not only interview

prosecution witnesses but search for any other witnesses who might challenge the prosecution's

version of the offense.

In the punishment phase, "defense counsel must both rebut the prosecution's case in favor

of the death penalty and affirmatively present the best possible case in favor of a sentence other than

death." Id.

3

If the defendant has any prior criminal history, the prosecution can be expected to attempt to offer it in support of a death sentence. Defense counsel accordingly must comprehensively investigate - together with the defense investigator, a mitigation specialist, and other members of the defense team - the defendant's behavior and the circumstances of the conviction. Only then can counsel protect the accused's Fourteenth Amendment right to deny or rebut the factual allegations made by the prosecution in support of a death sentence. . . .

If uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly must thoroughly investigate it as an integral part of preparing for the penalty phase.

Along with preparing to counter the prosecution's case for the death penalty, defense counsel must develop an affirmative case for sparing the defendant's life. A capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death. This Eighth Amendment right to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'"

Even effective trial representation does not "diminish the need for equally effective representation on appeal. . . .

Id. at 926-930.

The Constitution guarantees effective assistance of counsel on an appeal as of right. The "guiding hand of counsel" must lead the condemned client through direct review. Appellate counsel must be intimately familiar with . . . the substantive state, federal and international law governing death penalty cases, including issues which are "percolating" in the lower courts but have no yet been authoritatively resolved by the Supreme Court."

Id. at 931.

The Commentary to this section concludes that "[u]nless legal representation at each stage of a capital case reflects current standards of practice, there is an unacceptable 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.' Accordingly,

4

any jurisdiction wishing to impose a death sentence must at minimum provide representation that comports with these Guidelines." Id. at 938.

The Guidelines mandate the adoption of a Legal Representation Plan by every death penalty jurisdiction which must provide high quality legal representation.

> Guideline 4.1, A.1. The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.
>
> 2. The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairment.

Id., Guideline 4.1, at 952.

The commentary to this Guideline notes that "[n]ational standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel have access to adequate 'supporting services, [including]. . . expert witnesses, as well as personnel skilled in social work and related disciplines to provide assistance at pretrial release hearings and at sentencing." Id., at 955.

> In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row. Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings. . . .
>
> Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or

5

genetic studies, and consultation with additional mental health specialists may also be necessary.

Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

Id. at 956-957.

The commentary to Guideline 4.1 makes it crystal clear that "the standard of practice demands that counsel have certain specific forms of assistance in every case." Id. at 958.

## A.    The Investigator

The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings. Although some investigative tasks, such as assessing the credibility of key trial witnesses, appropriately lie within the domain of counsel, the prevailing national standard of practice forbids counsel from shouldering primary responsibility for the investigation. Counsel lacks the special expertise required to accomplish the high quality investigation to which a capital defendant is entitled and simply has too many other duties to discharge in preparing the case. . . . As a result, an investigator should be part of the defense team at every stage of a capital proceeding.

## B.    The Mitigation Specialist

A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and ability to elicit sensitive, embarrassing and often humiliating

6

evidence (e.e. family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

. . . .

For all of these reasons, the use of mitigation specialists has become "part of the existing 'standard of care'" in capital cases, ensuring "high quality investigation and preparation of the penalty phase."

Id. at 958-960.

Guideline 10.4(D) insists that counsel "should demand on behalf of the client all resources necessary to provide high quality legal representation." Id. at 63. Counsel must assemble a defense team selecting team members that, "include at least one mitigation specialist and one fact investigator, one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments and any other members needed to provide high quality legal representation." Id.

7

Guideline 10.7 mandates "thorough and independent investigations relating to the issues of both guilt and penalty," regardless of the client's wishes. Id. at 1015.

Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel "sit idly by, thinking that investigation would be futile." Id. at 1021.  Counsel cannot responsibly advise a client about the merits of different courses of  action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.

"Because the sentencer in a capital case must consider in mitigation, 'anything in the life of the defendant which might militate against'" the use of the death penalty for the defendant, "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." Id. at 1022.  In the case of the client, this begins with the moment of conception. Counsel needs to explore:

> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual or emotional abuse; family history of  mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g. failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack

8

thereof, and activities;

(4) Military service. . . .

(5) Employment and training history (including skills and performance, and barriers to employ ability)

(6) Prior juvenile and adult correctional experience. . . .

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses.

Id. at 1022-1023.

Accordingly, immediately upon counsel's entry into the case appropriate members of the defense team should meet with the client to:

1.    discuss the alleged offense or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affect the client's rights;

2.    explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors; and

3.    obtain necessary releases for securing confidential records relating to any of the relevant histories.

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview. Obtaining such information typically requires overcoming considerable barriers, as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer.  As noted . . . . , a mitigation specialist who is trained to

9

recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments such as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records - from courts, government agencies, the military, employers, etc. - can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins and children. A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources - a time consuming task - is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

Id. at 1023-1025.

The commentary then lists the types of records that must be obtained, including school records, social service and welfare records, etc. It insists that the investigation explore the adequacy of institutional responses to childhood trauma, mental illness, or disability." Id. at 1026. It specifically notes as an example, the investigation into pesticide exposure, what pesticides were used and their effects on a child's developing brain. Id.

Guideline 10.11 addresses the defense penalty case. Subsection (F) makes it clear that in deciding which evidence to prepare and use, counsel should consider witnesses familiar with the client's life and development "that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present

10

positive aspects of the client's life, or would otherwise support a sentence less than death.  Id. at 1055-1056. Counsel should also consider the use of expert witnesses and documentation "to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; . . .or otherwise support  a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor."  Id. at 1056. Counsel has to consider "whether all or part of the aggravating evidence may be challenged as inaccurate or misleading."  Id. at 1057.

The commentary makes it clear that a necessary component of this process is a complete social history of the client. Expert assistance is essential to this process in order to explain the significance of the observations. Id. at 1061.  The commentary also notes that  defense counsel must prepare for the prosecutor's case for death in the sentencing phase "in much the same way as for the prosecutor's case at the guilt/innocence phase." Id. at 1064. "Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded,  rebutted or undercut." Id. at 1064.

Finally, appellate counsel is under a duty to "not let any possible ground for relief go unexplored or unexploited."  Id. at 1083.

In this case, virtually none of these guidelines were followed. First, the Northern District of Texas has no plan that achieves the standards of the ABA; it requires only that counsel be qualified. Second, defense counsel failed to use the services of either a skilled investigator or a mitigation specialist and failed to make certain that someone, indeed anyone, on the defense team,  had any

11

expertise in evaluating mental health issues, preferring instead to rely on their own assessment. Defense counsel hired someone who had a criminal history. Third, little or no evidence of Robinson's background was investigated or developed with the result that, as defense counsel has admitted, the evidence presented on Robinson's behalf was not truthful. Fourth, no investigation was conducted into the prosecution's case for death when even a minimal investigation would have revealed that the Government's case for death was based on false evidence and that, in all likelihood, the Government knew it. Fifth, defense counsel never consulted with their "future dangerousness" expert, Mark Cunningham, about the alleged kidnaping and attempted murder of Michael Williams who testified against Robinson's alleged connection to the offense. Had they done so, Dr. Cunningham would have been able to present to the jury persuasive proof that despite this evidence, the public and the Bureau of Prisons (hereinafter "BOP") had nothing to fear from Julius Robinson. Dr. Cunningham could have presented the jury with BOP policy statements, regulations and court decisions that would have allowed either this Court, the United States Attorney's Office or the BOP to hold Robinson incommunicado, rendering him unable to intimidate or harm other people. No such steps were ever taken by any of these officials or entities for the simple reason that no one really considered Robinson to pose such a threat. Fifth, no investigation into Robinson's life was ever conducted; the jury thus was deprived of essential information that would have led them to spare Robinson's life. Finally, defense counsel failed to raise on appeal issues that would have vacated Robinson's convictions and sentence of death.

## JURISDICTION

This Court has jurisdiction to grant the requested relief under 28 U.S.C. § 2255.

## PROCEDURAL HISTORY

On June 19, 2001, the grand jury returned a superseding indictment charging Julius Robinson ("Robinson") as follows:

| | |
|---|---|
| Count 1: | 21 U.S.C. §§ 846 & 841 (b)(1)(B) Conspiracy to Distribute More than 100 kilograms of Marijuana |
| Count 2: | 21 U.S.C. §§ 846 & 841 (b)(1)(A) Conspiracy to Distribute More that 5 kilograms of Cocaine |
| Count 3: | 21 U.S.C. § 848 (e) Murder while Engaging in a Continuing Criminal Enterprise |
| Counts 4, 8 & 17: | 19 U.S.C. § 934 (c)(1)(A)(i) & (c)(1)(C)(i) Possession Firearm in Furtherance of Drug Trafficking Crime |
| Counts 5, 9, 13: | 18 U.S.C. § 924 (c)(1)(A)(ii) Carry/Use Firearm in Furtherance of Drug Trafficking Crime |
| Counts 6, 10 & 14: | 18 U.S.C. § 924 (c)(1)(C)(iii) Carry/Use/Discharge Firearm During Drug Trafficking Crime |
| Counts 7, 11 & 15: | 18 U.S.C. § 924 (j) Murder in Court of Carrying/Using Firearm during a Drug Trafficking Crime |
| Count 12: | 21 U.S.C. §§ 841 (a)(1) & 841 (b)(1)(A) & 848 (e) Murder while Engaged in Possession of More than 5 kilograms of Cocaine with Intent to Distribute |

On October 30, 2001, this Court severed Robinson's trial from his co-defendant's trial and ordered Robinson to proceed to trial on February 4, 2002.

Trial commenced on February 19, 2002.  From February 19, 2002 through March 8, 2002,

Robinson was tried by a jury before this Court.  On March 11, 2002, the jury found Robinson guilty on all counts.

From March 12, 2002 through March 15, 2002, the same jury heard testimony and argument in the penalty phase.  On March 18, 2002, the jury returned a verdict of death on the Shelton and Reyes murders and a sentence of life imprisonment for the Resendez murder.

The court entered judgement on June 5, 2002, sentencing Robinson to death.

Robinson timely appealed his conviction and sentence to the Fifth Circuit, which affirmed U.S. v. Robinson, 367 F.3d 278 (5th Cir. 2004).

Robinson petitioned the U.S. Supreme Court for a writ of certiorari.  On November 29, 2004, the Court denied the petition for writ of certiorari.

## STATEMENT OF FACTS

### A.    Voir Dire

There were only eight black people in the venire, who were questioned as potential jurors. The prosecutors questioned all black potential jurors more aggressively than they questioned white potential jurors.  The prosecutor succeeded in striking four black potential jurors for cause.  The prosecutors exercised peremptory challenges against three of the four remaining black jurors.

The prosecutors' first peremptory against a black woman went unchallenged.  After prosecutors exercised a peremptory against a black woman, defense counsel tendered a Batson objection.  The prosecutor stated that he was striking the juror because he knew her family, which was false.  The court allowed the peremptory strike.  The prosecutor exercised a third peremptory against another black woman, and the defense tendered a Batson objection.  The prosecutor stated that the juror was reluctant to impose the death penalty.  The court allowed the peremptory strike.

14

The only black juror who remained was a black male whom the defense had unsuccessfully moved to strike for cause. The jury that heard the case consisted of eleven white people and one black man.

### B.   Guilt Phase

#### 1.   Prosecution's Case

The prosecution presented evidence that federal agents became aware of a drug distribution operation after the interception of a shipment of marijuana going from Arkansas to Arlington, Texas. The federal agents sought and received authority to conduct wiretaps on Robinson's telephone. As a result of the wiretaps, surveillance, and information developed from sources, federal agents were able to intercept numerous shipments of marijuana and cocaine associated with Robinson.

During the course of the investigation, the agents developed evidence linking Robinson with three drug-related murders in 1998 and 1999. The Government relied on numerous co-defendants, who had pleaded guilty and cooperated in order to receive "5 K.1 motions," to establish Robinson's participation in the murders.

#### 2.   Defense Cases

Defense counsel waived opening statement and called Isaac Rodriguez, a witness to the shooting of Juan Reyes. Rodriguez identified Robinson as the man who shot Reyes and tried to shoot him. 18 RT 40. The defense then called the case agent Andy Farrell to testify that Rodriguez had been shown a photo spread containing a photo of Robinson, but did not identify Robinson as one of the shooters. 18 RT 45-49.

15

### C.    Penalty Phase

#### 1.    Prosecution's Case

The prosecution introduced evidence that Robinson shot at Sarah Tucker, a customer who refused to pay for cocaine she had used.  The prosecution also introduced evidence that Michael "One Love" Williams, a witness called by the government at guilt phase, had been abducted and threatened by three assailants.  The prosecution argued that the abduction occurred because Robinson had issued a "hit" from the detention center where he was being held pending trial.

#### 2.    Defense Case

The defense called several of Robinson's high school football coaches, who testified that Robinson had always been hardworking and respectful.  The defense also called several guards from the detention center, who testified that Robinson was a model inmate.  The defense called Dr. Mark Cunningham, Ph.D., who testified that Robinson posed a low risk of future dangerousness if he were sentenced to life in prison.[1]

The defense also called Robinson's paternal uncle, John Hollimon, who lived in the area, and his mother, Rose Hollimon.  Hollimon testified that his sister, Rose, had problems with alcohol. Hollimon testified that Julius had a stable environment when he lived with his grandparents in Dermott, and that his problems did not begin until he moved from Dermott to Texas to live with his

/ / /

/ / /

/ / /

---

[1] Dr. Cunnningham was hired, not at the instance of defense counsel, but at the suggestion and request of Death Penalty Resource Counsel Kevin McNally only two weeks before trial.

mother. Rose testified that she left her children with her parents in Dermott, so they would have a "good home." She admitted smoking "primos" – cocaine-laced marijuana cigarettes – but told the jury that she had conquered the addiction, and downplayed the effect of drug addiction on the life of her children.

## ARGUMENTS

I.      **THE COURT SHOULD VACATE THE DEATH SENTENCE BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO INVESTIGATE AGGRAVATING EVIDENCE.**

Defense counsel in a capital case has a duty to investigate the Government's case in aggravation. See Rompilla v. Beard, __U.S.__, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). In Rompilla, the Supreme Court granted penalty phase relief to a capital defendant whose lawyers failed to review records of prior convictions that would have helped them rebut aggravating evidence at the penalty phase. The Court held a "lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." Rompilla, 125 S.Ct. at 2460. The Court stressed that there could be no valid strategic reason for skipping over such an important aspect of the preparations for penalty phase:

> With every effort to view the facts as a defense lawyer who would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously comprising their opportunity to respond a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense.

125 S.Ct. at 2465.

**A.**    **Trial Counsel's Failure to Investigate the Abduction of Michael Williams was Deficient Performance.**

Future dangerousness was a central issue at the penalty phase in this case. The Government introduced evidence purporting to prove that while detained pending trial, Robinson ordered a "hit" against Michael ("One Love") Williams, who testified against Robinson at the guilt phase of the trial. The prosecution introduced evidence through the case agent and Williams that three young men had abducted Williams, attempted to rob him, and threatened to kill him because he had informed against an "O.G." in Texas. 20 RT 92-105, 137-171. The prosecution introduced tapes of recorded telephone conversations between Robinson and family members purporting to show that the abduction was ordered by Robinson from the detention center. 20 RT 99. Defense counsel knew that the prosecution intended to use the abduction of Williams in support of an argument that Robinson posed a threat to others even while incarcerated; they placed great emphasis on Robinson's lack of "future dangerousness." They called several guards from the Fort Worth Medical Center, who testified that Robinson was, in effect, a model prisoner. 21 RT 18-42, 54-75, 81-120. They also called Mark Cunningham, Ph.D., to testify about "future dangerousness" studies. 22 RT 13-100.

At the penalty phase arguments, the Government argued that life in prison without parole was not an appropriate penalty because Robinson could continue to direct murders or violent activities from a jail cell, as he had done with the hit against Michael Williams. 23 RT 99-103. Defense counsel conceded at argument that future dangerousness was the "most important" issue in the case. 23 RT 82.

Despite the significance of the alleged hit ordered by Robinson, defense counsel did nothing to investigate this incident. There is nothing in defense counsel's trial files indicating any

18

investigation of an alleged hit on Michael Williams. Exs. 6, 31, Decl. of Jesse Wallis and Scott Connor. In addition, Wes Ball, one of the two lawyers appointed to represent Robinson in the capital trial, has admitted that counsel did not conduct any investigation whatsoever in Dermott, Arkansas, where both Williams and his assailants lived. Consequently, as in <u>Rompilla</u>, defense counsel had no way of rebutting the prosecution's aggravating evidence.

If trial counsel had investigated in Arkansas, they would have learned that the alleged co-conspirators in the kidnaping of Michael Williams admitted to kidnaping and robbing Williams – declarations against their own penal interest – but denied any connection whatsoever with Julius Robinson. Keith Edington, who was present during the offenses, has declared:

> I recall the December 28, 2000 incident involving Michael "One Love" Williams. I have been told that the prosecutor in Julius Robinson's capital case argued that Kentrel Pitts, Wayne Jordan and I received an order from Julius Robinson to kill One Love. That is not true. We were seventeen years old at the time and had no relationship with Julius, other than being from the same town. We did not take orders from him.

Ex. 8, Keith Edington Decl. at par. 2

Another participant, Wayne Jordan, has stated that the incident arose from a dispute between Alquantis Kentrel Pitts ("Kentrel") and One Love over a drug deal. Jordan disavowed any notion that the group acted at the direction of Julius Robinson:

> At no time during the entire incident did I hear anyone threaten to kill One Love, nor did I hear anyone make any comment about One Love providing information or giving testimony against Julius Robinson.

Ex. 21, Wayne Jordan Decl. at par. 15.

Alquantis Kentrel Pitts has candidly admitted he couldn't afford to repair his car and that

"[he] decided to rob One Love to get money to get [his] car back." Ex. 28, Alquantis Pitts Decl. at

par. 3. However, Pitts denied that his criminal actions had anything to do with Julius Robinson:

> On the way to [One Love's] grandfather's house, Keith [Eddington] said something about One Love snitching on people in Texas and that he [One Love] ought to be killed for it. Keith was just talking. We had not been given any order to kill One Love. Keith was just stating his opinion. I have never had any business dealing with Julius Robinson, nor have I ever received any kind of order from him.

Ex. 28, Alquantis Kentrel Pitts Decl. at par. 9.

The kidnappers acted for their own reasons; the incident had nothing to do with a hit ordered

by Robinson. Even the victim of the scheme, Michael Williams, has expressed skepticism of the

Government's claim at trial that Robinson ordered a hit against him. Williams has declared:

> I believe that the young men wanted money from me, and this was the cause of the incident. I do not believe that they had really been ordered by Julius Robinson to kill me. If they had been wanted ordered to kill me, or if they had wanted to kill me for some other reason, I would have been killed on that date. It was three against one, and they had a gun.

Ex. 34, Mike Williams Decl. at par. 3.

Under Rompilla, defense counsel's failure to investigate the Government's main piece of

aggravating evidence at penalty phase was "objectively unreasonable," and constitutes deficient

performance.

20

B.      **Even If the Allegations That Robinson Arranged to Have Michael Williams Abducted and Threatened Had Even Remotely Been True, Trial Counsel Failed to Take Readily and Easily Available Steps to Rebut the Effect of These Allegations.**

The Bureau of Prisons, this Court and the United States Attorney's Office all have within their power, the ability to prevent inmates from threatening witnesses and other people by holding those inmates incommunicado and simply not allowing any such conduct.  Dr. Cunningham would have been able to display similar orders and to explain their effect. Further, he could have explained to the jury the difference between those threats that are retributive, that is, in retaliation for testimony and those that are preventative, i.e. designed to prevent witnesses from testifying. Once a trial  is completed, there no longer exists any motive to engage in that level of violence.  Most importantly, despite the Government's knowledge of  Robinson's phone calls (two of them were transcribed and introduced into evidence), no one in charge of incarcerating Robinson ever took any steps to hold him incommunicado.  It is a reasonable inference from that omission that no one, despite the Government's allegations, ever considered Robinson dangerous to anyone while he was in jail. Defense counsel here made no effort to investigate these issues or to present them.

