# THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

# FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CAUSE NO. 4:00-CR-00260-2** |
| | **:** | **DEATH PENALTY CASE** |
| **vs.** | **:** | |
| | **:** | **Honorable Terry Means** |
| **JULIUS ROBINSON** | **:** | **United States District Judge** |

---

## EXHIBIT NUMBER 1 (PART 1 OF 4, PAGES 1-31)

### SUBMITTED IN SUPPORT OF MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

(Filed Electronically Under the Electronic Filing System Requirements)

---

# MARK D. CUNNINGHAM, PH.D., ABPP

**Clinical & Forensic Psychology**

*Board Certified in Forensic Psychology – American Board of Professional Psychology*

417 Oak Bend, Suite 260    Lewisville, Texas 75067

972-459-0658    Fax 972-459-0958    mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846,*
*Idaho #PSY-379, Illinois #071-006010, Indiana #20041376, Louisiana #794, New Mexico #0768,*
*Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #2351*

### Declaration of Mark D. Cunningham, Ph.D., ABPP

**Re:**    U.S. v Julius Omar Robinson

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare:

1.      I am a clinical and forensic psychologist, licensed as a psychologist in the states of Texas, Arizona, Arkansas, Colorado, Connecticut, Idaho, Indiana, Illinois, Louisiana, New Mexico, Oklahoma, Oregon, South Carolina, and Tennessee. I am over age 21, have personal knowledge of the facts contained in this affidavit, and am competent to testify about them. My curriculum vitae is attached (Attachment A).

2.      I am the same Mark D. Cunningham, Ph.D. who testified as a teaching witness regarding violence risk assessment at the capital sentencing trial of Mr. Robinson in March 2002. Had it been requested, I was available at that time to provide an evaluation of factors that could have been considered in mitigation.

3.      I received a Bachelor's degree in Psychology from Abilene Christian College in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. I completed a one-year internship in clinical psychology at the National Naval Medical Center of Bethesda, Maryland. I subsequently served as an active duty Clinical Psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981. I was an assistant professor of psychology at Hardin-Simmons University in Abilene, Texas from 1981 to 1983. I have maintained a private practice in clinical and forensic psychology with offices in Texas since 1981.

4.      I was board certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP). This distinction follows a rigorous examination process and is held by approximately 200 psychologists in the United States. I have served as a work sample reviewer and oral examiner for the American Board of Forensic Psychology. I have provided forensic evaluation services in over 450 cases. I have participated in extensive

## Exhibit 1 - 1

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

continuing education in the area of forensic psychology. I have served as an ad hoc
reviewer for three respected peer reviewed journals.

5.      I have been recognized as a clinical and forensic psychology expert in testifying
regarding sentencing determination issues including mitigation and future dangerousness in
both state and federal courts. I have been qualified and testified as a clinical and forensic
psychology expert regarding sentencing determination issues in approximately 40 federal
capital cases and approximately 65 state capital cases in state and/or federal courts in
jurisdictions including Alabama, Arizona, Arkansas, California, Colorado, Idaho, Illinois,
Indiana, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New
Jersey, New Mexico, New York, North Carolina, Pennsylvania, Puerto Rico, Ohio,
Oklahoma, Oregon, South Carolina, Virginia, and West Virginia. I have provided
declarations/affidavits and testimony in state postconviction and federal habeas
proceedings. Federal capital sentencing trials where my testimony has been heard
include:

> **U.S. v Louis Jones, Jr.** (1995),  Cause No. 5:95-CR-047-C in the U.S. District
> Court, Northern District of Texas.
>
> **U.S. v Paul Hardy,** (1996), Cause No. CR94-381"C" (4) in the U.S. District
> Court, Eastern District of Louisiana.
>
> **U.S. v Bruce Webster** (1996), Cause No. 4:94-CR121-Y in the U.S. District
> Court, Northern District of Texas.
>
> **U.S. v Trinity Ingle**  (1997), Cause No. 96-60023 in the U.S. District Court,
> Western District of Arkansas, Hot Springs Division.
>
> **U.S. v Dean Beckford** (1997), Cause No. 3:96CR66-01 in the U.S. District
> Court, Eastern District of Virginia, Richmond Division.
>
> **U.S. v Darryl Johnson**  (1997), Cause No. 96 CR 379-1 in the U.S. District
> Court, North District of Illinois, Eastern Division.
>
> **U.S. v Aquilia Marcivicci Barnette**  (1998), Criminal Docket 3:97CR23-P in the
> U.S. District Court, Western District of North Carolina, Charlotte Division.
>
> **U.S. v LaFawn Bobbitt**  (1998), Criminal No. 3:97CLR169 in the U.S. District
> Court, Eastern District of Virginia, Richmond Division.
>
> **U.S. v Anthony Ayeni Jones** (1998), Cause No. CR-WMN-96-0458 in U.S.
> District Court for the District of Maryland.
>
> **U.S. v Marvin Holley** (1998), Cause No. CR96-B-0208-NE in U.S. District
> Court, Northern District of Alabama.

2

**Exhibit 1 - 2**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**U.S. v Saheem Johnson and Raheem Johnson** (1998), Criminal No. 97-00241-A in the U.S. District Court, Eastern District of Virginia, Alexandria Division.

**U.S. v Daniel Lewis Lee** (1999), Case No. LR-CR-97-243(1) in the U.S. District Court, Eastern District of Arkansas.

**U.S. v Christopher Andre Vialva** (2000), Criminal No. W-99-CR-070 in the U.S. District Court, Western District of Texas, Waco Division.

**U.S. v Willis Haynes** (2000), Criminal No. PJM 98 0520 in the U.S. District Court for District of Maryland.

**U.S. v Daymon Smith** (2000),  No. 1:909-CR-164(3) in U.S. District Court, Eastern District of Texas, Beaumont Division.

**U.S. v Coleman Leake Johnson, Jr.** (2001), No. 3:00CR00026 in U.S. District Court, Western District of Virginia, Charlottesville Division.

**U.S. v Khalfan Khamis Mohamed,** (2001), Criminal No. 98-CR-1023:008 in U.S. District Court of New York.

**U.S. v Keith Nelson** (2001), Cause No. 99-00303-01-CR-W-2, in the U.S. District Court, Western District of Missouri, Western Division.

**U.S. v Marvin Charles Gabrion, II** (2002), Cause No. 1:99-CR-76 in the U.S. District Court, Western District of Michigan.

**U.S. v Julius Omar Robinson** (2002), Cause No. 4:00-CR-260-Y in the U. S. District Court, Northern District of Texas, Fort Worth Division.

**U.S. v Samuel S. Ealy** (2002), Cause No. 1:00-CR-104 in the U.S. District Court, Western District of Virginia.

**U.S. v Carl Haskell** (2002), Cause No. 00-395-01-CR-W-2  in the U.S. District Court, Western District of Missouri, Western Division.

**U.S. v Aquilia Marcivicci Barnette**  (2002),  3:97CR23-T in the U.S. District Court, Western District of North Carolina, Charlotte Division.

**U.S. v Aaron Haynes** (2003), CR-01-202-47 in the U.S. District Court, Western District of Tennessee, Western Division.

**U.S. v Wesley Purkey** (2003), 01-308-01-CR-W-FJG in the U.S. District Court, Western District of Missouri, Western Division.

3

**Exhibit 1 - 3**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**U.S. v John Bass** (2003), 97-CR-80235 in the U.S. District Court for the Eastern District of Michigan.

**U.S. v Gary Sampson** (2003), CR-02-199964 in the U.S. District Court for Massachusetts.

**U.S. v Emile Dixon** (2003), 01 CR 389 (S-2)(RJD) in the U.S. District Court for the Eastern District of New York.

**U.S. v Keon Moses** (2004), CCB-02-0410 in the U.S. District Court for the District of Maryland, Northern Division.

**U.S. v Styles Taylor** (2004), Cause No 2:01-CR-0073, in the U.S. District Court, Northern District of Indiana, Hammond Division.

