# THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CAUSE NO. 4:00-CR-00260-2 |
| | : | **DEATH PENALTY CASE** |
| vs. | : | |
| | : | Honorable Terry Means |
| JULIUS ROBINSON | : | United States District Judge |

_____

### EXHIBIT NUMBER 1 (PART 2 OF 4, PAGES 32-62)

### SUBMITTED IN SUPPORT OF MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

(Filed Electronically Under the Electronic Filing System Requirements)

_____

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

Josephine, Rose's sister, was pregnant at 17. Josephine has four children: Spyri, Terrence, Reggie, and Josephine. Spyri has a history of spousal abuse, as well as alcohol and marijuana abuse. FBI interviews indicate that he was involved in drug trafficking. Reggie has a history of drug abuse and arrest. Terrence was a member of the Gangster Disciples from his pre-teens, and faced juvenile adjudication for shoplifting, unlawful use of a firearm, and truancy (sentencing phase testimony, vol. 20:59,61-62). Terrence has been involved in drug trafficking and has three drug-related arrests.

Robert, Rose's brother, dropped out of school in 10th grade and had a drinking problem until approximately a year ago. John, Jr., Rose's brother, left school at age 14-15 when he impregnated his girlfriend.

Her sister, Mildred, dropped out of school and had her first child at age 15-16. Mildred has had five children: Kevin, Jana, Tony, Monique, and Cliff. Jana was pregnant at age 12 and dropped out of school. Jana was also a member of the Crips (declaration of Jana Holliman, 10-23-05). Tony began to get into trouble as a juvenile. He has a history of drug abuse and arrest for violent crimes. Monique had a baby at age 14. Cliff dropped out of school and has had problems with drug abuse.

Marcus, Julius' older brother, has also reenacted aspects of the generational family legacy. He acknowledges that he has used marijuana on a daily basis since 7th grade, and is currently a very heavy user (an ounce daily). He has children by two women, and has been in arrears on child support to both. Marcus had an arrest in 1995 for marijuana possession and was a co-defendant in the Nathan Henderson drug conspiracy case.

**Implications of generational family dysfunction:** Family history is critically important to character and background. There are several reasons for this. Some personality characteristics and vulnerabilities are genetically transmitted. Genetic susceptibility to substance abuse and psychological disorder that Julius faced will be discussed in subsequent sections. Other dysfunctional patterns are conveyed by scripts and modeling, as well as by sequential damage from generation to generation.

Family scripts are broad outlines of behavior and life sequence that are conveyed both verbally and more importantly by example in the lives of parents, grandparents, siblings, and extended family. Such scripts in Julius' generational extended family included substance (alcohol) abuse and dependence, violence, irresponsibility, family instability, and emotional neglect or abandonment of children.

Individuals tend to model their behavior after the behavior of family members near them in childhood, whether or not these "role models" are positive. In Julius' multigenerational family system, "role models" presented mixed models. On one hand there were histories of education and employment. At the same time the lives of various models were characterized by substance abuse and dependence, volatile reactions and relationships, irresponsibility, poor sexual boundaries, and/or other deviant processes.

32

**Exhibit 1 - 32**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Maladaptive behaviors, including criminal activity and violence, may also be the result of sequential emotional damage. In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources, and as a result may not parent their own children humanely or effectively. Consistent with this observation, Green (1988) reported that "the childhood history and background of abusing parents include a high frequency of physical abuse and neglect, scapegoating, maternal deprivation, and exploitation" (843). The children of these abusive parents are then in turn emotionally damaged themselves and thus at greater risk for broad adverse adult outcomes including parental abuse and neglect, substance dependence, criminal activity, and violence. Sequential generational neglect is particularly damaging. Because effective emotional regulation, interpersonal relationship capacity, and social functioning throughout life begin with stable secure attachments to a primary parent figure, deficient parental care and attachment results in fundamental damage to the foundations of personality and interpersonal functioning. The problematic effects of early abandonment and disrupted primary parental attachment may not be evident until adolescence or early adulthood.

**Genetic predisposition to alcohol and drug dependence:** As is detailed above, there is an extensive history of alcohol and drug abuse and dependence in Julius' extended family. This includes paternal great-grandfather, paternal grandfather, father, maternal grandfather, maternal uncle, mother, and brother.

**Implications of genetic predisposition to alcohol and drug dependence:** Heredity is the primary risk factor for alcohol and drug dependence. The incidence of alcoholism among first degree relatives of alcoholics is 4-5 times the rate in the general population (Cotton, 1979). Twin and adoption studies across 20 years of research have provided evidence of significant genetic influences on the familial transmission of alcoholism (Schuckit, 1987). A large scale, multidisciplinary study of 2,551 adult male biological relatives of alcoholics involving six research centers across the U.S. reported that two-thirds were heavy drinkers or severely affected alcoholics (Begleiter, 1995).

Consistent with Julius' abuse of alcohol and marijuana, clinical findings point toward a common biological vulnerability to dependence on alcohol and other drugs. Research findings clearly support a uniform theory for a neurochemical basis of alcohol and drug addiction (Miller & Gold, 1993). In a study of 150 cocaine addicts: 90% were alcoholic; half were cannabis dependent; and half had family history of alcoholism (Miller, Gold, & Belkin, 1989). In a study of 82 subjects: there was an 89% chance the cocaine addict was also an alcoholic; and half of the cocaine addicts had a family history of a first or second degree relative with alcoholism (Kosten, Rounsaville, & Kleber, 1987).

## *Parenting*

**Teenage mother:** Rose Hollimon, Julius' mother, was 16 years old when she gave birth to Marcus, and was 18 years old when Julius was born.

33

**Exhibit 1 - 33**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Implications of having a teenage mother:** Mothers who begin childbearing as teenagers place their sons at significant additional risk of criminality. Nagin and Tremblay (1999) reported that the age of the mother at initial childbearing is a key indicator of persistent antisocial behavior among sons whether the target child is first born or later born. The sons of teenage mothers are subject to a number of other developmental and subsequent life outcome risks (see Kids having kids: A Robin Hood Foundation special report on the costs of adolescent childbearing).

- More likely to be low birth weight (x 1.5)*

- Suffer poorer health in childhood but receive only half the level of medical care

- Much less likely to grow up in a family with a father

- Quality of the home is lower in emotional support and cognitive stimulation

- More likely to run away from home (x 2.5)

- Far more likely to be physically abused, abandoned, or neglected (x 2 compared to 20-21 year old mothers)

- 5% end up in foster care

- Do much worse in school. Less likely to be rated "excellent" by teachers (x 2-3)

- More likely to repeat a grade (x 1.5)

- More likely to drop out of school (x 2 – half related to teen mother)

- At age 24 approximately 30% are neither in school nor working (x 1.71 – half related to teen mother)

- Sons of teen mothers are more likely to land in prison (x 2.7 – 19% attributed to teen mother alone)

- Adolescent childbearing alone cost $1 billion annually in prison costs for their sons. Total annual social cost to taxpayers is $29 billion.

*x = odds ratios

**Mother exhibited indications of sub-average intelligence:** Though no records of formal intellectual assessment are available for Rose Hollimon, there are indications that her intellectual functioning was impaired. Her ex-husband and Julius' father described:

34

**Exhibit 1 - 34**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Some of the Hollimons are a little slow. It's very noticeable with Milton and Mildred, the twins. I wouldn't say that Rose was like her twin siblings but there was something off with her that wasn't obvious. She [Rose] seemed to have difficulty doing things differently that [sic] what she was accustomed to doing. For example, if the bundle of dirty clothes she took to the Laundromat was larger than what she usually washed, rather than washing another load, she would only wash the customary amount and bring back the rest unwashed. There was no convincing her to do otherwise – she wouldn't budge. (declaration of Jimmie Lee Robinson)

A conclusion that Rose suffered from some intellectual deficiency is also given some support by the observation of a former teacher:

> Rose Hollimon was in my class for two years. She was a quiet girl in school who stayed to herself. In this day and age Rose would be in Special Education class. The whole Hollimon family has learning problems. She left school when she became pregnant in her mid teens. (declaration of Guffrie Gorins, 10-21-05)

**Implications of mother exhibiting implications of sub-average intelligence:** Julius was faced with the alcohol and drug addictions of his parents, disrupted primary attachment, parental neglect and functional abandonment, observed domestic violence, learning problems, corruptive community, systemic racial prejudice, and other adverse developmental challenges. Accordingly, he required the most capable parenting, guidance, and assistance. The intellectual deficits of his mother would act to limit her ability to provide the understanding, interventions, or ameliorative experiences that Julius required. Rose's intellectual limitations also provide some understanding for her poor family-related decision making and the ensuing chronic domestic conflict, violence, and chaos.

