# THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CAUSE NO. 4:00-CR-00260-2 |
| | : | **DEATH PENALTY CASE** |
| vs. | : | |
| | : | **Honorable Terry Means** |
| JULIUS ROBINSON | : | United States District Judge |

_____

### EXHIBIT NUMBER 1 (PART 3 OF 4, PAGES 63-93)

### SUBMITTED IN SUPPORT OF MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

(Filed Electronically Under the Electronic Filing System Requirements)

_____

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Implications of teen recruitment into drug dealing:** Julius' involvement in drug dealing as a teen was a corruptive influence that pulled him more deeply into criminal activity. Because violence is endemic in the illicit drug business, this involvement also markedly increased his risk of violent victimization or perpetration. He decision to begin this illegal activity was, again, made as an immature adolescent. Once that trajectory had been established, however, it was difficult to recover from.

Julius' involvement in drug dealing as a teen was much more than the deviant choice of an individual teen. Rather, beginning in the early to mid 1980's a broad evolution occurred in drug dealing nationwide to shift street level sales to juveniles who faced much milder sanctions when apprehended. An exemplar of this nationwide trend to involve children in drug trafficking was illustrated in the testimony of Terrence Holiman (maternal cousin), who reported that he was selling crack cocaine in Chicago in his early teens (sentencing phase vol. 20:61).

To illustrate this trend of involving juveniles in drug trafficking with the experience of a single metropolitan area, Stanton and Galbraith (1994) reported that arrests for drug dealing in Baltimore among African-American youth increased from 86 arrests in 1981 to 1,304 arrests in 1991. Environment factors that place youth at greater risk for involvement in drug trafficking have been specified (Leviton, Schindler, & Orleans, 1994; Stanton & Galbraith, 1994). These include:

*Community*
- Perception that neighbors are involved in drug trafficking.
- Recruitment and encouragement by adult drug dealers.

*Family*
- Poverty
- Single parent household
- Perception that family members are involved in drug trafficking.
- Ineffective parent-child communication.
- Poor parental monitoring

*Peers*
- Perception that friends are involved in drug trafficking.

A number of these factors were present in Julius' community and family environment in Dermott.

Finally, violence is endemic to drug trafficking. In the absence of social structures such as contracts, courts, arbitration, etc., violence and intimidation are the primary mechanisms utilized to maintain market share, reduce the likelihood of victimization, communicate deterrence, resolve conflicts, etc. Julius was a student of this social reality, not the originator of it. Much was made of Julius being "two-faced" or "manipulative" in the Government's final arguments – i.e. that his respectful, pro-social behaviors at school,

63

**Exhibit 1 - 63**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

on the football field, or in custody were not the "real" Julius. Integration of the records and descriptions from numerous declarations, however, point to both "faces" being authentic. Julius' violence appears to be restricted to the social context of drug dealing. In other arenas of life or interpersonal interactions he does not exhibit violent behavior or belligerence. This does not point to an absence of conscience so much as a compartmentalized arena of life (i.e. drug dealing) where normal ethics and sensibilities do not apply. Analogous contexts where individuals may display a similar compartmentalization include warfare, mob action, used car selling, etc.

**Inadequate interventions:** Several critical phases of inadequate interventions are notable in Julius' history. First, there is no indication that any social service intervention or follow-up was initiated in response to the neglect Julius and Marcus were experiencing early childhood in the face of their parents' chronic substance abuse, drug trafficking, and domestic violence – even though this latter circumstance had come to the attention of the authorities. Second, a reasonable social service investigation and home study would have in all likelihood found the home of the maternal grandparents to be an inappropriate placement for young children. Third, the resources available to address the needs of the youth in Dermott, much less the systemic issues of generational racism, poverty, and economic disenfranchisement, were wholly inadequate. Mr. Leroy Kennedy, counselor for Delta Youth and Family Services explained:

> At the time I was supervising Julius, I had a case load of 60-70 kids. It was a bit overwhelming, and I often felt I was fighting a losing battle. There was simply not enough time for each child. I would have 10-15 minutes to talk with them, find out if they were okay, then I would have to move onto the next one. If one of the kids had been suspended from school, I would try to deal with that. I had very little in the way of tools at my disposal to assist the kids. There was no budget to take the kids on field trips and get them out of the area for awhile. I really needed more resources to affect a change in the lives of the kids I was counseling. More than that, I needed more time. The caseload just didn't allow that.  (declaration of Leroy Kennedy, 10-21-05)

Fourth, and on a far broader scale, efforts to intervene in adolescent drug trafficking were characterized as "virtually non-existent" in the United States at the time of Julius' greatest vulnerability (Stanton & Galbraith, 1994). This absence of a coordinated national policy to address this almost epidemic phenomenon among African-American male youth living in poverty was not from an absence of scholarly perspectives regarding steps that could reduce teen drug trafficking. Such recommendations included (Leviton, Schindler, & Orleans, 1994):

- Reduce child poverty.
- Strengthen families.
- Enhance parenting skills.
- Provide adequate education for all children.
- Institute and evaluate programs within schools to prevent drug trafficking.

