# THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CAUSE NO. 4:00-CR-00260-2** |
| | **:** | **DEATH PENALTY CASE** |
| **vs.** | **:** | |
| | **:** | **Honorable Terry Means** |
| **JULIUS ROBINSON** | **:** | **United States District Judge** |

---

### EXHIBIT NUMBER 39 (PART 1 OF 3, PAGES 1-35)

### SUBMITTED IN SUPPORT OF MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

(Filed Electronically Under the Electronic Filing System Requirements)

---

## Summary: 1983 Soybean Pesticide Use Survey

*Note:   Only pesticides used on a minimum of 5,000 acres have been included on this list.
**Note: Underlining indicates that at least 30% of the pesticide was sprayed by aerial application.

**Applied Pre-Seedling Emergence**
- Alachlor
- Dinoseb
- Fluchloralin
- Metolachlor
- Metribuzin
- Pendimethalin
- Trifluralin

**Applied Between Emergence and Harvest**
- 2,4-DB
- Acifluorfen
- Benomyl
- Bentazon
- Dinoseb
- Glyphosate
- Linuron
- Naptalam
- Sethoxydim

**Exhibit 39 - 1**

## SUMMARY OF PESTICIDES USED IN 1983 ON SOYBEAN FARMS IN ARKANSAS

**2, 4-DB**: Herbicide. Introduced in 1942. Registered in 1958. Excessive exposure can affect the nervous and digestive systems. Is considered a developmental toxin. Applied once or twice per season. Not expected to bioaccumulate in the environment.

**Acifluorfen:** Herbicide. Registered in 1988, but used earlier. Considered a probable human carcinogen.

**Alachlor**: Herbicide. Introduced in 1969. Registered in 1975. Is considered a developmental toxin. Repeated exposure has been reported to cause organ toxicity and anemia. Possibly carcinogenic. Moderately persistent in soil and water. Highest chronic risk to children ages 1-6.

**Benomyl**: Registered in 1969. Voluntarily cancelled in 2001. A general use fungicide considered by the EPA to be virtually non-toxic. However, it rapidly degrades to carbendizim (MBC). MBC and Benomyl can cause liver toxicity, developmental toxicity (brain malformation, increased mortality) and reproductive effects. Also a possible human carcinogen.

**Bentazon**: Herbicide. Moderately toxic by ingestion, slightly toxic by skin contact. Can cause apathy, incoordination, prostration, tremors, anorexia, vomiting and diarrhea. Can cause reduced body weight, increased blood clotting times and increased liver and kidney weight. Considered non-carcinogenic to humans, but is slightly toxic. Resistant to degradation. Rapidly absorbed, excreted and dissipated. May impact surface and groundwater. Mostly used on soybeans.

**Dinoseb**: Herbicide. Introduced in 1945. Registered in 1976. Suspended in 1986 due to risk of birth defects. Cancelled in 1989. Can cause decreased fetal weight. It is a developmental toxin considered to be highly to extremely toxic. Inhalation is dangerous, dermal contact has been known to kill. Adversely affects reproduction. It is a possible human carcinogen and can damage organs. It contaminates water and produces toxic fumes during decomposition. Usually aerially sprayed in Arkansas.

**Fluchloralin**: Herbicide. Registered in 1970. No longer registered. Not usually aerially sprayed. Not a lot of information out there about this pesticide.

**Glyphosate**: Registered in 1974. Moderately toxic general use herbicide in the organophosphate category. One of the most widely used by volume. Non-carcinogenic to humans. High doses can effect mortality, skin, weight, blood, pancreas and digestion. It can contaminate water but is quickly broken down. It has been linked to Non-Hodgkin's and Hodgkin's Lymphoma. It is persistent in soil and can persist in food products for up to 2 years. Inert ingredients have been linked to skin irritation, gastric and respiratory problems. Usually aerially sprayed in Arkansas.

**Linuron**: Herbicide. Registered in 1967. Considered a developmental toxin. Can cause abnormal blood pigment. Possible human carcinogen. Mostly applied to soybeans. Can cause

**Exhibit 39 - 2**

changes in blood cell counts, retard growth, destroy blood cells, cause liver tumors and interfere with transmission of male hormones. People can be exposed through diet. Extra risk of exposure to children ages 1-6. Moderately persistent in the soil and water, relatively immobile. The smaller the mammal, the greater the level of concern for acute effects.

**Metolachlor**: Slightly toxic. Human exposure most commonly occurs through skin or eye contact. More dangerous when inhaled than when ingested. Low dermal toxicity to humans, but can cause skin sensitivity. Possible human carcinogen. Exposure can cause damage to the liver and irritate the eyes and mucous membranes. It is quickly metabolized and is mobile in the soil and resists breakdown for long periods of time. It can also contaminate groundwater.

**Metribuzin**: Herbicide. Registered in 1973. Considered a developmental toxin. It can cause liver and kidney damage, decreased body weight and mortality. Organ toxicity can also be caused. A person can be exposed to it through diet. Inhalation can cause major risk. Residues have been found in groundwater and food sources.

**Naptalam**: Herbicide. Registered in 1949. Usually applied once per year. Dermal exposure is the most likely cause of damage, then ocular, then inhalation. Usually aerially sprayed in Arkansas.

**Pendimethalin**: Herbicide. Registered in 1975. Suspected carcinogen. Suspected endocrine, gastrointestinal and liver toxicant. One of the most hazardous compounds to the environment. Not typically aerially sprayed. Most exposure comes through diet. However, it is considered low toxicity by the EPA. Groundwater residue occurs and occupational hazards are feasible.

**Sethoxydim**: Herbicide. It can negatively affect the liver and bone marrow. It can also cause skin and eye irritation. Low inhalation and dermal toxicity. Moderate ocular toxicity. It doesn't persist for very long in the soil. Usually aerially sprayed in Arkansas.

**Trifluralin**: Herbicide. Registered in 1973. Cancelled in 1982, but is still being used. It can cause increased liver weights and increase in methemoglobin. It is a possible human carcinogen. Skin and eye irritation, nausea, dizziness and headache can occur. People can be exposed to it through diet. Low acute toxicity. It is persistent and non-mobile. Contamination of surface water may occur with spray drift.

**Exhibit 39 - 3**

| United States Environmental Protection Agency | Prevention, Pesticides And Toxic Substances (7508C) | EPA-738-F-05-001 March 2005 |
| --- | --- | --- |

# EPA R.E.D. FACTS

# 2,4-DB

**Pesticide Reregistration**

All pesticides sold or distributed in the United States must be registered by EPA (the Agency), based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment. Because of advances in scientific knowledge, the law requires that pesticides, which were first registered before November 1, 1984, be reregistered to ensure that they meet today's more stringent standards.

In evaluating pesticides for reregistration, EPA obtains and reviews a complete set of studies from pesticide producers, describing the human health and environmental effects of each pesticide. To implement provisions of the Food Quality Protection Act (FQPA) of 1996, EPA considers the special sensitivity of infants and children to pesticides, as well as aggregate exposure of the public to pesticide residues from all sources, and the cumulative effects of pesticides and other compounds with common mechanisms of toxicity. The Agency develops any mitigation measures or regulatory controls needed to effectively reduce each pesticide's risks. EPA then registers pesticides that meet current health and safety standards and can be used without posing unreasonable risks to human health or the environment.

When a pesticide is eligible for reregistration, EPA explains the basis for its decision with the Reregistration Eligibility Decision (RED) document. This fact sheet summarizes the information in the RED document.

**Use Profile**

2,4-DB is manufactured as an acid (2,4-DB) and an amine salt (2,4-DB-DMAS). 2,4-DB and 2,4-DB-DMAS are systemic herbicides used to control broadleaf weeds in alfalfa, clover, peanuts, soybeans, peppermint, spearmint, and birdsfoot trefoil. There are no registered residential uses. Approximately 375,000 pounds of 2,4-DB and 2,4-DB-DMAS are used annually. Applications are made aerially or by ground equipment. There are six products containing 2,4-DB (four technical products and two end-use-products) and 15 products containing 2,4-DB-DMAS (one formulation intermediate and fourteen end-use-products). There is one Section 24C Special Local Need registration for 2,4-DB-DMAS use on mint in Idaho. All end-use product formulations are liquids.

1

**Exhibit 39 - 4**

**Regulatory History**

2,4-DB and 2,4-DB-DMAS have been registered for use on broadleaf weeds since 1958.

EPA completed the tolerance reassessment for 2,4-DB and 2,4-DB-DMAS on January 31, 2005. The Agency concluded that there is a reasonable certainty of no harm to any population subgroup from aggregate exposure to 2,4-DB or 2,4-DB-DMAS from dietary (food and water) exposure and all other non-occupational sources for which there is reliable information.

**Human Health Assessment**

**Toxicity**

Both 2,4-DB and 2,4-DB-DMAS are considered to have low acute toxicity, with the exception of 2,4-DB-DMAS being a Toxicity Category I eye irritant (Category I being the most severe). 2,4-DB is placed in the following acute Toxicity Categories: oral III; dermal III; inhalation IV; eye irritation III; and, dermal irritation IV. 2,4-DB-DMAS is placed in the following acute Toxicity Categories: oral III; dermal III; inhalation IV; eye irritation I; and, dermal irritation IV. 2,4-DB and 2,4-DB-DMAS are classified as "not likely to be a human carcinogen".

