# THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

# FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | <u>**DEATH PENALTY CASE**</u> |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **JULIUS ROBINSON** | : | **United States District Judge** |

_____

## EXHIBIT NUMBER 39 (PART 2 OF 3, PAGES 36-70)

**SUBMITTED IN SUPPORT OF MOTION TO VACATE CONVICTION
AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255
AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

(Filed Electronically Under the Electronic Filing System Requirements)

_____

5123 Comstock Hall
Cornell University
Ithaca, NY 14853-0901
(607)255-1866


Cornell University

Questions regarding the development of this web site should be directed to the PMEP Webmaster

**Exhibit 39 - 36**

**fluchloralin (Basalin) Herbicide Profile 6/85**

1.              CHEMICAL FACT SHEET FOR:
                FLUCHLORALIN

FACT SHEET NUMBER:  52

DATE ISSUED:  JUNE 30, 1985


## 1. DESCRIPTION OF CHEMICAL

- Generic Name:  Fluchloralin
- Common Name:  fluchloralin
- Trade Name:  Basalin
- EPA Shaughnessy Code:  108701
- Chemical Abstracts Service (CAS) Number:  33245-39-5
- Year of Initial Registration:  1970
- Pesticide Type:  Herbicide
- Chemical Family:  chloroaniline
- U.S. and Foreign Producers:  BASF Wyandotte, Inc.


## 2. USE PATTERNS AND FORMULATIONS

- Application sites:  Dry and succulent peas and beans, cotton, okra, peanuts, soybeans, and sunflowers.
- Types of formulations:  Emulsifiable concentrate (4 lbs. a.i. per gallon).
- Types and methods of application:  Preplant broadcast or banded spray, using ground equipment.  Soil incorporation recommended.
- Application rates:  0.5-1.5 lbs. a.i./A on beans (including soybeans), okra, peas, peanuts, and sunflowers.
- Usual carriers:  Water


## 3. SCIENCE FINDINGS

Chemical Characteristics

- Physical state:  crystalline solid
- Color:  orange-yellow
- Odor:  faint, unusual
- Melting point:  42-43 C
- Solubility (at 20 C):  ethyl acetate >100 g/100 g, benzene 100 g/100 g, cyclohexane 25.1 g/100 g, ether >100 g/100 g, acetone

**Exhibit 39 - 37**

>100 g/100 g, chloroform >100 g/100 g, ethanol 17.7 g/100 g, water
<7 g/100 g.
- Vapor pressure:  6 x 10(-6) mm Hg at 20 degrees C, 2.5 x 10(-5) mm Hg
  at 30 degrees C
- Stability:  Sensitive to ultraviolet light.  Stable in aqueous
  solution over range of pH 5 to 9.

Toxicological Characteristics

- Acute effects:
  - Acute oral LD50:  data gap
  - Acute dermal LD50:  data gap
  - Dermal irritation:  data gap
  - Acute inhalation toxicity:  data gap
  - Primary eye irritation: data gap
- Chronic effects:
  - Oncogenicity:  data gap
  - Teratology:  data gap
  - Reproductive effects:  data gap
  - Mutagenicity:  data gap
  - Feeding studies:  data gap
- Major routes of exposure:  dermal, ocular, and ingestion.

Physiological and Biochemical Behavioral Characteristics

- Foliar absorption:  Not applicable; fluchloralin is soil-
  incorporated.
- Translocation:  Residues are taken up and translocated through the
  roots and shoots of cotton and soybean plants.  Parent compound and
  some metabolites have been identified in cotton and soybean foliage
  following exposure of the roots to fluchloralin.
- Mechanism of pesticidal action:  Believed to affect seed germination
  and other physiological growth processes.
- Metabolism and persistence in plants and animals:  Plant metabolism
  is not adequately understood.  Fluchloralin residues did not
  transfer to ruminant tissues at exaggerated rates (67 X the expected
  intake by beef cattle).  Degradation in animals is stepwise through
  N-dealkylation and N-hydrolysis.

Environmental Characteristics

- Adsorption and leaching in basic soil types:  Fluchloralin (unaged)

**Exhibit 39 - 38**

and fluchloralin residues (aged 30 days) are relatively immobile to slightly mobile in loamy sand and sandy soils, but the degradate 2,6-dinitro-4-trifluoromethylphenol is highly mobile in loamy sandy soil and mobile in sandy clay loam soil. Fluchloralin is slightly mobile in runoff from plots (5-12% slope) of silt loam soil.
- Microbial breakdown: No data
- Loss from photodecomposition and/or volatilization: Fluchloralin photodegrades rapidly (half-life 27 minutes) in water (pH 5.6) when exposed to artificial sunlight. Photodegradation of solid fluchloralin film is slower (half-life 48 hours in artificial sunlight). No valid volatilization data are available.
- Bioaccumulation: No valid data
- Resultant average persistence: Half-life ranges from <32 to 120 days, depending on soil type.
- Half-life in water: Stable in water over pH range from 5.0 to 9.0, if not exposed to light

Ecological Characteristics

- Hazards to birds: data gap
- Hazards to aquatic invertebrates: data gap
- Hazards to fish: High toxicity poses potential threat to fish populations. Hazard cannot be evaluated until receipt of certain environmental fate data.
- Potential problems with endangered species: USDI has made a jeopardy assessment, finding threats to slackwater darter and 11 freshwater mussels from use of fluchloralin on soybeans.

Tolerance Assessment

- List of crops and tolerances:

| Crop | Tolerance (ppm) |
|---|---|
| Cotton, seed | 0.05N |
| Peanuts | 0.05 |
| Peanuts, forage | 0.05 |
| Peanuts, hay | 0 05 |
| Peanuts, hulls | 0.1 |
| Soybeans | 0.05N |
| Sunflower, seeds | 0.05 |
| Vegetables, seed & pod (dry/succulent) | 0.05 |
| Vegetables, seed & pod, forage | 0.1 |

**Exhibit 39 - 39**

Vegetables, seed & pod, hay          0.1
NOTE: N = negligible

- List of food contact uses:  beans (dry and succulent), okra, peas
  (dry and succulent), peanuts, soybeans, and sunflower seeds.
- Results of tolerance assessment:  Current PADI is 0.0026 mg/kg/day,
  based on a NOEL of 5.250 mg/kg/day (210 ppm) and an LEL of 15.75
  mg/kg/day (hemisiderosis in the liver) using a safety factor of
  2000.  The portion of the PADI currently occupied is <3%.  However,
  the feeding study on which the PADI was based has been declared
  invalid, and no other toxicological data are available.


Problems Known to have Occurred from Use

- No PIMS data available.


Summary Science Statement

No valid acute or chronic toxicity data are available.  One metabolite
has shown potential for leaching through soil, but the toxicological
properties of this metabolite are unknown.  Toxicity to fish is very
high.


## 4.  SUMMARY OF REGULATORY POSITION AND RATIONALE

- Use classification:  Not classified
- Use, formulation, or geographic restrictions:  Manufacturing-use
  products may only be formulated into end-use products intended for
  use as a herbicide on dry and succulent peas and beans, cotton, okra,
  peanuts, soybeans, and sunflowers.
- Unique label warning statements:
  - Use pattern statements:  Labels of manufacturing-use products must
    bear the statement:  For formulation into end-use herbicide products
    intended only for use on kidney, lima, navy, green, pinto, or Great
    Northern beans, or edible soybeans, blackeyed, cow, field, or garden
    peas, cotton, okra, peanuts, or sunflowers.
- Precautionary statements:
  - Labels of manufacturing-use products must bear the statement:  Do
    not discharge effluent containing this product into lakes,
    streams, ponds, estuaries, oceans, or public waters unless this
    product is specifically identified and addressed in an NPDES
    permit.  Do not discharge effluent containing this product to

**Exhibit 39 - 40**

sewer systems without notifying the sewage treatment plant authority. For guidance, contact your State Water Board or Regional Office of the EPA.
- The labels of all end-use products must bear the statement: Do not apply directly to water. Do not contaminate water by cleaning of equipment or disposal of wastes.

## 5. SUMMARY OF MAJOR DATA GAPS

| Data Requested | Due Date* |
|---|---|
| Statement of composition | 6 months |
| Discussion of formation of impurities | 6 months |
| Preliminary analysis | 12 months |
| Certification of limits | 12 months |
| Analytical methods for enforcement of limits | 12 months |
| Density, bulk density, or specific gravity | 6 months |
| Dissociation constant | 6 months |
| Octanol/water partition coefficient | 6 months |
| pH | 6 months |
| Stability | 6 months |
| Metabolism in plants | 24 months |
| Residue, dill, crop field trials | 24 months |
| Residue, okra, crop field trials | 24 months |
| Hydrolysis | 9 months |
| Photodegradation on soil | 9 months |
| Anaerobic soil | 27 months |
| Leaching and adsorption/desorption | 12 months |
| Field dissipation, soil | 27 months |
| Accumulation, confined rotational crops | 39 months |
| Accumulation, field rotational crops | 50 months |
| Accumulation in fish | 12 months |
| Acute oral toxicity | 9 months |
| Acute dermal toxicity | 9 months |
| Acute inhalation toxicity | 9 months |
| Primary eye irritation | 9 months |
| Primary dermal irritation | 9 months |
| Dermal sensitization | 9 months |
| 21-day dermal toxicity | 12 months |
| Chronic toxicity, rodent and non-rodent | 50 months |
| Oncogenicity, 2 species | 50 months |
| Teratogenicity | 15 months |
| Reproduction, 2-generation | 39 months |

**Exhibit 39 - 41**

Gene mutation                              9 months
Chromosomal aberration                    12 months
Other mechanisms of mutagenicity           12 months
General metabolism                        24 months

NOTES: *Number of months after issuance of the Standard.
   **A study has been submitted, but not yet reviewed.


