# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | § | |
| | § | |
| **aka Face, aka Scar, aka Scarface** | § | |
| **Defendant-Petitioner,** | § | |
| | § | |
| **v.** | § | **NO.  4:00-CR-260-Y** |
| | § | **(Civil No. 4:05-CV-756-Y)** |
| | § | **DEATH PENALTY CASE** |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff-Respondent.** | § | |

## RESPONSE OF THE UNITED STATES TO
## <u>28 U.S.C. § 2255 MOTION</u>

**SUSAN COWGER**
**Assistant United States Attorney**
**Texas State Bar No: 08390150**
**1100 Commerce Street, Third Floor**
**Dallas, Texas 75242**
**Telephone:  214.659.8622**
**Facsimile:  214.767.2846**
**E-mail:       susan.cowger@usdoj.gov**
**Attorneys for Respondent**

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.     Case History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    (i) Procedural history . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    (ii) Evidence of drug offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    (iii) Evidence of murders and of other aggravating factors . . . . . . . . . . . . . . . . . 7

          a. Shelton murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          b. Reyes murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          c. Resendez murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          d. Prior violence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          e. Future dangerousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    (iv)   Mitigation evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B.     Overarching Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.     Response to Each Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    1.     A claim that this district's plan for conducting death penalty
         prosecutions is constitutionally inadequate is procedurally
         barred, and also fails on the merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    2.     Defense counsel were constitutionally effective . . . . . . . . . . . . . . . . . . . . 29

         a.     The claim that counsel did not use the services of a skilled
              investigator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

         b.     The claim that counsel did not use the services of a mitigation
              specialist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

         c.     The claim that counsel did not sufficiently investigate or present
              evidence of penalty mitigation factors. . . . . . . . . . . . . . . . . . . . . 35

        d.     The claim that counsel did not sufficiently investigate or present evidence regarding the penalty aggravation factor of future dangerousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        e.     The claim that counsel did not raise a *Batson* challenge on direct appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

   3.    A collateral *Batson* challenge to the jury selection process is procedurally barred, and also fails on the merits . . . . . . . . . . . . . . . . . . . 71

   4.    A challenge to the allegedly discriminatory application of the Federal Death Penalty Act is procedurally barred and also fails on the merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

   5.    The claim that the prosecution offered culpability theories at Robinson's trial which were inconsistent with those offered at L.J. Britt's separate trial is procedurally barred, and also fails on the merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

   6.    The claim that the prosecution knowingly presented false evidence regarding the penalty aggravation factor of future dangerousness is procedurally barred, and also fails on the merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

   7.    This Court is without jurisdiction to entertain Robinson's motion for a new trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                      **Page(s)**

*Batson v. Kentucky*, 476 U.S. 79 (1986) . . . . . . . . . . . . . . . 2, 55, 57-59, 62, 64-66, 70-71

*Berry v. King*, 765 F.2d 451 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 58

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Emery v. Johnson*, 139 F.3d 191 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Faulder v. Johnson*, 81 F.3d 515 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 49

*Flanagan v. Johnson*, 154 F.3d 196 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Furman v. Georgia*, 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Garland v. Maggio*, 717 F.2d 199 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Green v. Johnson*, 116 F.3d 1115 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hernandez v. New York*, 500 U.S. 352 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

*Herrera v. Collins*, 506 U.S. 390 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*In re United States*, 397 F.3d 274 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Jones v. Barnes*, 463 U.S. 745 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Kitchens v. Johnson*, 190 F.3d 698 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Lamb v. Johnson*, 179 F.3d 352 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 43

*Lockett v. Anderson*, 203 F.3d 695 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**FEDERAL CASES, cont'd.**

*Lockett v. Ohio*, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Mann v. Scott*, 41 F.3d 968 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Massaro v. United States*, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . 27, 71, 78, 79

*May v. Collins*, 955 F.2d 299 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*McCleskey v. Kemp*, 481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 73, 76, 77

*Miller-El v. Dretke,* 142 Fed.Appx. 802 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 56

*Miller-El v. Dretke*, 125 S. Ct. 2317 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 56, 58, 66, 69

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Robinson v. United States*, 543 U.S. 1005 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Robison v. Johnson*, 151 F.3d 256 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Rompilla v. Beard*, 125 S. Ct. 2456 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 46-48

*Soria v. Johnson*, 207 F.3d 232 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . 30-32, 46, 55

*Theriot v. Parish of Jefferson*, 185 F.3d 477 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Adi*, 759 F.2d 404 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Armstrong*, 517 U.S. 456 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Bentley-Smith*, 2 F.3d 1368 (5th Cir. 1993) . . . . . . . . . . . . . . . . 56, 59, 62

*United States v. Bin Laden*, 126 F. Supp. 2d 256 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . 76

*United States v. Capua*, 656 F.2d 1033 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . 26

**FEDERAL CASES, cont'd.**

*United States v. Cook*, 670 F.2d 46 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*United States v. Frady*, 456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 71

*United States v. Fuller*, 769 F.2d 1095 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Granza*, 427 F.2d 184 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*United States v. Green*, 882 F.2d 999 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 30, 35, 49

*United States v. Haese*, 162 F.3d 359 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*United States v. Hoover*, 727 F.2d 387 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 72, 73

*United States v. Huey*, 76 F.3d 638 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Jennings*, 724 F.2d 436 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Jones*, 159 F.3d 969 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Lewis*, 786 F.2d 1278 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Medina*, 118 F.3d 371 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*United States v. Merida*, 985 F.2d 198 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Montgomery*, 210 F.3d 446 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Patten*, 40 F.3d 774 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*United States v. Ramirez*, 765 F.2d 438 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Segler*, 37 F.3d 1131 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Shaid*, 937 F.2d 228 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 26, 27, 71

*United States v. Smith*, 844 F.2d 203 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**FEDERAL CASES, cont'd.**

*United States v. Sparks*, 2 F.3d 574 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 76

*United States v.  Thomas*, 203 F.3d 350 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 4-5

*United States v. Ugalde*, 861 F.2d 802 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 81

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1999) . . . . . . . . . . . . . . . . 72, 73, 75-77

*United States v. Williams*, 264 F.3d 561 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 57

*Wayte v. United States*, 470 U.S. 598 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . 28, 36, 43-46, 48

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 45, 48

*Woodson v. North Carolina*, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**FEDERAL STATUTES AND RULES**

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 924(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 848(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 848(q)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**FEDERAL STATUTES AND RULES, cont'd.**

21 U.S.C. § 848(q)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26

FED. R. CIV. P. 6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FED. R. CRIM. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

**OTHER AUTHORITIES**

Miscellaneous Order No. 3, Local Rules, N.D. Texas . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

http://www.txnd.uscourts.gov/publications/CJA-Dallas/Chapter7.html . . . . . . . . . . . . 29

http://www.txnd.uscourts.gov/forms/cja/deathpenalty_HCP.html . . . . . . . . . . . . . . . . 29

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON, | § | |
| aka Face, aka Scar, aka Scarface | § | |
| Defendant-Petitioner, | § | |
| | § | |
| v. | § | NO.  4:00-CR-260-Y |
| | § | (Civil No. 4:05-CV-756-Y) |
| | § | **DEATH PENALTY CASE** |
| UNITED STATES OF AMERICA, | § | |
| Plaintiff-Respondent. | § | |

**RESPONSE OF THE UNITED STATES TO
28 U.S.C. § 2255 MOTION**

**Introduction**

The United States opposes Robinson's motion to vacate his conviction and

sentence and for a new trial.  Robinson's trial and sentence were fair, they comported

with all appropriate constitutional standards, and they should not be disturbed on

collateral review.

Robinson raises several claims, which the United States construes as follows:

1.     This district's plan for the conduct of death penalty prosecutions is

inadequate.

2.     Defense counsel were constitutionally ineffective.

    a.     Counsel did not use the services of a skilled investigator.

    b.     Counsel did not use the services of a mitigation specialist.

**Response to 28 U.S.C. § 2255 motion -- Page 1**

c.    Counsel did not sufficiently investigate or present evidence of penalty mitigation factors.

d.    Counsel did not sufficiently investigate or present evidence regarding the penalty aggravation factor of future dangerousness.

e.    Counsel did not raise a discriminatory jury selection claim (under *Batson v. Kentucky*) on direct appeal.

3.    The jury selection process was discriminatory.

4.    The Federal Death Penalty Act is applied in a discriminatory way to African-American defendants.

5.    The prosecution offered culpability theories at Robinson's trial which were inconsistent with those offered at L.J. Britt's separate trial, resulting in unfairness.

6.    The prosecution knowingly presented false evidence regarding the penalty aggravation factor of future dangerousness.

*****

The government will first set forth a history of this case, will then describe the prevailing legal standards for analyzing Robinson's motion, and will finally respond to each of his claims in turn.

**A.    Case History**

**(i) Procedural history**:  On November 2, 2000, Julius Omar Robinson and 36 other defendants were named in an indictment charging narcotics offenses.  The indictment was superseded twice.  Among the charges against Robinson in the final

**Response to 28 U.S.C. § 2255 motion -- Page 2**

indictment, filed on June 19, 2001, were three that resulted in a sentence of death: engaging in a continuing criminal enterprise that included the murder of three people, in violation of 21 U.S.C. § 848 (count three), and using and discharging a firearm in the course of a drug crime, resulting in the murder of Johnny Lee Shelton (count seven) and Juan Reyes (count eleven), in violation of 18 U.S.C. § 924(j).  Robinson was also charged with: a marijuana distribution conspiracy and a cocaine distribution conspiracy, in violation of 21 U.S.C. § 846 (counts one and two); possessing, using, or brandishing guns in connection with drug crimes, in violation of 18 U.S.C. § 924(c) (counts four, five, six, eight, nine, ten, thirteen, fourteen, and seventeen); possession with intent to distribute cocaine, in the course of which Rudolfo Resendez was murdered, in violation of 21 U.S.C. §§ 841, 848(e) (count twelve); and using and discharging a firearm in the course of a drug crime, resulting in the murder of Rudolfo Resendez, in violation of 18 U.S.C. § 924(j) (count fifteen).

On October 19, 2001, the United States filed its notice of intent to seek the death penalty.  A jury trial began on February 19, 2002, following eight days of jury selection. Evidence in the guilt/innocence phase was concluded on March 8, 2002, and the jury returned guilty verdicts on all counts, as well as positive findings on certain death-eligibility factors, on March 11, 2002.

The penalty phase of the case began on March 12, 2002, and concluded on March 15, 2002.  The jury returned its special verdict on March 18, 2002, recommending a sentence of death on counts three, seven, and eleven, and a sentence of life in prison on

counts twelve and fifteen.  On June 5, 2002, this Court imposed those sentences, but did not impose any prison terms on the remaining counts because they were all lesser-included offenses.

In his direct appeal, Robinson claimed the following errors:

- The indictment was flawed for failure to allege statutory aggravating factors.

- The Federal Death Penalty Act (FDPA), violates the indictment clause and the due process clause of the Fifth Amendment because it establishes the prosecutor as the source for notice of aggravating factors.

- Improper hearsay evidence regarding the attempted 'hit' on Michael Williams ("One Love") was admitted during the penalty phase.

- The FDPA violates the due process clause of the Fifth Amendment and the cruel and unusual punishment clause of the Eighth Amendment, because innocents might conceivably be executed under it.

- The aggravating factors were duplicative.

- Alleging and proving non-statutory aggravating factors was error.

The Court of Appeals affirmed Robinson's conviction and sentence in a published opinion on April 14, 2004.  *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004).  The Supreme Court denied a petition for writ of certiorari on November 29, 2004.  *Robinson v. United States*, 543 U.S. 1005 (2004).  Robinson's current motion, filed in this Court on November 29, 2005, was timely under the law.  28 U.S.C. § 2255; *United States v.*

**Response to 28 U.S.C. § 2255 motion -- Page 4**

*Thomas*, 203 F.3d 350, 354-355 (5th Cir. 2000) (for purposes of section 2255, one-year limitation on filing begins to run when a petition for writ of certiorari is denied by the Supreme Court); *Flanagan v. Johnson*,154 F.3d 196 (5th Cir. 1998) (following Rule 6(a), FED. R. CIV. P., day of event starting the one-year clock is not counted; thus, last day for filing is anniversary date of starting event).

**(ii) Evidence of drug offenses:**    Robinson has never challenged the sufficiency of the evidence of his guilt as to any offense.  He, along with Nathan Henderson, L.J. Britt, and others, conspired from around 1996 to 2000 to traffic in distribution quantities of cocaine and marijuana, in Texas and surrounding states.  The conspiracies, as well as the substantive offenses that carried them out, were amply proven by the testimony of co-conspirators, wiretapped telephone conversations, seized drugs and money, and documents.

Carmen Byrd, Robinson's girlfriend from 1996-1998, testified that Robinson and Henderson were friends and in the marijuana business together.  She saw them packaging and selling the drug, in Texas and Arkansas.  Sometimes she drove for Robinson, delivering marijuana or cocaine.  On one occasion, when she was arrested with cocaine in her car, Robinson bailed her out.  (R9/128-45.)

Brandi Scales testified that her boyfriend, Angelo Harris aka Step, and Robinson were in the drug business together.  Harris would buy cocaine from Robinson and take it back to Oklahoma for distribution.  (R11/123-41.)  Leon Jenkins testified that he was working with Harris, and that they made six to seven trips from Oklahoma to Texas to

**Response to 28 U.S.C. § 2255 motion -- Page 5**

buy cocaine from Robinson, around a kilogram each time.  They later converted it to crack.  (R15/179-88.)

Victor Jiminez testified that he sold marijuana and cocaine to Robinson and Henderson.  He sold, overall, about 3-4 kilograms of cocaine to Robinson, and about 1,500-2,000 pounds of marijuana to Robinson and Henderson, who seemed to him sometimes to be working together, sometimes independently.  Jiminez also believed that Jason Gehring worked for Robinson and Henderson.  (R12/7-14, 52-53.)  Gehring himself confirmed this when he testified; he, Robinson and Henderson sold drugs together for three to four years.  (R14/79-81; 120-28.)

Misty Grounds testified that she bought marijuana from Robinson, whom she met through Henderson.  Robinson paid her to drive marijuana three times, once to Dermott, Arkansas, once to Shreveport, Louisiana, and once to St. Louis, Missouri.  Either Robinson or someone on his behalf received the drugs in the destination city.  (R12/79-91.)

Dorothy Hodges testified that she bought marijuana from Robinson in ¼ to 1 pound quantities, about fifty times in all.  Sometimes Robinson delivered it to her himself, sometimes "Q" (Quentin Knox) delivered it for him.  (R12/119-23; 10/132.)

Jewell Ewing testified that he met Robinson in about late 1997, in Little Rock, and bought marijuana from him for two years.  Sometimes, Henderson or Gehring was with Robinson.  The dope was either delivered by car, with Robinson or a female driving, or it was shipped via UPS.  (R12/138-49.)

**Response to 28 U.S.C. § 2255 motion -- Page 6**

Some UPS shipments went to Dermott, Arkansas, where Robinson had been born and raised. Michael Williams was a customer there, who bought both cocaine and marijuana from Robinson. If he shipped the drugs, Robinson would have friends or relatives sign for the packages. (R17/183-88.) Leteisha Barnett worked for Henderson and Robinson; her duties included shipping marijuana packages for them and signing for incoming packages of cash, and storing marijuana for them at her home. (R14/25-26, 31-36, 39-46.)

Terence Holimon, Robinson's cousin, was an Arkansas customer, and knew that L.J. Britt bought marijuana from Robinson and helped Robinson out as a sort of bodyguard sometimes. Holimon, Robinson, Britt, and Henderson once stole 100 pounds of marijuana together. (R17/214-224.)

Many tapes and transcripts played and admitted at trial reflected inculpatory conversations among Robinson and his coconspirators, mostly from May-July, 2000. (See GX (noncontinuous) from 299 through 553, 893, 901-03, 929-30.) Several seizures of drugs, money, and documents (at the time of arrest) in 1999 and 2000 further corroborated Robinson's guilt.

