IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON, | § | |
| aka Face, aka Scar, aka Scarface | § | |
| Defendant-Petitioner, | § | |
| | § | |
| v.                          . | § | NO.  4:00-CR-260-Y |
| | § | (Civil No. 4:05-CV-756-Y) |
| | § | **DEATH PENALTY CASE** |
| UNITED STATES OF AMERICA, | § | |
| Plaintiff-Respondent. | § | |

## AFFIDAVIT OF WESSLEY T. BALL

I am in all respects competent to make this affidavit.

I, along with Jack Strickland, represented Julius Omar Robinson in this case, before and during trial, through the direct appeal, and through the filing and rejection of a petition for certiorari in the U.S. Supreme Court. I was appointed by this Court on or about July 12, 2001, and I was permitted to withdraw from the representation in about December, 2004, after certiorari had been denied.

I was licensed as a lawyer in Texas in 1980. I am admitted to practice in the State of Texas, the United States District Court for the Northern District of Texas, the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court. I graduated from the Texas Tech University School of Law in 1980. I was employed as a prosecutor for the Tarrant County District Attorney's Office from 1980 to 1987 when I entered private practice. My last position with the Tarrant County District Attorney's Office was in a supervisory capacity.

**AFFIDAVIT OF WES BALL – Page 1**

GOVERNMENT EXHIBIT A

I have been a named partner in the firm Ball & Hase, P.C. (formerly Ball, Hase & Wisch) since 1987. My practice is limited to the defense of criminal cases in both state and federal courts, trial and appellate. I became a Board Certified Specialist in Criminal Law in 1985 and have remained so certified to the present (renewable every 5 years).

I am a former board member of the Texas Criminal Defense Lawyers Association and a past President of the Tarrant County Criminal Defense Lawyers Association (TCCDLA). I received the first "Roland Hill" award from my colleagues in TCCDLA for exceptional achievement in criminal defense in 2004. This award was started due to my successes in criminal trial work. It has been awarded subsequently to only one other attorney in my county. I have never had any meritorious grievances filed against me, nor have I been disciplined by any court

I have tried approximately 200 cases to a conclusion before a jury. All of these were criminal cases and this includes both state and federal matters. I have handled approximately 80 appellate matters in both state and federal courts. I have tried at least 8 cases in which the death penalty was sought. One of those cases was in my position as an Assistant District Attorney for Tarrant County, Texas.

Julius Robinson has made several claims regarding Mr. Strickland's and my representation of him, all of which lack merit.

First, Robinson claims we did not use the services of a skilled investigator. This is false. Our investigator was David Bruce Cummings of Fort Worth. I have known Mr. Cummings since at least the early 1990s. I likely met Mr. Cummings through his wife, the Honorable Jamie Cummings, presiding judge of County Criminal Court Number 5, of

**AFFIDAVIT OF WES BALL – Page 2**

Tarrant County, Texas. I have made use of his investigative services in at least 20, maybe as many as 50, cases that have gone to a jury trial. I have used Mr. Cummings' services in cases where I was appointed as counsel, as well as cases where I was retained by the client. I have used Mr. Cummings' services in well over 100 cases that did not ultimately proceed to trial. Mr. Cummings has worked with me on at least 5 murder trials in which the death penalty was sought. I have found Mr. Cummings' work to be first rate. His services are available to attorneys in our area and he is used by many attorneys with excellent reputations. I have used other experienced investigators in criminal cases over the years, but I have almost always selected Mr. Cummings when I have had a choice.

Due to our longstanding professional relationship, I have become accustomed to the manner in which Mr. Cummings conducts his investigative activities and I am confident he has become accustomed to how I conduct the defense of criminal cases. It has been quite common for me to provide Mr. Cummings with oral, not written, instructions regarding investigative activities that I believe need to be accomplished or attempted. It is also common for Mr. Cummings to provide me with a mix of oral and written reports concerning his work, and the results of my investigative requests. It is typical that these investigative instructions that I provide to Mr. Cummings will include copies of either a complete set or a portion of discovery materials, *e.g.,* government investigative reports, witness statements, etc., as I deem necessary. It is also typical that strategy meetings are held when instructions are provided to Mr. Cummings. Mr. Cummings will also provide his recommendations and suggestions from time to time in a given case. In our work on the Julius Robinson case, these typical procedures were

**AFFIDAVIT OF WES BALL – Page 3**

utilized. Accordingly, in some instances there may be written documentation of an investigative activity, and in other instances the reports and instructions were purely oral.

