IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON,<br>   aka Face, aka Scar, aka Scarface<br>   Defendant-Petitioner,<br><br>v.<br><br><br>UNITED STATES OF AMERICA,<br>   Plaintiff-Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 4:00-CR-260-Y<br>     (Civil No. 4:05-CV-756-Y)<br>**DEATH PENALTY CASE** |

## AFFIDAVIT OF JACK V. STRICKLAND

My name is Jack V. Strickland. I am the same Jack V. Strickland who was appointed by

Judge Terry Means, United States District Judge for the Northern District of Texas, Fort Worth

Division, to represent Julius Omar Robinson ("Robinson") before and during his trial, through his

direct appeal to the Fifth Circuit Court of Appeals, and through the filing of his petition for writ of

*certiorari* to the United States Supreme Court.

I have been licensed as an attorney by the Supreme Court of Texas since September, 1971.

My license is in good standing. I am also admitted to practice in the United States District Courts

of the Northern, Eastern, and Southern Districts of Texas, the Fifth Circuit Court of Appeals, and the

United States Supreme Court. I have been certified as a specialist in criminal law from 1977 to the

present, and have been a member of the Texas Board of Law Examiners since 1997. I have served

as chair of that Board since 2003. I have been continuously listed in *Best Lawyers in America* since

1995. I have never had a meritorious grievance filed against me, have never been disciplined by any

court, and have never been found to have rendered ineffective assistance of counsel.

I have tried approximately 400 felony jury trials during my career, including sixteen death



GOVERNMENT
EXHIBIT
B

penalty cases, five for the State and eleven as defense counsel.

At the outset and before responding to the complaints raised by Robinson in his writ application, I wish to emphasize that I do so only to the extent that I reasonably believe necessary in order to respond to Robinson's allegations concerning the representation rendered by my co-counsel Wes Ball and me. R. 1.05, *Texas Disciplinary Rules of Professional Conduct* (TDRPC). Absent a need to do so, I have not, and will not, reveal either privileged or unprivileged confidential information regarding Robinson.

Robinson has made several claims regarding the representation rendered him by Mr. Ball and me. Mr. Ball, who was lead counsel in this case, has responded to those claims in some detail in his affidavit. I have reviewed Mr. Ball's affidavit carefully and discussed both the claims and his responses with him. Like Mr. Ball, I dispute all of Robinson's claims with the single exception that there arose a break-down in the attorney-client relationship during the appeal of his case. For the sake of brevity, I concur with the facts and conclusions as stated by Mr. Ball and incorporate them into this affidavit without the necessity of restating them. However, notwithstanding my intention to be brief, I do wish to elaborate on several issues.

Let me turn first to Robinson's criticism of the manner in which we presented the testimony of Mark Cunningham, a forensic psychologist called in behalf of the defense. Dr. Cunningham was an expert witness retained for the purpose of offering mitigation/risk assessment testimony at Robinson's trial. I was primarily responsible for preparing and presenting Dr. Cunningham to the jury. Prior to the Robinson case, I had used Dr. Cunningham as an expert witness in several cases, including death penalty litigation. In addition, I had watched Dr. Cunningham testify in other cases, been on at least one CLE program with him, and spoken to other defense lawyers, prosecutors,

judges, and mental health professionals about him. Perhaps most importantly, I had interviewed jurors who had served in cases in which Dr. Cunningham had testified, a permissible practice in State court. At the risk of being rude, the consensus was, and is, that Dr. Cunningham is long-winded, pedantic, and frequently viewed as being arrogant. He is perceived as being often argumentative, and talking down to both lawyers and jurors. I do not mean to imply by these rather blunt observations that he is not knowledgeable or conscientious; I think he is both. But it is a fact that Dr. Cunningham is a difficult witness to present effectively. My job was to elicit what I could from Dr. Cunningham, to keep the jurors awake, to not unduly test the patience of the trial court, and to not open any doors for the government. Prior to his testimony I, along with Mr. Ball, spent considerable time with Dr. Cunningham reviewing Robinson's background and the details of his criminal offenses. Dr. Cunningham's own bill to the court reflects almost 30 hours in conference and discussions with Wes Ball and me. My bill to the court reflects 16 long-distance telephone calls made on my office phone to Dr. Cunningham. That figure is not a true reflection however, as it does not include calls placed on my cell phone, my home phone, Mr. Ball's phone, or calls placed by Dr. Cunningham to me. We also reviewed some prior testimony given by Dr. Cunningham in other cases, as well as going over his written materials, slides, and his anticipated testimony. It was my decision to cut his presentation dramatically. I take responsibility for that decision and would do so again under the circumstances. Had I not done so, and simply allowed Dr. Cunningham to go on at will, it is conceivable that direct and cross-examination would have run on for many more hours, if not days. That is, of course, assuming that the court would have tolerated that approach, an assumption I deem unlikely.

