IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| JULIUS OMAR ROBINSON,<br>    aka Face, aka Scar, aka Scarface<br>        Defendant-Petitioner,<br><br>v.<br><br><br>UNITED STATES OF AMERICA,<br>        Plaintiff-Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO.  4:00-CR-260-Y<br>(Civil No. 4:05-CV-756-Y)<br>**DEATH PENALTY CASE** |

## AFFIDAVIT OF FRED SCHATTMAN

I am an Assistant United States Attorney for the Northern District of Texas and

have been so employed since December 2, 1985.  I was one of the lawyers in charge of

the prosecution of the case of *United States of America vs. Julius Omar Robinson, No.*

*4:00-CR-0260-Y (02)*, in the United States District Court for the Northern District of

Texas.  I make this affidavit with regard to certain challenges made to my actions in

exercising the Government's peremptory challenges in the trial of that case.


### *Charline Boulet*

I exercised a peremptory strike against prospective juror Charline Boulet for three

principal reasons.  First, both her questionnaire and her answers and demeanor at voir dire

showed that she very much wanted to serve on the jury.  Such an attitude is unusual and

many times indicates that the prospective juror has some other agenda that is motivating

them.  Several factors made me suspect that this might be true of Ms. Boulet: her cousin

**Affidavit of Fred Schattman – Page 1**


GOVERNMENT
EXHIBIT
D

had been brutally murdered and the murderer had received a very lenient sentence, she professed to be a "liberal", and she expressed significant reservations about accomplice testimony. A juror with an agenda is a bad juror. Second, her expressed admiration for "Dr. Phil" of the Oprah Winfrey television show reflected, in my opinion, a lack of mature thought and judgment. Third, from her answers at voir dire we learned that her son frequented the CD shop - "That Sounds Good" - which I knew to be the place where Nathan Henderson, Julius Robinson, John Turner, and others gathered and was a front for the drug business they conducted. I knew that the government would be offering evidence to that effect during the trial and was unsure of what Ms. Boulet's reaction to such evidence might be. Her race played no part in my decision to exercise a strike against her.

### Dorothy Jean DeBose

I chose to exercise a peremptory challenge against prospective juror Dorothy Jean DeBose for a number of reasons - none of which involved any consideration of her race. From the jury questionnaire I noted that Ms. DeBose was married to Luster DeBose who had been convicted of a federal felony drug offense. At the time of the jury selection in the Robinson case, I recalled that his case had involved the distribution of drugs in the early 1980s and that fairly early on in my career with the United States Attorney's Office I had reviewed his case file and was aware that Luster DeBose had been involved with a large drug trafficking organization operating in southeast Fort Worth and was only one of

Affidavit of Fred Schattman – Page 2

a fairly large number of persons charged. My recollection was that DeBose had been involved in the sale and distribution of either cocaine or heroin. It was a D.E.A. case and either Tom Waddill or John Lunt - both of whom are now retired from D.E.A. - had been the case agent. At the time of the jury selection in the Robinson case, I could not remember the exact circumstances under which I had reviewed that file. Further Mrs. DeBose's questionnaire revealed that her brother had also been convicted of drug trafficking. I had only a vague recollection of having looked at that case, and did not then, nor do I now recall with any precision the facts other than the case involving several others and involving heroin or cocaine. However, the fact that Dorothy Jean DeBose was married to a person who had significant ties to a drug trafficking organization and had a brother who had similar ties gave me pause and was part of the reason that I chose to exercise a peremptory challenge against her.

Subsequent to the trial of the Robinson case, I have determined that I reviewed the DeBose file in connection with an investigation into the Billy Ray Maddox drug trafficking organization because we had determined that DeBose worked for Maddox and was subpoenaed to testify before a federal grand jury in 1988. At the time that he was subpoenaed, he was on federal parole following his conviction in No. 4:82-CR-006 for the offense of Distribution of Heroin. Maddox and some twenty other persons had been indicted and we were continuing the investigation through the Grand Jury. DeBose appeared at the Grand Jury with his counsel, Wes Ball. Mr. Ball advised that Mr. DeBose would be invoking his Fifth Amendment privilege to as to all questions - other than his

**Affidavit of Fred Schattman – Page 3**

name. DeBose came before the Grand Jury, was sworn, but did not invoke the privilege as to any question. DeBose was not charged in the Maddox investigation.