C.      **Trial Counsel's Ignorance of the Facts about the Abduction of Michael Williams Prejudiced the Defense.**

The failure to investigate the kidnaping of Michael Williams prejudiced the defense in several respects.  Trial counsel wanted to exclude evidence about the abduction of Michael Williams. They moved in limine to prevent the Government from presenting evidence that Robinson had "orchestrated" the abduction after that Williams had "snitched" on him. 20 RT 8.  The prosecution

responded that it would "link the kidnaping of Michael Williams to Robinson by virtue of Williams himself together with the testimony of investigating agents." 20 RT 10. Because trial counsel had not investigated this incident, they had no way of rebutting the prosecutor's conclusory statement, and the motion in limine was denied. 20 RT 10. Defense counsel did not know that everybody involved in the incident, the victim and the perpetrators, denied any connection to a hit ordered by Julius Robinson.

The prejudice went far beyond the erroneous denial of a motion in limine. Most of trial counsel's presentation consisted of evidence that Robinson was well liked and trusted by all those in authority, who came to know him. In addition to testimony from athletic coaches, trial counsel called various staff members from the FMC where Robinson was incarcerated pending trial. 21 RT 54-67, 68-75, 81-96. All of them testified to the high regard in which they held Robinson. None of them regarded him as a potential threat. Counsel presented the testimony of Dr. Mark Cunningham who demonstrated how someone convicted of a capital offense would not pose a threat; the system could both protect itself and the general public. 22 RT 13-100. The defense was on notice that the Government intended to prove that, despite his incarceration, Robinson could easily arrange to have witnesses against him kidnaped and murdered, evidence which powerfully rebutted their argument that he posed no threat of future danger. Despite being on this notice, **defense counsel made no effort to find out if the allegation was even true and simply assumed that the Government's witness was telling the truth**. Trial counsel's lassitude resulted in a false presentation regarding the issue of Robinson's "future dangerousness," which emerged as a central issue at the penalty phase. The prosecution argued that the act of ordering a hit on witness from a jail cell was compelling evidence of Robinson's future dangerousness, which justified imposition of a death

sentence. 23 RT 100-102.  According to the prosecution, sentencing Robinson to life imprisonment would put others' lives at risk because Robinson's ordering a hit against Michael Williams from the detention center demonstrated that he could and would continue to pose a risk of violence to other people not withstanding his incarceration.  Trial counsel had no real way to rebut this argument.  Dr. Cunningham's testimony about future dangerousness was based on academic studies and generalized evidence; the prosecution pointed to the specific incident of the ordered "hit" and the abduction of Michael Williams.  23 RT 100-102.  Although there was a host of evidence that the prosecution's accusation that Robinson had ordered a hit was false, defense counsel did not know about it because they failed to conduct a reasonable investigation.  Thus, the failure to investigate allowed the prosecution to exploit a false and misleading factual scenario regarding future dangerousness at the penalty phase.

The failure to investigate the claimed abduction of Williams also crossed over to the direct appeal, which trial counsel also litigated.  In "issue number three" of Appellant's Original Brief ("AOB"), counsel argued that the admission of the assailant's statements during the abduction of Michael Williams was hearsay and was improperly admitted based on the "erroneous belief that such statements were admissible as co-conspirator statements. "  AOB at 19.  Counsel argued that the admission of this evidence violated Rule 801(d)(2)(E) of the Federal Rules of Evidence because there was "no showing that the declarant and Robinson both [were] members of a conspiracy." AOB at 20.  However, because counsel had not investigated the abduction of Michael Williams, they did not know that all the participants in that incident, including Williams himself, would have confirmed that the Robinson was not a member of the conspiracy to kidnap and rob Williams.  Consequently, counsel placed no evidence into the district court record that a conspiracy existed, which relegated

23

their appeal regarding the improper admission of the so-called co-conspirator statements to counsel's

ispse dixit assertions that Robinson was not a member of the conspiracy. The Fifth Circuit rejected

this argument and affirmed the conviction, writing:

> This testimony easily fits the first three prongs of the rule 801
> (d)(2)(E) exception, because the government made a competent
> showing that Robinson initiated a conspiracy to have Williams
> murdered, that the Declarant Pitts was involved in the conspiracy and
> that the statement was made while Pitts carried out the conspiracy.
> As to the fourth requirement, "[t]his Court has consistently held that
> in the furtherance requirement is not be construed too strictly lest the
> purpose of the exception be defeated. . . It is sufficient, in this
> respect, that Pitts's declaration – which was not only a threat but an
> explanation of why the threat was legitimate – put Williams under his
> immediate control as the three men forced him to go along to the
> location where they intended to kill him. The district court did not
> abuse its discretion in admitting this testimony.

United States v. Robinson, 367 F.3d 278, 292 (5th Cir. 2004).

Counsel's own arguments on appeal reveal how prejudicial their failure to investigate this

evidence was to Robinson's defense at the penalty phase: "The uncorroborated and highly suspect

'evidence' that Robinson was capable of ordering criminal activity outside his place of confinement

would necessarily affect a punishment verdict – which in this case was death. The harm of the error

was direct, obvious and ultimately life-ending." AOB at 21.[2]

_____

[2] Even had the allegation been true, defense counsel failed to take steps to minimize the impact of
the testimony of Williams's incident. Dr. Cunningham could have presented testimony that would have
established why, in spite of that evidence, the public still had no reason to fear Robinson. As he noted in the
attached declaration, such incidents are often either retaliatory or anticipatory, that is motivated by a desire
to prevent testimony. If the latter is true, the motive for inciting violence against witnesses is gone after a
defendant is convicted. Even if they are retaliatory, the Government, had it taken the threats seriously, could
have restricted Robinson's access to communications, actions the BOP records reveal never occurred and
records defense counsel made no effort to obtain, despite the notice of the Government's intent to use the
Williams's incident. Finally the BOP has the authority to order such prisoners held incommunicado as it has
done in other cases.

24

**D.**      **The Court Should Vacate the Death Sentences Based on Ineffective Assistance**

**of Counsel at the Penalty Phase for Failure to Investigate Mitigation.**

The Sixth Amendment requires that defense counsel not only provide effective representation

at trial, but also that counsel conduct a sufficient investigation, both factual and legal, to insure that

all of the available defenses are explored and considered.

> Underlying Lockett v. Ohio, 438 U.S. 586 (1978) and Eddings
> v. Oklahoma, 455 U.S. 104 (1982) is the principle that punishment
> should be directly related to the personal culpability of the criminal
> defendant. If the sentencer is to make an individualized assessment
> of the appropriateness of the death penalty, "evidence about the
> defendant's background and character is relevant because of the
> belief, long held by this society, that defendants who commit criminal
> acts that are attributable to a disadvantaged background, or to
> emotional or mental problems, may be less culpable than defendants
> who have no such excuse."

Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989), quoting
California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J.,
concurring).

Under Strickland, trial counsel must conduct a reasonable investigation. The Supreme Court

has repeatedly held that in capital cases, a reasonable investigation requires investigating the client's

social history. Williams (Terry) v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000);

Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), Rompilla v. Beard,

__U.S. __, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

The Supreme Court has recently reiterated that the American Bar Association (ABA)

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases reflects

"standards to which we have long referred to as 'guides to determining what is reasonable.'"

Rompilla, 125 S.Ct. at 2466 ("We long have referred to these ABA standards as guides to

determining what is reasonable."). The ABA standards provide that investigations into mitigating evidence "'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" Wiggins, 539 U.S. at 524, 123 S.Ct. at 2537 (emphasis in original), quoting ABA Guidelines, 11.4.1 (c), p. 93 (1989). The ABA Guidelines in effect at the time of Robinson's trial also required that counsel conduct a thorough investigation of the defendant's background. Williams v. Taylor, 529 U.S. at 396, 120 S.Ct. at 1515, citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980).

The Supreme Court has discussed defense counsel's duty to investigate and present mitigating evidence in the context of varying fact patterns. In Williams, trial counsel did not begin to prepare for the penalty phase of the proceeding until a week before trial began. Id. at 395. That preparation failed to uncover extensive records describing a "nightmarish" childhood. Id. The Supreme Court found that failure to investigate was ineffective assistance of counsel. Wiggins involved a post-conviction proceeding with a claim, like Robinson's, that trial counsel failed to investigate the background and history of their client. There, counsel were aware of some of their client's background, but they made a decision to limit the scope of their investigation into potential mitigating evidence, focusing instead on a tactic which sought to portray the client's limited involvement in the crime. 539 U.S. at 521, 123 S.Ct. at 2535. The Court in Wiggins held that defense counsel's failure to uncover voluminous mitigating evidence at sentencing could not be justified as a valid tactical decision because counsel "had not fulfilled their obligation to conduct a thorough investigation of defendant's background." Id. at 522, quoting Williams, 529 U.S. at 396, 120 S.Ct. at 1515. And having failed to conduct such thorough examination, counsel's tactical

decision not to present such mitigating evidence was also objectively unreasonable. Wiggins, 539 U.S. at 527-528, 123 S.Ct. at 2538-2539.

In Rompilla, counsel erroneously believed that there was no mitigation based on a cursory investigation of the social history, which consisted of interviews of five family members and one report from a mental health expert. Counsel failed to discover school reports, incarceration records and a court file regarding a prior conviction which would have alerted them to substantial mitigation. The Supreme Court held that counsel was ineffective for failing to investigate such relevant social history documents. Rompilla, 125 S.Ct. at 2459 ("[E]ven when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the trial's sentencing phase.")

### 1.      Trial Counsel's Investigation and Presentation at the Penalty Phase

Trial Counsel elected to put on a penalty defense that required very little, if any, investigation outside the Dallas-Fort Worth area. They called several coaches from the local high school football team. 21 RT 2-10, 43-46, 46-53, 74-80. During the trial, counsel noticed Larry Burdine, a friend of Robinson's in the courthouse; they asked Burdine if he would testify. Ex. 4, Decl. at Landry Burdine, at pars. 3, 4. They called Burdine without any prior preparation. Id. at par. 5.

Trial counsel also called five guards from the pretrial detention facility where Robinson was housed awaiting trial. Counsel also called Mark Cunningham, a forensic psychologist, to testify about "future dangerousness." However, they did not provide Dr. Cunningham with any social history documents or any other information specific to Robinson. Dr. Cunningham did not meet with Robinson prior to trial. Rather, he gave a statistical presentation regarding "future

27

dangerousness" that was not tethered to Robinson or the facts of his case.

Finally, trial counsel called Rose Hollimon, Robinson's mother, and John Hollimon, Robinson's uncle who lived in Texas. 21 RT 131-170. Trial counsel did not prepare the family members for their testimony. Ex. 15 at par. 10; Ex. 17 at par. 27. Both testified that Robinson was raised in a stable home by grandparents who loved him and gave him support and guidance throughout his childhood. 21 RT 142, 160. John Hollimon testified to some of his sister's problems with drugs and alcohol. 21 RT 141-144. Most of the two family members' testimony portrayed Robinson's background in an incomplete and untrue manner. However, because counsel had not investigated Robinson's social history, they had no way of evaluating this testimony.

### 2. Trial Counsel Was Deficient For Failing to Investigate Robinson's Social History.

#### a. Failure of the Northern District to Adopt a Plan That Would Insure High Quality Representation.

The ABA Guidelines make it clear that every death penalty jurisdiction is to adopt a plan that will insure that Guideline recommendations are put into effect, especially as to the creation of the defense team. No such plan exists in the Northern District; the plan of this District calls only for the appointment of qualified counsel.

#### b. Defense Counsel Failed to Take the Necessary Steps to Comply with the ABA Guidelines.

As has been discussed extensively above, the ABA Guidelines call for the creation of a defense team that includes a trained and qualified fact investigator, a mitigation specialist and someone associated with the team that has training and experience in recognizing mental health

issues. Guidelines at p. 952. Defense Counsel here took none of those steps. First, no mitigation specialist was ever hired. Second, the investigator employed by the defense team, Bruce Cummings, was not an adequate substitute for a mitigation specialist because he lacked training in the preparation and presentation of mitigating evidence in capital cases. Third, Cummings has a criminal history, a history which could have made it very difficult to even talk to Robinson.

### c.      Failure to Investigate Mental State

In this case, trial counsel did not conduct an adequate investigation of Robinson's mental state. Trial counsel failed to obtain Robinson's academic records from the Dermott and Arlington School systems. Trial counsel did not hire any mental health experts to conduct any evaluations of Robinson. Trial counsel's failure to investigate their client's mental state was particularly unreasonable in light of the red flags of mental disabilities. Robinson had a history of academic problems in school. Dermott Elementary School records reflect that Robinson failed and repeated the third grade. Ex. 37, School Records. Robinson was considered academically slow by nearly all elementary and high school teachers. He was unable to complete the normal curriculum at Lamar High School and was transferred to Venture School, an alternative school for students with difficulties learning. Ex. 37, School Records.

If trial counsel had investigated Robinson's mental state, they would have learned that Robinson had learning disabilities and brain damage, which were likely caused by exposure to pesticides. The results of a neuropsychological evaluation of Robinson revealed:

> [V]ariable abilities including several areas of mild impairment along with multiple areas of cognition that fell within normal limits. These results are generally consistent with subtle cognitive deficits associated with chronic exposure to organophosphate pesticides combined with general learning disabilities. . . Research has

29

> demonstrated that chronic exposure to organophosphate pesticides can have negative behavioral effects involving learning capacity as well as other cognitive abilities. Review of Mr. Robinson's academic and medical history suggests that although he was never diagnosed with ADD or any specific learning disabilities, his school performance was quite variable over the years.

Ex. 2, Decl. of Dr. Martin, at par. 3.

### 3.    Trial Counsel's Failure to Investigate Background and Social History

Trial counsel did not investigate in Dermott, Arkansas, where Robinson grew up. Trial counsel Wes Ball has stated that he relied on phone calls and correspondence to conduct the social history investigation in Dermott. The trial files do not reflect any notes of telephonic interviews of anybody or any investigation-related correspondence. (Exs. 6, 31, Decl. of Scott Connor and Jesse Wallis.)

Robinson's family and friends in Dermott told L.J. Britt's lawyer, Danny Burns, who went there several times to prepare for the penalty phase, that they were also willing to help counsel for Robinson. Burns relayed this information to Robinson's trial counsel. Yet, Robinson's trial counsel did nothing to investigate.

If trial counsel had investigated in Dermott, they would have found a host of mitigating evidence for the penalty phase, which is set forth in the "social history" below.

### a.    Social History

Julius Robinson grew up against the background of poverty, racism, neglect, abuse and alcoholism. He was exposed in utero to alcohol and drugs and, as a child to toxic pesticides. He grew up with learning disabilities that made it impossible for him to succeed and pull himself out

of the quagmire that was Dermott Arkansas.[3]

Josephine Dotson was Julius Robinson's aunt. Her father, John Hollimon, Julius Robinson's grandfather, made it only to the fourth grade in Camden Arkansas. He could spell and count and worked as a field hand on farms surrounding Dermott as long as he could, picking cotton and vegetables. Robinson's mother, Margaret Hollimon, was and remains illiterate. She also worked as a field hand, chopping cotton and picking beans. Some of Ms. Dotson's siblings were born at home through the services of a midwife; others at the hospital in Lake Port Arkansas.

Her father, John Hollimon, first started losing his eyesight when she was four years old. He was chopping wood and a splinter flew off into his eye, blinding it. He gradually lost the eyesight in the remaining eye, and, though he had surgery, he eventually was totally blind.

The entire Hollimon family received very minimal welfare assistance and all of the children worked as field hands, except Julius Robinson's mother, Rose Hollimon. Rose lived with a neighbor that everyone referred to as Miss Sarah. Miss Sarah Pittman was a widow with no children and wanted to keep Rose out of the fields. The rest of the Hollimon family worked the fields.

The Hollimon house had no indoor plumbing. At one point, the house burned to the ground and the family lived in a series of houses with no plumbing while they built another home.

---

[3] According to current economic statistics, Dermott has about 3500 people, almost 75% of whom are black. The median income in 2000 was almost $18,000 per year and the average house value was almost $33,000.00. Only a third of the town's residents are married. Compared to the rest of Arkansas, its median income is significantly below the state average, as is its household value. Its unemployment rate of over 13% is well above the state average. The percentage of its population that is institutionalized is significantly above the state average and its percentage of those residents with a college education is well below the state average. 87% of the 635 students in its school system in 2003-04 were eligible for either a free or reduced price lunch program because of their parents' low incomes. It was and remains a very poor community, a fact confirmed by the interview with Rodney White, Julius Robinson's cousin.

Josephine remembers the Dermott schools as segregated. She later attended a private school for which she paid her own tuition by working as a teacher's aide while in school.

John Hollimon was a drunk for many years until he reformed and started attending church. He would drink whiskey with his friends and the children would have to go get him. They would hold him up to keep him from falling into ditches. He would often come home late and fight with Margaret. He couldn't hit her only because he was blind. He was very jealous and would not let her go anywhere without him, except to work the fields. John Hollimon did not stop drinking until Josephine was twenty.

Rose Hollimon did well in school until she had an affair with a teacher.[4]  Ex. 7, Decl. of Josephine Dotson at par. 11. No action was taken against the teacher because Rose denied it to the school authorities but she began to sneak out of Ms. Sarah's home at night. Id. Even though her father intervened, it did no good.

---

[4] Ms. Dotson's memory of her sister's academic achievement is erroneous. Guffrie Gorins taught Rose Hollimon and states that if Rose were in school today, she would be in special education. "The whole Hollimon family had learning problems." Jimmie Lee Robinson, Julius' father, confirms that assessment:

> Some of the Hollimons are a little slow. It's very noticeable with Milton and Mildred, the twins. I wouldn't say that Rose was like her twin siblings but there was something off with her which wasn't as obvious. She seemed to have difficulty doing things differently that what she was accustomed to doing. For example, if the bundle of dirty clothes she took to the laundromat was larger than what she usually washed, rather than washing another load, she would only wash the customary amount and bring back the rest unwashed. There was no convincing her to do otherwise - she wouldn't budge.

> Rose was very lenient with the kids. In terms of educating the children, Rose used to say, "What's wrong with what we got?" I would tell her that we may not be in jail, though I later had some of that myself, but we're not that good. Much later I learned that the term which describes us is dysfunctional. Rose thought there was nothing wrong with drinking while she was pregnant. I brought it up once. She claimed that Margaret drank while she was pregnant, and that there was nothing wrong with it. When I first got together with Rose, I saw John Hollimon drink but not Margaret. I don't know if what Rose said was true. There was alcoholism in Rose's family as well as mine. I remember her Uncle Red was drunk all the time.

Julius's father, Jimmie Lee Robinson lived nearby the Hollimon family and was in the same grade level of Josephine. Ex. 7, Decl. of Josephine Dotson, at par. 12.  He was a very violent young man. Id.  He attacked a girl named Miki simply because she said something that made him angry. Id.  Rose became pregnant by Jimmie Lee at age of 16 and gave birth to Julius' brother, Marcus. Id. at par. 13.  Jimmie Lee started selling marijuana before Julius was born. Id. at par. 13.  He and Rose were smoking it from a very early point in their relationship. Id.

Jimmie Lee later joined the military and he and Rose moved to North Carolina. Id.  at par. 14.  Ms. Sarah moved with them to take care of Marcus Robinson. Id. Later, when Rose was pregnant with Julius, Sarah Pittman brought Marcus with her back to Dermott. Id.  She would talk about Jimmy Lee's violence against Rose. Id. They would start arguing, go into their room and he would hit, kick and stomp on Rose. Id. When Ms. Pittman would try to intervene, Robinson would yell at her to leave them alone. Id. Ms. Pittman, when she could stand no more, left.

After Julius Robinson was born, Rose came back to Dermott to pick up Marcus and return to North Carolina.  Ex. 7 at par. 15.  She would call her sister every other month or so to ask for money. Id.  Rose had no money for food and the military authorities could no nothing to help her. Id.  Rose would also get money from her father to pay rent. Id.  Jimmie Lee Robinson lived with other women. Id.

At some  point, according to Josephine,  Rose sent both Marcus and Julius back home to Dermott to be raised by their grandparents, John and Margaret  Hollimon. Ex. 7, Decl. of Josephine Dotson.  Julius was less than a year old when this occurred.  The Hollimons had to take over because social services was about to take the children away from their mother. Id.

Julius described his life as a child to his girlfriend, Jamila Camp. He and his brother Marcus,

33

often got left with people other than his parents. Ex. 5, Decl. of Jamila Camp, at par. 11. He thought it forced him to grow up quickly and that he matured faster and better than his brother, Marcus. Id. Julius saw himself as the provider for his family, including Marcus and that Marcus never appreciated what his younger brother did for him. Marcus, according to Julius and Jamila, always lived off women. "Julius ended up being more of a father to Marcus' kids than Marcus." Id.