**U.S. v Dustin Honken** (2004), Case No. CR-01-3047MWB in U.S. District Court, Northern District of Iowa.

**U.S. v Nasih Ra'id (Odell Corley)** (2004), Case No. 3:02 CR 116 in the U.S. District Court, Northern District of Indiana, Hammond Division.

**U.S. v Hernaldo Medina-Villegas** (2005), Criminal No. 02-117 (PG) in the U.S. District Court, District of Puerto Rico.

**United States v. Xavier Williams, et al. (Michael Williams)** (2005), (S1) 00-CR-1008 (NRB) in the US District Court, Southern District of New York.

**U.S. v Denis Rivera et al, (Ismael Cisneros)** (2005) Criminal No: 1:04 CR283-A in U.S. District Court, Eastern District of Virginia, Alexandria Division.

**U.S. v Angela Jane Johnson** (2005), Case No. 01-CR-3046-MWB in the U.S. District Court, Northern District of Iowa.

**U.S. v John Richard Mayhew** (2005), Case No. CR 2-03-165 in the U.S. District Court, Southern District of Ohio, Eastern Division.

**U.S. v Kenneth Lighty** (2005), in the U.S. District Court, District of Maryland.

6.    I am the first author or co-author of over 20 scholarly papers related to forensic psychology published within the past seven years or currently in press in peer reviewed journals, scholarly texts, and professional periodicals. I am a nationally recognized scholar regarding psychological evaluations at capital sentencing. I am first author of the chapter on capital sentencing evaluations in the 12-volume <u>Handbook of Psychology</u>. I

4

**Exhibit 1 - 4**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

have authored or co-authored a number of scholarly papers regarding capital sentencing determinations. These have analyzed case law and statutes relevant to mitigation and violence risk assessment considerations at capital sentencing, discussed routinely observed approaches to these issues by the prosecution and the defense, reviewed methodology that increases the scientific foundation and reliability of capital sentencing evaluations, and/or examined empirical studies and correctional data that can best inform these considerations.  My scholarly papers relevant to capital sentencing considerations include the following:

> Cunningham, M.D., & Reidy, T.J. (1998).  Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 333-351.

> Cunningham, M.D. & Reidy, T.J. (1998).  Integrating base rate data in violence risk assessments at capital sentencing.  Behavioral Sciences & the Law, 16, 71-95.

> Cunningham, M.D., & Reidy, T.J. (1999).  Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

> Cunningham, M.D. (2001). Bias in capital sentencing evaluations [invited opinion column]. American Psychology and Law Society News, 21, 2, 8-9.

> Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death:  Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

> Reidy, T.J., Cunningham, M.D. & Sorensen, J. (2001).  From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

> Cunningham, M.D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo,  Forensic mental health assessment:  A casebook (152-171).  New York:  Oxford University Press.

> Cunningham, M.D. & Reidy, T.J. (2002).  Violence risk assessment at federal capital sentencing:  Individualization, generalization, relevance, and scientific standards.  Criminal Justice and Behavior, 29, 512-537.

> Cunningham, M.D. & Goldstein, A.M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

5

**Exhibit 1 - 5**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. Criminal Justice Policy Review, 15, 365-376.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. Behavioral Sciences & the Law, 23, 307-320.

Cunningham, M. D. & Sorensen, J. R. (in press). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. Criminal Justice and Behavior.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

Cunningham, M. D. (manuscript under review). Unparalleled need to know: Informed consent in capital sentencing evaluations.

Cunningham, M. D. & Sorensen, J. R. (manuscript under review). An actuarial model for assessment of prison violence risk among high security inmates: A replication and extension.

7.    My scholarly activities have been noted by my peers. I have been selected to receive the 2006 American Psychological Association Award for Distinguished Contribution to Research in Public Policy. This award is bestowed on one psychologist annually. The Distinguished Contribution awards, four of which recognize research activities, are among the highest recognitions extended by the American Psychological Association. The award for Distinguished Contribution to Research in Public Policy recognizes "a psychologist who has made distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work." To my knowledge, I am the first psychologist working outside of a university or research institute setting who has been given this research-related award. I am the recent recipient of the 2005 Texas Psychological Association Award for Outstanding Contribution to Science. This is an annual award, given in recognition of significant scientific contribution in the discovery and development of new information to the body of psychological knowledge. My research and forensic consultation contributions to capital sentencing determinations have additionally been recognized with the 2004 John Augustus Award from the National Association of Sentencing Advocates.

6

**Exhibit 1 - 6**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

8.      The American Academy of Forensic Psychology is an association of psychologists who have been board certified by the American Board of Forensic Psychology. A primary mission of the Academy is to raise the standard of practice of psychology to the courts. Accordingly, the Academy conducts continuing education workshops on various forensic psychology applications. At the request of the Academy I provided full day workshops under their auspices on: "The role of the forensic psychologist in death penalty litigation" (March 1998 - Milwaukee, Wisconsin; February 1999 - Austin, Texas; January 2000 - Monterey, California; February 2002 - San Diego, California; September 2003 - Cincinnati, Ohio). These workshops emphasized research literature, statistics, and conceptualizations relevant to assessments of capital defendants. Under the auspices of the Texas Psychological Association, in November 2003 in Dallas, Texas I provided a similar full day continuing education workshop for psychologists.

9.      Federal habeas counsel for Mr. Robinson, Michael Charlton, Esq., has requested my expert forensic psychology consultation regarding what testimony and associated argument regarding mitigation could have been presented at the punishment phase of Julius Robinson's trial in March 2002. In providing this consultation I have reviewed the declarations of family members and other third parties, as well as the transcript of the punishment phase of the trial, and research regarding the influences and long-term effects of adverse developmental factors. These types of data and sources are of a sort that are reasonably relied upon by clinical and forensic psychologists in coming to conclusions on relevant issues in this field of expertise.

10.      Because records and third party reports are much less subject to assertions of self-serving distortion or misreport, these are emphasized in forensic psychology evaluations and were the primary basis of my findings. It is acknowledged that I have not interviewed Mr. Robinson. The principle caveat of not comprehensively interviewing Mr. Robinson is that additional mitigating factors may remain unidentified, and the psychosocial history lacks anecdotal detail that he might have provided in response to expert probing. However, the absence of an interview has no effect on conclusions that various adverse developmental factors present in his background increased the risk of a deviant or criminally violent life trajectory.

11.      To explain, direct evaluation in mental health practice, whether clinical or forensic, provides two functions: 1. obtaining a history; 2. assessing the presence of current symptoms of a mental disorder. There is little to no data obtained from an interview or testing that would demonstrate whether an adverse event in a patient's (or defendant's) developmental history "caused" a currently observed condition or outcome in adulthood. Rather, certain historical/developmental factors are identified as risk factors that contributed to the adult outcome with varying degrees of weight - based on research on groups of similarly situated individuals. The clinical practice of medicine and psychology rests on the application of such group derived "risk" data to the specific patient. Further, it is not anticipated that a patient or defendant has comprehensive insight into how he has been affected by these developmental risk factors, nor is the impact dependent on his recognition of it. The application of research findings to the

7

**Exhibit 1 - 7**

**Re:  U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

developmental experiences of a particular defendant is based on the presence or absence of these events in the defendant's history, not on whether this history was self-described or accompanied by insight. Thus, apart from the history obtained, interview observations and/or testing data do not illuminate the nexus between adverse developmental experience and criminal and/or violent outcome. Consistent with this conclusion, findings of the United States Department of Justice regarding the nexus between adverse developmental factors and criminal/violent outcome by late adolescence and early adulthood, and the associated prescription of preventative measures, are without recourse to interviewing or testing specific at-risk youth to determine whether the nexus applies to them.