**Alcohol and drug dependence of both parents:** Jimmie and Rose began drinking and drugging heavily before Julius was born. Jimmie described:

> Things between Rose and me started to fall apart when we got to Fort Bragg. Military life was wild. I lost all my principles then. Even before Julius was born, Rose and I had already started having extramarital affairs and partying. Partying meant drinking and doing drugs, mainly smoking marijuana. We lost all control of our lives. Rose went back to her old ways – she was promiscuous – and I didn't restrain myself from sleeping around either…Furthermore, I was drinking heavily, at least two six-packs per day and smoking weed. (declaration of Jimmie Lee Robinson)

Jimmie described Rose as drinking heavily at that time as well. Jimmie also reported that Rose became a heavy cocaine abuser during her pregnancy with Julius or soon after:

> One of the women, a New Yorker, introduced cocaine to the group [a recurring

35

**Exhibit 1 - 35**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Soap Opera party group at Rose's residence], I came to find out some months after Julius was born. I found out when I tried to purchase a car with twelve thousand dollars I thought we had in our bank account. Rather than twelve thousand, we had around eighteen hundred dollars. Rose had been giving me deposit slips but I wasn't aware that she was writing checks to buy drugs and who knows what else. I saw copies of the checks in the bank's microfiche records. Rose told me about what had happened when I confronted her. She said that when the New York woman first brought the cocaine they all chipped in to buy it. After some time, because it was so expensive, Rose was the only one who was paying for it. She had more cash available than the others from the drug sales going on in our place.

Rose continued a lifestyle of alcohol and drug abuse, neglect of her children, and chaotic domestic relationships after the marriage to Jimmie ended. Her brother John Hollimon Jr. described:

> Rose came and stayed with my family in Wichita Falls after she left Jimmie. Her two children stayed with my parents back in Dermott. She lived with us for about a year. She got a job in a nursing home…While she stayed with us, she was drinking and smoking marijuana. She also had several boyfriends during the time she stayed with us. I can remember only one of her boyfriends, Zebidiah Young. He was very rough and violent. One time, I came home and found that he had broken the coffee table and the chandelier was down. (declaration of John Holliman Jr., 11-13-05)

Jimmie reported that after leaving the U.S. Army in 1978 or 1979, he returned to Dermott, Arkansas, and became "a terrible alcoholic, drinking at least a case of beers per day and smoking marijuana" (declaration of Jimmie Lee Robinson). Rose had also returned to Dermott and left Marcus and Julius with her parents, while she lived with her sister, Josephine, and was "drinking and partying."

In 1986, following his divorce from his second wife, Linda, Jimmie reported that he began a 15-year addiction to crack cocaine. He described:

> The year 1986 was the beginning of my addiction to crack cocaine which became my crutch and my death. In 1987, I was arrested for Possession of Drugs. In 1992, I was arrested five times for the same crime. Rather than being sent to prison for so many possession charges, I was identified as an addict and was ordered to participate in a rehabilitation program. In 1994, I participated in a two year recovery program and stayed clean until 1998 when I was picked up again and did a ninety day jail program. I was clean again from 1999 to 2001 then had a six month relapse. In all, I was addicted to crack cocaine for fifteen years. I cannot claim that I am clean and sober because I will occasionally smoke a joint, a marijuana cigarette or drink a beer in social situations but I have not binged. (declaration of Jimmie Lee Robinson)

36

**Exhibit 1 - 36**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Implications of alcohol and drug dependence of both parents:** Alcoholism has a number of adverse impacts on parental functioning. First, as described above, the alcoholism and drug dependence of Julius' mother and father represented a genetic predisposition to alcohol and drug dependence for Julius, as well as affective and other psychological disorders.

Second, alcoholism of the mother increases the risk of fetal alcohol exposure for her children. This has already been described in an earlier section.

Third, parental substance dependence represents corruptive modeling of how to cope with life demands and stresses. A substantial aspect of parental socialization of a child occurs through modeling – as the child absorbs behavior patterns from observing the actions of parents, and subsequently imitates these. When this parental modeling is faulty or corruptive, the patterns that have been instilled from early childhood may wreak substantial havoc in the child's own adult behavior, including substance abuse/dependence.

Fourth, children who grow up in a home characterized by parental substance dependence are at substantially increased risk of psychological injury. Specifically, a parent who is substance dependent is more likely to be emotionally detached – a product of both being under the influence and being preoccupied with drug seeking behavior.

Fifth, the children of a substance abusing parent are more likely to be neglected and inadequately supervised. An alcoholic parent is both more likely to physically or emotionally abuse the children of the household, as well as to fail to protect the children from abuse perpetrated by the other parent of the household. Children in such a home often experience marked inconsistency and unpredictability associated with the wide fluctuations in parental reactions and competency. Rose's brother, John Hollimon Jr., described observations consistent with this risk on occasions of visiting Rose after she had resumed care of Julius in his teen years:

> I came to Arlington several times while Julius was in high school and I stayed with him and my sister, Rose. I was very concerned by what I saw. Rose was drinking and smoking marijuana. Julius was on his own. My sister was not capable of raising up a boy. Julius was more or less taking care of her. On my two visits, Rose was really out of it. She was often drunk. She would go to work and when she came home, she would begin drinking. She drank whiskey then. When she drank, you couldn't talk to her. She has a real temper. I would say to her, Rose, you have been drinking too much and I think you should slow down. She would get really mad at me, yell "don't tell me how to live my life," and walk out, slamming the door. She would be staggering drunk and slurring her words. (declaration of John Hollimon Jr., 11-13-05)

Similarly, Marcus described their mother as routinely intoxicated, verbally aggressive,

37

**Exhibit 1 - 37**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

broadly neglectful in her supervision, and involved with corruptive partners:

> I moved to Arlington in 1994 or 1995. I lived with my mother and brother for about five months. My mother was working as a nurse's aide. When she came home from work she smoked marijuana. She smoked every day. She also drank. When she drank, her speech would become slurred and she would yell. Sometimes she would leave the apartment and sometimes she would just go to bed. I was always amazed that she could get up the next morning and go to work after how much she had been drinking the night before. Sometimes Julius would leave the apartment, also, and sometimes he wasn't even there. My mom had a boyfriend living with her then, a guy named Vernon Ozby, who I knew for a fact was on crack. He wasn't allowed to drive my mother's car so he had me give him a ride and I saw him buy crack. (declaration of Marcus Jwain Robinson, 11-13-05)

Sixth, In the face of the impairment of a substance abusing parent, the children of an alcoholic parent are frequently compelled to assume roles of premature responsibility. Such demands for precocious maturity are not a benign developmental event. This role reversal of the child assuming responsibility for the parent in an adaptation of precocious "maturity" is ultimately damaging to the child – who experiences increased traumatic and corruptive exposures, inadequate parental structure and guidance, chronic anxiety regarding the unpredictability of the home, feelings of incompetence in not being able to prevent the parent from drinking, and rejection at being abandoned to this role of the non-alcoholic parent. This role reversal of the child having to be responsible for both himself and the parent, as well as the ongoing distress in Julius' adulthood of his mother's addiction, were described by Ms. Jamila Camp, former girlfriend:

> Julius loved his mother more than I ever could have, given the circumstances. He was very hurt and embarrassed by her substance abuse and her behavior, but he always tried to include her in his life. He gave her money to move to Ohio, to get a fresh start, and he brought her back to Texas for his birthday party. I remember him getting tense if he saw her with a drink, because she wasn't the kind of person that could have one drink. She would get falling down drunk if he didn't stop her...Julius always needed to be responsible. Because he was forced to grow up early and take care of himself, he developed an attitude of: If I don't do it, it won't get done. He always tried to take care of the needs of his family and friends. (declaration of Jamila Camp, 11-10-05)

Profoundly ambivalent feelings toward both parents are common as the child feels protective on one hand but harbors much anger on the other at the lack of support, the demand to assume responsibilities that rightly belong to the parent, and the loss of childhood. Not uncommonly, these conflicted feelings are evidenced in significant depression, anger, and behavior problems. Marcus, Julius' older brother, described his own conflicted feelings about his mother in the face of her addiction:

38

**Exhibit 1 - 38**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> I was a really angry young man my last years in high school. I felt our mother had abandoned us when we were kids. After spending time with our mother during the summers and seeing her drinking, smoking dope and running around with men, I thought she was just no good. Except for when she woke up in the morning, she was always drunk or high on marijuana or both. Julius would sometimes tell our mother that she needed to stop doing all the drinking and smoking she was doing, but that never changed her. I don't know if Julius was angry like I was because he kept his feelings from showing. (declaration of Marcus Jwain Robinson, 11-13-05)

In summary, parental alcoholism or substance dependence is a broad social/psychological risk factor for relationship problems, self-control deficits and behavior disorders, feelings of defectiveness, psychological disorders, and criminal behavior. This latter association between parental substance abuse, as well as attitudes favorable to substance abuse, and serious violence in adolescence and early adulthood has been confirmed by research reviews sponsored by the U.S. Department of Justice (1995; Hawkins et al., 2000).