64

**Exhibit 1 - 64**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

- Enhance programming to assist children and families before they enter the juvenile justice system.
- Fund job training programs.
- Establish alternatives to jailing youthful offenders.
- Expand diversion programs for first-time offenders.
- Encourage antiviolence strategies including gun control reform and alternative treatment approaches to dealing with substance abuse problems.

Consistent with approaching youth delinquency and violence from a public health model of risk and protective factors (as endorsed by the U.S. Department of Justice), the above recommendations focus on reducing risk factors and increasing protective factors rather than simplistically tasking youth to make better choices.

**Summary and analysis of sentencing phase evidence in mitigation:** My review of records and the declarations of family members and other third parties reveals the presence in Julius' history of many of the developmental risk factors for delinquency and violence identified in scholarly literature published by the U.S. Department of Justice. Julius had the benefit of few protective factors, and these were largely absent until his high school years – late in his development, after his exposure to gangs, and in the presence of an alcoholic and drug abusing mother. Additionally, I have distilled from these records and declarations _25 major adverse developmental factors_ that could have been identified and illustrated by the defense at Julius' capital sentencing. The implications of each factor for disrupted developmental trajectory, problematic adolescent and adult outcomes, and/or criminality and criminal violence could have been presented through expert testimony relying on scholarly literature available at the time of trial. These 25 factors include:

## _Wiring_

**Prenatal drug and alcohol exposure**
**Recurrent exposure to herbicides and pesticides**
**Neuropsychological deficits**
**Learning problems**
**Teen onset alcohol abuse and subsequent dependence**
**Youthfulness at the outset of delinquency and gang activity**

## _Generational Influences_

**Generational family dysfunction**
**Genetic predisposition to alcohol and drug dependence**

## _Parenting_

**Teenage mother**

65

**Exhibit 1 - 65**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Mother exhibited indications of sub-average intelligence
Alcohol and drug dependence of both parents
Parental drug trafficking
Disrupted and inadequate primary attachment
Observed domestic violence
Parental emotional neglect
Functional parental abandonment
Death of surrogate parent figure
Potential sexual abuse
Instability in family structure and residence
Inadequate supervision and discipline

## Family and Community

Legacy of racial prejudice and discrimination
Systemic economic hardship and social desperation among Blacks in
        Dermott:
Corruptive family and older peer influences
Corruptive community influences and gang recruitment
Teen recruitment into drug dealing
Inadequate interventions

Both the particularized DOJ risk and protective factors, and the 26 major adverse developmental factors represented essential information for the jury's consideration in weighing Julius' moral culpability and associated death worthiness. Had this same mitigation evaluation function been requested of me in the months prior to the sentencing phase, and had I been provided with the interview summaries or declarations of third parties, I or another informed mental health expert could have testified to these same factors and their implications as contained in this declaration. In the absence of such expert testimony regarding the nexus of these damaging developmental factors and deviant life trajectory and criminal violence, the jury would have no mechanism to give informed weight to the developmental factors that they heard testimony regarding from lay witnesses. Further, had these factors and their supporting data been identified prior to trial, additional family witnesses could have been called to provide this history and those who were called could have been examined more comprehensively.

My review of the sentencing phase transcript reveals that only a few of the above factors were even referenced in testimony, and those only in a partial and cursory manner. There was no expert testimony regarding the implications of the very limited and incomplete background presented. More specifically:

- There was no testimony regarding the prenatal alcohol and drug exposure of Julius.

- There was no testimony regarding the recurrent exposure to herbicides and

66

## Exhibit 1 - 66

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

pesticides that Julius or his parents were exposed to.

- There was no testimony regarding neuropsychological deficits in Julius.

- There was no testimony regarding Julius' learning problems.

- There was no testimony regarding Julius' early adolescence onset alcohol abuse and subsequent alcohol dependence.

- There was no testimony regarding Julius youthfulness at the outset of his delinquency and gang activity.

- There was no testimony regarding the generational family dysfunction that pervaded both the paternal and maternal family systems. John Hollimon, Jr., maternal uncle, was not queried regarding the lack of supervision in his parents' household, his father's regular drunkenness when younger, or other family problems. Instead, the defense utilized him to inaccurately represent that his parents had a stable, nurturing household. Similarly, no other extended family members were called to describe the historic dysfunction of this family system.

- There was no testimony regarding the genetic predisposition to alcohol and drug dependence in the maternal and paternal family systems.

- Rose Hollimon acknowledged that she was age 15 when she married, but there was no testimony regarding her being a teen when she gave birth to Marcus and Julius.

- There was no testimony regarding Rose exhibiting indications of sub-average intelligence.

- Both Rose and her brother, John, testified regarding her alcohol and drug abuse. The extent of this and its impact on her parenting was not developed in testimony. There was no testimony regarding the role of alcohol and drug abuse in the neglect and family chaos during the critically important infancy and preschool years of Julius' life. There was no testimony regarding the alcohol and drug dependence of Jimmie Lee Robinson, Julius' father.

- There was no testimony regarding parental drug trafficking.

- There was no testimony regarding the disrupted and inadequate primary attachment suffered by Julius. Further, Rose's testimony that she kept the boys with her while residing in Wichita Falls following the divorce from Jimmie is inconsistent with the declarations of Jimmie Lee Robinson, John Hollimon, and Marcus Robinson.