**Dietary Risks**

EPA determined that there is reasonable certainty that no harm to any population subgroup will result from aggregate exposure to 2,4-DB or 2,4-DB-DMAS when considering dietary (food and water) exposure. Both acute and chronic exposures are below the Agency's level of concern. For acute dietary exposure, the most sensitive group, females 13-49, was less than 1% of the acute Population Adjusted Dose (aPAD). For chronic dietary exposure the general U.S. population was less than 1% of the chronic Population Adjusted Dose (cPAD). Tolerance level residues and 100% crop treated assumptions were used to determine the above acute and chronic screening level risk estimates. 2,4-DB and 2,4-DB-DMAS are not expected to accumulate in drinking water. Drinking water models showed that the Estimated Drinking Water Concentrations (EDWCs) for ground water and surface water are below the Agency's level of concern. Both the acute ground water EDWC of 0.51 µg/L and the acute surface water EDWC of 318.68 µg/L are less than the acute drinking water level of concern (DWLOC) of 18,000 µg/L for females 13-49. In addition, both the chronic ground water EDWC of 209 µg/L and the chronic surface water EDWC of 72.40 µg/L are below the chronic DWLOC of 290 µg/L for infants less than one year of age and 1,050 µg/L for the general population. Therefore, exposure from drinking water is not of concern to the Agency.

**Residential and Other Non-Occupational Risks**

There are no registered residential uses for 2,4-DB and thus residential exposure is not expected.

2

**Exhibit 39 - 5**

## FQPA Considerations

EPA has determined that there is a reasonable certainty that no harm to any population subgroup will result from aggregate exposure to 2,4-DB and 2,4-DB-DMAS when considering dietary (food and water) exposure and all other non-occupational sources of pesticide exposure for which there is reliable information.

EPA did not perform a cumulative risk assessment as part of this reassessment of 2,4-DB and 2,4-DB-DMAS because the Agency has not determined that there are any other chemical substances that have a similar mechanism of toxicity.

## Worker Risks

Occupational workers can be exposed to a pesticide through mixing, loading, and/or applying a pesticide, or re-entering treated sites. Occupational handlers of 2,4-DB and 2,4-DB-DMAS includes the following: individuals who mix, load, and/or apply pesticides with aerial or ground equipment. Non-cancer risks for all of these potentially exposed populations is measured by a Margin of Exposure (MOE) which determines how close the occupational exposure comes to a No Observed Adverse Effect Level (NOAEL) taken from an animal study. For 2,4-DB and 2,4-DB-DMAS, MOEs greater than 100 do not exceed the Agency's level of concern. All short-term and intermediate-term MOEs are not of concern to the Agency when applicators are wearing baseline personal protective equipment (PPE) and mixers/loaders are wearing baseline PPE and chemical resistant gloves. Post-application exposure to re-entry workers is possible. Since 2,4-DB and 2,4-DB-DMAS are applied only once or twice a season it is anticipated that exposure will be primarily short-term. No toxicity endpoint for short-term dermal exposures was identified, therefore, short-term post-application risks were not assessed. 2,4-DB-DMAS is a Toxicity Category I eye irritant and protective eye-wear is required for early re-entry post-application activities.

# Environmental Assessment

## Ecological Fate

Available data indicates that 2,4-DB-DMAS rapidly dissociates in moist soils and aquatic environments, therefore, ecological risks were only assessed for 2,4-DB. In soil environments 2,4-DB dissipation is dependent on leaching and on oxidative microbial-mediated degradation. 2,4-DB's metabolism half-life is 24.5 days in mineral soils, and ranges from 6.3 - 17.2 days in aquatic environments. The primary route of dissipation is transformation with the major transformation product being 2,4-D. 2,4-DB is not expected to bioaccumulate in the environment.

## Ecological Risks

The ecological risk assessment shows that terrestrial plants are at the greatest risk from 2,4-DB and 2,4-DB-DMAS applications. Potential effects to non-target terrestrial plants are most likely to occur as a result of spray drift and runoff from aerial and ground applications. All acute freshwater risk quotients (RQs) are not of

3

**Exhibit 39 - 6**

concern to the Agency. The Agency is requiring additional studies to better understand the potential risk to estuarine and marine invertebrates. The Agency is not concerned with chronic risks to freshwater organisms. Both acute and chronic risks to birds are not of concern to the Agency. Predicted residues from all uses of 2,4-DB and 2,4-DB-DMAS are below the acute level of concern for mammals. No mammalian chronic levels of concern were exceeded for scenarios when considering one or two applications at average labeled rates and a default half-life of 35 days.

The risk assessment for threatened and endangered species indicates that 2,4-DB and 2,4-DB-DMAS exceed the threatened and endangered species levels of concern for the following use sites: freshwater fish (Texas alfalfa scenario); small mammals feeding (soybean, alfalfa, and peanut scenarios); medium size mammals (alfalfa); small and medium size birds (Texas alfalfa scenario); and, terrestrial plants (at highest application rates). These findings are based solely on the Agency's screening level assessment and do not constitute "may affect" findings under the Endangered Species Act.

## Risk Mitigation

### Dietary Risk

For all supported commodities, the acute and chronic dietary exposure estimates (food and drinking water) are below the Agency's level of concern. Therefore, no risk mitigation measures are required to address exposure to from food and drinking water.

### Occupational Risk

Currently, not all 2,4-DB and 2,4-DB-DMAS labels require mixers and loaders wear chemical resistant gloves. Based on toxicity studies, the Agency is requiring mixers and loaders to wear gloves made from chemically resistant material. Because 2,4-DB-DMAS is a Toxicity Category I eye irritant, protective eyewear should be worn by early re-entry workers and a re-entry interval of 48 hours will be established for 2,4-DB-DMAS products.

### Ecological Risk

The major contributing factor of risk associated with 2,4-DB and 2,4-DB-DMAS is spray drift. To mitigate risk associated with spray drift, the registrant has agreed to include droplet size restrictions on 2,4-DB and 2,4-DB-DMAS labels. Labels must specify medium to coarse droplet size or a volume mean diameter of 300 microns or greater for spinning atomizer nozzles and prohibit fine sprays. Additionally, for aerial applications, the boom length must not exceed 75% of the wingspan or 90% of the rotor blade diameter to reduce spray drift. The Agency has concluded that risks posed by 2,4-DB and 2,4-DB-DMAS to most mammalian, avian, plant, and aquatic species will be substantially reduced by adhering to best management practices for aerial applications.

4

**Exhibit 39 - 7**

**Additional Data Required**

The generic database supporting the reregistration of 2,4-DB and 2,4-DB-DMAS has been reviewed and determined to be substantially complete. However, the following additional data requirements have been identified by the Agency as confirmatory and are listed below. Additionally, responses to outstanding data requirements regarding spray drift and droplet size spectrum (OPPTS GLN 201-1) are currently outstanding.

OPPTS GLN 850.4100/4500  Seedling Emergence and Vegetative Vigor

OPPTS GLN 850.1075  Estuarine/Marine Fish Acute Toxicity

OPPTS GLN 850.1025  Estuarine/Marine Invertebrate Acute Toxicity

**Regulatory Conclusion**

The use of currently registered products containing 2,4-DB and 2,4-DB-DMAS in accordance with approved labeling will not pose unreasonable risks or adverse effects to humans or the environment if the risk mitigation measures and label changes outlined in the RED are implemented. Therefore, all uses of these products are eligible for reregistration. These products will be reregistered once the required product specific data, confidential statements of formula (CSFs), and revised labeling are received and accepted by EPA. Products which contain ingredients in addition to 2,4-DB and 2,4-DB-DMAS will be reregistered when all of their other active ingredients also are reregistered.

**For More Information**

To obtain a copy of the 2,4-DB RED document, please contact the OPP Public Docket (7502C), US EPA, Ariel Rios Building, 1200 Pennsylvania Avenue, NW, Washington, DC 20460-0001, telephone: (703) 305-5805. Electronic copies of the 2,4-DB RED and all supporting documents are also available on the Agency's electronic docket at http://www.epa.gov/edocket.

For more information about EPA's pesticide reregistration program or the 2,4-DB RED, please contact the U.S. EPA, OPP, Special Review and Reregistration Division (7508C), 1200 Pennsylvania Avenue, NW, Washington, DC 20460, telephone (703) 308-8000.

For more information about the health effects of pesticides, or for assistance in recognizing and managing pesticide poisoning symptoms, please contact the National Pesticide Information Center (NPIC). Call toll-free (800) 858-7378, from 6:30 am to 4:30 pm Pacific Time, or 9:30 am to 7:30 pm Eastern Standard Time, seven days a week. The NPIC internet address is http://www/npic.orst.edu.