## 6. CONTACT PERSON AT EPA

Robert Taylor
TS-767C
U.S. EPA
401 M Street S.W.
Washington, DC  20460
(703) 557-1800


DISCLAIMER:  THE INFORMATION PRESENTED IN THIS CHEMICAL INFORMATION
FACT
SHEET IS FOR INFORMATIONAL PURPOSES ONLY AND NOT TO BE USED TO
FULFILL
DATA REQUIREMENTS FOR PESTICIDE REGISTRATION AND REREGISTRATION.

---

**Exhibit 39 - 42**

| United States Environmental Protection Agency | Prevention, Pesticides And Toxic Substances (7508W) | EPA-738-F-93-011 September 1993 |
| --- | --- | --- |

 **R.E.D. FACTS**

# Glyphosate

**Pesticide Reregistration**

All pesticides sold or distributed in the United States must be registered by EPA, based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment. Because of advances in scientific knowledge, the law requires that pesticides which were first registered years ago be reregistered to ensure that they meet today's more stringent standards.

In evaluating pesticides for reregistration, EPA obtains and reviews a complete set of studies from pesticide producers, describing the human health and environmental effects of each pesticide. The Agency imposes any regulatory controls that are needed to effectively manage each pesticide's risks. EPA then reregisters pesticides that can be used without posing unreasonable risks to human health or the environment.

When a pesticide is eligible for reregistration, EPA announces this and explains why in a Reregistration Eligibility Decision (RED) document. This fact sheet summarizes the information in the RED document for glyphosate.

**Use Profile**

Glyphosate is a non-selective herbicide registered for use on many food and non-food field crops as well as non-crop areas where total vegetation control is desired. When applied at lower rates, glyphosate also is a plant growth regulator.

Glyphosate is among the most widely used pesticides by volume. It ranked eleventh among conventional pesticides used in the U.S. during 1990-91. In recent years, approximately 13 to 20 million acres were treated with 18.7 million pounds of glyphosate annually. The largest use sites include hay/pasture, soybeans and field corn.

Three salts of glyphosate are used as active ingredients in registered pesticide products. Two of these active ingredients, plus technical grade glyphosate, are contained in the 56 products that are subject to this RED.

The isopropylamine salt, an active ingredient in 53 registered products, is used as a herbicide to control broadleaf weeds and grasses in many food and non-food crops and a variety of other sites including ornamentals, lawns and turf, residential areas, greenhouses, forest plantings and industrial rights-of-way. It is formulated as a liquid, solid or pellet/tablet, and is applied using ground or aerial equipment.

**Exhibit 39 - 43**

The sodium salt of glyphosate, an active ingredient in two registered pesticide products, is used as a plant growth regulator for peanuts and sugarcane, to modify plant growth and hasten the ripening of fruit. It is applied as a ground spray to peanut fields and as an aerial spray to sugarcane. Preharvest intervals are established for both crops.

The monoammonium salt of glyphosate is an active ingredient in an additional seven herbicide/growth regulator products. This form of glyphosate was initially registered after November 1984, so it is not subject to reregistration or included in this RED. However, in reassessing the existing glyphosate tolerances (maximum residue limits in or on food and feed), EPA included those for the monoammonium salt.

## Regulatory History

EPA issued a Registration Standard for glyphosate in June 1986 (NTIS PB87-103214). The Registration Standard required additional phytotoxicity, environmental fate, toxicology, product chemistry and residue chemistry studies. All of the data required have been submitted and reviewed, or were waived.

## Human Health Assessment

### Toxicity

Glyphosate is of relatively low oral and dermal acute toxicity. It has been placed in Toxicity Category III for these effects (Toxicity Category I indicates the highest degree of acute toxicity, and Category IV the lowest). The acute inhalation toxicity study was waived because glyphosate is non-volatile and because adequate inhalation studies with end-use products exist showing low toxicity.

A subchronic feeding study using rats showed blood and pancreatic effects. A similar study with mice showed reduced body weight gains in both sexes at the highest dose levels. A dermal study with rabbits showed slight reddening and swelling of the skin, decreased food consumption in males and decreased enzyme production, at the highest dose levels.

Several chronic toxicity/carcinogenicity studies using rats, mice and beagle dogs resulted in no effects based on the parameters examined, or resulted in findings that glyphosate was not carcinogenic in the study. In June 1991, EPA classified glyphosate as a Group E oncogen--one that shows evidence of non-carcinogenicity for humans--based on the lack of convincing evidence of carcinogenicity in adequate studies.

In developmental toxicity studies using pregnant rats and rabbits, glyphosate caused treatment-related effects in the high dose groups including diarrhea, decreased body weight gain, nasal discharge and death.

One reproductive toxicity study using rats showed kidney effects in the high dose male pups; another study showed digestive effects and decreased body weight gain. Glyphosate does not cause mutations.

2

## Exhibit 39 - 44

In one metabolism study with rats, most of the glyphosate administered (97.5 percent) was excreted in urine and feces as the parent compound; less than one percent of the absorbed dose remained in tissues and organs, primarily in bone tissue. Aminomethyl phosphonic acid (AMPA) was the only metabolite excreted. A second study using rats showed that very little glyphosate reaches bone marrow, that it is rapidly eliminated from bone marrow, and that it is even more rapidly eliminated from plasma.

## Dietary Exposure

The nature of glyphosate residue in plants and animals is adequately understood. Studies with a variety of plants indicate that uptake of glyphosate or AMPA from soil is limited. The material which is taken up is readily translocated throughout the plant and into its fruit. In animals, most glyphosate is eliminated in urine and feces. Enforcement methods are available to detect residues of glyphosate and AMPA in or on plant commodities, in water and in animal commodities.

85 tolerances have been established for residues of glyphosate and its metabolite, AMPA, in or on a wide variety of crops and crop groups, as well as in many processed foods, animal feed and animal tissues (please see 40 CFR 180.364, 40 CFR 185.3500 and 40 CFR 186.3500). EPA has reassessed the existing and proposed tolerances for glyphosate. Though some adjustments will be needed, no major changes in existing tolerances are required. EPA also has compared the U.S. tolerances with international Codex maximum residue limits (MRLs), and is recommending certain adjustments to achieve greater compatibility.

EPA conducted a dietary risk assessment for glyphosate based on a worst-case risk scenario, that is, assuming that 100 percent of all possible commodities/acreage were treated, and assuming that tolerance-level residues remained in/on all treated commodities. The Agency concluded that the chronic dietary risk posed by glyphosate food uses is minimal.

A reference dose (RfD), or estimate of daily exposure that would not cause adverse effects throughout a lifetime, of 2 mg/kg/day has been proposed for glyphosate, based on the developmental toxicity studies described above.

## Occupational and Residential Exposure

Occupational and residential exposure to glyphosate can be expected based on its currently registered uses. However, due to glyphosate's low acute toxicity and the absence of other toxicological concerns (especially carcinogenicity), occupational and residential exposure data are not required for reregistration.

Some glyphosate end-use products are in Toxicity Categories I or II for primary eye irritation or skin irritation. In California, glyphosate ranks high among pesticides causing illness or injury to workers, who report numerous incidents of eye and skin irritation from splashes during mixing and loading.

3

**Exhibit 39 - 45**

EPA is not adding any personal protective equipment (PPE) requirements at this time, but any existing PPE label requirements must be retained.

The Worker Protection Standard (WPS) for Agricultural Pesticides (please see 40 CFR 156 and 170) established an interim restricted entry interval (REI) of 12 hours for glyphosate. The Agency has decided to retain this REI as a prudent measure to mitigate risks to workers. During the REI, workers may reenter areas treated with glyphosate only in the few, narrow exceptions allowed in the WPS. The REI applies only to glyphosate uses within the scope of the WPS, so homeowner and commercial uses are not included.

## Human Risk Assessment

EPA's worst case risk assessment of glyphosate's many registered food uses concludes that human dietary exposure and risk are minimal. Existing and proposed tolerances have been reassessed, and no significant changes are needed to protect the public.

Exposure to workers and other applicators generally is not expected to pose undue risks, due to glyphosate's low acute toxicity. However, splashes during mixing and loading of some products can cause injury, primarily eye and skin irritation. EPA is continuing to recommend PPE, including protective eye wear, for workers using end-use products that are in Toxicity Categories I or II for eye and skin irritation. To mitigate potential risks associated with reentering treated agricultural areas, EPA is retaining the 12 hour REI set by the WPS.

## Environmental Assessment

### Environmental Fate

Glyphosate adsorbs strongly to soil and is not expected to move vertically below the six inch soil layer; residues are expected to be immobile in soil. Glyphosate is readily degraded by soil microbes to AMPA, which is degraded to carbon dioxide. Glyphosate and AMPA are not likely to move to ground water due to their strong adsorptive characteristics. However, glyphosate does have the potential to contaminate surface waters due to its aquatic use patterns and through erosion, as it adsorbs to soil particles suspended in runoff. If glyphosate reached surface water, it would not be broken down readily by water or sunlight.