**(iii) Evidence of murders and of other aggravating factors:** Robinson was assessed the death penalty for the murders of two victims: Johnny Lee Shelton and Juan Reyes. He got a life term for the murder of Rudolfo Resendez. The government also presented evidence of a prior act of violence by Robinson, and of his future dangerousness.

**Response to 28 U.S.C. § 2255 motion -- Page 7**

a.  Shelton murder

On September 20, 1998, Robinson made a complaint to the Dallas police that the truck he was driving, which belonged to Nathan Henderson, had been hijacked from him in a McDonald's parking lot by two men with guns.  (R13/207-11.)  Leteisha Barnett, who worked for Robinson and Nathan Henderson, heard from Henderson that the hijackers ripped Robinson off for about $30,000.  Henderson and Robinson both said they wanted to get even for the robbery, and that they thought a man nicknamed Big Friday was the one behind it.  (R14/18-21; 87-90.)

On the night of December 2, 1998, Johnny Lee Shelton and his friend, Jerell Gardner, went to the Spy Club and left around closing time, driving a Cadillac. (R13/120-23.)  Shelton and Big Friday had similar appearances, and both drove light colored Cadillacs.  (R14/73-74.)

Nathan Henderson and Jason Gehring were also at the Spy Club that night. Henderson told Gehring that he saw Big Friday there, and called Robinson on the phone to tell him the same thing.  He then told Gehring that Robinson was on his way over. After Robinson arrived, he, L.J. Britt, and Gehring got into Henderson's truck.  (R14/22, 69-70, 90-97.)

Gehring was driving, Robinson was in the middle, and Britt was by the passenger door.  Robinson and Britt told Gehring to follow the white Cadillac that was heading down Lovers Lane toward Central Expressway.  While following the Cadillac, Robinson and Britt discussed whether one of the two men in it was Big Friday.  When they caught

up to it, Robinson said, "that's him," grabbed an AK 47 automatic weapon, leaned over Britt, and started shooting.  Then Britt asked Robinson to let him shoot, too, and he did. (R14/101-06.)

Big Friday was not in the Cadillac; it contained Johnny Lee Shelton and Jerell Gardner.  Gardner heard the gunshots first.  As Shelton was saying that he didn't think it was gunfire, he was shot in the stomach; Gardner saw blood spreading across his shirt. Gardner took the wheel and pulled the car over to the shoulder as Shelton braked. Gardner tried to drive the car to a hospital, but a tire was blown out and it wouldn't move. Gardner flagged someone down, while Shelton was writhing in the car with blood coming out of his mouth.  The occupants of a passing van stopped, and drove Shelton to Parkland Hospital, where he died.  (R13/128-33.)

Naturally, there were several other cars on the highway at the time.  (R13/127, 184.)  One of them contained Rodney Wilson, along with two friends.  (R13/180-82.)  A bullet struck their car in the trunk, traveled through the back seat and driver's seat, passed through the driver's shirt, and hit the speedometer.  The glass shattered and struck Wilson in the face.  (R13/189-90.)

After the highway shooting, Gehring, Robinson, and Britt met up with Henderson, who was driving Gehring's car.  Robinson and Britt put their guns in Gehring's trunk, and Robinson came by the next morning to get them.  (R14/108-11.)  They all learned at some point that they had not killed Big Friday, but someone else.  (R14/112-13.)  Robinson, in

**Response to 28 U.S.C. § 2255 motion -- Page 9**

the course of describing these events to Tyrone Bryant, expressed regret that he had missed killing Big Friday.  (R16/172-74.)

        b.  <u>Reyes murder</u>

In May, 1999, Angelo Harris and Leon Jenkins bought what they thought was cocaine from Robinson.  It turned out to be a block of wood covered with sheetrock.  (R15/188-89.)  The phony dope had been prepared by Dakari Warner and a man named Nino.  Robinson paid Warner and Nino $17,000 for the dope, and Angelo Harris took it back to Oklahoma, where he discovered it was bogus.  (R15/239-43.)

The next morning, which was Mother's Day, Harris returned to Texas.  (R15/190; 16/15.)  He and Robinson went together to try to find the person who had cheated them.  (R16/10.)  While they were gone, Harris' girlfriend reached Robinson by phone; Robinson told her they were taking care of business and would be home shortly.  (R16/11.)  At around 3:00 p.m. that day, they got out of their car in front of the home of Juan Reyes, uncovered automatic weapons from under towels, and asked Reyes for their money back.  Reyes said he didn't know what they were talking about.  One of the men then shot Reyes in the foot, causing him to hop around on the other foot undoubtedly in severe pain.  Then, Robinson and Harris both repeatedly shot him until (and likely after) he was dead.  (R15/190-92; 16/179; 18/6-9, 20, 24-27.)

The medical examiner's autopsy revealed nine gunshot wounds in Reyes' body.  (R13/69-70, 101.)  There were at least two wounds that could have been the fatal one, both hitting Reyes in the chest and damaging several vital organs.  (R13/74-78.)  Among

**Response to 28 U.S.C. § 2255 motion -- Page 10**

the other wounds were some that were consistent with Reyes being struck by a bullet while lying on the cement, so that fragments of cement and bullet re-entered his body after ricocheting.  (R13/84-86, 88-89.)  That bullet would have been fired within one to five feet from Reyes.  (R13/108.)

Upon hearing that Reyes had been killed, Dakari Warner called Robinson to ask him why they shot Reyes, who had nothing to do with the fake cocaine.  Robinson was nonchalant about the killing, and said he thought it was justified because Reyes was Nino's brother-in-law.  (R15/247.)  Robinson also admitted Reyes' murder to Jason Gehring and Tyrone Bryant.  (R16/135-38, 184-85.)

At the time of the shooting, there were at least two children playing on the street. (R15/72-74.)  Across the street from the shooting, there was a barbecue going on, with 10 or 15 people in attendance.  (R15/88-89.)  Finally, apart from killing Reyes, the gunfire Robinson and Harris had generated also struck Isaac Rodriguez, who had been standing with Reyes and had tried to run away when the shooting started.  Rodriguez was hit twice in the back and once in the leg.  (R18/6-10.)  Rodriguez's cousin, Nicholas Marques, who was sitting in a car parked nearby, barely managed to escape with his life; the car was riddled with bullets.  (R18/7-8, 27-28.)

c.  <u>Resendez murder</u>

Rudolfo Resendez was killed in July, 1999.  The murder came about because of an allegedly stolen shipment of 100 kilograms of cocaine to Edy Zamudio, also known as "Mama," from her supplier – a man named Ochoa.  Ochoa wanted Zamudio to get it back

and threatened to kill her son, Christian Morales, if it was not retrieved.  Ochoa also promised to give a cut of the cocaine to those involved in retrieving it.  (R16/186-87, 194-96, 199.)  Zamudio and Morales asked Tyron Bryant, who was one of their drug customers, and his friend, Hank Tunstall, to help them with the stolen cocaine situation.  (R16/189, 193-94.)  Bryant called Robinson to see if he would help.  (R16/197.)  The plan was for Bryant and Zamudio to pose as drug dealers interested in buying cocaine from Resendez, who was suspected of having stolen it, and then steal it back from him.  (R16/197-98.)  Ochoa also wanted Resendez to be killed.  (R16/198.)[1]

A couple of days before the murder, Bryant told Robinson that the deal was on; Robinson said he was interested and that he had already called L.J. Britt to help.  (R16/201, 208.)  Everybody involved in the deal planned to have at least one weapon, and they all brought surgical gloves, as well.  (R16/207.)

On the evening of the murder, Bryant picked up Tunstall, phoned Robinson, and said it was time to do the deal.  Robinson said he was ready.  Bryant, Tunstall, Robinson, Britt, Morales, and Resendez all met at the home of someone named Lisa.  (R16/209.)  Morales flashed $5,000 in cash to Resendez, (R17/7-8), and told everyone they needed to do the deal elsewhere.  Robinson decided who would ride with whom.  He and Bryant rode in one car, trailing a second car containing the four remaining participants.  (R17/7-

---

[1]  While Bryant testified at trial that there was a prior understanding that Resendez was to be killed, (R17/30), he had told investigators earlier that it was a spur-of-the-moment decision and minimized his own involvement.  (R17/39-40.)

**Response to 28 U.S.C. § 2255 motion -- Page 12**

8.) The occupants of both cars communicated while driving to Fort Worth using two-way radios. They followed a route using dark, back roads. (R17/9-11.)

At an isolated spot along the way, Bryant saw and heard four or five gunshots in the car ahead of him. (R17/11-12.) When he drove up alongside, he saw Resendez's body slumped over. (R17/12.) After the cars stopped, Britt, Tunstall, and Morales dragged the body behind a tree, while Bryant and Robinson kept watch. Someone stomped on Resendez's cell phone and threw it into the bushes. (R17/12-13.) Then, everyone drove back to Arlington, where they divided up the 20 kilograms of cocaine – half to Morales and the other half to all the others. Britt asked for a bigger cut for shooting Resendez, and Robinson wanted a bigger cut for recruiting Britt. (R17/14.) Bryant was nervous about this argument taking place on an outdoor driveway, because one of the cars had bullet holes and blood in it, and there were guns. To end the dispute, Bryant and Tunstall agreed to take four kilos, while Robinson and Britt got six. Britt asked for the flash money, but Morales kept it. (R17/15-16.)

Later, Bryant sold his share of the cocaine through Robinson. (R17/18-19, 73-74.) When Robinson sold some to Michael Williams, he told Williams that he had "hit a lick" to get the cocaine. (R17/193.) Britt told Williams that he had to "split a mother fucker head open" to get the drugs, and that they had left the person "stinking." (R17/195.)

> d. Prior violence

Sarah Michelle Tucker went to high school with Robinson. (R20/14.) She was a crack addict and, when she ran out of money, she stole to support her habit. In February,

**Response to 28 U.S.C. § 2255 motion -- Page 13**

1995, Robinson (aged 18) fronted her $120 worth of crack.  A few days later, when she had not paid him yet, Robinson saw Tucker in her truck in the parking lot of her parents' apartment.  He fired a gun at her from the passenger seat of the car he was in, putting seven bullet holes in her truck and several more in her parents' apartment.  (R20/17-19; 36-37.)  Robinson was convicted of the Texas offense of Deadly Conduct, and was sentenced on March 11, 1996, to five years on probation.  (GX 295.)

      e.  <u>Future dangerousness</u>

Michael Williams, aka One Love, was in the drug business and did deals with Robinson involving both cocaine and marijuana.  (R17/183-88.)  During the investigation of this case, Williams gave information to the DEA and testified in the grand jury.  At Robinson's detention hearing in November, 2000, testimony revealed that Williams had provided information to authorities.  (R20/94-96.)

Later, in prison, Robinson told Nathan Henderson that Williams was "telling on" people to reduce his own prison time, and Robinson hoped someone would "get" Williams, and/or that he needed someone to get Williams.  On December 28, 2000, Robinson called his brother Marcus, who made the call a three-way conversation with Robinson's aunt, Josephine Dotson.  On the tape, Robinson said to Dotson: "That dude One Love, man that dude right there go hard, Joe."  Henderson testified that he did not know exactly what Robinson said on the phone to his relatives, but said, "I just know if someone is snitching in Dermott and there is a message gave to them down there, that means get them.  Stop them from talking."  (R20/115.)  On New Year's Eve, Robinson

**Response to 28 U.S.C. § 2255 motion -- Page 14**

had been on the phone in prison and, when he got off, he told Henderson that the "youngsters" in Dermott had dragged Williams into or behind a car.  (R17/214; 20/52, 113-16, 130; GX 929a.)

At trial Williams related what had happened.  (R20/138-45.)  He was accosted by three young men, one of whom – Kentrel Pitts (nicknamed Cracker) – pointed a .38 pistol at him and hit him on the jaw with it.  (R20/140-41.)  Williams testified that when Pitts got in his car,

> I remember him telling me to drop it off, and that I snitched on his cousin – I mean on his OG[2] down in Texas, and they was going to – I was suppose to be dead.  They were going to kill me and all that stuff.
>
> They asked me how much money I had.  He went in my pocket and got $20 out.  We road [sic] around.  When he asked me how much money I had, I told him I didn't have none with me.  I told him, what's this all about, money or something?  I said, how much they paying you all?  You know, I can pay you all what they trying to pay.
>
> And I convinced them that I had some money hid –  or I had the money – I convinced them at first that I had money at a bank account.  So we went up to the bank, and I'm stalling all this time trying to figure out how to get away from them.
>
>      \* \* \*
>
> We made two or three attempts to go to the bank.  So I just told them forget it, you know.  Just go and do what you got to do.  Let's ride out and do what you all got to do.
>
> And we was going – we was going past my grandparent's house, and I remember telling them that I had some money hid up in the house.  So we'll stop and get that.  But I told them, all three of you can't come in the house.  Probably just one of you all can come in the house, because my

---

[2]  Henderson had previously explained to the jury that an OG is "like a leader"  and that the young gang members in Arkansas saw Robinson as an OG.  (R20/116.)

**Response to 28 U.S.C. § 2255 motion -- Page 15**

grandparents, they didn't like youngsters. So the one named Pitts came in the house with me.

(R20/142-43.) At some point Pitts said; in Williams' words, "if I'm dead, they have got a three o'clock phone call to make [to Texas] that they get their money, if I'm dead around 3 o'clock." (R20/148.) There was a struggle between Williams and Pitts, after which Pitts ran off, Williams spoke to the local police, and later tried to advance his sentencing date so as to get into custody, and out of danger, sooner. (R20/143-47.)

### (iv)    Mitigation evidence

Robinson called several witnesses, both fact and expert, in the penalty phase. One group of fact witnesses was the "coach/teacher/teammate" category. Eddie Peach, the head football coach and athletic coordinator at Lamar High School in Arlington, testified that Robinson, who had played ball there for three years, was polite, well-liked, and did what was asked of him, both on the field and in the classroom. (R21/2-6.)

Mike Nelson, a track coach at Lamar, related an occasion when Robinson turned in a wallet he had found in the locker room, containing about $120. Nelson recalled the incident because it was unusual that the cash had not been stolen. (R21/43-45.)

Elvin Jones coached both football and track at Lamar. Jones said that Robinson was "reasonably quiet," "very respectful" to the coaches and his teammates, and "never gave us any problem whatsoever. He was always willing and excited about working." (R21/49, 50.) Jones also said Robinson knew how to exercise self-discipline, stay focused, and accept responsibility. (R21/52, 53.)

**Response to 28 U.S.C. § 2255 motion -- Page 16**

David York was the defensive coordinator at Lamar and worked closely with Robinson. He testified similarly – that Robinson played hard, was very coachable, did not have confrontations with others, and was easy to get along with. (R21/77, 79.) Robinson acquitted his responsibilities to come to practices and to play at games to the best of his ability, and always had a good attitude. (R21/78.)

A teammate of Robinson's named Landry Burdine testified that Robinson was a good player, and really enjoyed the game. His teammates liked playing with him and got along well with him. He laughed a lot and was a friend to everyone. (R21/15.) Burdine said that he came to testify because he had heard about Robinson being in a bad spot and wanted to show his support. He asked the jury, based on his knowledge of Robinson as a person, to spare Robinson's life. (R21/17-18.)

Also testifying as to Robinson's education was Debbie Wesson, a representative of a computer-skills training school. (R21/121.) Robinson attended classes there for four hours each evening. (R21/130.) He missed only twelve hours of the 212 that had been scheduled for him up to the date of his arrest in November, 2000, which was above average attendance. (R21/126-27.) While he took the course, he was successful, passing an interim test that certified him to work in Microsoft Work Station. (R21/128.) He was seeking to become a Microsoft Certified Systems Engineer, which would have helped him in the employment marketplace. (R21/123-24.)