Mr. Robinson claims that Mr. Cummings had a criminal record. This claim is not true. Mr. Cummings has the same exact name and date of birth as an individual that apparently resides in California. It is my understanding that this individual served one or more prison sentences in California. This issue arose when Mr. Cummings sought entry to the federal correctional facility where Mr. Robinson was being housed prior to his trial. Mr. Cummings had gone to that facility pursuant to his investigative responsibilities. A cursory record check by the staff at that facility discovered the criminal record of the California individual with the same name. A few telephone calls resolved the problem, permitting Mr. Cummings to proceed with his work.[1]

Mr. Cummings interviewed witnesses and potential witnesses in this case, met with Mr. Robinson, and followed our instructions. At times, I was in the company of Mr. Cummings when witnesses were interviewed, at other times he would report to me (typically orally) the results of his interviews or attempts to interview. We had considered whether to travel, or have Mr. Cummings travel, to Arkansas. We were able to conduct the interviews and obtain the information that we believed to be reasonably necessary through communications by telephone. Had we believed it necessary to travel to Arkansas or anywhere else, we would have done so. Mr. Cummings arranged for some

---

[1] I have to say that during a telephone interview with investigators working on Mr. Robinson's § 2255 application, while Mr. Cummings and I were on the line, no one bothered to ask Mr. Cummings about this claim. Had they done so, it could have quickly been explained.

**AFFIDAVIT OF WES BALL – Page 4**

witness interviews that were conducted at places of confinement. Permissions had to be obtained from these witnesses' legal counsel before we could ethically meet with them. In some instances we were not able to secure the approval of legal counsel for the witnesses and accordingly the interviews were not conducted.

Mr. Robinson alleges, correctly, that we did not use the services of a so-called "mitigation specialist." My reasons for this choice are several. At the time of Mr. Robinson's trial, the use of mitigation specialists was in my professional opinion not as common as it is today. My view of mitigation specialists is that they are another form of investigator, doing investigative work that had traditionally been done by ordinary investigators and the attorneys themselves. Since Mr. Robinson's trial, I have used mitigation specialists in capital cases and am still of the opinion that this investigative work can be done by others. I can say without reservation that I have done effective mitigation investigation in many cases without the use of such a titled specialist. An example would be where I have identified a mental health issue in a case. I would simply in that instance employ mental health professionals to examine and report to me their findings in that regard. The current proliferation of the use of "mitigation specialists" is in some instances simply a response to the fear of "ineffective assistance" claims on the premise that the mere failure to employ one is on its face ineffective. I disagree with this view.

Mr. Robinson alleges that we did not adequately represent him with respect to presenting mitigation evidence, and defending against aggravation evidence. I disagree.

**AFFIDAVIT OF WES BALL – Page 5**

On the subject of mitigation generally, it was fairly clear to me that Mr. Robinson's mother had neglected him and provided a poor example for him. Also, based on what was told to me by family members of Mr. Robinson and Mr. Robinson himself, I believed that his upbringing by his grandparents was for the most part functional. I was of the opinion that Mr. Robinson's grandparents were poor in terms of money and things of material value, but they provided a decent home for him. It was after Mr. Robinson came to Arlington, Texas that things largely started to go awry.

We had some evidence of Mr. Robinson having a connection to a criminal street gang in Arkansas. However, it has been my experience that gang evidence is almost always detrimental to a defendant as jurors are very frightened of gangs. Accordingly, we did not go into any gang type evidence, the effects of gangs on young people, etc. in the defense of Mr. Robinson. It was and remains my opinion that the better strategy was to depict Mr. Robinson's upbringing in Arkansas as largely positive and concentrate on the changes that began to occur when he was living with his drug-abusing mother in Arlington.

I spoke with Mr. Robinson's mother on at least two occasions before she traveled to Texas.[2] Prior to Mr. Robinson's mother's testimony, I attempted to convince her not to minimize her dysfunction. Mr. Strickland and I even made arrangements with the U.S. Marshal's Service for Mr. Robinson to meet privately with his mother so she could

---

[2] I do not recall whether Mr. Cummings interviewed Mr. Robinson's mother independently from me on any other occasions. Mr. Cummings may have been instrumental in making the travel arrangements for her.

**AFFIDAVIT OF WES BALL – Page 6**

understand the seriousness of his plight. Unfortunately, Mr. Robinson's mother in my opinion was not willing to portray herself in a light that was too negative.