It was also my decision that Dr. Cunningham not interview Robinson or conduct a mental

3

status examination of him. After investigating Robinson's background and the circumstances of these three homicides, it was Mr. Ball's and my concern that an examination of Robinson could well have led to the conclusion that he exhibits the classic symptoms of an antisocial personality disorder. In my view, Robinson unquestionably meets the diagnostic criteria for such a diagnosis. *See*, DSM, IV, 301.7. While experienced trial lawyers realize that such a diagnosis might in fact be fairly benign because it describes many, if not most, persons charged with a crime, a skilled prosecutor can nonetheless quickly transform such a benign diagnosis into an impressively ominous disorder. It is a simple task to emphasize the commonly misunderstood concept of the "psychopath" who is aggressive, disregards the safety or well-being of others, lacks remorse and fails to learn from his mistakes into a potent prosecutorial argument. I know; I have made that argument myself and seen good prosecutors do the same. The seriousness of such a diagnosis is aggravated when the defendant appears to be as intelligent and charming as Robinson was. A further issue arises when your expert examines the client. Doing so then allows the government's expert to likewise examine your client, in my experience usually not a helpful development. That is not to say that there are no situations in which a mental status examination may be imperative or at least tactically sound; there clearly are. But in my judgment this was not such a case.

A close reading of Dr. Cunningham's affidavit illustrates many of his traits which I have already noted. For example, Dr. Cunningham's affidavit demonstrates his inclination to second-guess every decision made by the lawyers in a case and to attempt to supersede their judgment with his own. I contend that it is well outside Dr. Cunningham's area of expertise to characterize our decision not to make an opening statement at punishment as "inexplicable" or to suggest that our use of the term "future dangerousness", rather than the term "probability of future acts of criminal violence" was

4

detrimental to Robinson. "Criminal violence" is in fact a broader term than "dangerousness," inasmuch as violence can be committed against both persons and property. Furthermore, not all violence is *per se* dangerous. Not to put too fine a point on this, but these examples illustrate Dr. Cunningham's rather inflated view of his own personal opinions.

In addition, Dr. Cunningham's affidavit consists in large part of boiler-plate data, not specifically developed in connection with this case. Having worked with Dr. Cunningham and having listened to his testimony in other cases, I can state with some certainty that this is "research" which Dr. Cunningham uses time and again to bolster his conclusions. The prosecutors in this case were well-prepared for Dr. Cunningham, having reviewed his testimony in other cases. It was my belief that they were poised to vigorously cross-examine Dr. Cunningham by in part demonstrating the predictability of his testimony.

I have examined many mental health professionals over the years, both on direct and cross-examination, for both the government and the defense. It is my view that the average juror regards such experts, whether psychiatrists, psychologists, or psychiatric social workers, with a great deal of skepticism. Jurors are attentive only to a point and they harbor a great deal of resentment against experts who appear to rationalize or trivialize horrific criminal behavior with what the juror may perceive as psycho-babble. While that may not be true in cases of demonstrable retardation, chronic psychosis, or mental defect caused by trauma, jurors are usually very skeptical of psychological testimony when a bright and ambitious defendant such as Robinson is on trial. I think it is worth noting that although Robinson did not take the stand, he nonetheless in effect testified throughout his trial. The government's evidence included playing hours of tape recordings of Robinson speaking intelligently, recounting facts, giving orders, often speaking in guarded language, and planning

criminal enterprises. In addition, the jury heard evidence from friends, prison guards, and former teachers about Robinson's outgoing personality, his strong work ethic, and his ability to conform to the rules of the federal prison in which he was held while awaiting trial. It would have been ludicrous to suggest to the jury to a greater extent than we did that Robinson's upbringing by a decent, well-intentioned grandmother in rural Arkansas rendered him unable to conform to legal and societal prohibitions against killing people. I do acknowledge however, that such a tactic might seem perfectly logical to lawyers or psychologists who have limited or no trial experience.