In addition to her marriage to Luster DeBose, there was an additional reason for striking Mrs. DeBose. From her questionnaire I had noticed that she had been employed at John Peter Smith Hospital. My sister-in-law had also been employed at John Peter Smith Hospital and I recalled hearing her talk about her dealings with Mrs. DeBose. Prior to the day that Mrs. DeBose appeared for individual voir dire, I called my brother - who had served as a state district judge for some 20 years - and asked him about Mrs. DeBose. My brother advised that Mrs. DeBose made snap judgments and would then disregard all evidence contrary to that snap judgment. He thought she would make a terrible juror in any kind of case, and certainly in a capital case. I never met or saw Mrs. DeBose prior to the Robinson trial and she would have no reason to know me. I knew that our case was complex and that the government would be relying on the testimony of several cooperating co-defendants and that their initial impression on a jury might not be too favorable. I did not think that I could afford having a person prone to snap judgments and unwilling to listen to contrary evidence as a juror in the Robinson case.

### *Marchesia Amarh*

I exercised one of the Government's peremptory challenges against prospective juror Marchesia Amarh because I did not think that she would be a strong juror for the Government in the case. Her answers to the questionnaire indicated very serious

**Affidavit of Fred Schattman – Page 4**

reservations about imposing the death penalty. The answers in court made me believe that she would vote to impose the death penalty "if it was her duty". I regarded the likelihood of her overcoming her stated hesitancy in imposing the death penalty as problematic. At the time that she was questioned, we were very close to completing jury selection - ten jurors had been selected. Furthermore, the Government had used thirteen of its allotted twenty strikes and the defense had used sixteen of twenty. If one side uses all of their strikes, the other is essentially in control of the composition of the remainder of the jury. Having reviewed the questionnaires of the upcoming prospective jurors I knew that there were "stronger" jurors coming up. I preferred to have one of those stronger jurors. By striking Ms. Amarh, I believed that it would put the government in a strategically superior position, since the defense would either have to accept the stronger jurors or exercise the remainder of their strikes and thus put the government "in charge" of the selection of the remainder of the jury. Ms. Amarh's race played no role whatsoever in my decision to exercise a peremptory challenge against her.

When responding to the *Batson* challenge made by the defense after exercising the peremptory challenge, I said that her views on the death penalty were the same as prospective juror Brenda Broadwell - a white female of the same approximate age. At the time that made that statement, I believed it to be true. Looking back at the questions and answers of the two, it is clear that my belief was incorrect. I do not recall now which juror questionnaire I was looking at when I questioned her about her views on the death penalty. While both expressed a desire to serve as jurors in answer to question 119 on the

Affidavit of Fred Schattman – Page 5

questionnaire, their views on the question of the death versus life without parole (question 52a) were different. In looking back at the notes that I made in preparation for voir dire I have noticed that I made a note that Ms. Broadwell's answer to question 52 was "No" and drew a box around it. When responding to the *Batson* challenge I may have glanced back at my notes on Ms. Broadwell and mistakenly concluded that her answer to question 52a was "No", although I cannot be sure of that. I do know that the government had previously exercised a peremptory challenge against a white female with reservations about the death penalty which were very similar to those of Ms. Amarh.

Date: **21 April 2006**

Fred Schattman
Affiant

Before me the undersigned authority personally appeared Fred Schattman who is known by me to be the person whose signature is subscribed above and who, being first duly sworn by me, states upon his oath that the statements made in this affidavit are true and correct.

LINDA G. COOK
MY COMMISSION EXPIRES
August 24, 2006

4/21/06

**Affidavit of Fred Schattman – Page 6**