The family lived next to a farm and crop duster aircrafts constantly sprayed pesticides over the crops to control mosquitos. Ex. 7 at par. 17. Josephine remembers the planes spraying the field hands as they worked the crops. Id.

Bernice Johnson was Margaret Hollimon's half-sister and Rose Hollimon's aunt. She also described Jimmie Lee Robinson as a violent man who, once, after Marcus Robinson was born, burst into Ms. Johnson's home with a gun, looking for his wife. Ex. 18, Decl. Bernice Johnson, at par. 5. He wanted to kill her. Id. The violence continued even as Rose Hollimon was pregnant with Julius. Id. at par. 6.

Beotha Moore was a friend of Rose Hollimon and she knew about Jimmie Lee's violent relationship with Rose. "Jimmie would beat Rose up and she would have a black eye, a cut lip or bruises." Ex. 24, Decl. of Beotha Moore, at par. 2. They would fight in the streets of Dermott, often about Jimmie Lee's drinking and seeing other women. Ex. 24, Decl. of Beotha Moore, at par. 4. He would hit Rose in her face and throw her to the ground, in front of their older son, Marcus. Id. The violence continued when Rose was pregnant with Julius. Id. Ms. Moore saw Rose when she came back to Dermott from North Carolina while Rose was pregnant with Julius. Id. at par. 3. Rose would often drink beer while pregnant with Julius and did so at least every weekend. Id.

34

Mildred Hollimon, Rose and Josephine's sister, had a twin brother named Milton. They were born prematurely at seven months. Ex. 12, Decl. of Mildred Holliman, at par. 1. Her oldest brothers, John and Robert, did not graduate from school; John left for Texas at the age of fifteen. Id. at par. 2. She remembers her mother and the other children, except Rose, working in the fields, chopping cotton. Id. at par. 3. Mildred stayed home with her father to help with the housework. Id. She remembers that her parents inflicted little discipline and that they simply obeyed their parents' verbal orders. Id. at par. 4. She has five children and had her first child when she was sixteen years old. Id. at par. 5. She finished the eleventh grade. Id. She also remembers Sarah Pittman coming back to Dermott from North Carolina with tales of Jimmie Lee's violence to Jana's sister Rose.[5] Ex. 12, Decl. of Mildred Holliman, at par. 6.

Mildred's twin, Milton Hollimon also recounts how Rose lived with Sarah Pittman and that neither Rose nor Mildred, because of childhood polio, ever picked cotton. Ex. 13, Decl. Milton Willis Holliman, par. at 3. He started picking cotton at the age of twelve and would pick as much as 75 pounds of cotton in a single day. Id. At the age of 16, he started chopping cotton because picking it was too hard. Id.
"Each person, children and adults, earned five dollars a day chopping cotton in the 1970's." Id.

Milton's father, John, took Milton with him when he went to drink; it was Milton's job to get him home when he was too drunk. Ex. 13, Decl. of Milton Willis Holliman, at par. 5. His father disciplined him only once, when he rang a chicken's neck despite his father's contrary orders. Id. at par. 6. His mother never disciplined any of them. He knew about his sister Rose's smoking

---

[5] Her son, Tony Billups, when he started to get into trouble, went to Arlington Texas at Julius's request and was doing well, especially in sports, until he tore ligaments in this leg and had to return to Dermott. He dropped out of school. Ex. 12, Decl. of Mildred Holliman, at par. 9.

marijuana and drinking on her trips back home to Dermott. Id. at 7.  He remembers Sarah Pittman

bringing both Julius and Marcus home to Dermott from North Carolina because Rose and Jimmie

Lee were fighting too much and the social service authorities were getting ready to take the children

away from them. Id. at par. 8.

John Hollimon is Rose's older brother and also noted his family's welfare status and his

mother's illiteracy. "Our family was very poor, we usually had only one set of clothes, but we always

had something to eat."  Ex. 14, Decl. of John Hollimon, Jr., at par. 2.  He left Dermott in 1970

because his girlfriend and later wife, was pregnant with their child.  He was sixteen.  There were no

jobs in Dermott, either for young people or adults, outside of farm work.  He moved to Wichita Falls

where he worked at Shepherd Air Force Base for 22 years. Id. at par. 5.  He knew about Rose and

her violent relationship with Jimmie Lee Robinson.  Rose came to Wichita Falls to stay with John

after leaving Jimmie Lee; both Marcus and Julius stayed in Dermott.  While living with her brother,

Rose would drink and smoke marijuana and have several boyfriends. Id.  One of her boyfriends,

Zebediah Young, was very rough and violent. Id.  Once, John came home and found that Young had

broken the coffee table and torn down the chandelier. Id.

Marcus Robinson has vivid memories of life with parents trying to destroy one another:

> My earliest memories are of me and Mama Sarah, who helped
> my mother take care of me and my brother, sitting outside of our
> house.  I could hear my mother and father fighting inside the house.
> I heard their voices, yelling at each other.  I think it must have been
> when we lived in North Carolina where my dad was stationed.  I can't
> remember my brother being there, although he may have already been
> born.  I can also remember my mother going out and I wanted to go
> with her, so I would follow her.  She would yell at me and whip me
> with a switch or hit me with her hand on my butt.  She would tell me
> I couldn't come with her and that made me cry.  I remember that
> happening often.

My parents were always arguing and when they fought, it was physical fights with hitting and punching. When I was a little boy, Mama Sarah would say to me, "When you grow up, don't fight and drink and do drugs like they do. And, don't you hit ladies." The fighting was always my daddy's fault because my mother could do no wrong in Mama Sarah's eyes.

Our parents split up when my brother and I were very young and we were sent to live with my mom's mother and father. Mama Sarah would also stay off and on with my grandparents and take care of us when we were little. I felt closer to her when I was growing up than I felt to either my mother or my grandmother, Margaret.

Mama Sarah was much easier on my brother and me than our grandparents who we lived with. My grandmother was the one who disciplined us. She used a switch from a tree and she would whip our butts. Julius got into much more trouble than I did.

Our father would send clothes and shoes for me and my brother. He visited us maybe two or three times that I can remember. One of the times, he came with his second wife, Linda Love. I must have been eight or ten years old. Our father at least made an effort to do something for us. Our mom wasn't doing anything. She came to see us once or twice in all the time we lived with our grandparents and she never sent us anything. When our mother visited Dermott, she was on the go all the time, always partying and going out with her friends. She really didn't spend the time with my brother and me. I cried when she would go out partying.

Ex. 30., Decl. of Marcus Robinson, at pars. 2-6.

Guffrie Gorins, a long time school teacher in Dermott noted that "[l]iving in Dermott has always been difficult. The few industries we had here started moving away in the eighties and nineties [just at the time Julius was a teenager]. The situation in the town has been dismal for a while now. People are living in miserable conditions. I saw the product of the depressed state of the town when I taught school, so many children were and are in need." Ex. 10, Decl. of Guffrie Gorins, at par. 4.

37

Marcus Robinson confirms this. "In Dermott, you've got to survive and there is absolutely no work there. When I was growing up in Dermott, there were no jobs and there still aren't any jobs." Ex. 30, Decl. of Marcus Robinson, at par. 14. Jimmie Lee Robinson, the father of Marcus and Julius, provides a compelling picture of life in a poor and racist town.

> I was born in 1953 in Dermott, Arkansas, and grew up there. My mother was Bertha Scales Robinson and my father was named Eddie Robinson. The last time I saw my father was when I was eight or nine years old. My father left for the Bellglade/Orlando area to work on the citrus harvest and never returned. I have a memory of trucks full of white men, police and hooded Klu Klux Klan men, driving up to my house looking for my father. They said to my mother, "Where is he? We're gonna kill that nigger." My mother told them that my father had gone into the woods. This happened before my father went to Florida. My mother told me that the men were looking for my father because he had stood up to some police officers who wanted to keep the black men from getting together at a black café on Saturday nights.

Ex. 29, Decl. of Jimmie Robinson, at par. 2.

Jimmie Lee, not surprisingly, grew up in a family filled with violence. Id. at par. 3. His father had a weekend ritual: drinking moonshine until he was completely drunk. Someone would usually toss his father out of a truck onto his front yard where he would sometimes sleep off his intoxication. Id. His mother was crippled for life when his father allegedly shot her, an incident his parents described as an accident, a story no one believed. Id. at par. 4. Jimmie Lee's paternal grandfather made and sold moonshine whiskey and, like his father, a "bad alcoholic." Id. at par. 5.

Like almost every African American in Dermott, Jimmie Lee worked the fields:

> I worked in the fields when I was around eight years old, picking cotton, beans and tomatoes. We were not slaves, because we were paid for the work but we were treated like animals. A person could be fired or beaten for the smallest reason, if the boss felt like it. If the beating was severe and the worker badly hurt, the boss might

38

take him to the clinic, not a real hospital but the place for black people. A black person couldn't appeal to the law for a white on black crime. The police were white and they would never punish a white person for harming a black person.

There were planes, crop dusters, dropping pesticides on the fields during the harvest season. One could smell, feel and see the pesticides. The whole town was also sprayed for insects, mainly mosquitoes. There were fields planted with cotton and soy beans in back of the Hollimons and my mother's house. My Uncle Hoss had a cotton field directly behind my mother's house on Deere Street. Across the street, he planted corn. All of the neighborhood kids played in the crop fields when I was a child and when Marcus and Julius were kids. I saw my boys playing there. This is just what Dermott kids did and probably still do. Another activity kids have there is going into the woods. You have to walk through the fields to get to the woods.

Being black in Dermott meant that life was going to be really hard. It wasn't that far from the days of slavery. Sheer desperation allowed people to survive. There was always a sense of desperation. People talked of getting out of the ghetto when they expressed their desire to break away from being downtrodden and poor. There was not only the history of blacks and whites to contend with but there were few jobs to be found in Dermott. I remember my mother and my grandmother, Mahaela Scales, going to Lake Village, some twenty miles away, with a cotton sack that would be filled with government assistance food. Everyone who could, planted vegetables and people hunted and fished. People bartered if they had something to exchange for what they needed. There was no electricity in my house until I was seven or eight years old, in the early 60s. For cooking we used a wood stove, meats were preserved in the smoke house and refrigeration was provided by the blocks of ice delivered by the iceman.

I do not like to use derogatory terms but the word nigger was used frequently by whites in Dermott. The races were completely separated in the town, physically by the railroad tracks, and socially by laws and customs. There were white businesses and a few black stores, white water fountains and no water fountains for the blacks. Black people had to follow prescribed guidelines when in the white part of town and they couldn't go there simply because they felt like it. Integration of the schools came to Dermott in 1971 but some small

39

> changes started to be seen the year before - the Dollar General Store discontinued its practice of prohibiting blacks from using the front door. This small opening of society was not widespread though, blacks could still not go to white restaurants and most places continued to be segregated.
>
> It was very dangerous to violate the practice of keeping the races separate. When I was a boy, my mother and I saw a black man taking a drink from a white drinking fountain. The man seemed to be very tired. A white woman saw the man take a drink and called the police. The man ran back across the tracks but the police caught up with him and beat him fiercely. I saw the man, all bloodied , being dragged away to jail. The next day, the man was found dead in the middle of one of the streets in the black side of town.

Ex. 29, Decl. of Jimmie Robinson, at par. 7-11.

He described his wife, Rose as "easy - she slept around." Id. at par. 15. After Rose was pregnant with Marcus, Jimmie Lee's mother thought it important that he instill values on Rose, something that had not probably occurred in her family. Id. Jimmie Lee admitted that was a job he was in no position to fulfill. ". . . I got hooked on alcohol and drugs. We both fell into a very unhealthy lifestyle." Id.

Military life proved his ultimate undoing:

> Things between Rose and me started to fall apart when we got to Fort Bragg. Military life was wild. I lost all my principles then. Even before Julius was born, Rose and I had already started having extramarital affairs and partying. Partying meant drinking and doing drugs, mainly smoking marijuana. We lost all control of our lives. Rose went back to her old ways - she was promiscuous - and I didn't restrain myself from sleeping around either. I had already started selling drugs, marijuana and microdot acid, to increase my income. Both Rose and I were involved in the business. I hustled the drugs on the outside and Rose dispensed them out of our home. Furthermore, I was drinking heavily, at least two six-packs per day and smoking weed. During the pregnancy with Julius, Rose drank a minimum of two to three beers per day and smoked a half an ounce of marijuana, around twelve joints, every day. We would get drunk, smoke

marijuana and get into huge fights.  Our arguing and physical fights were so constant that Miss Sarah took Marcus and went to stay with some friends who lived across the way.   There was one incident that occurred when Rose was pregnant with Julius that I recall well.  We were riding in the car, both of us were drunk or high, or both, and we got into one of our arguments.  Rose jumped out of the car in the middle of the highway.  When I got her back in the car, I punched her in the chest.  She had bruises on her chest from me hitting her.   I can't remember the exact incident, but Rose had bruises on her ribs after another one of our fights too.  Rose did not smoke marijuana when she was pregnant with Marcus, and the drinking, to my knowledge, did not start until we were in North Carolina.

While she was pregnant with Julius and after she gave birth, Rose held "Soap Opera" parties at our home.  Ten or twelve women would get together at our house from noon to four o'clock and watch television, drink and smoke marijuana, while Rose tended to the customers who dropped by the house to buy drugs.  One of the women, a New Yorker, introduced cocaine to the group, I came to find out some months after Julius was born.  I found out when I tried to purchase a car with the twelve thousand dollars I thought we had in our bank account.  Rather than twelve thousand, we had around eighteen hundred dollars.  Rose had been giving me the deposit slips but I wasn't aware that she was writing checks to buy drugs and who knows what else.  I saw copies of the checks in the bank's microfiche records.  Rose told me about what had happened when I confronted her.  She said that when the New York woman first  brought the cocaine they all chipped in to buy it.  After some time, because it was so expensive, Rose was the only one who was paying for it.  She had more cash available than the others from the drug sales going on in our place.  I don't know for a fact that Rose used cocaine when she was pregnant with Julius, she probably did because of the money she was spending, but she certainly used it right after he was born.

The last two years Rose and I were together, Julius's first two years of life, were really bad.  After Julius was born, Rose wanted to party even more and did.  I also rejected my responsibilities and wanted to party more and went ahead and did it.  Drugs, alcohol and violence were the order of the day in our home.  We would both get high and drunk and start fighting.  We argued every day and I hit Rose several times, that I can remember.  I would push and shove her more often.  I was filled with jealousy and insecurity, and I would question Rose on her activities.  Rose had the serious habit of picking

41

things up and hitting me with them. One time, she hit me over the head with a bottle. I shoved her against a wall. Rather than mellowing out with marijuana, Rose became more aggressive.

I was transferred to Fort Hood, Texas, in 1978. We spent thirty days back in Dermott before heading to my new assignment. Miss Sarah had left Fort Bragg a couple of months before we did. Fort Hood was even more of a problem. Rose had gotten used to her independent lifestyle and took the same pattern to Fort Hood but all of our money was blown so things were tight. We could not afford to rent our own place so we ended up staying with friends . I started hustling drugs again and after three months of living with our friends, I could afford to rent an apartment. Rose couldn't get used to Fort Hood, she didn't like it, and told me that she was going to Wichita Falls to stay with some of her kin. She took the kids but promised to be back when I got housing on the base. I was finally able to get us a place on base but Rose only lasted three months. She tried working on the base washing dishes but it didn't work out. Living on the base in Fort Hood sort of cramped our habits. We continued to have our loud rows, too loud for our, mainly white, neighbors. One time, during one of our fights, our neighbors called the Military Police and they took me away in handcuffs. I wasn't charged with anything and was sent home after six hours but Rose and the kids were gone by then. I got a hold of an old car and attempted to drive it to Arkansas to get Rose and the boys but the car broke down in Louisiana.

Ex. 29, Decl. of Jimmie Robinson, pars. 17-20.

When Jimmie Lee left the military, he returned to Dermott and became, in his words, a "terrible alcoholic." Id. at par. 23. He "never developed the structure to continue the role of a father. I would have to say that I didn't know how to be a father. There were some things I could do, like provide a few material things, before I let drugs and alcohol take over my life, but the boys needed me there with them to guide them and to be with them. In reality, my boys ended up without a mother or a father." Id. at par. 25.

Marcus and Julius were reared by their grandparents, Margaret and John Hollimon and my mother, Bertha Robinson. The boys lived with Margaret and John but spent a lot of time with my mother who

42

> lived next door.  My mother and grandmother, Mahaela Scales, lived together.  My mother died first in the late 80s and my grandmother died one year later.  My mother told me that Julius had a temper just like my father.  She said that there was something odd about Julius.  When he became angry, he would sit in a corner and cry and stew for an inordinate amount of time for a child.
>
> One of the times I visited, when Julius was around five years old, Margaret told me that one of the neighborhood boys had touched Julius's private parts.  Margaret wanted me to talk with Julius about it.  I told Julius that he had to tell momma, Margaret, if anyone tried to touch him again and that no one was to touch his privates.  When Julius heard me say that to him, he pitched a fit the likes of which I had never seen anyone throw in my life. Julius thrashed about, hitting and throwing himself against things and screaming uncontrollably , "Daddy, you don't love me.  Daddy, you don't love me." My mother told me that Julius would go to extremes with his tantrums and cry and cry and cry.

Ex. 29, Decl. of Jimmie Robinson, at par. 32-33.

### i.      Julius as a Young Child and Teenager

Julius Robinson, contrary to most assessments of him by family and friends, had a problematic education. Ex. 37, School Records.  He was held back in the third grade in Dermott and his grades were seldom above the "C" level.   His achievement test scores also reflected a performance level below his grade level.  Dr. Stephen Martin of Tyler Texas administered a series of tests to Robinson and, on the  Wide Range Achievement Test, known as the WRAT-3, Robinson's reading level was at the 7th grade level, or bottom 12%, spelling at the third grade level, or bottom 3%, and math, at the 6th grade level or bottom nine percent, levels inconsistent with his IQ and indicative of learning disabilities, possibly due to pesticide exposure discussed below.

Arlette Gorins taught Julius Robinson in the seventh grade and her experience sheds some light on his academic performance. Julius was in her Remedial English class.  Ex. 9, Artlette Gorins,

at par. 2. "He was academically slow but was not a trouble maker. He received an F in my class. In looking at Julius Robinson's grades, I noted he received a B in geography. I had observed that most students in that particular geography class received either an A or a B, whether they earned it or not." Id. Most telling is her description of the role sports played in Julius' academic performance:

> If a student was good in sports but had a lot of difficulty in academic subjects, the coaches would request that he or she receive some special attention in the form of one-on-one help. The student, thereby, would be able to meet the grade requirements needed to participate in sports. [6] Id. at par. 3.

---

[6] This same assessment was rendered by Carol Wilson, one of Julius' teachers from Lamar High School in Arlington:

> Julius was a good kid who was always positive and smiling. After leaving the school, Julius came back to Lamar to enroll his younger cousin who was having some trouble. He spoke with me about the cousin. I thought that it was amazing that Julius was doing this. He was a child himself and yet he was taking on the role of caretaker.

> I had the impression that Julius did not have a good home life from little comments he made and from listening to other kids talking about him. I do not remember specific remarks.

> Julius was not a strong academic student as is borne out by his transcripts. In reviewing his records, I notice that he had to repeat classes in summer school, indicated by the letter "R." The "M"s in the transcript refer to courses in which the material is modified for the student who has difficulties. These modifications provide the student with opportunities for passing the class. Julius's grade point average was a 4.9 out of a possible 12, that is in the 70-72 or C- range. Omission of his Physical Education grades in the calculation would lower his Grade Point Average even further. His ranking in the school, 387 out of 482, places him in the lower third of his class. Julius lost credits in the 11th grade due to his absences.

> Julius ended up at Venture Alternative School because he lacked the credits to graduate. He attended the first part of his 12th grade at Lamar and then moved to Venture. The Venture Alternative School is not an institution for students with discipline problems but rather one for students who cannot deal with regular instruction, for whatever reason. Kids with disciplinary issues are referred to Turning Point School. At Venture, students can work at their own pace. There is a lot more interaction with

44

Willie Parker was a coach in the  Dermott schools for thirty years.  He coached Julius and his brother Marcus.  His report is quoted from at length:

> Julius was a nice boy but he grew up in the streets without parental guidance.  I would see him around town on his own.  My years of experience with kids have taught me to recognize the ones who are lacking TLC, tender loving care, and Julius was someone who was not getting it.  The Dermott School sets aside certain athletic events to recognize the parents of the students.  These are called Parent Appreciation Days. On the special day, each student athlete gets to escort his parent or parents to the reserved seats before the game begins, while everyone watches.  During the time he played sports, Julius never had a parent to accompany.