12.    Accordingly, the following findings then are offered with a reasonable degree of psychological certainty.

13.    **Procedures of evaluation:** (In addition to documents reviewed prior to my trial testimony in March 2002)

*Declarations reviewed*

| | |
|---|---|
| Jimmie Lee Robinson | Father |
| Marcus Jwain Robinson | Brother |
| | |
| Mildred Holiman | Maternal aunt |
| Milton Holiman | Maternal uncle |
| John Hollimon, Jr. | Maternal uncle |
| Josephine Dotson | Maternal aunt |
| Bernice Johnson | Maternal great aunt |
| Terry Billups | Maternal cousin |
| Jana Holimon | Maternal cousin |
| Rodney White | Paternal cousin |
| | |
| Beotha Moore | Dermott neighbor and friend of maternal grandparents |
| Jamila Camp | Former girlfriend |
| | |
| Keith Edington | Younger Dermott peer |
| Louise Johnson | Dermott peer |
| Wayne Jordan | Younger Dermott peer |
| Alquantis Pitts | Dermott youth involved in robbery of Michael Williams |
| Michael Williams | Dermott drug dealer and 12-28-00 robbery victim |
| | |
| Leroy Kennedy | Former counselor for Delta Youth and Family Services |
| Carl McCree | Dermott native and former Dermott police officer and chief |
| Willie Nimmer | Former Dermott police officer |
| | |
| Guffrie Gorins | Dermott native and former school teacher |

8

**Exhibit 1 - 8**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

| | |
|---|---|
| Arlette Gorins | Former school teacher |
| Carol Wilson | High school teacher |
| Willie Parker | High school coach |
| Elvin Jones | High school football coach |
| David York | High school football coach |

| | |
|---|---|
| Stephen K. Martin, Ph.D., | Neuropsychologist |

*Records reviewed*

School records
Birth records

*Review of punishment phase transcripts*

## 14.    Findings:

**Section 1** describes the failures of Mr. Robinson's defense to articulate a coherent theory of mitigation; to present adequate evidence of damaging developmental and mental state factors, and/or to provide expert testimony regarding the nexus of those factors with problematic outcomes including criminal violence.

**Section 2** outlines adverse developmental factors and experiences in Julius Robinson's history that singularly and collectively increased the likelihood of psychological and social maladjustment, morality deficits, poor impulse control, poor judgment, criminal activity, and violent criminal offending. Only a few of these factors were touched on in a cursory fashion during evidence offered by the defense at Mr. Robinson's capital sentencing. Each adverse developmental factor detailed in this section is accompanied by a discussion of the mitigating implications of this factor, and in many cases, associated research available in March 2002. Expert perspectives on the linkage between damaging developmental factors and criminal violence were entirely absent from Mr. Robinson's capital sentencing phase. Accordingly, the jury was deprived of a scientifically informed basis to give weight to that history and psychological status. The mitigating factors and implications were, with even limited investigation, reasonably available to defense counsel and testifying mental health experts at Mr. Robinson's capital murder trial in March 2002.

**Section 3** describes the risk assessment perspectives that I could have testified to had I been queried regarding them by the defense. Additionally, I had prepared slides to illustrate some data, but was not prompted to present or explain these slides. Accordingly, I have included in an appendix all of the slides that I had prepared to illustrate my testimony in this case.

9

**Exhibit 1 - 9**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## Section 1

The defense failed to explain to the jury how they were to apply the very limited mitigating developmental history that they heard. In fact, defense inexplicably waived an opening statement at sentencing, and then offered only a few cryptically oblique sentences regarding how the jury should consider the developmental history:

> ...[regarding Julius as a teen going to reside with his mother] Rosa has an appointment with a bottle and some primos, some marijuana cigarettes with crack rolled up in it, and that's the environment and ask yourself what kind of life that might be. And Jimmy Lee, the father, not present, not a card, not any help at all. And I'm not saying that's a reason to go out and deal drugs or shoot anybody, but I submit to you it's a factor. It's something you can consider. It's in the instructions. (sentencing phase, vol. 23: 78)

In addition to a failure to describe an extraordinary sequence of damaging developmental factors, the defense failed to articulate the role of "moral culpability" as the jury weighed these factors and the associated the deathworthiness of Julius Robinson. Moral culpability is a concept at the heart of mitigation (*Burger v. Kemp*, 1987), citing *Woodson v. North Carolina* (1976). An understanding of the concept of moral culpability was critical to the jury's consideration of the nexus between the mitigating factors presented to the jury and the capital offense. To explain, the concept of moral culpability acknowledges an elementary psychological reality: we do not all arrive at our choices out of equivalent raw material. It follows that the degree of "blameworthiness" of an individual for criminal or even murderous conduct may vary depending on what factors and experiences shaped, influenced, or compromised that choice. The relationship of developmental damage and other impairing factors to the exercise of choice, and subsequently to moral culpability is illustrated in the graphic models below. As the damage and impairing factors (e.g. neglect, abuse, psychological disorder, corruptive socialization, substance dependency/intoxication, etc.) increase, choice is exercised on an increasing slope, and moral culpability is correspondingly reduced.

10

## Exhibit 1 - 10

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05



The greater the damaging or impairing factors, the steeper the angle or slope on which the choices are made; and thus the lower the level of moral culpability. This concept of moral culpability is central to the rationale of <u>Wiggins v South Carolina</u>, <u>Atkins v Virginia</u> and <u>Roper v Simmons</u> – i.e. background factors, mental retardation and/or youthfulness all impact on the level of moral culpability of a capital defendant, and the associated death eligibility and deathworthiness of that defendant. The formative or limiting impact from any source of developmental damage or impairment is relevant in weighing of moral culpability. An appraisal of moral culpability involves an examination of the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibilities and the exercise of volition or free will. Stated more plainly, how steep was the angle that the choices were made from?

The arguments of the Government were quite predictable. The typical theory of the Government at capital sentencing is that the defendant's criminal conduct, including the capital offense, is the result of the totally volitional, unfettered, free exercise of choice of the defendant arising solely from his malignantly evil heart. The equally typical and predictable argument that any pro-social behaviors represented a manipulation, as well as the focus on the depravity of the criminal offenses and/or lack of remorse/conscience at capital sentencing by the Government is to provide a clinical characterization of that "evil heart." Consistent with this observation, in final argument at Mr. Robinson's sentencing, the Government asserted:

> Why has Julius Robinson earned his way into this courtroom? Because Julius Robinson, the cold-blooded, calculated, manipulative killer that he is, has participated in three homicides. (sentencing phase, vol. 23: 96)

11

Exhibit 1 - 11

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> You know that Julius Robinson is, as Mr. Schattman, called it two-face. You know that Julius Robinson has a public persona and a private persona…You know the true Julius Robinson because you were able to hear the true Julius Robinson through those wiretaps. (sentencing phase, vol. 23: 98)

> I would submit to you that Julius Robinson lacks a conscience. (sentencing phase, vol. 23: 104)

> Not only does Julius Robinson lack a conscience, ladies and gentlemen, but Julius Robinson does not value the sanctity of life. (sentencing phase, vol. 23: 105)

> …And you know because of his lack of conscience, you know because of the value that he places on lives that are not important to him, that Julius Robinson does not value life appropriately. (sentencing phase, vol. 23: 107)

The theory of the defense at capital sentencing, by contrast, is typically that the defendant's choices in the capital offense were limited, shaped, and arose from the interaction of damaging and impairing bio-psycho-social factors and experiences. Unfortunately, Mr. Robinson's defense not only failed to provide an explanation of moral culpability or how the jury was to weigh the mitigating developmental factors, but also failed to either present or explain the relevance of the damaging developmental experiences that impacted on Mr. Robinson's development.