**Parental drug trafficking:** Jimmie reported that he and Rose began dealing drugs while he was in the military. He described their trafficking in drugs while he was stationed at Fort Hood and Fort Bragg following his return from a two-year tour in Korea:

> I had already started selling drugs, marijuana and microdot acid, to increase my income. Both Rose and I were involved in the business. I hustled the drugs on the outside and Rose dispensed them out of our home. (declaration of Jimmie Lee Robinson)

Jimmie's drug dealing was also observed by Rose's sister Josephine, who recalled:

> One time, Rose, Jimmie Lee and I were all together. This was before Julius was born. Jimmie Lee offered me a ride somewhere and on the way, he stopped the car and asked some people if they wanted to buy some marijuana. I told him to take me home as soon as I realized he was selling marijuana. Both Jimmie Lee and Rose smoked marijuana, starting early in their relationship. (declaration of Josephine Dotson, 9-18-05)

Jimmie reported that he was arrested for possession of drugs in 1987, and in 1992 was arrested five times for the same offense. It is unclear whether the drug possession prompting these post-military arrests was simply associated with his crack cocaine addiction, or was also associated with drug dealing.

**Implications of addiction, irresponsibility, and drug trafficking by parents:**
Hawkins et al. (2000) in their comprehensive review of research identified parental criminality and parental attitudes favorable to substance abuse and violence as significant risk factors in the development of serious youth delinquency and violence. This makes intuitive sense. The value systems and behavior patterns of children are strongly

39

**Exhibit 1 - 39**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

impacted by the behaviors and attitudes of family members – particularly older males and/or father figures who represent role models to them.

Strong positive male role models and relationships are an important part of male child development. In adolescence this assumes additional significance as the teenage male is creating a more adult identity and as the presence of an older male to whom the male teen is well-bonded provides limit-setting guidance. Julius' father, Jimmie modeled addiction, criminality, violence, and irresponsibility.

**Disrupted and inadequate primary attachment:** The heavy alcohol and drug abuse, partying, drug trafficking, extramarital affairs, and chronic domestic conflict characterizing the behavior of both of Julius' parents during the first two years of his life point to neither being sufficiently stable or available to Julius to form an adequate primary parental bond with him. That neither Jimmie nor Rose was effectively bonded to Julius is additionally manifested by their respective failures to keep him in their care, provide for his support, or even remain involved with him. Jimmie described that following the marital break-up when Julius was 2-3 years old he had only limited contact with him for several years while living in Dermott. Jimmie then discontinued contact altogether until Julius' mid-adolescence (declaration of Jimmie Lee Robinson). Rose abdicated care of Julius and Marcus to her own mother and father, while she resided with her sister Josephine, and subsequently her brother, John, in Wichita Falls, Texas. Rose made little effort to remain an emotional presence or to exhibit any functional parental involvement in Julius' life.

Julius' care in childhood appears to have shifted between his parents, Miss Sarah, the maternal grandparents, and the paternal grandmother. For example, Miss Sarah assisted with Marcus and Julius for a period of time in Julius' first two years of life, but this relationship was disrupted by the divorce:

> Our parents split up when my brother and I were very young and we were sent to live with my mom's mother and father. Mama Sarah would also stay off and on with my grandparents and take care of us when we were little. I felt closer to her when I was growing up than I felt to either my mother or my grandmother, Margaret. (declaration of Marcus Jwain Robinson, 11-13-05)

Thus while adequately fed, clothed, and sheltered, Julius did not have an enduring, stable relationship with a single primary parent figure. In considering the impact of this, it is important to recognize that a child is not like a used car that can simply be moved from one garage to another with impunity. Rather, a child requires a stable, enduring primary emotional bond to a single human being for healthy psychological development.

**Implications of disrupted and inadequate primary attachment:** There is ample research demonstrating the devastating and potentially irreparable psychological damage that may accompany attachment failure. Psychological research unequivocally demonstrates that a secure attachment to a parent figure is crucial to healthy psychological

40

**Exhibit 1 - 40**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

development, not only in infancy, but in later childhood as well (e.g. Ainsworth, 1979; Arend, Gove, & Sroufe, 1979;  Cantelon, 1994; Curtis, 1980; Lewis, 1985; Matas, Arend, & Sroufe, 1978; Pardeck, 1983; Sroufe, 1979; Sroufe & Waters, 1977; Waters, Wippman, & Sroufe, 1979; Yarrow et al., 1973). Conversely, numerous studies have demonstrated that when a child is deprived of the opportunity to develop affectionate bonds early in life, his physical, intellectual, and emotional development may be seriously retarded – and such early life experiences can have lasting effects which are not easily remedied (Curtis, 1980). Similarly, recurrently disrupted or broken attachments in childhood also result in lasting fundamental psychological harm. Bowlby (1966, 1971, 1973) and Rutter (1979) concluded that early parent separation is a risk factor for emotional disturbance in children and adults, constituting a psychological stress that could pose serious and potentially long-lasting harm to the child's psychological development. Thus, reviews by Rutter as well as Straus and Straus and again cited by Curtis summarize:

> Even the critics who challenge the empirical evidence admit that there is a consensus among psychologists that disruptions of a child's attachment to his parents risk detrimental effects.  The findings relied upon here are bedrock, not seriously disputed among the contending schools and camps or by skeptical outsiders.

To simplify, an infant is not born because he is ready for independent functioning. Rather he is born while still extraordinarily dependent because he has outgrown the womb. The physical and emotional nurturance of intensive parental care forms a secondary "womb" that is essential for continued development. The attachment to a parental figure, particularly across the first several years of life, is the "umbilical cord" that provides the essential conduit for emotional nurturance in this family womb. It is through a secure, caring relationship with a parent figure that the child establishes the foundation for a stable identity, emotional self-regulation, empathy, capacity for intimacy, and responsible social behavior. As described above, there are multiple indications that neither Julius' mother nor anyone else established a strong, secure attachment or emotional bond to him in the first two years of life.

This deficiency would be expected to be particularly damaging in the face of the subsequent placement instability and insecurity. To explain, disruptions in family structure and physical setting may adversely affect development through insufficient structure and predictability, broken or disrupted attachments, excessive demands for adaptation, disrupted peer relationships, inadequate continuity of intervention services, and other deleterious processes. Disrupted attachment and the associated disrupted developmental trajectory are broad risk factors for psychological disorder, delinquency, criminal activity, and violent criminal activity.

To comment further on one of the sequelae of disrupted attachment mentioned above, in the absence of a stable and secure relationship with a parent figure, a structured and predictable routine, and limit-setting and guidance through discipline, the child does not have the opportunity to internalize stable external structures. In other words, during

41

**Exhibit 1 - 41**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

childhood and adolescence, the stability and structure surrounding the developing child gradually moves "from the outside to the inside" – providing the basis for self-control. Without this internalized structure, there is grave risk to psychological health and positive socialization (Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996).

Damaged attachment in early childhood, whether from failure to establish a secure attachment or the loss of it, is frequently quite central to the etiology of conduct disorders in childhood and antisocial behaviors in adolescence and adulthood – including violent offenses (Meloy, 1988; Patterson, DeBaryshe, & Ramsey, 1989).  It is illuminating to note that callousness and potential criminality can be conceptualized in many cases as severe attachment damage "all grown up" (Meloy, 1988). Green (1988) described the impact of deprivations like Julius suffered:

> Early and persistent exposure to parental rejections, assault, and deprivation impairs the child's capacity to form subsequent relationships….Most abused children are unable to achieve Erickson's (1950) stage of basic trust. They learn to regard violence and rejection as the major ingredients of human encounters. (850)

This nexus of disordered family/attachment damage and violent offending is not a matter of personal conjecture. Career investigators from the Behavioral Science Unit of the FBI in studying the causes of a particular type of homicide have asserted that the quality of the attachments to parents and other members of the family during childhood was central to the etiology of these offenses (Ressler, Burgess, & Douglas, 1988).