67

**Exhibit 1 - 67**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

- There was no testimony regarding Julius and Marcus observing the domestic violence of their parents.

- Rose reported living separately from Julius for periods of time, but there was no testimony describing her emotional neglect of the children in early childhood secondary to her own alcohol and drug dependence, drug trafficking, chaotic marital relationship, and youthfulness. Further, there was no testimony regarding extent of her failure to remain emotionally/functionally involved with the children during their years with the maternal grandparents or when in her care as teens.

- The absence of Jimmie Lee from the children's lives was noted in Rose's testimony, though not the implications of this. Her own abandonment of the children was not clearly established in testimony.

- There was no testimony regarding the death of the paternal grandmother, a surrogate parent figure in Julius' life.

- There was no testimony regarding Julius potentially being sexually abused at age five.

- There was no testimony regarding the instability in family structure and residence of Julius' time with his parents in early childhood, the household of his maternal grandmother in middle childhood and early adolescence, or the household of his mother in his high school years.

- There was no testimony regarding the inadequate supervision and discipline Julius received in the households of his maternal grandparents or his mother.

- There was no testimony regarding the legacy of racial prejudice and discrimination in Dermott.

- There was no testimony regarding the systemic economic hardship and social desperation among Blacks in Dermott.

- There was no testimony regarding corruptive family and older peer influences in Julius' initial involvement in gang activity and drug dealing.

- There was no testimony regarding the corruptive community influences and gang recruitment that occurred in Dermott in Julius' early adolescence.

- There was testimony regarding Julius dealing drugs in high school. There was no testimony regarding his early teen recruitment into drug dealing in Dermott, or the larger phenomenon of teens being recruited into drug dealing nationally and the

68

**Exhibit 1 - 68**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

associated risk factors for this.

- There was no testimony regarding the inadequate interventions made available to Julius.

**Section 3**

*Future danger:*

The Government alleged as a non-statutory aggravating factor that: "Robinson is a future danger to the lives and safety of other persons as evidenced by lack of remorse, poor rehabilitative potential, and specific threats and acts of violence" (sentencing phase, vol. 20:35). Had defense counsel consulted with me regarding this "future danger" wording of this aggravator, or inquired of me regarding this concept in my testimony, I would have noted that the relevant special issue as affirmed in *Jurek v Texas* is: "Whether there is a probability the defendant would commit acts of criminal violence that would constitute a continuing threat to society." This special issue is not an assessment of a static characteristic of dangerousness. Rather it calls for an evaluation of the likelihood of violent acts. This is not an inconsequential distinction (see Cunningham, in press; Cunningham & Goldstein, 2003; Cunningham & Reidy, 1998; 2001). If the special issue is re-framed as "danger," it ceases to be definable or measurable in a scientifically reliable and reasonably discriminating fashion. More problematically, when construed as "dangerousness" the issue loses any individualizing value in the application of the death penalty. All violent felons, and particularly all capital offenders, would be considered to be dangerous. Their "dangerousness" is a significant rationale for their long-term confinement in highly secure correctional facilities. It is understandable why the Government would seek to reframe this special issue as "future danger" as opposed to "probability of acts of criminal violence." A jury, having just convicted the defendant of a capital murder, is much more likely to agree with the proposition that a defendant is a "future danger" than they are to find that he is disproportionately probable to commit acts of criminal violence in prison - particularly when the jury has the benefit of expert testimony on the relevant probabilities. It is less understandable why the defense would not object to such a mischaracterization of the Supreme Court affirmed wording of this issue.

In fact, there is little evidence that the defense appreciated the difference between "future danger" and the "probability of acts of criminal violence." Indeed, Mr. Ball twice used the word "danger" in discussing this aggravator at the conclusion of his final argument (sentencing phase, vol. 23: 80, 81). Similarly, Mr. Strickland, far from objecting to it, early in his final argument repeatedly adopted the Government's mischaracterization of the issue:

> Strickland: The first of the factors is this question of future dangerousness. Will the defendant present a future danger. (sentencing phase, vol. 23: 82)

69

**Exhibit 1 - 69**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Strickland: But the question of future dangerousness is paramount. (sentencing phase, vol. 23: 83)

Strickland: And they talk to you about the question of future dangerousness. (sentencing phase, vol. 23: 84)

Strickland: …that was directed to help you make a decision as to the question of future dangerousness. (sentencing phase, vol. 23: 84)

Strickland: We don't have to infer whether that was a question of future dangerousness. (sentencing phase, vol. 23: 84)

Strickland: …to periodically assess whether or not a defendant presents a future danger to other persons, not just staff, not just other inmates, other persons. (sentencing phase, vol. 23: 84)

Strickland: The government wants you to speculate that that's an indication of future dangerousness. (sentencing phase, vol. 23: 85)