5

**Exhibit 39 - 8**

| United States Environmental Protection Agency | Prevention, Pesticides And Toxic Substances (7508C) | EPA-738-F-98-018 December 1998 |
| --- | --- | --- |

 **EPA R.E.D. FACTS**

# Alachlor

**Pesticide Reregistration**

All pesticides sold or distributed in the United States must be registered by EPA, based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment. Because of advances in scientific knowledge, the law requires that pesticides which were first registered before November 1, 1984, be reregistered to ensure that they meet today's more stringent safety standards.

Under the Food Quality Protection Act of 1996, EPA must consider the increased susceptibility of infants and children to pesticide residues and determine the need for an additional safety factor for the protection of infants and children. When establishing or reassessing tolerances, the Agency must also consider aggregate exposures to a pesticide, that is, combining the exposures that result from consuming pesticide residues in food and water, or using pesticide products in and around the home. Additionally, the Agency must assess the cumulative effect of pesticides and other chemicals that demonstrate a common mechanism of toxicity. Mechanism of toxicity is defined as the steps leading to an adverse health effect following exposure to a chemical. A common mechanism of toxicity occurs when two or more chemicals produce the same adverse health effect by the same sequence of steps.

In evaluating pesticides for reregistration, the pesticide producers submit to EPA a complete set of studies describing the human health and environmental effects of each pesticide. Agency scientists review the submitted studies to determine if the studies are scientifically valid. These studies are the basis for the Agency's risk assessment. The Agency then develops any mitigation measures or regulatory controls needed to effectively reduce each pesticide's risks, and then reregisters those pesticides and/or uses that can be used without posing unreasonable risks to human health or the environment.

When a pesticide is eligible for reregistration, EPA explains the basis for its decision in a Reregistration Eligibility Decision (RED) document. This fact sheet summarizes the information in the RED document for reregistration case 0063, alachlor.

**Exhibit 39 - 9**

**Use Profile**      Alachlor is a herbicide used for weed control on corn, soybeans, sorghum, peanuts, and beans.  There are liquid, dry flowable, microencapsulated, and granular formulations.  The timing of applications is preplant, pre-emergent, at plant for corn and soybeans, post-transplant, post-emergent, and at ground crack for peanuts only. Alachlor is applied by ground, aerial, and chemigation equipment.  It can also be mixed with dry bulk fertilizer.

Regulatory      Alachlor was first registered in 1969 as a selective herbicide for control
History      of broadleaf weeds and grasses. Alachlor is produced by the Monsanto Company in the US.

A Registration Standard was issued for alachlor on November 20, 1984. The Registration Standard involved a thorough review of the scientific data base underlying pesticide registrations and an identification of essential, but missing, studies.  The Registration Standard (1) stated that alachlor was classified as an oncogen, (2) required additional data on the leaching and mobility of alachlor to examine the potential of alachlor to contaminate ground and surface water, (3) required a monitoring study of ground and surface water were required, and required additional data in the areas of toxicology, product chemistry, and residue chemistry.

On January 9, 1985, the Agency published a Notice of Initiation of Special Review of Registrations of Pesticide Products Containing Alachlor (<u>Federal Register</u>, Volume 50, No. 1115) and the Alachlor Position Document (PD-1) that detailed the basis for the Special Review.  The Special Review was initiated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) because pesticide products containing alachlor met or exceeded the Agency's  oncogenicity criteria.

Following the review of public comments and additional information received in response to the Notice of Initiation of Special Review and the Alachlor PD-1, EPA issued a Notice of Preliminary Determination on October 8, 1986 (<u>Federal Register</u>, Volume 51, No. 36106). In this notice the Agency proposed to allow the continued use of alachlor products subject to modifications of the terms and conditions of registration .

Following review of comments and additional information received in response to the Preliminary Notice, EPA issued a notice entitled "Alachlor; Notice of Intent to Cancel Registrations, Conclusion of Special Review on December 31, 1987 (<u>Federal Register</u>, Volume 52, No. 49480). This notice is

2

**Exhibit 39 - 10**

also known as Alachlor Position Document 4 (PD-4). The PD-4 concluded the Special Review and stated that EPA would cancel the registrations and deny applications for registration of products containing alachlor that did not comply with the modified terms and conditions of registration set forth in this notice. The PD-4 stated that tolerances would be rewritten once all residue data required by the Registration Standard were received and evaluated. The PD-4 required the following label amendments: Restricted Use due to Oncogenicity, a tumor hazard warning, use of a mechanical transfer system to be used by mixer/loaders and/or applicators who treat 300 or more acres annually, and human flaggers were prohibited for aerial application. Additional ground water monitoring data were required. Labeling bearing required changes was submitted and accepted in early 1988.

## Human Health Assessment

### Toxicity

Data from acute toxicity studies serve as the basis for labeling and packaging requirements. In studies using laboratory animals, alachlor generally has been shown to be of low acute toxicity. All acute studies have been classified as either Category III or IV, the two lowest classifications.

Alachlor has been evaluated for carcinogenic activity in rats and mice. In accordance with the 1996 EPA proposed Guidelines for Carcinogen Risk Assessment, alachlor was classified as "likely" to be a human carcinogen at high doses, but " not likely" at low doses. Based on numerous studies submitted by the registrant that were reviewed by Agency scientists, as well as an external peer review panel, it was agreed that a margin of exposure (MOE) approach (indicative of a non-linear dose response) should be used for the risk assessment.

The scientific validity of the MOE approach has been documented by various review panels, such as the FIFRA Scientific Advisory Panel, and the Cancer Review Committee. However, the policy implications, methodology, and appropriateness of using an MOE approach in regulatory decision making have not yet been fully developed by the Agency. Perhaps, the most critical of the decision criteria to develop are those for determining the appropriate regulatory level. While informed by the science, this determination is ultimately a risk management decision. Once this methodology has been developed, then the available chemical-specific data would be used to determine whether or not the MOEs identified in the risk assessment constitute acceptable risks.

For now, the regulatory decision for alachlor will be based on both the $Q_1^*$ approach and the MOE approach for the evaluation of carcinogenic potential. These are not directly comparable approaches. The $Q_1^*$ approach

3

## Exhibit 39 - 11

is indicative of a linear approach and reflects the assumption that any exposure to alachlor could cause cancer. The MOE approach is indicative of a non-linear approach and reflects the assumption that there is an exposure dose below which tumor formation is not likely to occur. Thus, the risk numbers do not translate from one approach to the other. Each approach must be considered separately.

The alachlor database for pre-and post-natal effects is complete based on current requirements. The Agency has reviewed two developmental toxicity studies: one in rats, and one in rabbits. Developmental studies are designed to identify possible adverse effects on the developing organism during pre-natal development, which may result from the mother's exposure to the pesticide. For alachlor, there is also a multi-generation rat reproduction study. A reproduction study is designed to provide general information concerning the effects of a test substance on mating begavior, conception, parturition, lactation, weaning, and growth and development of the offspring.

Review by Agency scientists indicates no evidence of increased susceptibility of rats or rabbits to in utero and/or early postnatal exposure to alachlor. Based on this conclusion, as well as additional information on exposure to alachlor in food and water, the Agency has concluded that the additional safety factor, as required by FQPA for the protection of infants and children, can be removed. Therefore, this safety factor need not be applied to the alachlor risk assessment.

The toxicological effects of a pesticide can vary with different exposure durations and routes. For example, an individual may be exposed throughout their lifetime to pesticide residues in the food and water consumed, but a farm worker could also be exposed for several days or a month to pesticide formulations that can enter the body through the skin, or be inhaled. The Agency considers the entire toxicity database and, based on the effects seen for different durations and routes of exposure, determines which risk assessments are necessary to insure that the public is adequately protected from any pesticide exposure.

The alachlor reregistration eligibility review considered the following assessments to be appropriate:

4

**Exhibit 39 - 12**

| Assessment | Exposure Route | NOEL[1] for Use in Estimating Risk |
|---|---|---|
| Acute | Dietary (food and water) | Not required - no evidence of significant toxicity from a one day or single event exposure by the oral route |
| Chronic (non-carcinogenic) | Dietary (food and water) | RfD[2,3] = 0.01 mg/kg/day |
| Short-Term Occupational | Dermal + Inhalation | NOEL = 150 mg/kg/day Use of dermal absorption factor (0.24) required.[4] |
| Intermediate-Term | Dermal + Inhalation | NOEL = 50 mg/kg/day Use of dermal absorption factor not required since NOEL is from a dermal study.[4] |
| MOE Approach[5] Carcinogenic | Dietary (food and water) | NOEL = 0.5 mg/kg/day (nasal) NOEL = 14 mg/kg/day (stomach) |
| MOE Approach Carcinogenic Occupational | Dermal + Inhalation | Not appropriate - Exposure assessment does not indicate that use is long-term and continuous. |
| $Q_1^*$ Approach[6] Carcinogenic | Dietary (food and water) | $Q_1^* = 0.08$ $(mg/kg/day)^{-1}$ |
| Residential | Dermal + Inhalation | Not appropriate - The Agency has not identified any alachlor products that are intended for home use, or uses in/around schools, parks or other public areas. |

1    A NOEL (no observed effect level) is the dose at which no effects were observed in the test animals.

2    The chronic Reference Dose (RfD) is the traditionally selected endpoint for chronic dietary risk.  The RfD represents the quantity of a substance which if absorbed on a daily basis over a lifetime, is not expected to pose significant risk of adverse health effects.