### Ecological Effects

Glyphosate is no more than slightly toxic to birds and is practically non-toxic to fish, aquatic invertebrates and honeybees. Due to the presence of a toxic inert ingredient, some glyphosate end-use products must be labeled, "Toxic to fish," if they may be applied directly to aquatic environments. Product labeling does not preclude off-target movement of glyphosate by drift. EPA therefore is requiring three additional terrestrial plant studies to assess potential risks to nontarget plants.

EPA does not expect that most endangered terrestrial or aquatic organisms will be affected by the registered uses of glyphosate. However,

4

**Exhibit 39 - 46**

many endangered plants as well as the Houston toad (due to its habitat) may be at risk. EPA is deferring any use modifications or labeling amendments until it has published the Endangered Species Protection Plan and has given registrants guidance regarding endangered species precautionary labeling.

### Ecological Effects Risk Assessment

Based on current data, EPA has determined that the effects of glyphosate on birds, mammals, fish and invertebrates are minimal. Under certain use conditions, glyphosate may cause adverse effects to nontarget aquatic plants. Additional data are needed to fully evaluate the effects of glyphosate on nontarget terrestrial plants. Risk reduction measures will be developed if needed, once the data from these studies are submitted and evaluated.

### Additional Data Required

EPA is requiring three generic studies (Tier II Vegetative Vigor, Droplet Size Spectrum, and Drift Field Evaluation) which are not part of the target data base and do not affect the reregistration eligibility of glyphosate. The Agency also is requiring product-specific data including product chemistry and acute toxicity studies, as well as revised Confidential Statements of Formula and revised labeling.

### Product Labeling Changes Required

All end-use glyphosate products must comply with EPA's current pesticide product labeling requirements. In addition:

- **Protection of Aquatic Organisms**

  Non-Aquatic Uses - End-use products that are not registered for aquatic uses must bear the following label statement:

  > *Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark. Do not contaminate water when disposing of equipment washwaters and rinsate.*

  Aquatic Uses - End-use products registered for aquatic uses must bear the following label statement:

  > *Do not contaminate water when disposing of equipment washwaters and rinsate. Treatment of aquatic weeds can result in oxygen loss from decomposition for dead plants. This loss can cause fish kills.*

- **Worker Protection Standard (WPS) Requirements**

  Any product whose labeling permits use in the production of an agricultural plant on any farm, forest, nursery or greenhouse must comply with the labeling requirements of:

  - PR Notice 93-7, "Labeling Revisions Required by the Worker Protection Standard (WPS)," and

5

**Exhibit 39 - 47**

- PR Notice 93-11, "Supplemental Guidance for PR Notice 93-7."

Unless specifically directed in the RED, all statements required by these two PR Notices must appear on product labeling exactly as instructed in the Notices. Labels must be revised by April 21, 1994, for products distributed or sold by the primary registrant or supplementally registered distributors, and by October 23, 1995, for products distributed or sold by anyone.

- **Personal Protective Equipment (PPE)**

No new PPE requirements must be added to glyphosate labels. However, any existing PPE requirements on labels must be retained.

- **Entry Restrictions**

Products Not Primarily Intended for Home Use:

o Uses Within the Scope of the WPS - A 12-hour restricted entry interval (REI) is required for all products with uses within the scope of the WPS, except products intended primarily for home use. The PPE for early entry should be that required for applicators of glyphosate, except any applicator requirement for an apron or respirator is waived. This REI and PPE should be inserted into the standardized statements required by PR Notice 93-7.

- Sole Active Ingredient End-Use Products - Labels must be revised to adopt the entry restrictions set forth in this section. Any conflicting entry restrictions on current labeling must be removed.

- Multiple Active Ingredient Products - Registrants must compare the entry restrictions set forth in this section to those on their current labeling and retain the more protective. A specific time period in hours or days is considered more protective than "until sprays have dried" or "dusts have settled."

o Uses Not Within the Scope of the WPS - No new entry restrictions must be added. However, any entry restrictions on current product labeling with these uses must be retained.

Products Primarily Intended for Home Use:

o No new entry restrictions must be added. However, any entry restrictions on current product labeling must be retained.

**Regulatory Conclusion**

The use of currently registered pesticide products containing the isopropylamine and sodium salts of glyphosate in accordance with the labeling specified in this RED will not pose unreasonable risks or adverse effects to humans or the environment. Therefore, all uses of these products are eligible for reregistration.

These glyphosate products will be reregistered once the required product-specific data, revised Confidential Statements of Formula and revised labeling are received and accepted by EPA.

6

**Exhibit 39 - 48**

Products which contain active ingredients in addition to glyphosate will not be reregistered until all their other active ingredients also are eligible for reregistration.

**For More Information**

EPA is requesting public comments on the Reregistration Eligibility Decision (RED) document for glyphosate during a 60-day time period, as announced in a Notice of Availability published in the Federal Register. To obtain a copy of the RED document or to submit written comments, please contact the Pesticide Docket, Public Response and Program Resources Branch, Field Operations Division (7506C), Office of Pesticide Programs (OPP), US EPA, Washington, DC 20460, telephone 703-    305-5805.

Following the comment period, the glyphosate RED document will be available from the National Technical Information Service (NTIS), 5285 Port Royal Road, Springfield, VA 22161, telephone 703-487-4650.

For more information about EPA's pesticide reregistration program, the glyphosate RED, or reregistration of individual products containing glyphosate, please contact the Special Review and Reregistration Division (7508W), OPP, US EPA, Washington, DC 20460, telephone 703-308-8000.

For information about the health effects of pesticides, or for assistance in recognizing and managing pesticide poisoning symptoms, please contact the National Pesticides Telecommunications Network (NPTN). Call toll-free 1-800-858-7378, between 8:00 am and 6:00 pm Central Time, Monday through Friday.

7

**Exhibit 39 - 49**

| *chemicalWATCH* Factsheet |
| --- |

# GLYPHOSATE

Despite widespread use of the weed killer glyphosate, and the prevalent myth that it is harmless, this pesticide is tied to acute human health effects and linked to non-Hodgkin's lymphoma. It is found in two Monsanto products, available over the counter, Roundup$^{TM}$ and Rodeo$^{TM}$, making glyphosate one of the most widely used and well-known herbicides on the market. If there is one pesticide that represents the "fast-food," quick-fix generation, glyphosate would likely be it – the McPesticide of toxic chemicals.

## General Use

Glyphosate (N-phosphono-methyl glycine), according to the Environmental Protection Agency's (EPA) most recent data on pesticide usage, was the seventh most widely used active ingredient in agriculture, with 34 to 38 million pounds used in 1997.[1] In 1995/96, glyphosate ranked as the second most used active ingredient in non-agricultural settings, with five to seven million pounds used in the home and garden and nine to twelve million pounds used in commercial settings.[2] Glyphosate use is currently growing at a rate of about 20 percent per year, due in large part to the growing number of genetically engineered crops that are resistant to the herbicide.[3] With this growth rate, it is estimated that as much as 100 million pounds of glyphosate was applied in 2000. Of course these numbers fail to reflect the poundage of inert ingredients in the formulations that are mixed with the glyphosate.

First registered for use in 1974, there are 63 glyphosate-containing pesticide formulations registered for use in the U.S. The isopropylamine salt of glyphosate, the active ingredient in 53 of these products, is used to kill a variety of broadleaf weeds and grasses. The principal agricultural uses include corn, wheat, sorghum, citrus and stone fruits, potatoes, onions, asparagus, coffee, peanuts and pineapple.[4] There are also a good number of non-food uses including ornamental, turf, forestry and rights-of-way.[5]

Some of the most widespread uses of glyphosate that have been attracting public attention include use in invasive weed management and home gardening. The increase of glyphosate use in these areas is directly tied to the larger problem of poor land management, including over grazing, over development, soil compaction and other stressors. Glyphosate has replaced ecologically sound and sustainable cultural practices such as green-mulching, and preventive maintenance such as aeration and dethatching.

## Mode of Action

Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die in two to three days. Because plants absorb glyphosate it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains. It has been shown to persist in food products for up to two years.[6]

## Inert Ingredients

A letter published in the Feburary 6, 1988 *Lancet* (page 299) cited a Japanese report of 56 cases of toxic exposure to Roundup$^{TM}$ between June, 1984 and March, 1986. The individuals had ingested the pesticide, and experienced a range of adverse effects to their respiratory, cardovascular, and central nervous systems; nine patients died. An analysis of the findings identified one of the so-called "inert ingredients" (inerts) in the formulation, polyoxyethyleneamine (POEA), as the cause of harm. POEA is a surfactant, a chemical added to help glyphosate work its way into the plant tissue. Roundup$^{TM}$ contains 15% POEA.

All pesticide formulations are actually toxic soups, a mixture of the active ingredient (the registered pesticide) with a variety of other chemicals such as solvents, surfactants (like POEA), and emulsifiers – the inerts. Federal law classifies inerts as trade secrets and pesticide manufactures are not required to list inert ingredients on the pesticide label. Inerts, which can make up to as much as 99% of a pesticide formulation, are often highly toxic chemicals that can be more hazardous then the active ingredient.

Inerts known to be included in glyphosate products include ammonium sulfate, benziothiazolone, 3-iodo-2-propynl butylcarbamate (IPBC), isobutane, methyl pyrrolidinone, pelargonic acid, sodium sulfite, sorbic acid, and isopropylamine. All of these chemicals are associated with skin irritation, gastric and respiratory problems.[7]

## Acute Exposure

While EPA considers glyphosate to be "of relatively low oral and dermal acute toxicity,"[8] the agency does classify glyphosate in toxicity class II (class I chemicals are the most toxic in a scale from I-IV). Some glyphosate products are of higher acute toxicity, primarily due to eye and/or skin irritation.