A second group of fact witnesses were employees at the Federal Medical Center (FMC) in Fort Worth, where Robinson was imprisoned. Stanley Gibson described the

structure at the FMC, explaining that it housed a regular population separately from the "presentence inmates." (R21/20-21.) He also explained that there was a special housing unit, in which Robinson was kept, that was divided up into those under administrative confinement and those under disciplinary confinement. (R21/21.) Those who are under disciplinary confinement have fewer privileges than other inmates. (R21/24.) Those who are under administrative confinement – like Robinson – might be there for various reasons, such as for protective custody, or because of a high profile case, but not for disciplinary reasons. (R21/24-25.)

Mr. Gibson testified that Robinson never caused any problems. Gibson described Robinson as "one of the better inmates I have seen in administrative detention or in the housing units over there, period. Courteous, respectful toward his officers and counselors, even to the other inmates." (R21/28-29.) Gibson said he had heard of no other guards having problems with Robinson, either. (R21/29-30.) He also testified that his conversations with Robinson had usually been about the Bible, and that Robinson was earnest and knowledgeable on the subject. (R21/30-31.) Finally, Gibson described a typical day for inmates in Robinson's position, including the fact that they are escorted to and from various places in hand irons, are kept separate from one another, and are not allowed televison. (R21/32-34.) He said that Robinson, unlike some others, never seemed to get irate about lack of privileges, and that he had adjusted well to his circumstances. (R21/34.)

**Response to 28 U.S.C. § 2255 motion -- Page 18**

Frederick Wagner testified that he, too, had come to know Robinson at the FMC. (R21/57-58.) Robinson was placed in the special housing unit because his case, as a capital matter, was high-profile. (R21/58, 64.) Wagner had no problems with Robinson, whom he described as "respectful and quiet" and someone who "does a lot of reading." (R21/59.) He said Robinson did not misbehave, have a bad attitude, or show a tendency to violence. (Id.) In Wagner's opinion, Robinson had adjusted to his institutional setting, and could continue to do so for an extended confinement. (R21/61.) Wagner also established that there are procedural means for dealing with misbehavior at the prison, although he had never had any such problems with Robinson. (R21/62-63.)

Stephen Sabolchick was another guard at the FMC. (R21/70-71.) He described Robinson as someone who "followed the rules. He never gave anybody problems. He's what you would say a cooperative inmate, sir." (R21/71.)

Testifying similarly was Frank Logan, who was leader of the special housing unit crew on the day shift. (R21/82.) He came to know Robinson, and described him this way: "I've never had any problems with him. He always does what we tell him to do. He's never created a management problem for me or my crew while I was over there." (R21/84.) Logan never had problems with Robinson's attitude, and believed that Robinson had "adjusted quite well" to his situation. (R21/85.) He rated Robinson's behavior as "above average" and characterized him as polite and respectful (Id.)

The last witness in this group was Dan McCauley, the jail unit manager at the FMC. (R21/87.) McCauley described his experience with the Bureau of Prisons over 21

**Response to 28 U.S.C. § 2255 motion -- Page 19**

years, including his promotions and general duties in various positions.  (R21/87-92.)  He

came to the FMC in January, 1999, and took responsibility as manager of the jail unit,

housing about 100 pretrial inmates.  (R21/92.)  McCauley explained that Robinson had

been moved to the special housing unit when his case became a capital case.  Before that,

from his arrest in November, 2000, Robinson had been in the general jail population.

(R21/96.)  In neither place did Robinson have any disciplinary problems.  (R21/97-98, 99-

100.)  On cross-examination by the prosecutor, McCauley acknowledged that he had

learned that Robinson had broken prison rules by making three-way telephone calls,

which were not permitted.  (R21/107-09.)  On redirect, the defense established that

prisons have security measures appropriate to the population they house, and that those

inmates with more serious offenses are subject to higher security.  (R21/115-17.)

McCauley also testified that convicts do not laze around but are generally required to

work to subsidize their own upkeep.  (R21/119-20.)

A final group of fact witnesses consisted of two of Robinson's relatives: his uncle,

John Hollimon, Jr., and his mother, Rose Hollimon.  John Hollimon testified that his

parents – Margaret and John Hollimon, Sr. –  had provided him and his siblings a loving

family, even though they were poor.  (R21/34-35.)  Margaret and John, Sr., did not

engage in behavior like drinking or taking drugs, and did a pretty good job of raising their

children.  (R21/142.)  John, Jr., told the jury that his parents raised Robinson and

Robinson's older brother, Marcus, in their younger years in Dermott, after Robinson's

mother, whom he called Rosa Mae, had split from her husband.  (R21/138-39.)  He

Response to 28 U.S.C. § 2255 motion -- Page 20

believed his parents had done everything they could to raise Robinson well, including seeing to it that he went to school and to church.  (R21/151.)

Hollimon testified that Rose had alcohol and drug problems and that, when she did take her sons to live with her in Texas in their adolescent years, it was a dangerous environment for the boys.  (R21/140-42.)  Robinson was pretty much on his own and had to take on the role of man of the house, despite his youth.  (R21/143-44.)  Once, in the spring of 2000, Hollimon stayed with Robinson in the latter's apartment. (R21/144.)  He described how excited Robinson was about taking the computer course.  It was something Robinson said he wanted to do, could do, and would do.  Robinson told Hollimon he wanted to go into marketing and have his own business.  (R21/144-45.)

Hollimon also testified that Robinson was respectful to his family, particularly to his grandparents who raised him.  Robinson sent money to them when they needed help. (R21/146-47.)  Hollimon said that Robinson was not the cold-blooded murderer the prosecution had portrayed, and he asked the jury to spare Robinson's life.  (R21/148-49.)

When Rose Hollimon testified, she agreed that it had been difficult for her after she and her husband separated.  He provided no support at all to her and her sons, who were four and five at the time.  (R21/159, 162.)  She was young and inexperienced, having gotten married at the age of 15, and she soon decided to leave her sons with their grandparents.  (R21/156, 160.)  She believed they provided the boys with a decent home and did their best at raising her sons.  (R21/162.)

**Response to 28 U.S.C. § 2255 motion -- Page 21**

When Robinson came to live with her in Texas, he attended high school until graduating and played sports. He was an average student, taking home B's and C's. He then attended Tyler Junior College for a while on a football scholarship. (R21/164-65.) Nevertheless, Rose admitted that while Robinson lived with her as a teenager, she was drinking too much and smoking crack-laced marijuana joints. (R21/167-68.) She asked the jury to spare her son's life. (R21/170.)

Last, Robinson called an expert witness, Dr. Mark Cunningham, on his behalf.[3] Dr. Cunningham was a board-certified forensic psychologist who testified as a teaching witness essentially on the topic of risk assessment, i.e., the probability that a person in Robinson's position would engage in seriously violent conduct in the future. (R22/22, 26, 30-*passim*.) Dr. Cunningham testified that the topic of risk assessment was one which was broadly accepted and recognized in forensic psychology. (R22/32.) He had testified about it as an expert in about 45 state and federal cases. (R22/33.)

Dr. Cunningham's methodology involved four essential questions. 1) What is the probability of a serious act of violence? 2) What severity or form of violence? (As severity increases, probability drops dramatically.) 3) At what time period? (Probability drops steadily with age.) 4) In what context – open community or prison and, if prison, what level of custody? (R22/40.) Because Robinson could not hope to be released, Cunningham's opinion was limited to the likelihood of violence in the prison setting, taking into account preventive measures that could reduce the risk. (R22/41.)

---

[3] All that Dr. Cunningham testified to, and more, is contained within the affidavit and appended materials submitted as Exhibit 1 in support of Robinson's motion.

**Response to 28 U.S.C. § 2255 motion -- Page 22**

Dr. Cunningham testified that, though it seemed counter-intuitive, the research indicated that violence in the community is not a good predictor for violence in prison. (R22/41-42, 66.)  Nor is the nature or severity of the current offense or prior offenses, or escape history such a predictor.  (R22/66.)  Some of the research tracked capital offenders in prison, including people who had been sentenced to death but who ended up being removed from death row for one reason or another.  (R22/43.)  Other research tracked the relationship between the seriousness of an offender's crime and how the offender behaved while in prison.  (Id.)  A good deal of the data on which Dr. Cunningham relied was collected by the prisons and jails themselves, not by academicians, as a means of evaluating security and determining how best to operate those facilities.  (R22/46-47.)

Based on a study of the 533 inmates who were commuted from death sentences that had been imposed before the decision in *Furman v. Georgia*, 408 U.S. 238 (1972), Dr. Cunningham testified that 69.5% of those offenders had no serious rule violations (homicide, aggravated assault, rioting, work strike, aggressive sexual assault) in prison over the next 15 years.  Fifteen percent had only one such rule violation; 7.5% had two such rule violations; the last 7.5% had three or more.  (R22/50-52.)  There were similar rates for offenders who had been sentenced at the outset to life in prison.  (R22/56-57.)  The primary reason for the low rates of serious violence, according to Dr. Cunningham, was the structure of the prison community: not impersonal, inmates inform on other inmates, less access to weapons and drugs, and intensive staffing and supervision. (R22/53.)  He also ascribed some of the reason to the fact that people who know they are

**Response to 28 U.S.C. § 2255 motion -- Page 23**

to be in prison for a very long time have only a few ways to make that time pass more tolerably, and good behavior is necessary to get the few privileges they might earn. (R22/60-62.)

Dr. Cunningham also showed comparisons among 90 post-1972 death-sentenced inmates who were commuted to life in prison, 107 post-1972 life-sentenced inmates, 38,000 inmates across the Texas prison population, and 1,700 inmates in higher security units. The group of 90 had 1.61 serious violent rule infractions per 100 inmates per year; the group of 107 had 2.5 such infractions, the group of 38,000 had about 11 such infractions, and the group of 1,700 had about 20. (R22/58-59.)

Another study showed that federal capital defendants had similar rates of violent behavior regardless of whether they had initially been sentenced to death, life without parole, or life with the possibility of parole. (R22/62.) Almost eighty percent of such inmates engaged in no assaults, and one-third of the assaults by the other 20% of the inmates were minor. Only 1% of the inmates in each group killed another inmate. (R22/62-63.) Yet another study of 25 federal capital defendants sentenced to life in prison showed that 80% of them had no assaults. Eleven of those defendants had no disciplinary write-ups of any kind. (R22/63-64.)

Dr. Cunningham's overall summary of the data was that there is a 20-30% chance that a capital inmate in prison will be involved in serious violence, a 70-80% chance he will not, a 10% chance of repetitive violence, and about a 1% chance of the commission of murder. (R22/64.)

**Response to 28 U.S.C. § 2255 motion -- Page 24**

Finally, Dr. Cunningham also educated the jury about how the Bureau of Prisons classifies inmates for security purposes, noting that security levels vary greatly. The higher the security level at an institution, the greater the control and oversight of its inmates, and the fewer privileges they have. The lowest possible level for Mr. Robinson would be the penitentiary level, which is just under the "super-max" facility in Florence, Colorado. (R22/70-72, 75.) Even within a penitentiary, there would be administrative detention facilities which would be more secure than general population facilities, should the need for such additional security arise. (R22/75.) Dr. Cunningham also spoke about the facilities at the super-max facility, which were highly restrictive. (R22/75-78.)[4] It was Dr. Cunningham's opinion that the Bureau of Prisons takes into account an inmate's probability of violence when it classifies him, and that it has the experience and resources to make adequate arrangements for the safety of the inmates and staff within its facilities. (R22/78-79.)

Correlating with this presentation by Dr. Cunningham, the defense offered and the court admitted into evidence a document from the Bureau of Prisons, reflecting the judgment of psychologists there that Robinson presented a low risk of causing harm to others. (R22/10-11; DX 2.)

---

[4] A witness the government called after Dr. Cunningham provided a slightly more detailed description of the various security levels in federal prisons. (R22/108-11.) This witness also opined that the two main predictors for violence in prison were 1) past violence, and 2) young age. (R22/112.) Finally, he described the kind of facility in which Robinson would likely be housed, including the fact that a lot of his time would be spent interacting with other inmates and staff, and the fact that he would have access to telephones. (R22/115-17.)

**Response to 28 U.S.C. § 2255 motion -- Page 25**

The final bit of evidence as to mitigation was the parties' stipulation that there were several people as to whom the government did not intend to seek the death penalty, and who would not be punished by death. They included Nathan Henderson, Jason Gehring, Angelo Harris, and a number of people involved in the Resendez killing. (R22/12-13; DX 4.)

B.    Overarching Legal Standards

Relief pursuant to 28 U.S.C. § 2255 is strictly circumscribed. "The grounds for relief under section 2255 are narrower than those for relief on direct appeal. On direct appeal a defendant may raise any error subject to the limiting reality of the harmless error rule. In contrast, section 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice.'" *United States v. Smith,* 844 F.2d 203, 205-206 (5th Cir. 1988); *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994). Nonconstitutional and nonjurisdictional claims that could not have been asserted on direct appeal can be raised on collateral review only if the alleged error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981); *United States v. Patten*, 40 F.3d 774, 776 (5th Cir. 1994).

A defendant may not raise even a jurisdictional or constitutional claim for the first time on collateral review without showing both "cause" for his procedural default and "actual prejudice" resulting from the error. *See United States v. Shaid*, 937 F.2d 228, 232

**Response to 28 U.S.C. § 2255 motion -- Page 26**

(5th Cir. 1992) (en banc); *United States v. Frady*, 456 U.S. 152, 168 (1982); *Patten, supra*, 40 F.3d at 776. This test applies with respect to failure to raise the error both at trial and on appeal. *See Shaid*, 937 F.2d at 234-235; *United States v. Merida*, 985 F.2d 198, 200 (5th Cir. 1993). To show prejudice, a defendant must prove that the error he alleges "worked to his *actual* and substantial disadvantage, infecting his entire trial with error." *Frady*, 456 U.S. at 170 (emphasis in original).

### C.    Response to Each Claim

#### 1.    A claim that this district's plan for conducting death penalty prosecutions is constitutionally inadequate is procedurally barred, and also fails on the merits.

Robinson claims, almost in passing and providing no argument, that this District "has no plan that achieves the standards of the ABA; it requires only that counsel be qualified." (Motion at 11 and 28.) This conclusion follows a long exposition of the standards the ABA has devised for the conduct of death penalty cases by defense counsel.

First, this claim is procedurally barred. The "general rule" is that "claims not raised on direct appeal may not be raised on collateral review." *Massaro v. United States*, 538 U.S. 500, 504 (2003). Robinson certainly could have raised this matter on direct appeal, but he did not. Thus, he is foreclosed from raising it now, at least in the absence of a showing of cause and prejudice. *Shaid, supra; Frady, supra.* Robinson makes no effort to establish either, not even arguing that counsel should have raised this claim on appeal and were ineffective for not doing so. If he were to be heard to make such an argument, it would fail.

Response to 28 U.S.C. § 2255 motion -- Page 27

While Robinson would have it otherwise, this District was not required to follow the ABA standards he espouses or to adopt any particular plan whatsoever. "Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984); *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("We have declined to articulate specific guidelines for appropriate attorney conduct . . . ."). In light of this reasoning by the Supreme Court, it is constitutionally adequate to require only that defense counsel be qualified. If they are not qualified, and prejudice ensues, the defendant will have his remedy, whether or not there was a set of lengthy guidelines in place in the District.

Anyway, this District requires more than merely "qualified" counsel. The District's CJA Plan, embodied in Miscellaneous Order No. 3 (the "Plan"), contains several relevant points. It notes that a capital defendant is entitled, in accordance with 18 U.S.C. § 3005, to two lawyers, at least one of whom is knowledgeable in the law applicable to death penalty cases. It also allows for the appointment of additional

**Response to 28 U.S.C. § 2255 motion -- Page 28**

counsel, if that is "necessary for adequate representation." Plan at III.C.2.a. The Court's CJA Handbook similarly provides that if reasonably necessary to a defense, the Court may appoint other professionals, such as investigators, doctors, technicians, and paralegals. *See* http://www.txnd.uscourts.gov/publications/CJA-Dallas/Chapter7.html at § B.3., and http://www.txnd.uscourts.gov/forms/cja/deathpenalty_HCP.html at § V.