I also conducted the interviews of other relatives, including John Hollimon who testified at the trial. I have some notes that indicate I interviewed other relatives and acquaintances by telephone. Those witnesses were not called to testify because in my judgment they would not have aided the defense case, at least to the extent and degree that would have merited calling them as witnesses. There were witnesses that might have provided some information useful at punishment, but they were involved in the conspiracy at issue in our case and we decided that what potential benefit they would offer was offset by their involvement in the criminal enterprise.

Mr. Cummings was instructed to interview coaches and personnel at Lamar High School regarding their knowledge of Mr. Robinson while he was a student at Lamar. Mr. Cummings reported back to me the nature of those interviews and the results. I do not independently recall whether I spoke with any of the Lamar witnesses by telephone, but think I did follow up on Mr. Cummings' information. I believe there were more of those types of witnesses interviewed than were actually used. I also know that these witnesses were summoned to the courthouse and I spoke with each of them, out of the presence and hearing of the others at the courthouse, before they were presented to the jury. I noticed in their affidavits that they do not recall that occurring, but I have never in my legal career presented any witness before personally reviewing their testimony with them. There are times when those reviews are brief, but they always occur.

AFFIDAVIT OF WES BALL – Page 7

I also know that we had a variety of records to review. Many of those records were obtained in discovery requests from the government, and others were obtained outside of the government's participation. I remember reviewing school records and criminal records on Mr. Robinson, as well as records from prison and from the computer school Mr. Robinson attended.

In addition to the work that we asked of Mr. Cummings, Mr. Strickland and I made conscious and strategic choices about the conduct of the penalty phase of the case. With regard to Mr. Robinson's mental/emotional condition, it was my professional opinion that Mr. Robinson did not suffer from any such condition to an extent and degree that would be considered mitigating by any jury that was likely to hear his case. While Mr. Robinson's current lawyers try to make the case that we should have investigated exposure to pesticides, we did not see any indication for doing such a thing. Mr. Robinson in my opinion is intelligent. He possessed a sophisticated understanding of his legal plight and circumstances, and never declined to provide information in response to our requests about either his life, or the allegations against him.

Moreover, my experienced opinion is that a jury would find a defensive tactic based on pesticide exposure either laughable or offensive, from the perspective that if exposure to pesticides would cause a child to grow into a murderer, then the entire town should have turned out the same way. The same holds true for a defense based on poverty or less than excellent performance in school. And while I do not profess to be a mental health professional, I have extensive experience with clients who have presented a variety of forms of mental health issues and concerns. I have used mental health

**AFFIDAVIT OF WES BALL – Page 8**

professionals where I believed they were warranted. Additionally, we had in place documentation from the government's own staff psychologist, Dr. Womack, characterizing the defendant as a low risk for harm to others in the future. It was my opinion that Dr. Womack's conclusion would carry a good deal of weight since he was working for the Federal Bureau of Prisons, and that using a defense specialist who had analyzed Mr. Robinson would be counterproductive.

Part of my concern in that regard was that an expert who met and interviewed Mr. Robinson would draw unfavorable conclusions. Mr. Robinson made the comment to me during a visit at his place of confinement that if he had everything to do over again, he would choose white collar crime instead of narcotics because the consequences would be less punitive and the earnings would be better. It was my opinion based on this comment and on my experience that a mental health professional would likely deem Mr. Robinson to be a sociopath. A sociopathic personality would not in my opinion be a useful mitigating circumstance and would correctly be considered aggravating. Mr. Strickland and I discussed this view and we were in agreement on this point and our opinions regarding Mr. Robinson were the same.

With regard to Dr. Mark Cunningham, as I recall, Mr. Strickland worked primarily with this expert witness. I had attended a portion of a state death penalty trial where Dr. Cunningham testified for five (5) hours concerning risk assessment and his actuarial method, among other testimony that he provided in that case. It was my professional opinion that Dr. Cunningham's effectiveness was damaged due to the length of his testimony, the number of slides in his presentation, and the broad nature of the topics he

**AFFIDAVIT OF WES BALL – Page 9**

covered. The defendant in that state prosecution was sentenced to death. It was my opinion that while Dr. Cunningham had information that was useful, it was much too long and would put a jury to sleep. When we decided to use him as a witness in Robinson's case, it was my opinion that his presentation needed to be cut down in length, the numbers of slides reduced and the testimony narrowed to the probability of a defendant in our client's situation engaging in an act of violence against another. I believed that portion of his presentation was potentially effective. We chose not to have Dr. Cunningham actually examine or interview Mr. Robinson as the cross-examination material that would be exposed would be more likely damaging to our position.