Robinson also complains that Mr. Ball and I failed to employ the services of a so-called "mitigation expert." That is superficially correct, inasmuch as no such "expert" was employed. However, I am unclear as to what such an expert can do that a skilled investigator and conscientious attorneys cannot do and in fact did in this case. "Mitigation experts" may simply be another in an ever-expanding group of cottage industry self-proclaimed "experts" who have sprung up and carved out a niche for themselves in criminal prosecutions in general, and death penalty litigation specifically. In any event, it is my view that such an expert would have been redundant, and therefore unnecessary in this case.

Robinson raises a claim that our decision not to travel to Dermott, Arkansas, was deficient. I was then, and am now, of the opinion that such a trip would have yielded nothing material that we did not otherwise know.

The testimony of "One Love" was almost laughably far-fetched and is a case in point. His testimony was inconsistent and the jury appeared to be less than impressed with his demeanor, as well as the substance of his testimony. The witness recounted his own criminal history in some detail. Mr. Ball and I decided that by far the better approach was to minimize "One Love's" testimony. That was

6

a judgment call, based on the state of all of the evidence heard by the jury up to that point, the witness' lack of credibility, and the lack of what appeared to be any clear directives from Robinson that he had ordered or even wished a "hit" on "One Love."

It is rank speculation to suggest that it was this testimony that resulted in two death penalties for Robinson. In my professional judgment, what most disturbed the jurors and ultimately sealed Robinson's fate was the premeditated nature of these murders, coupled with the fact that they appeared to stem from cold-blooded decisions made by Robinson to further and enhance his interstate narcotics business.

Lastly, allow me to address the concern that there was a breakdown in the attorney-client relationship during the Robinson appeal. I agree that matters deteriorated following Robinson's conviction and sentencing. However, I dispute any contention that this breakdown was caused by any dereliction on the part of Mr. Ball or me. Robinson quickly turned from being a personable, congenial, cooperative client, fully involved in his defense, to an inmate who made unreasonable demands on us. Of course, anyone who has tried more than a handful of criminal cases recognizes this as an often predictable development. When a defendant is suddenly convicted, sentenced to death, and transferred to death row, the enormity of the matter becomes much more apparent. In spite of the growing tension between us, Mr. Ball and I were willing to discuss potential claims and issues with Robinson, although he increasingly demanded that we raise what we considered to be unmeritorious claims in his appeal. When we attempted to discuss those demands, he was resistant, continuing to insist that we raise claims that in our view lacked factual and/or legal merit. Robinson also demanded that we either copy the trial record or petition the court for a copy of the record. I would not do the former without the permission of the court reporter. When I petitioned the Fifth

7

Circuit to order the latter, the court declined to do so. Mr. Ball and I eventually obtained permission from the court reporter to copy the reporter's record and Robinson was provided a copy. However, if Robinson in fact suffers from the mental impairments now claimed by writ counsel, I am puzzled by the value of providing him the record.

Suffice it to say that Mr. Ball and I share the opinion that a lawyer has a professional obligation not to simply channel the thoughts, wishes, and strategies of a client. That is true regardless of the client's intelligence, education, and sophistication. I have represented lawyers in the past and I harbor the same opinion regarding my professional obligations to them and to the court.

In conclusion, I do not agree that Mr. Ball or I rendered deficient or ineffective representation to Robinson. Mr. Ball is an extremely conscientious, competent, and ethical lawyer. We are both experienced and skilled in all aspects of criminal defense, from pre-trial through appeal. In addition, I must say that I greatly resent lawyers with limited or no trial experience casually slandering the efforts and reputations of lawyers who labor in the trenches, doggedly defending extremely difficult and unpleasant cases against often overwhelming evidence. Although it has become an all-too common tactic to do so during the writ process, it is an abusive practice which often achieves little good for applicants, while imposing considerable harm on the legal process.

JACK V. STRICKLAND
State Bar No. 19397000

8

THE STATE OF TEXAS                              §

COUNTY OF TARRANT                               §

BEFORE ME, the undersigned authority, on the 26th day of April, 2006, personally appeared

JACK V. STRICKLAND, who, after being duly sworn, stated that the allegations contained in the

foregoing affidavit are true and correct.



DEBORAH K. FITZPATRICK
MY COMMISSION EXPIRES
August 19, 2009

NOTARY PUBLIC, STATE OF TEXAS

9