> Julius was an exceptional child considering the material and emotional poverty in which he grew up.  I knew the family and their situation.  Julius's grandparents, his guardians, were simple country people without any kind of education and with the added impediment of John Hollimon, who could have been the bread-winner, being blind.  The grandparents were good people but were ill-prepared to educate and care for their grandchildren.  I don't know if the family was on welfare but Julius participated in the free lunch program at the school.  I believe the income and resource criteria to qualify for the program was the same as for welfare - it was reserved for children from poor families.

> The attention Julius would have needed to come from his parents, he ended up getting from his peers.  Nevertheless, Julius was appreciative of any little thing.  Even if I just sat with him on the bleachers and chatted, his thank-yous and his face showed that these moments meant a lot to him.  Furthermore, Julius stood out in how receptive he was when a teacher called his attention to something he was doing. Sometimes after a game, the boys would get a little rowdy and the coaches would have to bring some order to the group.  Julius was always responsive to our requests.  He was a nice kid.

> Julius was a slow learner but his personality helped him.  Although Julius was not a Special Education student, he was a Resource student. These students receive special assistance with their

the instructors.  Hours are also more flexible so as to take into account the needs of students who have to work.

45

school work.  My feeling is that if a student is doing his best, he shouldn't be held back.  About half of the Dermott students need special assistance, and the ones that do are not always identified.  It is very frustrating to be a teacher here.  It is an overwhelming problem.

In Dermott, we have an ongoing relationship with the police department when it comes to kids who participate in sports.  The police would come by and let us know if the athletes were getting into trouble.  No one ever said anything to me about Julius.[7]

Ex. 27, Decl. of Willie Parker, at pars. 2-6.

Jamila Camp, Julius's girlfriend, used to tease Julius about his spelling and writing skills when he lived in Texas. Ex. 5, Decl. of Jamila Camp, at par. 5.  She thought he was dyslexic and that he had some trouble speaking.  She had a hard time understanding him. Id.

In the early 1980's, several people from Los Angeles, Satra and John John, came to Dermott and started a gang, called the Crips. Ex. 16., Decl. of Jana Holiman, at par. 5.  Their initiations, according the Jana Hollimon, Julius' cousin, consisted of a person being jumped in, that is, he would be put into the center of seven to ten members where the newcomer would be pummeled by the surrounding members.  Id. This would last four to five minutes and, if the newcomer were still standing, he was in the gang. Id.  If not, the process started over again.  Jana herself was initiated. She did not witness Julius' initiation but assumed that it occurred because he started wearing the

---

[7] Jimmie Lee confirms Parker's assessment of the Hollimon family:

Margaret was not the disciplining type of caretaker, as she hadn't been with her own children, unlike my mother who was loving but strict. Margaret is a simple person who could not deal with the difculties the boys had.  She fed them and provided shelter but she had to resort to John to keep them in line but John with his blindness couldn't really keep on top of things either.  She also relied on my mother for many things.  Margaret would send the kids to my mother's for help with school work and other problems.

colors of the Crips, blue or black and never red. [8] Id. at par. 6.

Leroy Kennedy was a counselor for the Delta Youth and Family Services Organization in Dermott in the lat 1980's and early 1990's. Id. at par. 2. Julius was referred for counseling to Delta from June 1, 1989 to May 1, 1990. Kennedy can't recall why Julius was so referred or who referred him.[9] Id. The referral might have come from the school system, though as noted in footnote 3, it was not from the juvenile court system. Id. The reason for the referral could have been school problems or gang activity, which had become prevalent in Dermott in 1989. Id. Kennedy believed that Julius had some gang association because of those with whom he associated and the clothing he wore. Id. Kennedy saw Julius three times a week and checked on him in school and at home. Id. at par. 9. "Julius was a pretty good kid. He was smart and had some initiative. Julius seemed to take responsibility for his actions. I like Julius. He was always very respectful to me." This was not the same attitude he noticed with his other kids and the increasing gang activity. ". . . I noticed a dramatic change generally. A change in attitude, a change in attendance, etc. Id. There were more fights all of a sudden, and more break ins. Id. I remember that weapons were stolen and used to shoot up houses." Id. Kennedy regarded Margaret Hollimon, Julius' grandmother, as naive for always believing whatever her grandson told her. Id. "I remember being concerned that the grandparents' home was somewhat chaotic. They had a revolving door policy, with young people coming and

---

[8] Jimmie Lee Robinson was told by Julius' grandmother, Margaret Hollimon, that the other kids had hit Julius with bottles. "He was so badly injured that it took Margaret one month to cure him. She used home remedies and didn't take him to the doctor."

[9] Counsel filed a motion seeking disclosure of any juvenile records of Julius Robinson with the Juvenile District Court of Chicot County Arkansas. After the clerk of the Court examined all of her records, she informed counsel that her court had no records of any referral to the Court for Julius Robinson. He simply never came to the attention of the juvenile authorities.

going all the time. Friends and relatives seemed to live there for a few days, then disappear. It was not a stable environment." Id.

In an interview with counsel, a football coach, Steve Fleming noticed the same difference between Julius Robinson and the other young men. He knew that Julius belonged to a gang; virtually every young African-American man in Dermott belonged to a gang. With Julius, however, it was different. Fleming had a standing policy with his athletes: they were to leave the gang association at the field house door. He wanted them there to play football and if gang activity were ever to interfere with that goal, he did not want them on his team. According to Fleming, Julius never had a problem following those instructions, as far as Fleming could determine, participated in gang related issues. For example, Fleming's team would travel to other area towns for football games. If that town had a rival gang, there would inevitably be a fight when the Dermott team arrived. Julius Robinson never, ever participated in those gang fights, according to fleming. Sometimes the police would come to the school to talk about various students and discuss who was a problem in town. Julius' name never came up.

Carl McCree was a police officer in Dermott from 1988 to 2000 when he was the department's chief. Ex. 23, Decl. of Carl McCree, at par. 1. He details the rise in gang activity and the resulting rise in criminal activity. He never had any information that Julius was involved in drug related activities, only that he arrested Julius for curfew violations and that his grandmother, Margaret Hollimon would always believe her grandson. Id. at pars. 3-5. Willie Nimmer, another Dermott police officer, also states that the only time he ever had to arrest Julius was for a curfew violation. Ex. 26, Decl. of Willie Nimmer, at par. 4. Later, Julius apologized to Nimmer for any trouble he might have caused.

48

At one point, Julius was told by his grandparents that he had to leave town at the insistence of the police. Neither McCree nor Nimmer had any idea what that was about. Most of Julius' family believed that he was being "set up" for an offense that he did not commit.[10] Ex. 7, Decl. of Jospehine Dotson, at par. 18; Ex. 14, Decl. of John Hollimon, Jr. at par. 7. John Hollimon, Julius' uncle, confirms that Julius was sent to Arlington to protect him "from how the law treated young black men in Dermott." Ex. 14, Decl. of John Hollimon, Jr., at par. 7.

Rodney White is Julius' cousin on his father's side of the family; White's father and Jimmie Lee Robinson are brothers. He confirms the rise of gang activity in Dermott and that Julius was once picked up, along with virtually every other young African American male in town, for a school break in. Nothing came of their arrest.

Julius Robinson's cousin, Jana Hollimon visited Julius when he lived with his mother in Arlington, Texas. She stayed with them for several months. Ex. 16, Decl. Jana Holliman, at par. 4. Rose would come home for work and immediately go to her room or bathroom to smoke marijuana. Id. at par. 4. On the weekends, she would smoke a combination of marijuana and cocaine, called Primos. Id. Marcus Robinson noted that when he visited his mother and brother in Arlington there was nothing to eat but potatoes with Ketchup or hot sauce for days, waiting for my mother to get her paycheck. Ex. 30, Decl. of Marcus Robinson, at par. 15. That's all the food there was in the house. Id. When she got paid, she bought food and also a big bottle of whiskey. The bottle would last her about "four or five days." Id.

---

[10] Counsel filed an Arkansas state Public Information act request with the Chicot County District Attorney's office seeking every report of criminal activity that the police suspected of Julius Robinson. No documents were provided because his name was never mentioned in any offense report. Counsel also talked with the Chicot County District Attorney who grew up in Dermott; he had never heard of Julius Robinson.

49

I was a really angry young man my last years in high school. I felt our mother had abandoned us when we were kids. After spending time with our mother during the summers and seeing her drinking, smoking dope and running around with men, I thought she was just no good. Except for when she woke up in the morning, she was always drunk or high on marijuana or both. Julius would sometimes tell our mother she needed to stop doing all the drinking and smoking she was doing, but that never changed her. I don't know if Julius was angry like I was because he kept his feelings from showing.

I moved to Arlington in 1994 or 1995. I lived with my mother and brother for about five months. My mother was working as a nurse's aide. When she came home from work, she smoked marijuana. She smoked every day. She also drank. When she drank, her speech would become slurred and she would yell. Sometimes she would leave the apartment and sometimes she would just go to bed. I was always amazed that she could get up the next morning and go to work after how much she had been drinking the night before. Sometimes Julius would leave the apartment, also, and sometimes he wasn't even there.

My mom had a boyfriend living with her then, a guy named Vernon Ozby, who I knew for a fact was on crack. He wasn't allowed to drive my mother's car so he had me give him a ride and I saw him buy the crack.

Ex. 30, Decl. of Marcus Robinson, at pars. 16, 18-19.

Jamila Camp was Julius' girlfriend and also noted the problems of Rose Hollimon. According to her, Julius Robinson loved his mother and was very hurt by her drug abuse and behavior. Ex. 5, Decl. of Jamila Camp, at par. 12. He gave her money to start a new life in Ohio. Id. He always tried to stop his mother from getting too drunk. Id. John Hollimon on his two visits from Wichita Falls to Arlington, noted that Rose was "really out of it. She was often drunk. She would go to work and when she came home, she would begin drinking. . . . When she drank, you couldn't talk to her. She has a real temper." Ex. 14, Decl. of John Hollimon, at par. 9. Rose was in

50

denial of her problem, an attitude she retains to this day:

> I would say to her, Rose, you have been drinking too much and I think you should slow down. She would get really made at me, yell "don't tell me how to live my life," and walk out, slamming the door. She would be staggering drunk and slurring her words."

Ex. 14, Decl. of John Hollimon, Jr., at par. 9.

David York, a coach at Lamar High School, who testified at trial, had the impression that Julius had no one at home to take care of him. "My experience working with kids has taught me to recognize the kids whose home life is compromised.  I am convinced that if Julius had grown up in a different environment, he would have had another kind of life. I say this because he tried so hard to do well.  He showed a real need to take care of people."  Ex. 36, Decl. of David York, at par. 2.

### ii.    Pesticide Exposure

Jana Hollimon is Julius Robinson's cousin. Until she was six years old, she lived with her mother, Mildred Hollimon and then until she was ten years old, with a woman named Alice Johnson. In the summers from ages seven to eleven, she would play at her grandmother's home, that of Margaret Hollimon and often with Julius Robinson. Id. at par. 3.  The played ball between the rows of soybeans in the fields behind the Hollimon house. Id.  Those fields, during the summers, were dusted two to three times per week and, early evening, if during the week. Id.  If on the weekends, the dusting occurred in the morning. Id.  The children would be in the fields and the plane would fly directly over them. Id.  The spray felt like a kind of mist, like a light rain. Id.  The town of Dermott also used trucks to spray for mosquitos; the children called the spray "Ocean Spray" because it smelled like the fruit drink. Id.

Mildred Hollimon, Julius's aunt, related that the homes of her parents, and herself, backed up to soybean fields farmed by Bob Green who would spray the fields; children playing there would get sprayed on. Ex. 12, Decl. of Mildred Holliman, at par. 7. Marcus Robinson also confirms this. Ex. 30, Decl. of Marcus Robinson, at par. 7.

Guffrie Gorins, a school teacher in Dermott for thirty one years, noted that there were fields strewn all around Dermott and that crop dusters were very active in the spring and late summer. Ex. 10, Decl. of Guffrie Gorins. Clouds of pesticides were dropped to kill pests which attacked crops. Id.

According to Dr. Max Mesch of the University of Arkansas, the two most common pesticides used in Arkansas to control the mosquitos were Malathion and Fenthion, both of which were highly toxic and known to affect the human nervous system. Malathion is an organic phosphate or a cholinesterase inhibiting compound, the exposure to which can have a profound effect on a human's ability to control his aggression. It is a known carcinogen. It is suspected of causing learning disabilities in math, reading, short term memory damage, language and speech difficulties, aggression, irritability, depression and increased emotionality. It should be noted that these effects are common to all organophosphates and the amount of exposure required to establish these effects, among others, is many times lower than that required to cause cancer, birth defects, organ damage and other physical effects. Fenthion's approval by the FDA was withdrawn because of an excessive number of poisoning deaths. Like every other organophosphate, it is absorbed through the skin and affects the central nervous system. Repeated exposure can impair the memory and concentration, can result in depression and irritability as well as speech difficulties. Ex. 2, Decl. of Dr. Stephen K. Martin. The United States Environmental Protection Agency concluded that it posed an

unreasonable risk to human health and the environment.

According to a 1983 report on the use of pesticides in Arkansas soybean production, a number of chemicals were applied both prior to plant emergence and before harvest. These chemicals and their toxicological effect can be summarized:

2,4-DB          Affects nervous system, is considered a developmental toxin

Acifluorgen     Probable human carcinogen

Alachlor        Developmental toxin, can cause organ toxicity

Benomyl         Developmental toxicity

Bentazon        Can  cause apathy, incoordination etc.

Dinosseb        risk of birth defects, a developmental toxin considered to be highly to

                extremely toxic

Fluchloralin    risk unknown. no longer registered

Blyphosate,     linked to Lymphonas

Linuron         Developmental Toxin, extra risk of exposure to children, ages 1-6.

Metolachlor     possible human carcinogen

Metribuzin      Developmental Toxin

Maptalam        unknown effects

Pendimethalin Suspected carcinogen. Suspected endocrine, gratrointestinal and liver toxicant

Sethoxydim      negative effects on liver and bone marrow and ocular toxicity

Trifluralin     Registration cancelled in 1982, possible human carcinogen.

**4.          Trial Counsel's Failure to Investigate Prejudiced the Defense.**

Under Strickland, a petitioner shows prejudice by demonstrating that "there is a reasonable

53

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 695, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984).

If counsel had presented evidence of Robinson's mental disabilities, background and social history it is reasonably probable that the result of the penalty phase would have been different.  The failure to investigate mitigation did not just deprive the jury of the ability to hear about Robinson's troubled and deprived childhood and adolescence; it resulted in a false and misleading presentation about Robinson's life.  Robinson's maternal uncle, John Hollimon, testified that Robinson had grown up in the "stable environment" of a small town, 21 RT 142, with grandparents who "raised them right."  21 RT 151.  According to John Hollimon, Robinson did not face problems until he moved to Texas to live with his mother, who drank excessively and did not care for him.  Robinson's mother, Rose Hollimon, testified that she visited the boys whenever her schedule permitted, 21 RT 161, and that her parents provided a "good home" for them.  21 RT 162.  Rose even tried to downplay the effects of her crack addiction on her children; she made it sound as if her problems with addiction were a recent and temporary development in her and the boys' lives.  21 RT 168.

A reasonable investigation by trial counsel would have revealed that none of this testimony was true.  As a child, Robinson was not raised in a stable home.  His parents were locked in a cycle of addiction, violence and illegal activities, including drug-selling.  21 RT 168. Ex. 33, Decl. of Willie White, at par. 11; Ex. 18, Decl. of Bernice Johnson, at par. 5-6; Ex. 29, Decl. of Jimmie Robinson, at par. 17.  After his parents abandoned him, Robinson lived in his grandparents' house in Dermott, Arkansas. Ex. 30, Decl. of Marcus Robinson, at par. 4, 16.  John and Margaret Hollimon were so overwhelmed by their own problems that they had little, if any, ability to guide him. Ex. 33,

Decl. of Willie White, at par.9.  The residents of Dermott viewed the Hollimons' home as "chaotic,"
filled with people coming and going. Ex. 22, Decl. of Julius and his brother were not well cared for;
people saw him running the streets at a young age. Ex. 27, Decl. of Willie Parker, at par. 2; Ex. 29,
Decl. of Jimmie Robinson, at par. 40; Ex. 30, Decl. of Marcus Robinson, at par. 11.  His
grandparents did not guide his school work or accompany him to school events. Ex. 27, Decl. of
Willie Parker, at par. 2; Ex. 30, Decl. of Marcus Robinson, par. 2; Ex. 30, Decl. of Jesse Wallis, par.
9.  Robinson's teachers recognized he needed more parental guidance and supervision. Ex. 36, Decl.
of David York, at par. 2; Ex. 37, School Records.

Robinson's problems did not begin in late adolescence.  He struggled with learning problems
throughout school. Ex. 37, Decl. of School Records.  He failed the third grade, a major sign of
developmental problems.  With a father who never saw or contacted him, Robinson's only male role
models were older cousins and their friends who lauded the gang lifestyle and the benefits of
criminal activities.  21 RT 159; Ex. 30, Decl. of Marcus Robinson, at par. 11, 12; Ex. 32, Decl. of
Rodney White, at par. 19.  Many of the young boys in Dermott tried to emulate the big-city gang
lifestyle, and Robinson was not immune from it. Id.  Despite this, Robinson did not have a juvenile
arrest history.  He struggled to educate himself despite learning disabilities.

Throughout her whole life Robinson's mother, Rose Hollimon, put her own needs, including
addiction, before the needs of her children. Ex. 29, Decl. of Jimmie Robinson, at pars. 18,19.
Contrary to her testimony at the penalty phase, Rose did not visit Robinson whenever she could. 21
RT 161 Ex. 15, Decl. of Robert Hollimon, at par. 10.  When the Hollimons sent Robinson to live
with her in Texas, Rose did not provide for his emotional or financial needs. Ex. 14, Decl. of John
Hollimon, Jr., at pars. 7,8; Ex. 30, Decl. of Marcus Robinson, at pars. 15, 18.  She did not buy food;

she did not pay the rent. Ex. 7, Decl. of Josephine Dotson, at par. 19. Worse still, Rose expected Julius to support himself and her, including her drug habit. Ex. 7, Decl. of Josephine Dotson, at par. 19. Robinson turned to drug sales as a way to support the family. Id. While none of this is a legal excuse for drug-related murders, it shows that Robinson was not a cold, calculated gang leader willing to kill anybody in order to maintain his lucrative lifestyle as a narcotics dealer.

The effect of this evidence is described in detail by Dr. Mark Cunningham's declaration and demonstrates precisely how this evidence could have been explained to the jury to demonstrate both the argument about why Robinson merited a life sentence and to bolster the claim that Robinson posed no threat of future danger. Ex. 1, Decl. of Dr. Cunningham.

Defense counsel's sole reference to mitigation was oblique:

> …[regarding Julius as a teen going to reside with his mother] Rosa has an appointment with a bottle and some primos, some marijuana cigarettes with crack rolled up in it, and that's the environment and ask yourself what kind of life that might be. And Jimmy Lee, the father, not present, not a card, not any help at all. And I'm not saying that's a reason to go out and deal drugs or shoot anybody, but I submit to you it's a factor. It's something you can consider. It's in the instructions.

23 RT 78.

Cunningham notes that the defense made no effort to explain moral culpability to the Sentencing Jury:

> An understanding of the concept of moral culpability was critical to the jury's consideration of the nexus between the mitigating factors presented to the jury and the capital offense. To explain, the concept of moral culpability acknowledges an elementary psychological reality: we do not all arrive at our choices out of equivalent raw material. It follows that the degree of "blameworthiness" of an individual for criminal or even murderous conduct may vary depending on what factors and experiences shaped,

56

influenced, or compromised that choice. The relationship of developmental damage and other impairing factors to the exercise of choice, and subsequently to moral culpability is illustrated in the graphic models below. As the damage and impairing factors (e.g. neglect, abuse, psychological disorder, corruptive socialization, substance dependency/intoxication, etc.) increase, choice is exercised on an increasing slope, and moral culpability is correspondingly reduced.

Ex. 1, Decl. of Dr. Cunningham.