## Section 2: Mitigating Factors

*Failure to present or explain the relevance of damaging developmental experiences:*

Apparently from a failure to investigate, Mr. Robinson's defense failed to identify the numerous damaging developmental factors present in Julius' background, and/or articulate these factors and the supporting evidence of them. By failing to identify and provide evidence of such factors, the defense effectively put almost no mitigation before the jury.
It is not surprising, then, that the jury would find Julius' level of moral culpability to be death-worthy.

*DOJ risk and protective factors in Julius' background:*

To initially illustrate that the failure of the defense to clearly identify mitigating factors in Mr. Robinson's background was not a result of a paucity of relevant developmental features, his developmental experience will be examined through the lens of research sponsored by the U.S. Department of Justice regarding the precursors of serious and chronic delinquency as well as youth violence. Risk factors and protective factors as specified by the U.S. Department of Justice (1995) are listed below. Risk and protective

12

## Exhibit 1 - 12

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

factors that were present in Mr. Robinson's history are placed in *italics*. Inspection of these factors in light of Mr. Robinson's history reveals that Mr. Robinson had numerous risk factors identified by the U.S. Department of Justice as having cumulative impact in leading to chronic delinquency and youth violence; and few of the protective factors.

## U.S. Department of Justice Risk Factors (1995)

Conception to age 6

*Perinatal difficulties*
Minor physical abnormalities
*Brain damage*
*Family history of criminal behavior and substance abuse*
*Family management problems*
*Family conflict*
*Parental attitudes favorable toward, and parental involvement in, crime and substance abuse (alcohol abuse of parent figures)*

*(Julius had 6 of 7 of the above risk factors)*

Age 6 through adolescence

*Extreme economic deprivation*
*Community disorganization and low neighborhood attachment*
*Transitions and mobility*
*Availability of firearms*
*Media portrayals of violence*
*Family management problems*
*Family conflict*
*Parental attitudes favorable toward, and parental involvement in, crime and substance abuse*
*Early and persistent antisocial behavior*
Academic failure
Lack of commitment to school
Alienation and rebelliousness
*Association with peers who engage in delinquency and violence*
*Favorable attitudes towards delinquent and violent behaviors*
Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

*(Note: Julius had 11 of 15 of the above risk factors)*

13

## Exhibit 1 - 13

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

### U.S. Department of Justice risk factors for delinquency and violence
### (Hawkins et al., 2000)

Individual factors

Hyperactivity, concentration problems, restlessness, and risk taking (x 2 – 5)
Aggressiveness (x 1.5 – 6)
Early initiation of violent behavior (x 6)
*Involvement in other forms of antisocial behavior*
*Beliefs and attitudes favorable to deviant or antisocial behavior*

Family factors

*Parental criminality (x 0 – 3.8)*
*Child maltreatment*
*Poor family management practices (x 2)*
*Low levels of parental involvement*
*Poor family bonding and family conflict*
*Residential mobility (±)*
*Parental attitudes favorable to substance abuse and violence (x 2)*
*Parent-child separation*

School factors

*Academic failure*
Low bonding to school
Truancy and dropping out of school
Frequent school transitions
*High delinquency rate schools*

Peer-related factors

Delinquent siblings
*Delinquent peers*
*Gang membership (x 3-4)*

Community and neighborhood factors

*Poverty (x 2)*
*Community disorganization (crime, drug-selling, gangs, poor housing)*
*Availability of drugs and firearms*
*Neighborhood adults involved in crime*
*Exposure to violence and racial prejudice*

Situational factors

14

**Exhibit 1 - 14**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## U.S. Department of Justice Protective Factors (1995)

Individual characteristics

Female gender
Intelligence
*Positive social orientation*
Resilient temperament

Social bonding to positive role models

*Family members* (note: very limited and marginal)
Teachers
*Coaches*
Youth leaders
Friends

Other protective factors

Healthy beliefs and clear standards for behavior, including those that promote
    nonviolence and abstinence from drugs.
Effective early interventions

The concentration of risk factors for delinquency and criminal violence in Julius' life would be characterized as *seriously* cumulative at best. Julius had the benefit of few of the protective factors.

In considering the nexus between damaging developmental factors and adverse outcomes in adulthood, it is important to note that everyone need not totally succumb to adverse developmental exposures in order for a "toxic" effect to be implicated. Correspondingly, all similarly situated persons need not commit acts of criminal violence or suffer adverse life outcomes, in order to demonstrate a relationship between background and outcome. The analysis of risk, vulnerabilities, and protective factors in the etiology of criminal violence and other adverse life outcomes is quite similar to explanations of why some individuals contract cancer and others do not (i.e. carcinogen exposure, predisposing factors, and protective factors). All of the children growing up in a neighborhood built on top of a toxic waste dump do not get cancer – rather these children as a group experience a markedly increased incidence of cancer as compared to more benign settings. Similarly, only 20% of heavy smokers eventually suffer from lung cancer – yet the role of this exposure in these cancers is well-established. A history of adverse developmental experiences does not invariably result in a criminally violent or markedly impaired adult outcome – only a much increased likelihood of it.

15

**Exhibit 1 - 15**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

*Developmental factors that could have been brought to the attention of the jury:*

A *significantly expanded* discussion *of a number of contributing developmental* factors experienced by Julius Robinson, as well as their history and implications are described in the paragraphs that follow. In this section Mr. Robinson will be referred to as Julius as this reduces the likelihood of confusing him with other male relatives, and most accurately reflects his child status at the occurrence of these factors. Adverse developmental factors that will receive this expanded treatment are listed below:

## *Wiring*

Prenatal drug and alcohol exposure
Recurrent exposure to herbicides and pesticides
Neuropsychological deficits
Learning problems
Teen onset alcohol abuse and subsequent dependence
Youthfulness at the outset of delinquency and gang activity

## *Generational Influences*

Generational family dysfunction
Genetic predisposition to alcohol and drug dependence

## *Parenting*

Teenage mother
Mother exhibited indications of sub-average intelligence
Alcohol and drug dependence of both parents
Parental drug trafficking
Disrupted and inadequate primary attachment
Observed domestic violence
Parental emotional neglect
Functional parental abandonment
Death of surrogate parent figure
Potential sexual abuse
Instability in family structure and residence
Inadequate supervision and discipline

16

**Exhibit 1 - 16**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## *Family and Community*

**Legacy of racial prejudice and discrimination**
**Systemic economic hardship and social desperation among Blacks in**
    **Dermott**
**Corruptive family and older peer influences**
**Corruptive community influences and gang recruitment**
**Teen recruitment into drug dealing**
**Inadequate interventions**

All of the above contributing factors were present in Julius' life. Testimony that could have been provided the jury at Julius Robinson's sentencing phase to illustrate these factors, and scholarly perspectives on their implications for adverse and criminally violent outcome will be detailed in the sections that follow.

## *Wiring*

**Prenatal drug and alcohol exposure:** Both Julius' father and a family friend described Rose substance abuse during her pregnancy with Julius. Jimmie Lee Robinson, Julius' father described:

> During the pregnancy with Julius, Rose drank a minimum of two to three beers per day and smoked a half an ounce of marijuana, around twelve joints, every day. We would get drunk, smoke marijuana and get into huge fights. Our arguing and physical fights were so constant that Miss Sarah took Marcus [older brother of Julius] and went to stay with some friends who lived across the way. There was one incident that occurred when Rose was pregnant with Julius that I recall. We were riding in the car, both of us were drunk or high, or both, and we got into one of our arguments.