**Observed domestic violence:** The mutual alcohol and drug abuse of Jimmie and Rose contributed to chronic domestic conflict and violence. This began before Julius was born and continued during his early childhood. Beotha Moore, childhood friend and neighbor of Rose in Dermott, described the relationship between Jimmie and Rose as unstable and violent even when they were dating. She observed:

> Rose started seeing Jimmie Robinson when he and Rose were in school. They were always fighting, even back then. Jimmie would beat up Rose and she would have a black eye, a cut lip or bruises….I can remember [after Marcus was born] Rose and Jimmie fighting in the street, with both of them yelling at each other. They would fight about Jimmie's drinking and about him seeing other women. On at least one occasion, I stepped in between them when I thought Jimmie was going to hit Rose. On other occasions, I saw Jimmie hit Rose in the face with his fist and throw her to the ground. During this time, Rose and Jimmie had their older son, Marcus, with them. I saw them argue and fight in front of him. (declaration of Beotha Moore, 11-10-05)

Bernice Johnson, maternal great aunt, reported that Jimmie's violence toward Rose involved weapons as well. She reported:

> Rose started going out with Jimmie Lee Robinson. Jimmie Lee could be a wild

42

**Exhibit 1 - 42**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

person. He would go after Rose with a gun. One time, after Rose's first child, Marcus, was born, Jimmie Lee came into my house looking for Rose. He had a gun with him. I asked him what he was going to do with the gun. He told me "I'm going to kill her." I kept telling him Rose wasn't at my house and he better leave. (declaration of Bernice Johnson, 9-18-05)

Rose's sister, Josephine, described having heard about Jimmie's battering of Rose from Sarah following Sarah's return from living with Jimmie and Rose:

> Sarah would hear them fighting and would go into their room. She saw Jimmie Lee hitting and punching Rose and kicking and stomping on her. If she tried to intervene, Jimmie Lee yelled at her to leave them alone. She told me that was why she had to leave. (declaration of Josephine Dotson, 9-18-05)

Jimmie acknowledged that there was chronic conflict and violence from early in his marriage to Rose. He described:

> [during the pregnancy with Julius] We would get drunk, smoke marijuana and get into huge fights. Our arguing and physical fights were so constant that Miss Sarah took Marcus and went to stay with some friends who lived across the way. There was one incident that occurred when Rose was pregnant with Julius that I recall well. We were riding in the car, both of us were drunk or high, or both, and we got into one of our arguments. Rose jumped out of the car in the middle of the highway. When I got her back in the car, I punched her in the chest. She had bruises on her chest from me hitting her. I can't remember the exact incident but Rose had bruises on her ribs after one of our fights too.

> ...The last two years Rose and I were together, Julius' [sic] first two years of life, were really bad. After Julius was born, Rose wanted to party even more and did. I also rejected my responsibilities and wanted to party more and went ahead and did it. Drugs, alcohol and violence were the order of the day in our house. We would both get high and drunk and start fighting. We argued every day and I hit Rose several times, that I can remember. I would push and shove her more often. I was filled with jealousy and insecurity, and I would question Rose on her activities. Rose had a serious habit of picking things up and hitting me with them. One time, she hit me over the head with a bottle. I shoved her against the wall. Rather than mellowing out with marijuana, Rose became more aggressive.

> ...Living on the base in Fort Hood sort of cramped our habits. We continued to have our loud rows, too loud for our, mainly white, neighbors. One time, during one of our fights, our neighbors called the Military Police and they took me away in handcuffs. I wasn't charged with anything and was sent home after six hours but Rose and the kids were gone by then. (declaration of Jimmie Lee Robinson)

The chronic domestic violence between Jimmie and Rose was also described by Marcus,

43

**Exhibit 1 - 43**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Julius' brother who was two years older:

> My earliest memories are of me and Mama Sarah, who helped my mother take care of me and my brother, sitting outside of our house. I could hear my mother and father fighting inside the house. I heard their voices, yelling at each other...My parents were always arguing and when they fought, it was physical fights with hitting and punching. (declaration of Marcus Jwain Robinson, 11-13-05)

The domestic violence was of such severity, and perhaps associated with sufficient neglect, that a social service intervention was looming:

> I was still living at home with my parents on Deer Street in Dermott when Miss Sarah came back to Dermott from North Carolina [i.e., Fort Bragg]. She brought Rose's children, Marcus and Julius with her. They all stayed at our house. Julius was just a little boy still in diapers. Miss Sarah told us she came because Rose and Jimmie Lee were fighting too much and the authorities were getting ready to take the children away from them. (declaration of Milton Holliman, 10-21-05)

**Implications of observed domestic violence:** Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment (American Psychological Association Presidential Task Force on Violence and the Family, 1996). Thus the observation of violence directed towards others in the family is associated with an equivalent emotional distress, psychological disorder, and adverse outcome as is the direct experience of physical abuse. Thornberry (1994), in research sponsored by the U.S. Department of Justice, described data from the Rochester Youth Development Study regarding the association of family violence exposure and subsequent rates of serious youth violence from these families. Three types of family violence exposure were studied: spouse abuse, abuse of children, climate of violence and hostility. Among children without a history of family violence, the rate of serious youth violence was 38%. If one type of family violence was present the rate of serious youth violence was 60%; increasing to 73% and 78% with an exposure history to two and three types of family violence respectively. Kitzmann et al. (2003), in a meta-analysis of 118 studies (almost all published prior to 2002) concluded that about two-thirds of children exposed to parental violence fared more poorly than the average child who was not exposed to parental violence.

It is important to note that the occurrence of family violence in Julius' early childhood, and thus before the onset of continuous narrative autobiographical memory, does not lessen the impact of this exposure. The damaging impact of trauma in early childhood is independent of whether there are conscious memories of these events. Quite the contrary, some of the enduring effects of trauma exposure in childhood may occur through misshaping of the brain's architecture and processing as well as faulty learning. For example, Schwarz and Perry (1994) identified a sustained neurobiological impact of trauma

44

**Exhibit 1 - 44**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

on the developing individual, describing that the plasticity of the developing brain makes it "more susceptible to the formation of malignant memories that affect not only the stress response system but also the emerging organization of neuro networks regulating other basic states and characteristics of the individual" (313). This plasticity of nervous system development in childhood may explain why youthfulness is the most consistently demonstrated pre-trauma risk factor for adverse responses to trauma, and subsequent development of Posttraumatic Stress Disorder (PTSD). It is notable in regard to this risk factor that the traumatic experiences impacting on Julius occurred during his childhood and adolescence.

More broadly, Terr (1991) described childhood psychic trauma as a crucial etiological factor in the development of a number of serious psychological disorders both in childhood and adulthood. Terr compared psychic trauma in childhood to rheumatic fever, in that both may set in motion a number of different problems that may emerge later in life. In the case of childhood psychological trauma, these reactions may eventually coalesce into personality disorders in adulthood. Thus traumatic experience in childhood often results in long-term developmental disturbances and undesirable changes in life trajectory (life direction and course). Schwarz and Perry also described that trauma induced influences on development can extend well beyond childhood. Primary developmental tasks may also be disrupted by childhood traumatic experience. Specifically, the intense negative emotion of childhood traumatic experience disrupts maturing mechanisms of emotional regulation. Traumatic experiences further have the potential to retard or accelerate critical developmental transitions.

Childhood trauma thus disrupts not just the subjective experience of childhood, but also both the trajectory of development and the psychological structures of middle and later adulthood. The fundamental alterations in the way the child perceives himself, others, and the world around him, as well as potential trauma-based adaptations in brain functioning, likely account for the sustained experience or resurgence of PTSD symptoms, or their character-engrained legacy, into adulthood. These "characterological" elements in childhood trauma exposure are quite important in understanding Julius' involvement in drug trafficking in his mid-teens. Stated simply, the maltreatment the child experiences becomes pathologically engrained into the developing child's personality structure, resulting in pervasively maladaptive and even antisocial functioning. These conceptualizations give some understanding to Julius' teen and adult life trajectory.

*Relationship of childhood trauma to psychological, behavioral, and relationship pathology:*
Experienced and/or observed physical abuse as well as other forms of childhood trauma are associated with substantial mental health morbidity – frequently taking the form of Posttraumatic Stress Disorder (PTSD), depression, relationship disturbances, personality disorder, and/or antisocial behavior. **Traumatic experience in childhood from abuse or other insults can result in impairments of perception, judgment and behavior; vulnerability to poor role models and negative influences; chronic self-defeating behavior; chronic agitation; poor problem-solving skills; an inability to predict the consequences of one's behavior accurately; an inability to modulate or understand**

45

**Exhibit 1 - 45**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

one's emotions; an inability to use emotions as guides for appropriate action; an inability to assign language to emotions; a constant state of internal and external fear; a foreshortened sense of future; chronic self-medication and substance addiction; a fragmented sense of self; an inability to successfully achieve developmental milestones; pervasive low self-esteem; a chronic and inescapable sense of shame and worthlessness; and behavioral misconduct and criminal conduct. There is evidence that these symptoms and disorders stem from trauma initiated changes in brain structure and metabolism that can be persistent. Chronic victimization can also result in survival responses of attempting to emulate the toughness of those that perpetrated the victimization (i.e. identification with the aggressor). The legacy of traumatic experience is strongly implicated in Julius' developmental trajectory and outcome.

*Implications of father's anger management problems:* The violent temper displays of Julius' father not only represented a pathological model in early childhood. It also represented a potentially inherited vulnerability. Many psychological traits and proclivities, personality disorders, and other psychological disorders have a genetic transmission. Notably in this light, Julius was described as having unusually strong temper reactions from early childhood. His maternal great aunt observed:

> Julius always had a temper when he was young, often over nothing. If he wanted something and couldn't have it, he would have a temper and scream and cry. (declaration of Bernice Johnson, 9-18-05)

Obviously, in a young child as neglected and traumatized as Julius was, such emotional displays could result from maltreatment alone. Still, Julius' anger management problems are reminiscent of his father's. This was an potentially important point to make in blunting the Government's assertions of the violence Julius displayed representing his "two-faced" nature.