*Risk of ordering violence from prison:*

Violence risk assessment at capital sentencing can address any or all of three primary risk contexts: 1. personally perpetrated violence in prison; 2. criminal violence of capital parole (if applicable); or, 3. risk of ordering violence from prison. In U.S. v Robinson, the risk of criminal violence on parole was a moot issue as a federal capital term is without possibility to parole. I was only requested by the defense to address the first risk context, that of personally perpetrating violence during a capital life term in the Bureau of Prisons. Review of the trial transcript, however, reflects that the third context (i.e., risk of ordering violence from prison) was a central focus of the Government's assertion of "future dangerousness." Final arguments asserting this issue included:

> One issue, one issue, that you have got to decide among a host of issues, certainly, not the only issue, but I would suggest to you that as long as Julius Robinson has access to a telephone, Julius Robinson continues to be a danger to society….So I would submit to you, ladies and gentlemen, that the overwhelming evidence on that future dangerousness issue sadly is that Julius Robinson will always be a future danger, and his target environment just got a little bit bigger because "H" and every one of the courageous individuals who came down here to testify against him is now a target. They have got a target sign on their chest to anyone that he can get word to to take care of. (sentencing phase, vol. 23: 102)

The Government's offering into evidence the transcripts of telephone calls by Mr. Robinson from federal pretrial confinement, as well as the testimony from Michael "One Love" Williams made the above assertions in final argument quite predictable. Had I

70

**Exhibit 1 - 70**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

been queried by the defense regarding assessment of this central risk assertion by the Government regarding ordered violence from prison, I could certainly have addressed factors involved in such a risk analysis. Indeed, I testified regarding such an analysis of risk of order violence in the community from prison as early as U.S. v Marvin Holley (1998). Factors involved in such a risk analysis include the following:

*Motivation*
- Was the solicitation of violence in the community motivated by a desire for retaliation or to prevent prosecution by witness intimidation or elimination? If vindictiveness or desire for retaliation is primary, then there is a continuing motivation and risk.

- If, however, the motive was to avoid prosecution, that motive has ended with the conviction. It would appear that Mr. Robinson's motive, if there was any solicitation, was of a prosecution avoidance nature and accordingly ended with his conviction

*Resources*
- Does the defendant continue to have operational control of a criminal enterprise that will carry out his commands? It would appear that most if not all of the Nathan Henderson crew were in custody and/or had cooperated with the Government. It is anticipated that Mr. Robinson's control over a younger generation of gang members in Dermott would rapidly deteriorate, if it ever existed, with his life-without-parole confinement.

- Does the defendant possess significant financial resources that could purchase violence in the community? I have no indication that Mr. Robinson continues to control significant financial resources.

*Credibility*
What evidence is there that the Government regarded the allegation of solicited violence as sufficiently creditable that it responded to the allegations with:

- restrictions on the defendant's telephone and mail communications? I saw no evidence from the sentencing transcript that the Government had sought Special Administrative Measures (SAMs) to restrict Mr. Robinson's access to the phone or mail?

- reducing the potential for the solicited violence to be accomplished by placing the purported target in protective custody (if incarcerated); enrolling the target in the Witness Protection Program, relocation of the target, or other protective measures? From the transcript I saw no testimony that would suggest that any of these measures were undertaken.

71

**Exhibit 1 - 71**

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

Additionally, what is the evidence that the purported target responded with alarm?

*Prevention*

Should the DOJ or the Bureau of Prisons believe that an inmate represents a threat to effecting violence in the community, special conditions of confinement can be brought to bear that place extraordinary restrictions on that inmate's communications, including barring contact with other inmates and monitoring/restricting visitation, phone, and mail contacts. The authority of the Court, DOJ, and BOP to impose such restrictions was asserted by DOJ and subsequently upheld by the 2nd Circuit in U.S. v Luis Felipe. The Government's assertions that a telephone would be available to Mr. Robinson "at any prison setting" (sentencing phase, vol. 23: 105) is inconsistent with the special communication restrictions DOJ has indicated that they and BOP can order and enforce.

- Under such communication restrictions, the likelihood of being able to successfully effect violence in the community is regarded as near negligible.

I hereby declare under the penalty of perjury of the laws of the State of Texas and the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated this 28th day of November, 2005 at Orange County, California.

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

72

**Exhibit 1 - 72**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Additionally, what is the evidence that the purported target responded with alarm?

*Prevention*

Should the DOJ or the Bureau of Prisons believe that an inmate represents a threat to effecting violence in the community, special conditions of confinement can be brought to bear that place extraordinary restrictions on that inmate's communications, including barring contact with other inmates and monitoring/restricting visitation, phone, and mail contacts. The authority of the Court, DOJ, and BOP to impose such restrictions was asserted by DOJ and subsequently upheld by the 2nd Circuit in U.S. v Luis Felipe. The Government's assertions that a telephone would be available to Mr. Robinson "at any prison setting" (sentencing phase, vol. 23: 105) is inconsistent with the special communication restrictions DOJ has indicated that they and BOP can order and enforce.

- Under such communication restrictions, the likelihood of being able to successfully effect violence in the community is regarded as near negligible.

:

I hereby declare under the penalty of perjury of the laws of the State of Texas and the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated this 28th day of November, 2005 at Orange County, California.

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

72

**Exhibit 1 - 73**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## REFERENCES

Ainsworth, M.D.S. (1979). Infant-mother attachment. American Psychologist, 34, 932-937.