3    Acceptable risk is less than 100% of the RfD.

5

**Exhibit 39 - 13**

4    Acceptable risk results in a MOE that is greater than 100.

5    Acceptable risk has not been determined.

6    Acceptable risk is $1 \times 10^{-6}$, or lower.

## Dietary Risk (Food Only)

People may be exposed to small amounts of alachlor through the consumption of food containing residues of alachlor. Tolerances are pesticide residue levels that should not be exceeded in or on a raw agricultural commodity in the channels of interstate commerce when the pesticide is applied according to label directions. Tolerances have been established (see 40 CFR 180.249) for residues of alachlor in/on a variety of food and feed commodities:

- beans, which includes dry beans, lima beans, forage and fodder;
- corn, fresh sweet, and forage, fodder, and grain;
- eggs;
- milk;
- peanuts, forage, hay, and hulls;
- sorghum, fodder, forage, and grain;
- soybeans, forage, and hay;
- meat and meat byproducts of cattle, goats, hogs, poultry and horses.

Sufficient data are available to determine the adequacy of most established tolerances. Based on this data, some tolerances need to be revoked, and some need to be increased. The reassessed tolerances for alachlor will range from 0.02 to 10 ppm.

EPA has also assessed the chronic (non-carcinogenic) dietary risk posed by alachlor. Using refinements to the dietary assessment process and considering all food uses recommended through reregistration, the Anticipated Residue Concentration (ARC) for the overall U.S. population represents less than 1% of the chronic Reference Dose (RfD), the amount believed not to cause adverse effects if consumed daily over a 70-year lifetime. The most highly exposed subgroup, non-nursing infants less than one year old, has an ARC which also represents less than 1% of the chronic RfD. This low fraction of the allowable RfD is considered to be an acceptable dietary risk.

EPA has assessed the total carcinogenic dietary risk posed by alachlor by both the $Q_1^*$ approach and the MOE approach. Both approaches are discussed below in the Aggregate Dietary Discussion.

## Dietary Risk (Drinking Water Only)

6

**Exhibit 39 - 14**

People may be exposed to small amounts of alachlor through the consumption of water containing residues of alachlor. Alachlor residues in drinking water are regulated under the SDWA (Safe Drinking Water Act). The MCL (Maximum Contaminant Level), set by the Agency, for alachlor is 2 ppb. An MCL is the maximum permissible level of a contaminant in drinking water that is delivered to any user of a public water supply system. For alachlor, there is extensive monitoring data for both ground and surface water sources.

EPA has assessed the chronic (non-carcinogenic) drinking water risk posed by alachlor. Using the monitoring data for alachlor only and Agency assumptions on the amount of water consumed, the estimated exposure represents less than 1% of the chronic Reference Dose (RfD), for adult males, adult females, and children (1 - 6 years) sub-population groups. This is considered to be an acceptable drinking water risk.

EPA has assessed the carcinogenic drinking water risk posed by alachlor, using water monitoring data and Agency assumptions on the amount of water consumed, for both the $Q_1^*$ approach and the MOE approach. Both approaches are discussed below in the Aggregate Dietary Discussion.

**Aggregate Dietary Risk (Food and Drinking Water)**

FQPA requires that the Agency consider aggregate risk, that is, exposure from all food, water, and residential (non-occupational, non-dietary) exposures when making a safety determination. Since there are no residential uses of alachlor, the aggregate exposure is for food and water only. The highest chronic risk is 4% of the chronic RfD which represents the sub-population children (1 - 6 years). This was calculated considering both food and water containing residues of alachlor as well as consumption of water containing residues of the alachlor ESA degradate. The Agency considers this to be an acceptable risk.

The aggregate carcinogenic risk using the $Q_1^*$ approach considers exposures from both food and water. For adult males and adult females carcinogenic risks range from $7.8 \times 10^{-7}$ to $1.4 \times 10^{-6}$. These risks are consistent with the carcinogenic level ($1 \times 10^{-6}$) that the Agency considers to be negligible.

The aggregate carcinogenic MOEs (food and drinking water) for adult males and adult females vary from 29,000 to 1,400,000. At this time, the Agency is not making any conclusions regarding the adequacy of these calculated MOEs for carcinogenic dietary risk. This is due to the fact that the Agency has not yet made a final decision as to the appropriate uncertainty

7

**Exhibit 39 - 15**

factors which would be adequately protective of a carcinogenic endpoint regulated using a non-linear approach. However, given that the cancer risk using the $Q_1^*$ approach is acceptable and that the magnitude of the calculated MOEs is quite large, the Agency believes that the dietary cancer risk from the use of alachlor is not of concern.

### Occupational Exposure

Based on current use patterns, handlers (mixers, loaders, and applicators) may be exposed to alachlor during normal use of granular, liquid, and dry flowable formulations.   No protective equipment is required for the granular formulations.  For worker protection, the Agency will require the use of additional protective equipment (chemical resistant gloves, apron, and chemical resistant shoes) when handling liquid and dry flowable formulations for workers supporting groundboom applications.  For workers supporting aerial applications, closed (mechanical transfer)  systems will be required for liquid formulations.  Monsanto will be required to develop water soluble packaging for dry flowable formulations for aerial applications.  Closed (mechanical transfer)systems will be required for the dry bulk fertilizer impregnation process.

The levels of protection required were based on the intermediate-term exposure (one week to several months) scenario.  As previously stated, the exposure assessment indicated that use of alachlor is an intermittent exposure (not long-term and continuous.)  The carcinogenic MOE approach is not appropriate for an occupational risk assessment for alachlor, because the exposure is not of sufficient duration (i.e., chronic) to produce tumors.

Unlike the MOE approach to carcinogenic risk assessment, the $Q_1^*$ approach assumes that any exposure could result in tumor formation.  Thus, this type of assessment could be performed for an intermittent exposure.  However, the scientific validity of the MOE approach for carcinogenic risk assessment of alachlor has been documented.  Alachlor was classified as "likely" to be a carcinogen at high doses, but "not likely" at low doses.  It is only the policy on determining an appropriate regulatory level that has not been fully developed by the Agency.  Since, performing a carcinogenic MOE risk assessment for the occupational scenario is not appropriate, a $Q_1^*$ carcinogenic occupational assessment for comparison purposes is not necessary.

The potential for post-application worker exposure is negligible, provided the Restricted Entry Interval of 12 hours is observed.  This is due to the timing of applications.  Alachlor is applied to the soil and/or soil incorporated preplant, and pre-emergent.  Thus the application of alachlor to

## Exhibit 39 - 16

emerging plants, well before the plants are mature, mitigates the potential for post-application exposure.

## Environmental Assessment

### Environmental Fate

The Environmental Fate Assessment shows that:

- Alachlor has a low affinity to adsorb to soils and is expected to be highly mobile.
- Alachlor is moderately persistent and dissipates primarily by aerobic soil metabolism processes with a half-life of 2-3 weeks.
- The major acid degradates of alachlor are very mobile and appear to be persistent.
- Field dissipation studies confirm this fate profile (half-life of 6-11 days; leaching through 42-48 inches in one of the studies).

### Water Resources Assessment

The Water Resources Assessment concludes that:

- Alachlor is highly mobile and moderately persistent. These two characteristics are generally observed in chemicals that reach ground water and surface water.
- Alachlor presents a clear hazard to groundwater quality. Reliable monitoring studies have demonstrated that alachlor, even when used according to label directions, results in significant groundwater contamination. Alachlor use also results in groundwater in the use areas being contaminated with degradation products, which are also very mobile and persistent.
- Monitoring studies show that alachlor levels in surface water result in effects on aquatic plants and indirectly on aquatic animals.
- Available information indicates that (surface) drinking water supply systems will usually comply with the SDWA.

### Ecological Effects

The available toxicity data for alachlor indicate that alachlor is:

- Slightly to practically non-toxic to birds on an acute oral basis ($LD_{50}$ of 1500 mg/kg).
- Slightly toxic to mammals, based on a rat study ($LD_{50}$ of 930 mg/kg).
- Slightly toxic to honey bees ($LD_{50} > 36$ ug/bee).
- Slightly to moderately toxic on an acute basis to freshwater fish ($LC_{50}$ 1-33 ppm).
- Highly to moderately toxic to freshwater fish on a chronic basis ($NOEC \geq 0.1$ ppm, $LOEC \geq 0.2$ ppm).

9

**Exhibit 39 - 17**

- Moderately toxic to saltwater fish (3.9 ppm), moderately toxic to saltwater mysid (2.4 ppm) and moderately toxic to shellfish (1.6 ppm).
- Highly toxic to aquatic plants (based on a single species tested: NOEL=0.35 ppb, LOEL=0.69 ppb, $EC_{50}$=1.64ppb).

Therefore, a potential risk to nontarget terrestrial and aquatic plants, and endangered plant species exists. The available information on the major alachlor degradates indicates that the degradates appear to be less toxic to aquatic organisms than the parent.