The most recent data (1998) from California's Department of Pesticide Regulation finds that glyphosate ranks first among herbicides as the highest causes of pesticide-induced illness or injury to people in California.[9] Beyond Pesticides' own pesticide incident reporting system has received numerous reports

*Revised and Reprinted: Vol. 21, No. 1, March 2001*

**Beyond Pesticides**

701 E Street, S.E., Suite 200 • Washington DC 20003
202-543-5450 (v) • 202-543-4791 (f)
info@beyondpesticides.org • www.beyondpesticides.org

**Exhibit 39 - 50**

of people poisoned by exposure to glyphosate from around the country. These victims of pesticide exposure suffered from eye soreness, headaches, diarrhea, and other flu-like symptoms.

Symptoms following exposure to glyphosate formulations include: swollen eyes, face and joints; facial numbness; burning and/or itching skin; blisters; rapid heart rate; elevated blood pressure; chest pains, congestion; coughing; headache; and nausea.[10]

In developmental toxicity studies using pregnant rats and rabbits, glyphosate caused treatment-related effects in high dose groups, including diarrhea, decreased body weight gain, nasal discharge and death.[11]

**Chronic Exposure**
One reproductive study using rats found kidney effects in the high dose group while another study showed digestive effects and decreased body weight gain.[12] A cancer study looking at rats found an increase in pancreas and liver tumors in males as well as an increase in thyroid cancer in females.[13]

A 1999 study, *A Case-Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides,* (American Cancer Society, 1999), found that people exposed to glyphosate are 2.7 times more likely to contract non-Hodgkin Lymphoma.

There has been controversy regarding whether glyphosate at high doses causes tumors of the thyroid and testes in rats. EPA has reported that technical glyphosate is contaminated with "less than 100 parts-per-billion" of N-nitroso-glyphosate (NNG), a by-product of synthesis. Many N-nitroso compounds are animal carcinogens. EPA is not, however, requiring further investigation of the toxicological effects of NNG, because it does not typically require data on N-nitroso contaminants present at levels of less than one part-per-million.

**Environmental Effects**
Much of the belief about glyphosate's environmental safety is based on the expectation that residues will be "immobile in soil," and therefore the chemical will not contaminate groundwater. EPA acknowledges that the material does have the potential to contaminate surface waters. If glyphosate reaches surface water, it is not broken down readily by water or sunlight.[14] The half-life of glyphosate in pond water ranges from 70 to 84 days.[15]

Glyphosate is moderately persistent in soil, with an average half-life of 47 days, although there are studies reporting field half lives of up to 174 days.[16] Residues of glyphosate have been known to persist for months in anaerobic soils deficient in microorganisms. Glyphosate residues are difficult to detect in environmental samples and most laboratories are not able to perform this service because of the lack of generally available, economically feasible methodology.

**Effects on Nontarget Animals**
Glyphosate use directly impacts a variety of nontarget animals including insects, earthworms, and fish, and indirectly impacts birds and small mammals.[17] A study conducted by the International Organization for Biological Control found that exposure to Roundup$^{TM}$ killed over 50 percent of three species of beneficial insects – a parasitoid wasp, a lacewing and a ladybug.[18] Repeated applications of glyphosate significantly affected the growth and survival of earthworms.[19] Studies have also shown that glyphosate, and in particular the inert ingredients in the formulation of Roundup$^{TM}$ are acutely toxic to fish.[20]

---

## Glyphosate *chemicalWATCH* Factsheet Bibliography

[1] Environmental Protection Agency. 1999. *Pesticides Industry Sales and Usage: 1996 and 1997 Market Estimates.* EPA-733-R-99-001. p. 21, Table 8. <http://www.epa.gov/oppbead1/pestsales/97pestsales/97pestsales.pdf>
[2] Ibid. p. 22, Table 9.
[3] Northwest Coalition for Alternatives to Pesticides. 1998. *Herbicide Factsheet: Glyphosate (Roundup).* Journal of Pesticide Reform, vol. 18, no. 3, p. 4.
[4] Environmental Protection Agency. 1993. *Glyphosate Reregistration Eligibility Decision.* p. viii. <http://www.epa.gov/REDs/old_reds/glyphosate.pdf>
[5] Ibid.
[6] Pesticide Action Network, 1997. Glyphosate fact sheet. For more information about glyphosate visit <http://data.pesticideinfo.org/

4DAction/GetRecord/PC33138>
[7] NCAP. 1998. p. 5.
[8] EPA. 1993.
[9] California Pesticide Illness Surveillance Program Report – 1998. Table 4. <http://www.cdpr.ca.gov/docs/dprdocs/pisp/1998pisp.htm>
[10] NCAP. 1998. p. 5, Table 1.
[11] EPA. 1993.
[12] Ibid.
[13] NCAP. 1998. Citing EPA OPPTS, 1991, Second Peer Review of Glyphosate. Memo from W. Dykstra and G.Z. Ghali, HED to R. Taylor, Registration Division and L. Rossi, Special Review and Reregistration Division.
[14] EPA. 1993
[15] Extension Toxicology Network. 1996. Pesticide Information Profiles: Glyphosate. <http://ace.orst.edu/cgi-bin/mfs/01/pips/

glyphosa.htm>
[16] Ibid.
[17] NCAP. 1998. pps. 11-13.
[18] Ibid. p. 11. Citing: Hassan, S.A. et al. 1988. Results of the fourth joint pesticide testing programme carried out by the IOBC/WPRS-Working Group "Pesticides and Beneficial Organisms." J. Appl. Ent. 105: 321-329.
[19] Ibid. Citing: Springett, J.A. and R.A.J. Gray. 1992. Effect of repeated low doses of biocides on the earthworm *Aporrectodea caliginosa* in laboratory culture. *Soil Biol. Biochem.* 24(12): 1739-1744.
[20] Ibid. p. 12. Citing: Folmar, L.C., H.O. Sanders, and A.M. Julin. 1979. Toxicity of the herbicide glyphosate and several of its formulations to fish and aquatic invertebrates. *Arch. Environ. Contam. Toxicol.* 8: 269-278.

*Beyond Pesticides*
701 E Street, S.E., Suite 200 • Washington DC 20003
202-543-5450 (v) • 202-543-4791 (f)
info@beyondpesticides.org • www.beyondpesticides.org

## Exhibit 39 - 51

| United States Environmental Protection Agency | Prevention, Pesticides And Toxic Substances (7508W) | EPA-738-F-95-003 March 1995 |
|---|---|---|

 **EPA**

# R.E.D. FACTS

# Linuron

**Pesticide Reregistration**

All pesticides sold or distributed in the United States must be registered by EPA, based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment. Because of advances in scientific knowledge, the law requires that pesticides which were first registered years ago be reregistered to ensure that they meet today's more stringent standards.

In evaluating pesticides for reregistration, EPA obtains and reviews a complete set of studies from pesticide producers, describing the human health and environmental effects of each pesticide. The Agency imposes any regulatory controls that are needed to effectively manage each pesticide's risks. EPA then reregisters pesticides that can be used without posing unreasonable risks to human health or the environment.

When a pesticide is eligible for reregistration, EPA announces this and explains why in a Reregistration Eligibility Decision (RED) document. This fact sheet summarizes the information in the RED document for reregistration case 0047, 3-(3,4-dichlorophenyl)-1-methoxy-1-methylurea, commonly known as linuron.

**Use Profile**

Linuron is a herbicide used to control germinating and newly emerging grasses and broad-leafed weeds. It is applied to agricultural crops, ornamental bulbs, and poplar trees for use in shelterbelts in the mid-west. Most of the linuron applied in the U.S. is to soybean crops. Formulations include water dispersable granules, wettable powders, flowable concentrates, and emulsifiable concentrates/liquid suspensions.

Linuron usually is applied after a crop has been planted but before weeds emerge, using ground or aerial equipment. In some crops, such as carrots and celery, linuron is applied to newly emerging plants as an over-top spray. In asparagus, linuron is applied between cuttings of newly emerging spears for weed control during harvest.

Use practice limitations include prohibitions against applying linuron directly to water, or to areas where surface water is present, or to intertidal areas below the mean high water mark; applying linuron aerially (DuPont only; Griffin allows aerial application to potatoes and soybeans before crop emerges); and applying linuron through any type of irrigation system.

**Exhibit 39 - 52**

**Regulatory History**

Linuron was first registered as a pesticide in the U.S. in 1966. EPA issued a Registration Standard for Linuron in June 1984 (NTIS #PB85-149011). From 1984 through 1988, linuron was the subject of a Special Review because it exceeded oncogenicity risk criteria. However, the weight of evidence suggested that its cancer-causing potential in humans is weak. EPA concluded that no regulatory action was warranted, and reduced linuron's cancer classification from a quantifiable to an unquantifiable Group C carcinogen (that is, a possible human carcinogen for which there is limited animal evidence).

EPA issued Data Call-In notices (DCIs) in May 1986, September 1990 and November 1993, requiring additional studies on product chemistry, chronic toxicity, processing and cooking, ecological effects, phytotoxicity, and residue chemistry, as well as cropfield trials replacement data for studies generated by Craven Laboratories. Currently, 23 linuron end-use products and 5 technical products are registered.