The District's Plan furthermore, at III.C.3., adopts the law set out at 21 U.S.C. § 848(q)(4)(A) and (5), requiring among other things that counsel have at least three years' experience trying federal felonies, and have been admitted to practice at least five years. The Plan also requires that lawyers appointed under it conform to the highest standards of professional conduct including, but not limited to, provisions of the ABA's Model Rules of Professional Conduct. Plan at VI.A. It goes on to require of such attorneys that they have "demonstrated experience in, and knowledge of, the Federal Rules of Criminal Procedure, the Federal Rules of Evidence, the Sentencing Guidelines, the Bail Reform Act, and local criminal rules . . . ." Plan at Appendix I, Section III.A.2.

In light of these requirements, governed ultimately by the overarching constitutional mandate that lawyers must do an objectively reasonable and professional job of representing their clients, the District's Plan for representation of capital defendants is wholly adequate.

## 2.    Defense counsel were constitutionally effective.

Robinson claims deficient attorney performance in several particulars. Each is subject to the same analysis, and each fails. While each claim will be discussed

Response to 28 U.S.C. § 2255 motion -- Page 29

separately, the record as a whole, from the pretrial stage and up through sentencing and appeal, shows that Robinson's lawyers did not only a constitutionally adequate job of representing him, but a superlative one. Any defendant, capital or not, would be fortunate to have such skilled counsel. The government is confident that the Court's own recollection of events will accord with such a judgment.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686. In order to prevail on a claim that he was denied his constitutional right to the effective assistance of counsel, Robinson must satisfy two requirements: (1) he must show that his attorneys' conduct fell below an objective standard of reasonableness, and (2) he must demonstrate a reasonable probability that he was prejudiced by his attorneys' unprofessional errors. *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989); *see also Strickland*, 466 U.S. at 687.

To demonstrate that a lawyer's conduct was deficient requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* With regard to the deficiency prong, the Supreme Court has cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The performance inquiry must be whether counsel's assistance was reasonable considering all the facts of the case as of the time of counsel's conduct. *Id.* at 688-690.

**Response to 28 U.S.C. § 2255 motion -- Page 30**

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is **strongly presumed** to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690 (emphasis added).

"Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed."  *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999); *Strickland*, 466 U.S. at 690-691; *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) ("[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness"); *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997) (same); *Moore v. Johnson*, 194 F.3d 586, 592 (5th Cir. 1999) (strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation). Representation is not inadequate merely because, with the benefit of hindsight, a court may disagree with counsel's strategic choices.  *Emery v. Johnson*, 139 F.3d 191, 196 (5th Cir. 1997).

Turning to the issue of prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test."  *Strickland*, 466 U.S. at 693.  A showing

of prejudice requires that Robinson demonstrate his "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687. He must show that "it is reasonably likely that the jury would have reached a different decision absent counsel's unprofessional errors." *Faulder v. Johnson,* 81 F.3d 515, 519 (5th Cir. 1996); *see also Strickland*, 466 U.S. at 694. As that question is applied to the sentencing phase, it means that he must establish a "reasonable probability" that the jury would not have imposed the death sentence in the absence of errors by counsel. *Strickland*, 466 U.S. at 695; *Moore*, 194 F.3d at 592. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In reviewing an ineffective assistance claim, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by a defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 698; *see also United States v. Fuller*, 769 F.2d 1095, 1097 (5th Cir. 1985).

    a.    <u>The claim that counsel did not use the services of a skilled investigator.</u>

As with his claim that this judicial district has an inadequate plan for the conduct of death penalty cases, Robinson makes only the fleeting allegation that defense counsel did not use the services of a skilled investigator.[5] He also alleges that the person defense

---

[5] The allegation that the investigation was less than satisfactory in terms of its scope, apart from who conducted it, will be addressed below, in sections 2.c. and 2.d.

**Response to 28 U.S.C. § 2255 motion -- Page 32**

counsel did hire had a criminal history.  (Motion at 11-12.)  Neither allegation has any merit.

As stated in Exhibit A, Mr. Ball's affidavit, their investigator was David Bruce Cummings.[6]  Mr. Ball had worked with Mr. Cummings on numerous cases before, and had always been satisfied with his work, describing it as "first rate."  Mr. Cummings' own affidavit, Exhibit C, details his long experience.  He has been a licensed investigator since 1989, and had worked on hundreds of criminal defense investigations since 1991, mainly on serious violent felonies.  He has helped with several trials of capital murder cases, in some of which the state was seeking the death penalty.

In this case, Mr. Cummings helped to review discovery, to locate and interview witnesses, to obtain necessary documents, to discuss strategy with counsel, and to gather facts from Mr. Robinson himself.  He was certainly competent at what he did.

As for the allegation that Mr. Cummings has a criminal history, Robinson is mistaken.  It happens, however, that there is a David Bruce Cummings with exactly the same date of birth as Mr. Cummings, the investigator, who does have a criminal history.  (*See* Exhibit G, NCIC report on the criminal Cummings, filed under seal).  The defense team in this case did not hire that person.

In sum, the defense lawyers' choice of an investigator did not fall below an objectively reasonable professional standard, and the choice caused no prejudice to Robinson.  Thus, counsel were not constitutionally ineffective in this regard.

---

[6]  Mr. Strickland's affidavit is attached as Exhibit B.

**Response to 28 U.S.C. § 2255 motion -- Page 33**

b.    The claim that counsel did not use the services of a mitigation specialist.

As Robinson alleges, his defense team did not include a so-called mitigation specialist.  Of course, there is no absolute right to the services of a such a person.  As explained by the court in *Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993), "[a]n indigent defendant requesting non-psychiatric experts must demonstrate something more than a mere possibility of assistance from a requested expert."  *Id.* at 227.  Nor has any court held that every capital defendant must have a mitigation specialist in order to receive a fair trial.  Yet this is what Robinson's argument suggests.  He appears to claim that defense counsel, no matter how experienced or intelligent, and no matter how well-assisted by an investigator, will never be able to be sure they have correctly assessed a defendant's personal history and will thus always have to employ a specialist to look into that matter.  The case law does not support such a universal proposition; indeed, Robinson cites no holding to support his view of the matter.  Instead, the decision whether this kind of 'expert' will be of any benefit to a particular defendant must be made on a case-by-case basis, as it was here.

The decision not to hire a mitigation specialist for Mr. Robinson was a conscious choice by defense counsel.  *See* Affidavits of counsel, Exhibits A and B.  Counsel did not believe that such an expert was required or would be helpful, given all that they knew about Robinson and about the evidence against him.  Mitigation specialists are, in counsels' experienced view, not often a worthwhile addition to the traditional defense team.  Experienced lawyers and investigators can accomplish such specialists' tasks quite

**Response to 28 U.S.C. § 2255 motion -- Page 34**

well.  Counsel's informed choice to forego this kind of specialist comported with reasonable professional standards.  It also caused Robinson no prejudice because, as discussed in more detail below, even had all the mitigating evidence Robinson now parades been presented to his jury, it is not reasonably probable that he would have been spared the death penalty.

> c.  The claim that counsel did not sufficiently investigate or present evidence of penalty mitigation factors.

Robinson claims broadly that counsel unreasonably failed to uncover evidence that should have been presented to the jury at the sentencing phase and that he argues would likely have saved him from the death penalty.  These claims fail, in part because counsel did uncover much of the cited evidence but more importantly, because the evidence in question would not likely have tipped the balance in Robinson's favor.

"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."  *Lockett v. Anderson*, 203 F.3d 695, 713 (5th Cir. 2000), quoting *United States v. Green,* 882 F.2d 999, 1003 (5th Cir. 1989).  Robinson's claim is not that counsel utterly failed to investigate or failed to present any mitigating evidence, but is "a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing."  *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999).  A court must, therefore, be "particularly wary" of them.  *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000).

**Response to 28 U.S.C. § 2255 motion -- Page 35**

Robinson complains with specificity about only two main areas of alleged mitigation: failure to investigate mental state (Motion at 29-30), and failure to investigate social history, including family life, peer relations, and alleged pesticide exposure. The pesticide factor is also part of the mental state allegation. (Motion at 30-53).

**(i) Mental state** – Robinson contends that his lawyers did not get his academic records, and did not hire a mental health expert to evaluate him. The first contention is true only with respect to elementary school records from Arkansas. Counsel did review high school records from Arlington and records from Tyler Junior College which they obtained in discovery from the government. They also obtained records from the computer school in which Robinson had enrolled. These records showed that Robinson was mostly an average or above average student. (*See* Defense Exhibit 37.) More important, they did not reveal anything which would logically point to the need for further expert evaluation for mental retardation or something equally serious.

The only facts to which Robinson now points, and which he calls "red flags," are that he had to repeat the third grade and that he transferred to an alternative high school. Yet these facts – which were known to defense counsel – do not establish that Robinson was sufficiently mentally impaired that expert evaluation was required. *See Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (it is not required for "counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing"). Indeed, a declaration from a teacher at the alternative school states that Robinson had an excellent attitude and that he was open to

**Response to 28 U.S.C. § 2255 motion -- Page 36**

learning.  He eventually, of course, did graduate from high school, after passing the tests

required to do so.  (*See* Defense Exhibit 11.)  More important, the expert evaluation

Robinson has recently undergone falls far short of establishing the sort of mitigating

evidence that would have been likely to turn the jury away from the death penalty.

Dr. Stephen Martin has now examined Robinson, and administered a battery of

tests.  (Defense Exhibit 2, at page 1.)  The results of these tests show:

• Robinson has a verbal IQ of 102 (**average**),

• He has a performance IQ of 113 (**high average**),

• He has a full scale IQ of 107 (**average**),

• He had low **average** skills in an assessment of verbal concept formation,

• He had **average** skills in an assessment of vocabulary and auditory attention,

• He had high **average** skills in an assessment of general fund of knowledge,

• He had **superior** skills in an assessment of social comprehension,

• He had low **average** skills in an assessment of visual motor learning and motor

  persistence,

• He had **average** skills in an assessment of visual perceptual reasoning and problem

  solving,

• He had high **average** skills in an assessment of attention to detail and visual

  sequencing,

• He had **very superior** skills in an assessment of abstraction and problem solving,

**Response to 28 U.S.C. § 2255 motion -- Page 37**

- He had relatively **low** scores in reading, spelling, and arithmetic, possibly indicative – given his intellectual status – of learning difficulties,

- On a measure of "biological integrity of the brain" he was at the low end of the **average** range.

Without going on and on quoting Dr. Martin's findings, the Court will find that throughout them, Robinson's skills were mostly described as "average," "low average," "above average," "within normal limits," "adequate." Some skills were described as "mildly impaired." Then, without any proof – scientific or anecdotal – that Robinson had been "chronically" exposed to pesticides, Dr. Martin concluded that Robinson's mental profile was "consistent with subtle cognitive deficits associated with chronic exposure to organophosphate pesticides combined with general learning disabilities." (Defense Exhibit 2 at page 3.)[7] Dr. Martin says nothing with respect to what else such deficits may be associated or consistent with. Nor does he say anything with respect to whether it was more the pesticides or more the general learning disabilities that would give rise to the subtle cognitive deficits. Nor, finally, does he say anything with respect to how chronic

---

[7] In fact, the evidence now presented with respect to exposure to pesticides is markedly deficient to prove anything material, and certainly does not support Robinson's casual claim that he is brain-damaged. (Motion at 29.) There is absolutely no scientific evidence that Robinson was exposed to pesticides that caused him any problems. Josephine Dotson speaks of pesticide use when she was a child, long before Robinson lived in Dermott. (Defense Exhibit 7 at pp. 6-7.) Guffrie Gorins, a peer of Robinson's mother, also speaks of pesticide use, but is likewise vague on the time frame. (Defense Exhibit 10 at p. 1) Mildred Holliman's affidavit was similar, not specifying a time frame. (Defense Exhibit 12 at page 2.) Jana Holiman's affidavit does speak of pesticide usage when she and Julius were youngsters, 2-3 times a week in the summer, but there is no evidence of what was used. (Defense Exhibit 16 at pp 1-2; *see also* Defense Exhibit 30 at page 3.) While Robinson argues without citation (Motion at 52) that two particular pesticides were very toxic, apparently neither of them was used in Arkansas in the relevant time period. (Defense Exhibit 39.)

**Response to 28 U.S.C. § 2255 motion -- Page 38**

pesticide exposure, if it occurs, will affect the probability that a person will plan to and then murder three people to advance his business interests.

For these reasons, it is questionable whether this Court would have permitted evidence about pesticide exposure because it would have been irrelevant to Robinson's "background, record, or character." Although "respect for humanity underlying the Eighth Amendment [citation omitted] requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death," *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), a court may still exclude "as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978).  If evidence of pesticide exposure was inadmissible because it was irrelevant, then counsel could not be ineffective for failure to locate and introduce it.  *See Robison v. Johnson*, 151 F.3d 256, 260 (5th Cir. 1998) (defendant's ineffective assistance claim that counsel failed to introduce evidence at trial foreclosed by determination that such evidence was inadmissible).  At best, such evidence would have been on the cusp of admissibility and likely given little or no mitigating weight by a jury.

Finally, despite what Robinson may suggest based on Dr. Martin's findings, both of Robinson's trial lawyers and the defense investigator formed the impression that he had strong native intelligence.  (*See* Exhibits A-C.)  So did some of the people from whom Robinson has now obtained declarations.  (*See, e.g.,* Defense Exhibit 22 at page 1

**Response to 28 U.S.C. § 2255 motion -- Page 39**

– counselor's opinion that Robinson was smart and had initiative.)  As Mr. Strickland aptly explains, the jury was likely to form the same opinion of Robinson even though he did not testify from the stand.  Robinson's words and his actions, his contacts and dealings with others, as described by witnesses and played on tapes, exhibited a person of normal intelligence.[8]  It was and is counsel's reasoned professional opinion – even though they did not investigate the specific notion of pesticide exposure – that to try to portray Robinson as someone with mental deficiencies sufficient to explain his murderous behavior would have been dismissed by the jury as hogwash.

**(ii) Social history –** A good deal of Robinson's presentation on this point consists of declarations from relatives and neighbors in Dermott, Arkansas, about the privation that people suffered there in the past.  For example, Josephine Dotson's declaration speaks for the most part of her own childhood with her parents, long before Robinson was born.  The only part of her statement that concerns Robinson speaks of when he was living with his mother in Texas, a subject the jury already heard about from two witnesses, Rose Hollimon and John Hollimon, Jr.  (*See* Defense Exhibit 7.)  The same is true for Mildred Hollimon's, Milton Hollimon's, John Hollimon, Jr.'s, Robert

---

[8]   This conclusion would not have been seriously undermined by the opinions of some that Robinson was sometimes academically slow.  Despite that, he eventually made up all the ground required to graduate from high school and even attend junior college for a period.  (*See* Defense Exhibit 27 at pp. 1-2 – coach's opinion that Robinson was "an exceptional child" and, although a slow learner, was not in a Special Education curriculum but merely received extra assistance; Defense Exhibit 9 – teacher's opinion that Robinson was a slow learner but received one-on-one assistance and met grade requirements; Defense Exhibit 35 – teacher's opinion that Robinson was not strong academically but had a C- average.)  He was certainly not impaired enough that his mental condition would explain his criminal conduct.

**Response to 28 U.S.C. § 2255 motion -- Page 40**

Hollimon's, Beotha Moore's, and Willie White's declarations.  (*See* Defense Exhibits 12-15, 24, 33.)[9]  They have little non-cumulative relevant evidence to offer.