Clearly one of the mitigation avenues we wanted to use was to demonstrate to the jury the relatively exemplary behavior Mr. Robinson exhibited at his place of confinement. I personally spoke to at least one correctional officer at the prison during one of my visits with Mr. Robinson. I came to understand that Mr. Robinson was generally well-liked and that the opinions of the rank and file correctional officers were positive. It is my professional opinion that this type of evidence can be extremely significant to a jury. We devoted considerable efforts to identify and interview these correctional officers. Since they were employees of the Federal Bureau of Prisons, we had to interview the officers through the approval of legal counsel of the Bureau. After jumping through those hoops, we met with the officers that we had identified individually and, as the trial record reflects, called several of the correctional officers and a supervisor. We also submitted records from the prison showing essentially no disciplinary problems with Mr. Robinson.

**AFFIDAVIT OF WES BALL – Page 10**

As for the claim that we were ineffective regarding the government's theory that Mr. Robinson had ordered a "hit" on Michael Williams, aka "One Love," it is my opinion that the claim does not have merit. We reviewed the events involving One Love including the intercepted recording of Mr. Robinson's calls from jail. I also believe that either Mr. Cummings or I spoke to a police official in Arkansas concerning this event and Mr. Robinson. I do not find where I made any notes concerning that contact. I do not recall if we attempted to interview the purported assailants on Mr. Williams. I have read their declarations submitted with Mr. Robinson's application and they appear to be inconsistent with one another, but I do not believe we ever spoke with them.

It was my opinion that the telephone calls from prison were not persuasive government evidence. It did not appear to us that Mr. Robinson was ordering a killing or "hit" on One Love, but only that he was being told what had happened. In reviewing files that I turned over to Mr. Robinson's current attorneys and have since been returned to me, I found a handwritten note that I made to that effect, adding that although the government was recording all of Mr. Robinson's calls, there was no call where he ordered or instructed anyone to do anything to One Love. Mr. Strickland and I discussed the potential impact of the "One Love" testimony and we felt as a matter of strategy that since the government's "hit" theory was relatively weak, a decision not to focus time and attention on that evidence would be better than a fight that would likely give it more credence. I was also of the opinion that the evidence tying Mr. Robinson to any conspiracy with the three assailants on Mr. Williams was not very reliable and that

**AFFIDAVIT OF WES BALL – Page 11**

therefore, the trial court would be justified in excluding their statements as hearsay, or merely unreliable. However, the trial court overruled our objections on this point.

It is my opinion that the death penalty verdict was due largely to the proof of three homicides that each had characteristics of brutality, recklessness, and premeditation. I am of the opinion that premeditation is perceived by capital jurors as particularly reprehensible. At least with regard to the victims Shelton and Reyes, the killings were conducted with assault rifles and the victims were sought out, in the case of Mr. Shelton by a vehicle with Mr. Robinson firing an AK-47 out of the window as they flew down the freeway attempting to kill Mr. Shelton without regard to the other motorists. When I went into this case and began to review all of the evidence, I believed that if the government could prove direct participation in at least the two murders and some participation in the events leading to the Resendez murder, saving Mr. Robinson's life would be likely an impossible task. I personally liked Mr. Robinson and found him to be a pleasant individual, which motivated me to do the best I could to save his life. Unfortunately, the facts of the crimes were too horrific and we were unsuccessful.

Finally, Mr. Robinson alleges that Mr. Strickland and I were deficient in our treatment of the jury selection process, both at trial and on appeal. Again, I disagree. I have interviewed thousands of jurors over my career. I have a general idea what I am looking for and what I want to avoid. In a case that was going to have evidence of the brutality that this case would involve, the jury composition can make the difference between life and death. We enlisted a jury service that does considerable work in civil cases in determining not only what type of jurors to look for, but what evidence seemed

**AFFIDAVIT OF WES BALL – Page 12**

to matter to jurors in making decisions. We had feedback from what was essentially a mock jury presented with a scaled-down version of the facts likely to be presented in our case, and we incorporated it into our strategy. It was our strategy to conduct jury selection with the primary goal being to attempt to seat twelve (12) jurors who would ultimately vote in a way that would spare Mr. Robinson's life. This strategy is not always consistent with what are "legal" strategies, e.g., running out of all of your peremptories to protect the appellate record regarding erroneous rulings of the court. Also, in this case, victim Shelton was a member of the black race which in my view mandates against any assumptions that black jurors are necessarily good defense jurors.