Cunningham further notes:

> The greater the damaging or impairing factors, the steeper the angle or slope on which the choices are made; and thus the lower the level of moral culpability. This concept of moral culpability is central to the rationale of <u>Wiggins</u>, <u>Atkins v. Virginia</u> and <u>Roper v. Simmons</u> – i.e. background factors, mental retardation and/or youthfulness all impact on the level of moral culpability of a capital defendant, and the associated death eligibility and deathworthiness of that defendant. The formative or limiting impact from any source of developmental damage or impairment is relevant in weighing of moral culpability. An appraisal of moral culpability involves an examination of the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibilities and the exercise of volition or free will. Stated more plainly, how steep was the angle that the choices were made from?

<u>Id.</u>

Cunningham thought the Government's argument was predictable:

> The typical theory of the Government at capital sentencing is that the defendant's criminal conduct, including the capital offense, is the result of the totally volitional, unfettered, free exercise of choice of the defendant arising solely from his malignantly evil heart. The equally typical and predictable argument that any pro-social behaviors represented a manipulation, as well as the focus on the depravity of the criminal offenses and/or lack of remorse/conscience at capital sentencing by the Government is to provide a clinical characterization of that "evil heart." Consistent with this observation, in final argument at Mr. Robinson's sentencing, the Government asserted:

Why has Julius Robinson earned his way into this courtroom? Because Julius Robinson, the cold-blooded, calculated, manipulative killer that he is, has participated in three homicides. (sentencing phase, vol. 23: 96)

You know that Julius Robinson is, as Mr. Schattman, called it two-face. You know that Julius Robinson has a public persona and a private persona…You know the true Julius Robinson because you were able to hear the true Julius Robinson through those wiretaps. (sentencing phase, vol. 23: 98)

I would submit to you that Julius Robinson lacks a conscience. (sentencing phase, vol. 23: 104)

Not only does Julius Robinson lack a conscience, ladies and gentlemen, but Julius Robinson does not value the sanctity of life. (sentencing phase, vol. 23: 105)

…And you know because of his lack of conscience, you know because of the value that he places on lives that are not important to him, that Julius Robinson does not value life appropriately. (sentencing phase, vol. 23: 107)

The theory of the defense at capital sentencing, by contrast, is typically that the defendant's choices in the capital offense were limited, shaped, and arose from the interaction of damaging and impairing bio-psycho-social factors and experiences. Unfortunately, Mr. Robinson's defense not only failed to provide an explanation of moral culpability or how the jury was to weigh the mitigating developmental factors, but also failed to either present or explain the relevance of the damaging developmental experiences that impacted on Mr. Robinson's development.

Ex. 1, Decl. of Dr. Cunningham, at pp. 11-12.

Cunningham identified a number of risk factors and protective factors determined by the Department of Justice to be causally linked to violent behavior. He sets out the facts supporting each of those factors and then discussed their implications. To save space, only the implications are set forth here but they graphically underscore the effect of counsel's failure.

**<u>Implications of Prenatal Drug and Alcohol Exposure:</u>**

Alcohol has a well-established teratogenic impact on a developing embryo and fetus in utero. The extent of this toxic effect is dependent on the timing, frequency, and extent of the maternal alcohol consumption during pregnancy (Day & Richardson, 1991; Mattson & Riley, 1998). As research on the damaging effects of alcohol on fetal brain development has progressed over the last several decades, the threshold of concern regarding the degree of alcohol exposure that is "toxic" in utero evolved from fetal alcohol syndrome, to fetal alcohol effects, to fetal alcohol exposure. Julius' alcohol exposures in utero would be considered profound in both amount and chronicity. According to the National Institute on Alcohol Abuse and Alcoholism (2000) prenatal exposure to alcohol is associated with the following brain-related deficits:

*Verbal Learning*
- Problems with language and memory, particularly with encoding verbal information

*Visual-Spatial Learning*
- Perform poorly on tasks that involve learning spatial relationships among objects.

*Attention*
- Attention problems a hallmark of prenatal alcohol exposure.

*Reaction Time*
- Longer reaction times; slower, less efficient information processing.

*Executive Functions*
- Important deficits in executive functions (i.e., activities that require abstract thinking, such as planning and organizing).

- Difficulty abandoning ineffective strategies when approaching problem-solving tasks, a type of behavioral inflexibility referred to as perseveration.

- Distractibility and impulsivity – contributing to attention and learning problems.

<u>Id.</u>

A number of these are implicated in the pattern of neuropsychological deficits, learning disabilities, and attention-related problems exhibited by Julius. Recurrent exposure to Herbicides

59

and pesticides may have subtle but significant neuropsychological deficits. <u>Id.</u>  Cunningham goes

on to illustrate the implications of this risk factor plus others:

> **<u>Implications of Neuropsychological Deficits:</u>**
>
> The presence of brain dysfunction is a risk factor for multiple adverse outcomes which may increase the likelihood of criminal conduct or violent offense.  These adverse effects include academic frustration and failure, impulsivity, judgment deficits, emotional dyscontrol, and behavioral disturbance.  Further, there is a growing body of psychological, psychiatric, and neurological literature which identifies that brain damage is present in disproportionately high incidence among violent offenders.
>
> **<u>Implications of Learning Problems:</u>**
>
> The chronic frustration and failure associated with learning disabilities result in these deficits being a strong risk factor for disruptive school behavior and eventual dropout.  This latter risk was realized in Julius life.  The literacy deficits exhibited by Julius in adulthood would have certainly acted to restrict the career opportunities open to him.
>
> <u>Implications of youthfulness at the outset of delinquency and gang activity:</u>
>
> . . .Beyond the typical immaturity in cognitive capability, judgment, impulse control, modulation of emotion, and moral development, there is reason to believe that Julius was even more psychologically *immature* as a teen than most of his age mates. There are two lines of evidence supporting this assertion.
>
> > 1. The neuropsychological deficits and learning problems exhibited by Julius point to mild nervous system dysfunction that would serve to reduce the effectiveness of cognitive processes associated with "maturity."
> >
> > 2. The adverse developmental factors in Julius' childhood would act to delay functional emotional maturity.

<u>Id.</u> at par. 26.

**Implication of Generational Family Dysfunction:**

Family history is critically important to character and background. There are several reasons for this. Some personality characteristics and vulnerabilities are genetically transmitted. Genetic susceptibility to substance abuse and psychological disorder that Julius faced will be discussed in subsequent sections. Other dysfunctional patterns are conveyed by scripts and modeling, as well as by sequential damage from generation to generation.

Family scripts are broad outlines of behavior and life sequence that are conveyed both verbally and more importantly by example in the lives of parents, grandparents, siblings, and extended family. Such scripts in Julius' generational extended family included substance (alcohol) abuse and dependence, violence, irresponsibility, family instability, and emotional neglect or abandonment of children.

Individuals tend to model their behavior after the behavior of family members near them in childhood, whether or not these "role models" are positive. In Julius' multigenerational family system, "role models" presented mixed models. On one hand there were histories of education and employment. At the same time the lives of various models were characterized by substance abuse and dependence, volatile reactions and relationships, irresponsibility, poor sexual boundaries, and/or other deviant processes.

Maladaptive behaviors, including criminal activity and violence, may also be the result of sequential emotional damage. In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources, and as a result may not parent their own children humanely or effectively. Consistent with this observation, Green (1988) reported that "the childhood history and background of abusing parents include a high frequency of physical abuse and neglect, scapegoating, maternal deprivation, and exploitation" (843). The children of these abusive parents are then in turn emotionally damaged themselves and thus at greater risk for broad adverse adult outcomes including parental abuse and neglect, substance dependence, criminal activity, and violence. Sequential generational neglect is particularly damaging. Because effective emotional regulation, interpersonal relationship capacity, and social functioning throughout life begin with stable secure attachments to a primary parent figure, deficient parental care and attachment results in

61

fundamental damage to the foundations of personality and interpersonal functioning. The problematic effects of early abandonment and disrupted primary parental attachment may not be evident until adolescence or early adulthood.

**Implication of Genetic Predisposition to Alcohol Dependence:**

Heredity is the primary risk factor for alcohol and drug dependence. The incidence of alcoholism among first degree relatives of alcoholics is 4-5 times the rate in the general population (Cotton, 1979). Twin and adoption studies across 20 years of research have provided evidence of significant genetic influences on the familial transmission of alcoholism (Schuckit, 1987). A large scale, multidisciplinary study of 2,551 adult male biological relatives of alcoholics involving six research centers across the U.S. reported that two-thirds were heavy drinkers or severely affected alcoholics (Begleiter, 1995).

Consistent with Julius' abuse of alcohol and marijuana, clinical findings point toward a common biological vulnerability to dependence on alcohol and other drugs. Research findings clearly support a uniform theory for a neurochemical basis of alcohol and drug addiction (Miller & Gold, 1993). In a study of 150 cocaine addicts: 90% were alcoholic; half were cannabis dependent; and half had family history of alcoholism (Miller, Gold, & Belkin, 1989). In a study of 82 subjects: there was an 89% chance the cocaine addict was also an alcoholic; and half of the cocaine addicts had a family history of a first or second degree relative with alcoholism (Kosten, Rounsaville, & Kleber, 1987).

Ex. 1, Decl. of Dr. Cunningham, at p. 33.

**Implication of Having a Teenage Mother:**

Mothers who begin childbearing as teenagers place their sons at significant additional risk of criminality. Nagin and Tremblay (1999) reported that the age of the mother at initial childbearing is a key indicator of persistent antisocial behavior among sons whether the target child is first born or later born. The sons of teenage mothers are subject to a number of other developmental and subsequent life outcome risks (see Kids having kids: A Robin Hood Foundation special report on the costs of adolescent childbearing)

- More likely to be low birth weight (x 1.5)*

- Suffer poorer health in childhood but receive only half the level of medical care

- Much less likely to grow up in a family with a father

- Quality of the home is lower in emotional support and cognitive stimulation

- More likely to run away from home (x 2.5)

- Far more likely to be physically abused, abandoned, or neglected (x 2compared to 20-21 year old mothers)

- 5% end up in foster care

- Do much worse in school. Less likely to be rated "excellent" by teachers (x 2-3)

- More likely to repeat a grade (x 1.5)

- More likely to drop out of school (x 2 – half related to teen mother)

- At age 24 approximately 30% are neither in school nor working (x 1.71 – half  related to teen mother)

- Sons of teen mothers are more likely to land in prison (x 2.7 – 19% attributed to teen mother alone)

- Adolescent childbearing alone cost $1 billion annually in prison costs for their sons. Total annual social cost to taxpayers is $29 billion.

*x = odds ratios

**Implications of Mother Exhibiting Indications of Sub-average Intelligence**:

Julius was faced with the alcohol and drug addictions of his parents, disrupted primary attachment, parental neglect and functional abandonment, observed domestic violence, learning problems, corruptive community, systemic racial prejudice, and other adverse developmental challenges. Accordingly, he required the most capable parenting,

63

guidance, and assistance. The intellectual deficits of his mother would act to limit her ability to provide the understanding, interventions, or ameliorative experiences that Julius required. Rose's intellectual limitations also provide some understanding for her poor family-related decision making and the ensuing chronic domestic conflict, violence, and chaos.

Id. at par. 34, 35.

### Implications of Alcohol and Drug Dependence of Both Parents:

Alcoholism has a number of adverse impacts on parental functioning. First, as described above, the alcoholism and drug dependence of Julius' mother and father represented a genetic predisposition to alcohol and drug dependence for Julius, as well as affective and other psychological disorders.

Second, alcoholism of the mother increases the risk of fetal alcohol exposure for her children. This has already been described in an earlier section.

Third, parental substance dependence represents corruptive modeling of how to cope with life demands and stresses. A substantial aspect of parental socialization of a child occurs through modeling – as the child absorbs behavior patterns from observing the actions of parents, and subsequently imitates these. When this parental modeling is faulty or corruptive, the patterns that have been instilled from early childhood may wreak substantial havoc in the child's own adult behavior, including substance abuse/dependence.

Fourth, children who grow up in a home characterized by parental substance dependence are at substantially increased risk of psychological injury. Specifically, a parent who is substance dependent is more likely to be emotionally detached – a product of both being under the influence and being preoccupied with drug seeking behavior.

Fifth, the children of a substance abusing parent are more likely to be neglected and inadequately supervised. An alcoholic parent is both more likely to physically or emotionally abuse the children of the household, as well as to fail to protect the children from abuse perpetrated by the other parent of the household. Children in such a home often experience marked inconsistency and unpredictability associated with the wide fluctuations in parental reactions and competency. Rose's brother, John Hollimon Jr., described observations consistent with this risk on

64

occasions of visiting Rose after she had resumed care of Julius in his teen years:

> I came to Arlington several times while Julius was in high school and I stayed with him and my sister, Rose. I was very concerned by what I saw. Rose was drinking and smoking marijuana. Julius was on his own. My sister was not capable of raising up a boy. Julius was more or less taking care of her. On my two visits, Rose was really out of it. She was often drunk. She would go to work and when she came home, she would begin drinking. She drank whiskey then. When she drank, you couldn't talk to her. She has a real temper. I would say to her, Rose, you have been drinking too much and I think you should slow down. She would get really mad at me, yell "don't tell me how to live my life," and walk out, slamming the door. She would be staggering drunk and slurring her words. (Declaration of John Hollimon Jr., 11-13-05)

Similarly, Marcus described their mother as routinely intoxicated, verbally aggressive, broadly neglectful in her supervision, and involved with corruptive partners:

> I moved to Arlington in 1994 or 1995. I lived with my mother and brother for about five months. My mother was working as a nurse's aide. When she came home from work she smoked marijuana. She smoked every day. She also drank. When she drank, her speech would become slurred and she would yell. Sometimes she would leave the apartment and sometimes she would just go to bed. I was always amazed that she could get up the next morning and go to work after how much she had been drinking the night before. Sometimes Julius would leave the apartment, also, and sometimes he wasn't even there. My mom had a boyfriend living with her then, a guy named Vernon Ozby, who I knew for a fact was on crack. He wasn't allowed to drive my mother's car so he had me give him a ride and I saw him buy crack. (Declaration of Marcus Jwain Robinson, 11-13-05)

Sixth, In the face of the impairment of a substance abusing parent, the children of an alcoholic parent are frequently compelled to assume roles of premature responsibility. Such demands for precocious maturity

65

are not a benign developmental event. This role reversal of the child assuming responsibility for the parent in an adaptation of precocious "maturity" is ultimately damaging to the child – who experiences increased traumatic and corruptive exposures, inadequate parental structure and guidance, chronic anxiety regarding the unpredictability of the home, feelings of incompetence in not being able to prevent the parent from drinking, and rejection at being abandoned to this role by the non-alcoholic parent. This role reversal of the child having to be responsible for both himself and the parent, as well as the ongoing distress in Julius' adulthood of his mother's addiction, were described by Ms. Jamila Camp, former girlfriend:

> Julius loved his mother more than I ever could have, given the circumstances. He was very hurt and embarrassed by her substance abuse and her behavior, but he always tried to include her in his life. He gave her money to move to Ohio, to get a fresh start, and he brought her back to Texas for his birthday party. I remember him getting tense if he saw her with a drink, because she wasn't the kind of person that could have one drink. She would get falling down drunk if he didn't stop her…Julius always needed to be responsible. Because he was forced to grow up early and take care of himself, he developed an attitude of: If I don't do it, it won't get done. He always tried to take care of the needs of his family and friends.  (Declaration of Jamila Camp, 11-10-05)

Profoundly ambivalent feelings toward both parents are common as the child feels protective on one hand but harbors much anger on the other at the lack of support, the demand to assume responsibilities that rightly belong to the parent, and the loss of childhood. Not uncommonly, these conflicted feelings are evidenced in significant depression, anger, and behavior problems. Marcus, Julius' older brother, described his own conflicted feelings about his mother in the face of her addiction:

> I was a really angry young man my last years in high school. I felt our mother had abandoned us when we were kids. After spending time with our mother during the summers and seeing her drinking, smoking dope and running around with men, I thought she was just no good. Except for when she woke up in the morning, she was always drunk or high on marijuana or both. Julius would sometimes tell our mother that she needed to stop doing

66

all the drinking and smoking she was doing, but that never changed her. I don't know if Julius was angry like I was because he kept his feelings from showing. (Declaration of Marcus Jwain Robinson, 11-13-05)

In summary, parental alcoholism or substance dependence is a broad social/psychological risk factor for relationship problems, self-control deficits and behavior disorders, feelings of defectiveness, psychological disorders, and criminal behavior. This latter association between parental substance abuse, as well as attitudes favorable to substance abuse, and serious violence in adolescence and early adulthood has been confirmed by research reviews sponsored by the U.S. Department of Justice (1995; Hawkins et al., 2000).

### Implications of Addition, Irresponsibility, and Parental Drug Trafficking:

Hawkins et al. (2000) in their comprehensive review of research identified parental criminality and parental attitudes favorable to substance abuse and violence as significant risk factors in the development of serious youth delinquency and violence. This makes intuitive sense. The value systems and behavior patterns of children are strongly impacted by the behaviors and attitudes of family members – particularly older males and/or father figures who represent role models to them.

Strong positive male role models and relationships are an important part of male child development. In adolescence this assumes additional significance as the teenage male is creating a more adult identity and as the presence of an older male to whom the male teen is well-bonded provides limit-setting guidance. Julius' father, Jimmie modeled addiction, criminality, violence, and irresponsibility.

### Implications of Disrupted and Inadequate Primary Attachment:

There is ample research demonstrating the devastating and potentially irreparable psychological damage that may accompany attachment failure. Psychological research unequivocally demonstrates that a secure attachment to a parent figure is crucial to healthy psychological development, not only in infancy, but in later childhood as well (e.g. Ainsworth, 1979; Arend, Gove, & Sroufe, 1979; Cantelon, 1994; Curtis, 1980; Lewis, 1985; Matas,

Arend, & Sroufe, 1978; Pardeck, 1983; Sroufe, 1979; Sroufe & Waters, 1977; Waters, Wippman, & Sroufe, 1979; Yarrow et al., 1973). Conversely, numerous studies have demonstrated that when a child is deprived of the opportunity to develop affectionate bonds early in life, his physical, intellectual, and emotional development may be seriously retarded – and such early life experiences can have lasting effects which are not easily remedied (Curtis, 1980). Similarly, recurrently disrupted or broken attachments in childhood also result in lasting fundamental psychological harm. Bowlby (1966, 1971, 1973) and Rutter (1979) concluded that early parent separation is a risk factor for emotional disturbance in children and adults, constituting a psychological stress that could pose serious and potentially long-lasting harm to the child's psychological development. Thus, reviews by Rutter as well as Straus and Straus and again cited by Curtis summarize:

> Even the critics who challenge the empirical evidence admit that there is a consensus among psychologists that disruptions of a child's attachment to his parents risk detrimental effects. The findings relied upon here are bedrock, not seriously disputed among the contending schools and camps or by skeptical outsiders.

To simplify, an infant is not born because he is ready for independent functioning. Rather he is born while still extraordinarily dependent because he has outgrown the womb. The physical and emotional nurturance of intensive parental care forms a secondary "womb" that is essential for continued development. The attachment to a parental figure, particularly across the first several years of life, is the "umbilical cord" that provides the essential conduit for emotional nurturance in this family womb. It is through a secure, caring relationship with a parent figure that the child establishes the foundation for a stable identity, emotional self-regulation, empathy, capacity for intimacy, and responsible social behavior. As described above, there are multiple indications that neither Julius' mother nor anyone else established a strong, secure attachment or emotional bond to him in the first two years of life.

This deficiency would be expected to be particularly damaging in the face of the subsequent placement instability and

68

insecurity. To explain, disruptions in family structure and physical setting may adversely affect development through insufficient structure and predictability, broken or disrupted attachments, excessive demands for adaptation, disrupted peer relationships, inadequate continuity of intervention services, and other deleterious processes. Disrupted attachment and the associated disrupted developmental trajectory are broad risk factors for psychological disorder, delinquency, criminal activity, and violent criminal activity.

To comment further on one of the sequelae of disrupted attachment mentioned above, in the absence of a stable and secure relationship with a parent figure, a structured and predictable routine, and limit-setting and guidance through discipline, the child does not have the opportunity to internalize stable external structures. In other words, during childhood and adolescence, the stability and structure surrounding the developing child gradually moves "from the outside to the inside" – providing the basis for self-control. Without this internalized structure, there is grave risk to psychological health and positive socialization (Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996).