> ....While she was pregnant with Julius and after she gave birth, Rose held "Soap Opera" parties at our home. Ten or twelve women would get together at our house from noon to four o'clock and watch television, drink and smoke marijuana, while Rose tended to the customers who dropped by the house to buy drugs....I don't know for a fact that Rose used cocaine when she was pregnant with Julius, she probably did because of the money she was spending, but she certainly used it right after he was born....Rose thought there was nothing wrong with drinking while she was pregnant. I brought it up once. She claimed Margaret [Rose's mother] drank while she was pregnant, and that there was nothing wrong with it. (declaration of Jimmie Lee Robinson)

Beotha Moore, family friend and neighbor in Dermott, did not observe Rose abusing illicit drugs during her pregnancy with Julius, but did observe Rose drinking during this pregnancy. Ms. Moore described:

17

**Exhibit 1 - 17**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> I saw Rose when she came to Dermott and was pregnant with her second son, Julius Robinson. While she was pregnant with Julius, I saw her drinking beer and smoking cigarettes. Although I believe it was early in her pregnancy, her pregnancy showed. I know Rose knew she was pregnant because she told me. Rose was drinking beer at least every weekend. (declaration of Beotha Morre, 11-10-05)

**Implications of prenatal drug and alcohol exposure:** Alcohol has a well-established teratogenic impact on a developing embryo and fetus in utero. The extent of this toxic effect is dependent on the timing, frequency, and extent of the maternal alcohol consumption during pregnancy (Day & Richardson, 1991; Mattson & Riley, 1998). As research on the damaging effects of alcohol on fetal brain development has progressed over the last several decades, the threshold of concern regarding the degree of alcohol exposure that is "toxic" in utero evolved from fetal alcohol syndrome, to fetal alcohol effects, to fetal alcohol exposure. Julius' alcohol exposures in utero would be considered profound in both amount and chronicity. According to the National Institute on Alcohol Abuse and Alcoholism (2000) prenatal exposure to alcohol is associated with the following brain-related deficits:

*Verbal Learning*
- Problems with language and memory, particularly with encoding verbal information

*Visual-Spatial Learning*
- Perform poorly on tasks that involve learning spatial relationships among objects.

*Attention*
- Attention problems are a hallmark of prenatal alcohol exposure.

*Reaction Time*
- Longer reaction times; slower, less efficient information processing.

*Executive Functions*
- Important deficits in executive functions (i.e., activities that require abstract thinking, such as planning and organizing).
- Difficulty abandoning ineffective strategies when approaching problem-solving tasks, a type of behavioral inflexibility referred to as perseveration.
- Distractibility and impulsivity – contributing to attention and learning problems.

A number of these are implicated in the pattern of neuropsychological deficits, learning disabilities, and attention-related problems exhibited by Julius.

**Recurrent exposure to herbicides and pesticides:** Julius and his older brother Marcus were repeatedly exposed to aerial herbicides and pesticides as children. Marcus described:

18

**Exhibit 1 - 18**

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

> Julius and I played in the fields behind my grandparent's house all the time when we were kids. During the summer, we played ball there with our cousins or flew kites. Soybeans and cotton was grown there and during certain times of the year, especially in the summer, a crop duster sprayed pesticides on the fields. They sprayed at least three times a week. We would be playing out there and they sprayed right on top of us. (declaration of Marcus Jwain Robinson, 11-13-05)

Consistent with this report, maternal aunt Mildred Holliman described:

> Both my parents and my houses on Deer Street were backed by fields. Those fields were farmed by Bob Green. He grew soy beans. Bob Green would spray the fields. The kids would be playing outside in the fields and would get sprayed on. No one thought to come inside. (declaration of Mildred Holliman, 10-22-05)

As with many aspects of life in Dermott, this casual approach to direct exposure of children and other persons with agricultural chemicals had a long legacy. Julius' father described regarding his own childhood:

> I worked in the fields when I was around eight years old, picking cotton, beans and tomatoes....There were planes, crop dusters, dropping pesticides on the fields during harvest season. One could smell, feel and see the pesticides. The whole town was also sprayed for insects, mainly mosquitos. There were fields planted with cotton and soy beans in back of the Hollimans and my mother's house. My uncle Hoss had a cotton field directly behind my mother's house on Deere Street. Across the street, he planted corn. All of the neighborhood kids played in the crop fields when I was a child and when Marcus and Julius were kids. I saw my boys playing there. This is just what Dermott kids did and probably still do. (declaration of Jimmie Lee Robinson)

**Implications of exposure to herbicides and pesticides:** The effects of chronic exposure to organophosphate pesticides were summarized by Stephen K. Martin, Ph.D., neuropsychologist: "Research has demonstrated that chronic exposure to organophosphate pesticides and have negative behavioral effects involving learning capacity as well as other cognitive abilities" (declaration of Stephen K. Martin, Ph.D.)

**Neuropsychological deficits:** On the basis of his November 2005 neuropsychological evaluation, Dr. Martin summarized that Julius demonstrated the following deficits:

> More specifically, he [Julius] demonstrated mild deficits involving aspects of language including word finding problems, low average verbal recall for contextual information, mild constructional dyspraxia, as well as subtle deficits involving sustained auditory attention and mental flexibility. He also demonstrated mild to moderate bilateral impairment on a measure assessing simple motor skills. (declaration of Stephen K. Martin, Ph.D.)

19

**Exhibit 1 - 19**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Implications of neuropsychological deficits:** The presence of brain dysfunction is a risk factor for multiple adverse outcomes which may increase the likelihood of criminal conduct or violent offense. These adverse effects include academic frustration and failure, impulsivity, judgment deficits, emotional dyscontrol, and behavioral disturbance. Further, there is a growing body of psychological, psychiatric, and neurological literature which identifies that brain damage is present in disproportionately high incidence among violent offenders.

Lewis et al. (1986) in a study of 15 death row inmates identified that all 15 had histories of severe head injury.

Langevin et al., (1987) found neuropsychological variables to be significant in one fifth to one quarter of violent offenders and found that 1 in 3 killers exhibited clinically significant neuropsychological impairment.

Elliott (1987) stated: "Over the past twenty years it has become increasingly evident that overt and covert neurological and neuropsychological impairments are far more common in recurrently violent individuals than in non-violent populations."

Martell (1992) in a study of 50 randomly selected mentally disordered offenders found at least one indicator of potential brain dysfunction in 84% of the subjects. In those subjects in which an organic brain disorder was diagnosed, 75% have been charged with murder, manslaughter, or attempted murder. The remaining 25% had been charged with violent sex offenses.

Blake et al. (1995) reviewed the medical records of 31 individuals awaiting trial or sentencing for murder and found abnormal EEG's in 8 of 20 subjects, abnormal MRI's in 9 of 19, evidence of frontal lobe dysfunction in 64%, and evidence of temporal lobe dysfunction in 29% of the subjects. These references are by no means exhaustive of the literature on this subject.

There is additional research regarding the interactive effect of intoxication and brain dysfunction in the occurrence of aggressive conduct. This is particularly relevant, given the potential of Darrel's intoxication associated with one or both of the murders he has been convicted of. Hoaken, Assaad, and Pihl (1998) described that while individuals with intact brain functioning are able to inhibit the aggressive impulses that often accompany intoxication, brain impaired individuals may experience inhibition failure – with associated increased likelihood of violent conduct. Obviously, the combination of brain dysfunction, psychiatric disorders, and intoxication would present particularly problematic challenges to impulse control.

**Learning problems:** Julius' literacy problems persisted into his adulthood. When assessed by Stephen K. Martin, Ph.D., neuropsychologist, in early November 2005, Julius obtained the following grade equivalent scores on the Wide Range Achievement Test – Third Edition (WRAT-3): Reading – 7th grade, Spelling – 4th grade, and Arithmetic – 6th grade. These are

20

**Exhibit 1 - 20**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

well below the performance expected from his performance on intellectual assessment. Also consistent with a learning disability were "evidence of dsynomia, spelling apraxia and central dysarthia" (declaration of Stephen K. Martin, Ph.D.). Dr. Martin reported that Julius has exhibited variable school performance. He described Julius' self-report of having had longstanding problems with concentration and distractibility, as well as having had to work harder for his grades than other students in school.