**Parental emotional neglect:** The failure of either of Julius' parents to provide a sober, stable, nurturing environment in his early childhood is detailed elsewhere in this declaration, as is their subsequent physical absence. There was, however, an additional, painful aspect of this maternal neglect in the paucity of emotional support for Julius and Marcus, even when this participation would have been little hardship. Marcus described:

> Our father would send clothes and shoes for me and my brother. He visited us maybe two or three times that I can remember. One of the times, he came with his second wife, Linda Love. I must have been eight or ten years old. Our father at least made an effort to do something for us. Our mom wasn't doing anything. She came to see us once or twice in all the time we lived with our grandparents and she never sent us anything. When our mother visited Dermott, she was on the go all the time, partying and going out with her friends. She really didn't spend the time with my brother and me. I cried when she would go out partying. (declaration of Marcus Jwain Robinson, 11-13-05)

46

**Exhibit 1 - 46**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Marcus described that when Julius was in high school, Rose's neglect took on a physical aspect as well. Marcus recalled:

> I visited my mother and brother in Arlington twice, during the summers when I was going to high school. I stayed with them for about a month each time. My brother [Julius] was in high school. I remember not having anything to eat but potatoes with ketchup or hot sauce for days, waiting for my mother to get her paycheck. That's all the food there was in the house. When she got paid, she bought food and a big bottle of whiskey. The bottle would last her about four or five days. (declaration of Marcus Jwain Robinson, 11-13-05)

This neglect continued when Julius resided with his mother in Arlington, Texas as a high school student. One of his football coaches observed:

> Although Julius never mentioned anything about his family, I had the impression that Julius didn't really have anyone at home to care for him. My experience working with kids has taught me to recognize kids whose home life is compromised. (declaration of David York, 11-18-05)

**Implications of parental emotional neglect:** Child neglect may be physical or emotional. Regardless of its form, neglect has been identified as more psychologically and developmentally damaging than physical abuse. Widom (1989) described neglected children as being at greater risk for adult violence than abused children. This is a function of insufficient stability and/or security in parental attachments, daily life, or practical care; as well as unmet physical and emotional needs. The long-term impact of child neglect includes distorted cognitive, perceptual, emotional, and interpersonal capacities; pervasive anxiety; identity disturbance; insufficient capacity for emotional self-regulation and behavioral control; psychological disorder; behavior disturbance; and violent and criminal conduct.

Child maltreatment can also involve the failure to provide supervision, appropriate discipline, and moral guidance. Healthy child development requires not only practical nurturance in the context of a stable and secure relationship with a parent, but also limit-setting and guidance through structure and appropriate discipline. In the absence of ample structure and consistent, appropriate discipline and limit-setting, there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (Friday, 1994; Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996). Quite simply, lack of parental structure and appropriate discipline contribute to aggressiveness and predisposes to violence in the community. In the absence of guidance, "self-control does not develop and aggression can unfold and bring instrumental gain" (p.122, Staub, 1996). Children need order and external structures to develop internal structures and capacity for self-guidance. Thus Patterson et al. described the relationship of poor parental structure/discipline/ limit-setting to childhood and adolescent conduct disturbances as a developmental progression.

47

**Exhibit 1 - 47**

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

The American Psychological Association Presidential Task Force on Violence and the Family (1996) concluded that maltreated children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including low self esteem, depression, anger, exaggerated fears, suicidal feelings, poor concentration, eating disorders, excessive compliance, regressive behavior, health problems, withdrawal, poor peer relations, acting out, anxiety disorders, sleep disturbance, lack of trust, secretive behavior, excessively rebellious behavior, drug or alcohol problems. The task force further identified the following broad conclusions:

1.      Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulty in self control.

2.      Abused and not treated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

3.      When abused children are not given appropriate treatment for the effects of the abuse, the lifetime cost to society for an abused child is very high.

Research sponsored by the U.S. Department of Justice demonstrates a nexus between the experience of childhood maltreatment and delinquent, criminal, and criminally violent outcomes. English, Widom, & Brandford, (2001), in a DOJ published study, reported on 15-24 year follow-up of over 800 children who had been abused or neglected, and a matched group of controls. The abused and/or neglected children were 4.8 times more likely to be arrested as juveniles; 2 times more likely to be arrested as adults; and 3.1 times more likely to be arrested for violent crime as adults.

These scholarly reports of the increased rate of criminal outcomes of children who are maltreated is consistent with the experience of David York, Julius' football coach, as he observed cohorts of teenage males move through his high school and athletic program:

We have a lot of kids who come from difficult backgrounds and most of them don't make it. Many kids drop out or don't get enough preparation to live a stable and productive life. (declaration of David York, 11-18-05)

Importantly, Coach York regarded Julius as a teen who might have established a productive life had he had a healthy and supportive family. Coach York described:

I am convinced that if Julius had grown up in a different environment, he would have had another kind of life. I say this because he tried so hard to do well. He showed a real need to take care of people. (declaration of David York, 11-18-05)

It is important to note that parental neglect is not an indication that the parent does not "love" the child. Rather, the quality of love that the parent is providing is inadequate. "Love" in this context is most accurately viewed as continuum from healthy and affirming

48

**Exhibit 1 - 48**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

to destructive and injurious. This is consistent with the earlier discussion of sequential emotional damage and other trans-generational influences that may result in poor parenting and "love" expressions that are on the lower end of the continuum.

## Functional parental abandonment:

*Mother absence:* As has been described above, Julius' mother was psychologically absent for the first two years of his life, and subsequently had virtually no parental interaction with Julius to his middle adolescence when she resumed "care" of him. Because of her addiction, however, the care was without meaningful emotional support, parental structure, or supervision.

*Father absence:* As has been described above, Julius' father was psychologically absent when Julius was age 0-2 years old, only present for a handful of visits at best from the time Julius was age 2 to 8, entirely absent to Julius' middle adolescence, and inconsistently involved with him there after.

## Implications of functional parental abandonment:

*Mother absence:* The impacts of mother absence have already been described in terms of inadequate and disrupted attachment, and neglect.

*Father absence:* Father absence has been broadly implicated in delinquent and criminal outcomes. More specifically, there is an extensive literature specifically addressing the developmental risks of father absence, including delinquency, criminal activity, and murder. Examples of these findings and the research citing them are listed below:

- The low supervision of adolescents frequently found in father-absent homes was more the cause of delinquency than poverty (Sampson & Laub, 1994).

- Father-absent adolescents are more likely to commit a school crime (Jenkins, 1995).

- The likelihood that a young male will engage in criminal activity doubles if he is raised without a father and triples if he lives in a neighborhood with a high concentration of single-parent families (Hill & O'Neil, 1993).

- 70% of the juveniles in state reform institutions grew up in single- or no-parent situations (Beck, Kline, & Greenfield, 1988).

- 72% of adolescent murderers grew up without fathers (Cornell, D. et. al., 1987).

49

**Exhibit 1 - 49**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

- Children who grow up in a father-absent home are at a dramatically greater risk of drug and alcohol abuse, mental illness, suicide, poor educational performance, teen pregnancy and criminality (U.S. Department of Health and Human Services, 1993).

**Death of surrogate parent figure (paternal grandmother):** Though not a substitute for a primary parental attachment, Julius' paternal grandmother Bertha was a source of some "parental" support and supervision for the boys. Julius' older brother, Marcus, described:

> She may have been in a wheelchair [paralyzed from having been "accidentally" shot by paternal grandfather] but she could make us mind better than our grandmother, Margaret. Grandma Bertha was more aware, you couldn't slip anything past her. Unlike Grandma Margaret, Grandma Bertha didn't cuss but if we heard her say "Darn it!" we'd say. "Oh, Oh, she hot. We're in big trouble."
>
> Grandma Bertha was the only one who could help us with our school work because Grandma Margaret was illiterate. Our grandfather was blind so he had his limits, but he was good at math. We just had to tell him the problem and he would give us the answer. It didn't help us to learn just to get the answers, though. He didn't show us the process like Grandma Bertha did. We got all our school work help and guidance from her.

Marcus described that when Julius was age 10-11, Bertha deteriorated and died of cancer:

> It was hard when she got sick with cancer. It hurt to see her fall apart like she did, especially when she was getting chemotherapy. I was around twelve or thirteen when she died. The chemotherapy really changed her. She had long hair and all her hair fell off. It was scary the way she looked. We lost a really strong person in our lives when she died. (declaration of Marcus Jwain Robinson, 11-13-05)

**Implications of death of surrogate parent figure:** Grandma Bertha was as close to a functional parent figure as Julius had. The impact of this death is perhaps best understood, then, in light of scholarly perspectives on the effects of parental death on a child. To illustrate this research, Silverman and Worden (1992) found that even several months after the death of a parent a significant percentage of 6-17 year old children continued to experience marked distress, with symptoms such as frequent crying, sleep disturbance, headaches, difficulty concentrating in school, conversations with the deceased, frightening perceptions of being watched by the deceased, and/or behavior problems.