American Psychological Association (1996). Effects of abuse on children. Presidential Task Force on Violence and the Family. Author.

American Society for Adolescent Psychiatry & the American Orthopsychiatric Association filed as an amici curiae in Thompson v Oklahoma (1986).

Beck, A., Gilliard, D., Greenfeld, L., Harlow, C., Hester, T., Jankowski, L., Snell, T., Stephan, J., Morton, D., (1993). Survey of state prison inmates, 1991. U.S. Department of Justice, Bureau of Justice Statistics, NCJ-136949.

Begleiter, H. (1995). The collaborative study on the genetics of alcoholism. Alcohol Health & Research World,19, 228-236.

Blake, P., Pincus, J., & Buckner, C., (1995). Neurologic abnormalities in murderers. Neurology, 45, 1641 - 1647.

Bowlby, J. (1971). Attachment and loss: Vol. 1. Attachment. Hammondsworth, England: Pelican.

Bowlby, J. (1973) Attachment and loss: Vol. 2. Separation, anxiety, and anger. New York: Basic Books.

Cantelon, S.L. (1994). Family strengthening for high-risk youth. Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Fact sheet #8.

Cornell, D. et. al. (1987). Characteristics of adolescents charged with homicide. Behavioral Sciences and the Law, 5, 11-23.

Curtis, C. (1980). The psychological parent doctrine in custody disputes between foster parents and biological parents. Columbia Journal of Law and Social Problems, 16, 149-191.

Day, N.L. & Richardson, G.A. (1991). Prenatal alcohol exposure: A continuum of effects. Seminars in Perinatology, 15, 271-279.

Briere, J., Evans, D., Runtz, M., & Wall, T. (1988). Symptomatology in men who were molested as children: A comparison study. American Journal of Orthopsychiatry, 457- 461.

73

## Exhibit 1 - 74

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Chaiken, M. R. (March, 2000). Violent neighborhoods, violent kids. Office of Juvenile Justice and Delinquency Prevention. U.S. Department of Justice.

Cotton, N.S. (1979). The familial incidence of alcoholism: A review. Journal of Studies on Alcohol, 40, 89-116.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

Cunningham, M.D. & Goldstein, A.M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Elliott, F.A. (1987). Neuroanatomy and neurology of aggression. Psychiatric Annals, 17, 385-388.

English, D.J., Widom, C.S., & Brandford, C. (2001). Childhood victimization and delinquency, adult criminality, and violent criminal behavior: A replication and extension, final report. National Institute of Justice, U.S. Department of Justice. NCJ 192291.

Esman, A.H. (1988). Assessment of the adolescent. In C.J. Kestenbaum & D.T. Williams (Eds.) Handbook of clinical assessment of children and adolescents (pp. 217-231). New York: New York University Press.

Finkelhor, D., & Brown, A. (1985). The traumatic impact of child sexual abuse, a conceptualization. American Journal of Orthopsychiatry, 55, 530-542.

Finkelstein, H. (1988). The long-term effects of early parent death: A review. Journal of Clinical Psychology, 44, 3-9.

Friday, J.C. (1994). The psychological impact of violence in underserved communities. Journal of Health Care for the Poor and Underserved, 6, 403-409.

Green, A.H. (1988). The abused child and adolescent. In C.J. Kestenbaum & D.T. Williams (Eds.) Handbook of clinical assessment of children and adolescents (pp. 842-863). New York: New York University Press.

74

**Exhibit 1 - 75**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Greenfeld, L.A. (1998). Alcohol and crime: An analysis of alcohol involvement in crime, U.S. Department of Justice, Bureau of Justice Statistics, NCJ-168632

Gustafson, R. (1993). What do experimental paradigms tell us about alcohol-related aggressive responding? Journal of Studies on Alcohol, Supplement No. 11: 20-29.

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Hill, M.A. & O'Neil, J. (1993). Underclass behaviors in the United States: Measurement and analysis of determinants. City University of New York, Baruch College.

Hirschi, T. & Gottfredson, M. (1989). Age and the explanation of crime. American Journal of Sociology, 89, 552-584.

Hoaken, P.N.S., Assaad, J.M, & Pihl, R.O. (1998). Cognitive functioning and the inhibition of alcohol-induced aggression. Journal of Studies of Alcohol, 59, 599-607.

Jenkins, P.H. (1995). School delinquency and school commitment. Sociology of Education, 68, 221-239.

Langevin, R., Ben-Aron, M., Wortzman, G., Dickey, R., & Handy, L. (1987). Brain damage, diagnosis, and substance abuse among violent offenders. Behavioral Sciences & the Law, 5, 77-94.

Leviton, S., Schindler, M.A., & Orleans, R.S. (1994). African-American Youth: Drug trafficking and the justice system. Pediatrics, 93, 1078-1084.

Lewis, D., Pincus, J., Feldman, M., Jackson, L., & Bard, B.(1986).Psychiatric, neurological and psychoeducational chararcteristics of 15 death row inmates in the United States. American Journal of Psychiatry, 143, 838-845.

Lewis, M. (1985). Predicting psychopathology in 6 year olds from early parental relations. Integrative Psychiatry, 3, 284-289.