**Ecological Risk Assessment**

An evaluation of the risk to nontarget organisms from the use of alachlor products, combining toxicity data with potential exposure, indicates that:
- Alachlor poses a potential risk to terrestrial animals on a <u>chronic</u> basis. Additional information are required to confirm this assessment.
- The granular formulations and high use rate pose the greatest risk to nontarget organisms.
- Alachlor levels observed in surface water monitoring studies could result in extensive adverse effects on aquatic plants.
- Aquatic animals are not at acute risk due to exposure to alachlor, but chronic effects may be observed under certain circumstances.

**Risk Mitigation**

To lessen the human health, ecological, water and food quality risk posed by alachlor, the registrant has voluntarily agreed to reduce the maximum single application rate from 6 lb to 4 lb ai/acre, and to classify alachlor as a restricted use pesticide (RUP) for groundwater concerns. EPA is requiring additional mitigation measures that will: protect non-target species, control surface water and ground water contamination, and protect workers.

**Additional Data Required**

EPA is requiring the following additional generic studies for alachlor to confirm its regulatory assessments and conclusions:
- avian reproduction
- aquatic plant studies
- analytical methodologies
- handler exposure studies

The Agency also is requiring product-specific data including product chemistry and acute toxicity studies, revised Confidential Statements of Formula (CSFs), and revised labeling for reregistration.

**Product Labeling**

All alachlor end-use products must comply with EPA's current pesticide product labeling requirements. The following label changes are required: (For

10

**Exhibit 39 - 18**

**Changes Required**  a comprehensive list of labeling requirements, please see the Alachlor RED Document, Table 78.)

- Classify alachlor as a Restricted Use Pesticide (RUP) for ground water concerns.
- Label language regarding mixing/loading setbacks must appear in Precautionary Statements in the Environmental Hazards Section.
- Groundwater advisory language.
- Surface water advisory language.
- Advisory statement in the Environmental Hazards Section of toxicity to terrestrial and aquatic plants, fish, and aquatic invertebrates.
- Advisory statement for granular products.
- Spray Drift Labeling Language.
- For liquid (emulsifiable concentrate) formulations or dry flowable formulations require that mixers, loaders, and persons cleaning equipment must wear long-sleeved shirt, long pants, chemical-resistant gloves, chemical-resistant footwear, and chemical-resistant apron for those workers supporting groundboom application.
- For workers supporting aerial applications and chemigation, for liquid (emulsifiable concentrate) formulations require that mixers, and loaders, must wear long-sleeved shirt, long pants, and chemical-resistant gloves, and the use of closed (mechanical transfer) systems.
- For workers supporting aerial applications and chemigation, for dry flowable formulations require that Monsanto develop water soluble packaging.
- For impregnating dry bulk fertilizer with alachlor require the use of closed mixing systems.
- A 12 hour restricted entry interval (REI) is required for uses within the scope of the WPS. The PPE required for early entry is coveralls, chemical-resistant gloves, and shoes plus socks.

**Regulatory Conclusion**    EPA has determined that the reassessed tolerances for alachlor meet the safety standard under the FQPA, and that there is a reasonable certainty that no harm will result to infants and children or to the general population from aggregate exposure to alachlor residues. The use of currently registered products containing alachlor in accordance with approved labeling will not pose unreasonable risks or adverse effects to humans or the environment. Therefore, all uses of these products are eligible for reregistration. Alachlor products will be reregistered once the required product-specific data, revised Confidential Statements of Formula, and revised labeling are received and accepted by EPA.

11

**Exhibit 39 - 19**

**For More Information**       EPA is requesting public comments on the Reregistration Eligibility Decision (RED) document for alachlor during a 60-day time period, as announced in a Notice of Availability published in the Federal Register. To obtain a copy of the RED document or to submit written comments, please contact the Pesticide Docket, Public Information and Records Integrity Branch, Information Resources and Services Division (7502C), Office of Pesticide Programs (OPP), US EPA, Washington, DC 20460, telephone 703-305-5805.

Electronic copies of the RED and this fact sheet are available on the Internet. See http://www.epa.gov/REDs.

Printed copies of the RED and fact sheet can be obtained from EPA's National Center for Environmental Publications and Information (EPA/NCEPI), PO Box 42419, Cincinnati, OH 45242-2419, telephone 1-800-490-9198; fax 513-489-8695.

Following the comment period, the Alachlor RED document also will be available from the National Technical Information Service (NTIS), 5285 Port Royal Road, Springfield, VA 22161, telephone 703-605-6000.

For more information about EPA's pesticide reregistration program, the Alachlor RED, or reregistration of individual products containing alachlor please contact the Special Review and Reregistration Division (7508C), OPP, US EPA, Washington, DC 20460, telephone 703-308-8000.

For information about the health effects of pesticides, or for assistance in recognizing and managing pesticide poisoning symptoms, please contact the National Pesticide Telecommunications Network (NPTN). Call toll-free 1-800-858-7378, from 6:30 am to 4:30 pm Pacific Time, or 9:30 am to 7:30 pm Eastern Standard Time, seven days a week. Their website address is ace.orst.edu/info/nptn/.

**Exhibit 39 - 20**



## U.S. Environmental Protection Agency

# Pesticides: Reregistration

Recent Additions | Contact Us | Print Version    Search: [    ] GO

EPA Home > Pesticides > Regulating Pesticides > Reregistration > Chemical Status

**Candidates for Decisions**

**Chemical Status**

**Tolerance Reassessment**

**NRDC Consent Decree**

**Other Information Resources**

# Benomyl RED Facts

November 2001
EPA-738-F-02-001

This fact sheet serves as and explains EPA's reregistration eligibility decision (RED) for benomyl, which consists of a voluntary voluntary cancellation of this pesticide. Benomyl was scheduled for reregistration in 2002; however, during 2001, the registrants of benomyl requested voluntary cancellation. The following provides background information on pesticide registration, reregistration, and tolerance reassessment, an overview of the uses and health effects associated with benomyl, and a summary of the terms of its cancellation. Because of the voluntary cancellation decision, EPA did not complete risk assessments for benomyl and will not issue a RED document for this pesticide.

## Background

Benomyl was first registered in 1969 by E.I. du Pont de Nemours and Co.(DuPont). EPA issued a Registration Standard for benomyl in June 1987. A June 1992 Data Call-In (DCI) required additional data. DuPont voluntarily canceled registrations for dry flowable (DF) products in 1995. Over the years, DuPont also canceled the following use sites: post harvest use on apples, citrus, pineapple, bananas, pears, and stone fruit; flowers; ornamentals; bulbs; shade trees; greenhouse, dip treatment for sugarcane, drench treatment for strawberry plants; and turf and residential uses. On April 18, 2001, DuPont requested voluntary cancellation of all its benomyl registrations. EPA published a Federal Register Notice on May 23, 2001 (Federal Register Notice, OPP-66288; FRL-6794-9), announcing receipt of DuPont's request for cancellation and inviting the public to comment during the next 30 days. The Agency considered the comments submitted and on August 8, 2001, the cancellation of benomyl registrations became effective. All other companies holding benomyl product registrations have also since requested and obtained voluntary cancellation of their benomyl products. See 6(f) notice in the Federal Register (FR) on October 12, 2001, and cancellation order on January 15, 2002.

## Uses

Benomyl is a systemic foliar fungicide registered for control of a wide range of diseases of fruits, nuts, vegetables, and field crops. Benomyl is formulated as a wettable powder (WP) and wettable powder in water soluble film (i.e., packets WSP), both of which contain 50 percent active ingredient. These formulations may be applied as delayed dormant, foliar, seed, and seed piece treatments. Application techniques include airblast, aerial, tractor-drawn equipment (groundboom

## Pesticide Registration and Reregistration

All pesticides sold or distributed in the United States must be registered by EPA, based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment. Because of advances in scientific knowledge, the law requires that pesticides which were first registered before November 1, 1984, be reregistered to ensure that they meet today's more stringent standards.

To implement provisions of the Food Quality Protection Act of 1996 (FQPA), EPA considers the special sensitivity of infants and children to pesticides, as well as aggregate exposure of the public to pesticide residues from all sources, and the cumulative effects of pesticides and other compounds with common mechanisms of toxicity. The Agency develops any mitigation measures or regulatory controls needed to effectively reduce each pesticide's risks. EPA then reregisters pesticides that meet the safety standard of the FQPA, and can be used without posing unreasonable risks to human health or the environment.

or spreader), chemigation, and hand held equipment. Benomyl was registered for us on the following crops: almonds, apples, anise, apricots, asparagus, avocado, banana, barley, bean vine, blueberries, brassica (broccoli, Brussels sprouts, cabbage, chicory, Chinese cabbage, cauliflower, colllards, kale, kohlrabi, mustard greens, rutabagas, and turnips), caneberries (raspberries, blackberries, boysenberries, loganberries, and dewberries), cardoon, carrots, celery, cherries, citrus, conifers, corn, cucurbits (cucumber, melons, pumpkins, and squash), currants, dandelions, dill, figs, grapes, macadamia nuts, mangoes, mushrooms, nectarines, onions, oats, papayas, peaches, peanuts, pears, peas, pecans, peppers, pineapple, pistachio, plums, prunes, rape, rice, rye, soybeans, spinach, strawberry, sugar beets, tomatoes, wheat, and yams.Tolerance Reassessment Decisions

## Health Effects

Benomyl rapidly degrades to carbendizim (MBC) which is also of toxicological concern. MBC is the primary metabolite of thiophanate methyl, another fungicide, and is also registered as an active ingredient.