**Human Health Assessment**

**Toxicity**

Linuron is of relatively low acute toxicity. It is slightly toxic by the oral, dermal and inhalation routes, and has been placed in Toxicity Category III (the second-to-lowest of four categories) for these effects. It causes slight eye irritation in rabbits (Toxicity Category III), and is not a skin irritant (Toxicity Category IV) or sensitizer.

A subchronic toxicity study using rats resulted in changes in blood cell counts, and retarded growth at the high dose level.

In a chronic toxicity and carcinogenicity study using beagle dogs, linuron caused changes in blood, including red blood cell destruction, and in liver weight. A study using rats resulted in testicular tumors and blood cell destruction. Another rat study showed growth retardation and destruction of red blood cells. A third rat study showed significant changes in blood pigments. An oncogenicity study using mice caused a statistically significant increase in liver tumors, as well as decreased body weight and body weight gain, increased liver weights, and other liver effects. As a result of the Agency's Special Review, linuron remains classified as an unquantifiable Group C carcinogen (that is, a possible human carcinogen for which there is limited animal evidence).

In a developmental toxicity study using rats, the highest dose level caused maternal toxic effects including decreased body weight gain and food consumption, as well as increases in postimplantation loss and fetal resorptions. In a study using rabbits, linuron caused decreases in maternal body weight, food consumption and liver weight, as well as more abortions, fewer fetuses per litter, decreased fetal body weight, and an increased incidence of fetuses with skeletal skull variations.

**Exhibit 39 - 53**

In a 2-generation reproductive toxicity study using rats, linuron caused effects on the parents including decreased body weight gain and abnormalities in the eyes and testes. Linuron was shown to interfere with the transmission of male hormones. Rats exposed to linuron could develop cell tumors in testicular tissue. A 3-generation study using rats showed reduced body weights and fertility, decreased pup survival, and decreased weanling body, liver and kidney weights, as well as liver atrophy. Linuron does not appear to be mutagenic.

**Dietary Exposure**

People may be exposed to residues of linuron through the diet. Tolerances or maximum residue limits have been established for linuron in many vegetables, grain crops, meat, milk, and other agricultural commodities (please see 40 CFR 180.184(a) and (b)). EPA has reassessed these tolerances and found that sufficient data are available to support the established tolerances for carrots; field corn grain; field corn forage and fodder; celery; cottonseed; parsnips; potatoes; sorghum grain; wheat grain and straw; meat and milk. Additional residue data are required for asparagus; sweet corn; sweet corn forage; sorghum forage and fodder; soybean forage and hay; wheat forage; and field corn grain dust. Several existing tolerances for barley, oats, and rye, forage, grain, hay, and straw; and corn, popcorn, forage and fodder will be revoked since there are no registered uses of linuron on these commodities. New tolerances have been proposed for lettuce, ginger and taro; several tolerance revisions have been proposed; and a tolerance for corn fodder needs to be raised.

Food and feed additive tolerance proposals are required for potato granules, chips, and processing waste. Under the Delaney clause of the Federal Food, Drug, and Cosmetic Act (FFDCA), however, food and feed additive tolerances may not be established for pesticides that induce cancer in man or animals. Although its cancer-causing potential in humans is weak, EPA still considers linuron to be a chemical that "induces cancer" within the meaning of the Delaney clause. Therefore, under current policy, EPA would not issue these food and feed additive tolerances, and would not continue in effect the tolerance for the associated raw agricultural commodity, potatoes.

EPA currently is evaluating legal challenges to its policies regarding pesticide tolerances, registrations and the Delaney clause. Because of these issues, the Agency is unable to make a reregistration eligibility decision at this time regarding the use of linuron on potatoes.

Although the basic manufacturer of linuron deleted the cotton use in 1991, cotton still exists on linuron end-use product labels. Registrants of these end-use products must now either submit a required cottonseed processing study or delete the cotton use from their labels.

3

**Exhibit 39 - 54**

EPA has assessed the dietary risk posed by linuron. For the overall U.S. population, chronic exposure from all existing linuron tolerances represents 2% of the Reference Dose (RfD), or amount believed not to cause adverse effects if consumed daily over a 70-year lifetime. The two most highly exposed subgroups are non-nursing infants (less than 1 year old), whose exposure represents 6% of the RfD, and children age 1 to 6 years old, with exposures representing 4% of the RfD. Therefore, chronic dietary risk appears to be minimal.

Acute exposure to the subgroup of greatest concern, women of childbearing age, results in a Margin of Exposure (MOE) of 1,667 for developmental toxicity. This is likely to be an overestimate due to the conservative assumptions used. Thus, acute dietary risk also appears to be minimal.

**Occupational and Residential Exposure**

Based on current use patterns, workers may be exposed to linuron during and after applications to agricultural crops, ornamental bulbs and poplar trees. The Agency is not aware of any linuron products intended for home use.

Margins of Exposure (MOEs) were estimated for applicators and mixer/loaders of linuron. While most MOEs are greater than 100 (the margin generally considered acceptable), exposure of mixer/loaders during aerial applications is of concern, as is exposure of handlers using open mixing/loading methods.

Post-application/reentry worker exposure to linuron is unlikely, except during asparagus harvesting where linuron is applied between cuttings. However, a supplemental worker exposure study indicates that all the MOEs for asparagus harvesters are over 100. A 24-hour reentry interval required for this use was converted to a 24-hour restricted entry interval (REI) by the Worker Protection Standard (WPS). EPA is requiring a 24-hour REI for all linuron uses within the scope of the WPS, based on the asparagus reentry data.

Personal protective equipment (PPE) requirements for workers should be based on the acute toxicity of end-use products. However, due to concerns about worker risks, EPA is establishing minimum handler PPE requirements for any end-use product containing linuron. Such products may have more stringent PPE, but in no case may have less stringent PPE than: coveralls over long-sleeved shirt and long pants, chemical-resistant gloves, chemical-resistant footwear, and chemical-resistant apron.

**Human Risk Assessment**

Linuron is of relatively low acute toxicity, but is classified as an unquantifiable Group C carcinogen (that is, a possible human carcinogen for

4

**Exhibit 39 - 55**

which there is limited animal evidence), and shows some evidence of developmental and reproductive toxicity.

Although people may be exposed to residues of linuron in a number of food commodities, acute and chronic dietary risks appear to be minimal. Handler and post-application worker risks are of concern, but are being mitigated by requiring a 24-hour REI and minimum PPE for all agricultural uses of linuron.

## Environmental Assessment

### Environmental Fate

Although the environmental fate data base for parent linuron is essentially complete, two environmental fate data requirements (leaching/adsorption/desorption and terrestrial field dissipation studies) are not fulfilled. The environmental fate assessment for linuron is incomplete and tentative because information on the persistence, mobility and dissipation pathways of several degradates of linuron is not available.

Parent linuron appears to be moderately persistent and relatively immobile. Increased mobility may occur under specific environmental conditions such as in coarse textured soils and soils with low levels of organic matter. Linuron dissipates principally by biotic processes such as microbial degradation. In surface soils with adequate organic matter, the combined processes of adsorption and microbial degradation would limit linuron's potential to migrate to ground water. Linuron could runoff to surface water bodies. In that case, it would degrade fairly rapidly to three primary metabolites. However, information on the persistence and mobility of these degradates is not currently available.

Linuron exhibits some of the properties and characteristics of chemicals that have been detected in ground water, and linuron itself has been detected in ground water in four states (Georgia, Missouri, Virginia and Wisconsin). Linuron is moderately persistent with an aerobic soil metabolism half-life ranging from 57 to 100 days. Because linuron is sufficiently persistent and may be mobile under certain environmental conditions, it has the potential to impact ground water quality.

Linuron can be applied by ground spray and therefore could contaminate surface waters through spray drift. It has the potential to be somewhat persistent in surface waters, particularly those with low microbiological activity and long hydrological residence times. It may be less persistent in water and sediment under anaerobic conditions than under aerobic conditions. Its bioconcentration potential is relatively low.

Linuron is not currently regulated under the Safe Drinking Water Act, and water supply systems are not required to sample and analyze for it. No Maximum Contaminant Level (MCL) or drinking water health advisories have been established for linuron. The primary treatment processes employed by most water systems may not always be completelyeffective in

5

## Exhibit 39 - 56

removing linuron. As a result, the Agency does have some moderate concerns regarding potential risks of linuron to surface water source supply systems.

## Ecological Effects

Linuron is practically nontoxic to mammals on an acute basis, and practically nontoxic to honey bees. Linuron is slightly toxic to birds on an acute basis. Though studies are not available, US Fish and Wildlife Service extrapolation suggests that linuron would be slightly toxic to practically nontoxic to birds on a subacute dietary basis. However, linuron causes reproductive effects in birds.

In acute oral toxicity studies, linuron is moderately toxic to both cold and warm water fish. Acute testing using a formulated product indicates that linuron is slightly toxic to moderately toxic to fish. In a fish early life stage chronic study, linuron caused effects on fish length even at the lowest dose level, so additional testing is required.

Linuron is highly toxic to aquatic invertebrates, while the formulated product is moderately toxic to freshwater aquatic invertebrates. A life cycle chronic test produced inconsistent results so additional testing is required. In estuarine/marine acute toxicity studies, linuron is highly toxic to the sheepshead minnow and moderately toxic to the eastern oyster and mysid shrimp.