Bernice Johnson's declaration, too, speaks partly about past history that did not affect Robinson.  (Defense Exhibit 18.)  It also, however, seeks to paint a picture of a willful, undisciplined young Robinson.  She starts this effort with the unremarkable observation that when Robinson was young, he would throw a temper tantrum if he wanted something and could not have it – an observation that applies to millions of young children and would not rightly be considered mitigating.  Johnson's remarks about Robinson being coddled by his grandfather, despite his grandmother's attempted discipline, are contradicted by former police chief Carl McCree's declaration, which says that it was Robinson's grandmother who "thought he could do no wrong" and his grandfather who was more realistic and interested in discipline.[10]  Furthermore, Johnson corroborates the fact that Robinson and his brother had a decent spiritual upbringing by their grandparents, who brought them to church often.

Robinson's father, Jimmie Lee Robinson (Jimmie Lee), also speaks to a large extent about his own long-past history.  (Defense Exhibit 29.)  When he gets to remarks about his sons, he indicates that the boys were living with their grandparents from around

---

[9]  White's declaration does include some observations about Robinson when he was young, but they were cumulative with respect to the fact that Rose Hollimon was a poor mother (Defense Exhibit 33 at ¶ 15), and they contradicted the facts defense counsel affirmatively wanted to present to prove that Robinson had a good upbringing by his grandparents and was therefore a candidate for redemption and a life sentence.  (Id. at ¶ 16.)

[10]  The recollection of Marcus Robinson was in line with Ms. Johnson's; he said his grandmother disciplined him and his brother.  (Defense Exhibit 30 at ¶ 5.)  Whoever is right, apparently there were efforts at instilling proper behavior.

**Response to 28 U.S.C. § 2255 motion -- Page 41**

the time Robinson was only two years old.[11]  Nothing in Jimmie Lee's statement supports the idea that Robinson was physically abused for the short time he lived with his own parents (Jimmie Lee and Rose), although he probably was somewhat neglected and the home life was not ideal.  This, however, was a fact the jury could have easily concluded based on the testimony they heard from Robinson's own mother and his uncle.  The same is true for Marcus Robinson's affidavit about his experiences with his mother; it would have been cumulative.  (Defense Exhibit 30 at ¶¶ 2-3, 6, 15-16, 18.)[12]  Furthermore, Jimmie Lee's remarks about the positive influence his own mother had on Robinson when he was growing up in Dermott, corroborated by Marcus Robinson's declaration, would have been consistent with what the jury heard about that time period in his life, and thus, also cumulative.  It would also have contradicted to a degree the picture Robinson now tries to paint, of a childhood in which he had no good influences from start to finish.  (Id. at ¶ 36; Defense Exhibit 30 at ¶¶ 9-10.)

Jimmie Lee's declaration is the only one that passingly suggests a fact which Robinson's motion overemphasizes: that he was touched sexually when he was about five years old by a neighborhood boy and that the experience upset him.  (Defense Exhibit 29 at ¶ 33; Motion at 77-78, 86.)  Notably, there is no declaration from Robinson himself on the subject.  These few uncorroborated sentences in Jimmie Lee's declaration, describing

---

[11]  Josephine Dotson said Robinson was less than one year old when he began living in Dermott. (Defense Exhibit 7 at ¶ 16.)  In any event, he was quite young and had not spent much time in his parents' inadequate care.

[12]  Marcus Robinson would also have been impeached, if he testified for Robinson, with evidence of his criminal history, not to mention his understandable bias in favor of his brother.

**Response to 28 U.S.C. § 2255 motion -- Page 42**

one unproven – and even if true, fleeting – incident, do not support the broad conclusions Robinson would have the Court draw about him having been sexually abused as a child and how that experience would mitigate against the death penalty.[13]

Some of Robinson's supporting declarations speak about the fact that he became involved with gangs while he was still living in Dermott. (*See* Defense Exhibits 23, 26, 29 at ¶ 35, 30 at ¶ 11, 32, 33 at ¶ 19.)  However, counsel were aware of this possibility and purposely chose not to highlight it because they felt it would do more harm than good. (*See* Exhibit A at p.6.)  This, again, was consistent with their effort to persuade the jury that Robinson had lived his younger life decently, with good influences, and was not therefore so far past redemption that the death penalty was an appropriate sentence for him.  Counsel's informed choice in such a matter is entitled to deference, especially where the evidence in question is "double-edged" as it was here.  *See Boyle v. Johnson*, 93 F.3d 180, 187-188 (5th Cir. 1996) (heavy deference owed trial counsel when deciding strategically to forego admitting evidence of a "double edged nature" which might ultimately harm a defendant's case); *Mann v. Scott*, 41 F.3d 968, 984 (5th Cir. 1994) (same); *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (same).

On the overall question of failure to investigate mitigating evidence, Robinson seeks to align his own case with *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith, supra*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 125 S.Ct. 2456 (2005).  This

---

[13]  Dr. Cunningham includes "potential sexual abuse" as a 'parenting' problem for Robinson. (Motion at 83; Defense Exhibit 1 at 66.)  There is absolutely NO evidence of such a history.  Dr. Cunningham has simply made it up.

**Response to 28 U.S.C. § 2255 motion -- Page 43**

effort is misbegotten; those cases involved extreme scenarios of counsel's failure to investigate circumstances of their clients' lives which simply do not exist here.

In *Williams*, the defense lawyer failed altogether to uncover and present evidence in several broad categories. The defendant had been subject to a "nightmarish childhood" involving abuse and neglect, including being regularly beaten by his drunken father, living in a filthy home with human waste on the floors, being placed in abusive foster care while his parents were in jail, and then being returned to their custody.[14] He was borderline mentally retarded, left school in the sixth grade, had suffered repeated head injuries, and might have had organic brain damage. Prison officials who testified for the prosecution would also have testified, if asked, that he would not pose a future danger if kept in a structured environment. They also could have testified to commendations the defendant had received for breaking up a prison drug ring and returning a guard's wallet. A local CPA/lay minister offered to testify for the defendant that he seemed to thrive in a structured environment like prison. *Williams*, 529 U.S. at 370-71, 395-96. Defense counsel did not make a strategic choice not to look for or present any of this evidence. Instead, he either utterly neglected the matters or concluded wrongly that certain information was not allowed to be obtained. *Id.* at 373.

Plainly, Robinson did not have in his past the sort of suffering and impairment that Williams had undergone. Having testimony from all of his current declarants would not have changed that conclusion. Moreover, Robinson's lawyers did offer compelling

---

[14] Robinson says that "nothing in the facts of [*Williams, Wiggins*, and *Rompilla*] is significantly different than the abuse [he] suffered. . . . " (Motion at 87.) This claim is obscenely self-serving.

**Response to 28 U.S.C. § 2255 motion -- Page 44**

testimony from prison officials about his good behavior and admirable adjustment to prison life, and equally compelling character testimony from respected community members, such as teachers and coaches. There is simply no common ground between this case and *Williams*.

In *Wiggins*, the differences are even starker. There, counsel eschewed a complete investigation of what would have been a "powerful" set of mitigating facts. *Wiggins*, 539 U.S. at 534. The defendant was severely deprived and abused to the age of six while living with his alcoholic, absentee mother. She left him and his siblings alone for days, so that they had to beg for food and eat garbage. She locked her children out of the kitchen, and beat them for breaking in. She had sex in the same bed in which her children were sleeping. She once forced the defendant's hand against a hot stove, which put him in the hospital. *Id.* at 517.

After he was placed in foster care, Wiggins suffered physical and sexual abuse, including rape. At 16, he ran away and lived on the streets. He was in intermittent foster care again later, and was allegedly gang-raped by his foster brothers in one home. He was also allegedly sexually abused by a supervisor in a Job Corps program. *Id.*

While Wiggins' lawyers knew some of this history, they did not have all the details. More important, instead of developing the investigation further or even presenting what they had, they chose to follow a strategy of persuading the sentencing jury that Wiggins did not kill the victim by his own hand. Such a finding would have

**Response to 28 U.S.C. § 2255 motion -- Page 45**

taken the death penalty off the table. They also showed, in mitigation, that Wiggins had no prior convictions. *Id*. at 514-15, 518.

Even if this Court were to grant, for the sake of argument, that Robinson's lawyers unreasonably failed to investigate his past fully enough, it could never align his case with *Wiggins* on the prejudice prong of the inquiry. As noted earlier, where it "is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 698.

Again, for Robinson to assert that his own life was anywhere near as horrible as Wiggins' life is abhorrent and morally bankrupt. *See* footnote 14, above. To the contrary, the evidence presented to the jury showed that Robinson loved and respected his grandparents, who raised him in a decent home. The claim, moreover, does not advance the argument on the merits. The merits of the argument establish that presentation to Robinson's jury of all the so-called mitigating evidence that is cited in the instant motion would <u>not</u> have been reasonably likely to change the death verdict. The conclusion was just the opposite in *Wiggins* because of the horrific evidence available there, especially as compared to the relatively weak case in favor of the death penalty. *Wiggins*, 539 U.S. at 534-35, 537-38 (Wiggins had no history of prior violence and the case against his direct responsibility for the murder was arguable). *Wiggins* simply does not support Robinson's claims.

Finally, Robinson cites *Rompilla v. Beard,* 125 S.Ct. 2456 (2005), in support of his claim of flawed investigation. In that case, the decisive factor showing deficient attorney

performance was <u>not</u> failure to look further for mitigating evidence after receiving no leads in that direction from the defendant, his family, or mental health experts.  Instead, the attorneys were faulted for not reviewing a prior conviction file which they knew the prosecution would be using as aggravating evidence.  *Id.* at 2462-63.  If they had reviewed that easily obtainable file, they would have found significant evidence and leads toward more evidence of a seriously mitigating social history.  The history included the facts that the defendant had a serious alcohol problem, he had a third-grade cognition level after nine years in school, his father beat him and his mother, he and his brother were locked in a wire dog pen filled with excrement, he could not visit with other children or speak to anyone on the phone, he slept in an unheated attic, and he had to attend school in rags.  *Id.* at 2468-69.  Furthermore, post-conviction analysis showed that the defendant had organic brain damage, significant impairment of several cognitive functions,[15] and probably fetal alcohol syndrome.  *Id.*

Thus, yet again, Robinson's case bears no material similarity to *Rompilla*.  There is no allegation here that defense counsel did not look at the prosecution's evidence on aggravating factors, the most important of which was the brutality of the offenses themselves.[16]  Furthermore, and dispositively, no amount of investigation by counsel would have yielded the sort of mitigation evidence found in *Rompilla*.  That kind of

---

[15] Compare this to Dr. Martin's assessment of "subtle cognitive deficits."

[16]  Robinson does allege that counsel should have done more independent investigation of the One Love "hit" by interviewing additional witnesses.  That allegation is addressed in the next section of this brief.  However, he does not contend, nor is it so, that most of these witnesses were going to be presented by the prosecution, as was the case for the prior conviction facts in *Rompilla*.

**Response to 28 U.S.C. § 2255 motion -- Page 47**

evidence simply does not exist for Robinson, who had a relatively normal, if poor, upbringing, normal intelligence, and no history such as that in *Wiggins, Williams*, and *Rompilla* that would probably lead a jury to forego the death penalty based on sympathy.

* * * * *

In summary, Robinson's allegations of a failure to investigate are in large part un-founded. Counsel did uncover much of the evidence now cited to this Court or, at least, evidence that was the same in substance.[17] In any event, whatever limits there were to the investigation cannot ultimately be judged material to the outcome of the case. The only real differences between the picture of Robinson's social history that he presents here and the one his defense counsel presented in court are that he had some difficulty in school and that perhaps his home life as a child in Dermott was not as full of good influence as was shown. These differences are not enough to establish that the jury, with the newly-minted version, would in any reasonable likelihood have foregone the death penalty. Furthermore, Robinson's irrelevant and vague evidence of pesticide exposure, irrelevant evidence of the impoverished and discriminated-against lives led not by himself but by his ancestors, irrelevant evidence of his birth records (about which he argues nothing), and cumulative evidence of the poor influence of his mother would have done nothing to alter the outcome of the sentencing phase of his trial. As defense counsel both relate, it is their reasoned view – and it makes sense in light of the record as a whole – that Robinson

---

[17] Many of Robinson's declarants end their statements with the assertion that they would have provided the information to Robinson's defense lawyers if they had been asked. Two of those people <u>were</u> asked, having been interviewed by Mr. Cummings. (*See* Exhibit C; Defense Exhibits 27, 33.)

**Response to 28 U.S.C. § 2255 motion -- Page 48**

was sentenced to die primarily because of the brutality, indifference, and number of his murders. The facts of those crimes strongly outweighed, and would outweigh, the existing and alleged mitigating evidence. Consequently, Robinson has failed to show prejudice stemming from a lack of any such evidence.

"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989); *see also United States v. Lewis,* 786 F.2d 1278, 1283 (5th Cir. 1986) (same); *Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985). That is, he must show that "it is reasonably likely that the jury would have reached a different decision absent counsel's unprofessional errors," if there were any. *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000), quoting *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). Robinson has not met this burden, and is entitled to no relief.

        d.      <u>The claim that counsel did not sufficiently investigate or present evidence regarding the penalty aggravation factor of future dangerousness.</u>

Robinson claims that his lawyers failed to find out enough about the attack on Michael Williams that the government showed Robinson had instigated from jail. In fact, Robinson goes so far as to allege that counsel "did nothing to investigate this incident." He claims that counsel should have gone to Dermott, Arkansas, where he alleges they would have learned from Williams' attackers that Robinson had nothing to do with the attack. They also rely on a recent declaration from Williams himself. These arguments lack merit.

**Response to 28 U.S.C. § 2255 motion -- Page 49**

First, in his entire discussion of the matter, Robinson never acknowledges that the government's proof included the direct testimony of Nathan Henderson that Robinson told Henderson he wanted someone to "get" Williams, and that he reported to Henderson about the attack on Williams after it happened.  Robinson's assault on the proof, and his contentions of what the three attackers would say if they testified, thus utterly fails to account for the linchpin of the government's theory – Henderson's testimony.  It also simply skates over the facts that 1) Williams' current declaration only slightly undercuts his trial testimony, but does not completely contradict it, and 2) the declarations of Williams' assailants – all of whom have criminal histories[18] – is materially inconsistent.  These matters are crucial to determining the prejudice prong of the ineffectiveness inquiry, because they go quite far to establish that the verdict of the jury would not have been different with the evidence Robinson now cites.

First, it is important to analyze what the current declarations say and what they do not say.  Beginning with Williams, he testified at sentencing that his attackers said things that indicated the attack was ordered by an "OG" from Texas on whom he, Williams, had snitched.  The inference was that the OG was Robinson, and that inference was supported by Henderson's testimony.  Williams now says that he does not <u>believe</u> the assault was ordered by Robinson, but he still admits that the attackers called him a snitch and said they ought to kill him.  He says he believes that they were just trying to scare him and to

---

[18]  Criminal history reports on Edington, Jordan, and Pitts are filed under seal as Exhibits H, I, and J.  These histories would have provided ample material for cross-examination had any of these witnesses testified.

**Response to 28 U.S.C. § 2255 motion -- Page 50**

convince him they meant business, but were really only after his money.  Regardless of whether Williams were to testify to such a belief, the grounds for inferring Robinson's involvement in the attack would still be valid.[19]  Furthermore, defense counsel cannot be faulted for failing to learn that Williams would try to change his testimony years afterward.

Second is the declaration of Alquantis Pitts, the person Williams had testified called him a snitch, and with whom he struggled.  (Defense Exhibit 28.)  Pitts' declaration admits the "snitch" comment was made, but says that Keith Edington said it and that Edington further said Williams ought to be killed for snitching.  Pitts denies having any business dealings with Robinson, and denies having received an order from him.  He says his sole purpose in hijacking Williams that day was to steal money and to get a shotgun back from him that he had lost gambling.  He says Williams did give him the shotgun back.  He also says he was arrested for this incident, and that a police officer hit him in the face.  He claims the police agreed to drop the robbery charges in exchange for his promise not to sue for his injury.