It is also my practice to confer with my client regarding whether we want to strike or keep a particular juror. We conducted jury selection in this case in that manner. We consulted with Mr. Robinson, providing our insight and opinions, and considered his views. Upon review of the boxes of files provided to Mr. Robinson's current counsel, I have found a jury list that appears to be one Mr. Robinson used in court during his trial and upon which he made notes regarding jurors. I compared each time he wrote "strike" or "we got to strike" with my copy of our defense strike list. It appears that on each occasion where Mr. Robinson indicated "we got to strike," that is exactly what we did. In one instance Mr. Robinson wrote next to the juror's name "ByeBye." A review of my copy of our strike list shows that we caused that juror to go "ByeBye."

Speaking more specifically with regard to two jurors who were members of the black race, Mr. Strickland and I are very familiar with the *Batson* case and its principles. We endeavored to identify any *Batson* issues that occurred. One prospective juror that

AFFIDAVIT OF WES BALL -- Page 13

was a member of the black race that was struck by the Government was juror #36, Dorothy DeBose. I believe we objected to the government's strike on Ms. DeBose based on *Batson* which prompted the government to provide a race-neutral explanation. Assistant United States Attorney Fred Schattman explained that he seemed to recall that the juror's husband had somehow been involved in a criminal narcotics investigation that Mr. Schattman had worked on. As a matter of fact, Mr. DeBose was the target and subject of a serious federal narcotics investigation in the Northern District of Texas involving a drug king-pin, Billy Ray Maddox. Late one evening Mr. DeBose received a federal grand jury subpoena to appear the following morning to testify. Mr. DeBose hired me as legal counsel to represent him in the matter. In the course of the representation, I talked to his wife, the juror under consideration. Mr. DeBose was not indicted in the matter, but his parole for possession with intent to deliver was revoked. I represented Mr. Debose in the parole matter. I believed then, and I believe now, that Mr. Schattman's explanation was correct and that Ms. DeBose was being stricken as a juror for proper reasons.

A second juror at issue was #18, Ms. Charline Boulet. Ms. Boulet was a member of the black race. It would appear that Ms. Boulet was struck by both the government *and* the defense. I cannot independently recall what the specific reason was that caused us to strike this juror, but it would have been consistent with the strategy I have referred to previously. We would not have struck Ms. Boulet had we been of the opinion that she would be a good defense juror. Sometimes the exercise of peremptory challenges can hinge, not only on the content of the juror's answers, but also their demeanor and other

**AFFIDAVIT OF WES BALL – Page 14**

considerations not apparent from a cold reading of the trial record. It also would have been after conferring with Mr. Robinson. Since we struck this juror, I am not aware that we could make a valid *Batson* claim on her. Our decision to eliminate Ms. Boulet was made based on her merits, irrespective of whether she would have made good *Batson* fodder.

I have known both trial prosecutors for the government for a number of years: Mr. Schattman in the neighborhood of 25 years. It is and always has been my opinion that Mr. Schattman is not a prosecutor who uses race as a criterion to strike jurors. I have known Mr. O'Connor for a period of time and have the same opinion of him. I have experienced prosecutors who unfortunately do make juror strikes based on race. I do not believe either of the prosecutors in Mr. Robinson's trial engaged in that behavior in his trial, nor have I seen or heard of them doing it in any other criminal trial.

Finally, Mr. Robinson contends that there was a breakdown in the attorney-client relationship during the appeal process. I would agree that Mr. Robinson's tone with Mr. Strickland and me turned during his direct appeal. It was my view that Mr. Robinson wanted us to raise claims that we felt professionally did not have merit. It is my opinion that as an appellate attorney, I should not raise claims that I do not believe have legal merit. We believed that we did have one extremely meritorious claim involving the failure to aver the aggravating factors in the indictment following the logic of *Ring v. Arizona*. Unfortunately, we were not successful on that issue. I believe we presented the issues on direct appeal that had legal merit as was our responsibility. Whether Mr.

**AFFIDAVIT OF WES BALL – Page 15**

Robinson got along with Mr. Strickland and me during his appeal process was not a professional requirement as I understand it.

In summary, I do not believe that I provided deficient representation to Mr. Robinson, nor that anything I did or omitted to do would have made for a different penalty if it had been handled differently. I am prepared to testify at any evidentiary hearing the Court may schedule on the matter.

_____
WES BALL

SUBSCRIBED AND SWORN TO before me, the undersigned Notary Public, on April 20 , 2006.

ERMALINDA A. DAVIS
MY COMMISSION EXPIRES
December 22, 2006

**AFFIDAVIT OF WES BALL – Page 16**