Damaged attachment in early childhood, whether from failure to establish a secure attachment or the loss of it, is frequently quite central to the etiology of conduct disorders in childhood and antisocial behaviors in adolescence and adulthood – including violent offenses (Meloy, 1988; Patterson, DeBaryshe, & Ramsey, 1989). It is illuminating to note that callousness and potential criminality can be conceptualized in many cases as severe attachment damage "all grown up" (Meloy, 1988). Green (1988) described the impact of deprivations like Julius suffered:

> Early and persistent exposure to parental rejections, assault, and deprivation impairs the child's capacity to form subsequent relationships….Most abused children are unable to achieve Erickson's (1950) stage of basic trust. They learn to regard violence and rejection as the major ingredients of human encounters. (850)

This nexus of disordered family/attachment damage and violent offending is not a matter of personal conjecture. Career investigators from the Behavioral Science Unit of the FBI in

studying the causes of a particular type of homicide have asserted that the quality of the attachments to parents and other members of the family during childhood was central to the etiology of these offenses (Ressler, Burgess, & Douglas, 1988).

**Implications of Observed Domestic Violence:**

Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment (American Psychological Association Presidential Task Force on Violence and the Family, 1996). Thus the observation of violence directed towards others in the family is associated with an equivalent emotional distress, psychological disorder, and adverse outcome as is the direct experience of physical abuse. Thornberry (1994), in research sponsored by the U.S. Department of Justice, described data from the Rochester Youth Development Study regarding the association of family violence exposure and subsequent rates of serious youth violence from these families. Three types of family violence exposure were studied: spouse abuse, abuse of children, climate of violence and hostility. Among children without a history of family violence, the rate of serious youth violence was 38%. If one type of family violence was present the rate of serious youth violence was 60%; increasing to 73% and 78% with an exposure history to two and three types of family violence respectively. Kitzmann et al. (2003), in a meta-analysis of 118 studies (almost all published prior to 2002) concluded that about two-thirds of children exposed to parental violence fared more poorly than the average child who was not exposed to parental violence.

It is important to note that the occurrence of family violence in Julius' early childhood, and thus before the onset of continuous narrative autobiographical memory, does not lessen the impact of this exposure. The damaging impact of trauma in early childhood is independent of whether there are conscious memories of these events. Quite the contrary, some of the enduring effects of trauma exposure in childhood may occur through misshaping of the brain's architecture and processing as well as faulty learning. For example, Schwarz and Perry (1994) identified a sustained neurobiological impact of trauma on the developing individual, describing that the plasticity of the developing brain make it "more susceptible to the formation of

malignant memories that affect not only the stress response system but also the emerging organization of neuro networks regulating other basic states and characteristics of the individual" (313). This plasticity of nervous system development in childhood may explain why youthfulness is the most consistently demonstrated pre-trauma risk factor for adverse responses to trauma, and subsequent development of Posttraumatic Stress Disorder (PTSD). It is notable in regard to this risk factor that the traumatic experiences impacting on Julius occurred during his childhood and adolescence.

More broadly, Terr (1991) described childhood psychic trauma as a crucial etiological factor in the development of a number of serious psychological disorders both in childhood and adulthood. Terr compared psychic trauma in childhood to rheumatic fever, in that both may set in motion a number of different problems that may emerge later in life. In the case of childhood psychological trauma, these reactions may eventually coalescing into personality disorders in adulthood. Thus traumatic experience in childhood often results in long-term developmental disturbances and undesirable changes in life trajectory (life direction and course). Schwarz and Perry also described that trauma induced influences on development can extend well beyond childhood. Primary developmental tasks may also be disrupted by childhood traumatic experience. Specifically, the intense negative emotion of childhood traumatic experience disrupts maturing mechanisms of emotional regulation. Traumatic experiences further have the potential to retard or accelerate critical developmental transitions.

Childhood trauma thus disrupts not just the subjective experience of childhood, but also both the trajectory of development and the psychological structures of middle and later adulthood. The fundamental alterations in the way the child perceives himself, other, and the world around him, as well as potential trauma-based adaptations in brain functioning, likely account for the sustained experience or resurgence of PTSD symptoms, or their character-engrained legacy, into adulthood. These "characterological" elements in childhood trauma exposure are quite important in understanding Julius' involvement in drug trafficking in his mid-teens. Stated simply, the maltreatment the child experiences becomes pathologically engrained into the developing child's personality structure, resulting in pervasively

71

maladaptive and even antisocial functioning. These conceptualizations give some understanding to Julius' teen and adult life trajectory.

*Relationship of childhood trauma to psychological, behavioral, and relationship pathology:* Experienced and/or observed physical abuse as well as other forms of childhood trauma are associated with substantial mental health morbidity – frequently taking the form of Posttraumatic Stress Disorder (PTSD), depression, relationship disturbances, personality disorder, and/or antisocial behavior. **Traumatic experience in childhood from abuse or other insults can result in impairments of perception, judgment and behavior; vulnerability to poor role models and negative influences; chronic self-defeating behavior; chronic agitation; poor problem-solving skills; an inability to predict the consequences of one's behavior accurately; an inability to modulate or understand one's emotions; an inability to use emotions as guides for appropriate action; an inability to assign language to emotions; a constant state of internal and external fear; a foreshortened sense of future; chronic self-medication and substance addiction; a fragmented sense of self; an inability to successfully achieve developmental milestones; pervasive low self-esteem; a chronic and inescapable sense of shame and worthlessness; and behavioral misconduct and criminal conduct.** There is evidence that these symptoms and disorders stem from trauma initiated changes in brain structure and metabolism that can be persistent. Chronic victimization can also result in survival responses of attempting to emulate the toughness of those that perpetrated the victimization (i.e. identification with the aggressor). The legacy of traumatic experience is strongly implicated in Julius' developmental trajectory and outcome.

### Implications of Parental Emotional Neglect:

Child neglect may be physical or emotional. Regardless of its form, neglect has been identified as more psychologically and developmentally damaging than physical abuse. Widom (1989) described neglected children as being at greater risk for adult violence than abused children. This is a function of insufficient stability and/or security in parental attachments, daily life, or practical care; as well as unmet physical and emotional needs.

72

The long-term impact of child neglect includes distorted cognitive, perceptual, emotional, and interpersonal capacities; pervasive anxiety; identity disturbance; insufficient capacity for emotional self-regulation and behavioral control; psychological disorder; behavior disturbance; and violent and criminal conduct.

Child maltreatment can also involve the failure to provide supervision, appropriate discipline, and moral guidance. Healthy child development requires not only practical nurturance in the context of a stable and secure relationship with a parent, but also limit- setting and guidance through structure and appropriate discipline. In the absence of ample structure and consistent, appropriate discipline and limit-setting, there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (Friday, 1994; Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996). Quite simply, lack of parental structure and appropriate discipline contribute to aggressiveness and predisposes to violence in the community. In the absence of guidance, "self-control does not develop and aggression can unfold and bring instrumental gain" (p.122, Staub, 1996). Children need order and external structures to develop internal structures and capacity for self-guidance. Thus Patterson et al. described the relationship of poor parental structure/discipline/ limit-setting to childhood and adolescent conduct disturbances as a developmental progression.

The American Psychological Association Presidential Task Force on Violence and the Family (1996) concluded that maltreated children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including low self esteem, depression, anger, exaggerated fears, suicidal feelings, poor concentration, eating disorders, excessive compliance, regressive behavior, health problems, withdrawal, poor peer relations, acting out, anxiety disorders, sleep disturbance, lack of trust, secretive behavior, excessively rebellious behavior, drug or alcohol problems. The task force further identified the following broad conclusions:

1. Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulty in self control.

2. Abused and not treated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

3. When abused children are not given appropriate treatment for the effects of the abuse, the lifetime cost to society for an abused child is very high.

Research sponsored by the U.S. Department of Justice demonstrates a nexus between the experience of childhood maltreatment and delinquent, criminal, and criminally violent outcomes. English, Widom, & Brandford, (2001), in a DOJ published study, reported on 15-24 year follow-up of over 800 children who had been abused or neglected, and a matched group of controls. The abused and/or neglected children were 4.8 times more likely to be arrested as juveniles; 2 times more likely to be arrested as adults; and 3.1 times more likely to be arrested for violent crime as adults.

It is important to note that parental neglect is not an indication that the parent does not "love" the child. Rather, the quality of love that the parent is providing is inadequate. "Love" in this context is most accurately viewed as continuum from healthy and affirming to destructive and injurious. This is consistent with the earlier discussion of sequential emotional damage and other trans-generational influences that may result in poor parenting and "love" expressions that are on the lower end of the continuum.

**Implications of Functional Parental Abandonment:**

*Mother absence*: The impacts of mother absence have already been described in terms of inadequate and disrupted attachment, and neglect.

*Father absence:* Father absence has been broadly implicated in delinquent and criminal outcomes. More specifically, there is an extensive literature specifically addressing the developmental risks of father absence, including delinquency, criminal activity, and murder. Examples of these findings and the research citing them are listed below:

· The low supervision of adolescents frequently found in father-absent home was more the cause of

74

delinquency than poverty (Sampson & Laub, 1994).

·        Father-absent adolescents are more likely to commit a school crime (Jenkins,1995).

·        The likelihood that a young male will engage in criminal activity doubles if he is raised without a father and triples if he lives in a neighborhood with a high concentration of single-parent families (Hill & O'Neil, 1993).

·        70% of the juveniles in state reform institutions grew up in single- or no-parent situations (Beck, Kline, & Greenfield, 1988).

·        72% of adolescent murderers grew up without fathers (Cornell, D. et. al., 1987).

·        Children who grow up in a father-absent home are at a dramatically greater risk of drug and alcohol abuse, mental illness, suicide, poor educational performance, teen pregnancy and criminality (U.S. Department of Health and Human Services, 1993).

### Implications of Death of Surrogate Parent Figure (Paternal Grandmother).

Grandma Bertha was as close to a functional parent figure as Julius had.  The impact of this death is perhaps best understood, then, in light of scholarly perspectives on the effects of parental death on a child. To illustrate this research, Silverman and Worden (1992) found that even several months after the death of a parent a significant percentage of 6-17 year old children continued to experience marked distress, with symptoms such as frequent crying, sleep disturbance, headaches, difficulty concentrating in school, conversations with the deceased, frightening perceptions of being watched by the deceased, and/or behavior problems.

Samuels (1988) found that parental death during childhood resulted in multiple immediate effects:

| | | |
|---|---|---|
| sleep disturbance | phobic responses | angry outbursts |
| regressive behaviors | confusion | loss of resiliency |
| nightmares | separation reactions | increased tension |
| depression | | |

Samuels further identified serious psychological vulnerabilities that were still present 18 months later:

| | |
|---|---|
| lessened resiliency | preoccupation with illness |
| uncertainty about the future | separation problems |
| lowered self-esteem | worry about growing up |

Finkelstein (1988) in summarizing the research described parental death in childhood as not so much a single stressful event, as a series of events that pervaded almost all aspects of the child's life. Parental death in childhood was identified as reaching to the core of the way the child makes sense of the world around him. The research indicates that children whose parents die are at long-term increased risk for physical and mental illness, inability to cope with later life stresses, depression, alcoholism, suicide, problems with intimacy and autonomy, problems with sexual identity and behavior, marital difficulties, delinquency, and criminal activity.

The extent to which the above risk factors are realized in a given child is determined by factors such as:

The child's temperament and vulnerabilities – Julius exhibited problems with attention, learning, and neuropsychological functioning; in a family context of parental addiction, violence, neglect, and abandonment. Accordingly, he would be considered far from resilient.

The continuity of the child's daily life – Julius' daily life was disrupted by the loss of supervision and academic support, and eventually by rejoining his mother.

The stability of the home – The home setting with the maternal grandparents offered inadequate supervision and structure, and his later residence with his alcoholic, drug addicted mother even less.

Julius was thus at particular risk for problematic long term outcomes from his grandmother's death.

Potential Sexual Abuse:

Finkelhor & Brown (1985) identified four broad traumatic impacts of being sexually abused as a child. Traumatic sexualization may occur as the child's sexuality is inappropriately shaped by the abuse experience. Being sexually abused represents a profound betrayal as someone whom the child was dependent or vulnerable to has caused them harm. This may subsequently be associated with relationship distrust, feeling unlovable, interpersonal dependency, and retaliatory aggression. The child experiences a profound sense of powerlessness in the face of sexual abuse as his will and sense of control are overwhelmed. This may result in continuing feelings of incompetence, depression, anxiety, and adult victimization or domination. The sexually abused child may experience a significant sense of stigmatization as badness, shame, and guilt become incorporated into the child's self image. This may result in low self-esteem, anticipation of rejection, poor relationship choices, or promiscuity. These four traumagenic dynamics of sexual abuse – traumatic sexualization, betrayal, powerlessness, and stigmatization - were subsequently the conceptual basis for a brief four amicus curiae filed with the U.S. Supreme Court in Maryland v Craig (1989) by the American Psychological Association.

A history of childhood sexual victimization appears to be associated with equal levels of later psychological dysfunction in both male and female clinical subjects (Briere et al., 1988). These psychological dysfunctions include dissociation, anxiety, depression, anger, sleep disturbance, and post sexual abuse trauma. Interestingly, males displayed as much psychological disturbance as females though reporting less extensive and less extended abuse. This suggests one of two hypothesis: (1) There is an equivalent impact of sexual abuse for males or females regardless of any differences in its severity or duration between the sexes, (2) sexual abuse is more traumatic for

77

males since lower male abuse levels were associated with symptoms that were equal to that of more severely abused females.

A number of factors may negatively affect the recovery of males from sexual abuse. These include reluctance to seek treatment, minimizing the experience of victimization, difficulty accepting shame and guilt, exaggerated efforts to reassert masculinity, difficulties with male intimacy, confusion about sexual identity, power/control behavior patterns, externalization of feelings, vulnerability to compulsive behaviors, greater difficulty in adjusting to stress, and difficulty in expressing and communicating affect (Struve, 1990; Urquiza & Keating, 1990).

Urquiza and Capra (1990) described that sexual abuse creates unique disclosure problems for male victims. In other words, males tend not to disclose their complaint about the sexual abuse experiences as readily as do females. The authors note that boys are sexualized with a male ethic of self-reliance that inhibits disclosure of victimization. Disclosing same sex abuse to peers or parents might threaten a boy's developing masculinity or pose a risk of being labeled as homosexual. Additionally, disclosure may result in a loss or curtailment of the boy's greater independence and freedom.

Urquiza and Capra described initial effects on males following sexual abuse as most commonly involving behavioral disturbances including aggression, delinquency, and non-compliance. Other problematic initial effects may include emotional distress; displays of guilt, shame, negative self-concept; psychosomatic symptoms; confusion regarding sexual identify and sexual preference; problematic sexual behaviors; and vulnerability to juvenile sexual offenses. Long-term effects of sexual abuse as described by Urquiza and Capra include increased risk for depression, somatic disturbance, self esteem deficits; difficulty maintaining intimate relationships; problems with sexual adjustment; alcohol and substance abuse; and sexual offending.

**Implications of Instability in Family Structure and Residence:**

Chronic instability (i.e. transitions) in family structure is one of the delinquency risk factors identified by Department of Justice research. Again, this is not surprising. Household instability has a destabilizing impact in a child's life. As children require structure and stability for healthy emotional and social development, mobility of

residence or parent figure may undermine this basic need. Transitions in family structure and "caretakers" are a notable risk factor in adolescence as well. To explain, adolescence represents a stage of development that depends on a stable parental/family structure for limit setting, guidance, and emotional anchoring during vulnerable years of identity formation and social identification. As the number of transitions in placement, family structure, and parental figures increase, the risk to health adolescent development becomes correspondingly grave. This conclusion is supported by large scale research sponsored and reported by the U.S. Department of Justice (Thornberry et al., 1999). This series of studies found that as the number of transitions (changes in caretakers) during the teen years increased, so did rates of delinquency and drug use. Among youth experiencing three or more such transitions, the delinquency rate was 80%. The number of transitions also had a significant effect on rates of drug abuse.

**Inadequate Supervision and Discipline:**

Healthy child development requires not only a stable and secure relationship with a parent, but also limit setting and guidance through discipline and supervision. In the absence of either of these fundamental parenting factors there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (Friday, 1994; Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996. Quite simply, lack of parental discipline contributes to aggressiveness and predisposes to violence in the community. In the absence of guidance, "self-control does not develop and aggression can unfold and bring instrumental gain", i.e. children need order and external structures to develop internal structures and capacity for self-guidance (p.122, Staub, 1996).

Ex. 1, Decl. of Dr. Cunningham, at pp. 44-45.

Cunningham then noted a number of community factors that played a role in Julius Robinson's development: a legacy of racial prejudice and discrimination, systemic economic hardship and social desperation among Dermott's African American community. Id. at pp. 55-57.

Both the legacy of racism and the economic desperation of the Black community in Dermott made this a fertile field for the eruption of gang activity that occurred in Julius' early adolescence. As will be obvious in the sections that follow, Julius was not the originator or

gang activity in Dermott, nor was he without unusually pronounced risk factors for gang identification, nor was he the only youth swept into the corruptive clutches of this deviant identification.

Ex. 1, Decl. of Dr. Cunningham, at p. 57.

Additionally, corruptive family and older peer influences played an ugly role:

> In the face of the abandonment by both parents, and in the supervision vacuum left by the ineffectual supervision and guidance of his maternal grandparents, Julius was particularly vulnerable in early adolescence to the structure and sense of belonging that gang membership would have provided. With this affiliation came an increased concentration of exposure to delinquent peers and deviant values. As was stated in an earlier section, these elections were made from a developmentally immature position, without reasoned insight into the nature of the values that were being adopted or the trajectory that this affiliation placed him on.

Ex. 1, Decl. of Dr. Cunningham, at p. 58.

> An economically deprived minority community setting such as Dermott has a strong interactive effect with parental and family deficiencies that are over-represented in such a social context. Such family and parenting vulnerabilities include mother head of household, poor supervision, and corruptive family influences. The combined effects of family vulnerability and corruptive community results in markedly increasing risk of youth delinquency and criminality/violence in early adulthood. This is evident in the rapid inroads gang activity made in Dermott after its emergence there in the late 1980's. Former Dermott police officer Carl McCree described the pervasiveness of penetration this gang activity achieved in that community:

>> The gang problem in Dermott got so bad that Chief Melton was interviewed on the national news. Nearly all of the young African-American males in Dermott were jumped into the Crip gang. (declaration of Carl McCree, 10-20-05)

> Consistent with the high prevalence rate of gang affiliation among Black youth in Dermott, Terrence Holiman (maternal cousin), testified that all of his friends from Chicago were involved in gang

80

activity. The corruptive influence of such low income urban settings on male delinquency has long been reported, and is illustrated by research published by the U.S. Department of Justice (Chaiken, 2000). Ex. 1, Decl. of Dr. Cunningham, See Piechart.

Inspection of the above figure demonstrates that almost 80% of the male teens in these neighborhoods were actively involved in criminal activity. Such high rates cannot be explained by individual deviant choices. Rather, these rates point to epidemic level corruptive community influences that are pulling the majority of male youth in these neighborhoods into criminal activity. This study does not stand in isolation. A study sponsored by the NAACP and conducted by the Harvard Law School (Ogletree et al., 1995) reported that in 1991, on any given day, approximately half of the Black males aged 18-35 in Washington, D.C. and Baltimore were in the criminal justice system. The interaction of family, community, and social factors is also implicated in homicides (Pridemore, 2002 – note: published after 1999 but reviewing extensive data available in 1999). For example, the annual rate of homicide among Black males age 18-24 nationwide (1989-1994) was 237-347 per 100,000 community residents vs. 26-33 per 100,000 for white males (Pastore and Maguire, 1998). Pridemore emphasized that these differences are NOT a function of race. Rather, they reflect the disproportionate incidence of adverse family, community, and social factors in the lives of Black adolescents and young adults.

These findings are intuitively logical. Social and moral development are strongly influenced by the surrounding community values, mores, and models. Thus peer relationships, particularly during adolescence are quite influential in moral and social development. When community adults and peers are deviant, the risk of an anti-social developmental trajectory increases markedly – and with that the risk of criminality, violence, and homicide. These findings are also supported by crime map comparisons demonstrating the marked over-representation of general crime and violent crime in particular zones in a large metropolitan area. These data and perspectives, and the U.S. Department of Justice and scholarly literature supporting evidence, could have provided an additional explanation for Julius' criminal activity.

Ex. 1, Decl. of Dr. Cunningham.