Ms. Jamila Camp, former girlfriend, also observed Julius' literacy deficits and behaviors consistent with verbal processing deficits:

> When we were dating I used to tease Julius about his writing skills. His spelling was terrible, and sometimes he would word his sentences in a way you couldn't understand them. I used to say: What are you, dyslexic? From time to time, he would have the same trouble speaking. I had a hard time figuring what he was talking about. The problem would show up mostly in his writing. His letters were often difficult to figure out. (declaration of Jamila Camp, 11-10-05)

Julius' learning problems and associated deficient literacy do not appear to have been the result of chronic poor motivation. One of his alternative high school teachers described:

> I was Julius Robinson's twelfth grade Informal Geometry teacher at Venture School…Venture School is an Arlington School District alternative school for students who are at least one semester behind in their course work. It is not a school for students who present disciplinary problems. Most students at Venture are academically challenged. I was impressed with Julius' attitude. Julius never let his lack of knowledge sour him. He was always open to learning, and though he wanted to move on and get his high school requirements completed, Julius was never disdainful. Julius was not just killing time at school, he wanted his diploma. (declaration of Andrew Hagman)

Carol Williams who taught Julius as a high school also reported his struggling academically:

> Julius was not a strong academic student as is borne out by his transcripts. In reviewing his records, I notice that he had to repeat classes in summer school, indicated by the letter "R." The "M"s in the transcript refer to courses in which the material is modified for the student who has difficulties. These modifications provide the student with opportunities for passing the class. (declaration of Carol Williams, 11-18-05)

**Implications of learning problems:** The chronic frustration and failure associated with learning disabilities result in these deficits being a strong risk factor for disruptive school behavior and eventual dropout. This latter risk was realized in Julius' life. The literacy deficits exhibited by Julius in adulthood would have certainly acted to restrict the career opportunities open to him.

21

**Exhibit 1 - 21**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Teen onset alcohol abuse and subsequent dependence:**  In his interviews with federal habeas investigators, Julius reported that "Miss Sarah," who had reared his mother and was involved in providing care to Julius during his childhood, gave him his first beer when he was about 7 or 8 years old. This account is consistent with Miss Sarah's earlier liaise faire approach to limit setting regarding the context of Julius' father courting Rose as a mid-teen. When he was 11 or 12, Julius reported that he got drunk for the first time. Julius recalled becoming quite ill and vomiting on that occasion. Subsequently, Julius and his friends would pool their money together and get "some drunk" who was hanging out at the liquor store to buy them beer.  He frequently drank a 40 oz. or more of beer on these occasions.  Julius described that in time the beer was replaced by increasing amounts of cognac. He reported that from 1998 until he was locked up, he drank approximately a fifth of cognac per day.

**Implications of teen onset alcohol abuse and subsequent dependence:** Primary risk factors for alcohol and/or drug dependence include genetic predisposition, modeling of substance abuse, developmental trauma, and Attention Deficit Hyperactivity Disorder. All but the latter of these risk factors were present in Julius' history.

Susceptibility to alcohol and drug dependence:

*Genetic predispositions:* As will be described in a subsequent section, there is a pattern of extensive substance abuse and dependence among members of both his paternal and maternal family systems.  Also as will be described in a subsequent section, the presence of this genetic predisposition in his family history had significant implications for Julius' risk of substance abuse and dependence.

*Modeling:* Julius' family background involved routine modeling of alcohol abuse by his father, mother, brother, and extended family.

*Developmental trauma:*  Developmental trauma is implicated by Julius' history of parental substance dependence, observed parental violence, parental neglect and disrupted primary attachment, parental abandonment, death of his paternal grandmother, potential sexual abuse, and other developmental emotional injuries. Among individuals with histories of developmental trauma, substance abuse can be conceptualized as an attempt at analgesic self-medication of the associated anxiety spectrum symptoms.

*Inadequate supervision:* The poor supervision that Julius received in the households of his maternal grandparents and his mother will be detailed in a subsequent section. Quite obviously, the parental supervision of Julius was deficient as he was able to maintain a routine pattern of heavy alcohol abuse as a minor. The absence of effective parental supervision or limit setting during adolescence is a further risk factor for alcohol and substance dependence. With three of four primary substance abuse risk factors present, as

22

**Exhibit 1 - 22**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

well as inadequate supervision, Julius was at markedly increased risk to initiate a pattern of alcohol and substance dependence in early adolescence.

Effect of substance dependence on development:

Julius' choice to begin substance abuse was made as an immature early adolescent with the deficient reasoning and judgment that accompanies that developmental stage, as well as without the support of a stable, effective, sober, supportive family network. The resultant substance dependence impeded further gains in maturity. Substance dependence in adolescence significantly disrupts and blocks the developmental tasks of this stage including growth in maturity and coping capabilities, adaptive socialization, and responsible achievement.

Relationship of substance abuse and dependence to criminality and violence:

*Intoxication and violence:* Substance abuse and dependence may be implicated in criminally violent conduct in several ways. First, in the face of his routine consumption of a fifth of liquor daily, there is an increased likelihood that Julius was intoxicated and/or under the influence at the time of some or all of the capital offenses. Such intoxication or alcohol-related effects would represent a risk factor for violence in the community and have a nexus to his involvement in the capital offenses of conviction. To explain, a number of research studies identify a frequent intersection of alcohol/substance abuse and criminal violence. Murdock et al. (1990) reviewed 26 studies from 11 countries involving 9,000 crimes: 62% of violent offenders were drinking at the time of the crime. Beck et al. (1993) found that 52% of homicide offenders were under the influence of alcohol and/or drugs at the time of the homicide. Gustafson (1993) reviewed experiments of alcohol-related aggressive responding, concluding that intoxication results in increased perception of threat, the predominance of frustration / threat increases aggression when intoxicated. Gustafson explained that the perceptual experience of intoxicated individuals results in a focus on frustration and threat cues to the exclusion of broader perceptions. Added to that, Gustafson observed that intoxicated individuals are more responsive to peer pressure,

*Substance dependence and violence:* The presence of substance dependence, even apart from acute intoxication, is also a substantial risk factor for violence in the community. Research on incarcerated homicide offenders, collected and reported by the U.S. Department of Justice (Greenfeld, 1998), found that 32% of state prison inmates convicted of homicide had had a pattern of daily drinking. Swanson et al. (1990) reported on the interviews of 7000 community respondents in Durham and Los Angeles: alcohol abuse / dependence was associated with an 11-fold greater incidence of violent behavior (one year prevalence 2.28% vs. 23.62%); similar findings were reported for substance abuse; and an adverse combined effect was observed if a co-morbid psychological disorder was present. Such co-morbid psychological disorders were present in Julius.

23

**Exhibit 1 - 23**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

*Broad impacts of substance dependence:* In examining the effects of substance dependence and/or acute intoxication on the etiology of a criminally violent act, it is not so simple as a dichotomy of being either acutely intoxicated on one hand or completely unaffected on the other. Instead, there is a continuum of the extent to which substance dependence and intoxication undermine the quality of personality and cognitive processes, with associated resentment, projection of blame, inappropriate emotional reactions, poor behavioral control, poor judgment, impaired capacity to consider alternatives, and poor planning. Thus it not necessary for someone to be staggeringly intoxicated before their judgment is impaired by substance abuse – particularly chronic substance abuse.

This is part of the rationale of the random drug testing of individuals in critical occupations - even though they show no overt evidence of intoxication. In other words, substance abuse/dependence can significantly affect the quality of judgment and behavioral responses though the individual is still capable of purposeful behavior and may not overtly appear to be under the influence. Further, substance dependence undermines the quality of judgment apart from episodes of intoxication. This is why recovery from substance dependence involves so much more than simply no longer abusing the substance. Rather Alcoholics Anonymous and other treatment efforts are typically necessary to restore adaptive perspectives regarding self and others, to develop healthy coping resources, to assume greater personal responsibility, and to establish psychological maturity. Thus as individuals in recovery from substance dependence reflect on their period of active abuse, they describe not only the behaviors associated with acute intoxication, but also the "stinking thinking" that typified their broader life decisions and interpersonal behaviors.