Samuels (1988) found that parental death during childhood resulted in multiple immediate effects:

50

**Exhibit 1 - 50**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

| | | |
|---|---|---|
| sleep disturbance | phobic responses | angry outbursts |
| regressive behaviors | confusion | loss of resiliency |
| nightmares | separation reactions | increased tension |
| depression | | |

Samuels further identified serious psychological vulnerabilities that were still present 18 months later:

| | |
|---|---|
| lessened resiliency | preoccupation with illness |
| uncertainty about the future | separation problems |
| lowered self-esteem | worry about growing up |

Finkelstein (1988) in summarizing the research described parental death in childhood as not so much a single stressful event, as a series of events that pervaded almost all aspects of the child's life. Parental death in childhood was identified as reaching to the core of the way the child makes sense of the world around him. The research indicates that children whose parents die are at long-term increased risk for physical and mental illness, inability to cope with later life stresses, depression, alcoholism, suicide, problems with intimacy and autonomy, problems with sexual identity and behavior, marital difficulties, delinquency, and criminal activity.

The extent to which the above risk factors are realized in a given child is determined by factors such as:

The child's temperament and vulnerabilities – Julius exhibited problems with attention, learning, and neuropsychological functioning; in a family context of parental addiction, violence, neglect, and abandonment. Accordingly, he would be considered far from resilient.

The continuity of the child's daily life – Julius' daily life was disrupted by the loss of supervision and academic support, and eventually by rejoining his mother.

The stability of the home – The home setting with the maternal grandparents offered inadequate supervision and structure, and his later residence with his alcoholic, drug addicted mother even less.

Julius was thus at particular risk for problematic long term outcomes from his grandmother's death.

Potential sexual abuse: There is a report that Julius was sexually abused in childhood. His father, Jimmie, described:

> One of the times I visited, when Julius was around five years old, Margaret [maternal grandmother] told me that one of the neighborhood boys had touched Julius' private parts. Margaret wanted me to talk with Julius about it. I told Julius

51

**Exhibit 1 - 51**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> that he had to tell momma, Margaret, if anyone tried to touch him again and that
> no one was to touch his privates. (declaration of Jimmie Lee Robinson)

That something did happen to Julius is given some support by the magnitude of Julius'
reaction to this admonition. Jimmie described:

> When Julius heard me say that to him, he pitched a fit the likes of which I had
> never seen anyone throw in my life. Julius thrashed about, hitting and throwing
> himself against things and screaming uncontrollably, "Daddy, you don't love me.
> Daddy, you don't love me." (declaration of Jimmie Lee Robinson)

**Implications of potential sexual abuse:** Finkelhor & Brown (1985) identified four broad
traumatic impacts of being sexually abused as a child. Traumatic sexualization may occur
as the child's sexuality is inappropriately shaped by the abuse experience. Being sexually
abused represents a profound betrayal as someone whom the child was dependent or
vulnerable to has caused them harm. This may subsequently be associated with relationship
distrust, feeling unlovable, interpersonal dependency, and retaliatory aggression. The child
experiences a profound sense of powerlessness in the face of sexual abuse as his will and
sense of control are overwhelmed. This may result in continuing feelings of incompetence,
depression, anxiety, and adult victimization or domination. The sexually abused child may
experience a significant sense of stigmatization as badness, shame, and guilt become
incorporated into the child's self image. This may result in low self-esteem, anticipation of
rejection, poor relationship choices, or promiscuity. These four traumagenic dynamics of
sexual abuse – traumatic sexualization, betrayal, powerlessness, and stigmatization  - were
subsequently the conceptual basis for a brief four amicus curiae filed with the U.S. Supreme
Court in Maryland v Craig (1989) by the American Psychological Association.

A history of childhood sexual victimization appears to be associated with equal levels of
later psychological dysfunction in both male and female clinical subjects (Briere et al.,
1988). These psychological dysfunctions include dissociation, anxiety, depression, anger,
sleep disturbance, and post sexual abuse trauma. Interestingly, males displayed as much
psychological disturbance as females though reporting less extensive and less extended
abuse. This suggests one of two hypothesis:  (1) There is an equivalent impact of sexual
abuse for males or females regardless of any differences in its severity or duration between
the sexes, (2) sexual abuse is more traumatic for males since lower male abuse levels were
associated with symptoms that were equal to that of more severely abused females.

A number of factors may negatively affect the recovery of males from sexual abuse. These
include reluctance to seek treatment, minimizing the experience of victimization, difficulty
accepting shame and guilt, exaggerated efforts to reassert masculinity, difficulties with male
intimacy, confusion about sexual identity, power/control behavior patterns, externalization
of feelings, vulnerability to compulsive behaviors, greater difficulty in adjusting to stress,
and difficulty in expressing and communicating affect (Struve, 1990; Urquiza & Keating,
1990).

52

**Exhibit 1 - 52**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Urquiza and Capra (1990) described that sexual abuse creates unique disclosure problems for male victims. In other words, males tend not to disclose their complaint about the sexual abuse experiences as readily as do females. The authors note that boys are sexualized with a male ethic of self-reliance that inhibits disclosure of victimization. Disclosing same sex abuse to peers or parents might threaten a boy's developing masculinity or pose a risk of being labeled as homosexual. Additionally, disclosure may result in a loss or curtailment of the boy's greater independence and freedom.

Urquiza and Capra described initial effects on males following sexual abuse as most commonly involving behavioral disturbances including aggression, delinquency, and non-compliance. Other problematic initial effects may include emotional distress; displays of guilt, shame, negative self-concept; psychosomatic symptoms; confusion regarding sexual identify and sexual preference; problematic sexual behaviors; and vulnerability to juvenile sexual offenses. Long-term effects of sexual abuse as described by Urquiza and Capra include increased risk for depression, somatic disturbance, self esteem deficits; difficulty maintaining intimate relationships; problems with sexual adjustment; alcohol and substance abuse; and sexual offending.

**Instability in family structure and residence:** During his childhood, care of Julius shifted from his parents, to Miss Sarah, to his maternal grandparents, to his paternal grandmother off and on, to his mother. Even when in the care of his maternal grandparents, the household configuration was transient and unstable. Mr. Leroy Kennedy, counselor for Delta Youth and Family Services organization in Dermott. Mr. Kennedy reported that Julius was referred to his caseload and received services from June 1989 to May 1990 – around the time gang activity started in Dermott. Mr. Kennedy indicated that he checked on Julius at home or school three times weekly. He described regarding the household:

> I remember being concerned that the grandparents' home was somewhat chaotic. They had a revolving door policy, with young people coming and going all the time. Friends and relatives seemed to live there for a few days, then disappear. It was not a stable environment. (declaration of Leroy Kennedy, 10-21-05)

This description of the household of the maternal grandparents where Julius spent the better part of his childhood is substantially at odds with the inexplicable and apparently uninformed characterization of this home by Mr. Wes Ball in final arguments of the sentencing proceeding:

> He had grandparents who are good, fine people, and I believe his grandmother – she's here right now, Margaret, fine salt of the earth kind of folks. And John, a blind man, and they did the best they could to help out and raise these two boys in Dermott, Arkansas when Rosa left them with them in a good environment. (sentencing phase, vol. 23: 78)

53

**Exhibit 1 - 53**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

The defense characterization of the wholesomeness of this household is also inconsistent with the generational dysfunction of the maternal family system outlined in an earlier section. Additionally, as the perspectives in this declaration demonstrate, Dermott could not reasonably be described as a "good environment" for a Black male to be growing up in during the 1980's and 1990's.

**Implications of instability in family structure and residence:** Chronic instability (i.e. transitions) in family structure is one of the delinquency risk factors identified by Department of Justice research. Again, this is not surprising. Household instability has a destabilizing impact in a child's life. As children require structure and stability for healthy emotional and social development, mobility of residence or parent figure may undermine this basic need. Transitions in family structure and "caretakers" are a notable risk factor in adolescence as well. To explain, adolescence represents a stage of development that depends on a stable parental/family structure for limit setting, guidance, and emotional anchoring during vulnerable years of identity formation and social identification. As the number of transitions in placement, family structure, and parental figures increase, the risk to health adolescent development becomes correspondingly grave. This conclusion is supported by large scale research sponsored and reported by the U.S. Department of Justice (Thornberry et al., 1999). This series of studies found that as the number of transitions (changes in caretakers) during the teen years increased, so did rates of delinquency and drug use. Among youth experiencing three or more such transitions, the delinquency rate was 80%. The number of transitions also had a significant effect on rates of drug abuse.