Looney J.G. & Oldham, D.G. (1989). Normal adolescent development. In H.I. Kaplan & B.J. Sadock (Eds). Comprehensive textbook of psychiatry, 5th Edition (p.1710). Baltimore: Williams & Wilkins.

**Exhibit 1 - 76**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Martell, D.A. (1992). Estimating the prevalence of organic brain dysfunction in maximum-security forensic psyciatric patients. Journal of Forensic Sciences, 37, 878-893.

Mattson, S.N. & Riley, E.P. (1998). A review of the neurobehavioral deficits in children with fetal alcohol syndrome or prenatal exposure to alcohol. Alcohol, Clinical and Experimental Research, 22, 279-294.

Meloy, J. R. (1988). Psychopathic mind: Origin, dynamics, and treatment. Northvale, NJ: Jason Aronson.

Miller, S. J., Dinitz, S., & Conrad, J. P. (1982). Careers of the violent: The dangerous offender and criminal justice. Lexington, MA: Lexington Books.

Murdock, D., Pihl, R. O., & Ross, D. (1990). Alcohol and crimes of violence: Present issues. The International Journal of the Addictions, 25, 1065-1081.

Nagin, D.S. & Tremblay, R.E. (1999). Trajectories of boys' physical aggression, opposition, and hyperactivity on the path to physically violent and nonviolent juvenile delinquency. Child Development, 70, 1181-1196.

National Institute on Alcohol Abuse and Alcoholism (December 2000). Fetal alcohol exposure and the brain. National Institute of Health, No. 50. Rockville, MD.

Pardeck, J.T. (1983). Empirical analysis of behavioral and emotional problems of foster children as related to re-placement in care. Child Abuse and Neglect, 7, 75-78.

Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. American Psychologist, 44, 329-335.

Robin Hood Foundation. Kids having kids: A Robin Hood Foundation special report on the costs of adolescent childbearing. R.A. Maynard (Editor).

Rutter, M. (1979). Maternal deprivation, 1972-1978: New findings, new concepts, new approaches. Child Development, 50, 283-305.

Ogletree et al., (1995). Harvard Law School, NAACP

Pridemore, W. A. (2002). What we know about the social structure of homicide. A review of the theoretical and empirical literature. Violence and Victims, 17, 127-156.

Ressler, R.K., Burgess, A.W., & Douglas, J.E. (1988). Sexual homicide: Patterns and motives. New York: Lexington Books.

76

**Exhibit 1 - 77**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Sampson, R.J. & Laub, J.H. (1994). Urban poverty and the family context of delinquency: A new look at structure and process in a classic study. Child Development, 65, 523-540.

Samuels, A. (1988). Parental death in childhood. In S. Altschul and G.H. Pollock (eds.) Childhood Bereavement and Its Aftermath. Madison, WI: International Universities Press.

Schwarz, E.D. and Perry, B.D. (1994). The post traumatic response in children and adolescents. Psychiatric Clinics of North America, 17, 311-358.

Silverman, P.R. & Worden, J.W. (1992). Children's reactions in the early months after the death of a parent. American Journal of Orthopsychiatry, 62, 93-104.

Sroufe, L.A. (1979). The coherence of individual development: Early care, attachment, and subsequent developmental issues. American Psychologist, 34, 834-841.

Stanton, B. & Galbraith, J. (1994). Drug trafficking among African-American early adolescents: Prevalence, consequences, and associated behaviors and beliefs. Pediatrics, 93, 1039-1043.

Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51:2, 117-132.

Terr, L.C. (1991). Childhood traumas: An outline and overview. American Journal of Psychiatry, 148, 10-20.

U.S. Department of Health and Human Services (1993), National Center for Health Statistics, Survey of child health, Washington, D.C.

U.S. Department of Justice (1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders, Juvenile Justice Bulletin, Juvenile Justice Clearinghouse, Washington, D.C.

Yarrow, L.J., Goodwin, M.S., Manheimer, H., & Milowe, I.D. (1973). Infancy experiences and cognitive personality development at 10 years. In L.J. Stone, H.T. Smith, & L.B. Murphy (Eds.) (pp. 1274-1281), The competent infant: Research and commentary. New York: Basic Books.

Schuckit, M.A. (1987). Biological vulnerability to alcoholism. Journal of Consulting and Clinical Psychology, 55, 301-30.

Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

77

**Exhibit 1 - 78**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Struve, J. (1990). Dancing with the patriarchy: The politics of sexual abuse. In M. Hunter(Ed.), The sexually abused male. New York: Lexington Books.

Swanson, J. W., Holzer, C. E. III, Granju, V.K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. Hospital and Community Psychiatry, 41, 761-770.

Thornberry, T.P. (December, 1994). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice.

Urquiza, A.J., & Capra, M., (1990).   The impact of sexual abuse:  Initial and long-term effects.In The sexually abused male, edited by M. Hunter, 106-135.  New York: Lexington Books.

Urquiza, A.J., &  Keating, L.M.,  (1990).   The prevalence of sexual victimization of  males.  In The sexually abused male, edited by M. Hunter, 89-103.  New York: Lexington Books.