Effects associated with both benomyl and MBC include liver toxicity, developmental toxicity (such as fetal eye and brain malformations and increased mortality), and reproductive (testicular) effects.

### Tolerance Reassessment Decisions

EPA issues a TRED (Tolerance Reassessment Eligibility Decision) for a pesticide that requires tolerance reassessment decisions, but does not require a reregistration eligibility decision at present because: (1) the pesticide was initially registered after November 1, 1984, and by law is not included within the scope of the reregistration program; (2) EPA completed a RED for the pesticide before FQPA was enacted on August 3, 1996; or (3) the pesticide is not registered for use in the U.S. but tolerances are established that allow crops treated with the pesticide to be imported from other countries. TREDs for pesticides that are part of a cumulative group, such as the organophosphates, will not become final until EPA considers the cumulative risks of all the pesticides in the group.

Both benomyl and MBC are also considered possible human carcinogens.

### Tolerances

100 tolerances exist for food and feed items such as fruits and nuts, vegetables, soybeans, grains, meat, milk, and eggs. EPA published an FR notice January 15, 2002, proposing to revoke tolerances for benomyl. EPA will make a final decision regarding tolerance revocation after considering public comments on the proposal.

### Regulatory Conclusion

All Dupont registrations of pesticide products that contain benomyl were effectively canceled on August 8, 2001, and all other registrants' benomyl product registrations were canceled effective January 15, 2002.

Sale and distribution of existing stocks of products already in the channels of trade is permitted until December 31, 2002.

EPA expects that use of any remaining benomyl products will end in 2003 given that production ceased in 2001 and the sale and distribution of benomyl products will end on December 31, 2002.

### For More Information

For additional information regarding the voluntary cancellation of benomyl, visit the EPA website at http://www.epa.gov/pesticides/reregistration or see http://www.epa.gov/pesticides/reregistration/status.htm.

Exhibit 39 - 22

| United States Environmental Protection Agency | Prevention, Pesticides And Toxic Substances (7508W) | EPA-738-F-94-026 September 1994 |
|---|---|---|

 **EPA**

# R.E.D. FACTS

# Bentazon

**Pesticide Reregistration**

All pesticides sold or distributed in the United States must be registered by EPA, based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment. Because of advances in scientific knowledge, the law requires that pesticides which were first registered years ago be reregistered to ensure that they meet today's more stringent standards.

In evaluating pesticides for reregistration, EPA obtains and reviews a complete set of studies from pesticide producers, describing the human health and environmental effects of each pesticide. The Agency imposes any regulatory controls that are needed to effectively manage each pesticide's risks. EPA then reregisters pesticides that can be used without posing unreasonable risks to human health or the environment.

When a pesticide is eligible for reregistration, EPA announces this and explains why in a Reregistration Eligibility Decision (RED) document. This fact sheet summarizes the information in the RED document for reregistration case 0182, bentazon, which includes bentazon technical and sodium bentazon, the active ingredient in end-use pesticide products.

**Use Profile**

Bentazon, also known by its trade name Basagran, is a selective herbicide that is used after seedlings have emerged to control broadleaf weeds and sedges among food and feed crops including alfalfa, beans, corn, peanuts, peas, peppers, peppermint, rice, sorghum, soybeans and spearmint. Bentazon also is registered for use on ornamental lawns and turf. Most bentazon used in the U.S. (73%) is applied to soybean crops.

Bentazon may be applied either aerially or using ground equipment (except to lawns and turf, which may be treated using ground equipment only). Formulations include a flowable concentrate and a soluble concentrate/liquid. Use practice limitations prohibit applying bentazon through any type of irrigation system; discharging effluent containing the product into sewage systems or bodies of water; using treated plants for feed or forage; and treating crops/sites within 30 to 75 days of harvest or 12 to 50 days of grazing.

**Regulatory History**

EPA issued a Registration Standard for bentazon in September 1985 (NTIS #PB86-159563). An August 1990 Data Call-In (DCI) required additional data on terrestrial and aquatic animal effects, environmental fate, toxicology, residue chemistry, and plant protection. Products currently

## Exhibit 39 - 23

registered contain bentazon alone or in combination with atrazine.

## Human Health Assessment

### Toxicity

Bentazon is slightly acutely toxic by the oral, dermal and inhalation routes, and has been placed in Toxicity Category III (the second-to-lowest of four categories) for these effects. It is a skin sensitizer in guinea pigs.

In a subchronic toxicity study using rats, bentazon caused a variety of effects at the highest dose tested including reductions in body weight gain, an increase in blood clotting times, and increased kidney and liver weights.

A chronic toxicity study in beagle dogs produced adverse effects at the two highest dose levels including clinical signs of toxicity, anemia-like changes in blood, depressed body weight gains, intestinal inflammation and congestion of the small intestine and spleen.

In two combined chronic toxicity and carcinogenicity studies using rats and mice, bentazon caused no compound-related increases in tumors. Numerous other adverse effects were observed at the highest dose levels, however, including effects on blood clotting and to the testes, pancreas and liver, changes in kidney, thyroid and pituitary gland weights, reduced body weight gain, and hemorrhage in the liver and heart. Based on these studies, bentazon was classified as a "Group E" carcinogen, that is, a compound that shows evidence of non-carcinogenicity for humans.

In a developmental toxicity study using rats, bentazon did not cause maternal toxicity but at the highest dose tested caused an increase in postimplantation loss and effects on bone development in fetuses. In rabbits, bentazon caused some evidence of both maternal toxicity and developmental toxicity. In a reproductive toxicity study using rats, at the highest dose levels, bentazon caused a decrease in body weights of pups during lactation and reductions in food consumption and weight gain, as well as kidney and liver effects in parents. Bentazon is not mutagenic.

### Dietary Exposure

People may be exposed to residues of bentazon through the diet. Tolerances or maximum residue limits have been established for raw agricultural commodities including various types of beans, corn, mint, peanuts, peas, peppers, rice, sorghum and soybeans (please see 40 CFR 180.355(a)); for animal commodities including milk, eggs, and the fat, meat and meat byproducts of cattle, goats, hogs, poultry and sheep (see 40 CFR 180.355(b); and for the processed commodity spent mint hay (see 40 CFR 186.375). A tolerance for rice hulls is proposed. EPA has reassessed the existing bentazon tolerances and found that several changes and corrections are needed, as explained in the RED document.

EPA has assessed the acute and chronic dietary risks posed by bentazon. In the chronic risk analysis, the Agency used a Reference Dose (RfD), or amount believed not to cause adverse effects if consumed daily over a 70-year lifetime, of 0.03 mg/kg bwt/day (milligrams/kilogram of bodyweight/day).

## Exhibit 39 - 24

This RfD is based on a No Observed Effects Level (NOEL) of 3.2 mg/kg bwt/day established in the dog feeding study described earlier, plus an uncertainty factor of 100. For the overall U.S. population and 22 subgroups, exposure from all current tolerances represents 2.2% of the RfD. The exposure level of the most highly exposed subgroup, non-nursing infants less than one year old, represents 8.1% of the RfD. Based on these estimates, chronic dietary risk is not of concern.

In the acute dietary risk analysis, EPA used a NOEL derived from the developmental toxicity study in rats, described earlier. The subgroup of most interest in terms of developmental toxicity, females aged 13 and above (women of child bearing age), have a margin of exposure (MOE) of 500. This means they receive approximately $1/500^{th}$ the amount that represents the NOEL in animals. Thus, acute dietary risk from bentazon is not of concern.

**Occupational and Residential Exposure**

Based on current use patterns, workers may be exposed to bentazon during and after applications in agricultural and other settings. The Agency was concerned about developmental toxicity effects resulting from this exposure. Margins of Exposure (MOEs) were estimated for short and intermediate term exposure scenarios involving mixing, loading and applying bentazon using both ground and aerial application methods. The resulting MOEs ranged from 1,714 to 100,000; all are well over 100, the margin regarded as acceptable from a safety standpoint. Therefore, the personal protective equipment (PPE) required for early entry is the minimum PPE required under the Worker Protection Standard (WPS): coveralls, chemical-resistant gloves, shoes and socks.

The risk to homeowners who handle bentazon is expected to be lower than that of people who handle the pesticide occupationally.

**Human Risk Assessment**

Bentazon is slightly acutely toxic by all routes (Toxicity Category III) and is a skin sensitizer. It is classified as a "Group E" carcinogen--a chemical showing evidence of non-carcinogenicity to humans, but causes some developmental toxicity effects in rats and rabbits.

Bentazon is used on a variety of food crops, and people may be exposed to residues through their diets. Based on EPA's acute and chronic dietary risk assessments, however, dietary exposure to the bentazon uses supported for reregistration is not of concern.

Although the Agency has concerns about possible developmental toxicity effects among workers exposed to bentazon, these concerns are minor based on our assessment that worker risks are low. There are no concerns that warrant the establishment of personal protective equipment (PPE) requirements beyond those required by the Worker Protection Standard (WPS) or appearing on existing product labels for non-WPS uses.