A number of additional studies are required.

## Ecological Effects Risk Assessment

Linuron poses minimal risk to honeybees. However, chronic risk to birds is posed at all use sites. Restricted use levels of concern are exceeded for birds on short grass, and endangered species levels of concern are exceeded for all uses evaluated.

Regarding mammals, the smaller the animal, the greater the level of concern for acute effects from exposure to linuron. For example, levels of concern are exceeded for the least shrew but not for the rat. Chronic effects in wild mammals are likely.

Regarding aquatic risks, restricted use and endangered species levels of concern are exceeded for fish from exposure to linuron in rights of way (ROW), and for aquatic invertebrates at all use sites evaluated. Chronic effects cannot be fully assessed without further testing.

Although further data on the toxicity of linuron to nontarget plants is needed, a preliminary aquatic plant risk assessment indicates that high risk and endangered plant levels of concern are exceeded for aquatic plants. The risk to terrestrial plants cannot be assessed without further data.

Endangered species levels of concern are exceeded in some circumstances for acute and chronic effects to birds, wild mammals and aquatic organisms, and for acute effects to nontarget plants. When the

6

**Exhibit 39 - 57**

Endangered Species Protection Program goes into effect, limitations on the use of linuron will be required to protect endangered and threatened species.

**Risk Mitigation**     Since the current uses of linuron exceed ecological effects levels of concern in many circumstances, EPA is requiring the following risk mitigation measures proposed by the technical registrant, DuPont:

- Reduce application rates for use of linuron on soybeans, field corn, potatoes and asparagus.
- Limit the maximum number of applications to 1 per year (pre-emergent use only) for soybeans, field corn, and potatoes, and to 3 per year for asparagus.
- Prohibit aerial applications.
- Prohibit use on sand or loamy sand, and on soils of less than 1% organic matter.
- Voluntarily cancel the high application rate uses including hybrid poplar and non-cropland (rights-of-way) uses.
- Add a ground water advisory to all product labels.
- Add a surface water advisory to all product labels.

Since it meets the proposed triggers, EPA will consider linuron as a candidate for classification as a restricted use pesticide due to ground water concerns, once the ground water restricted use rule is finalized. Also, the potential for spray drift exists when linuron is applied by ground spray.

Once pertinent data are submitted and reviewed, EPA will decide whether spray drift labeling statements are required for linuron.

**Additional Data Required**     EPA is requiring the following generic studies for linuron to confirm its regulatory assessments and conclusions:

Starting Materials and Manufacturing Process;

Foliar Dislodgeable Residues (Carrots/Celery);

Soil Dislodgeable Residues (Carrots/Celery);

Dermal Exposure (Carrots/Celery);

Inhalation Exposure (Carrots/Celery);

Cropfield Trials - Asparagus, Corn Aspirated Fractions (Grain Dust), Sorghum Forage and Fodder and Wheat;

Cropfield Trials - Soybean Forage and Hay;

Acute Avian Dietary Toxicity with TGAI - Quail and Duck;

Acute Aquatic Invertebrate Toxicity;

Fish Early Life Stage - Both Rainbow Trout and Sheepshead Minnow;

Aquatic Invertebrate Life Cycle - Mysid Shrimp;

Leaching/Adsorption/Desorption;

7

**Exhibit 39 - 58**

Terrestrial Field Dissipation;

Cottonseed Processing Study - To support use on cotton;

Cropfield Trials - Sweet corn - To support use on sweet corn;

Acute Marine/Estuarine (TEP) - Sheepshead Minnow using DF formulation for rights-of-way.

The following studies also are required, though they are not part of the target data base:

Seed Germination/Seedling Emergence - 10 Species;

Vegetative Vigor - 10 Species;

Aquatic Plant Growth - 4 Additional Species.

The Agency also is requiring product-specific data including product chemistry and acute toxicity studies, revised Confidential Statements of Formula (CSFs) and revised labeling for reregistration.

## Product Labeling Changes Required

All linuron end-use products must comply with EPA's current pesticide product labeling requirements, and with the following:

**Worker Protection Standard**

***Entry Restrictions***

WPS Uses - A 24-hour restricted entry interval (REI) is required for all uses within the scope of the Worker Protection Standard (WPS). The personal protective equipment (PPE) required for early entry must be the PPE required for handlers of linuron (see below). Labels of multiple active ingredient products that contain linuron must bear the more protective of either these entry restrictions or those on current labeling.

Non-WPS Uses - Labels of products with uses outside the scope of the WPS must bear the following statement:

For liquid applications: "Do not enter or allow others to enter the treated area until sprays have dried."

***Personal Protective Equipment Requirements***

Products containing linuron may contain more stringent PPE, but in no case may require less stringent PPE than the following requirements. Producers must compare the PPE requirements in this section with those on current labeling and retain the more protective.

Handler PPE for Occupational Use Products - For all uses of linuron, both within and outside the scope of the WPS, the minimum or baseline PPE requirements for pesticide handlers (mixers and loaders) are:

- coveralls over long-sleeved shirt and long pants,
- chemical-resistant footwear,
- chemical-resistant gloves, and
- chemical-resistant apron.

8

**Exhibit 39 - 59**

Early Entry PPE - Since linuron is in Toxicity Category III for eye and skin irritation potential and acute dermal toxicity, the PPE required for early entry is coveralls, chemical-resistant gloves, shoes and socks.

**Other Labeling Requirements**

***Environmental Hazard Section*** - The labels of all linuron end-use products must be revised to bear the following statements under this section:

Ground Water Advisory

"This chemical is known to leach through soil into ground water under certain conditions as a result of agricultural use. Use of this chemical in areas where soils are permeable, particularly where the water table is shallow, may result in ground-water contamination."

Surface Water Advisory

"Linuron may contaminate surface water through spray drift or, under certain conditions, from surface runoff into adjacent surface water bodies (ponds, lakes, streams, etc.). For several weeks post-application, linuron has a high potential to runoff when applied to fields with any of the following conditions: sloping land draining into nearby surface waters; very poorly to somewhat poorly drained soils; areas with extremely shallow ground water; frequently flooded areas; fields with surface water canals or ditches; and highly erodible land cultivated with poor management practices."

For Terrestrial Uses Except Rights-of-Way

"This pesticide is toxic to fish and aquatic invertebrates. Do not apply to water or to areas where surface water is present, or to intertidal areas below the mean high water mark. Do not apply when weather conditions favor drift from treated areas. Do not contaminate water when disposing of equipment wash water or rinsate."

For Rights-of-Way - If a registrant chooses to support the rights-of-way use, he must submit the data required in this RED document and his labels must bear the following statement:

"This pesticide is toxic to fish and aquatic invertebrates. Do not contaminate water when disposing of equipment washwaters or rinsate."

If a registrant does not support the rights-of-way use, he must amend his labels to delete this use.

***Directions for Use Section*** - The labels of all linuron end-use products must be revised to bear the following statements under this section:

Application Restrictions:

"Do not apply this product in a way that will contact workers or other persons, either directly or through spray drift. Only protected handlers may be in the area during application."

9

**Exhibit 39 - 60**

"Aerial application is prohibited."

"Use on sand or loamy sand is prohibited."

"Use on soils of <1% organic matter is prohibited."

*Crop Uses Section* - The labels of all linuron end-use products must be revised to bear the following application rates for the respective crops, under this section:

Application Rates:

For use on soybeans:  A maximum application rate of 1.0 lb ai/A, with use limited to single application (pre-emergent use only) per year.

For use on corn, field:  A maximum application rate of 0.75 lb ai/A, with use limited to single application (pre-emergent use only) per year.

For use on potatoes:  A maximum application rate of 1.5 lbs ai/A, with use limited to single application (pre-emergent use only) per year.

For use on asparagus:  A maximum application rate of 2.0 lbs ai/A per year, with use limited to 3 applications per year.

Do not exceed 2.0 lbs total per acre per year.

**Regulatory Conclusion**

Although levels of concern are exceeded for ecological effects and ground water quality, most uses of currently registered products containing linuron, amended to reflect the risk mitigation measures imposed in this RED, will not pose unreasonable risks or adverse effects to humans or the environment.  Therefore, products containing linuron for all registered uses **except** use on cotton, non-cropland (rights-of-way), sweet corn, and potatoes are eligible for reregistration.

EPA is unable to make a reregistration eligibility decision for use of linuron on cotton, non-cropland (rights-of-way) and sweet corn because the Agency does not have key generic data to support these uses.  The basic manufacturer, DuPont, has voluntarily cancelled or plans to cancel these uses, so end-use product registrants must either delete the uses from their labels or submit the required data.

EPA also is unable to make a reregistration eligibility decision regarding the use of linuron on potatoes because, under current policy, the food additive tolerances needed to support this use appear to be barred by the Delaney clause in the FFDCA.

Linuron products with eligible uses will be reregistered once the required product-specific data, revised Confidential Statements of Formula, and revised labeling are received and accepted by EPA.

**For More Information**

EPA is requesting public comments on the Reregistration Eligibility Decision (RED) document for linuron during a 60-day time period, as announced in a Notice of Availability published in the Federal Register.  To

10

**Exhibit 39 - 61**

obtain a copy of the RED document or to submit written comments, please contact the Pesticide Docket, Public Response and Program Resources Branch, Field Operations Division (7506C), Office of Pesticide Programs (OPP), US EPA, Washington, DC 20460, telephone 703-305-5805.