Edington's declaration (Defense Exhibit 8) says nothing about Pitts intending to steal money from Williams.  His story is that Pitts bought some bad drugs from Williams and wanted a refund – indeed, he heard Pitts say as much to Williams.  He also says nothing about getting the shotgun back from Williams, even though Pitts says the gun was handed to Edington and Jordan in the back seat of the car.  Edington's declaration differs

---

[19]  This result would not change with the mere addition, even if it were admissible, of the opinion of one Tony Billups (Defense Exhibit 3) that Williams cannot be trusted and lacks honor.

**Response to 28 U.S.C. § 2255 motion -- Page 51**

from Pitts' on the additional subject of whether the party went to a bank to try to withdraw some of Williams' money; Edington says it never happened, while Pitts says it did. Finally, Edington denies having said anything about killing Williams, while Pitts says he did make such a statement. Edington claims he took no orders from Robinson.

Wayne Jordan's affidavit is more consistent with Edington's on the subject of why the party went after Williams; it was to confront him about the bad drugs he had sold to Pitts. Jordan confirmed that, having sold drugs for Williams occasionally, he knew that Williams would sometimes cheat buyers that way. Jordan says that Pitts confronted Williams, and that Williams offered to make good with new drugs or a refund. He says Pitts and Williams drove off together for a while – a fact not present in anyone else's version – and then he and Edington rejoined them. Jordan says he never heard anyone threaten to kill Williams, and never heard any mention of Williams snitching on Robinson. Despite his version of the events, Jordan agreed to plead guilty to robbery because "it wasn't worth it to try to fight the case."

Another declarant, Louis Johnson (Defense Exhibit 19), says that he was with Williams on the day in question and that Williams had sold bad cocaine the day before to all three of the assailants: Pitts, Edington, and Jordan. Johnson says the three approached him and said they wanted their money back. When Johnson told this to Williams, Williams just laughed. Later, when Johnson and Williams were driving around, the other three men flagged them down. Williams smiled and said, "Watch me sell them more cocaine." Pitts came up to the car and pulled a gun, demanding their money back. Then

**Response to 28 U.S.C. § 2255 motion -- Page 52**

Johnson got out of the car and heard no more.  He says he never heard any mention of Robinson, and did not know of any business relationship any of the three assailants had with Robinson.  Johnson admits that when the FBI interviewed him about the incident, he denied having been in the car with Williams.[20]  He contradictorily claims that he would have told all to the defense if only he had been asked.

Plainly, all these versions do not hang together well.  They certainly do not establish that Williams' initial version was false, as Robinson asserts they do.  Two of the witnesses (Williams and Pitts) say there <u>was</u> a mention of snitching and a threat to kill Williams.  Two others (Edington and Jordan) deny it; not surprisingly, one of these (Edington) was accused of making such comments.  However, Edington's version does not account for the possibility that while Robinson did not explicitly 'order' an attack, it was nevertheless made known to youngsters in Dermott that attacking someone who snitched on Robinson would please him.[21]  Another witness (Johnson) was not around long enough to hear such a comment if it was made.  One witness (Pitts) says he was just trying to steal from Williams, but the others (Edington, Jordan, and Johnson) say they were after a refund for bad drugs.  Other, smaller details likewise lack consistency.

The new declarations do not establish that defense counsel's decision about how to handle the Williams incident was unreasonable.  It was their view that Williams' testimony at sentencing was not credible, either in its substance or in how he came across

---

[20]  See Section 6, below, describing what Johnson told the FBI, and referring to his interview report.

[21]  This possibility is consistent with Henderson's testimony that, regardless of what Robinson actually said on the phone, his interest in retaliation would be clear to those loyal to him.  (R20/115.)

**Response to 28 U.S.C. § 2255 motion -- Page 53**

as a witness.  Counsel certainly did not assume Williams was telling the truth, as

Robinson now claims.  (Motion at 22.)  Counsel also concluded that the telephone calls

played in court, in which Robinson was recorded talking to relatives about Williams, did

not establish that Robinson had a part in ordering a "hit" on Williams.  Counsel argued

that prison officials were apparently unconcerned about Robinson's phone calls, giving

rise to the inference that the calls were meaningless and did not prove Robinson was

perceived as a threat to anyone from inside the prison.  (R23/79.)  Furthermore, it was a

large part of the defense strategy to show that Robinson was well-behaved in prison, and

had no disciplinary problems at all.  The defense expert, Dr. Cunningham, testified at

length about the security measures available to the Bureau of Prisons, and that it was for

the most part a well-run bureaucracy.[22]  Indeed, the defense may have had a good

argument on future dangerousness, and the facts they presented went a long way to rebut

the government's case on that topic.  They likely went a lot farther than the presentation

of these new and highly varying versions of events, presented by witnesses with criminal

histories and impaired credibility, would have done.

Moreover, the special verdict contradicts any likelihood that the penalty would

have been different if the new testimony had been presented to the jury.  The facts

establishing future dangerousness based on the Williams incident applied across the board

to all of the death-eligible counts.  However, the jury declined to impose the death penalty

---

[22]  Robinson speaks out of both sides of his mouth, acknowledging that Dr. Cunningham testified that the Bureau of Prisons was capable of protecting the public from inmates who might pose a danger, (Motion at 22), while simultaneously claiming that he was not asked to present such testimony (Motion at 24 n.2).

**Response to 28 U.S.C. § 2255 motion -- Page 54**

for the Resendez murder, indicating that they did not believe the future dangerousness factor was sufficient to tip the balance in favor of such a penalty for that crime. It is reasonable to conclude that they also did not give deciding weight to the future dangerousness factor for the other death-eligible counts. Instead, as defense counsel have opined and as is supported by the record, the death penalty was most likely imposed for the Shelton and Reyes murders because of their brutality and premeditated nature, because of the grave danger they posed to innocent bystanders, and because of Robinson's complete indifference to killing two men who, as it turned out, were not the intended targets. The death penalty was most likely not imposed for the Resendez murder because Robinson was less directly involved in killing Resendez.

The record as a whole does not support a finding that defense counsel's performance was deficient for failing to uncover and present the weak and contradictory testimony now laid before this Court. Nor does it support a finding that Robinson was prejudiced at all in this regard. Therefore, Robinson has not proven his entitlement to relief. *Strickland.*

    e.    <u>The claim that counsel did not raise a *Batson* challenge on direct appeal.</u>[23]

Robinson claims there was racial discrimination in the selection of his jury and that counsel should have appealed to vindicate his rights under *Batson v. Kentucky,* 476 U.S. 79 (1986). In order to prevail on this claim, Robinson must show that his lawyers' failure

---

[23] Robinson observes in passing (Motion at 100) that appellate counsel refused to raise an issue he asked them to raise, regarding the jury instruction on continuing criminal enterprises. He does not further brief or argue this as an instance of ineffectiveness. The government understands his only claim of appellate ineffectiveness to be the failure to raise the *Batson* issue.

**Response to 28 U.S.C. § 2255 motion -- Page 55**

to appeal the *Batson* issue fell below an objectively reasonable standard of professionalism and also that, had they raised the issue, they would have won relief from the appellate court in the form of a new trial. *See Miller-El v. Dretke,* 142 Fed.Appx. 802 (5th Cir. 2005) (awarding new trial on remand from the Supreme Court in *Miller-El v. Dretke*, 125 S.Ct. 2317 (2005) ("*Miller-El II*")).

"The Supreme Court has outlined a three-step process for determining whether peremptory strikes have been applied in a discriminatory manner.  First, the claimant must make a *prima facie* showing that the peremptory challenges have been exercised on the basis of race.  Second, if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges.  Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination." *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993); *United States v. Huey*, 76 F.3d 638, 640-641 (5th Cir. 1996).

The party making the claim of purposeful discrimination bears the ultimate burden of persuasion. *Bentley-Smith,* 2 F.3d at 1373.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered should be deemed race-neutral. *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality).  "[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-biased." *Bentley-Smith*, 2 F.3d at 1375.  A finding of purposeful discrimination "largely turns on an evaluation of the credibility or demeanor of the attorney who exercises the challenge."

**Response to 28 U.S.C. § 2255 motion -- Page 56**

*Id.* at 1373.  Because credibility is such a large part of the equation at this last stage of the analysis, it is not surprising that on appeal, the standard of review of the district court's conclusion regarding whether the peremptory strike was racially motivated is the clear error standard.  *United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001), citing *Hernandez v. New York*, 500 U.S. 352, 364 (1991).  An appellate court will generally not find clear error unless the district court's conclusion was implausible – a very difficult burden to carry when the district court is judging credibility.  *See Theriot v. Parish of Jefferson*, 185 F.3d 477, 490 (5th Cir. 1999) (in context of claim of racial discrimination in legislative redistricting, the "burden of showing that the findings of a district court are clearly erroneous is heavier if credibility of witnesses is a factor in the district court's determination).  Stated another way, "a reviewing court ordinarily should give [such credibility-based] findings great deference." *Batson*,  476 U.S. at 98 n.21.

*Batson*, of course, regulates the use of peremptory challenges to strike venire members.  Thus, as Robinson correctly concedes, the issue boils down to the government's use of three of its peremptory challenges to strike three black venire members: Charline Boulet (Juror 18), Dorothy Jean DeBose (Juror 36), and Marchesia Amarh (Juror 69).[24]  It does not concern the strike for cause of any venire member,

---

[24]  Robinson has included the juror questionnaires of Ms. DeBose and Ms. Amarh in his Appendix.  The government refers in this brief to the questionnaires of several additional people.  The government is assuming that the Court has copies of all the juror questionnaires as part of its official file and that it can conveniently refer to them in considering this matter, but we are prepared to file any questionnaires under seal if they are needed.

**Response to 28 U.S.C. § 2255 motion -- Page 57**

regardless of race.[25]  A full recitation of the facts surrounding the three peremptory strikes establishes that there was no racial motivation, and that there was no hope of success if a *Batson* challenge had been made on appeal.  Therefore, defense counsel were not ineffective.

(i) **Charline Boulet**.   First, and easiest, is the case of Ms. Boulet.  It was not only the government that struck her peremptorily.  Robinson did so as well – a fact he neglects to mention.  (RIII/155.)  Common sense dictates that in such circumstances, it would be ludicrous for defense counsel to make a *Batson* challenge, which explains why Robinson's lawyers did not do so.[26]  Their not having done so would have raised the bar on appeal to an insurmountable height, as failure to make a *Batson* challenge in the trial court waives the claim on appellate review.  *Brown v. Kinney Shoe Corp.* 237 F.3d 556, 561-62 (5th Cir. 2001).  This makes sense, as a party who makes no *Batson* challenge has not even attempted to satisfy the first part of the required showing: a *prima facie* case of racial discrimination.

---

[25]  It should be noted that the one black venire member who served on the jury (Sheila Rayfield) was individually questioned and selected as a juror before any of these three women were questioned. The government did not strike Ms. Rayfield, although the defense unsuccessfully moved to strike her for cause.  (RII/109-11.)

[26]  Although in *Miller-El II*, the Court faced a situation where the defense peremptorily struck certain jurors and suggested that the fact was irrelevant, 125 S.Ct at 2328 n.4, the Court's rationale does not apply here.  In *Miller-El II,* the defense did not strike peremptorily until after the prosecution decided not to strike.  That was not the case here, where both sides struck Ms. Boulet simultaneously.  Also in *Miller-El II*, the Court's remark was in the context of the prosecutor having kept a white venireperson, not having struck a black one.  Those situations are qualitatively very different, as the Court made clear: "the underlying question is not what the defense thought about these jurors but whether the State was concerned about views on rehabilitation when the venireperson **was not black.**"  *Id.* (emphasis added).

**Response to 28 U.S.C. § 2255 motion -- Page 58**

Furthermore, if counsel had made a *Batson* challenge as to Ms. Boulet, this Court's first question might rationally have been, "What do you want me to do about it? Reinstate her after you struck her peremptorily?" *See Batson*, 476 U.S. at 99 n.24 (possible remedy for racial discrimination by government is to reinstate the improperly struck venireperson). Additionally, while defense counsel do not independently recall exactly why they struck Ms. Boulet (*see* Exhibit A at p.14), her questionnaire and her answers during voir dire revealed that she was fairly strongly in favor of the death penalty – not a juror Robinson would want. (RIII/71, 77.) Moreover, she affirmatively wished to be on the jury, a fact that often makes lawyers a little nervous.[27] (RIII/75.) *See Bentley-Smith*, 2 F.3d at 1374 ("[M]any of the judgments made by counsel in picking a jury are purely intuitive and based upon inarticulable factors, or even hunches."). Finally, Robinson's lawyers discussed all of their proposed strikes with their client before making them. (*See* Exhibit A at p. 13.) The notion that Robinson had a meritorious *Batson* claim as to this strike that would have prevailed either before this Court or on appeal is simply wrong.

**(ii) Dorothy Jean DeBose.** The second venireperson at issue is Ms. DeBose. Defense counsel did make a *Batson* challenge to the prosecutor's peremptory strike of Ms. DeBose. The argument was that Ms. DeBose had not stated any unwillingness to apply the law properly, and there was nothing in her background that would reasonably give rise to the strike, so that it must have been racially motivated. (RIV/163-64.) This

---

[27] Her wishing to be on the jury was one of the race-neutral reasons the prosecutor had for striking Ms. Boulet. (*See* Exhibit D, Mr. Schattman's affidavit.)

**Response to 28 U.S.C. § 2255 motion -- Page 59**

Court observed that it was unclear whether a *prima facie* case of racial motivation had been established, but asked the prosecutor to respond anyway. Mr. Schattman first advised the Court that Ms. DeBose was known to members of his family, and that he had thereby gained "reputation information" about her.[28] He also recalled, although vaguely, that he was involved to some degree with federal drug cases against both her brother and her husband, cases which she acknowledged in her questionnaire (questions 73 and 80). Given her connection to those drug cases, the prosecutor felt that she would not be an acceptable juror to the government, and that he had "concerns about this woman sitting as a juror on this kind of a case." (RIV/164-65.)

On a further request from the Court to articulate the concern, the prosecutor said that Ms. DeBose's connection to a brother and a husband who both had drug-dealing problems "would give any prosecutor cause [sic]." (RIV/166.) The Court continued to inquire, establishing that Mr. Schattman recalled that the case against the husband involved either heroin or cocaine, that it was brought by federal authorities, that he was convicted via guilty plea and served time, and that Judge Belew had presided. (RIV/166-67.) Another AUSA then asked for a moment to confer, after which Mr. Schattman added that Ms. DeBose also had an apparent reluctance about the death penalty to a degree that made him uncomfortable. (RIV/167.) Mr. Schattman did not thus "shift" the government's rationale, as Robinson paints it, but merely added to that rationale. All of

---

[28] *See* Mr. Schattman's affidavit, Exhibit D. Given the facts he states, it is not surprising that Ms. DeBose did not know Mr. Schattman, as Robinson points out in an effort to debase Schattman's credibility. (Motion at 95-96.) Moreover, Mr. Schattman never told the Court that she knew him, only that his family knew her.

**Response to 28 U.S.C. § 2255 motion -- Page 60**

the government's proffered reasons for striking Ms. Boulet were plainly race-neutral, and Robinson does not now contend they were otherwise.  Instead, he attacks the prosecutor's credibility.  (Motion at 95-96.)

Defense counsel below did the same thing.  He argued that it wasn't established that relatives of Ms. DeBose had been the subjects of the federal case(s) the prosecutor recalled.  The Court responded – speaking to the issue of credibility – that it did not have to be established, so long as the prosecutor honestly believed it to be true.  (RIV/167-68.) In any event, defense counsel recalled that he might himself have represented Ms. DeBose's husband before a federal grand jury, lending credence to the prosecutor's recollection.[29]  Counsel also argued that Ms. DeBose would not be a bad juror for the government, given her overall profile, to which this Court aptly responded that those matters went to "whether the government ought to exercise its challenge and not whether it may."  (RIV/168.)