Finally, there was no intervention from the social services agencies:

> On a broader scale, efforts to intervene in adolescent drug trafficking were characterized as "virtually non-existent" in the United States at the time of Julius' greatest vulnerability (Stanton & Galbraith, 1994). This absence of a coordinated national policy to address this almost epidemic phenomenon among African-American male youth living in poverty was not from an absence of scholarly perspectives regarding steps that could reduce teen drug trafficking. Such recommendations included (Leviton, Schindler, & Orleans, 1994):
>
> •       Reduce child poverty.
> •       Strengthen families.
> •       Enhance parenting skills.
> •       Provide adequate education for all children.
> •       Institute and evaluate programs within schools to prevent drug trafficking.
> •       Enhance programming to assist children and families beforet they enter the juvenile justice system.
> •       Fund job training programs.
> •       Establish alternatives to jailing youthful offenders.
> •       Expand diversion programs for first-time offenders.
> •       Encourage antiviolence strategies including gun control reform and alternative treatment approaches to dealing with substance abuse problems.
>
> Consistent with approaching youth delinquency and violence from a public health model of risk and protective factors (as endorsed by the U.S. Department of Justice), the above recommendations focus on reducing risk factors and increasing protective factors rather than simplistically tasking youth to make better choices.

Ex. 1, Decl. of Dr. Cunningham.

Cunningham's final summation:

> My review of records and the declarations of family members and other third parties reveals the presence in Julius' history of many of the developmental risk factors for delinquency and violence identified in scholarly literature published by the U.S. Department of Justice. Julius had the benefit of few protective factors, and these were large absent until his high school years – late in his development, after his exposure to gangs, and in the presence of an alcoholic and drug abusing mother. Additionally, I have distilled from these records and declarations *25 major adverse developmental factors* that could have been identified and illustrated by the defense

at Julius' capital sentencing. The implications of each factor for disrupted developmental trajectory, problematic adolescent and adult outcomes, and/or criminality and criminal violence could have been presented through expert testimony relying on scholarly literature available at the time of trial. These 25 factors include:

*Wiring*

**Prenatal drug and alcohol exposure**
**Recurrent exposure to herbicides and pesticides**
**Neuropsychological deficits**
**Learning problems**
**Youthfulness at the outset of delinquency and gang activity**


*Generational Influences*

**Generational family dysfunction**
**Genetic predisposition to alcohol and drug dependence**

*Parenting*

**Teenage mother**
**Mother exhibited indications of sub-average intelligence**
**Alcohol and drug dependence of both parents**
**Parental drug trafficking**
**Disrupted and inadequate primary attachment**
**Observed domestic violence**
**Parental emotional neglect**
**Functional parental abandonment**
**Death of surrogate parent figure**
**Potential sexual abuse**
**Instability in family structure and residence**
**Inadequate supervision and discipline**

*Family and Community*

**Legacy of racial prejudice and discrimination**
**Systemic economic hardship and social desperation among Blacks in Dermott:**
**Corruptive family and older peer influences**
**Corruptive community influences and gang recruitment**
**Teen recruitment into drug dealing**

83

**Inadequate interventions**

Both the particularized DOJ risk and protective factors, and the 25 major adverse developmental factors represented essential information for the jury's consideration in weighing Julius' moral culpability and associated death worthiness. Had this same mitigation evaluation function been requested of me in the months prior to the sentencing phase, and had I been provided with the interview summaries or declarations of third parties, I or another informed mental health expert could have testified to these same factors and their implications as contained in this declaration. In the absence of such expert testimony regarding the nexus of these damaging developmental factors and deviant life trajectory and criminal violence, the jury would have no mechanism to give informed weight to the developmental factors that they heard testimony regarding from lay witnesses. Further, had these factors and their supporting data been identified prior to trial, additional family witnesses could have been called to provide this history and those who were called could have been examined more comprehensively.

My review of the sentencing phase transcript reveals that only a few of the above factors were even referenced in testimony, and those only in a partial and cursory manner. There was no expert testimony regarding the implications of the very limited and incomplete background presented. More specifically:

There was no testimony regarding the prenatal alcohol and drug exposure of Julius.

There was no testimony regarding the recurrent exposure to herbicides and pesticides that Julius or his parents were exposed to.

There was no testimony regarding neuropsychological deficits in Julius.

There was no testimony regarding Julius' learning problems.

There was no testimony regarding Julius youthfulness at the outset of his delinquency and gang activity.

There was no testimony regarding the generational family dysfunction that pervaded both the paternal and maternal family systems. John Hollimon, maternal uncle, was not queried regarding the lack of supervision in his parents' household, his father's regular drunkenness when younger, or other family problems. Instead, the defense utilized him to inaccurately represent that his parents had a stable, nurturing household.

There was no testimony regarding the genetic predisposition to alcohol and drug dependence in the maternal and paternal family systems.

Rose Hollimon acknowledged that she was age 15 when she married, but there was no testimony regarding her being a teen when she gave birth to Marcus and Julius.

There was no testimony regarding Rose exhibiting indications of sub-average intelligence.

Both Rose and her brother, John, testified regarding her alcohol and drug abuse. The extent of this and its impact on her parenting was not developed in testimony. There was no testimony regarding the role of alcohol and drug abuse in the neglect and family chaos during the critically important infancy and preschool years of Julius' life. There was no testimony regarding the alcohol and drug dependence of Jimmie Lee Robinson, Julius' father.

There was no testimony regarding parental drug trafficking.

There was no testimony regarding the disrupted and inadequate primary attachment suffered by Julius. Further, Rose's testimony that she kept the boys with her while residing in Wichita Falls following the divorce from Jimmie is inconsistent with the declarations of Jimmie Lee Robinson, John Hollimon, and Marcus Robinson.

There was no testimony regarding Julius and Marcus observing the domestic violence of their parents.

Rose reported living separately from Julius for periods of time, but there was no testimony describing her emotional neglect of the children in early childhood secondary to her own alcohol and drug dependence, drug trafficking, chaotic marital relationship, and youthfulness. Further, there was no testimony regarding extent of her failure to remain emotionally/functionally involved with the children during their years with the maternal grandparents or when in her care as teens.

The absence of Jimmie Lee from the children's lives was noted in Rose's testimony, though not the implications of this. Her own abandonment of the children was not clearly established in testimony.

There was no testimony regarding the death of the paternal grandmother, a surrogate parent figure in Julius' life.

85

There was no testimony regarding Julius potentially being sexual abused at age five.

There was no testimony regarding the instability in family structure and residence of Julius' time with his parents in early childhood, the household of his maternal grandmother in middle childhood and early adolescence, or the household of his mother in his high school years.

There was no testimony regarding the inadequate supervision and discipline Julius received in the households of his maternal grandparents or his mother.

There was no testimony regarding the legacy of racial prejudice and discrimination in Dermott.

There was no testimony regarding the systemic economic hardship and social desperation among Blacks in Dermott.

There was no testimony regarding corruptive family and older peer influences in Julius' initial involvement in gang activity and drug dealing.

There was no testimony regarding the corruptive community influences and gang recruitment that occurred in Dermott in Julius' early adolescence.

There was testimony regarding Julius dealing drugs in high school. There was no testimony regarding his early teen recruitment into drug dealing in Dermott, or the larger phenomenon of teens being recruited into drug dealing nationally and the associated risk factors for this.

There was no testimony regarding the inadequate interventions made available to Julius.

Ex. 1, Decl. of Dr. Cunningham.

The jury that decided Robinson's fate did not know any of this. The jury's special verdicts demonstrate how the failure to investigate mitigation skewed the penalty phase in favor of the Government. For example, on the special verdict form the jury was asked the following question:

Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse,

86

> abandonment, or neglect as a child ad was deprived of parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Special Verdict at p. 7.

The special verdict reflects that "0" jurors found this non-statutory mitigating factor.. The evidence that Robinson suffered "emotional abuse, abandonment and neglect" and was "deprived of parental guidance" is overwhelming. The jury simply did not know about it because none of the mitigation evidence was presented at the penalty phase. Of course, such evidence was not presented because defense counsel failed to investigate these matters and did not know about Robinson's background and mental disabilities.

There was no valid excuse for not investigating mitigation. Robinson was cooperative with defense counsel. Robinson did not direct them to refrain from contacting family members or otherwise prohibit them from investigating his mental state, background and social history. Nor was Robinson's family unavailable or uncooperative. Robinson's mother, grandmother and uncle were all present during portions of the trial. His family and friends in Dermott told counsel for Britt that they wanted to help Robinson and were willing to speak with his trial counsel. Counsel ignored these offers to help.

The mitigating evidence reasonably available to trial counsel in Williams, Wiggins, and Rompilla was powerful. See Williams, 529 U.S. at 395, 120 S.Ct. at 1514; Wiggins, 539 U.S. at 527-528; Rompilla, 125 S.Ct. at 2468-2469. But nothing in the facts of any of these cases is significantly different than the abuse suffered by Robinson. This is compelling evidence in mitigation, which, although not an excuse for the crimes, goes a long way in both explaining Robinson's conduct and justifying a sentence less than death. It is exactly the type of evidence

87

which the Supreme Court in Williams and Wiggins found so compelling as to conclude that the state courts which denied penalty relief rendered a decision that was contrary to "clearly established Federal Law." 28 U.S.C. § 2254(d)(1).

The general legal proposition that mitigation is important to the decision to sentence a defendant to live or die is borne out by the specific circumstances of the companion case, United States v. L.J.Britt, which was severed and tried after Robinson's case. As was Robinson, Britt was accused of participating extensively in the interstate drug trafficking operation and actually fatally shooting two victims. Like Robinson, Britt grew up in Dermott, Arkansas and had experienced many challenges and deprivations associated with poverty and racism in rural Arkansas. Britt had a substantial record – much greater than Robinson's record. However, Britt's counsel conducted a reasonable investigation of mitigation, including going to Dermott and investigating his client's background and social history. The jury that heard the mitigation in Britt's case voted to spare his life. A different verdict in a companion case where mitigation was investigated and presented shows a "reasonable probability" of a different outcome in this case.

## II.    THE COURT SHOULD VACATE THE CONVICTIONS BECAUSE THEY WERE OBTAINED IN VIOLATION OF EQUAL PROTECTION.

### A.    Racial Discrimination Permeated the Entire Trial Against Julius Robinson, Both in the Selection of His Jury and in the Decision to Seek the Death Penalty Against Him.

Robinson's capital trial fell far short of the Fourteenth Amendment's guarantee to "equal protection under the law." U.S. Const. Amend. XIV. As set forth, below the jury that decided his case was selected in a racial discriminatory manner. The selection of Robinson for prosecution

88

under the Federal Death Penalty Act was also the product of institutional discrimination against Black people, who are prosecuted for federal capital crimes in Texas at a grossly higher rate than in the rest of the United States.

### B.    The Causal and Peremptory Strikes Against Black Jurors

Robinson's 125-person venire panel contained nine black females and one black male. Of the eight black jurors that were questioned on voir dire, only one black female was selected to serve. Voir Dire of Sheila Rayfield, 7 RT 92. The prosecution struck four black jurors for cause, citing the venirepersons' opposition to the death penalty. Voir Dire of Mary Hicks, 3 RT 10; Voir Dire of Frankie Vanzetta Johnson, 4 RT 134; Voir Dire of Carnesia Hall, 7 RT 61; Voire Dire of Jerrie Lee Small, 7 RT 134. The defense objected to the causal strike of Carnesia Hall on the grounds that although "she doesn't like the death penalty," Ms. Hall indicated on two or three occasions that she could impose it, given the proper circumstances. Id. 7 RT 61-62. Of the remaining four black jurors, three were the subject of peremptory strikes by the Government. Voir Dire of Charlene Boulet, 3 RT 155; Voir Dire of Dorothy Jean Debose, 4 RT 164, Voir Dire of Marchesa Amarh, 7 RT 101. Robinson brought Batson challenges to the peremptory strikes of Ms. Debose and Ms. Amarh which were overruled by the court. The Government used a combination of for cause and peremptory strikes to eliminate seven out of eight black veniremembers.

### C.    The Prosecutor's Strikes Violated Equal Protection

The Equal Protection Clause of the Constitution prohibits racial discrimination by the State in jury selection. Georgia v. McCollum, 505 U.S. 42, 49, 112 S.Ct. 2348, 2354, 120 L.Ed.2d 33 (1992); Batson v. Kentucky, 476 U.S. 79, 93-94, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986). Batson held that equal protection forbids prosecutors from using peremptory challenges on the basis

of a juror's race. 476 U.S. at 89. <u>Batson</u> established a three-step test for evaluating claims that a prosecutor used a peremptory strike in violation of equal protection. <u>Miller-El v. Crockwell</u>, 537 U.S. 322, 328, 123 S.Ct. 1029, 154 L.Ed.2d 93, (2003) ("<u>Miller-El I</u>"). "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" <u>Johnson v. California</u>, __U.S.__, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005). "Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." <u>Johnson</u>, 125 S.Ct. at 2416. "'At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation'" <u>Purkett v. Elem</u>, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). This step "does not demand an explanation that is persuasive, or even plausible." <u>Id.</u>

Third, if the State provides a race-neutral justification, "[T]he trial court then will have the duty to determine if the defendant has established purposeful discrimination." <u>Batson</u>, 476 U.S. at 98 (footnote omitted). "[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." <u>Miller-El I</u>, 537 U.S. at 338-339. At step three, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." <u>Purkett</u>, 514 U.S. at 768.

"In deciding if the defendant has carried his burden of persuasion, a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available'" and consider all relevant circumstances. <u>Batson</u>, 476 U.S. at 93; Miller-El v. Dretke, __U.S.__, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005) ("<u>Miller-El II</u>"); <u>Hernandez v. New York</u>, 500 U.S. 352, 363

90

(1991), 111 S.Ct. 1859, 114 L.Ed. 2d 395 (pl. op.) ("'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts"). Thus, "<u>Batson</u> provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." <u>Miller-El II</u>, 125 S.Ct. at 2331.

### 1.      Pattern of Strikes

The statistics regarding the Government's use of peremptory strikes raise a strong inference of purposeful discrimination.  Of the nine black members on Robinson's 125-person venire panel, only one was selected to serve.  While four black members were excluded for cause and one was never subjected to voir dire, three of the four black members who remained were peremptorily struck by the prosecution.  The Government therefore used its peremptory strike power to eliminate 75% of eligible black venire members from service on the jury.[11]  Black members constituted only 7.2% of the venire panel but were the target of three out of twelve, or 25%, of the Government's peremptory strikes.  The disparity between black members presence on the venire and their subsequent removal is not likely the product of chance.

### 2.      Comparison of White Jurors Seated

"If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination at <u>Batson</u>'s third step."  <u>Miller-El II</u>, 125 S.Ct. at 2325.  Opposition to the death penalty was the basis of the Government's causal strikes against Mary Hicks (3 RT 10); Frankie

---

[11] The combination of Government-initiated causal strikes and peremptory strikes resulted in the elimination of seven out of eight, or 87.5%, of black jurors who were subjected to voir dire.

Vanzetta Johnson (4 RT 134); Carnesia Hall, (7 RT 61); Jerrie Lee Small, (7 RT 134) as well as the peremptory strikes against Ms. Debose (4 RT 164) and Ms. Amarh (7 RT 103).  A review of the jurors who were seated[12], however, reveals that the Government did not seek to eliminate white jurors who expressed reservations about capital punishment.

Jimmy Broome, a white male, stated on voir dire that he would only use the death penalty in "extreme cases" (2 RT 75), that it would be "very hard" (2 RT 75) for him to participate in the penalty process, that he was "certainly uncomfortable" (2 RT 76) with capital punishment and that he thought it was good that the law puts so many hurdles in the path of the death penalty.  2 RT 86. Shirley Mills, a white woman who was seated, stated it would "bother her a great deal" (3 RT 139) to participate in a process where the ultimate result may be execution, that although she could vote for the death penalty, it would be "very difficult" (3 RT 145) and that "the thought of being responsible for someone's death is something that would not be an easy decision" for her. Voir Dire of Shirley Mills, 3 RT 148.  David Tribout, a white juror, stated that he was "very sorry" the death penalty had to exist (4 RT 5), that the imposition had to be done "amazingly carefully" (4 RT 5) and that he "had a hard time" saying he was for capital punishment though he was not against it either. Voir Dire of David Tribout, 4 RT 13.  Finally, Dana Banser, a white woman who was seated, indicated that she would always vote for life imprisonment over the death penalty (4 RT 109-110), that as a Christian she believed that imposing the death penalty is a decision she would carry with her the rest of her life (4 RT 110) and that she considered life without parole a death sentence as well.  Voir Dire of Dana Banser, 4 RT 117.  The fact that the Government allowed white, but not

---

[12] The Government seated one black juror, eleven white jurors and two alternate jurors, both of whom were also white.

black, venire members who had reservations about the death penalty to serve is evidence of purposeful discrimination.

### 3.    The Peremptory Strike of Ms. Amarh

The Government's aggressive questioning of Marchesa Amarh, a 40-year-old black female, also supports a finding of purposeful discrimination. Ms. Amarh was peremptorily stricken based on the Government's assertion that she "expressed great reluctance" to impose the death penalty. Voir Dire of Marchesa Amarh, 7 RT 103.  Like many white jurors, Ms. Amarh gave ambiguous answers on her jury questionnaire regarding her views on the death penalty.  She indicated that she was not in favor of the death penalty, but explained that "it depend (sic) on the circumstances of the crime." Ex. 40, Juror Questionnaire.   She further indicated she believed "that the death penalty is appropriate for some crimes involving murder and I could return a verdict which assessed the death penalty in a proper case." Id. at 46.  During voir dire, immediately after Ms. Amarh stated "there are some circumstances (sic) that do deserve the death penalty," (7 RT 88) the prosecutor told Ms. Amarh that he got the impression she was a "conscientious objector." 7 RT 89.  After Ms. Amarh again indicated that she did not support the death penalty but could impose it depending on the circumstances, (7 RT 89), the prosecutor then engaged in an extended narrative, stating

> ...there are some people who out of a sense of goodness, justice, mercy, faith, whatever it may be, know in their heart of hearts that if it came down to that and in any case, they know they would say 'let God choose the time.' I just can't do that.  And I suppose the question is, does that describe Marchesia Amarh?

Voir Dire of Marchesa Amarh, 7 RT 91

Ms. Amarh declined to make an affirmative response and reiterated for the third time that her decision to impose the death penalty would depend on the circumstances of the case. Id.  A review

93

of the entire voir dire reveals that none of the white jurors who were peremptorily stricken were subjected to the "conscientious objector" colloquy, despite the fact that some of them expressed hesitation about imposing the death penalty. Voir Dire of William Watson, 2 RT 6; Voir Dire of Buddy James, 2 RT 200; Voir Dire of Kristie Kate Martinets, 3 RT 27; Voir Dire of Carolyn Sue Mooney, 4 RT 59, Voir Dire of Margaret Susan Kahler, 5 RT 120, Voir Dire of Tracey Neal Smith, 6 RT 21; Voir Dire of Johnny Lloyd Cryer, 6 RT 30, Voir Dire of Brenda Kay Broadwell, 7 RT 66; Voir Dire of Bill Bear, 8 RT 58.

The Government's claim that it struck Ms. Amarh for the same, race-neutral reasons that white jurors were stricken does not withstand scrutiny. In justifying the peremptory strike of Ms. Amarh, the Government referenced its prior strike of Brenda Broadwell, a 45-year-old white woman "whose views on the death penalty were quite similar, if not congruent, with those expressed by Ms. Amarh." Voir Dire of Brenda Broadwell, 7 RT 103. In her jury questionnaire, Ms. Broadwell indicated that she was in favor of the death penalty, that the death penalty says "certain types of behaviors will not be tolerated," and that she could impose a sentence of death even when life without the possibility of parole was an option." Ex. 41, Juror Questionnaire, Nos. 45-46, 52a. When asked how she felt about the death penalty as a punishment, Ms. Broadwell replied "I personally do believe in the death penalty" (7 RT 70) and that she "would not have a problem" making the decision between life and death. Voir Dire of Brenda Broadwell, 7 RT 72. The Government's questioning of Ms. Broadwell then focused on the fact that Ms. Broadwell had been molested as a child (7 RT 72) and that she had expressed an unusual interest in serving on the jury. 7 RT 72. Given Ms. Broadwell's clear, unambiguous support of the death penalty, the Government's claim that it struck Ms. Amarh and Ms. Broadwell for similar reasons is not credible. The

94

Government's use of Ms. Amarh's views on the death penalty is a pretext for purposeful discrimination.