Thus, it was not necessary for Julius to have been intoxicated at the time of the capital offenses for his longstanding alcohol dependence to impact on his judgment, impulse control, and aggressiveness. Alcohol intoxication and dependency effects are also an potential explanation for why Julius' behavior might vary so widely in its aggressiveness.

**Youthfulness at the outset of delinquency and gang activity:** As will be described in a later section, Julius became involved in gang activity and associated delinquency in early adolescence.

**Implications of youthfulness at the outset of delinquency and gang activity:** Julius' teenage status at the time he began the gang and criminal activity trajectory that culminated in the capital offenses is important to an informed perspective regarding this teen activity. Unfortunately, there was no evidence presented at sentencing regarding the implications of his developmental immaturity. Adolescent immaturity has a clear neuro-developmental basis. To explain, brain development of the frontal lobes continues into the early twenties.

> …it is now known that mylenization of the frontal cortex and the reduction in the number of synaptic contacts (i.e. synaptic pruning) continues into this period. There is also a change in the brain's electrical activity. The transition from predominantly

24

**Exhibit 1 - 24**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

low-frequency waves seen in children to the characteristic alpha rhythms of adults occurs during the period of adolescence. (Looney & Oldham, 1989)

Executive functions associated with frontal lobe functioning include insight, judgment, impulse control, frustration tolerance, recognition and appreciation of the emotional reactions of others, and recognition of consequences. Significant age related growth in these capabilities, conventionally referred to as "maturing" or "growing up," occurs even between the ages of 18 and 22 in all individuals. While the age-related endpoint of adolescence varies by function or role, neurologically it can be considered to continue through this full frontal lobe mylenization in the early to mid-twenties. All individuals less than 22 years old are thus "immature" in brain development and in relation to adults. This neurological immaturity is reflected in limitations in psychological functioning and behavioral control, and accounts for the poor decision-making and poor impulse control often observed in adolescents, even in their late teens.

Compounding the judgment and behavior control problems associated with frontal lobe immaturity, the adolescent male brain is experiencing markedly rising levels of testosterone, and subject to the aggression-inducing effects of this hormone. At the same time, physical development is rapidly proceeding, psychosocial roles are changing, and identity is being transformed.

Additionally, adolescence is also characterized by egocentric perceptions of self-uniqueness, with an associated "personal fable" that the risks and consequences that might befall others do not apply to them. These classically adolescent perspectives explain the involvement of teens in high risk and even illegal activities, and their deficits in identifying and empathizing with others. The almost irresistible striving for independence among adolescents, combined with their continuing perception of themselves as children rather than adults, interferes with their accepting behavioral direction, identifying with the collective community, or perceiving any sense of responsibility for upholding collective moral values. In other words, an adolescent is unable to see beyond his own world, his personal perceptions, and/or his own need to be separate sufficiently to experience a sense of moral responsibility to his community.

Thus an immature brain is confronted with the additional psychological instability of significant hormonal, interpersonal, and identity upheaval – at times with disastrous behavioral results. As Esman (1988) summarized:

> The young person traversing this phase is confronted by a number of crucial developmental "tasks" requiring major adaptations in many aspects of life….It is not an easy time, and a fair number of adolescents do succumb to the stresses of the phase or to the predisposition they bring with them from their earlier years and experience of significant psychopathology. (p. 219)

Accordingly, our society broadly regards 18 year olds as still in need of some social restriction, as reflected in age for alcohol purchasing. Further, in most families, 18 year olds

25

**Exhibit 1 - 25**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

are still receiving some degree of financial and emotional support, as well as guidance. Their insufficient capacity for fully adult roles is also reflected in their deficient ability to adhere to the requirements of the law – particularly when outside of effective adult supervision for extended periods of time. To explain, adherence to the law among adults variously stems from effective impulse control, a realistic appraisal of apprehension, a recognition of long-term consequences to personal outcome, identification and empathy with potential victims, a clear identity as a law-abiding and/or moral individual, a sense of obligation to family and others, an identification with the community, an appreciation of the collective good, and/or a mature commitment to a religious or ethical belief system. Quite simply, teens lack the mental capability and psychological development to effectively exercise any of these characteristics, and thus are unable to act with the same level of moral culpability as adults.

Corroborative research findings formed the basis for a brief of the American Society for Adolescent Psychiatry and the American Orthopsychiatric Association filed as an *amici curiae* in *Thompson v Oklahoma* (1986) in the U.S. Supreme Court. Though commenting on the status of 16-17 year olds, these observations apply to some degree to teens closer to age 20. Regarding characteristics of adolescence confirmed by research, the brief summarized:

> …adolescents tend to be less mature, more impulsive, and less capable of controlling their conduct and thinking in terms of long-range consequences. Adolescence is a stage of human development in which one's character and moral judgment are incomplete and still undergoing formation. (p. 2)

> Psychiatrists, psychologists, and other child development experts recognize that adolescence is a transitional period between childhood and adulthood in which young people are still developing the cognitive ability, judgment and fully formed identity or character of adults. (p. 267)

Beyond the typical immaturity in cognitive capability, judgment, impulse control, modulation of emotion, and moral development, there is reason to believe that Julius was even more psychologically *immature* as a teen than most of his age mates. There are two lines of evidence supporting this assertion.

1.  The neuropsychological deficits and learning problems exhibited by Julius point to mild nervous system dysfunction that would serve to reduce the effectiveness of cognitive processes associated with "maturity."

2.  The adverse developmental factors in Julius' childhood would act to delay functional emotional maturity. This factors associated with this disrupted developmental trajectory are detailed in subsequent sections of this affidavit.

Regarding this second factor, Julius' insight regarding the impact of childhood deprivations as communicated to his then girlfriend, Jamila Camp, was mistaken. Jamila described:

> Julius told me that when he was a child, he and his brother got left with other people

26

**Exhibit 1 - 26**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

a lot. It forced Julius to grow up quickly. He matured faster, and better, than his brother, Marcus. (declaration of Jamila Camp, 11-10-05)

In reality, the premature assumption of self-responsibility does not result in an individual who is emotionally healthier or more mature. If such were the case, we would neglect and deprive our own children so as to create this advantage. Rather, neglect and trauma in childhood may produce a sort of pseudo-maturity that masks a fundamentally damaged or fractured core.

It should also be noted that engaging in delinquent activities and gang activity does not indicate that a teen is more psychologically or developmentally mature than his age would otherwise indicate.

The relevance of youthfulness to risk of criminality and violence in the community does not end with the teen years, rather peaks in the early twenties and then progressively falls across the later twenties, thirties, forties, and fifties. This trend is one of the most well-established in the field of criminality. Hirschi and Gottfredson (1989) presented arrest record data from an English cohort in 1842-1844 and a 1977 U.S. Department of Justice annual crime report which demonstrated almost identical and dramatically disproportionate over-representation of younger offenders (twenties). Miller, Dinitz, and Conrad (1982) reported similar decreasing incidences of arrest for aging cohorts after age 30 when tracking incidence of murder, rape, or robbery. Swanson, Holzer, Granju, and Jono (1990) described NIMH Epidemiologic Catchment Area data which found a marked progressive reduction in rates of community violence among successively older community members. This community data on preceding year prevalence of violent behavior by age is quite relevant to base rate estimates in risk assessments as demonstrated by findings for males shown in the graph below.  These data on community violence and age parallel the historic age-arrest relationship described by Hirschi and Gottfredson.