**Inadequate supervision and discipline:** An aspect of the neglect that Julius experienced was in inadequate discipline, supervision, and structure. This neglect did not simply occur when in the care of his mother. Rather, his maternal grandmother, Margaret, who provided the majority of his care in childhood, was poorly equipped to exercise these functions. Julius' father described:

> Margaret was not the disciplining type of caretaker, as she hadn't been with her own children, unlike my mother who was loving but strict. Margaret is a simple person who could not deal with the difficulties the boys had. She [Margaret] fed them and provided shelter but she had to resort to John to keep them in line but John [maternal grandfather] with his blindness couldn't really keep on top of things either. (declaration of Jimmie Lee Robinson)

Similarly, Mildred Holliman, maternal aunt and daughter of John and Margaret, described: "I never saw or heard of my parents disciplining the boys" (declaration of Mildred Holliman, 10-22-05)

An inadequate degree of parental supervision in the Holliman household was also observed by Mr. Kennedy:

54

**Exhibit 1 - 54**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Julius' grandfather was blind. His grandmother always believed whatever Julius told her. She was a bit naïve in that regard. (declaration of Leroy Kennedy, 10-21-05)

The poor limit setting, ineffectual and inconsistent discipline, and negligent supervision of Julius in the household of his maternal grandparents was also observed by Bernice Johnson, his maternal great aunt. Ms. Johnson described:

> When I would talk to Margaret about his [Julius'] behavior, Julius told her "Grandma, I didn't do it." Margaret said she would whip Julius but I never saw her do it. I did see Margaret try to whip Julius on some occasions, but John would always stop her. Margaret would say one thing and then John would say the opposite. If Julius asked Margaret for permission to do something and Margaret said no, he would go to his grandfather, John, who would say, oh, go on ahead. John was blind, so he wasn't always aware of what Julius was doing and he didn't really want to hear what was going on with him if it differed from the picture he had of Julius. Margaret was not that competent. She had a lot of memory loss and wasn't aware of Julius's problems. (declaration of Bernice Johnson, 9-18-05)

**Implications of inadequate supervision and discipline:** Healthy child development requires not only a stable and secure relationship with a parent, but also limit setting and guidance through discipline and supervision. In the absence of either of these fundamental parenting factors there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (Friday, 1994; Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996. Quite simply, lack of parental discipline contributes to aggressiveness and predisposes to violence in the community. In the absence of guidance, "self-control does not develop and aggression can unfold and bring instrumental gain", i.e. children need order and external structures to develop internal structures and capacity for self-guidance (p.122, Staub, 1996).

## Community and Extended Family

The adverse developmental factors impacting on Julius were not limited to wiring, generational, and parenting arenas. Rather, all of these were occurring within a community context – and interacting with that community. Unfortunately, the social factors present in the Dermott community predating and during Julius' childhood were as toxic as those he encountered in the other primary developmental arenas detailed in earlier sections of this declaration.

**Legacy of racial prejudice and discrimination:** A legacy of racial discrimination, prejudice, and violence was described as characterizing social interactions in Dermott for generations. Jimmie Robinson, Julius' father described:

> I do not like to use derogatory terms but the word nigger was used frequently by

55

**Exhibit 1 - 55**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

whites in Dermott. The races were completely separated in the town, physically by the railroad tracks, and socially by laws and customs. There were white businesses and a few black stores, white water fountains and no water fountains for the blacks. Black people had to follow prescribed guidelines when in the white part of town and they couldn't go there simply because they felt like it. Integration of the schools came to Dermott in 1971 but some small changes started to be seen the year before – the Dollar General Store discontinued its practice of prohibiting blacks from using the front door. This small opening of society was not widespread though, blacks could still not go to white restaurants and most places continued to be segregated.

It was very dangerous to violate the practice of keeping the races separate. When I was a boy, my mother and I saw a black man taking a drink from a white drinking fountain. The man seemed to be very tired. A white woman saw the man take a drink and called the police. The man ran back across the tracks but the police caught up with him and beat him fiercely. I saw the man, all bloodied, being dragged away to jail. The next day, the man was found dead in the middle of one of the streets in the black side of town. (declaration of Jimmie Lee Robinson)

The threat of racially motivated violence appears to have had an impact on the generational structure of Julius' paternal family. Jimmie described:

The last time I saw my father was when I was eight or nine years old. My father left for the Bellglade/Orlando area to work on the citrus harvest and never returned. I have a memory of trucks full of white men, police and hooded Klu Klux Klan men, driving up to my house and looking for my father. They said to my mother, "Where is he? We're gonna kill that nigger." My mother told them that my father had gone into the woods. This happened before my father went to Florida. My mother told me that the men were looking for my father because he had stood up to some police officers who wanted to keep the black men from getting together at a black café on Saturday nights. (declaration of Jimmie Lee Robinson)

**Systemic economic hardship and social desperation among Blacks in Dermott:**
Julius' father, Jimmie Robinson, described longstanding, deeply entrenched poverty among Blacks in Dermott, and associated feelings of desperation:

Being black in Dermott meant that life was going to be really hard. It wasn't that far from the days of slavery. Sheer desperation allowed people to survive. There was always a sense of desperation. People talked of getting out of the ghetto when they expressed their desire to break away from being downtrodden and poor. There was not only the history of blacks and whites to contend with but there were few jobs to be found in Dermott. I remember my mother and my grandmother, Mahaela Scales, going to Lake Village, some twenty miles away, with a cotton sack that would be filled with government assistance food.

56

**Exhibit 1 - 56**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> (declaration of Jimmie Lee Robinson)

Julius' maternal uncle, John Hollimon Jr., also described the sharply limited opportunities in Dermott that contributed to a depressed and desperate social milieu among the Black residents there:

> In Dermott, there were no jobs for young people. When I was growing up in Dermott, the closest place to find a summer job would have been in Monticello or Pine Bluff and they were 50 miles away. Even adults didn't have many options outside of farm work, picking cotton and other crops. (declaration of John Hollimon Jr., 11-13-05)

Both the legacy of racism and the economic desperation of the Black community in Dermott made this a fertile field for the eruption of gang activity that occurred in Julius' early adolescence. As will be obvious in the sections that follow, Julius was not the originator of gang activity in Dermott, nor was he without unusually pronounced risk factors for gang identification, nor was he the only youth swept into the corruptive clutches of this deviant identification.

**Corruptive family and older peer influences:** A bi-product of the cancer illness of paternal Grandma Bertha was the importation of a paternal cousin, Rodney White, to assist in caring for her. Rodney remained after Bertha's death, residing with paternal great-grandmother, Mahaela. Julius' relationship with Rodney was pivotal in Julius' subsequent drift into delinquency and gang activity. Marcus, Julius' older brother described:

> Julius was really taken by Rodney, who was older. My brother admired Rodney and started spending as much time as he could with him. Rodney ran with a guy from California named John-John Wright. John-John brought the whole idea of gangs to Dermott. It was around this time that my brother started getting into trouble. He was listening to the wrong music and he was listening to the wrong people…he looked up to Rodney and John-John. (declaration of Marcus Jwain Robinson, 11-13-05)

Julius' father also described the significance of Rodney's influence on Julius:

> I believe that Julius' corruption started when my nephew, Rodney White, went to stay in Dermott. Julius was around ten years old when Rodney came into his life. Rodney was already involved in drugs and gangs in Little Rock and brought these ways with him to Dermott. Rodney became a role model for Julius who admired him very much. Both Rodney and Spyri, Josephine's son, were into the street lifestyle. (declaration of Jimmie Lee Robinson)

In an apparent savage beating, Julius was eventually initiated into the Crips. His father,

57

**Exhibit 1 - 57**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Jimmie, described:

> When Julius was fourteen years old he came home one day all beaten up,
> Margaret told me. Julius told his grandmother that the other kids had hit him with
> bottles. It was his initiation into the Crips. He was so badly injured that it took
> Margaret one month to cure him. (declaration of Jimmie Lee Robinson)

**Implications of corruptive family and older peer influences:** In the face of the
abandonment by both parents, and in the supervision vacuum left by the ineffectual
supervision and guidance of his maternal grandparents, Julius was particularly vulnerable
in early adolescence to the structure and sense of belonging that gang membership would
have provided. With this affiliation came an increased concentration of exposure to
delinquent peers and deviant values. As was stated in an earlier section, these elections
were made from a developmentally immature position, without reasoned insight into the
nature of the values that were being adopted or the trajectory that this affiliation placed
him on.