U.S. Department of Justice (1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders, Juvenile Justice Bulletin, Juvenile Justice Clearinghouse, Washington, D.C.

Widom, C.S. (1989).  Child abuse, neglect, and adult behavior:  Research design and findings on criminality, violence, and child abuse. American Journal of Orthopsychiatric Association, 59, 355-367.

Exhibit 1 - 79

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Attachment A

## CURRICULUM VITAE OF MARK D. CUNNINGHAM, PH.D., ABPP

### EDUCATION

**Undergraduate:** Abilene Christian College, Abilene, Texas
*Bachelor of Arts*, (May 1973)
Majors: Psychology, Mass Communications

**Graduate:** Oklahoma State University, Stillwater, Oklahoma
*Master of Science* (December 1976)
*Doctor of Philosophy* (December 1977)
Specialty: Clinical Psychology (APA accredited)

**Internship:** National Naval Medical Center, Bethesda, Maryland
(February 1977 to February 1978)
Specialty: Clinical Psychology (APA accredited)

### BOARD CERTIFICATION

Forensic Psychology (1995), American Board of Professional Psychology (ABPP)

### PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Arizona #3662 | Arkansas #98-17P | Colorado #2305 |
| Connecticut #846 | Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376 | Louisiana #794 | New Mexico #0768 |
| Oklahoma #1002 | Oregon #1333 | South Carolina #764 |
| Tennessee #2255 | Texas #2351 | |

79

Exhibit 1 - 80

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## CURRICULUM VITAE (2)

### HONORS, AWARDS, AND DISTINCTIONS

*American Psychological Association Award for Distinguished Contribution to Research in Public Policy* – annual award bestowed for distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work, 2006 recipient

*Texas Psychological Association Award for Outstanding Contribution to Science* – annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge, 2005 recipient

*John Augustus Award* - annual award bestowed for outstanding contributions to the profession of sentencing advocacy, National Association of Sentencing Advocates, 2004 recipient

*Fellow, American Academy of Forensic Psychology* – distinction reflecting diplomate in forensic psychology by the American Board of Professional Psychology, 1995-

*Al Brown Memorial Award* – award bestowed for outstanding achievement, NIMH Sex Therapy Training Program, Yale University School of Medicine, 1979-1981

*Navy Commendation Medal* – decoration for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy, 1978-1980

*Magna cum Laude* - Bachelor of Arts, Abilene Christian College, 1973

### PROFESSIONAL PRACTICE

**1981 - date**    Clinical and Forensic Psychologist, Private practice

**1978 - 1981**    Clinical Psychologist (Lieutenant, MSC, USNR)
                   Naval Submarine Medical Center, Groton, Connecticut

### EDITORIAL

Ad hoc reviewer: *Assessment*
                 *Behavioral Sciences & the Law*
                 *Law & Human Behavior*

80

## Exhibit 1 - 81

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## CURRICULUM VITAE (3)

## ACADEMIC APPOINTMENTS

1981 - 1983    Assistant Professor: Psychology Department,
                   Hardin-Simmons University, Abilene, Texas

1978 - 1980    Instructor (part-time): Psychology Department,
                   Old Dominion University (U.S. Submarine Base Extension);
                   Mohegan Community College, Norwich, Connecticut

1974 - 1977    Teaching Assistant: Psychology Department
                   Oklahoma State University, Stillwater, Oklahoma

## PROFESSIONAL AFFILIATIONS

American Board of Professional Psychology (ABFP examiner)
American Academy of Forensic Psychology (workshop teaching faculty)
Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology

American Psychological Association
Texas Psychological Association
National Association of Sentencing Advocates
American Association for Correctional Psychology

## SCHOLARLY PUBLICATIONS

*Chapters in edited books:*

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death
    penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of
    12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

Cunningham, M. D. (in press). Special issues in capital sentencing. In M.A. Conroy, P.
    Lyons, & P. Kwartner (Eds.), *Forensic evaluations under Texas law: Selected
    criminal issues*. To be published by the Capacity for Justice.

81

## Exhibit 1 - 82

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## CURRICULUM VITAE (4)

*Papers in peer-reviewed journals:*

Cunningham, M. D. & Murphy, P. J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. *Journal of Learning Disabilities, 14*, 204 -208.

Cunningham, M. D. & Reidy, T. J. (1998).  Integrating base rate data in violence risk assessments at capital sentencing.  *Behavioral Sciences & the Law, 16*, 71-95.

Cunningham, M. D., & Reidy, T. J. (1998).  Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16*, 333-351.

Cunningham, M. D., & Reidy, T. J. (1999).  Don't confuse me with the facts:  Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.

Cunningham, M. D. & Vigen, M. P. (1999).  Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates.  *Criminal Justice and Behavior, 26*, 293-321.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001).  From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28*, 62-82.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death:  Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19*, 473-490.

Cunningham, M. D. & Reidy, T .J. (2002).  Violence risk assessment at federal capital sentencing:  Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29*, 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20*, 191-210.

Shuman, D. W., Cunningham, M. D., Connell, M. A, & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. *Professional Psychology: Research and Practice, 34,* 233-239.