**Exhibit 39 - 25**

## Environmental Assessment

### Environmental Fate

Dissipation of bentazon is dependent on microbe-induced degradation, leaching and surface water runoff. Bentazon is moderately resistant to degradation in aerobic mineral soils. Degradation in aquatic environments is dependent on photolysis. Degradation in soil is controlled by processes involving microbes in the presence of oxygen. Bentazon has a low binding affinity to soil and therefore may leach into ground water and runoff into surface waters. Leaching did not appear to be a major route of dissipation in field studies, however. Bentazon dissipates rapidly under typical use conditions.

The soil degradates of bentazon include AIBA, which is very mobile but not persistent, and N-methylbentazon which is not mobile. These compounds should not pose a threat to ground water.

### Environmental Fate Assessment

EPA concludes that, in addition to surface runoff, leaching through the soil profile also is a major route of dissipation for bentazon in the environment. Bentazon exceeds levels of concern for ground water quality, and also may impact the quality of surface water. Possible chronic effects of long-term drinking water exposure prompted EPA's Office of Water to establish a lifetime Health Advisory (HA) of 20 parts per billion (ppb), which will likely be increased to 200 ppb soon. However, bentazon is not regulated under the Safe Drinking Water Act (SDWA), no Maximum Contaminant Level (MCL) has been established, and water supply systems are not required to sample or analyze for its residues.

Bentazon has been detected in well water in four out of eight states sampled including California (with the greatest number of detections, extending over 11 counties), Florida, Missouri and Virginia. EPA is requiring a small-scale prospective ground water monitoring study to establish the conditions under which bentazon is prone to leach to ground water during normal agricultural use. The Agency also is requiring a ground water label advisory for bentazon to minimize its adverse effects on ground water. The registrant has agreed to prepare educational materials for end users, dealers and distributors regarding ground and surface water protection.

EPA also is requiring spray drift studies as confirmatory information, and in the future may require drift-related labeling statements for bentazon products applied aerially to agricultural crops.

### Ecological Effects

Bentazon is slightly toxic to birds on an acute oral and subacute dietary basis, and exceeds the level of concern for avian chronic effects. Bentazon is slightly toxic to small mammals on an acute basis, and is practically nontoxic to honeybees. Bentazon also is practically nontoxic to cold and warm water fish, aquatic invertebrates and estuarine/marine organisms. Bentazon poses a low risk to aquatic plants but may represent a hazard to terrestrial and semi-aquatic plants.

Exhibit 39 - 26

### Ecological Effects Risk Assessment

EPA concludes that the use of bentazon as an herbicide will not pose a serious environmental threat. Bentazon poses a chronic reproductive health risk to birds. However, the registrant has agreed to lower the maximum seasonal application rate from four to two pounds per acre, to reduce the potential for this risk. Although it is slightly toxic to birds and small mammals on an acute and subacute basis, bentazon is expected to pose minimal acute/subacute risks to both endangered and nonendangered birds and mammals as a result of its current uses. Since it is a herbicide, bentazon is expected to pose a risk to non-target terrestrial and semi-aquatic plants near treated sites. No hazard to aquatic animals or honeybees is anticipated.

## Additional Data Required

EPA is requiring additional generic product chemistry, residue chemistry, toxicology, environmental fate and ecological effects studies to confirm its regulatory assessments and conclusions regarding bentazon. The Agency also is requiring product-specific data including product chemistry and acute toxicity studies, revised Confidential Statements of Formula (CSFs) and revised labeling for reregistration.

## Product Labeling Changes Required

All bentazon end-use products must comply with EPA's current pesticide product labeling requirements. The following statements, some of which may be on some existing product labels, are now required on all labels as specified below.

### Environmental Hazard Statement

Non-residential end-use product labeling must bear the following statement for crayfish and catfish commercial farms:

> "For terrestrial uses only, do not apply directly to water, or to areas where surface water is present or to intertidal areas below the mean high water mark. Do not contaminate water when disposing of equipment washwater or rinsate."

### Ground Water Label Advisory

To minimize bentazon contamination of ground water, the following statement is required on all end-use product labeling:

> "This chemical is known to leach through soil into groundwater under certain conditions as a result of agricultural use. Use of this chemical in areas where soils are permeable, particularly where the water table is shallow, may result in ground water contamination."

### Worker Protection Requirements

- The following entry restriction is required for all non-WPS occupational uses of bentazon:

> "Do not enter or allow others to enter the treated area until sprays have

Exhibit 39 - 27

dried."

- The following entry restriction is required for all homeowner products:

    "Do not allow persons or pets to enter the treated area until sprays have dried."

- The following labeling statements are required for all bentazon products intended primarily for occupational use, including uses both within and not in the scope of the WPS.

Application Restrictions:

"Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application."

Engineering Controls:

"When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in the Worker Protection Standard (WPS) for agricultural pesticides (40 CFR 170.240(d)(4-6), the handler PPE requirements may be reduced or modified as specified in the WPS."

User Safety Requirements:

"Follow manufacturer's instructions for cleaning/maintaining PPE. If there are no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry."

User Safety Recommendations:

"Users should wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet."

"Users should remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing."

"Users should remove PPE immediately after handling this product. Wash the outside of gloves before removing. As soon as possible, wash thoroughly and change into clean clothing."

- Because bentazon is a skin sensitizer, the following statement must be placed in the "Hazards to Humans and Domestic Animals" section of the Precautionary Statements on the labeling of all end-use products:

    "This product may cause skin sensitization reactions in some people."

**Reduction in Application Rate**

All bentazon labels must be amended to reflect a maximum seasonal application rate of 2 lbs ai/a (2 pounds active ingredient per acre).

**Products Registered for Residential Use Only**

The following label statement is required for all products intended for use on lawns and turf:

"Do not apply directly to water. Do not contaminate water when disposing of equipment washwater or rinsate."

**Exhibit 39 - 28**

**Regulatory Conclusion**

The use of currently registered pesticide products containing bentazon in accordance with approved labeling will not pose unreasonable risks or adverse effects to humans or the environment. Therefore, all uses of these products are eligible for reregistration.

Bentazon products will be reregistered once the required confirmatory generic data, product-specific data, revised Confidential Statements of Formula and revised labeling are received and accepted by EPA.

Products that contain the active ingredient atrazine in addition to bentazon will be reregistered when atrazine also is eligible for reregistration.

**For More Information**

EPA is requesting public comments on the Reregistration Eligibility Decision (RED) document for bentazon during a 60-day time period, as announced in a Notice of Availability published in the Federal Register. To obtain a copy of the RED document or to submit written comments, please contact the Pesticide Docket, Public Response and Program Resources Branch, Field Operations Division (7506C), Office of Pesticide Programs (OPP), US EPA, Washington, DC 20460, telephone 703-305-5805.

Following the comment period, the bentazon RED document will be available from the National Technical Information Service (NTIS), 5285 Port Royal Road, Springfield, VA 22161, telephone 703-487-4650.

For more information about EPA's pesticide reregistration program, the bentazon RED, or reregistration of individual products containing bentazon, please contact the Special Review and Reregistration Division (7508W), OPP, US EPA, Washington, DC 20460, telephone 703-308-8000.

For information about the health effects of pesticides, or for assistance in recognizing and managing pesticide poisoning symptoms, please contact the National Pesticides Telecommunications Network (NPTN). Call toll-free 1-800-858-7378, between 8:00 am and 6:00 pm Central Time, Monday through Friday.

**Exhibit 39 - 29**

# E X T O X N E T

### Extension Toxicology Network

A Pesticide Information Project of Cooperative Extension Offices of Cornell University, Michigan State University, Oregon State University, and University of California at Davis. Major support and funding was provided by the USDA/Extension Service/National Agricultural Pesticide Impact Assessment Program.

**P**esticide

**I**nformation

**P**rofile

# Dinoseb

Publication Date: 9/93

## TRADE OR OTHER NAMES

Product names for pesticides containing dinoseb included Basanite, Caldon, Chemox, Chemsect DNBP, Dinitro, Dynamyte, Elgetol, Gebutox, Hel- Fire, Kiloseb, Nitropone, Premerge, Sinox General, Subitex, and Vertac Weed Killer. Approximately 180 different compounds contained some level of dinoseb as an active ingredient before its cancellation by the EPA.

## INTRODUCTION

Dinoseb is a phenolic herbicide used in soybeans, vegetables, fruits and nuts, citrus, and other field crops for the selective control of grass and broadleaf weeds in corn. It is also used as an insecticide in grapes; and as a seed crop drying agent.

In October 1986, the EPA issued an emergency suspension order which immediately prohibited further sale, distribution, and use of pesticide products containing dinoseb in the United States (2). This action was based on the significant risk of birth defects and other adverse health effects for applicators and other persons with substantial dinoseb exposure (3). Since that time, the use of dinoseb has been cancelled in the United States. The product is now not commercially available in the U.S. (10).

## TOXICOLOGICAL EFFECTS

**Exhibit 39 - 30**

# ACUTE TOXICITY

Dinoseb is a highly to extremely toxic compound, and is labeled with a DANGER signal word.