Electronic copies of the RED and this fact sheet can be downloaded from the Pesticide Special Review and Reregistration Information System at 703-308-7224. They also are available on the Internet on EPA's gopher server, *GOPHER.EPA.GOV*, or using ftp on *FTP.EPA.GOV*, or using WWW (World Wide Web) on *WWW.EPA.GOV*.

Printed copies of the RED and fact sheet can be obtained from EPA's National Center for Environmental Publications and Information (EPA/NCEPI), PO Box 42419, Cincinnati, OH 45242-0419, telephone 513-489-8190, fax 513-489-8695.

Following the comment period, the linuron RED document also will be available from the National Technical Information Service (NTIS), 5285 Port Royal Road, Springfield, VA 22161, telephone 703-487-4650.

For more information about EPA's pesticide reregistration program, the linuron RED, or reregistration of individual products containing linuron, please contact the Special Review and Reregistration Division (7508W), OPP, US EPA, Washington, DC 20460, telephone 703-308-8000.

For information about the health effects of pesticides, or for assistance in recognizing and managing pesticide poisoning symptoms, please contact the National Pesticides Telecommunications Network (NPTN). Call toll-free 1-800-858-7378, between 8:00 am and 6:00 pm Central Time, Monday through Friday.

11

**Exhibit 39 - 62**

E X T O X N E T

Extension Toxicology Network

A Pesticide Information Project of Cooperative Extension Offices of Cornell University, Michigan State University, Oregon State University, and University of California at Davis. Major support and funding was provided by the USDA/Extension Service/National Agricultural Pesticide Impact Assessment Program.

Pesticide

Information

Profile  Metolachlor

Publication Date: 9/93

## TRADE OR OTHER NAMES

Trade names for products containing metolachlor include Bicep, CGA-24705, Dual, Pennant, and Pimagram. The compound may be used in formulations with other pesticides (often herbicides that control broad leaved weeds) including atrazine, cyanazine, and fluometuron.

## INTRODUCTION

Metolachlor is usually applied to crops before plants emerge from the soil. It is used to control certain broadleaf and annual grassy weeds in field corn, soybeans, peanuts, grain sorghum, potatoes, pod crops, cotton, safflower, stone fruits, nut trees, highway right-of-ways and woody ornamentals.

Metolachlor acts by inhibiting protein synthesis. High-protein crops can be adversely affected by metolachlor applications (13). Certain additives included in product formulations to help protect sensitive crops like sorghum from injury.

Metolachlor is a general use pesticide.

## TOXICOLOGICAL EFFECTS

### ACUTE TOXICITY

Metolachlor is a slightly toxic chemical with a CAUTION signal word on its product labels. Metolachlor is not very acutely toxic to humans. Human exposure most commonly occurs through skin or eye contact. It is more dangerous when inhaled than when ingested. Signs of human intoxication from metolachlor include abdominal cramps, anemia, shortness of breath, dark urine, convulsions, diarrhea, jaundice, weakness, nausea, sweating, and dizziness (12).

**Exhibit 39 - 63**

The acute oral LD50 in rats for technical grade metolachlor is from 1,200 mg/kg (7) to 2,780 mg/kg (11). The oral LD50 of Dual 8E, a product containing metolachlor, is 2534 mg/kg in rats (5, 10). The 4-hour exposure inhalation LC50 of technical metolachlor for rats is greater than 1.7 ppm (11). The inhalation LC50 of Dual 8E in rats is greater than 6.0 ppm for 4 hours (5). The dermal LD50 in rabbits is greater than 10,000 mg/kg for technical-grade metolachlor, and is greater than 5,009 mg/kg for the product Dual 8E (5, 11). Moderate exposure to metolachlor can cause slight skin irritation. While these results indicate that metolachlor has a low dermal toxicity to humans, this chemical could cause skin sensitivity.

## CHRONIC TOXICITY

While metolachlor is not readily absorbed by the skin, repeated dermal exposures may create skin sensitization, especially among those who work with metolachlor. Except for skin sensitization studies, not enough information is available to accurately determine the chronic effects of metolachlor in humans.

In rats fed metolachlor for ninety days, the level at which no adverse compound related effects were noted was about 90 mg/kg/day (15). This indicates that the compound is capable of causing chronic toxic effects at exposure levels substantially below levels that cause acute toxicity.

### Reproductive Effects

Overall the evidence suggests that metolachlor has little or no effect on reproduction at commonly encountered levels. In two long-term rat reproduction studies, mating, gestation, lactation, and fertility were not affected at the low doses administered (50 mg/kg) (12). However, pup weights and parental food consumption decreased at this low dose. Another two-year test caused the wasting of testicles at moderate doses (150 mg/kg) (12).

### Teratogenic Effects

Studies to date indicate that metolachlor does not cause birth defects, even at doses which cause toxic effects in the mother. In one rat study, pregnant rats fed high doses of metolachlor during the sensitive period of pregnancy had normal offspring. No toxic effects in the fetuses were seen. At the highest dose, a decrease in food consumption was observed in the mother (4, 11). In another study, pregnant rabbits were fed high doses during the sensitive period. While the mothers showed toxicity to the chemical, none of the 319 offspring showed any birth defects (12).

### Mutagenic Effects

Metolachlor is clearly non-mutagenic. Metolachlor tested negative in two bacterial assays. In studies on mice, no effects were noted on fertility, zygote or embryo survival rates after very high single oral doses. No malformations of embryos were reported (4). Also, no mutagenicity effects were noted in a standard mouse test (11). From this evidence it is unlikely that the compound would pose a major mutagenic threat to humans.

### Carcinogenic Effects

Metolachlor shows limited carcino-genicity in animals. Male and female mice exposed to high doses for 18 to 20 months did not develop cancer (12). But, female rats given high doses for two

**Exhibit 39 - 64**

years showed a significant increase in new growths, nodules, and lesions in livers (11, 12). Because of the limited, evidence of carcinogenicity and lack of human data, metolachlor is classified as a possible human carcinogen (9, 12).

## Organ Toxicity

Exposure to metolachlor can damage the liver and irritate the skin, eyes, and mucous membranes. It has also caused skin sensitization in guinea pigs (11, 12).

In a two-year study of rats fed moderate doses (150 mg/kg), no negative effects on mortality or organ weights were observed. However, females fed metolachlor did not gain as much weight as the female controls, and both sexes showed microscopic changes in their livers (12).

## Fate in Humans and Animals

Metabolism studies show that orally administered metolachlor is quickly broken down into metabolites and is almost totally eliminated in the urine and feces of goats, rats, and poultry. Metolachlor itself was not detected in the urine, feces, or body tissues (4). Rats, given a single oral dose of metolachlor, excreted 70 to 90 percent of the metolachlor as metabolites within 48 hours (12).

In animals, trace amounts of metolachlor metabolites were found in kidneys, liver, blood, and milk. But, no residues were found in eggs, meat, or fat samples of laying chickens. It is unlikely the compound would concentrate in organisms through the food chain.

## ECOLOGICAL EFFECTS

Metolachlor is moderately toxic to both cold and warm water fish, including rainbow trout, carp, and bluegill sunfish. The 96 hr LC50 values for this compound in rainbow trout, carp and bluegill sunfish are 2.0, 4.9 and 15.0 mg/kg respectively.

Studies on algae and fish exposed to metolachlor in water indicate that very little is accumulated and that any accumulated material is excreted rapidly when the organisms are placed in clean water (4). Residues in fish were quite low and do not pose a threat to human health.

Wildfowl can tolerate metolachlor exposure. Both the mallard and the bobwhite quail can survive five day exposures of greater than 10,000 mg/kg, an indication that metolachlor is practically nontoxic to upland game birds and waterfowl (4). However, although mallard ducks showed no impairment of reproductive capabilities at high level long-term exposures, bobwhite quail fed a diet containing high levels of metolachlor for 17 weeks during mating, egg laying, and egg hatching produced fewer chicks.

## ENVIRONMENTAL FATE

Metolachlor, applied before plants emerge, is absorbed through shoots just above the seed, and may be absorbed from the soil into and through the roots. This chemical acts by inhibiting the production of essential plant components like chlorophyll and protein. Thus, metolachlor is a growth inhibitor affecting root and shoot growth after seeds have germinated.

**Exhibit 39 - 65**

The breakdown of metolachlor in corn, soybean, peanuts, and sorghum is similar. Metabolites are found in varying levels throughout the plant. For example, the roots, grain, and oil contain little, if any, residues of metolachlor or its metabolites. However the plants retain their metolachlor metabolites. Animals which eat these plants are able to rapidly break down and eliminate the chemical. Livestock should not be fed foliage from crops such as cotton because the leaves can hold metolachlor residues at much higher levels than the seeds.

Metolachlor is mobile in the soil, is easily leached, and resists breakdown for long periods of time. The breakdown of the compound is affected by temperature, moisture, microbe activity, amount of leaching, soil type, nitrification, oxygen concentrations and sunlight. Soil metabolism primarily occurs by both aerobic and anaerobic microorganisms. Some of these microorganisms can rapidly break down the chemical if the organisms are provided with enough energy. In one study using an aerobic bacterium, complete breakdown occurred in 16 days (8). Anaerobic degradation rates are even slower (4).

Any temperature and moisture changes which affect microbial activity will also affect the breakdown of this herbicide. As temperature increases, the degradation rate also increases. Also, the deeper the chemical is in the soil, the less organic matter and fewer soil microbes are present, so the herbicide takes longer to degrade. Most of acetanilide herbicides, of which metolachlor is a member, are lost through microbial decomposition (17).