Finally, when counsel attempted to argue that there were probably other venire members who had relatives with legal problems, the Court said, "If you can find another husband who has been convicted in federal court of a drug trafficking crime * * *[30] and a person who is not African-American who has not been stricken by the government, then we'll revisit it."  (RIV/169.)  The Court returned to this rationale, and declined to inquire

---

[29]  The government files under seal, as Exhibit K, a rap sheet on Luster DeBose, establishing that he did indeed have a checkered criminal history involving heroin.  *See also* Mr. Ball's affidavit, Exhibit A at pp. 13-14, recalling not only that he did represent Luster DeBose in the grand jury, but that Mr. Schattman was the prosecutor that day.

[30]  Here, Mr. Ball said, "I'm not sure I can."  Robinson does not now attempt to fill this gap and, in fact, there was no such other venire member.

**Response to 28 U.S.C. § 2255 motion -- Page 61**

further into the prosecutor's statements about the reputation information he had on Ms.

DeBose, noting that the drug trafficking conviction of the venire member's husband was

"certainly sufficient for him to have exercised that challenge."  (RIV/169.)

In light of this factual background, defense counsel would have gained no ground

in appealing the DeBose strike on *Batson* grounds.  The issue would have boiled down to

the third part of the analysis, whether Robinson persuaded the district court that the strike

was racially motivated.  He did not.  This Court concluded that the federal drug-

trafficking conviction of Ms. DeBose's husband was a sufficient race-neutral ground by

itself to support the strike, and that finding would have been given great deference by the

Court of Appeals.  Indeed, this Court's observation was true that there was no similarly

situated non-black venire member whom the government chose not to strike, and its

treatment of the matter would likely have been dispositive to the Fifth Circuit.

> [I]n circumstances where the Government's reason is fantastic or
> inconsistent with its treatment of similar non-minority jurors, we may have
> a basis for reversal.  However, where, as here, the Government's reasons
> are plausible, ultimately the inquiry boils down to whether the Government
> should be believed.  This is quintessentially a question of fact which turns
> heavily on demeanor and other issues not discernable from a cold record,
> such that deference to the trial court is highly warranted.

*United States  v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000), *quoting Bentley-Smith*,

2 F.3d at 1373.

**(iii) Marchesia Amarh.**  The third peremptory strike at issue was against Ms.

Amarh.  Her questionnaire showed some confusion.  It revealed that she was not in favor

of the death penalty (question 45), and she did not believe it served a legitimate societal

purpose (question 46). She also wrote, however, that she believed the penalty was appropriate for planned murders and she could assess it in a proper case (questions 47-48). She believed it should be imposed less frequently, but she had no personal beliefs which would prevent her from returning such a verdict (questions 49, 52). She also wrote that if there was an option of giving a defendant life without parole, she would like to use that option (question 52a).

Ms. Amarh's checkmarks on the penultimate two pages of the questionnaire were likewise confused and confusing. She said she disagreed that the death penalty is wrong, but slightly agreed that it is "absolutely never justified" and also slightly agreed that it is wrong and unnecessary in our civilization. At the same time, she slightly disagreed that the death penalty is unnecessary to modern civilization She agreed that the death penalty is necessary, but also agreed that it cannot be regarded as a sane method of dealing with crime.

On questioning in court, Ms. Amarh said that she was generally not in favor of the death penalty. She had thought about it over the years and said, "I just don't agree with it." (R7/87.) Nevertheless, she also said there are some circumstances that do deserve the death penalty. (R7/88.) The prosecutor attempted to refine his understanding of where Ms. Amarh stood, asking if he could liken her position to a conscientious objector, who sees the need for war but chooses not to participate in a way that would result in killing. (R7/88-89.) Ms. Amarh responded this way:

> It's kind of hard to say. If I have to do it, you know, as a duty, I will do it. But I
> just don't like, you know, the death penalty. I don't know exactly how to say it,

**Response to 28 U.S.C. § 2255 motion -- Page 63**

but I feel strongly against the death penalty. But if for some – it depends on the circumstances. The circumstances would have to be very strong if I have to do jury duty.

(R7/89.) A further round of question and answer between the prosecutor and Ms. Amarh did not clarify matters, and she continued to say "it just depends." (R7/91.)

The questioning by defense counsel spotlighted the idea that Ms. Amarh could keep an open mind, and was a person who would like to hear the facts before deciding such a serious issue. (R7/92.) Counsel also elicited from Ms. Amarh that she agreed the process of obtaining the death penalty ought to be a difficult one for the government, and that a juror's belief in being careful about the matter ought not to disqualify the juror. (R7/93-96.) Ms. Amarh further agreed that she could follow the law, and could vote for the death penalty, depending on the facts. (R7/96-97.) She said there was no reason she could not be fair to both sides. (R7/97-98.) Finally, on being questioned by the Court, Ms. Amarh reiterated that she could follow the law and could give fair consideration to the death penalty. (R7/100-01.)

In accordance with these answers, neither party moved to strike Ms. Amarh for cause. (R7/101.) However, the prosecutor exercised a peremptory strike, and the defense objected under *Batson*. (R7/101.)[31] Counsel articulated that Ms. Amarh's answers indicated she was qualified and could vote for the death penalty in the right circumstances, and he asked that the government be required to provide a race-neutral reason for striking her. (R7/102.) While not conceding that a *prima facie* case of racial

---

[31] The transcript erroneously identifies the objector as Mr. Schattman, rather than Mr. Strickland.

**Response to 28 U.S.C. § 2255 motion -- Page 64**

motivation had been made out, the prosecutor explained that Ms. Amarh had "expressed great reluctance concerning the death penalty. . . ."  The prosecutor also noted that it had earlier in the day peremptorily struck a white venire member with similar views on the death penalty (Ms. Broadwell).  He said, "We felt that she [Ms. Amarh] would not be, for lack of a better phrase, a strong juror in such case for the government, and we exercised our peremptory challenge on that basis, her view of the penalty."  (R7/103.)  Plainly, this qualified as a race-neutral explanation.  The Court immediately overruled the *Batson* objection and that was the end of the matter.

A review of the questioning of Ms. Broadwell reveals that she did not, in fact, have similar views on the death penalty to those of Ms. Amarh, but apparently Mr. Schattman believed she did because he was looking at the wrong questionnaire while interviewing Ms. Broadwell.  (R7/70-72.)

In any event, Mr. Schattman's race-neutral explanation for striking Ms. Amarh was consistent with her answers on the death penalty.  It cannot be reasonably controverted that Ms. Amarh had serious reservations about the sanction, even though many of her answers were confused and contradictory.  Indeed, the confusion and contradictions themselves would provide a sufficient race-neutral basis for a peremptory strike.  This Court apparently found Mr. Schattman's explanation both credible and consistent with Ms. Amarh's answers, such that it did not believe Robinson had carried his burden of proving a racially motivated action.  As with Ms. DeBose, and any case where the prosecutor's credibility is one of the final deciding factors, Robinson would not

in all reasonable likelihood have been successful in raising this *Batson* claim in the Fifth Circuit.

While Robinson attempts to equate his case with *Miller-El II*, they in fact have nothing in common. First, in *Miller-El II*, it was determined that the prosecutor's office had an institutional policy to try to keep blacks off juries. *Miller-El II*, 125 S.Ct. at 2338-39. There is no such evidence here, nor even the suggestion of such a policy. If Robinson were to make such a suggestion, it would be false.

Second, the prosecutor's two challenged strikes were both based on objective facts that were not subject to inconsistencies observed in *Miller-El II*. In the case of Ms. DeBose, and as this Court pointed out, the decision to strike her because of her husband having been convicted in a federal drug case as to which Mr. Schattman had some involvement was appropriate, and it was certainly not a problem appearing in the profile of any other panelist of any race. Thus, her situation finds no mirror in *Miller-El II*, where the Supreme Court detailed the state's disparate treatment of jurors who had similar views. *Id.*, 125 S.Ct at 2326-30. Ms. DeBose was dissimilar from all other jurors in a highly significant particular – even apart from Mr. Schattman's knowledge of her through his family, which this Court did not feel the need to consider but which only adds to the race-neutral picture – and striking her was patently not a race-based decision.

In the case of Ms. Amarh, while Robinson claims that white jurors with similar views were not struck, the claim does not stand up to scrutiny. For example, the very first venireperson questioned was William Watson. (RII/6-26.) While some of the

**Response to 28 U.S.C. § 2255 motion -- Page 66**

questioning focused on Mr. Watson's ability to serve as a juror in the face of his twin brother's recent suicide, a good deal of it also focused on his opposition to the death penalty. Like Ms. Amarh, he waffled a bit on that topic, but he did express serious reservations, both in writing and in court. (*E.g.*, RII/12-15.) The government moved to strike him for cause based on his grief issues, but was unsuccessful. (RII/25-26.) It later struck him peremptorily. This decision was rationally based not only on the personal grief issue, but also on the death penalty opinions, similar to Ms. Amarh's.

Another white juror whom the government struck peremptorily was Ms. Martinets. (RIII/27-39.) Her questionnaire indicated a person fairly strongly against the death penalty, but her answers in court made it clear that she could follow the law. Accordingly, she was not challenged or excused for cause, but the government chose not to have her as a juror. Thus, as with Ms. Amarh, the government was not comfortable with the venireperson's perceived ambivalence about imposing the death penalty.

Robinson's claim that Venireperson Broome (who was white and who was selected as a juror) had similar views to Ms. Amarh is flat wrong. Mr. Broome's questionnaire and his answers in court indicated that he was consistently in favor of the death penalty and that he could vote to impose it in the right circumstances despite the fact that he – as any rational person – would have difficulty making that decision. (*See* RII/75-80, 91.)

Venireperson Mills' answers were similar. She said at every opportunity that she could vote to impose the death penalty, despite what a hard decision it would be.

**Response to 28 U.S.C. § 2255 motion -- Page 67**

(RIII/136-39, 145-46, 148.)  She also did not provide questionnaire answers that indicated opposition to the death penalty, as Ms. Amarh had done.

Robinson points also to the answers of Venirepersons Tribout and Banser.  He gains no ground there, either.  Tribout's questionnaire answers showed that he was unopposed to the death penalty, and that he believed he could impose it, although he thought extreme care would be required.  The same is true for his answers given in court.  (RIV/5, 7-8, 13, 14.)  Likewise for Ms. Banser.  Her questionnaire answers showed she was in favor of the death penalty, and she believed it served a legitimate purpose and was necessary.  She also answered, however, that if a sentence of life without release were available, she could not recommend a sentence of death.  Her explanatory note read: "It would be a very hard decision.  Not truely [sic] certain about this."  (Question 52a.)  In court, the prosecutor clarified her position.  She gave a long answer which boiled down to the view that if the facts justified death being the necessary sentence, she could choose it.  (RIV/109-11.)  Her comments after that were consistent; she felt that while the process might be lengthy and difficult, she could participate in it.  (RIV/111-14, 117.)

None of these four jurors Robinson refers to – Broome, Mills, Tribout, and Banser – had views on the death penalty that were in line with those of Ms. Amarh.  Therefore, a comparison of how the prosecution treated those jurors is not material to a question of race discrimination.

Robinson also suggests that the prosecution more aggressively questioned Ms. Amarh because she was black in an effort to disqualify her, a matter the Supreme Court

**Response to 28 U.S.C. § 2255 motion -- Page 68**

discussed in *Miller-El II*, 125 S.Ct. at 2333-37.  The suggestion lacks substance.

Robinson refers to the question the prosecutor asked about whether Ms. Amarh perhaps

felt like a conscientious objector about the death penalty.  The prosecution asked

Venireperson Watson, who was white, a similar hard question, about whether he would

be able personally to participate in a decision that would lead to Mr. Robinson being put

to death.  (Compare RII/13 with R7/88-91.)  It did the same thing with Venireperson

James, also white, whose initial answers on his questionnaire revealed a person fairly

strongly in favor of the death penalty.  The prosecutor chose to plumb that opinion more

deeply with similar hard questions about the personal decision to vote for death of another

human being, and ended up striking Mr. James peremptorily, despite his questionnaire

answers.  (*See* RII/201-03, and compare with 7/88-91; *see also, e.g.,* RII/75-76 – question

of Venireperson Broome, who was seated; RII/187 – question of Venireperson Womble,

who was seated; RIII30-31 – questions of Venireperson Martinets, who was peremptorily

struck by the government; RIII/55-56 – question of Venireperson Chatham, who was

seated; RIII/137-39 – question of Venireperson Mills, who was seated).  Indeed, Mr.

Schattman's "conscientious objector" question of Ms. Amarh was significantly less

jarring a way to put the matter than the question that was posed to so many other jurors

about whether they could partake in a process that would lead to a day certain when

Robinson would be brought to the death chamber and executed until he ceased to exist.  It

is crystal clear that the prosecutors asked difficult questions of jurors whether they were

white or black, and whether they were ultimately to be seated as jurors or peremptorily

**Response to 28 U.S.C. § 2255 motion -- Page 69**

struck.  There is no merit to the claim that the government tried to poison the well with tough questions only for black jurors.

In summary, a review of the entire voir dire process reveals that the government's strikes, as well as its choices not to strike, were simply not race-based.  Robinson's claim to the contrary founders on the facts.

Finally, even apart from the issue of prejudice, i.e., whether a *Batson* claim would have succeeded on appeal, appellate counsel did not perform below a reasonably professional standard when choosing not to raise *Batson* as a ground for reversal.  The claim would have been quite weak at best.  Counsel may properly make tactical judgments about how best to put together an appeal, choosing the best issues and not the weakest ones.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments . . . and focusing on one central issue if possible").  Robinson's best issue on appeal, and the one his lawyers led with, was whether he had a right to a grand jury indictment that comported with the developing law on charging what were once considered merely sentencing factors.  (Robinson's brief on appeal is attached as Exhibit E.)  The Fifth Circuit had to make new law to dispose of that claim, and Robinson's lawyers made a reasonable tactical choice in trying to persuade the court to make the law in their favor.  That they chose this promising issue over the poor *Batson* issue does not mean they were incompetent.

**Response to 28 U.S.C. § 2255 motion -- Page 70**

3.    **A collateral *Batson* challenge to the jury selection process is procedurally barred, and also fails on the merits.**

This claim is procedurally barred because it was not raised on direct appeal, but could have been. *Massaro, supra; Shaid, supra; Frady, supra.* While Robinson contends that his lawyers' alleged ineffectiveness serves as the necessary "cause," that issue has already been briefed and the government has established that there was no meritorious *Batson* claim that counsel should have raised. *See* Section 2.e., immediately above. Therefore counsel were not ineffective for choosing not to do so. Also, no prejudice resulted to Robinson, for the reasons stated above.

4.    **A challenge to the allegedly discriminatory application of the Federal Death Penalty Act is procedurally barred and also fails on the merits.**

Like the previous claim, this one is also procedurally defaulted for Robinson's failure to raise it on appeal. Robinson did make a pretrial motion to dismiss the government's notice of its intent to seek the death penalty on the ground of racial discrimination. *See* Document 1404, filed December 21, 2001. He filed a subsequent motion partly on the same topic, along with a Special Appendix (a DOJ Survey) purporting to show racial discrimination by the Department of Justice. *See* Documents 1443, 1444, filed January 10, 2002. This Court denied relief. *See* Document 1575, filed February 19, 2002. Robinson did not pursue the claim on appeal, though he could have, and therefore may not now raise it collaterally, *Massaro, supra; Shaid, supra, Frady, supra*. Moreover, because of the procedural bar, Robinson should not be allowed to

pursue the discovery he requests on this issue, nor should he be permitted to raise the matter at any evidentiary hearing the Court may convene.

Even if the matter were not defaulted, it would fail on the merits. The statistics he proffers are insufficient to establish a *prima facie* case of discrimination. The first statistic Robinson cites is that eight out of ten defendants in Texas federal courts against whom the death penalty has been assessed have been black. He compares this 80% to the alleged 57% of people nationwide who are sentenced to death that are black. He also compares it to the percentage of the Texas population that is black, around 12%. These statistics do not advance his claim.