### 4.      The Peremptory Strike of Dorothy Jean Debose

The prosecutor's inability to state a "a clear and reasonably specific explanation," (Batson, 476 U.S. at 98, n. 20) of his race-neutral reason for striking Dorothy Jean Debose, demonstrates that he intended to exclude black jurors on account of race.  When asked to justify its peremptory strike of Ms. Debose, a 56-year-old black female, the prosecutor initially stated that she was "known to members of [his] family" and that he had "reputation information concerning Ms. Debose." Voir Dire of Dorothy Jean Debose, 4 RT 164.  He then added that he had reviewed the cases of both Ms. Debose's husband and brother for drug offenses and felt that "a woman [such as Ms. Debose] who has had that experience" and "who would be of the same age as the defendant's mother, would not be a juror acceptable to the state." Id. 7 RT 165.  When the trial court asked for specific information, the prosecutor claimed "only a vague recollection...in my early days in this office" that there was a "writ of habeas corpus" for "some relative of the defendant Debose." Id. 4 RT 166.  Finally the prosecutor claimed that Ms. Debose's husband had pleaded guilty to a federal drug trafficking crime before another judge in that district. 4 RT 166-167.  When the court's questioning persisted, the prosecutor conferred with co-counsel and altered his reason for the peremptory strike, stating the Government has a "general feeling that Ms. Debose expressed what I perceived to be a reluctance regarding the death penalty."  4 RT 167.  The Government's willingness to shift its rationale based on the court's questioning suggests a discriminatory motive.

Moreover, none of the reasons cited by the Government–Ms. Debose's "reputation," age, connection to a federal drug case and her views on the death penalty–are credible.  First, Ms.

Debose stated that she did not know and had never heard of the prosecutor, (Ex. 42, Juror Questionnaire, at No. 110) thereby undermining his claim that she was "known to members of [his] family." Voir Dire of Dorthy Debose, 4 RT 164.  Second, the Government's concern about the possibility that Ms. Debose would be impartial because she may be the same age as Robinson's mother is not only speculative, but incredible given that Ms. Debose is not herself a mother.  Ex. 42, Juror Questionnaire at 13.  Third, the PACER system of the Northern District of Texas does not reveal there ever having been a federal case involving Luster K. Debose, Ms. Debose's husband. Ex. 42, Juror Questionnaire at 10.  Given that Ms. Debose's jury questionnaire stated her spouse was convicted of drug possession, not trafficking, before their marriage (Id. at 73-74), the Government's failure to question Ms. Debose on the nature and effect of any prior conviction suggests that the proffered reason was not truly of concern to the Government.  It should also be noted that the Government did not strike Michael Chatham, a white man whose stepson was in prison, despite the fact that the same rationale would apply to him as well. Voir Dire of Michael Chatham, 3 RT 67. Finally, the Government's claim that Ms. Debose's expressed reluctance on the death penalty is not credible, since she stated she could assess the death penalty under the proper set of circumstances, Ex. 42, Juror Questionnaire at 47, could recommend a sentence of death even if life without parole was an option (Id. at 52a), and agreed that "we must have the death penalty for some crimes."  Id. at 29.

### 5.    The Peremptory Strike of Charlene Boulet

Though the Government was not forced to justify its peremptory strike of Ms. Boulet, nothing in her jury questionnaire or voir dire would indicate that she would be an unacceptable juror for the Government.  Ms. Boulet is a 40-year-old black female who expressed firm support for the

death penalty, stating "it serves its purpose" and that she "ha[s] no problem with it" so long as the evidence proved the defendant guilty. Voir Dire of Charline Boulet, 3 RT 71. Furthermore, Ms. Boulet revealed that her cousin was murdered by an ex-girlfriend who was sentenced to only a few years in prison, a punishment Ms. Boulet felt was too lenient. Id. 3 RT 73. Much of the Government's questioning of Ms. Boulet was focused on non-substantive matters, including her work as a restaurant manager (3 RT 73), her love of basketball (3 RT 74), and her admiration for Dr. Phil, a regular guest on the Oprah Winfrey Show. 3 RT 75. Id. After reaffirming that she could listen to the evidence and has no qualms or reservations about sitting on a capital case (3 RT 76), the Government peremptorily struck Ms. Boulet without explanation. Id. 3 RT 155. Because the defense is permitted to rely on the fact that peremptory strikes permit those to "discriminate who are of a mind to discriminate," (Batson, 476 U.S. at 96), the prosecutor's elimination of Ms. Boulet supports a finding that the Government excluded jurors from service on Robinson's jury on account of race.

## III.    THE FEDERAL DEATH PENALTY ACT, AS APPLIED IN TEXAS, VIOLATES EQUAL PROTECTION.

The Equal Protection violation that Robinson suffered is not limited to the prosecutors' exercise of their peremptory challenges in a racially discriminatory manner. The Federal Death Penalty Act, as applied to Robinson, violates his right to Equal Protection because federal authorities in Texas have applied the Act in a racially discriminatory manner. A defendant who raises an Equal Protection violation has the burden of proving the existence of "purposeful discrimination." McClesky v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 1795 L.Ed.2d 262 (1986). The Court in McCleskey also stated, "a corollary to this principle is that a criminal defendant must prove that the purposeful discrimination 'had a discriminatory effect' on him." 481 U.S. at 293, 107 S.Ct. at 1756.

97

(Citations omitted)   The Court "has accepted statistics as proof of  intent to discriminate . . .
Although the statistical proof normally must present a 'stark' pattern to be  accepted as the sole proof
of discriminatory intent under the Constitution." Id., quoting Arlington Heights v. Metropolitan
Housing Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed 2d 450 (1977).

     The statistics  regarding application of the death penalty in Texas bespeak a prima facie case
of "discriminatory effect."  Federal death penalty trials in the state of Texas have resulted in ten
death penalty verdicts.  TExas has sent more defendants to federal death row than any other sstate
in the nation.  Texas has sent 10 men to federal death row.[13]  Eight are Black.  One is Latino.  And
one is White.  Thus, 80% of the federal death row defendants from the state of Texas are Black.  The
percentage of Black people sentenced to death in Texas under the Act is substantially higher than
the percentage of Black people sentenced to death under the Act in the nation as a whole.  The
national average, which is often criticized as rationally discriminatory, is approximately 57%.  The
percentage of Black people in Texas sentenced to death under the Act far exceeds the percentage of
Black people in the general population of the state.  According to the 200 Consensus, 12.3% of the
population is black.  Yet 80 % of the federal death row inmates from Texas are Black.  Thus, the
statistics in Texas create a "stark pattern" of racial discrimination in the use of the federal death
penalty.

     Robinson concedes that at this point he has not proven discriminatory intent within the
meaning of McCleskey.  However, the statistics regarding federal death row defendants from the
state of Texas raise an inference of intentional racial discrimination.  Nor does Robinson rely "soley"

---

[13] They are: Orlando Hall, Bruce Webster, Christopher Vialva, Brandon Bernard, Julius Robinson,
Alfred Bourgeois, Sherman Fields, Shanon Agostky.  Two others, Juan Garza and Louis Jones, have already
been executed.

98

on statistics to prove his claim of racial discrimination. The prosecutors who tried his case participated in the DOJ death penalty protocols that resulted in the authorization to seek the death penalty against Robinson. These same prosecutors engaged in disparate questioning of Black potential jurors during voir dire, which stands as further evidence of discriminatory intent that is unrelated to the statistical proof. The general Texas statistics, coupled with the Batson challenges in this particular case, constitute a prima facie case that the Federal Death Penalty Act, as applied in the state of Texas, discriminates against Black people, and that Robinson himself has been discriminated against. Robinson requests discovery and an evidentiary hearing to develop evidence that the disparate impact of the Federal Death Penalty Act on Black People in Texas is the result of purposeful discrimination.

## IV.   THE COURT SHOULD VACATE THE CONVICTIONS BECAUSE ROBINSON RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

The Supreme Court has held that a criminal defendant has the right to effective assistance of counsel on appeal. Smith v. Robbins, 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); Smith v. Murray, 477 U.S. 527, 535-536, 106 S.Ct. 2661, 91 L.Ed.2d434 (1986).

The Court in Robbins has held that the standard for evaluating ineffective assistance of appellate counsel is the same as is used in any other ineffective-assistance-of-counsel claim:

> [T]he proper standard for evaluating Robbins' claim that appellate counsel was ineffective in failing to file a merits brief is that enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1980). . . Respondent must first show that his counsel was objectively unreasonable, see Strickland, 466 U.S. at 687-691, 104 S.Ct. 2052, in failing to find arguable issues to appeal. . . If Robbins succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's failure to file a merits brief, he

99

would have prevailed on his appeal.  See Id. at 69, 104 S.Ct. 2052.

528 U.S., at 285-286, 120 S.Ct., at 764.  The Court also held that ineffective assistance of appellate counsel can be "based on counsel's failure to raise a particular claim" as long as the petitioner demonstrates deficient performance and prejudice.  See 528 U.S. at 288, 120 S.Ct., 765.

The same lawyers who  represented Robinson in the trial court represented him on appeal.  Robinson urged the lawyers to attack the jury instruction regarding continuing criminal enterprise (CCE) and other issues.  Defense counsel refused to do so.  Robinson asked his lawyers to provide him with a copy of trial transcripts.  The lawyers refused to do so.  Against this background, Robinson filed a pro se request for new appointed counsel on appeal, which was denied.  The Fifth Circuit also denied Robinson's request to the court to provide him with a copy of the reporter's transcript.  All of this is indicative of a major breakdown of the attorney-client relationship and raises questions further ineffective assistance of counsel on appeal.

A.      **Defense Counsel's Failure to Raise the Batson Issue on Appeal Was Deficient Performance.**

Counsel's failure to raise the Batson issue on direct appeal is one example of their deficient performance on appeal.  The facts and circumstances of the Batson issue demonstrate that it was a strong potential appellate issue.  The 125-person venire panel included only nine Black women and one Black man.  Of the ten Black venire persons, eight made it into the jury box as prospective jurors.  The prosecution then used causal and peremptory strikes to remove seven of the eight Black potential jurors.  The final jury that was seated was composed of 11 Whites and 1 Black.  Both alternate jurors were also White.

Given the prosecution's aggressive use of for-cause challenges against Black people, its use

of peremptory challenges to strike three of four remaining Black jurors, and the racial composition of the seated jury, it was "objectively unreasonable" for counsel to fail to raise the Batson issue on appeal.

At the time counsel was researching and preparing Appellant's Original Brief, it was well known that the United States Supreme Court had expressed concerns that the Fifth Circuit had failed to seriously consider a Texas petitioner's claim that the prosecutors used peremptory challenges against Black people in a racially discriminatory manner. Four months before the filing of Robinson's brief, on February 25, 2003, the Supreme Court issued its opinion in Miller-El II. As the ABA guidelines note, appellate counsel was under a duty to familiarize himself with the pending law and to apply it to Robinson's case.

### B.      The Failure to Raise the Batson Issue Prejudiced Robinson's Case

The Supreme court's opinion in Miller-El II demonstrates the prejudice to Robinson's case. The Court in Miller-El II, held that the Texas courts' determination that the prosecutors had not engaged in racial discrimination was objectively unreasonable and granted habeas relief. Many of the factors discussed in Miller-El apply to this case. As in Miller-El II, the prosecutor engaged in disparate questioning of black jurors. As in Miller-El II, the prosecutors struck all but one Black potential juror from the jury. As in Miller-El II, the prosecutor's offered race-neutral reasons cannot survive a comparative analysis.

If the petitioner in Miller-El II, who was on collateral review and subject to the restraints of AEDPA, prevailed on his Batson claim, there is certainly a "reasonable probability" that Robinson would have prevailed on his direct appeal in the Fifth Circuit. The failure to even raise the issue precluded Robinson from appealing a strong legal issue.

## V.   THE COURT SHOULD VACATE THE DEATH SENTENCES BECAUSE THE PROSECUTION PURSUED FUNDAMENTALLY INCONSISTENT THEORIES AT SERIATIM CAPITAL TRIALS.

Robinson and a co-defendant, L.J. Britt, were tried separately in seriatim capital trials. Robinson was tried first. The prosecutor argued at Robinson's trial that Robinson was primarily responsible for the murders. The prosecutor portrayed Robinson as the leader and most culpable participant in the murder of Shelton. The prosecutor emphasized Robinson's participation in and responsibility for the murders. L.J. Britt was tried second. At Britt's trial, the prosecution argued that L.J. Britt was the leader and most culpable participant in the murders.

The use of inconsistent theories at seriatim trials violates due process. In the context of capital trials, the use of inconsistent theories also violates the Eighth Amendment because it interjects unreliability into capital sentencing.

The Supreme Court has addressed prosecutorial inconsistency three times – always in the context of a prosecutor taking inconsistent positions about the actual killer in seriatim capital trials. In each case, members of the Court have expressed deep concerns about a prosecutor tendering inconsistent evidence and arguments in capital trials. In Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam), two defendants, Moore and Green, were prosecuted for rape and murder in separate trials. At Moore's trial, the prosecutor elicited testimony from a witness that Moore had admitted shooting the victim twice after ordering Green to run an errand. Moore was convicted and sentenced to death. At the second trial, Green sought to admit the prior testimony of the witness who had testified at Moore's trial that Moore admitted shooting the victim himself while Green was gone. The trial court excluded the witness's prior testimony based on state hearsay rules.

102

The prosecutor then argued that "in the absence of direct evidence as to the circumstances of the crime, [the jury] could infer that [Green] participated directly in [the victim's] murder from the fact that more than one bullet was fired into her body." 442 U.S. at 95. The Court held that the exclusion of the witness's prior testimony violated due process because it "denied petitioner a fair trial on this issue of punishment." U.S. at 97.

In the second case, Jacobs v. Scott, 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995), two Justices dissented from the denial of certiorari and condemned prosecutorial inconsistency as "fundamentally unfair." 513 U.S. at 1068. Jacobs and his sister, Bobbie Hogan, were each charged with kidnaping and murdering a woman in the woods. At Jacobs' trial, the prosecution introduced Jacobs' confession that he had abducted and fatally shot the victim and testimony that Jacobs had led investigators to the body. Jacobs, however, testified that the confession was false and that he had made it in hopes of getting the death penalty rather than life imprisonment. He testified that he had kidnaped the victim and brought her to a cabin in the woods, but it was Hogan who shot the victim. According to Jacobs, he had not known that Hogan was armed and was not present when the killing occurred. The prosecutor argued to the jury that "the simple fact of the matter is that Jesse Jacobs and Jesse Jacobs alone killed the victim." Jacobs was convicted and sentenced to death.

At Hogan's subsequent trial, the prosecutor abandoned his theory that Jacobs had killed the victim and instead called Jacobs as a prosecution witness to testify that Hogan was the killer. The prosecutor told the jury that he had "changed my mind about what actually happened . . . And I'm convinced that Jesse Jacobs is telling the truth when he says that Bobbie Hogan is the one that pulled the trigger." Justice Stevens wrote:

> For a sovereign state represented by the same lawyer to take flatly

103

> inconsistent positions – and to insist on imposition of the death penalty after repudiating the factual basis for that sentence – surely raises a serious question of prosecutorial misconduct. In my opinion, it would be fundamentally unfair to execute a person on the basis of factual determination the State has formally disavowed.

513 U.S. at 1068.

Most recently, in <u>Bradshaw v. Stumpf</u>, __U.S.__, 125 S.Ct 2398, 162 L.Ed.2d 143 (2005) the Court revisited the issue of prosecutorial inconsistency. In this case, the prosecutor argued inconsistent theories at two capital trials. At the first trial, Stumpf pleaded guilty to capital murder, but the case proceeded to penalty phase before a three-judge panel. At the penalty phase, the prosecutor argued that Stumpf fatally shot the victim and that, as the actual killer, he deserved the death penalty. The panel found that Stumpf was the principal and sentenced him to death.

At the second capital trial, the same prosecutor argued that Wesley actually shot and killed the victim. The jury convicted Wesley but recommended 20 years to life rather than the death penalty.

The Court held that the prosecutorial inconsistency was "immaterial" to Stumpf's conviction, but remanded the case to the court of appeals to determine whether the prosecutorial inconsistency rendered his death sentence unconstitutional. In his concurring opinion, Justice Souter acknowledged that several "remedial questions" about a due process violation based on prosecutorial inconsistency remained unanswered. 125 S.Ct. at 2409. "May the death sentence stand if the State declines to repudiate its inconsistent position in the codefendant's case? Would it be sufficient simply to reexamine the original sentence and if so, which party would have the burden of persuasion? If more would be required, would a <u>de novo</u> sentencing hearing suffice?" 125 S.Ct. at 2409.

104

Given the above, the court should find that the prosecution's pursuit of inconsistent theories regarding participation in the murders and relative culpability at the seriatim trials violated Robinson's right to due process and the Eighth Amendment.

## VI.    THE PROSECUTION KNOWINGLY USED FALSE AND MISLEADING TESTIMONY TO SECURE ROBINSON'S DEATH SENTENCE.

The Supreme Court has held that the prosecution's presentation of false evidence at trial violates due process.  Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 1217 (1959) (presentation of material false evidence violates due process if the prosecutor knew or should have known of the falsity).  The prosecutor cannot sit silent while false testimony is given, even if he is not directly responsible for the false testimony.  Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957).  Due process also requires the prosecution to disclose material exculpatory evidence to the defense.  Bradshaw v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1983).

As noted above, one of the Government's principal arguments for death was the allegation that Robinson ordered others in Dermott, Arkansas to kill Michael Williams in order to prevent his testimony. Louis Johnson, however, told the FBI that the assault against Williams occurred because he had sold Jordan, Eddington, and Pitts some bad "dope"  and  that they wanted their money back. Despite having information that the abduction was unrelated to Robinson, the Government persisted in its efforts to paint Robinson as a dangerous murderer even while incarcerated.  The prosecution made no effort either to correct the misapprehension in front of the jury or to tell defense counsel about Johnson's perspective.

## **CONCLUSION**

For all the foregoing reasons, the Court should vacate the verdicts.  In the alternative, the court should grant an evidentiary hearing on Robinson's allegations of ineffective assistance of counsel.


Respectfully submitted,

MICHAEL B. CHARLTON
Attorney at Law


Dated:  November 29, 2005                    s/ Michael B. Charlton
                                             Law Office of Michael B. Charlton
                                             P.O. Box 1964
                                             El Prado, New Mexico 8759
                                             Telephone: (505) 751-0515
                                             Facimile: (505) 751-1133
                                             E-mail: mike@charlton-legal.com
                                             Attorney for Defendant


                                             MARIA E. STRATTON
                                             Federal Public Defender
                                             SEAN K. KENNEDY
                                             Deputy Federal Public Defender


Dated:  November 29, 2005                    s/ Sean K. Kennedy
                                             Federal Public Defender's Office
                                             321 East 2nd Street
                                             Los Angeles, California 90012
                                             Telephone: (213) 894-5063
                                             Facsimile: (213) 894-0081
                                             E-mail: sean_kennedy@fd.org
                                             Attorney for Defendant

## CERTIFICATE OF SERVICE

I, Mariza Vergara, hereby certify that on November 29, 2005, I electronically filed the

foregoing document with the clerk of the court for the U.S. District Court, Northern District of

Texas, using the electronic case filing system of the court.  The electronic case filing system sent a

"Notice of Electronic filing" to the following attorneys of record who have consented in writing to

accept this Notice as service of this document by electronic means:

ANGIE L. HENSON
Assistant United States Attorney
U.S. Attorney's Office
Burnett Plaza
801 Cherry Street
Suite 1700
Fort Worth, Texas 76102-6882
Telephone: (817) 252-5234
Facsimile: (817) 978-6381

I, Mariza Vergara, hereby certify that on November 29, 2005, I served the foregoing

document by mailing a copy to the following individuals.

| ANGIE L. HENSON | JULIUS OMAR ROBINSON |
|---|---|
| DOUGLAS A. ALLEN | BOP NO. 26190-177 |
| FREDERICK M. SCHATTMAN | USP - Terre Haute |
| Assistant United States Attorneys | P.O. Box 33 |
| U.S. Attorney's Office | Terre Haute, Indiana 47808 |
| Burnett Plaza | |
| 801 Cherry Street | |
| Suite 1700 | |
| Fort Worth, Texas 76102-6882 | |
| Telephone: (817) 252-5234 | |
| Facsimile: (817) 978-6381 | |

s/  Mariza Vergara
Mariza Vergara

107