27

**Exhibit 1 - 27**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05



*Swanson et al.: Community prevalence of violent behavior by age*

This graph demonstrates that a male between the ages of 18-29 is 73 times more likely to commit an act of violence in the community in any given year than a male over age 65.

## *Generational Influences*

**Generational family dysfunction:** Julius was the product of a family system that had been significantly dysfunctional for generations. Discovering this multi-generational family history required no more than interviewing Julius' parents and extended family regarding their family history. Had the defense conducted an adequate investigation, it would have discovered the following:

*Paternal family*

Julius' paternal great grandfather was described as a "bad alcoholic" who "beat his children mercilessly." Julius' paternal grandfather, Eddie Robison, was particularly targeted for this abuse. The paternal grandfather was also described as being involved in criminal activity, as he "made, sold, and delivered moonshine" (declaration of Jimmie Lee Robinson). Julius' paternal grandparents were Eddie and Bertha Scales Robinson. Like his father, Eddie was an

28

**Exhibit 1 - 28**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

alcoholic who was routinely violent when intoxicated. Jimmie Lee Robinson, Julius' father, described:

> My father was a hard working man who was an alcoholic and loved to fight, according to my mother. He was the foreman at Bynant Farms for ten years prior to leaving Dermott. He and his farm crew worked in the fields from Monday to Saturday noon. It was customary for the men to then pick their families after they got off work and, with their earnings, head to the store to do their weekly shopping for staples. The store was owned by Mr. Bynant's brother. After shopping, my father would head to the local café in the black side of town for his weekend ritual: spending the rest of his wages and drinking moonshine until he was completely drunk. Inevitably, fights would break out, and my father was involved more often than not. At the close of the evening, someone would usually put my father in back of a pick-up truck and he would be tossed out at our front yard. Sometimes he slept off his drunkenness outside on the yard. Other times, he made it inside the house and slept all of Sunday. On Monday, he was back at his job.

Julius' paternal grandmother, Bertha Scales Robinson, was paralyzed from a gunshot wound. Jimmie, Julius' father, described this injury occurring under questionable circumstances:

> My mother was paralyzed from a shot fired from my father's rifle. The incident was described to me by my mother as having been an accident, something about the loaded rifle leaning against the wall and discharging when some thunder shook the house and the weapon fell. This is different from other renditions of what happened. It is possible that my mother didn't want to tell me the harder things about my father so as not to tarnish my image of him. (declaration of Jimmie Lee Robinson)

Marcus, Julius' older brother, had heard a different version of this shooting incident. He described:

> I heard from the family that my grandfather, who I never met, shot her accidentally when he was cleaning his gun. That never made any sense to me, why would he be cleaning his gun with bullets in it? (declaration of Marcus Jwain Robinson, 11-13-05)

Eddie abandoned his wife and children when Jimmie, Julius' father, was in middle childhood. Jimmie described:

> The last time I saw my father was when I was eight or nine years old. My father left for the Bellglade/Orlando area to work on the citrus harvest and never returned. (declaration of Jimmie Lee Robinson)

While Jimmie graduated from high school and enlisted in the military, he acknowledged that by early adulthood his life reflected familiar aspects of his family legacy. He was addicted to

29

**Exhibit 1 - 29**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

drugs and alcohol, trafficked in illicit drugs, was domestically violent, and functionally abandoned his children (declaration of Jimmie Lee Robinson).

Willie White, Jimmie's half-brother, has been treated for depression. Willie has six children: Rodney, Michael, Derrick, LaTasha, and Ashley. Rodney and Michael have criminal records for drug-related offenses. Rodney has a history of alcohol abuse, and fathered a child at age 17.

*Maternal family*

Margaret, Julius' maternal grandmother, had her first child, Roosevelt, by Jessie Ford. Her subsequent eight children, including Rose Hollimon, Julius' mother, were by John Hollimon. The Hollimon family "were known as hardworking people but also known for their partying" (declaration of Jimmie Lee Robinson). John Hollimon attended school to the 4th grade. He became blind as an adult. Margaret only attended school to the third grade. While she can recognize some letters of the alphabet, she is unable to read or write (declaration of Josephine Dotson, 9-18-05). John also drank abusively. His son (Julius' maternal uncle) described:

> When I was very little, my dad would go down the street to be with his friends. They would hang out and drink. My dad would bring me with him. He drank whiskey and most of his friends drank beer. He always bought me a soda pop. My dad would get drunk and then it was my job to guide him home. When we got home, my mom would be mad and they would argue. After 15 or 20 minutes of argument, my dad would go to bed. (declaration of Milton Holliman, 10-21-05)

Josephine Dotson also described her father's drunkenness:

> Before we started going to church, my daddy [John Hollimon] used to drink. He would go off with his friends on the weekends and drink whiskey. Sometimes, my mother would have to send me and by [sic] brother or sister to go get him. We had to hold him up and sometimes, he was so drunk, he fell over into the ditch. When he would come home late, he and my mother would argue. He never did hit her, though, because he was blind and my mother could get out of the way. (declaration of Josephine Dotson, 9-18-05)

The marriage of John and Margaret was also marred by his jealousy and possessiveness. Ms. Dotson explained:

> My father was very jealous. He wouldn't let my mother go anywhere without him, except when she went to the fields with us. If she wanted to go to the store, she had to go with him. (declaration of Josephine Dotson, 9-18-05)

The household of John and Margaret was chaotic and characterized by inconsistent parental involvement.

30

**Exhibit 1 - 30**

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

> The mother [Julius' maternal grandmother], Margaret, was a little lax in her disciplining and the father was blind. The Hollimon children ruled the household, and there were always barbeques in their backyard with lots of drinking and music. The eldest sister, Marjorie, was the one who actually reared the kids, except for Rose who lived with a lady named Miss Sarah. (declaration of Jimmie Lee Robinson)

As noted above, from age four Rose was reared by a neighbor, Sarah "Miss Sarah" Pittman, who was also illiterate and lived next door to John and Margaret (declaration of John Hollimon, Jr., 11-13-05). Rose's placement out of the home, particularly in light of other children in the home being reared by a sibling, raises the specter of emotional neglect and disrupted attachment in Rose's own childhood.

Rose's emotional development was adversely impacted by being sexually abused by one of her school teachers. Her sister, Josephine, described:

> My sister, Rose, did pretty good in school until she started having an affair with one of her teachers, Charles Carr. My parents went to the school board to complain about this, but then Rose denied having relations with Mr.Carr, so nothing came of it. Rose started sneaking out of Sarah's house by the window. My dad would have talks with Sarah and he would bring Rose home for a while. Rose would go back to live with Sarah and start right up again, sneaking out. (declaration of Josephine Dotson, 9-18-05)

As the above reflects, Miss Sarah provided inadequate supervision of Rose. Jimmie characterized Rose as a "wild country girl," who was "what would be called easy – she slept around" (declaration of Jimmie Lee Robinson). Jimmie described Miss Sarah as being even more lax in her parenting than Margaret:

> Lax as she may have been, Margaret would require that young men who came courting her daughters stay on the porch. Miss Sarah thought it was all right to visit in the bedroom. (declaration of Jimmie Lee Robinson)

Predictably, Rose became pregnant by Jimmy. As will be illustrated in the sections that follow, Rose demonstrated the reverberations of her family legacy and the unstable parenting that she had received during her childhood in her own adult adjustment. She became drug dependent, promiscuous, and parasitic, as well as neglectful and functionally abandoning in her parenting of her own children.

Rose was not the only one of her siblings to become pregnant as a teenager, drop out of school, or have other problems that are part of the legacy of generational dysfunction. Margorie became pregnant when she was 15-16 years old and dropped out of school. She has had a longstanding dependency on crack cocaine. Margorie has two children, Shirley and Patrick. Shirley has been arrested for drug-related offenses.

31

**Exhibit 1 - 31**