**Corruptive community influences and gang recruitment:** Julius was not alone in
being enamored with John-John and gang activities. Marcus described:

> After John-John brought gangs to Dermott, most of the young boys became
> interested in belonging to a gang. You had to pick a side. Even if you weren't
> initiated, you had certain people you hung out with. I was never initiated but I was
> associated with the Gangster Disciples, started by Larry Hoover in Chicago….the
> kids in Dermott had a lot of little made-up gangs which were just the people you
> hung out with. (declaration of Marcus Jwain Robinson, 11-13-05)

Similarly, Tony Billups, second cousin, described:

> I grew up in Dermott, Arkansas. In the late 1980's, a man named Johnny Wright
> moved to Dermott. His nickname was *John-John* and he was a member of a *Crip*
> gang. He was from the Los Angeles area, and had been incarcerated. John-John
> lived in the Bellvue Apartments. We called them *The Projects*. John-John used to
> hang out at the playground by the projects and tell stories. The young kids were
> fascinated by his stories. Not long after John-John's arrival, a Crip gang formed in
> Dermott. After the Dermott gang formed, there were a lot more break-ins and a lot
> more drug activity. Also, I recall an ice storm one winter, possibly the winter of
> 1992, where the electrical power in Dermott was knocked out. During the black-
> out, a couple of pawn shops were burglarized and a number of guns were stolen.
> After that, there were incidents of people's houses being shot up. (declaration of
> Tony Billups, 10-21-05)

Mr. Leroy Kennedy, counselor for Delta Youth and Family Services organization in
Dermott also described a marked change in the delinquent activities among the youth in
Dermott with the introduction of gangs:

58

**Exhibit 1 - 58**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> When the gang activity began in Dermott, I noticed a dramatic change generally. A change in attitude, a change in attendance, etc. There were more fights all of a sudden, and more break-ins. I remember that weapons were stolen and used to shoot up houses. (declaration of Leroy Kennedy, 10-21-05)

A similar account of the introduction of gangs into Dermott was provided by Carl McCree, officer and subsequently chief of police in Dermott. Mr. McCree described:

> In the late 1980's, a man by the name of Johnny Wright moved to Dermott from the Los Angeles area. He had a prison record and a number of tattoos. His nickname was *John-John*. He organized some of the young boys in Dermott, including Julius Robinson, into a *Crip* gang. After that gang organized, we saw a lot more criminal activity in Dermott. Julius Robinson was twelve or thirteen years old at the time. We had an 11:00 p.m. curfew in Dermott, which Julius and others began violating....In my generation, Dermott was just a quiet little country town. The boys played basketball...went hunting and fishing...did things like that. Johnny Wright and the Crip gang changed all that. Kids burned cars and houses as part of their initiation into the gang. There was a sharp rise in thefts and serious assaults. Also, once the gang was organized, the drug activity in Dermott increased dramatically. (declaration of Carl McCree, 10-20-05)

Teenage females as well as males were pulled into the orbit of the gangs that came to Dermott with John-John. Jana Holliman, first cousin of Julius, described the process of a gang initiation that she took part in:

> In the early 1980's, several people, Satra and John John, came from Los Angeles and brought the gangs with them. They began doing initiations. The person being initiated was put in the center of a circle of between seven and ten gang members. The O.G., or oldest gang member, would ask person in the center what he wanted to be. If he said a Playboy Hustler Crip, the O.G. would hit him in the face really hard with his closed fist. Then the other gang members from the circle would fight the newcomer for four or five minutes, hitting, kicking and punching him. The newcomer could fight back. If at the end of the time, the newcomer was still standing, he was initiated. If he fell down during the fighting, he would have to go another round. After the initiation, they would get drunk and high. The process was the same for the girls. I went through initiation myself...I was a member of the East Coast Crips. We hung out at the projects in Dermott and at the trailer court. (declaration of Jana Holliman, 10-23-05)

The allure of Johnny "John-John" Wright to the young people in Dermott was described by Julius' cousin, Rodney White:

> I remember when Johnny Wright came on the scene in Dermott. They called him *John-John*. He was from the Los Angeles area, and he told city stories. The kids in

59

**Exhibit 1 - 59**

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

Dermott only knew country stories. The city stories excited the young kids; they sounded cool, sort of glamorous. John-John was older. He became a role model for the kids. It wasn't that he gave orders. The kids just wanted to be like him. John-John was on drugs. Inspired by John-John and his stories, the kids in Dermott formed a *Crip* gang. (declaration of Rodney White, 10-21-05)

**Implications of corruptive community influences and gang recruitment:** An economically deprived minority community setting such as Dermott has a strong interactive effect with parental and family deficiencies that are over-represented in such a social context. Such family and parenting vulnerabilities include mother head of household, poor supervision, and corruptive family influences. The combined effects of family vulnerability and corruptive community results in markedly increasing risk of youth delinquency and criminality/violence in early adulthood. This is evident in the rapid inroads gang activity made in Dermott after its emergence there in the late 1980's. Former Dermott police officer Carl McCree described the pervasiveness of penetration this gang activity achieved in that community:

> The gang problem in Dermott got so bad that Chief Melton was interviewed on the national news. Nearly all of the young African-American males in Dermott were jumped into the Crip gang. (declaration of Carl McCree, 10-20-05)

Consistent with the high prevalence rate of gang affiliation among Black youth in Dermott, Terrence Holiman (maternal cousin), testified that all of his friends from Chicago were involved in gang activity. The corruptive influence of such low income urban settings on male delinquency has long been reported, and is illustrated by research published by the U.S. Department of Justice (Chaiken, 2000). These findings are depicted in the pie chart below.

60

**Exhibit 1 - 60**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## Delinquency Rates of Male Teens in Three Violent DC Neighborhoods



21.6%
No Criminal Acts
(1/3 have recent
status offenses)

31.9
Property
Offenders

19.2%
Fighters
(Assaults only)

4.7%
Drug Dealers

7%
Robbers
(Also likely to commit
other offenses)

15.5%
Property Offenders /
Drug Dealers

Chaiken, M.R. (March, 2000). Violent neighborhoods, violent kids.
Office of Juvenile Justice and Delinquency Prevention. U.S.
Department of Justice.

Inspection of the above figure demonstrates that almost 80% of the male teens in these neighborhoods were actively involved in criminal activity. Such high rates cannot be explained by individual deviant choices. Rather, these rates point to epidemic level corruptive community influences that are pulling the majority of male youth in these neighborhoods into criminal activity. This study does not stand in isolation. A study sponsored by the NAACP and conducted by the Harvard Law School (Ogletree et al., 1995) reported that in 1991, on any given day, approximately half of the Black males aged 18-35 in Washington, D.C. and Baltimore were in the criminal justice system. The interaction of family, community, and social factors is also implicated in homicides (Pridemore, 2002 – note: published after 1999 but reviewing extensive data available in 1999). For example, the annual rate of homicide among Black males age 18-24 nationwide (1989-1994) was 237-347 per 100,000 community residents vs. 26-33 per 100,000 for white males (Pastore and Maguire, 1998). Pridemore emphasized that these differences are NOT a function of race. Rather, they reflect the disproportionate incidence of adverse family, community, and social factors in the lives of Black adolescents and young adults.

61

**Exhibit 1 - 61**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

These findings are intuitively logical. Social and moral development are strongly influenced by the surrounding community values, mores, and models. Thus peer relationships, particularly during adolescence are quite influential in moral and social development. When community adults and peers are deviant, the risk of an anti-social developmental trajectory increases markedly – and with that the risk of criminality, violence, and homicide. These findings are also supported by crime map comparisons demonstrating the marked over-representation of general crime and violent crime in particular zones in a large metropolitan area. These data and perspectives, and the U.S. Department of Justice and scholarly literature supporting evidence, could have provided an additional explanation for Julius' criminal activity.

**Teen recruitment into drug dealing:**  Former Dermott police officer Willie Nimmer also reported that drug activity increased markedly with the introduction of gangs into the community:

> With the gang activity came drug activity. They'd give it to the kids for free at first, to get them hooked. Then they'd sell it to them. They had kids working for them. We had young kids walking around Dermott with $400 or $500 in their pockets. People who had never worked a day in their lives were suddenly driving around in fancy cars. (declaration of Willie Nimmer, 10-20-05)

Drug dealing was also fostered in part by the quite limited employment and economic opportunities there for Black males. Marcus, Julius'older brother described:

> There was a lot of drugs in Dermott, even when I was growing up there. There was crack cocaine and marijuana. The same guys who sold it when I was in high school are still selling it today. In Dermott, you've got to survive and there is absolutely no work there. When I was growing up in Dermott, there were no jobs and there aren't any jobs. (declaration of Marcus Jwain Robinson, 11-13-05)

There was Government-sponsored testimony at trial from Sarah Michelle Tucker that Julius was one of the teens in Dermott engaged in drug dealing.

Julius' initial involvement in drug dealing in Arlington may have had some element of economic necessity in response to his mother's historic parasitic posture and her subsequent disability. Josephine Dotson explained:

> My sister, Rose, was working in a nursing home when Julius came to live with her. My father told me she called him often and told him she didn't have any money for the rent or food. Even though my father was on a fixed income and that income was minimal, he would wire the money for Rose's rent directly to her landlord. Then a woman fell on Rose at her work and she had surgery and wasn't working. Julius started selling marijuana and was able to help pay some of the bills. (declaration of Josephine Dotson, 9-18-05)

62

**Exhibit 1 - 62**