82

## Exhibit 1 - 83

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## CURRICULUM VITAE (5)

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15,* 365-376.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12,* 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23,* 307-320.

Cunningham, M. D. & Sorensen, J. R. (*in press*). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior.*

*Papers in edited legal journals:*

Lyon, A. D. & Cunningham, M. D. (*in press*) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law.*

*Invited case reports and teaching points:*

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (152-171). New York: Oxford University Press.

Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (96-114). New York: Oxford University Press.

Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (171-173). New York: Oxford University Press.

Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (114-115). New York: Oxford University Press.

83

## Exhibit 1 - 84

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## CURRICULUM VITAE (6)

*Articles in professional periodicals:*

Marcy, M. R., Hopkins, J. B. & Cunningham, M. D. (1978). A behavioral treatment of nocturnal enuresis, *U.S. Navy Medicine, 69*, 26-28.

Cunningham, M. D. & Reidy, T. J. (1998). Antisocial personality disorder vs. psychopathy as diagnostic tools. *Prosecutor's Brief: California District Attorneys Association, 20*, 9-11.

Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. *American Psychology and Law Society News, 21, 2*, 8-9.

*Manuscripts under review:*

Cunningham, M. D. (*manuscript under review)*. Unparalleled need to know: Informed consent in capital sentencing evaluations.

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*). Actuarial models for assessment of prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP).

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review)* Predictive factors for violent misconduct in close custody.

*Manuscripts in preparation:*

Sorensen, J. R. & Cunningham, M. D. (*manuscript in preparation*). Does the severity of the offense predict prison adjustment? A comparative study of the violent institutional misconduct rates of convicted murderers and other offenders.

## SCHOLARLY SYMPOSIUM

Competency to be executed. Symposium with Stanley Brodsky, Ph.D. & Patricia Zapf, Ph.D., American Psychology-Law Society Annual Conference, Austin, TX, March 2002.

Informed consent in forensic evaluations. Symposium with Mary Connell, Ph.D., William Foote, Ph.D., & Daniel Shuman, J.D., American Psychology-Law Society Annual Conference, LaJolla, CA, March 2005.

84

## Exhibit 1 - 85

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

Appendix B

Demonstrative Exhibits

(prepared to accompany my testimony at trial in March 2002)

85

**Exhibit 1 - 86**

# Risk Assessment

Exhibit 1 - 87

# Why capital offender base rates apply to capital inmates in BOP

- Offense histories sufficiently violent and aggravated that a death sentence was sought and returned.
- Inmate offense distribution is similar from state to state.
- Prison facilities and procedures have broad similarity.
- Consistency of findings
  - diverse geographic regions
  - diverse time periods
  - diverse prison settings
  - diverse capital statutes
  - diverse capital offense characteristics
- Peer reviewed acceptance of broad applications

**Exhibit 1 - 88**

# Risk Components

## Will this driver have an accident?
1. What probability?
2. Of what type of accident?
3. At what age?
4. In what  locale?



## Will there be violence?
1. What probability?
2. Of what form of violence?
3. At what time period?
4. In what context?

**Exhibit 1 - 89**

# Risk Assessment Techniques

*More Scientific*

## 1. Actuarial

(insurance company method)

## 2. Pattern

(using <u>patterns</u> of how the individual behaved in the past to estimate behavior in <u>similar</u> situations)

## 3. Intensive clinical evaluation

(inferring violence risk from personality characteristics -- notoriously unreliable in forecasting long-term violence)

## 4. Hypothetical inference

(seeing animals in the stars)

*Less Scientific*

Morris, N., & Miller, M. (1985). Predictions of dangerousness. In M. Tonry & N. Morris (Eds.), *Crime and justice: An annual review of research (Vol. 6)* (pp.1-50). Chicago: University of Chicago Press.

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

**Exhibit 1 - 90**

# Base Rates Relevant to Likelihood of Violence in Prison

1. Capital offenders and murderers in the general prison population

2. Assaults by inmates in Federal prisons

3. Homicide of inmates or staff in state and Federal prison

4. Disciplinary infractions of short-term and long-term inmates

5. Aging effects on criminality and violence

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26,* 20-43.

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

**Exhibit 1 - 91**

# Furman Commutees:
# Serious Rule Violations Across 15 years

-533 former death row inmates nationwide
- prison behavior over a 15 year period after removal from death row



69.5%
No Serious Violations

Marquart, J. & Sorensen, J. (1989). A national study of the *Furman*-commuted inmates: Assessing the threat to society from capital offenders. *Loyola of Los Angeles Law Review, 23 (5), 5-28.*

**Exhibit 1 - 92**

# Was being sentenced to death a life changing experience?

## <u>Death Row Commutees</u>

N = 47

32 years old

followed 1973-1988 (10yrs)

## <u>Life Sentence Inmates</u>

N = 156 (128 murd., 28rapists)

30 years old

followed 1973-1988 (11yrs)

No prison homicides            No prison homicides

*Serious Infractions*




*Aggravated Assault / Fighting with Weapon*




Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). *The Rope, the chair, & the needle: Capital punishment in Texas, 1923-1990.* Austin: University of Texas Press

**Exhibit 1 - 93**