Exposure to dinoseb can occur by direct contact, ingestion, and inhalation. Inhalation of dusts and sprays may be irritating to the lungs and eyes, and may cause serious illness. Symptoms occurring in humans include fatigue, thirst, sweating, insomnia, weight loss, headache, flushing of the face, nausea, abdominal pain, and occasional diarrhea.

Dinoseb is absorbed through animal and human skin, and direct skin contact will cause irritation, yellow stains, burns, and dermatitis. Spray operators have died upon dermal exposure to dinoseb. In one fatality, a farm worker was using a backpack hand-held sprayer that leaked dinoseb onto his body and penetrated his skin (11).

The oral LD50 of dinoseb for rats is 25-46 mg/kg, and dermal LD50 for rabbits is 75-80 mg/kg (8).

# CHRONIC TOXICITY

At chronic and acute exposure levels, dinoseb interferes with a cell's ability to convert food (such as glucose) into useable energy for the body. More specifically, it disturbs the production of ATP, a chemical in the cell that provides energy for all cellular activities (9). This interference is the basis for most all toxic effects related to the compound (9).

## Reproductive Effects

Dinoseb is reported to adversely affect reproduction in rats and mice at levels that are commonly found among occupational workers. Decreased sperm count and abnormal sperm shape were observed in male rats and mice after three weeks at low exposure levels (about 10 mg/kg/day) for 30 days (11, 12). In a separate study, rats were exposed to relatively small quantities of dinoseb through their diet for a total of 22 weeks. Effects such as decreased fertility, slow weight gain and poor survival of newborns appeared to be related this pesticide (5).

Because of the adverse effects observed in laboratory animals at low chronic exposure levels, it is believed that dinoseb may cause decreased fertility or sterility in humans (9).

Exhibit 39 - 31

## Teratogenic Effects

Dinoseb is a potential teratogen (9). Low levels of dinoseb fed to rats and rabbits caused birth defects in the fetuses of exposed females. When dinoseb was administered to pregnant mice, its breakdown products were found in the embryos. However, no teratogenic effects were noted.

Various tests of mice and rats fed or injected with small amounts of dinoseb (around 10 mg/kg) have shown maternal toxicity, decreased fetal body weights and changes in fetal development (12). In some studies of mice, oral doses to pregnant mothers caused an increased death rate in the exposed animals but caused no fetal damage (8). Other studies indicate that dinoseb is a stronger teratogen when injected than when ingested. At low feeding levels the compound was responsible for skeletal deformities and neurological problems in the newborn rats (9).

It is primarily due to the risks of birth defects in humans that this pesticide was banned for use in the United States by the EPA.

## Mutagenic Effects

Dinoseb was not mutagenic in laboratory studies performed to date.

## Carcinogenic Effects

Dinoseb is classified as a possible human carcinogen. While not carcinogenic to male mice, it was found to be carcinogenic to female mice. The compound caused liver cancer in the animals at moderate to high doses (9).

## Organ Toxicity

Dinoseb has the potential to damage human eyes; cataracts can develop with exposure to low levels of the compound. It may also affect the immune system, liver, kidneys, and spleen (5).

## Fate in Humans and Animals

Dinoseb is absorbed through the skin. The chemical is excreted in the urine and feces and is metabolized in the liver. Breakdown products are found in the liver, kidneys, spleen, blood and urine (5). Dinoseb can also pass through the placenta into the fetus of experimental animals.

**Exhibit 39 - 32**

# ECOLOGICAL EFFECTS

Dinoseb is highly toxic to fish (8). It is more toxic to fish in acidic water than in neutral or alkaline water. The species that have been tested include the cutthroat and lake trout, fathead minnow, and catfish (1).

The compound is also very toxic to birds, mammals, and invertebrates and may pose a threat to nontarget aquatic organisms including endangered species (9). During normal (field) applications, dinoseb could affect the survival of aquatic life if water from treated irrigation ditches is released into a stream or river without sufficient holding or detoxifying time. Dinoseb has caused fish-kills in small Scottish streams when washed from fields by rain. It also has the potential to cause field kills of pheasants and songbirds.

Dinoseb is rapidly taken up by fish. However, when the exposed fish are placed in clean water, the chemical is rapidly eliminated. Thus, the accumulation of the chemical in aquatic life is not a significant environmental risk (1).

# ENVIRONMENTAL FATE

Dinoseb affects plants by direct contact. No true translocation occurs within the plant. Twenty-eight days after topical application of dinoseb to apple fruits, about a third of the chemical remained. Breakdown products were found in apple skin and flesh. Dinoseb residues have not been detected in food samples. Dinoseb persists on treated crop soils for 2-4 weeks, under average conditions of use.

Water soluble salts of dinoseb leach readily in soil. However, oil soluble or water soluble formulations of true (non-salt) dinoseb leach much less. There is some evidence that the herbicide binds to certain organic and clay soils. Dinoseb does not accumulate in soil because of microbial breakdown.

Over a ten year period, dinoseb was found to be one of three particularly persistent contaminants in Ontario wells. Entry to the wells was due to spills of concentrated and dilute herbicide, drift during spraying, and from storm runoff. Well water concentrations ranged from 0.05-5,000 ppb in these wells, and removal of dinoseb proved to be very difficult (4). Dinoseb is stable in surface water and has been found in streams at about 5 ppb.

# PHYSICAL PROPERTIES AND GUIDELINES

**Exhibit 39 - 33**

Dinoseb is a dark reddish-brown solid or dark orange viscous liquid, depending on the temperature. It has a pungent odor. Dinoseb is corrosive to mild steel in the presence of water.

Toxic fumes are emitted upon decomposition of dinoseb. The chemical name for dinoseb is 2-(Sec-butyl)-4,6-dinitrophenol, and synonyms include 2,4-dinitro-6-(1-methylpropyl)phenol and 2,4-dinitro-6- sec-butylphenol.

The triethanolamine salt of dinoseb contains over 200 mg/kg N- nitrosodie-thanolamine, a highly toxic contaminant.

## Exposure Guidelines:

| | |
|---|---|
| **NOEL:** | 3 mg/kg/day (Dinitrophenol) |
| **ADI:** | 1.11 ug/kg (for females at least 13 years old) |
| **Drinking water health advisory:** | Drinking Water Equivalent Level (DWEL): 0.035 mg/L |

## Physical Properties

| | |
|---|---|
| **CAS #:** | 88-85-7 |
| **Solubility in water:** | 0.0052 g/100 g (25 degrees C) |
| **Solubility in solvents:** | Soluble in alcohol, ethanol, heptane, spray oil, and most organic solvents and oils. |
| **Melting point:** | 32-42 degrees C |
| **Vapor pressure:** | 1 torr (151.1 degrees C), 760 torr (332 degrees C) |
| **Log P:** | 0.0 (151.1 degrees C) |
| **Kow:** | 2138(6) |
| **Kd:** | 2.4 x 10 to the minus 5 power |
| **BCF:** | 135.1(7) |

# BASIC MANUFACTURER

DowElanco
P.O. Box 681428
Indianapolis, IN 46268-1189
Telephone: 317-871-8422

**Exhibit 39 - 34**

**Review by Basic Manufacturer:**

Comments solicited: December, 1992
Comments received:

# REFERENCES

1. Call, D.J., et al. 1984. J. Environ. Qual. 13(3):493-498.
2. Federal Register, October 14, 1986. 51 FR 36634.
3. Federal Register, October 14, 1986. 51 FR 36650.
4. Frank, R., Sirons, G.J., and Ripley, B.D. 1979. Pesticides Monitoring Journal 13(1):120-127.
5. Hall, L., et al. 1978. Toxicol. Appl. Pharm. 45(1):235-236.
6. Saarikoski, J., Lindstrom, R., Tyynela, M., and Viluksela, M. 1986. Ecotoxicol. Environ. Safety 11:158-173.
7. Spacie, A. and Hamelink, J.L. 1982. Environ. Toxicol. Chem. 1: 309-320.
8. National Library of Medicine. 1992. Hazardous Substances Databank. Dinoseb.
9. Walker, Mary M. and Lawrence H. Keith. 1991. EPA's Pesticide Fact Sheet Database. Lewis Publishers. Chelsea, MI.
10. Farm Chemicals Handbook. 1992. Meister Publishing Company. Willoughby, OH.
11. Gasiewicz, Thomas A. 1991. Nitro Compounds and Related Phenolic Pesticides. in Handbook of Pesticide Toxicology, Volume 3, Classes of Pesticides. Wayland J. Hayes and Edward R. Laws editors. Academic Press, NY.
12. Health Advisories for 50 Pesticides. 1988. United States Environmental Protection Agency.

---

**Disclaimer: Please read the pesticide label prior to use. The information contained at this web site is not a substitute for a pesticide label. Trade names used herein are for convenience only; no endorsement of products is intended, nor is criticism of unnamed products implied. Most of this information is historical in nature and may no longer be applicable.**

⬆ **To Top**

| For more information relative to pesticides and their use, please contact the PMEP staff at: | |
|---|---|

**Exhibit 39 - 35**