Breakdown by sunlight is another important degradation pathway. About fifty percent of applied metolachlor was found to have degraded on sunlit soil over a period of eight days. But, if this chemical was incorporated into the top two inches of soil, then degradation by photolysis was minimal (6% over one month) (4).

Metolachlor degradation also depends on binding to the soil. Breakdown rates decrease, and binding increases, with increased soil organic matter and clay content. Half-lives of 30 to 50 days in northern areas, and 15 to 25 days in southern areas have been observed (17). However, clay loams have significant soil water content and this contributes to more rapid breakdown. Half-lives found in the field were 17 days in clay loams at an average temperature of 20 degrees C, and 23 days in sandy loams at an average temperature of 23 degrees C (17).

Metolachlor is moderately persistent in silt loams, taking 10.1 weeks to halve the initial herbicide concentration from a depth of 10 to 20 cm at 23 degrees C (1). Extensive leaching occurs, especially in soils with low organic content (4). Very little metolachlor volatilizes from the soil.

Metolachlor is stable to breakdown in water over a wide water acidity. Its half-life at 20 degrees C is more than 200 days in highly acid waters and, in highly basic waters, the half-life is 97 days (4). Metolachlor is also relatively stable in water under natural sunlight. About 6.6 percent was degraded by sunlight in 30 days, a slow and minimal rate (4).

**Exhibit 39 - 66**

Because of the slow microbial and anaerobic degradation rates of this chemical and its ability to leach through soil, metolachlor has the potential to contaminate groundwater. Leaching is greatest if the soils are coarse and the ground water is near the surface. Metolachlor was one of four pesticides that were extensively studied throughout the nation in the National Alachlor Well Water Survey. This several year project analyzed the contents of over six million private and domestic well. Metolachlor was detected in about one percent of the wells (about 60,000 wells) at concentrations ranging from 0.1 to 1.0 ppb (11, 12, 18).

Metolachlor has been found in 1,644 of 1,997 surface water samples from 312 locations in 14 states, at the maximum concentration of 138 ppb (12). These levels may result from runoff during spring and summer applications in crop fields (11).

## PHYSICAL PROPERTIES AND GUIDELINES

Pure metolachlor is an odorless, off-white to colorless liquid at room temperature. In formulations, its color ranges from opaque white to tan. It is a member of the chloracetanilide chemical family, with a molecular weight of 283.46. The chemical name for metolachlor is 2-chloro-N-(2-ethyl-6- methylphenyl)-N-(2-methoxy-1-methylethyl) acetamide.

Technical metolachlor is stable for at least one year at room temperature (4). The shelf storage life of Dual 8E is 3-5 years when in a dry place (5).

Exposure Guidelines:

NOEL: 1.5 mg/kg/day (dog); 2.5 mg/kg/day (rat)

ADI: 0.092 mg/kg/day (11)

MPI: 0.075 mg/day (4)

Drinking water

health advisory: Drinking water equivalent level: 0.525 mg/L

Physical Properties:

CAS #: 51218-45-2

Solubility in water: 530 ppm (at 20 degrees C) (15)

Solubility in solvents: very soluble in benzene, dichloromethane, hexane, methanol, and octan-1-ol;

miscible with xylene toluene, dimethyl formamide, methyl cellusolve, butyl cellusolve, ethylene dichloride, and cyclohexanone.

Insoluble in ethylene glycol and propylene glycol.

Boiling point: 100 degrees C (at 0.001 mm Hg) (15)

Vapor pressure: 1.3 X 10 to the minus 5 mm Hg at 20 degrees C (14)

**Exhibit 39 - 67**

Koc: 1.48 at a soil depth of 10-20 cm; 0.92 at 40-50 cm (1)

Kd: 2.73 (3)

BASIC MANUFACTURER

Ciba-Geigy Agricultural Division

P.O. Box 18300

Greensboro, NC 27419-8300

Telephone 919-632-6000

Fax 919-299-8318

Review by Basic Manufacturer:

Comments solicited: January, 1992

Comments received: April, 1992

REFERENCES

Bouchard, D.C, T.L Lavy and D.B. Marx. 1982. Fate of metribuzin, metolachlor, and fluometuron in soil. Weed Sci. 30: 629-632.

Braverman, M.P.; T.L. Lavy, and C.J. Barnes. 1986. The degradation and bioactivity of metolachlor in the soil. Weed Sci. 34: 479-484.

Burkhard, N. and J.A. Guth. 1981. Rate of volatilisation of pesticides from soil surfaces. Pestic. Sci. 12: 37-44.

U.S. Environmental Protection Agency. Pesticide Regulation Standard for Metolachlor. September 1980.

Meister, R.T., ed. dir. 1992. Farm Chemical Handbook. Meister Pub. Co.

Fuerst, E.P. and J.W. Gronwald. 1986. Induction of rapid metabolism of metolachlor in sorghum shoots by CGA-92194 and other antidotes. Weed Sci. 34: 354-361.

Gosselin, R.E., R.P. Smith, H.C. Hodge and J.E. Braddock. 1984. Clinical Toxicology of Commercial Products. 5th edition. Williams & Wilkins.

Krause, A. et al. 1985. Microbial transformation of the herbicide metolachlor by a soil actinomycete. J. Agric. Food Chem. 33: 545-589.

"Review board urges Agriculture Canada to reinstate alachlor." Pesticide and Toxic Chemical News. pg. 15. 25 November 1987.

RTECS Quarterly Microfiche. April 1987. "Metolachlor." AN3430000.

U.S. Environmental Protection Agency. Office of Pesticide Programs. "Metolachlor." Chemical Fact Sheet No. 106. January 1987.

U.S. Environmental Protection Agency. Office of Drinking Water. Metolachlor Health Advisory. Draft Report. August 1987.

Wilkinson, R.E. 1981. Metolachlor influence on growth and terpenoid synthesis. Pest. Biochem.

**Exhibit 39 - 68**

and Physiol. 16:63-71.

Windholz, M., et al., eds. 1983. Metolachlor. pg. 880. The Merck Index. 10th ed. Merck & Co., Inc.

Worthing, C.R., ed. 1983. "Metolachlor." pg 377. The Pesticide Manual. 7th edition. British Crop Protection Council.

Zama, P. and K.K. Hatzios. 1987. Interactions between the bioicide metolachlor and the safener CGA-92194 in sorghum leaf protoplasts. Pesticide Biochem. and Physiology. 27: 86-96.

Zimdahl, R.L. and S.K. Clark. 1982. Degradation of three acetanilide herbicides in soil. Weed Sci. 30: 545-548.

Holden, Larry R. and Jeffery A. Grahm. 1992. Results of the National Alachlor Well Water Surver. Environmental Science and Technology. 26: 935-943.

-------------------------------------------------------------------------------

Disclaimer: Please read the pesticide label prior to use. The information contained at this web site is not a substitute for a pesticide label. Trade names used herein are for convenience only; no endorsement of products is intended, nor is criticism of unnamed products implied. Most of this information is historical in nature and may no longer be applicable.

To Top

For more information relative to pesticides and their use, please contact the PMEP staff at:

5123 Comstock Hall

Cornell University

Ithaca, NY  14853-0901

(607)255-1866

Questions regarding the development of this web site should be directed to the PMEP Webmaster

**Exhibit 39 - 69**

| United States Environmental Protection Agency | Prevention, Pesticides And Toxic Substances (7508W) | EPA-738-F-96-006 February 1998 |
|---|---|---|

 # R.E.D. FACTS

# Metribuzin

**Pesticide Reregistration**

All pesticides sold or distributed in the United States must be registered by EPA, based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment. Because of advances in scientific knowledge, the law requires that pesticides which were first registered before November 1, 1984, be reregistered to ensure that they meet today's more stringent standards.

In evaluating pesticides for reregistration, EPA obtains and reviews a complete set of studies from pesticide producers, describing the human health and environmental effects of each pesticide. The Agency edevelops any mitigation measures or regulatory controls needed to effectively reduce each pesticide's risks. EPA then reregisters pesticides that can be used without posing unreasonable risks to human health or the environment.

When a pesticide is eligible for reregistration, EPA explains the basis for its decision in a Reregistration Eligibility Decision (RED) document. This fact sheet summarizes the information in the RED document for reregistration case 0181, metribuzin.

**Use Profile**

Metribuzin is a herbicide used to selectively control certain broadleaf weeds and grassy weed species on a wide range of sites including vegetable and field crops, turf grasses (recreational areas), and non-crop areas. Formulations include wettable powder, emulsifiable concentrate, water dispersible granules (dry flowable), and flowable concentrate. Metribuzin is applied by various methods including aerial, chemigation, and ground application.

**Regulatory History**

Metribuzin was first registered as a pesticide in the U.S. in 1973. EPA issued a Registration Standard for metribuzin in July 1985 (PB86-174216). Data Call-Ins (DCIs) were issued in 1991 and 1995 requiring additional product chemistry, environmental fate and groundwater, and ecological effects data. Currently 86 metribuzin products are registered.

On August 3, 1996, the Food Quality Protection Act of 1996 (FQPA) was signed into law. FQPA amends both the Federal Food, Drug, and Cosmetic Act (FFDCA), and the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). The FQPA amendments went into effect immediately and were considered during this reregistration decision.

Exhibit 39 - 70