As noted by the Fifth Circuit, "the decision to prosecute one person and not another is a proper exercise of executive discretion with which [the courts] are reticent to interfere." *United States v. Webster*, 162 F.3d 308, 333 (5th Cir. 1999), citing *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984); *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion"). The Supreme Court also has noted favorably in the capital context "the capacity of prosecutorial discretion to provide individualized justice." *McCleskey v. Kemp*, 481 U.S. 279, 311-312 (1987). Certainly, the selection of certain defendants for capital prosecution on the basis of race would be impermissible. Nevertheless, because of the importance of prosecutorial discretion, the Supreme Court has held that it would

**Response to 28 U.S.C. § 2255 motion -- Page 72**

demand "exceptionally clear proof before [it] would infer that the discretion has been abused." *McCleskey*, 481 U.S. at 297.

The Supreme Court's "cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Drawing on equal protection standards, a defendant must show that the federal prosecutorial policy had both a discriminatory intent and a discriminatory effect in order to prevail on a selective prosecution claim. *See Armstrong*, 517 U.S. at 465; *Webster*, 162 F.3d at 333; *United States v. Jones*, 159 F.3d 969, 976 (6th Cir. 1998).

"To establish discriminatory intent in a case alleging selective prosecution based on race, a claimant must show that the prosecutorial policy was motivated by racial animus; to establish discriminatory effect, the claimant must demonstrate that similarly situated individuals of a different race were not similarly prosecuted." *Jones*, 159 F.3d at 977; *see also Armstrong*, 517 U.S. at 465; *Webster*, 162 F.3d at 333 (defendant must make a *prima facie* showing that he was singled out for prosecution but others similarly situated were not prosecuted); *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993) (same); *Hoover*, 727 F.2d at 389-391 (defendant met the 'effect' part of test by showing that of 300 traffic controllers who failed to report to work in the Houston area on a particular day, only three individuals, including the defendant, were prosecuted, but defendant failed to carry his heavy burden of showing invidious purpose). Robinson has not even alleged, must less tried to show statistically or otherwise, that similarly situated

individuals who were not black were not charged with capital offenses.  Some of the

statistics submitted pretrial, taken from the DOJ Survey covering 1988-2000, rebut any

such inference, as this Court observed when it denied the pretrial motion.

The percentages below reflect the number of defendants in each racial/ethnic

group for whom the Attorney General authorized the death penalty, divided by the total

number of defendants in that particular racial/ethnic group who initially entered the

Department's review process.  *See* DOJ Survey at 11.

- From 1988 to 1994, the Department of Justice sought the death penalty against 90 percent of the defendants submitted for review by United States Attorneys with recommendations exclusively in favor of seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Total submitted** | 52 | 7 | 39 | 5 | 1 |
| **Decision to seek DP** | 47 | 7 | 34 | 5 | 1 |
| **Percent** | 90% | 100% | 87% | 100% | 100% |

- From 1995 to 2000, the Department of Justice sought the death penalty against 23 percent of the defendants charged with crimes punishable by death and submitted for review by United States Attorneys with recommendations for or against seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Total submitted** | 682 | 134 | 324 | 195 | 29 |
| **Decision to seek DP** | 159 | 44 | 71 | 32 | 12 |
| **Percent** | 23% | 33% | 22% | 16% | 41% |

**Response to 28 U.S.C. § 2255 motion -- Page 74**

From 1995 to 2000, of the 159 defendants against whom the decision was made to seek the death penalty, 45 percent were black defendants (71 divided by 159) as opposed to 28 percent of similarly placed whites (44 divided by 159).  It should be noted, however, that the number of black defendants who fit the criteria for submission for consideration (324) was almost two and a half times the number of white defendants (134).  Consequently, that the actual number of black defendants prosecuted under the FDPA is greater should come as no surprise.  A review of the same statistics also shows, however, that a greater **percentage** of the total number of white defendants submitted for review were approved for the death penalty than black defendants: 33% as opposed to 22%.[32]  Clearly, Robinson cannot show that white defendants similarly situated to himself were not subjected to prosecution under the FDPA.

As for intent, a defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner.  *Webster*, 162 F.3d at 334.  A criminal defendant must present "clear evidence to the contrary" to dispel the presumption of prosecutorial good faith.  *Id.* at 334; *see also United States v. Jennings*, 724 F.2d 436, 445-446 (5th Cir. 1984) (finding bare generic allegations concerning the selective prosecution of racial groups insufficient to justify an evidentiary hearing);

---

[32]  This pattern of recommending the death penalty for a greater percentage of whites than blacks was consistent at each level of the federal review process:  the U.S. Attorneys recommended the death penalty for 36% of white defendants versus 25% of black; the Attorney General's Review Committee recommended the death penalty for 40% of white defendants versus 27% of black; and the Attorney General authorized the death penalty for 38% of white defendants versus 25% of black.  DOJ Survey, at 10.  It should be noted that the racial information included in the study, in accordance with Department policy, was not made known to Attorney General staff or the Review Committee recommending for or against the death penalty.  It was collected by separate paralegal staff and not disclosed to decisionmakers.  DOJ Survey at 5-6.

**Response to 28 U.S.C. § 2255 motion -- Page 75**

*United States v. Ramirez*, 765 F.2d 438, 440 (5th Cir. 1985) (holding "conclusional allegations of impermissible motive are not sufficient" to demonstrate the government acted in bad faith). He must show that the government "selected its course of prosecution 'because of,' rather than 'in spite of,' its adverse effect upon an identifiable group." *Sparks*, 2 F.3d at 580, citing *Wayte v. United States*, 470 U.S. 598, 610 (1985).

A defendant is not automatically entitled to an evidentiary hearing to make the required showing. *Webster*, 162 F.3d at 334. "He must first present facts 'sufficient to create a reasonable doubt about the constitutionality of [his] prosecution' resulting from selective prosecution." *Id.; see also In re United States*, 397 F.3d 274 (5th Cir. 2005) (issuing writ of mandamus against district judge who, in response to claim of selective prosecution, ordered broad discovery of Department practices). Mere statistical evidence of racial disparity usually is *per se* insufficient to support an inference of any "unacceptable risk" of racial discrimination in the administration of capital punishment. *Webster*, 162 F.3d at 334; *McCleskey*, 481 U.S. at 294-297. *See also United States v. Bin Laden*, 126 F.Supp.2d 256, 260-63 (S.D.N.Y. 2000) (rejecting arguments that the DOJ Survey sufficed to show a *prima facie* case of discriminatory government action, or to warrant further discovery into the matter).

In *Webster*, a case this Court handled at trial and on collateral review, the Fifth Circuit held that the defendant had failed to make a sufficient showing that he was singled out for selective prosecution, failing wholly to show that other similarly situated individuals committing similar acts were not prosecuted. Webster's attempt to rely

**Response to 28 U.S.C. § 2255 motion -- Page 76**

primarily on statistical evidence to support his claim of discriminatory prosecution failed

to rebut the good faith presumption recognized by *McCleskey*.   Although Webster, like

Robinson, pointed to language in *McCleskey*, 481 U.S. at 293 n. 12, which suggests that a

constitutional violation (or *prima facie* finding thereof) may be shown in very limited

circumstances if the data present a "stark" enough picture, the Fifth Circuit found that the

statistics cited by Webster (showing that 66% of federal death penalty cases involved

black defendants) were no more stark than were the statistics in the Baldus Study at issue

in *McCleskey*.[33]   The appellate court found that Webster's evidence "at best, show[ed]

action in spite of a putatively adverse discriminatory effect and not purposeful

discrimination."  *Webster,* 162 F.3d at 335.

The *Webster* Court also expounded on a non-discriminatory explanation for

seeking the death penalty which was evident on the facts: "It is justified by the objective

circumstances of the crime and the sufficiency and availability of evidence to prove the

required elements under the law.  These are the precise considerations the Supreme Court

identified as proper and legitimate grounds for such a decision."  *Webster*, 162 F.3d at

335.  The same considerations apply in Robinson's case.  He was convicted of three

brutal murders, based on overwhelming evidence, and it was entirely appropriate for him

to be prosecuted under laws making the death penalty applicable to his conduct.

---

[33]   The Baldus report suggested that Georgia prosecutors sought the death penalty in 70 percent of the cases involving black defendants and white victims, 32 percent of the cases involving white defendants and white victims, 15 percent of the cases involving black defendants and black victims, and 19 percent of the cases involving white defendants and black victims.  *See McCleskey,* 481 U.S. at 287; *Webster*, 162 F.3d at 334 n.25.  Here, Robinson does not rely on any disparity between his own race and that of his victims, one of whom was black and two others of whom were Hispanic.

**Response to 28 U.S.C. § 2255 motion -- Page 77**

**5.    The claim that the prosecution offered culpability theories at Robinson's trial which were inconsistent with those offered at L.J. Britt's separate trial is procedurally barred, and also fails on the merits.**

At page 102 of his motion, Robinson claims – with no citation to any record evidence – that, "At Britt's trial, the prosecution argued that L.J. Britt was the leader and most culpable participant in the murders." He contrasts this with the fact that at his own trial, Robinson was portrayed as the leader and most culpable person.

First, this claim is procedurally barred. Although Britt's trial occurred after Robinson's,[34] and defense counsel could not have objected on this ground during Robinson's trial, the Britt trial was concluded long before Robinson's appellate brief was filed in July, 2003. Thus, counsel could have raised the issue on direct appeal and did not. Therefore, Robinson may not raise it on collateral review. *Massaro, supra.* In any event, it would have been a frivolous claim to make on appeal, just as it is frivolous now.

This Court, having presided over both cases, knows that it is false that the government portrayed Britt as a leader, or in some way more culpable than Robinson. Attached hereto as Exhibit F is a verbatim copy of the Statement of Facts (with record references based on the Court of Appeals' volume numbers) which was part of the government's brief on Britt's direct appeal. Its summary of the trial evidence reveals quite amply that the government pursued the exact same theories on leadership and on degree of culpability in both the Robinson trial and the Britt trial, arguing consistently that Robinson was the leader and Britt was his occasional recruit, sometimes a bodyguard

---

[34] Robinson was tried in March, 2002. Britt was tried in November, 2002.

**Response to 28 U.S.C. § 2255 motion -- Page 78**

and sometimes a hired killer – never an instigator.  Robinson's bald allegation to the contrary is nothing more than an attempt to trump up a due process claim where none exists.

**6.      The claim that the prosecution knowingly presented false evidence regarding the penalty aggravation factor of future dangerousness is procedurally barred, and also fails on the merits.**

Robinson claims that the government knew, because of the FBI's interview of Louis Johnson, that the attack on Michael Williams arose because of the sale of bad drugs rather than because Robinson had ordered it.  He claims that the government did not disclose Johnson's version of events to him pretrial and that the existence of Johnson's version means the prosecutor presented false evidence to the jury.  Both claims are wrong.

First, the government had an open file discovery policy in this case.  All witness interview reports were available to defense counsel, including this one.  The claim of nondisclosure is fabricated.  For this reason, if there were two contradictory stories, counsel knew about it at the time of trial and appeal and never raised it.  Therefore, it is procedurally barred. *Massaro, supra.*

Second, it is not surprising that counsel did not raise such an issue because Johnson's story to FBI investigators was not as he now paints it in his declaration.  The FBI report of his interview is filed under seal as Exhibit L.  Johnson told Agent Farrell in December, 2001, that he learned Williams had been robbed by three young men on December 28, 2000.  Johnson said he believed Williams had sold them some bad drugs.

**Response to 28 U.S.C. § 2255 motion -- Page 79**

However, Johnson also told Agent Farrell that Williams had said he had a feeling he had been robbed because he had snitched on a group of guys from Texas, a story consistent with the one Williams told at trial.  Johnson admitted to Agent Farrell that he had falsely denied to local police being in the car with Williams that day.  It is quite clear from reading Johnson's interview report that if he had testified at sentencing consistent with his declaration, he would have been roundly impeached.[35]  Witnesses who change their stories are "viewed with extreme suspicion by the courts."  *United States v. Adi*, 759 F.2d 404, 408 (5th Cir. 1985); *May v. Collins*, 955 F.2d 299, 314 (5th Cir. 1992).  They are also discounted by juries, especially when their versions of events do not square with the remaining credible evidence.

Third, even if the FBI interview went as Johnson now claims it did, the mere fact that Johnson gave a story to investigators about why <u>he</u> thought the attack on Williams occurred that was different from Williams' sworn version does not make Johnson's version the truth, and does not make Williams' sworn version false.  Even less so does it establish that the prosecution <u>knew</u> Williams' version was false.  The government had the testimony of Nathan Henderson (among other evidence)[36] to corroborate Williams' version, and nothing of what Robinson now presents to cast doubt on it is worth a hill of beans.  (*See* Issue 2.d., above.)

---

[35]  Johnson has a substantial criminal history of his own.  *See* Exhibit M, filed under seal.

[36]  An FBI interview report of Louis Johnson's sister, Ann Marie, is filed under seal as Exhibit N. It establishes that the government had corroboration of Williams' story that he was a victim of retaliation for being a snitch.

**Response to 28 U.S.C. § 2255 motion -- Page 80**

In sum, while the government agrees with the legal proposition that its knowing presentation of false evidence would be a due process violation, that simply did not occur here. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. Haese*, 162 F.3d 359, 365 (5th Cir. 1998). Robinson has not met his burden of proving such a violation, and his claim must be rejected.

**7.    This Court is without jurisdiction to entertain Robinson's motion for a new trial**.

To the extent that Robinson moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, this Court is without jurisdiction to entertain it. Rule 33 provides that a motion for new trial based on any ground other than newly discovered evidence must be filed within seven days of the verdict of guilty, otherwise, the district court is without authority to act. *See* FED. R. CRIM. P. 33; *United States v. Cook*, 670 F.2d 46, 48 (5th Cir. 1982); *United States v. Granza*, 427 F.2d 184, 186 (5th Cir. 1970); *Herrera v. Collins*, 506 U.S. 390, 409 (1993) (Rule 33 time limits are strictly construed).

Under the case law of this Circuit, a new trial motion cannot be based on the "newly discovered evidence" of ineffective assistance of trial counsel. *United States v. Medina*, 118 F.3d 371, 372 (5th Cir. 1997); *United States v. Ugalde*, 861 F.2d 802, 807-809 (5th Cir. 1988). It is irrelevant whether the defendant's evidence of ineffective assistance was known or unknown to him at the time of trial – in neither case do the facts constitute new evidence for purposes of Rule 33. In light of this case law, none of Robinson's allegations raises the specter of newly discovered evidence.

**Response to 28 U.S.C. § 2255 motion -- Page 81**

## Conclusion

Because there are factual disputes raised by the pleadings on the ineffectiveness issue, and because this is a death penalty case, the Court should probably schedule a limited evidentiary hearing.  Upon the conclusion of the hearing, the Court should deny the motion for collateral relief in its entirety, and should also deny any request for a certificate of appealability.

Respectfully submitted,

RICHARD B. ROPER
United States Attorney


/s/ Susan Cowger
SUSAN COWGER
Assistant United States Attorney
Texas State Bar No. 08390150
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone:    214.659.8622
Facsimile:    214.767.2846
E-mail:        susan.cowger@usdoj.gov
Attorneys for Respondent

**Response to 28 U.S.C. § 2255 motion -- Page 82**

**CERTIFICATE OF SERVICE**

I certify that I filed this response electronically on April 28, 2006 using the court's

electronic case filing (ECF) system.  The ECF system sent a "Notice of Electronic Filing"

to the following attorney of record who has consented in writing to accept this Notice as

service of this document by electronic means:

Michael B. Charlton
P.O. Box 1964
El Prado, New Mexico, 87529

A copy was sent by mail on April 28, 2006 to:

Sean Kennedy
Assistant Federal Public Defender
321 E. 2nd Street
Los Angeles, California, 90012

 /s/ Susan Cowger
SUSAN COWGER
Assistant United States Attorney

**Response to 28 U.S.C. § 2255 motion -- Page 83**