# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

### FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON | : | **CAUSE NO. 4:00-CR-00260-2** |
| aka Face, aka Scar, aka Scarface, | : | **(Civil No. 4:05-CV-756-Y)** |
| Defendant/Petitioner, | : | |
| | : | |
| vs. | : | **DEATH PENALTY CASE** |
| | : | |
| UNITED STATES OF AMERICA | : | **Honorable Terry Means** |
| | : | **United States District Judge** |
| Plaintiff/Respondent. | : | |

---

## REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255

(Filed Electronically Under the Electronic Filing System Requirements)

---

MICHAEL B. CHARLTON
Assistant Federal Public Defender
Texas State Bar No. 04144800
411 E. Bonneville, Ste. 250
Las Vegas, NV  89101
Telephone: (702) 388-5106
Facsimile: (702) 388-5103
E-Mail:  mike_charlton@fd.org

SEAN K. KENNEDY
Acting Federal Public Defender
California State Bar No. 145632
E-Mail:  sean_kennedy@fd.org
CRAIG A. HARBAUGH
Deputy Federal Public Defender
California State Bar No. 194309
E-Mail:  craig_harbaugh@fd.org
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

**TABLE OF CONTENTS**

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

EVIDENTIARY HEARING STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.  PETITIONER HAS ESTABLISHED A *PRIMA FACIE* CASE THAT HE IS
    ENTITLED TO RELIEF BASED UPON THE CLAIM OF INEFFECTIVE
    ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE. . . . . . . . . . . . . . . . . 6

    A.  But for Trial Counsel's Deficient Performance, There Is a Reasonable
        Probability That At Least One Juror Would Have Held Out for Life . . . . . . . . . . 7

        1.  A Reasonable Investigation Would Have Allowed Defense
            Counsel To Undermine the Prosecution's Evidence Supporting
            Future Dangerousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            a.  The Prosecution's Allegation That Robinson Ordered a
                "Hit" Was False . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            b.  Robinson Associated With a Group of Adolescent Hoodlums
                Rather Than a Notorious Street Gang . . . . . . . . . . . . . . . . . . . . 19

            c.  Robinson Shot Into a Parked Truck Without Knowledge That
                Tucker Was Inside . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            d.  The Combined Effect of the Aggravating Evidence Introduced
                at the Penalty Phase Contributed Substantially to the Jury's
                Finding of Future Dangerousness . . . . . . . . . . . . . . . . . . . . . . . . 24

        2.  The Defense Penalty Phase Presentation Distorted and Omitted
            Significant Portions of Robinson's Life History That Could Have
            Engendered Sympathy With the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            a.  Robinson Suffered a Horrendous Infancy and Was Raised by
                Violent, Drug-Addicted and Drug-Dealing Parents . . . . . . . . . . . 28

            b.  The Jury Received No Evidence About Robinson's
                Difficult Childhood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Page**

c.    Robinson Spent the Remainder of His Childhood Neglected
by Disabled and Disconnected Grandparents  . . . . . . . . . . . . . . . 33

d.    The Cursory Presentation By Defense Counsel Regarding
Robinson's Care by his Grandparents Falsely Portrayed His
Chaotic Upbringing as "Stable" . . . . . . . . . . . . . . . . . . . . . . . . . . 36

e.    Robinson Struggled Throughout His Adolescence and Early
Adulthood To Support And Help his Drug-Addicted, Emotionally
Absent Mother  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

f.    The Defense Presentation at Trial Provided an Incomplete
and Inaccurate Snapshot of Robinson's Life in Arlington . . . . . . 39

3.    The Penalty Phase Was Devoid of Evidence Regarding Robinson's
Significant Mental Impairments Which Would Have Extenuated
His Crimes and Mitigated His Punishment  . . . . . . . . . . . . . . . . . . . . . . 43

4.    Due to Counsel's Ineffective Assistance, The Penalty Phase Was
Devoid of the Compelling Evidence of Robinson's Good Character
Notwithstanding His Difficult Upbringing  . . . . . . . . . . . . . . . . . . . . . . 50

5.    Balancing All Available Mitigating Evidence Against the Substantially
Diminished Aggravating Evidence, There Is a Reasonable Probability
that Robinson Would Have Averted the Death Penalty . . . . . . . . . . . . . . 53

B.    Trial Counsel Provided Deficient Performance By Failing to Conduct A
Reasonably Investigation As Defined by Supreme Court Authority . . . . . . . . . . 61

1.    The Prevailing Standards Dictated the Employment of A Mitigation
Specialist to Conduct a Thorough Mitigation Investigation  . . . . . . . . . . 62

2.    The Fifth Circuit Requires a Thorough Investigation into Both Mitigating
and Aggravating Circumstances  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

3.    Trial Counsel Failed to Discover All Reasonably Available Evidence
of Robinson's Background and Character . . . . . . . . . . . . . . . . . . . . . . . 66

4.    Trial Counsel Failed to Investigate the Aggravating Evidence Introduced
at the Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**Page**

a.  Trial Counsel Did Not Investigate the Williams/"One Love" Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

b.  Trial Counsel's Uninformed Decision to Ignore Certain Areas of Petitioner's Background Does Not Qualify as a Strategic Choice 72

c.  Trial Counsel's Investigation Amounted To Only a Fraction of the Total Time Spent on This Case and Was Substantially Less Than the Investigation Conducted by Robinson's Co-Defendant's Attorneys . . . . . . . . . . . . . . . . . . . . 76

6.  Robinson Must Be Afforded an Opportunity to Cross-Examine the Defense Team About their Declarations . . . . . . . . . . . . . . . . . . . . . . . . 78

II.   THE GOVERNMENT'S NEW EVIDENCE OF RACE-NEUTRAL REASONS REQUIRES AN EVIDENTIARY HEARING OF THE *BATSON* CLAIM. . . . . . . . . . . 81

III.  ROBINSON HAS MADE A *PRIMA FACIE* SHOWING OF DISCRIMINATORY APPLICATION OF THE FEDERAL DEATH PENALTY IN TEXAS . . . . . . . . . . . . . 84

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

## TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Alexander v. Quarterman*,
    2006 U.S. App. LEXIS 20012 (5th Cir. Aug. 4, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Anderson v. Johnson*,
    338 F.3d 382 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Banks v. Dretke*,
    540 U.S. 668, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004) . . . . . . . . . . . . . . . . . . . . . 17

*Batson v. Kentucky*,
    476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Bell v. Cone*,
    535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) . . . . . . . . . . . . . . . . . . . . . . 36

*Boyde v. California*,
    494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990) . . . . . . . . . . . . . . . . . . . . . . 50

*Bradshaw v. Stumpf*,
    545 U.S. 175, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005) . . . . . . . . . . . . . . . . . . . . . . 6

*Buckner v. Polk*,
    453 F.3d 195 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*California v. Brown*,
    479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) . . . . . . . . . . . . . . . . . . . . . . . 61

*Cole v. Dretke*,
    418 F.3d 494 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Coleman v. Thompson*,
    501 U.S. 722, 111 S. Ct. 2456, 115 L. Ed. 2d 640 (1991) . . . . . . . . . . . . . . . . . . . . . . 83

*Crawford v. United States*,
    212 U.S. 183, 29 S. Ct. 260, 53 L. Ed. 465 (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Dawson v. Delaware*,
    503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992) . . . . . . . . . . . . . . . . . . . . 19, 73

*Deck v. Missouri*,
    544 U.S. 622, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005) . . . . . . . . . . . . . . . . . . . . . 24, 61

*Dobbs v. Turpin*,
    142 F.3d 1383 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Eddings v. Oklahoma*,
    455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 60, 66

*Felder v. Johnson*,
    180 F.3d 206 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Florida v. Nixon*,
    543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) . . . . . . . . . . . . . . . . . . . . . 62, 76

*Foster v. Johnson*,
    293 F.3d 766 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Franklin v. Lynaugh*,
    487 U.S. 164, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988) . . . . . . . . . . . . . . . . . . . . . 50

*Friedman v. United States*,
    588 F.2d 1010 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Fuller v. Johnson*,
    114 F.3d 491 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gardner v. Florida*,
    430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977) . . . . . . . . . . . . . . . . . . . . . . . 5

*Guy v. Cockrell*,
    343 F.3d 348 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hedrick v. True*,
    443 F.3d 342 (4th Cir. 2006) *cert. denied*,
    2006 WL 1887211 (July 20, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 65

*House v. Bell*,
    ___ U.S. ___, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) . . . . . . . . . . . . . . . . . . . . . . . 15

*Jones v. United States*,
    527 U.S. 373, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999) . . . . . . . . . . . . . . . . . . . . . 55

*Jurek v. Texas*,
          428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kansas v. Marsh*,
          ___ U.S. ___, 126 S. Ct. 2516 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Kelly v. South Carolina*,
          534 U.S. 246, 122 S. Ct. 726, 151 L. Ed. 2d 670 (2002) . . . . . . . . . . . . . . . . . . . . . . 11, 26

*Knighton v. Maggio*,
          740 F.2d 1344 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Kyles v. Whitley*,
          514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Lewis v. Dretke*,
          355 F.3d 364 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 66

*Lockett v. Anderson*,
          230 F.3d  695 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Lockyer v. Andrade*,
          538 U.S. 63, 155 L. Ed. 2d 144, 123 S. Ct. 1166 (2003) . . . . . . . . . . . . . . . . . . . . . . . 54

*Loyd v. Whitley*,
          977 F.2d 149 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Martinez v. Dretke*,
          2006 WL 305666 (S.D. Tex. Feb. 7, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*McCleskey v. Kemp*,
          481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) . . . . . . . . . . . . . . . . . . . . . 86, 87

*McKoy v. North Carolina*,
          494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) . . . . . . . . . . . . . . . . . . . . . . 44

*Miller-El v. Cockrell*,
          537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) . . . . . . . . . . . . . . . . . . . . 87, 88

*Miller-El v. Dretke*,
          545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) . . . . . . . . . . . . . . . . . . . . . . 88

*Miller v. Dretke*,
     420 F.3d 356 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 66, 69

*Moore v. Johnson*,
     194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 70

*Murray v. Carrier*,
     477 U.S. 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 83

*Neal v. Puckett*,
     286 F.3d 230 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 50, 65, 76

*O'Neal v. Delo*,
     44 F.3d 655 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Penry v. Lynaugh*,
     492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) . . . . . . . . . . . . . . . . . . . . 26, 50

*Perez v. Dretke*,
     393 F. Supp. 2d 443 (N.D. Tex. 2005),
     app. denied, No. 05-70036 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Pippin v. Dretke*,
     434 F.3d 782 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Roberts v. Dretke*,
     356 F.3d 632 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 67

*Rompilla v. Beard*,
     545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) . . . . . . . . . . . . . . . . . . . passim

*Roper v. Simmons*,
     543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Simmons v. South Carolina*,
     512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994) . . . . . . . . . . . . . . . . . . . . . . . 26

*Skipper v. South Carolina*,
     476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Smith v. Dretke*,
     422 F.3d 269 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 66

*Smith v. Mullin*,
379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Sochor v. Florida*,
504 U.S. 527, 112 S. Ct. 2114, 119 L. Ed. 2d 326 (1992) . . . . . . . . . . . . . . . . . . . . . . . . 4

*Strickland v. Washington*,
466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) . . . . . . . . . . . . . . . . . . . . . passim

*Strickler v. Greene*,
527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Tennard v. Dretke*,
542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004) . . . . . . . . . . . . . . . . . . . . . 44, 50

*United States v. Abel*,
469 U.S. 45, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Agurs*,
427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Armstrong*,
517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) . . . . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Bagley*,
473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Bernard*,
299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Briggs*,
939 F.2d 222 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Dominguez Benitez*,
542 U.S. 74, 124 S. Ct. 2333, 159 L. Ed. 2d 157 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Drones*,
218 F.3d 496 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Frady*,
456 U.S. 152, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Hall*,
  2006 U.S. App. LEXIS 16826 (Jul. 5, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States v. Henderson*,
  100 Fed. App. 302, 303 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Irvin*,
  87 F.3d 860 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Martinez*,
  181 F.3d 627 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Webster*,
  162 F.3d 308 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 90

*Valdez v. Johnson*,
  93 F. Supp. 2d 769 (S.D. Tex. 1999), *rev'd on other grounds*,
  274 F.3d 941 (5th Cir. 2001), *cert. denied*, 537 U.S. 883 (2002) . . . . . . . . . . . . . . . . . . 71

*Vasquez v. Hillery*,
  474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wainwright v. Lockhart*,
  80 F.3d 1226 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*Waters v. Thomas*,
  46 F.3d 1506 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Wiggins v. Smith*,
  539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) . . . . . . . . . . . . . . . . . . . . passim

*Williams (Terry) v. Taylor*,
  529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). . . . . . . . . . . . . . . . . . . . . . 9, 26

*Woodford v. Visciotti*,
  537 U.S. 19, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 8, 54

*Yarborough v. Gentry*,
  540 U.S. 1, 124 S. Ct. 1,157 L. Ed. 2d 1 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Yick Wo v. Hopkins*,
  118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Zant v. Stephens*,
    462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 44

**State Cases**

*Martinez v. Dretke*,
    No. G-02-718, 2006 WL. 305666 (S.D. Tex. Feb. 7, 2006) . . . . . . . . . . . . . . . . . . . . . . 62

**Federal Statutes, Codes and Rules**

28 U.S.C.
    Section 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    Section 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

18 U.S.C.

    Section 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Section 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Federal Rules of Criminal Procedure

    Section 12.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74


**State Statutes, Codes and Rules**

Texas Code of Criminal Procedure
    Article 42.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Texas Penal Code
    Section 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Miscellaneous**

John H. Blume, et al.,
    FUTURE DANGEROUSNESS IN CAPITAL CASES: ALWAYS "AT ISSUE,"
    86 Cornell L. Rev. 397, 398 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Stephen P. Garvey,
    AGGRAVATION AND MITIGATION IN CAPITAL CASES: WHAT DO JURORS THINK?,
    98 Colum. L. Rev. 1538, 1559-60 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON** | : | **CAUSE NO. 4:00-CR-00260-2** |
| **aka Face, aka Scar, aka Scarface,** | : | **(Civil No. 4:05-CV-756-Y)** |
| **Defendant/Petitioner,** | : | |
| | : | |
| **vs.** | : | **DEATH PENALTY CASE** |
| | : | |
| **UNITED STATES OF AMERICA** | : | **Honorable Terry Means** |
| | : | **United States District Judge** |
| **Plaintiff/Respondent.** | : | |

_____

**REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255**

_____

**INTRODUCTION**

The Government's Response only serves to underscore Robinson's primary contention:

Robinson's trial counsel was deficient in their penalty phase investigation.  Prior to conducting

any investigation, lead trial counsel had resigned himself to the inevitability of a death sentence:

> When I went into this case and began to review all of the evidence, I believed that
> if the government could prove [the murder charges], *saving Mr. Robinson's life
> would be likely an impossible task.*[1]

---

[1]Resp. Ex. A, Aff. of Wessley T. Ball, p. 12 (emphasis supplied).

2

Trial counsel did little to prepare for the penalty phase. Specifically, trial counsel failed to conduct a reasonable investigation into Robinson's life history, failed to have Robinson mentally evaluated despite indications of learning disabilities, and failed to probe the prosecution's evidence regarding future dangerousness. Instead, trial counsel confined their preparation to interviewing only those people their client could remember.

Due to their inadequate investigation, trial counsel could not rebut the prosecution's aggravating evidence and failed to present a compelling case for mitigation. Unaware of the true facts surrounding the Williams robbery, trial counsel were unable to refute the allegation that Robinson ordered the murder of a prosecution witness from prison. Uninformed that the "Dermott Crips" was really a hapless group of juvenile delinquents, trial counsel had no way to undermine the false notion that Robinson was the leader of a notorious street gang. Relying exclusively of the prosecution's version of the shooting of Tucker's truck, trial counsel was unable to show that Robinson was unaware that Tucker was inside her parked car or that the State initially did not consider the offense serious enough to warrant a conviction. Without knowing the tragic details of Robinson's life history, trial counsel settled on a doomed course, consisting entirely of testimony by football coaches, jailers, a reluctant mother, an oblivious uncle, and a psychologist who never met the client.

Due to the inadequate investigation and presentation, trial counsel's premonition would become a reality. Informed by the defense that Robinson was essentially an average person with a normal upbringing, the jury had no reason to grant him mercy. Warned by the prosecution that Robinson would always pose a dangerous threat, even behind prison walls, the jury feared a life sentence would fail to protect society. Not one of the jurors found anything in Robinson's

3

background which would mitigate his crimes; all of the jurors found that Robinson was a future danger. With a "'thumb on death's side of the scale,'" the jury had no choice but to impose a death sentence. *Sochor v. Florida*, 504 U.S. 527, 532, 112 S. Ct. 2114, 119 L. Ed. 2d 326 (1992).

Had trial counsel satisfied their constitutional obligations, they would have been able to present a wealth of evidence that would have been more than sufficient to tip the scales in favor of life. By disproving that Robinson directed the Williams robbery and that he participated in a fearsome gang, the defense could have assuaged any concern that he posed a threat to society from prison. By presenting psychological testimony regarding Robinson's brain damage and learning disabilities, the defense could have shown how his cognitive impairments shaped his life choices and made him less morally culpable. By providing an accurate depiction of Robinson's life history, the defense could have explained how his oppressive background warranted sympathy. By elucidating Robinson's positive character traits, as exemplified by his many good deeds, the defense could have convinced the jury that Robinson was capable of redemption and worthy of sympathy notwithstanding his serious crimes. In sum, had trial counsel presented the jury with an accurate profile of Robinson, there is a reasonable probability that at least one juror would have voted for a life sentence.

A death sentence was not a foregone conclusion. The penalty verdict was foreordained by trial counsel's inadequate investigation. Therefore, the Court cannot have confidence in the outcome and Robinson's death sentence must be set aside.

## EVIDENTIARY HEARING STANDARD

"Section 2255 *requires* that the district court conduct a hearing on a petitioner's allegations 'unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *United States v. Martinez*, 181 F.3d 627, 628 (5th Cir. 1999) (emphasis supplied) (vacating denial of 2255 petition where district failed to conduct hearing despite conclusory allegations; lower court directed to allow defendant an opportunity to plead with greater particularity); *see* 28 U.S.C. § 2255 (2006).  Accordingly, if "the allegations in the 2255 motion are not negated by the record, the district court must hold an evidentiary hearing to 'decide all of these unresolved factual allegations which, if true, might support [his] constitutional claim.'" *United States v. Briggs*, 939 F.2d 222, 228-29 (5th Cir. 1991) (quoting *Friedman v. United States*, 588 F.2d 1010, 1012-15 (5th Cir. 1979)).

In this case, there is no question that Robinson is entitled to an evidentiary hearing. As discussed in greater detail below, Robinson has set forth a *prima facie* case for each of his claims, including his claim alleging ineffective assistance of counsel.  The Fifth Circuit has cautioned that courts "must be accurate and use care in reviewing [ineffective-assistance-of-counsel] claims." *Guy v. Cockrell*, 343 F.3d 348, 354 (5th Cir. 2003) (remanding for evidentiary hearing to address counsel's failure to investigate mitigating evidence).  Because trial counsel and their investigator have provided declarations to contradict his claims, Robinson's allegations must, at a minimum, be afforded an opportunity to cross-examine these witnesses.

That this is a death penalty case also weighs in favor of a hearing.  Because the death penalty is unique "in both its severity and its finality," *Gardner v. Florida*, 430 U.S. 349, 357, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), the Supreme Court has repeatedly emphasized "'the

heightened need for reliability in capital cases.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005) (Souter, J., concurring) (internal citation omitted); *cf. Pippin v. Dretke*, 434 F. 3d 782, 787 (5th Cir. 2005) (due to the severity of a death penalty sentence, "any doubt as to whether a COA should issue in a death-penalty case must be resolved in favor of the petitioner"). This district has consistently granted evidentiary hearings for 2255 petitions where the defendant's life at stake. *See, e.g., United States v. Louis Jones*, No. 5:95-CR-00047-1 (N.D. Tex.) (evidentiary hearing held June 7, 2004)*; United States v. Orlando Hall*, No. 94-CR-00121-2 (N.D. Tex.) (evidentiary hearing held Dec. 11, 2000).

Finally, the Government acknowledges that Robinson is entitled to an evidentiary hearing. As the Government explains, "[b]ecause there are factual disputes raised by the pleadings on the ineffectiveness issues, and because this is a death penalty case, the Court should probably schedule a limited evidentiary hearing." (Response of the United States to 28 U.S.C. § 2255 Motion ("Resp.") at 82.)

Consequently, in light of the complexity of the issues, the disputed material facts, the severity of the punishment, and the Government's concession, the Court should grant Robinson an evidentiary hearing.

## ARGUMENT

**I.     PETITIONER HAS ESTABLISHED A *PRIMA FACIE* CASE THAT HE IS ENTITLED TO RELIEF BASED UPON THE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE.**

Notwithstanding its concession that Robinson is entitled to an evidentiary hearing to address his ineffective-assistance-of-counsel claim, the Government contends that Robinson "is entitled to no relief." (Resp. at 49.) The Government argues that the Court need not even

consider the inadequacy of trial counsel's investigation because "Robinson has failed to show prejudice." (Resp. at 32, 46, 49). But as shown below, Robinson is able to demonstrate a reasonable probability, if not a substantial likelihood, that at least one juror would have spared his life.

**A.      But for Trial Counsel's Deficient Performance, There Is a Reasonable Probability That At Least One Juror Would Have Held Out for Life**

As an initial matter, the prejudice standard is not as onerous as the Government implies. The prejudice standard for ineffective assistance of counsel claims is a "reasonable probability" standard. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This standard is "identical" to the materiality standard for undisclosed exculpatory evidence. *Felder v. Johnson*, 180 F.3d 206, 214 (5th Cir. 1999); *Strickland*, 466 U.S. at 694. Under both standards, a "reasonable probability" is merely "a probability sufficient to undermine the confidence in the outcome." *Strickland*, 466 U.S. at 694; *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (discussing prejudice standard as whether the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."); *accord United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (Blackmun, J.) (plurality opinion).

Because the reasonable probability standard is "inevitably imprecise," it is important to establish what the burden does not entail. *United States v. Agurs*, 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). First, the determination does not equate to a preponderance of the evidence test. *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9, 124 S. Ct. 2333, 159 L. Ed. 2d 157 (2004). As such, a petitioner need not show it is "more likely than not that

the outcome would have been altered," had the omitted evidence been presented. *Woodford v.*

*Visciotti*, 537 U.S. 19, 22, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002); *see also Strickler v. Greene*,

527 U.S. 263, 289, 119 S. Ct. 1936; 144 L. Ed. 2d 286 (1999) (rejecting the preponderance

standard for *Brady* claims).

Second, the reasonable probability standard does not constitute a "sufficiency of the

evidence" test. *Kyles*, 514 U.S. at 435. Thus, relief is proper even if there remains a mere

possibility "that a jury could have heard [the mitigating evidence] and still have decided on the

death penalty." *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005).

Third, the petitioner need not establish that the entire jury would have changed its mind.

Rather, it is sufficient that one juror may have voted for life imprisonment. *Wiggins v. Smith*,

539 U.S. 510, 537, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (relief required when "there

is a reasonable probability that at least one juror would have struck a different balance");

*Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) *pet. reh'g pending* ("A reasonable probability

that . . . one juror considering the original and newly raised evidence together would have voted

for life imprisonment satisfies this [prejudice] standard."); *Foster v. Johnson*, 293 F.3d 766, 784

(5th Cir. 2002) (discussing whether the defense mitigation evidence "would have altered at least

one juror's balancing determination in favor of life").

In assessing the prejudice of the failure to present mitigation evidence, the court

must "reweigh the evidence in aggravation against the totality of available mitigating evidence."

*Miller v. Dretke*, 420 F.3d 356, 364 (5th Cir. 2005) *mandate issued* (*quoting Wiggins*, 539 U.S.

at 534); *Neal v. Puckett*, 286 F.3d 230, 241 (5th Cir. 2002); *see also Kyles*, 514 U.S. at 437

(noting that the omitted evidence must be evaluated "collectively, rather than item-by-item").

8

A defendant satisfies the reasonable probability standard by proving that the "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [his] moral culpability." *Wiggins,* 539 U.S. at 538 (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 398, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).

Here, in reweighing the totality of the available mitigating evidence against the aggravating evidence, there is a reasonable probability that the defense could have convinced at least one juror to hold out for life. At Robinson's trial, because of his counsel's failures, there was a paucity of evidence presented that militated against the death penalty. From the lack of any rebuttal to the prosecution's allegations of future dangerousness to the absence of any mitigating circumstances from Robinson's background and character, the penalty phase was barren of reasons to justify a lesser sentence. On the other hand, informed counsel, following a reasonable investigation, could have "alter[ed] the entire evidentiary picture." *Strickland*, 466 U.S. at 696. A juxtaposition of the actual penalty phase and the totality of available mitigating evidence makes this abundantly clear:

| **ACTUAL PENALTY PHASE EVIDENCE** | **AVAILABLE PENALTY PHASE EVIDENCE FOLLOWING REASONABLE INVESTIGATION** |
|---|---|
| **Future Dangerousness:** | |
| Robinson ordered a hit against prosecution witness Williams from prison. (20 RT 137-171; Ex.44.) | Robinson had nothing to do with the robbery and kidnaping of Williams. (Exs. 8, 19, 21,28, 34, 62, 64.) |
| Robinson was affiliated with the "Crips of Dermott" Gang. (20 RT 47-49, 53, 68, 116, Pros. Ex. 629, 634.) | Robinson was not affiliated with any gang, and certainly not a notorious criminal syndicate. (Ex. 59.) |

Robinson attempted to murder Sara Tucker.  (20 RT 12-20.)

At nighttime, Robinson fired shots at a parked truck without knowledge that Tucker was sitting inside; the trial court initially deferred adjudication of guilt and imposed community supervision instead.  (Ex. 54.)

| ACTUAL PENALTY PHASE EVIDENCE | AVAILABLE PENALTY PHASE EVIDENCE FOLLOWING REASONABLE INVESTIGATION |
|---|---|
| **Background:** | |
| No information about Robinson's early years. | Robinson was abandoned as a toddler by his drug-addicted, narcotics-dealing parents who were trapped in an endless cycle of violence. (Exs. 1, 13, 17, 18, 24, 29, 30, 46.) |
| Robinson was raised in a stable home by able-bodied grandparents.  (21 RT 131-170.) | Robinson was neglected throughout his childhood and was exposed to a variety of negative influences.  (Exs. 1, 7, 12, 13, 18, 22, 23, 27, 29, 30, 33, 37.) |
| Robinson enjoyed playing football like most adolescents, though he was inconvenienced by his mother's temporary experimentation with drugs.  (21 RT 2-18, 46-53, 74-80.) | Robinson juggled the demands of high school while struggling to support his destitute and drug-addicted mother, forcing him into a life of drug dealing.  (Exs. 5, 7, 14, 16, 29, 30, 36.) |
| **Cognitive Impairments:** | |
| No information regarding Robinson's intellectual functioning, and thus the jury viewed him as normal and fully capable. | Robinson suffered brain damage as the result of his mother drinking through her pregnancy and through his chronic exposure to pesticides as a child. (Exs.1,  2, 9, 12, 16, 17, 29, 30, 37, 38, 63.) |

10

**Character:**

| | |
|---|---|
| Robinson was liked by his football coaches and did not cause any problems in jail other than placing an unauthorized phone call to order a hit.  (21 RT 18-43, 54-74, 81-120.)  Robinson's only positive contribution was that once he turned in a lost wallet without taking any money first.  (21 RT 43-46.) | Robinson was a kind and compassionate person as demonstrated by acting as a part-time father to his brother's kids, assisting his mother with obtaining a fresh start to break her drug addiction, and helping his cousin turn his life around.  (Exs. 5, 12, 25, 35.) |

The chasm between these presentations is vast.  Robinson has satisfied the prejudice prong, as shown in more detail below.

> **1.    A Reasonable Investigation Would Have Allowed Defense Counsel To Undermine the Prosecution's Evidence Supporting Future Dangerousness**

The aggravating evidence introduced at the penalty phase was met with little resistance by the defense.  Had trial counsel investigated these matters, the defense could have refuted the prosecution's contention that Robinson posed a future danger from prison.

"Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable . . . element of criminal sentencing."  *Skipper v. South Carolina*, 476 U.S. 1, 5, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986); *Jurek v. Texas*, 428 U.S. 262, 275, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976).  "A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free . . . ."  *Kelly v. South Carolina*, 534 U.S. 246, 253-54, 122 S. Ct. 726, 731, 151 L. Ed. 2d 670 (2002).  Where evidence of prior acts goes unchallenged by the defense, it is expected that the jury will defer to the prosecution's claim of future dangerousness. *Rompilla*, 125 S. Ct. at 2465 n.5 ("We may reasonably assume that the jury could give more

11

relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest.").

The Government relied on three incidents to support an allegation of future dangerous: (1) ordering of a hit on Michael "One Love" Williams; (2) prior affiliation with the "Crips" gang; and (3) discharging a firearm at Sara Tucker.  Had trial counsel conducted a reasonable investigation into these events, they could have substantially undermined the prosecution's contention of future dangerousness.

### a.    The Prosecution's Allegation That  Robinson Ordered a "Hit" Was False

All witnesses to the incident deny that Robinson orchestrated any so-called "hit" on Williams.  It was nothing more than a desperate robbery scheme originating with Alquantis Kentrel Pitts.  Pitts denied that Julius Robinson had anything to do with his criminal actions. (Ex. 28, Decl. of Alquantis Kentrel Pitts, at ¶ 3.)  Pitts' cohorts also confirmed that Robinson had no hand whatsoever in the botched robbery.  (Ex. 8, Decl. of Keith Edington, at ¶ 2 (explaining they "had no relationship with Julius, other than being from the same town.  We did not take orders from him.")); (Ex. 21, Decl. of Wayne Jordan, at ¶ 15).  Even the victim and his companion confirm the story of their attackers.  Louis Johnson never heard Robinson's name mentioned, much less thought the incident was a botched vengeance killing as alleged by the prosecution.  (Ex. 19, Decl. of Louis Johnson, at ¶ 7) (Ex. 34, Decl. of Mike Williams, at ¶ 3 ("I do not believe that they had really been ordered by Julius Robinson to kill me.").)

12

The Government's efforts to minimize this evidence are unavailing.  The Government erroneously contends that such evidence would not have made a difference in light of the testimony by Nate Henderson.  (Resp. at 49.)  But the trial transcript shows that Henderson's testimony consisted of nothing more than meaningless speculation.  Henderson never heard Robinson tell anyone to carry out a hit on "One Love."  (20 RT 129-31.)  Instead, Henderson engaged in conjecture as to whether Robinson had directed someone to injure Williams.  (20 RT 115 ("if someone is snitching in Dermott and there is a message gave to them [sic] down there, that means get them.").)  Because Henderson was speaking from his own experience rather than any personal knowledge of Robinson's communication habits, Henderson was incapable of discerning what Robinson meant.  Certainly, Henderson had no way of knowing how the aunt might have interpreted the information, much less whether she actually relayed it.

Assuming Henderson's lay opinion was enough, his credibility was undermined by his inherent untrustworthiness.  Accomplice testimony is necessarily viewed "with the very greatest care and caution."  *Crawford v. United States*, 212 U.S. 183, 204, 29 S. Ct. 260, 53 L. Ed. 465 (1909).  Henderson was not only one of Robinson's co-defendants, he had originally been charged with being the mastermind behind the criminal enterprise until he was offered the plea agreement.  (20 RT 108.)  He was allowed to plead guilty to conspiracy to distribute marijuana in violation of 18 U.S.C. §§ 841(b)(1)(B) and 846 and to possession of firearms in furtherance of a drug-trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A).  *United States v. Henderson*, 100 Fed. App. 302, 303 (5th Cir. 2004).  In exchange for Henderson's testimony against Robinson, the prosecution even agreed to petition the judge for a reduction in Henderson's sentence.  (20 RT 109-10.)  Henderson would have felt enormous pressure

13

to support the prosecution's theory that Robinson ordered the hit, especially based on the prospect of a lifetime in prison without the deal.  (20 RT 108 (acknowledging prospect that he was facing a sentence of ten years to life).)

Not surprisingly, the Government glosses over the troublesome aspect of Henderson's character and instead emphasizes the criminal history of the participants in the "One Love" robbery as grounds for discounting their testimony.  (Resp. at 50.)  Admittedly, each of the perpetrators had a lengthy criminal record.  (*See* Resp. at 50; Resp. Exs. H-J.)  Far more compelling than their relative criminal histories, however, is the absence of any incentive for Pitts, Eddington and Jordan to exculpate Robinson in the attack.  Based on the seriousness of the allegations made by Williams, each had an obvious incentive to garner favor with law enforcement by shifting blame to Robinson.  The fact that they accept full responsibility, regardless of the consequences, enhances their credibility.

Second, the Government seizes upon minor inconsistencies to urge the Court to reject their accounts outright, on paper and without a hearing.  Specifically, the Government suggests that because the witnesses provided differing reasons for carrying out the robbery, they all must be lying.  (Resp. at 52-53.)  There are a variety of explanations for conflicting details, none of which impugns the witnesses' veracity.  Given the passage of five years since the incident, it is understandable, if not expected, that discrepancies would exist.  *Vasquez v. Hillery*, 474 U.S. 254, 280, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (noting that with the "passage of time . . . memories fade").  In addition, based upon Williams' unsavory reputation, it is entirely reasonable to assume that Pitts and his cohorts harbored a multitude of reasons for wanting to accost him, least of which would have been to retaliate against Williams for his cooperation with law

14

enforcement.  Even if some of the participants were motivated by a desire to avenge Robinson, they universally deny operating pursuant to some cryptic message conveyed by Robinson's aunt about a "hit."  Any impeachment aside, their testimonies would have certainly cast doubt on the prosecution's purely circumstantial case.[2]

Assuming *arguendo* that the jury would have found the testimonies of the "One Love" robbery participants to be incredible, other witnesses could have been presented to dispute Robinson's involvement.  The sole basis for the alleged incident was a three-way telephone conversation that Robinson had with his aunt, Josephine Dotson, and his brother, Marcus. (20 RT 85-86.)  According to the prosecution's theory, Robinson's request for a hit was reflected in the following statement:  "That dude ONE LOVE, Man that dude right there go hard." (Ex. 44, Prosecution Trial Ex. 929A.)   According to Marcus, the phrase "go hard" simply means that a person "would do anything, say anything."  (Ex. 64, Supp. Decl. of Marcus Jwain Robinson, at ¶ 4.)  In any event, Marcus did not believe that Robinson was asking him to convey a message and he certainly did not tell anyone about the conversation.  (*Id.*)  Neither did Josephine believe that her nephew was asking her to relay a hit to someone in Dermott.  (Ex. 62, Supp. Decl. of Josephine Dotson, at ¶ 6.)  Their testimony alone would have been sufficient to undermine the prosecution's implication.

---

[2]Suggesting that Robinson is obligated to "establish that Williams' initial version was false," the Government appears to scrutinize Robinson's evidence under an incorrect legal standard.  (Resp. at 53.)  Contrary to the Government's insinuation, Robinson need not offer dispositive evidence that he was actually innocent of the "One Love" incident.  *House v. Bell*, ___ U.S. ___, 126 S. Ct. 2064, 2077, 165 L. Ed. 2d 1 (2006)  (requiring petitioner, in seeking to satisfy the actual innocence exception, to prove "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.")  Instead, Robinson need only show the reasonable probability of a different result.  This is amply met by the sworn declarations from six witnesses.

In stark contrast to the information presented in this habeas proceeding, the evidence offered by trial counsel in no way refuted the powerful "hit" allegation.  Similar to the presentation of the high school football staff, trial counsel called several jail staff personnel to express their limited views on Robinson's behavior as a pretrial inmate.  "No problem," and "one of the better inmates," was the opinion of one of the correctional officers.  (21 RT 29.) Another officer reiterated Robinson's lack of disciplinary problems and found him to be "respectful" and "quiet."  (21 RT 59.)  Yet another found that Robinson had "adjusted well" and considered him to be a "better than average" inmate.  (21 RT 72.)  The jail unit manager mostly concurred with these opinions, stating that Robinson had caused no problems at the facility. (21 RT 97-98.)

Whatever the value of the jail evidence, it is clear that absent any specific rebuttal to the "One Love" hit allegation, such evidence did more harm than good.   In emphasizing Robinson's lack of disciplinary record in jail, the defense opened the door to questioning about Robinson's improper use of the telephone.  On cross-examination, the jail unit manager was forced to concede that jail regulations forbid three-way telephone calls by inmates.  (21 RT 109.)  Despite this prohibition, and the continuous surveillance of inmate telephone calls, the jail manager was still unaware that Robinson had made the prohibited call.  (21 RT 106-08.)  Because Robinson was alleged to have issued the "hit" through this unauthorized procedure, the prosecution was able to imply that Robinson may have committed other regulatory violations without detection. Worse still, the evidence permitted the prosecutor in his closing argument to rely on the inadequacies of the jail phone system as further support that Robinson could place other menacing calls in the future:

16

> Mr. McCauley, their witness, told you the general population out at the jail unit, where he ordered this hit on Michael Williams, is the same kind of set up that he's going to face [in post-trial confinement].

(23 RT 102-03.)

The expert testimony regarding the lack of future dangerousness was equally ineffective at overcoming the perception created by the "One Love" hit. As trial counsel conceded, the defense deliberately circumscribed Dr. Cunningham's testimony to discuss only future dangerousness for death row inmates generally. (Gov't. Ex. B, Decl. of Strickland, p. 3 ("[I]t was my decision to cut his presentation dramatically"). In the absence of any specific information about a defendant's behavior during incarceration, such garden-variety information only would have been helpful in providing an understanding of the low risk of violence among death row inmates generally. But the jury had already been told that *this* inmate had solicited a murder while in jail. Jurors would have rightly rejected (and possibly have been offended by) any hypothesis to the contrary.

There is no question that evidence of the "One Love" hit was devastating to Robinson's chances for a life sentence. The alleged hit against Williams was the "centerpiece of the [ ] prosecution's penalty-phase case." *Banks v. Dretke*, 540 U.S. 668, 710, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004) ("reasonable probability" standard met where the suppressed evidence related to testimony that was relied upon heavily by the prosecutor during penalty phase closing argument). Throughout his penalty phase closing argument, the prosecutor repeatedly invoked this incident as veritable proof that Robinson would continue to pose a risk of violence notwithstanding his incarceration:

17

> So when you ask yourself whether or not Julius Robinson is a future danger, ladies and gentlemen the overwhelming evidence is that he is, because with the telephone available to him as will be available to him at any prison setting, he is prepared to carry out whatever it takes to seek revenge on anybody.

(23 RT 105.)  The prosecutor also argued that Robinson had both the motivation and ability to continue issuing death threats from prison:

> So I would submit to you, ladies and gentlemen, that the overwhelming evidence on that future dangerousness issue sadly is that Julius Robinson will always be a future danger, and his target environment just got a little bit bigger because [Nate Henderson] and every one of the courageous individuals who came down here to testify against him is now a target.  They have got a target sign on their chest to anyone that he can get word to to take care of.

(23 RT 102.)

Due to the lack of any challenge to the "One Love" incident and the inflammatory argument by the prosecution, the jury had little choice but to impose a sentence of death.  Having been informed that Robinson was able to orchestrate outside attacks from his jail cell, the only logical conclusion for the jury to draw was that no prison could protect society from Robinson.  And because the jury was told of Robinson's fierce determination to retaliate against those responsible for his predicament, the jurors quite possibly assumed that they were next on the list.

Trial counsel now seeks to justify their performance by characterizing the prosecution's contention as "relatively weak."  (Resp. Ex. A, Aff. of Wessley T. Ball, p. 10.)  But immediately after trial, Robinson's attorneys held a much more dismal view of the "One Love" evidence:

> '[E]vidence' that Robinson was capable of ordering criminal activity outside his place of confinement would necessarily affect a punishment verdict – which in this case was death.  The harm of the error was direct, obvious and ultimately life-ending.

(App. Op. Brief at 21.)

18

**b.      Robinson Associated With a Group of Adolescent Hoodlums
Rather Than a Notorious Street Gang**

For the first time at the penalty phase, the prosecution sought to portray Robinson as a notorious gang member. (20 RT 45-69.) Terrence Hollimon, Robinson's cousin, claimed that Robinson had admitted being a member of the "Crips." (20 RT 47-48.) To corroborate his testimony, the prosecution asked Hollimon to view a series of photographs. (20 RT 48-49.) For each one, Hollimon identified Robinson displaying hand gestures that were consistent with gang signs. (*Id.*)

Once the prosecution established that Robinson was affiliated with a gang, the prosecution relied on its own prison expert to link Robinson to gang violence in prisons:

> Prison gangs do play a significant role in prison operations. Nearly all violence, serious violence, within a correctional setting, can be traced back to gang rivalries, racial rivalries that tie to the prison gangs, and to their continuing interactions with each other in looking for a balance of power between inmate groups.

(22 RT 112-13.)

As with the "One Love" incident, evidence of gang affiliation went unanswered by the defense. The introduction of gang membership evidence in a capital proceeding amounts to a constitutional error where the membership is not relevant to any of the issues being decided. *Dawson v. Delaware*, 503 U.S. 159, 165-67, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992) (finding constitutional error where prosecution introduced irrelevant evidence of defendant's membership in the Arayan Brotherhood at sentencing); *Wainwright v. Lockhart*, 80 F.3d 1226, 1234 (8th Cir. 1996) (finding error where state introduced evidence of gang membership at sentencing without linking it to any issues in the sentencing phase); *O'Neal v. Delo*, 44 F.3d 655, 661 (8th Cir. 1995); *Perez v. Dretke*, 393 F. Supp. 2d 443, 448 (N.D. Tex. 2005), *app. denied*, No. 05-70036

19

(March 23, 2006).  Generally, gang membership may be introduced only if it relates to one of four areas:

(1)    motive for committing the offense; *Perez*, 393 F. Supp. 2d at 448 (finding no error when defendant's membership in the San Antonio Mexican Mafia formed the motive and reason for the underlying murders as part of a gang rivalry);

(2)    future dangerousness of the defendant when violent history of the gang is introduced; *Fuller v. Johnson*, 114 F.3d 491, 497-98 (5th Cir. 1997) (finding defendant's membership in Aryan Brotherhood relevant to future dangerousness where the prosecution introduced evidence that the gang "had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults");

(3)    impeachment of defense witnesses based upon common gang affiliation; *United States v. Abel*, 469 U.S. 45, 52, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984) (upholding the introduction of gang affiliation of defense witness "because it supported the inference that his testimony was slanted or perhaps fabricated in respondent's favor."); and

(4)    rebuttal to mitigation evidence.  *Cf. Wainwright*, 80 F.3d at 1234.

Here, evidence of Robinson's involvement with the Dermott Crips was not relevant to any issue at the penalty phase.  The crimes were not motivated or related in any way to gang activity.[3]  Nor was there was any evidence that involvement with the Crips supported a finding

---

[3]Because none of the defense witnesses was alleged to have been a gang member, the evidence was not even admissible to show bias.

of future dangerousness.  Other than establishing Robinson's possible association with a Crips set in Dermott, the prosecution provided no information that the Crips supported criminal wrongdoing, much less violent activity.  Although Hollimon mentioned that the Crips engaged in "gang banging," this fairly benign ritual consisted of "riding around throwing your little signs up" or "hollering and doing a whole lot of crazy stuff."  (20 RT 65.)  Moreover, Hollimon denied that the Crip activities entailed "beating up on people or drug activity."  *(Id.)*  In fact, Hollimon conceded that Robinson was not even in Dermott at the time this alleged gang activity took place.  (20 RT 66.)

Assuming *arguendo* that gang evidence would have been admitted over defense objection, there was substantial evidence that the Dermott Crips was nothing more than a band of small town teenage truants.  Jerry Melton, the Chief of Police of Dermott at the time the "Crips" would have been active, scoffed at the suggestion that it was a fearsome gang:

> There were some kids who called themselves the Crips and others claimed to be the Bloods.  They would wear blue or red colors accordingly.  They didn't fight each other though and I looked at them as kids trying to imitate what they saw on television.  They were little wannabes.

(Ex. 59, Decl. of Jerry Melton, at ¶ 4.)

There is no doubt that Robinson's supposed gang affiliation would have factored heavily into the penalty phase deliberations.  *United States v. Bernard*, 299 F. 3d 467, 482 (5th Cir. 2002) (relying in part on defendant's gang membership as supporting future dangerousness finding).  Courts have "long recognized the substantial risk of unfair prejudice attached to gang affiliation evidence."  *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996); *Wainwright*, 80 F.3d at 1234 (recognizing that gang evidence generates fear in the jury "thereby making [the

21

defendant] himself appear more dangerous and threatening."). Even trial counsel concedes that "gang evidence is almost always detrimental to a defendant as jurors are very frightened of gangs." (Resp. Ex. A, Aff. of Wessley T. Ball, at 6.)

### c. Robinson Shot Into a Parked Truck Without Knowledge That Tucker Was Inside

The prosecution presented dubious testimony from Sara Tucker and raised the sinister implication that Robinson attempted to kill her over $120. Available court records could have substantially undermined the prosecution's theory. Not only was there significant establishing that Robinson was unaware of Tucker's presence inside the truck, the state trial court considered the offense to be minor by initially imposing community supervision instead of a conviction.

Tucker testified that Julius shot her truck seven times as she hid inside. (20 RT 20.) She claimed Robinson was trying to recover the money she had owed him for drugs. (20 RT 18-19.) She alleged that when she refused to answer the door at her apartment, Robinson hunted her down at her parent's residence. (20 RT 18-20.)

The available court file provided a very different account of events. In particular, the police reports contained within the file support the notion that Robinson was unaware of Tucker's presence when he discharged the firearm. (Ex. 54, Tarrant County Court records in *Texas v. Julius Robinson*, Case No. 0574361D). According to the records, by the time that Robinson arrived to confront Tucker, her truck had been parked for ten minutes. Thus, there was no chance that he would seen her vehicle in motion. (*Id.*) Moreover, the brown car in which Robinson was riding in had passed Tucker's truck without any confrontation. (*Id.*) It was only after the brown car had turned around that shots were fired. (*Id.*) As soon as Tucker heard shots,

22

she sunk down in her vehicle, making it even less likely that Robinson would have noticed her. (*Id.*)  All of the bullets were found in the rear portions of the vehicle.  (*Id.*)  If Robinson was aware that Tucker was present in the vehicle, it seems highly unlikely that no bullet holes would be found in the cab of the truck.  This is especially true given the fact that Robinson apparently drove directly past the vehicle.  In addition, Robinson's vehicle departed the scene slowly after the shots were fired, further undermining the supposition that he was aware that he had shot at someone.

Perhaps the strongest support for the proposition that Robinson was unaware of Tucker's presence was the initial disposition of the case.  Robinson had pled guilty to deadly conduct, which is the knowing discharge of a firearm.  (Ex. 54, Tarrant County Court records in *Texas v. Julius Robinson*, Case No. 0574361D; *see* Tx. Pen. Code § 22.05(b).)  This is a third-degree felony which carries a minimum sentence of two years.  (*See* § 22.05(e) (classifying the offense of discharging a firearm as a "felony of the third degree").)  Despite accepting Robinson's plea, the court withheld the imposition of both his conviction and sentence explaining that "the Court found that further proceedings should be deferred without making an adjudication of guilt").)  Under the "deferred adjudication" procedure, the court placed Robinson instead on community supervision.  (*See* Tex. Code Crim. Proc. art. 42.12.)  Community supervision is entirely discretionary.  (*Id.*) (authorizing, but not requiring, community supervision "when in the judge's opinion the best interest of society and the defendant will be served.").  Had the trial judge been concerned about the safety of Tucker or  society at large, it is highly doubtful that he would have extended Robinson supervised release.

Unfortunately, the jury was never apprised of the mitigating circumstances of the firearm offense or the initial disposition. Instead, the only evidence that the jury received was the ultimate judgment of conviction and the testimony of Tucker and her mother. (20 RT 11-12; Prosecution Ex. 925.) Tucker blatantly lied about the circumstances leading up to the shooting. For the first time, Tucker claimed that Robinson had went to her apartment initially and then followed Tucker to her parents' apartment. (20 RT 17-18.) None of her previous statements to police mention this earlier encounter, much less that Robinson followed her. As her statement indicates, Tucker had been parked for ten minutes before Robinson ever arrived. Unfortunately, Tucker was never confronted with her earlier statements.

Without any explanation from the defense, the prosecution was able to use the Tucker incident to bolster the future dangerousness allegation. The prosecutor hammered the shooting incident throughout his closing argument. (23 RT63, 66-67, 99, 106.) Twice, the prosecution implied that Robinson attempted to murder Tucker over a petty debt:

> The significant thing about a prior criminal record is back from the time that he is 19 years of age, his problem solver, his gun, Sarah Lee Tucker owed him a $100 for crack cocaine. So she's a problem. We'll take care of that.

(23 RT 63;23 RT 120 ("he is willing to shoot up that pickup truck with this little girl in it").)

### d. The Combined Effect of the Aggravating Evidence Introduced at the Penalty Phase Contributed Substantially to the Jury's Finding of Future Dangerousness

In any capital case, the issue of whether the defendant is a "danger to the community is . . . nearly always a relevant factor in jury decisionmaking, even where the [prosecution] does not specifically argue the point." *Deck v. Missouri*, 544 U.S. 622, 633, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005). Surveys of capital jurors provide ample support for this conclusion.

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559-60 (1998) (noting "the pervasive role future dangerousness plays in and on the minds of capital sentencing jurors"); John H. Blume, et al., Future Dangerousness in Capital Cases: Always "*At Issue*," 86 Cornell L. Rev. 397, 398 (2001) (observing, on the basis of interviews with over 100 capital jurors, that "future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials, no matter what the prosecution says or does not say").

Future dangerousness was certainly an important issue for the jury deciding Robinson's fate. As part of the penalty phase verdict, the jury was required to answer whether Robinson "is a future danger to the lives and safety of other persons." (Ex. 45, Special Verdict Form, at 4.) Even if the jury initially had been reluctant to place primary emphasis on future dangerousness, Robinson's trial counsel made it the "key consideration" in the case. (23 RT 82.) As trial counsel explained: "when it comes right down to the [sic] lick law, if one factor needs to be carved out, [future dangerousness is] the one that's most important to most jurors." (23 RT 83.) What's more, trial counsel highlighted the possibility that Robinson could receive a sentence of less than life in prison. In argument, trial counsel emphasized the "three choices" available to the jury: life, death, and "the last one, a sentence of something less than life that would be determined by the Court." (23 RT 70.) Based upon trial counsel's careless reminder, the jury would have been naturally afraid that Robinson may be released in society at some future date.

The combined effect of the uncontested aggravating evidence would have been truly devastating to Robinson's chances of avoiding a death sentence. The mere inference that Robinson had been involved an gang, tried to kill someone over drug money, and ordered a "hit"

from prison would have been enough to incite the fears of the jurors.   The visceral impact of this evidence was exacerbated by the closing argument of the prosecution as well as Robinson's own attorneys.   Once trial counsel had established future dangerousness as the key consideration, the prosecutor capitalized on these incidents as definitively resolving the issue.   In the end, the jury would have felt compelled to vote for death - if for nothing else than self-preservation.   *See Kelly*, 534 U.S. at 255 (noting that where evidence of acts in violence in prison went unchallenged, "the imposition of the death penalty was an act of 'self-defense'"); *Simmons v. South Carolina,* 512 U.S. 154, 157, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994).

**2.      The Defense Penalty Phase Presentation Distorted and Omitted Significant Portions of Robinson's Life History That Could Have Engendered Sympathy With the Jury**

"[A] defendant's background is unquestionably relevant to the jury's determination of whether a sentence less than death is warranted."  *Smith v. Dretke*, 422 F.3d 269, 282-83 (5th Cir. 2005); *Cole v. Dretke*, 418 F.3d 494, 501 (5th Cir. 2005) (identifying evidence of family history and emotional disturbance as relevant mitigation); *Roberts v. Dretke*, 356 F.3d 632, 641 (5th Cir. 2004) ("defendant's troubled history is relevant to deciding his moral culpability"). Background evidence is critical to the life and death calculus "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989).  Even if there is strong evidence of future dangerousness, background evidence alone may be sufficient to tip the balance in favor of life. *Williams*, 529 U.S. at 398 ("Mitigating evidence unrelated to dangerousness may

alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").

In arguing against the substantial prejudice suffered by Robinson, the Government paints a rosier picture of trial counsel's penalty phase presentation than what actually occurred. First, the Government claims that the penalty phase presentation was "compelling" even though it omitted virtually all of the details of Robinson's life story. (Resp. at 44-45.) Second, the Government minimizes the substantial evidence presented in this habeas proceeding, characterizing Robinson as someone "who had a relatively normal, if poor upbringing, normal intelligence, and no history, that would probably lead a jury to forego the death penalty." (Resp. at 48.) Alternatively, the Government notes only slight differences between trial counsel's defense and the presentation here, classifying the latter as merely establishing "that he had some difficulty in school and that perhaps his home life as a child in Dermott was not as full of good influence as was shown." (*Id.*[4])

Nevertheless, a realistic appraisal of the two presentations exposes the extreme contrast between the true life story of Robinson and the version that the jury received. The jury heard virtually nothing about Robinson's difficult life. As discussed below, the evidence trial counsel did present only served to portray Robinson's background in a false light, making him less worthy of mercy. Had trial counsel bothered to conduct even the most rudimentary investigation into Robinson's background, they would have discovered persuasive evidence in mitigation.

---

[4]The Government also claims that the evidence presented by Robinson pertains to people other than Robinson. Although some of the declarations provide background information of Robinson's relatives, this information is critical because it places Robinson's life in context. That said, the vast majority of material pertains directly to Robinson.

a.  **Robinson Suffered a Horrendous Infancy and Was Raised by Violent, Drug-Addicted and Drug-Dealing Parents**

From birth, Julius Robinson never had a fair chance.  Both of his parents failed miserably at providing the safe, stable and nurturing environment vital to any child's development.  Instead, Robinson was subjected to a life of substance abuse, violence, and drug dealing.

Robinson was born to a young girl unwilling and ill-suited for the demands of motherhood.  Robinson's mother, Rose Hollimon, began drinking and smoking marijuana almost every day as early as age twelve or thirteen.  (Ex. 17, Decl. of Rose Hollimon, at ¶ 8.)  Rose quit school after became pregnant with Robinson's brother at age sixteen and had barely attained majority age when Robinson was born. (Ex. 10, Decl. of Guffrie Gorins.)  Compounding matters was the fact that Rose was intellectually dull. (Ex. 10, Decl. of Guffrie Gorins, at ¶ 2.)  Jimmie Lee Robinson, her husband, also noticed that "there was something off" with his wife.  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 37.)   Recent psychological testing establishes that Rose is mildly mentally retarded.  (Ex. 46, Dr. Barna Psych. Report for Rosie Mae Hollimon, at 4.)  Rose's intelligent quotient (IQ) score is 65.  (*Id.* at 2.)  At the age of forty-seven, Rose has the reading and writing ability of an eight-year-old child.  (*Id.* at 3.)

Given her youthful ways and intellectual handicaps, it is no surprise that Rose was constantly making decisions that endangered Robinson's health and well-being.  (Ex. 1, Decl. of Dr. Cunningham, at 35 (opining that "Rose's intellectual limitations also provide some understanding for her poor family-related decision making.").)  For example, "[d]uring the pregnancy with Julius, Rose drank a minimum of two to three beers per day and smoked a half an ounce of marijuana, around twelve joints, every day."  (Ex. 29, Decl. of Jimmie Lee

28

Robinson, at ¶ 17.)  Even outside the home, Rose would continue to drink and use drugs while pregnant.  (Ex. 24, Decl. of Beotha Moore, at ¶ 4.)

Her chronic drug and alcohol abuse continued throughout Robinson's infancy and early childhood.  Rose and her husband drank alcohol and smoked marijuana practically every day.  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 19 ("Drugs, alcohol and violence were the order of the day in our house.").)  Instead of caring for Robinson, Rose hosted "Soap Opera" parties, informal gatherings devoted to drug and alcohol consumption.  (*Id.* at ¶ 18.)  Eventually, Rose squandered their family savings to purchase cocaine for herself and her friends.  (*Id.*)

Robinson's parents eventually began selling illicit drugs, an ominous precursor to their son's subsequent dealing.  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 17.)  Robinson's father sold marijuana and acid and Rose dispensed other drugs out of the home.  (*Id.*)

The tumultuous relationship between Robinson's parents only made matters worse.  According to his father, "the first two years of [Julius's] life were really bad."  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 19.)  Fueled by their constant intoxication, the couple was hostile and frequently combative.  Jimmie Lee "hit Rose several times" and would "push and shove her."  (*Id.*)  For her part, Rose "had a serious habit of picking things up and hitting [Jimmie Lee] with them."  One argument was so violent that the police were called and Jimmie Lee was arrested.  (*Id.* at ¶ 20.)

The constant fighting was felt by the whole family, including Robinson and his brother.  As Marcus explained, "[m]y parents were always arguing and when they fought, it was physical fights with hitting and punching."  (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 2.)  Beotha

Moore, a friend of Rose, witnessed many of these fights, often in the presence of Marcus.

(Ex. 24, Decl. of Beotha Moore, at ¶ 4.)

As these domestic quarrels grew more intense, the couple feared that child protective

services would try to remove the boys from the home. (Ex. 13, Decl. of Milton Hollimon, at ¶ 8

("Rose and Jimmie Lee were fighting too much and the authorities were getting ready to take

the children away from them.").)[5] Rather than mend their ways, Rose and Jimmie Lee decided

to send Robinson and his brother 850 miles away to live with Rose's parents in Dermott. (*Id.*)

This temporary placement of the children turned into a permanent desertion. Not long

after Robinson was delivered to his grandparents, his parents separated. (Ex. 29, Decl. of Jimmie

Lee Robinson, at ¶ 25.) Jimmie Lee had virtually no contact with his sons after that time. (*Id.*)

He saw Robinson and his brother approximately two to three times and occasionally sent

clothing. (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 6.) Rose had even less involvement

with her children:

> Our father at least made an effort to do something for us. Our mom wasn't
> doing anything. She came to see us once or twice in all the time we lived
> with our grandparents and she never sent us anything. When our mother visited
> Dermott, she was on the go all the time, partying and going out with her friends. She
> really didn't spend the time with my brother and me. I cried when she would go out
> partying.

(*Id.* at ¶ 6.) As Robinson's father acknowledged, "the boys ended up without a mother

or a father." (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 25.)

To say that the neglect and maltreatment Robinson suffered at the hands of his parents

was harmful would be a gross understatement. The long term effects of this extreme form

---

[5]Even the Government grudgingly concedes that Robinson's parents provided
"inadequate care." (Resp. at 42 n.11.)

of deprivation include "psychological disorder[,] behavior disturbance [,] and violent and criminal conduct." (Ex. 1, Decl. of Mark Cunningham, at 49.) The fact that the abuse was not physical is irrelevant. (*See* Resp. at 42 ("Nothing in Jimmie Lee's statement supports the idea that Robinson was physically abused for the short time he lived with his own parents . . . .").) Ironically, the expert retained by trial counsel could have readily explained that "neglect has been identified as more psychologically and developmentally damaging than physical abuse." (Ex. 1, Decl. of Mark Cunningham, at 49); (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 16 (describing the anger he felt from his mother's abandonment)).)

Bertha Robinson, Robinson's paternal grandmother, noticed Robinson exhibiting signs of emotional disturbance at a very young age. As she relayed to Robinson's father, Bertha noticed "something odd about Robinson. When he became angry, he would sit in a corner and cry and stew for an inordinate amount of time for a child." (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 32.) Bernice Johnson, an older relative, also noticed that there was something wrong: "Julius always had a temper when he was young, often over nothing. If he wanted something and couldn't have it, he would have a tantrum and scream and cry." (Ex. 18, Decl. of Bernice Johnson, at ¶ 7.) Robinson's behavior became even more intense as he got older, often resulting in temper tantrums. (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 33 (explaining that Robinson would "cry and cry and cry").)

### b. The Jury Received No Evidence About Robinson's Difficult Childhood

The defense presentation hardly broached the topic of Robinson's early childhood and certainly glossed over the painful details. Although Rose explained that she married at

age fifteen, she did not tell the jury that she was still a teenager at the time she gave birth to both Marcus and Julius. Neither did she inform the jury that she dropped out of high school immediately after becoming pregnant. (21 RT 156.) Rose also failed to discuss her abuse and neglect of Robinson during this time, including drinking alcohol and using drugs while she was pregnant.

Rose's testimony also left out significant compelling details of her combative marriage with Jimmie Lee and its harmful effects on Robinson. Beyond stating that their marriage ended after six years (21 RT 158-59), Rose failed to mention the pervasive domestic violence and drug addiction and the attendant impact on her children. Even when describing the divorce, Rose made it appear that the marriage ended amicably rather than after an abrupt split following another bout of violence and Jimmie Lee's arrest.

In addition to omitting critical aspects of Robinson's childhood, Rose also downplayed the abandonment of her children. Rose testified that after the marriage ended, she lived with Robinson and Marcus in Wichita Falls for the next few years until Robinson was four years old. (21 RT 159.) In reality, Rose gave up her children when Robinson was only two. Rose also tried to make it appear as if she was forced to give up her children due to financial hardship. Contrary to her trial testimony, Rose was not forced to leave her children because Jimmie Lee failed to provide adequate support. (21 RT 159-60.) Rose chose to give up her children to avoid intervention by social services. (Ex. 13, Decl of Milton Hollimon, ¶ 8.)

### c.    Robinson Spent the Remainder of His Childhood Neglected by Disabled and Disconnected Grandparents

Due to the psychological and emotional trauma Julius Robinson experienced as a young child, he required more, not less attention, during his formative years.  Unfortunately, Robinson was passed off from grandparent to grandparent, each less capable than the next.

Following the abandonment by his mother and father, Robinson and his brother were foisted upon their maternal grandparents, Margaret and John Hollimon.  The couple had already struggled with raising their own children.  Margaret was considered "on the slow side and didn't seem to be grounded enough to keep control of the family."  (Ex. 33, Decl. of Willie White, at ¶ 9.)  Margaret never really corrected her own children.  (Ex. 13, Decl. of Milton Willis Hollimon, at ¶ 7 (confirming that his mother never applied discipline); Ex. 12, Decl. of Mildred Hollimon, ¶ 4 (same).).  Oftentimes, the children would have to tend to their father rather than the other way around.  (Ex. 7,  Decl. of Josephine Dotson, at ¶ 8 (noting that following one of John's many drunken brawls, the children would have to go and collect their father from the bar.).)

By the time Robinson came to their house, John and Margaret were older and less able to handle the demands of parenthood.  Although they provided the bare necessities of food and shelter, the grandparents struggled financially.  Long before Julius and Marcus arrived, John had been struck blind and was receiving welfare.  Because the monthly stipend was not enough, Margaret and their children worked in the cotton fields.  The grandparents struggled even more with the addition of Julius and Marcus.  (Ex. 27, Decl. of Willie Parker, at ¶ 3 (noting that Robinson received the free lunch program at school.).)

Due to their own limited education, the grandparents were incapable of assisting Robinson with any problems in school. (*Id.* at ¶ 3 ("The grandparents were . . . ill-prepared to educate and care for their grandchildren").) John left school when he was in the fourth grade. (Ex. 7, Decl. of Josephine Dotson, at ¶ 2.) Margaret completed only the third grade and could not read or write. (Ex. 7, Decl. of Josephine Dotson, at ¶ 2.) This was a harmful environment for Robinson, who was considered by his teachers as a "slow learner." (Ex. 27, Decl. of Willie Parker, at ¶ 5.) Like his grandmother, Robinson would also struggle in the third grade -- he had to repeat the entire school year. (Ex. 37, School Records of Julius Robinson.)

John and Margaret were too feeble to provide the structure and discipline the young boys needed. Margaret "had a lot of memory loss and wasn't that aware of Julius's problems." (Ex. 18, Decl. of Bernice Johnson, at ¶ 10; *see also* Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 36 ("Margaret is a simple person who could not deal with the difficulties [Julius] had.").) Margaret maintained the same hands-off approach with Robinson she had done with her own children. (Ex. 12, Decl. of Mildred Hollimon, at ¶ 8 ("I never saw or heard my parents disciplining the boys [Julius and Marcus].").) John's physical handicap necessarily impaired his ability to oversee Robinson's activities. (Ex. 18, Decl. of Bernice Johnson, at ¶ 10 ("John was blind, so he wasn't always aware of what Julius was doing.").) At times, Robinson's care was assumed by his paternal grandmother, Bertha Scales Robinson. Although Bertha had greater mental acuity than Margaret, she was physically an invalid. (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 8.)[6]

---

[6]Before Robinson was born, the grandfather shot Bertha and she had been confined to a wheelchair ever since.

The absence of strong parental support in Robinson's life was obvious. Willie Parker, Robinson's coach, saw a clear distinction between him and other kids:

> Julius was a nice boy but he grew up in the streets without parental guidance. I would see him around town on his own. My years of experience with kids have taught me to recognize the ones who are lacking TLC, tender loving care, and Julius was someone who was not getting it.

(Ex. 27, Decl. of Willie Parker, at ¶ 2.)

Without basic adult supervision, Robinson fell victim to a number of negative influences. At age five, a neighbor touched Julius's private parts. (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 33.) When his father tried to question him about the incident, Robinson became hysterical:

> [H]e pitched a fit the likes of which I had never seen anyone throw in my life. Julius thrashed about, hitting and throwing himself against things and screaming uncontrollably.

(Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 33.) At age eight, Robinson had his first drink of alcohol and he got drunk by age twelve. (Ex. 1, Decl. of Mark Cunningham, at 22.) By seventh grade, Robinson was consuming large quantities of liquor on a frequent basis. (*Id.*) Occasionally, Robinson went to school intoxicated.

By early adolescence, Robinson craved any sort of attention. As one teacher observed, "[t]he attention Julius would have needed to come from his parents, he ended up getting from his peers." (Ex. 27, Decl. of Willie Parker, at ¶ 4.) Unfortunately, the only person willing to provide such attention was his gang-affiliated cousin, Rodney White. Rodney soon introduced Robinson to his friend, Johnny "John-John" Wright, who decided to instigate a pseudo-gang movement in Dermott. (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 11.) One by one, Rodney and John-John "initiated" Dermott youth into the gangs through violent beatings, including

Robinson.  (Ex. 23, Decl. of Carl McCree, at ¶ 5.)  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 35.) (noting that "the other kids had hit [Robinson] with bottles" and injured him so severely "that it took Margaret one month to cure him.").

Unfortunately, there was no one at home willing or able to look out for Robinson.  Leroy Kennedy, Robinson's youth counselor, explained:

> I remember being concerned that the grandparents' home was somewhat chaotic. They had a revolving door policy, with young people coming and going all the time. Friends and relatives seemed to live there for a few days, then disappear.  It was not a stable environment.

(Ex. 22, Decl. of Leroy Kennedy, at ¶ 5.)

Eventually, the police suggested to John Hollimon that Robinson needed to leave town. Consistent with the Hollimon tradition of abdicating parental responsibility, Robinson was shipped off to live with his mother.

> **d.**    **The Cursory Presentation By Defense Counsel Regarding Robinson's Care by his Grandparents Falsely Portrayed His Chaotic Upbringing as "Stable"**

John Hollimon, Jr., his uncle, was the only witness to testify regarding Robinson's childhood in Dermott.  Trial counsel relied on the least knowledgeable person to describe for the jury Robinson's childhood with his grandparents in Dermott.  As a result, the jury was left with the false impression that Robinson "led a relatively normal upbringing." *Bell v. Cone*, 535 U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

John, one of the older sons of John, Sr. and Margaret, left Dermott as teenager, long before Robinson had arrived.  (Ex. 14, Decl. of John Hollimon, Jr., at ¶ 5.)  Because John lacked any firsthand knowledge of the day-to-day circumstances of Robinson's home life in Dermott,

he gave the only answers one would expect from a distant relative. He testified that Robinson lived in a "stable environment" in a "decent home" run by grandparents who "raised [him] right." (21 RT 142, 151.)

Many other relatives and neighbors, much more familiar with Robinson's home life in Dermott, would have been able to provide a true picture of a much different reality. These witnesses could have testified that John and Margaret Hollimon were so constrained by their physical and mental limitations, they were unable to provide the guidance that Robinson required. (Ex. 33, Decl. of Willie White, at ¶ 9.) Far from stable, Robinson's home life is described as "chaotic," with people coming and going. (Ex. 22, Decl. of Leroy Kennedy, at ¶ 5.) It was the opinion of some that Robinson left to fend for himself, often seen roaming the streets at an early age. (Ex. 27, Decl. of Willie Parker, at ¶ 2.) Even his teachers noticed that Robinson was in serious need of parental guidance. (Ex. 36, Decl. of David York, at ¶ 2; Ex. 37, School Records of Julius Robinson.)

The problem with relying exclusively on John Hollimon's testimony is that it failed to explain how Robinson was neglected by his grandparents after being abandoned by his parents. By presenting the testimony of other witnesses who were much more familiar with Robinson's upbringing in Dermott, the jury would have learned how the grandparents' inadequate supervision contributed to Robinson's slide into juvenile delinquency.

e.       **Robinson Struggled Throughout His Adolescence and Early Adulthood To Support And Help his Drug-Addicted, Emotionally Absent Mother**

As bad as the situation was in Dermott, Robinson's life worsened when he moved to Arlington at age thirteen. (Ex. 37, School Records of Julius Robinson.)

Despite the passage of more than a decade since she had abandoned Robinson, Rose was still the same alcoholic, drug addict.  Whenever payday arrived, Rose would reward herself with a bottle of whiskey which lasted "about four or five days."  (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 15.)  Rose also smoked marijuana joints, including ones laced with cocaine. (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 18; Ex. 16, Decl. of Jana Hollimon, at ¶ 4.) During these episodes, Rose's behavior fluctuated between stuporous and irate.  (Ex. 14, Decl. of John Hollimon, Jr., at ¶ 9 (during his visits, Rose was "really out of it" and had a "temper" when she drank too much).)  Robinson often pleaded with his mother to quit using drugs and drinking, always to no avail.  (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 16.)

In the grips of her addiction, Rose had neither the inclination nor wherewithal to start acting as a mother to Robinson. "I had the impression that Julius didn't really have anyone at home to care for him." (Ex. 36, Decl. of David York, at ¶ 2.)

Rose did not have enough money to meet even the bare necessities.  Rose often called her father, complaining that "she didn't have any money for the rent or food."  (Ex. 7, Decl. of Josephine Dotson, at ¶ 15.)  Robinson still did not have enough to eat.  As Marcus observed during the times he stayed with Rose and Robinson in Arlington, the situation was quite bleak:

> I remember not having anything to eat but potatoes with ketchup or hot sauce for days, waiting for my mother to get her paycheck. That's all the food there was in the house.

(Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 15.)

When Rose quit working, Robinson's situation became dire. Robinson wanted to support his family, but the employment opportunities for a young adolescent without a high school diploma were virtually nonexistent. Desperate and destitute, Robinson tried to earn money the only way he knew how: illicit drug sales. (Ex. 7, Decl. of Josephine Dotson, at ¶ 19.)

> **f.     The Defense Presentation at Trial Provided an Incomplete and Inaccurate Snapshot of Robinson's Life in Arlington**

The only discussion of Robinson's difficult home life at his penalty trial consisted of his mother's half-hearted discussion of her drug and alcohol use. (21 RT 167.) As a result, the jury never learned of Robinson's difficult adolescence, much less told how his miserable home life lead to his drug dealing.

Although defense counsel had significant concerns about calling Robinson's mother as a witness, they nevertheless presented Rose as a witness and relied on her as the primary source of information regarding Robinson's life in Arlington. Even before Rose took the witness stand, lead defense counsel believed she would attempt to "minimize her dysfunction." (Resp. Ex. A, Aff. of Wessley T. Ball, at 6.) As defense counsel later conceded, that's precisely what Rose did: "[u]nfortunately, Mr. Robinson's mother in my opinion was not willing to portray herself in a light that was too negative." (Resp. Ex. A, Aff. of Wessley T. Ball, at 7.)[7] In her

---

[7]The defense investigator made a similar observation. (Gov't. Ex. C, Aff. of Bruce Cummings, at 4-5 (explaining their efforts to stress "the need [for her] to portray a more realistic accounting of what kind of mother she actually was. Those efforts proved fruitless.").)

brief testimony regarding her drug and alcohol use (21 RT 167-168), Rose grudgingly admitted to drinking "all the time," but she was deliberately vague about the details, such as the quantities and frequency with which she drank. She was certainly unwilling to discuss the impact of her behavior on Robinson. (*Id.*)

As friends and family members could have explained, the situation was far worse than Rose let on. The only time Rose uttered a sober breath was "when she woke up in the morning." (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 16.) Rose "wasn't the kind of person that could have just one drink." Instead, "[s]he would get falling down drunk." (Ex. 5, Decl. of Jamila Camp, at ¶ 12.) Rose was also quite belligerent when she drank, especially when someone attempted to stop her. (Ex. 14, Decl. of John Hollimon, Jr., at ¶ 9.) Not surprisingly, Rose refrained from discussing the impact that her drinking had on her children. (Ex. 5, Decl. of Jamila Camp, at ¶ 12.)

Rose was even less forthcoming in her testimony when addressing her drug use. According to Rose, it was her co-workers in Arlington who first exposed her to a marijuana and cocaine concoction known as "primos." (21 RT 167.) Rose made it seem as if she really had no intention of using drugs, she "just got caught up in the drug scene." Rose was adamant that she only "continued for a little while, and then [she] beat it." (21 RT 168.) Ultimately, Rose convinced the jury that her drug use was recreational and fleeting.

In reality, Rose had been a drug addict most of her life. As a teenager, Rose smoked marijuana and inhaled cocaine on a regular basis. Rose's addiction was so severe that she did not have the self-control to quit or at least curtail her drug use during her pregnancy with Robinson. (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 17.) Even the few times Rose visited Robinson in

Dermott, she was too preoccupied with smoking marijuana with friends to visit with her children. (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 6.) Whether or not Rose's first introduction to smoking "primos" was made by her co-workers, Rose quickly embraced the habit and took it to another level. Practically every weekend, Rose smoked primos -- not with her co-workers -- but with a cousin who lived nearby. (Ex. 16, Decl. of Jana Hollimon, at ¶ 4.) Because her addiction had escalated so dramatically, Rose was unable to "beat" her addiction, as she claimed. Rose was only able to stop through the aid of her son, Julius Robinson, who helped her "get a fresh start" in Ohio. (Ex. 5, Decl. of Jamila Camp at ¶ 12.)

Although John Hollimon testified regarding his observations of Robinson's home life in Arlington, he was unable to shed any light on day-to-day struggle as John visited his sister, Rose, only "a couple of times" when she lived in Arlington. (21 RT 142.) Thus, John's opinion that it was a "very dangerous environment" or that Rose was "not as strong as she need[ed] to be," would have carried little weight with the jury because he had only a modest opportunity to view the daily saga Robinson suffered at his mother's household. At base, such "skeletal" testimony "contained none of the details" which other witnesses could have provided. *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003).

A much more logical choice to provide a true picture of Robinson's adolescence was his brother, Marcus. *Lewis*, 355 F.3d at 368. Marcus lived with Rose and Robinson for five months in Arlington. He had extensive firsthand knowledge of the horrific cycle of substance abuse and parental neglect:

> When she came home from work, she smoked marijuana. She smoked every day. She also drank. When she drank, her speech would become slurred and she would yell. Sometimes she would leave the apartment and sometimes she would just go to

41

bed. I was always amazed that she could get up the next morning and go to work after how much she had been drinking the night before.

(Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 18.)[8]

Not only did the testimonies of Rose and John, Jr. provide the jury with a false depiction of Robinson's adolescence in Arlington, this presentation implicitly signaled the lack of any sympathetic circumstances in Robinson's background generally. Throughout the penalty phase presentation, the jury was told the importance of background information in deciding whether to mitigate the sentence. Accordingly, the jury would have naturally expected to learn about some sympathetic mitigation evidence. The jury was no doubt disappointed when it was told that the first and only hardship Robinson suffered was his mother's experimentation with drugs in his late adolescence. Without knowing that this event was only the latest in a lifetime of tragedies that befell Robinson, the jury would have considered his mother's drug use an aberration in an otherwise normal life.

The remainder of the defense evidence regarding Robinson's background served only to fuel the jury's misconception on this point. Trial counsel devoted the lion's share of the defense presentation to discussing Robinson's high school football career. Five witnesses testified solely to discuss their observations of Robinson on the gridiron. "Quiet, respectful, no problems" was the opinion of one coach. (21 RT 49.) Another coach described Robinson as

---

[8]Jana Hollimon also witnessed Rose's behavior:

One summer when I was about ten or eleven years old, I went to stay with Julius and his mother, Rose, in their apartment in Arlington, Texas. I remember staying with them for several months. . . . Rose would come home from work every day and go into her room or else the bathroom and smoke marijuana . . . .

(Ex. 16, Decl. of Jana Hollimon, at ¶ 4.)

42

having "played hard" and having a "good attitude" (21 RT 77), while another characterized him as being "well-liked" and never causing any problems.  (21 RT 5-6.)  Still another coach found that Robinson was "quiet" and "respectful."  (21 RT 49.)  The only teammate to testify expressed a similar view, characterizing Robinson as a "good player" who was "well-respected."  (21 RT 14.)  At best, the jury would have ignored evidence of Robinson's positive demeanor in football practice, finding it trivial and irrelevant to the sentence consideration.  At worst, the jury would have relied upon Robinson's involvement in football as further confirmation that he enjoyed a typical or perhaps even privileged existence.

Ironically, had trial counsel questioned any of these witnesses regarding Robinson's background, counsel could have placed his football experience in proper context.  Instead of portraying Robinson as a typical student engaged in extracurricular activities, the defense could have conveyed Robinson's remarkable determination to participate in the football program notwithstanding his difficult home life.  As one of the testifying coaches recently explained:

> Although Julius never mentioned anything about his family, I had the impression that Julius didn't really have anyone at home to care for him.  My experience working with kids has taught me to recognize the kids whose home life is compromised.  I am convinced that if Julius had grown up in a different environment, he would have had another kind of life.  I say this because he tried so hard to do well. . . .  Many kids drop out or don't get enough preparation to live a stable and productive life.

(Ex. 36, Decl. of David York, at ¶ 2.)

### 3. The Penalty Phase Was Devoid of Evidence Regarding Robinson's Significant Mental Impairments Which Would Have Extenuated His Crimes and Mitigated His Punishment

In addition to the disturbing circumstances of Robinson's life, the jury was never allowed to consider Robinson's significant mental impairments.  Robinson suffered brain damage from

43

his exposure to alcohol in utero and to pesticides throughout his childhood.  Far from "hogwash,"

so the Government contends, this mental health evidence could have further tipped the scale in

favor of life.  (Resp. at 40.)

Dr. Martin concludes that Robinson's mental impairments are generally consistent with

chronic exposure to organophosphate pesticides.  (Ex. 2, Statement of Stephen K. Martin, Ph.D.,

at 3.)   The Government's numerous attacks on Dr. Martin's opinion are unavailing.

Significantly, the Government has offered no expert opinion that Robinson does not suffer from

brain damage.  Thus, there is no competent attack on Dr. Martin's methodology or his ultimate

conclusion, just counsel's verbal pot shots.

In addition, the Government is simply erroneous in arguing that evidence of mental

impairments would not have been admissible as mitigating evidence.  (Resp. at 39.)  To be

material in the penalty phase of a capital proceeding, the evidence need only "tend[ ] logically to

prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have

mitigating value."  *Tennard v. Dretke*, 542 U.S. 274, 284, 124 S. Ct. 2562, 159 L. Ed. 2d 384

(2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440, 110 S. Ct. 1227, 108 L. Ed. 2d

369 (1990)).  Evidence of Robinson's mental impairments would have clearly been admissible at

the penalty phase. *Zant v. Stephens*, 462 U.S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)

(mental illness militates in favor of a lesser penalty).   Indeed, evidence of psychological

disorders or mental deficits is often compelling to a jury.  *Loyd v. Whitley*, 977 F.2d 149, 157

(5th Cir. 1992) (granting relief where counsel failed to develop independent evidence of mental

disease or defect); *see, e.g., Moore v. Johnson*, 194 F.3d 586, 613 (5th Cir. 1999) (discussing

44

"substantial evidence of impaired mental development and functioning, and some evidence of organic brain damage resulting from severe trauma.").

The Government also argues that there is no "anecdotal" proof that Robinson had been exposed to pesticides. (Resp. at 38.) This is belied by the record. As part of his original motion, Robinson included several declarations establishing that he was exposed to pesticides spraying throughout his childhood. (*See* Ex. 12, Decl. of Mildred Hollimon; Ex. 16, Decl. of Jana Hollimon; Ex. 29, Decl. of Jimmie Lee Robinson; Ex. 30, Decl. of Marcus Jwain Robinson.) As a child, Robinson lived next to soybean fields constantly sprayed with pesticides. (Ex. 12, Decl. of Mildred Hollimon, at ¶ 7.) Unaware of the dangers posed by pesticides, the grandparents often permitted Robinson and the other children to play in the fields. (Ex. 16, Decl. of Jana Hollimon, at ¶ 3; Ex. 30, Decl of Marcus Jwain Robinson, at ¶ 7.)

The Government completely ignores an additional etiology for Robinson's neurological impairments: Robinson's exposure to toxins *in utero*. While in the womb, Robinson was poisoned by alcohol. His father recalled that his mother "drank a minimum of two to three beers" and "smoked a half an ounce of marijuana" throughout her pregnancy with Julius. (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 17.) Upon being asked by habeas counsel the first time any counsel for Robinson investigated this issue, Rose candidly admitted her transgressions:

> I got pregnant with Julius, but I didn't realize I was pregnant until I was into my sixth month and I fainted while I was at a barbeque some friends were having. The next thing I knew, I woke up in the hospital. Once I found out I was pregnant, I stopped smoking [marijuana]. The doctor said I should stop drinking beer, but I didn't.

45

(Ex. 17, Decl. of Rose Hollimon, at ¶ 13.)  Because Rose was not aware that she was pregnant, she had not sought prenatal care until her third trimester.  (*Id.*; *cf.* Ex. 38, Medical Records, at p. 7 (first prenatal record dated May 6, 1976, p. 3) (Robinson was born August 11, 1976.).)

The direct effects of the alcohol exposure were apparent at Robinson's birth.  Growth retardation, such as low birth weight or height, is one of the diagnostic criterion for fetal alcohol exposure.  (Ex. 47, FETAL ALCOHOL SYNDROME:  GUIDELINES FOR REFERRAL AND DIAGNOSIS, CENTER FOR DISEASE CONTROL.)  At delivery, Robinson weighed only five pounds, six ounces. (Ex. 38, Medical Records, at p. 14).  Robinson's height and weight measurements would have been disconcerting for any newborn.  (Ex. 48, Robert C. Vandenbosche & Jeffrey T. Kirchner, INTRAUTERINE GROWTH RETARDATION, Am Fam Physician. 1998 Oct 15;58(6):1384-90.)  The fact that Robinson was not premature made these findings all the more worrisome.  Indeed, Robinson was beyond full term, having been born after forty-two weeks of gestation. (Ex. 38, Cape Fear Medical Records, p. 3, 18 ("42½ wks, delivered"); *see* Ex. 49, Jennifer R. Butler, MD, POSTTERM PREGNANCY, Emedicine.com (2006), available on the internet at www.emedicine.com/med/topic3248.htm (Jun. 14, 2006) (defining postterm pregnancy as greater than 42 weeks of gestation).)  Given Robinson's extremely low birth weight, and lengthy gestational period, the doctors designated Robinson as "SGA," which is the abbreviation for "small for gestational age."  (Ex. 38, Cape Fear Medical Records, at p. 3; Ex. 50, MEDLINE PLUS MEDICAL ENCYCLOPEDIA, available on the internet at http://www.nlm.nih.gov/medlineplus/ ency/article/002302.htm (defining SGA).)  Complicating the delivery further was the fact that Rose had too much amniotic fluid.  This phenomenon, known as "polyhydramnios," is correlative to congenital malformations, including birth defects affecting the central nervous

46

system.[9]  (Ex. 51, Stoll CG, Roth MP, Dott B, Alembik Y, STUDY OF 290 CASES OF POLYHYDRAMNIOS AND CONGENITAL MALFORMATIONS IN A SERIES OF 225,669 CONSECUTIVE BIRTHS, Community Genet. 2(1):36-42 (1999) (concluding that more frequent congenital malformations are associated with polyhydramnios were cardiac, digestive, central nervous system, musculoskeletal, and urinary).)  Alcohol exposure *in utero* is a common cause of such defects.  (Ex. 52, C.L. McGee & E.P. Riley, BRAIN IMAGING AND FETAL ALCOHOL SPECTRUM DISORDERS, Ann Ist Super Sanita, 42(1):46-52 (2006) ("Over thirty years of research has revealed that prenatal exposure to alcohol has a devastating impact on the structure and function of the developing central nervous system.").)

This chronic drug and alcohol exposure may have affected Robinson throughout his life.  As Dr. Cunningham explained in his report, "[a]lcohol has a well-established teratogenic impact on a developing embryo and fetus *in utero*."  (Ex. 1, Decl. of Mark Cunningham, at p. 18.)  Alcohol exposure, to the extent that Robinson suffered, would have produced significant neuropsychological deficits, including learning disabilities and attention-related problems.[10]  (*Id.*)  One of the most profound consequences would have been felt in the area of executive functioning.  (*Id.*); (Ex. 53, Connor PD, Sampson PD, Bookstein FL, Barr HM, Streissguth AP.  Related Articles, DIRECT AND INDIRECT EFFECTS OF PRENATAL ALCOHOL DAMAGE ON EXECUTIVE FUNCTION, Dev. Neuropsychol. (2000) 18(3):331-54.)  This includes such brain-

---

[9]One of the reasons for polyhydramnios is that the fetus has underdeveloped motor skills, including swallowing.  As a result, the fetus cannot ingest as much amniotic fluid as a normal fetus, thus, leaving too much amniotic fluid remaining in the womb.  (Ex. 51.)

[10]Dr. Martin's findings of cognitive impairments are entirely consistent with the effect of alcohol exposure *in utero*.  (Ex. 1, Decl. of Mark Cunningham, at 17-18.)

related deficits as distractability, impulsivity, and "perseveration," which is difficulty in abandoning ineffective strategies. (Ex. 1, p. 18.)

There is significant overlap between the cognitive impairments due to fetal alcohol exposure and pesticide exposure. As Dr. Martin explains, "The neuropsychological profile associated with pesticide exposure can share common neurocognitive characteristics with the neuropsychological profile associated with the teratogenic effects of fetal alcohol and fetal cannibis exposures." (Ex. 63, Supp. Statement of Dr. Stephen K. Martin.) At the time Dr. Martin issued his report, he had not received any material addressing possible drug or alcohol use by Rose during her pregnancy with Robinson. (Ex. 63.) "Although it remains [his] opinion that the results of Mr. Robinson's testing are generally consistent with subtle cognitive deficits associated with chronic exposure to organophosphate pesticides," Dr. Martin has also concluded that "fetal alcohol and cannabis exposure could serve as an additional etiological basis for Mr. Robinson's neuropsychological impairments." (*Id*.)

Whether Robinson's cognitive impairments resulted from his fetal alcohol exposure, chronic childhood pesticide exposure, or both, there is no question that Robinson suffered toxicological effects. Robinson had a history of academic problems in school. Dermott Elementary School records reflect that Robinson failed and repeated the third grade. (Ex. 37, School Records.) Robinson was considered academically slow by nearly all of his elementary and high school teachers. (Ex. 9, Decl. of Arlette Gorins, at ¶ 2 ("He was academically slow but was not a trouble maker. He received an F in my class.").) Robinson was incapable of completing the normal curriculum at high school and was transferred to an alternative school for students with learning difficulties. (Ex. 37, School Records.) Even though Robinson

48

ultimately received his high school diploma, his achievement fell far short of the education level expected of a high school graduate.[11]  Recent test results show that Robinson's reading level was at the 7th grade level, or bottom 12%; his spelling was at the third grade level, or bottom 3%; and his math skills were at the 6th grade level or bottom 9%.  (Ex. 37, School Records.)

Trial counsel could have used evidence of Robinson's neurological deficits to mitigate the punishment in this case.  Specifically, trial counsel could have explained how Robinson's cognitive impairments contributed to his ultimate involvement in selling drugs.  In light of his significant learning disabilities, coupled with the limited opportunities available to someone in Robinson's socio-economic situation, Robinson would never been able to attain any level of accomplishment.  Although Robinson desperately tried to support himself and his family through menial labor, this was never enough.  When his financial situation became dire, it is understandable that he would resort to selling drugs to support his family.  Therefore, evidence of Robinson's brain damage would have not only met the minimum admissibility threshold, it would have served as important evidence in mitigation.

---

[11]Because Robinson had some athletic talent, he was simply passed to the next grade throughout his academic career.  As one teacher explained:

> If a student was good in sports but had a lot of difficulty in academic subjects, the coaches would request that he or she receive some special attention in the form of one-on-one help. The student, thereby, would be able to meet the grade requirements needed to participate in sports.

(Ex. 9,  Decl. of Arlette Gorins, at ¶ 3.)

**4.    Due to Counsel's Ineffective Assistance, The Penalty Phase Was Devoid of the Compelling Evidence of Robinson's Good Character Notwithstanding His Difficult Upbringing**

In discounting the available mitigating evidence that the defense could have presented, the Government ignores significant evidence of Robinson's good character. But as the recent submission establishes, in the face of overwhelming oppression and limited guidance, Robinson nevertheless managed to express genuine kindness where he had been shown none. Whether this would have served as an independent ground for negating a death sentence, it would have undoubtedly contributed to titling the scales in favor of life.

Positive aspects of a defendant's character are relevant to the sentence determination. *Tennard*, 542 U.S. at 285; *Franklin v. Lynaugh*, 487 U.S. 164, 186, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988) (O'Connor, J., joined by Blackmun, J., concurring in judgment) (referring to "positive character traits that might mitigate against the death penalty"). Evidence of a defendant's good character despite a difficult background supports the notion that the defendant is not beyond redemption. *Boyde v. California*, 494 U.S. 370, 382, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); *Penry*, 492 U.S. at 306 ("a defendant who commits crimes attributable to a disadvantaged background or emotional and mental problems may be less culpable than one who has no such excuse."). At the very least, good character evidence "humaniz[es the defendant] by demonstrating that there were people along the way who saw some worth in him and befriended him." *Neal*, 286 F.3d at 236 (finding prejudice based upon trial counsel's failure to investigate available mitigation evidence). The sheer number of witnesses willing to testify positively on a defendant's behalf might be enough to persuade the jury to spare his life.

*Waters v. Thomas*, 46 F.3d 1506, 1519 (11th Cir. 1995) (en banc) (noting that just having

a witness on the stand can humanize the defendant in the eyes of the jury).

As the habeas investigation demonstrates, Robinson performed a variety of generous acts

despite his difficult background. Most striking was Robinson's support of his mother. Given

the physical abandonment and emotional neglect Rose had inflicted upon her son, one could

hardly expect Robinson to be civil towards her, much less express compassion. Despite it all,

Robinson loved his mother unconditionally. As his girlfriend explained:

> Julius loved his mother more than I ever could have, given the circumstances.
> He was very hurt and embarrassed by her substance abuse and her behavior, but he
> always tried to include her in his life.

(Ex. 5, Decl. of Jamila Camp, at ¶ 12.) In addition to providing financial support for himself

and his mother while attending high school, Robinson ultimately saved his mother from

her addiction. Realizing that she lacked the willpower to stop using drugs in Arlington,

Robinson paid for Rose to get a "fresh start" in Ohio.[12] (*Id.*)

Another example of Robinson's positive contributions was his efforts to shield

his younger cousin from negative influences. When Antonio Ford started to get into trouble

in Dermott, Robinson brought him to live with him in Arlington. (Ex. 12, Decl. of Mildred

Hollimon, at ¶ 9.) Robinson enrolled Tony at his alma mater, Lamar High School, and petitioned

the coaches to let him play football. The staff was more than impressed by Robinson's efforts.

(Ex. 25, Decl. of Willie Michael Nelson, at ¶ 3.) As one teacher noted: "I thought it was

amazing that Julius was [helping his cousin]. He was a child himself and yet he was taking on

the role of caretaker." (Ex. 35, Decl. of Carol Wilson, at ¶ 3.) What made his act of kindness

---

[12]Julius also provided for his older brother. (Ex. 5, Decl. of Jamila Camp, at ¶ 11.)

51

further remarkable was that Robinson never had anyone in his life looking after his welfare, yet he was willing to care for a cousin.

Robinson's compassion extended to caring for other people's children as well. Robinson helped babysit and even assumed the role of part-time father for his brother's children. Robinson also assisted with babysitting for newborn babies. As his girlfriend explained,

> Julius loved babies and children. . . . I offered to babysit [my niece] and give my sister a break when the baby was two or three months old. Julius helped me. He changed and burped the baby, did everything.

(Ex. 5, Decl. of Jamila Camp, at ¶ 9.)

Nothing in the defense penalty presentation came close to depicting Robinson's positive attributes. The only evidence presented was a single incident where Robinson had turned in a lost wallet without taking any money. (21 RT 44-46.) Such an insignificant, isolated example of positive character was likely completely ignored by the jury. Not surprisingly, the prosecution seized upon the wallet evidence as further support for Robinson's lack of positive attributes. (23 RT 66-67 ("He returns the wallet. At the same time, he is willing to shoot up that pickup truck with this little girl in it, shoot up her parents' house because they have his $130."); 23 RT 120 ("Sure he gave $120 back to one of those coaches, but he was expecting $120 from Sarah when she wasn't paying it, pumped her truck full of holes and a couple of rounds in her mother's apartment for good measure.").)

52

**5.    Balancing All Available Mitigating Evidence Against the
Substantially Diminished Aggravating Evidence, There
Is a Reasonable Probability that Robinson Would Have
Averted the Death Penalty**

Following a reasonable investigation, trial counsel could have influenced at least one juror to vote for a life sentence. Reasonable trial counsel would have discovered and offered strong evidence of Robinson's troubled background and refrained from presenting the false depiction of Robinson as someone who enjoyed a normal upbringing. Moreover, trial counsel would have shown that Robinson suffered brain damage as a result of his mother drinking alcohol through her pregnancy and from his constant exposure to toxic pesticides during his childhood. Trial counsel should have shown how Robinson displayed positive qualities. To counter the prosecution's evidence in aggravation, trial counsel should have been able to provide direct testimony to rebut the claim that Robinson ordered a hit against "One Love" Williams. Trial counsel would have also discounted the dubious claim that Robinson was affiliated with a notorious street gang. Finally, trial counsel would have shown that Robinson unknowingly fired shots at a parked truck when Tucker was inside. Given the totality of the available evidence in mitigation and the available evidence to rebut the case in aggravation, competent counsel would have succeeded in tipping the balance in favor of life.

To support its contention that Robinson was not prejudiced as a result of trial counsel's deficient investigation, the Government argues that Robinson's life history is not equivalent to the mitigating evidence present in the Supreme Court's recent trilogy addressing ineffective of assistance of counsel claims. (Resp. at 48 (contrasting Robinson's case with *Williams*, *Wiggins* and *Rompilla*, *supra*.).) But the Government misconstrues the facts upon which these

53

cases depend and misapprehends the principle upon which these cases stand.  Similar to Robinson's life, all of these cases dealt with  information regarding the defendant's sympathetic background and mental impairments.  And, just as in Robinson's case, the court found trial counsel ineffective for failing to investigate the client's life history.  The fact that the Supreme Court found the prejudice prong was satisfied in those cases, in no way delineated these showings as the minimum threshold.  Moreover, none of these cases dealt with the failure to rebut powerful evidence in aggravation, which was a critical issue at Robinson's penalty phase.

Finally, it is important to note that the Supreme Court was forced to apply a much more stringent standard in those cases than in the instant one.  Because the Supreme Court was dealing with habeas petitions filed by state prisoners, relief could only be granted if the state courts engaged in an "unreasonable application" of "clearly established federal law."  *See* 28 U.S.C. § 2254(d)(1) (2006).  Under this deferential standard, it is not enough the state ruling is "incorrect or erroneous," the decision must be "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75, 155 L. Ed. 2d 144, 123 S. Ct. 1166 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1; 157 L. Ed. 2d 1 (2003)).   Concerns for comity are not implicated when a federal prisoner seeks collateral relief, and AEDPA's onerous standards do not apply to this case. *Visciotti*, 537 U.S. at 24 (identifying the 2254 as a "highly deferential standard for evaluating state-court rulings . . . which demands that state court decisions be given the benefit of the doubt").  A federal prisoner need only establish "the sentence was imposed in violation of the Constitution or law of the United States." 28 U.S.C. § 2255 (2006).

Adopting the same reasoning that trial counsel advances to excuse their ineffective investigation, the Government also argues that the death verdict was inescapable given the

severity of the crimes.  (Resp. at 48-49.)  The Government's argument rests on the untenable

assumption that the jury completely its responsibility at the penalty phase.  As the Supreme Court

has cautioned, "the assessment of prejudice should proceed on the assumption that the

decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern

the decision." *Strickland*, 466 U.S. at 695.  In this case, once the jury found Robinson was

eligible for the death penalty, it still "had to decide whether he should receive a death sentence."

*Jones v. United States*, 527 U.S. 373, 377, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999).  Before

deciding on the death sentence, federal law "requires that the sentencing jury consider all of the

aggravating and mitigating factors and determine whether the former outweigh the latter." *Id.*

 (citing 28 U.S.C. §§ 3591(a), 3592, 3593(e)).  Without more, it is preposterous to assume that

the jury would have decided to "shirk its constitutional duty to render a reasoned, moral

decision." *Kansas v. Marsh*, ___ U.S. ___, 126 S. Ct. 2516, 2528 (2006); *Strickland*, 466 U.S.

at 694 ("a court should presume . . . that the judge or jury acted according to law").

Even assuming the jury relied substantially on the underlying crimes in deciding to

impose death, the record establishes that the verdict was also based on the penalty phase

evidence.[13]  As outlined in the special verdict form, the jury was to determine several statutory

and nonstatutory mitigating and aggravating factors before conducting the weighing calculus.

(Ex. 45, Special Verdict Form.)  Although many of these issues dealt with the relative culpability

and punishment of the co-defendants, two factors were concerned exclusively with Robinson.  In

each instance, the jury ruled against him.

---

[13]Nevertheless, if the Government's assumption is correct, then that provides a basis for relief.  To that end, the court should permit Robinson leave to interview the jurors, in order to put this issue to the test.

First, the jury unanimously concluded beyond a reasonable doubt that Robinson "is a future danger to the lives and safety of other persons." (Ex. 45, Special Verdict Form, at p. 4.) While the instruction listed lack of remorse as a possible basis, the aggravating factor was concerned essentially with Robinson's conduct, such as "specific threats" and "acts of violence." (*Id.*) Given the intense focus that the prosecution placed on the Williams "hit", gang membership and the Tucker shooting, these matters served as a significant basis for the jury's finding of future dangerousness.

Second, none of the jurors found anything in Robinson's background that militated against the death penalty. The special verdict form asked the following question:

> Do any of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

(Ex. 45, Special Verdict Form, at p. 7.) Not one of the jurors concluded that Robinson's background justified a lesser sentence. (*Id.* (reflecting "0").)

Based upon these predicate findings, the jury would have been hard pressed to conclude that the aggravating factors did not outweigh the mitigating factors. Indeed, in light of the disparity between aggravating and mitigating findings, the jury would have been forced to resort to "nullification" in order to reach a life sentence. *Strickland*, 466 U.S. at 695 ("An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.") Consequently, because the aggravating and mitigating findings were dictated by the inadequate presentation at the penalty phase, there is no question that trial counsel's performance directly affected the death verdict.

56

The likelihood that trial counsel's deficient performance prejudiced Robinson's sentence is underscored by the result reached in the companion case of L.J. Britt, which was also heard by this Court. Though not identical, there are numerous similarities between their cases. Both Robinson and Britt had been charged with personally killing two individuals and with participating extensively in the interstate drug trafficking operation. Both had been linked to the Dermott Crips. Both were accused of committing prior acts of violence, in addition to the capital crimes. Brit had been accused of twice burglarizing and then robbing a family at gunpoint. The second time, he fired a warning shot in the presence of four young children when the frantic wife failed to produce some money. Volume 24, Reporter's Transcript from *U.S. v. L. J. Britt*, No. 4:00-CR-00260-15, at 9-18 (hereinafter "BRT") Robinson had been accused of shooting at the truck of one of his drug customers as well as the home of her parents. Robinson was also implicated, albeit falsely, in the Williams assault.[14] Notwithstanding the many similarities, Britt's life was spared, Robinson was sentenced to die.

Obviously, there are some differences, too. Robinson had been implicated in an additional drug-related murder although there was no allegation that he was involved personally in the shooting. Britt had an extensive record of felony convictions, Robinson did not. But the most dramatic distinction by far was the amount and quality of mitigating evidence presented during their respective penalty phases.

Unlike Robinson's trial counsel, the defense attorneys for Britt presented a multitude of character and background witnesses on his behalf. The evidence offered at Britt's trial

---

[14]Each were known by a menacing nickname, Robinson was called "Scar Face" while Britt was called "Capone."

consisted of introducing residual doubt and highlighting Britt's good character.  Britt's younger sister, Felicia, characterized him as a kind and loving brother who had been positive influence on her life, including encouraging her to graduate from high school. (24 BRT 73-91.)  Britt's first cousin recounted his generosity when she was confined to a wheelchair, including cooking, babysitting for her children, and even the un-glamorous task of emptying her commode. (24 BRT 92-105.)  A close friend explained the attention Britt had shown towards her eight children and had often babysat for them.  (24 BRT 114-25.)  Kimmy Burnett, his current girlfriend, testified about his constant moral support.  He inspired her to remain in college when she was determined to quit and spent significant time with her nephew practically raising him as his own son.  (24 BRT 158-67.)  Zadrian Johnson talked about how Britt was a positive role model in his life, dissuading him from hanging out in the streets.  (24 BRT 168-74.)  All of these witnesses expressed disbelief as to Britt's guilt.  Despite overwhelming evidence to the contrary, each witness insisted that he was not involved in drug dealing, robberies, and certainly not murder.[15]

        To further elucidate Britt's positive attributes, the defense called two jailers who guarded Britt following his arrest and confinement.  The first officer confirmed that Britt had no record of disciplinary infractions throughout his entire thirteen-month incarceration.  (24 BRT 6.)  The other officer listed positive contributions that Britt had made during his detention.  Just some examples of his good deeds included helping prevent a potential suicide, thwarted a potential inmate attack, quelled fights between inmates and guards, and even spoiled an escape plot.

---

[15]The defense also presented numerous letters from coaches, teachers, and friends vouching for Britt's good character.

(24 BRT 6.)  In additional, the guard discussed how Britt regularly participated in Bible study and helped distribute laundry to inmates.  (*Id.*)

Apart from character witnesses, Britt's stepfather and mother testified on his behalf. Larry Robinson[16] discussed the privation that Britt suffered in his life.  (24 BRT 155-57.) He described how the family was poor and considered every day a struggle to survive. According to Mr. Robinson, there were too few jobs in Dermott.  Although he suspected that Britt sold marijuana, it was how he supported himself when he could not find work.  (*Id.*)

Larry Robinson also offered his opinion as to Britt's character.  He found Britt to be great with kids, patient and never violent.  (24 BRT 137-50.)  By way of example, Mr. Robinson explained how Britt showed enormous restraint following his brother's murder by not trying to avenge his death.  He never considered Britt much trouble and certainly not a bully to the other kids, despite his size.  Mr. Robinson, who had worked for the Arkansas Department of Corrections for ten years, was familiar with convicted murders and was certain that Britt was not like them.  (24 BRT 182-214.)

The defense presentation concluded with Britt's mother, Betty Jean.  She related her struggle to raise Britt as a single mother when he was only two years old.  Working two jobs, Betty rarely saw her children.  As Britt got older, he tried to alleviate his mother's burden, whether he was repairing the house, cooking and cleaning, or babysitting for his brothers and sisters.  Britt even performed well in school until he decided to drop out to take care of his son. Britt was very close to his son and had never been known to hurt him.  In the end, Betty Jean made a passionate plea for his life.  (24 BRT 182-214.)

---

[16]Larry Robinson is unrelated to Julius Robinson.

While Britt's evidence was strong, the presentation paled in comparison to the wealth of available mitigating evidence in Robinson's background.  According to Britt's trial counsel, Britt's mitigation presentation consisted of a lingering "alibi" defense and that Mr. L. J. Britt was "The Babysitter." (Ex. 56, Aff. of Danny Burns, at ¶ 8.)  Despite an extensive investigation, Burns uncovered none of the traditional mitigating factors.  (*Id*. at ¶ 6.)  Britt came from a very loving close-knit family and was raised by his father and stepmother.  (*Id*.)  A psychologist evaluated Britt and examine his records determined that Britt did not have any mental health issues.  (*Id*. at ¶ 5.)  Moreover, Britt did average or better than average in school and had no mental or psychological problems.  (*Id*.)

Unlike Britt, Robinson had many of the traditional areas of mitigation.  While Britt came from a loving and supportive home while Robinson "had been deprived of the care, concern, and paternal attention that children deserve." *Eddings v. Oklahoma*, 455 U.S. 104, 116, 102 S. Ct. 869, 877, 71 L. Ed. 2d 1 (1982).  While Britt had no mental problems and did well in school, Robinson suffered from brain damage and did poorly in school.  Finally, evidence of Robinson's good character was at least on par with the examples of babysitting and moral support introduced on Britt's behalf.   If Britt's penalty phase case was enough to convince the jury to spare his life, it follows *a fortiori* that a presentation reflecting all available mitigating evidence from Robinson's background would have succeeded.

Of course, it is impossible to divine precisely what the jury relied upon in deciding Robinson's fate.  The ultimate penalty in a capital case is not simply the answer to a technical equation but instead "reflects a reasoned *moral* response to the defendant's background, character, and crime." *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)

60

(quoting *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (O'Connor, J., concurring) (emphasis in original).  In determining whether a defendant deserves death, a jury must weigh considerations "which are often unquantifiable and elusive." *Deck v. Missouri*, 544 U.S. 622, 633, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005).  That said, given the gross disparity between the compelling mitigating evidence that could have been presented between what actually was presented, Robinson was harmed by counsel's deficient performance. Even if it cannot be conclusively proven that the entire jury would not have been dissuaded from a sentence of death, there is a reasonable probability that at least one juror would have held out for life.  Consequently, Robinson has adequately satisfied the prejudice standard.

### B.    Trial Counsel Provided Deficient Performance By Failing to Conduct A Reasonably Investigation As Defined by Supreme Court Authority

The inaccurate and ineffective penalty phase presentation was the direct result of a shoddy investigation.  First, trial counsel refused to investigate the aggravating evidence that the prosecution intended to offer at the penalty phase.  Second, trial counsel never explored Robinson's background other than questioning only those witnesses that the client was able to identify.  Even then, the defense investigator conducted only a handful of interviews and asked questions unrelated to mitigation.  In light of trial counsel's failure to conduct a reasonable investigation, trial counsel could not have developed a proper understanding of the available mitigating evidence.  Because an uninformed decision can never qualify as a strategic one, trial counsel's performance was objectively unreasonable.

61

### 1.    The Prevailing Standards Dictated the Employment of A Mitigation Specialist to Conduct a Thorough Mitigation Investigation

At the outset, the Government's efforts to minimize the importance of the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases (2003) ("ABA Guidelines") are unavailing.[17]  While it is technically true that the Supreme Court has never mandated "a particular set of detailed rules," *Strickland*, 466 U.S. at 688, the High Court "long ha[s] referred to [the Guidelines] as 'guides to determining what is reasonable.'"  *Rompilla*, 125 S. Ct. at 2466 (quoting *Wiggins*, 539 U.S. at 524); *see e.g., Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) (upholding trial counsel's decision to concede guilt based upon the ABA Guidelines).  Several circuits, including the Fifth Circuit, have looked to the ABA Guidelines in assessing trial counsel's performance.  *See Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004); *Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006), *cert. denied*, 2006 WL 1887211 (July 20, 2006); *Martinez v. Dretke*, No. G-02-718, 2006 WL 305666 (S.D. Tex. Feb. 7, 2006) (noting that although "the [ABA] guidelines are not binding . . . the Supreme Court has clearly indicated that they should be taken into consideration"); *Alexander v. Quarterman*, 2006 U.S. App. LEXIS 20012, No. 05-70010 (5th Cir. Aug. 4, 2006) (discussing ABA Guidelines in conjunction with Supreme Court decisions).

Trial counsel violated many requirements set forth in the ABA Guidelines.  First, there is no indication that trial counsel possessed the requisite experience and training for handling

---

[17]The Government mischaracterizes Robinson's motion as alleging an independent ground for relief based upon the failure by the Northern District of Texas to implement the ABA Standards.  (Resp. at 27.)  Instead, Robinson points out this inadequacy in showing that trial counsel may have been more inclined to follow the Guidelines had that been a condition of appointment.

capital cases, specifically with regard to pretrial investigation for the penalty phase. *Compare* ABA Guidelines, 5.1B.1.c, at 961 (designating qualified counsel as one having sufficient training); ABA Guidelines, 8.1B.3, at 977 (requiring training in several areas including "pretrial investigation, preparation, and theory development regarding guilt/innocence and penalty") *with* Resp., Exs. A & B (discussion of capital experience but no mention of training in the litigation of capital cases).

Second, while the trial investigator had purportedly worked on several capital cases, there is no indication that he has received any "specialized training" in this area. *Compare* ABA Guideline 4.1, Commentary at p. 958 with Resp. Ex. C (no mention of specialized training).

Third, no member of the defense team was "qualified by experience and training to screen for mental or psychological disorders or defects." ABA Guidelines 4.1 A.2. As lead trial counsel conceded, "I do not profess to be a mental health professional." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 8.)[18]

In fact, both trial counsel admit they deliberately refused to hire a mitigation specialist in direct contravention of the ABA Guidelines. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 6; Resp. Ex. B, Aff. of Jack V. Strickland, at p. 6.) Mr. Ball has employed mitigation specialists since Robinson's case but does not explain why he failed to do so here. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 5.)

---

[18]Mr. Strickland does not indicate whether he has specialized knowledge in mental health issues. Nonetheless, Mr. Strickland offers his lay opinion that Robinson "exhibits the classic symptoms of an antisocial personality disorder." (Resp. Ex. B, Aff. of Jack V. Strickland, at p. 4.)

Contrary to Mr. Ball's assertions, the requirement to employ a mitigation specialist was common practice at the time of Robinson's trial. (Resp. Ex. A, Aff. of Wessley T. Ball ("at the time of Mr. Robinson's trial, the use of mitigation specialists was in my professional opinion not as common as it is today.").) By 1998, the use of mitigation specialists was considered the existing "standard of care" for all death penalty cases in federal court. Subcomm. on Federal Death Penalty Cases, Comm. on Defender Services, Judicial Conference of the United States, Federal Death Penalty Cases: *Recommendations Concerning the Cost and Quality of Defense Representation* (1998) (commentary).[19]  The use of a mitigation specialist was also the prevailing standard in Texas during Robinson's trial. *Wiggins*, 539 U.S. at 524 (concluding that counsel's failure to prepare a social history report "fell short of the professional standards" in Maryland in 1989). As John Niland, an attorney with the Texas Defender Service, explains: "the standard of practice in Tarrant County, Texas from 2001 to 2002" included "the hiring of a mitigation specialist" for "conducting a thorough social history." (Ex. 60, Decl. of John Niland, at ¶ 6.) Indeed, more than six years prior to Robinson's trial, attorneys were employing mitigation specialists in federal capital cases in the Northern District of Texas. *See*, *e.g., United States v. Hall*, 2006 U.S. App. LEXIS 16826, No. 04-70050 (5th Cir. July 5, 2006).

By far, the worst dereliction of trial counsel in assembling Robinson's defense team was the failure to employ a mitigation specialist. "Defense attorneys cannot provide effective assistance of counsel in . . . death penalty cases [ ] without the assistance of a mitigation specialist." (Ex. 60, Decl. of John Niland, at p. 1; *see* ABA Guideline 4.1, commentary (identifying the mitigation specialist serves as an "indispensable member of the defense team.").)

---

[19]The report is available at http://www.uscourts.gov/dpenalty/4REPORT.htm#a037.

The mitigation specialist is critical, not only for carrying out an exhaustive investigation into the client's life history, but also in collaborating with the defense team "to develop a comprehensive and cohesive case in mitigation." (ABA Guideline 4.1, commentary.)

Trial counsel disagree with the importance placed on mitigation specialists by the Supreme Court and professional guidelines. Mr. Strickland appears to be opposed to ever using mitigation specialists:

> Mitigation experts may simply be another in an ever-expanding group of cottage industry self-proclaimed experts who have sprung up and carved out a niche for themselves in criminal prosecutions in general and death penalty litigation specifically.

(Resp. Ex. B, Aff. of Jack V. Strickland, at p. 6.) Mr. Ball considers mitigation specialists to be "another form of investigator, doing investigative work that had traditionally been done by ordinary investigators and the attorneys themselves." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 5.) Even assuming Mr. Ball is capable of conducting an "effective mitigation investigation . . . without the use of such a titled specialist," it is clear that he did not fulfill this responsibility in Robinson's case. (*Id.*)

###### 2.     The Fifth Circuit Requires a Thorough Investigation into Both Mitigating and Aggravating Circumstances

"[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983). Trial counsel's investigatory obligation entails two important avenues of inquiry. First, trial counsel must discover "all reasonably available mitigating evidence." *Hedrick*, 443 F.3d at 350 (*quoting Wiggins*, 539 U.S.

at 524); *Eddings,* 455 U.S. at 115 ("Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation.") (internal citations omitted).

Second, trial counsel must look for "evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524.

Trial counsel may not limit the scope of their investigation unless it determined that further investigation would be "counterproductive or fruitless." *Lewis v. Dretke*, 355 F.3d at 367; *Smith v. Dretke*, 422 F.3d at 280. In assessing the reasonableness of a particular investigation, courts must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Miller v. Dretke*, 420 F.3d at 361. Where trial counsel makes a tactical decision to conduct only a cursory investigation, "a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527; *Strickland*, 466 U.S. at 690-91 ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

### 3.    Trial Counsel Failed to Discover All Reasonably Available Evidence of Robinson's Background and Character

Trial counsel failed to conduct a constitutionally adequate investigation into Robinson's background. As set forth in his declaration, it appears that the defense investigator limited his entire investigation to only those individuals identified by the client. (*See generally*, Resp. Ex. C., Aff. of Bruce Cummings.)[20] With regard to his upbringing, Cummings relied entirely

---

[20]Trial counsel and their investigator readily concede that Robinson was entirely cooperative in assisting trial counsel and the investigator with his case. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 8 (noting that Robinson never declined to provide information in response to our requests); Resp. Ex. B, Aff. of Jack V. Strickland, at p. 6 (describing Robinson's

66

on Robinson to identify "who might make good fact witnesses for him." (Resp. Ex. C, Aff.

of Bruce Cummings, at 1.) Cummings took the same approach with regard to character

witnesses. (*Id.* at 1-2 (asking Robinson to individuals who "might be willing to speak on his

behalf."); *id.* at 3 ("Other persons that Mr. Robinson directed me to were his football and track

coaches at Lamar High School.").)

While the client is certainly an important source of investigative leads, he should never

be the only one. It is incumbent on trial counsel "to locate and interview the client's family

members, and virtually everyone else who knew the client and his family." (ABA Guidelines,

10.7 comm. at 1024; *see Wiggins*, 539 U.S. at 516 (inadequacy of trial counsel's mitigation

investigation demonstrated by post-conviction presentation of abuse as established through

"state social services, medical, and school records, as well as interviews with petitioner and

numerous family members").)

The rest of the information obtained by trial counsel was more the result of happenstance

than any comprehensive investigation. Evidence of Robinson's positive adjustment to prison

appears to have been serendipitous. (Resp. Ex. C, Aff. of Bruce Cummings, at 3-4.) Only after

one of the jail officers had volunteered their positive impressions of Robinson while escorting

Mr. Ball to a visit with Robinson did Mr. Ball decide to pursue evidence of his positive

adjustment. As with the other witnesses, trial counsel limited their investigation to those "guards

that [Robinson] thought might speak for him on these issues." (*Id.*) A similar approach was

---

during trial as a "personable, congenial, cooperative client, fully involved in his defense");
Resp. Ex. C., Decl. of Bruce Cummings, at 1 ("It should be noted that at all times that I spoke
to Mr. Robinson, I felt that he was providing accurate information to us.").) Thus, this is not
a case where trial counsel can shift blame to the client for hampering the investigation.
*Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004).

67

taken with the football and track staff that Robinson identified.  One of the witnesses, Landry

Burdine, was called as a witness only after being discovered in the courtroom gallery during

Robinson's trial.  (Ex. 4, Decl. of Landry Burdine, at ¶¶ 3-4.)

Not only did trial counsel improperly restrict the pool of potential witnesses to those

suggested by the client, trial counsel failed to ensure that the investigator adequately addressed

basic areas of mitigation.  To fulfill a proper background investigation, trial counsel must explore

a variety of topics, including "medical history, educational history, employment and training

history, family and social history, prior adult and juvenile correctional experience, and religious

and cultural influences."  *Wiggins*, 539 U.S. at 524 (internal citations omitted).  Cummings

claims that he spoke to the following relatives:  Brenda Hollimon, John Hollimon, Rose

Hollimon, Margaret Hollimon, Willie White, Marcus Robinson, and Josephine "Hollimon."[21]

(Resp. Ex. C, Aff. of Bruce Cummings, at 4.)   None of these individuals, with the exception

of Rose and John, was asked to provide relevant information regarding Robinson's background.

Mr. Cummings did not inquire into any of the basic areas of inquiry that is expected in a

reasonable mitigation investigation.  Instead, the questions were focused more on the

guilt/innocence issue.  And, Willie White was only asked about his knowledge of Robinson's

drug activities.  (Ex. 65, Supp. Decl. of Willie White, at ¶ 2.) The same line of questioning was

taken with Robinson's brother, Marcus.  (Ex. 64,   Supp. Decl. of Marcus Robinson, at ¶ 2.)

Josephine Dotson, Robinson's aunt, was only asked if she knew anything about Robinson's

attendance in school.  (Ex. 62, Supp. Decl. of Josephine Dotson, at ¶ 3.)  Josephine informed Mr.

Cummings that she lacked any information because she did not reside in Dermott when Robinson

---

[21]Josephine Hollimon is in fact Josephine Dotson.

68

was growing up but she did direct Mr. Cummings to speak to "[her] mother's half-sister, Bernice

Johnson, and [her] sister, Mildred, if he had questions about Julius." (*Id.*)  Yet, Cummings never

contacted these witnesses.  Josephine also warned Cummings that her mother, Margaret, had

limited intellectual functioning and would be unable to provide him with relevant information.

(*Id.*)  Brenda Hollimon, the wife of John Hollimon, was not asked anything about Robinson's

background.  (Ex. 58, Decl. of Brenda Hollimon, at ¶ 4.)

Even though the interviews of Rose and John pertained to Robinson's background,

the information developed during these meetings would have lead "a reasonable attorney

to investigate further."  *Miller*, 420 F.3d at 361.  With regard to Rose, the defense team knew

that she was reluctant to admit her own inadequacies as a mother.  As Mr. Cummings explained,

"Ms. Hollimon seemed to determine to paint a rosier picture of her role as a parent and to not

take responsibility for the upbringing of Mr. Robinson."  (Resp. Ex. C, Aff. of Bruce Cummings,

at 3-4.)  Mr. Ball held a similar concern that Rose would "minimize her dysfunction."  (Resp.

Ex. A, Aff. of Wessley T. Ball, at 6.)  Accordingly, trial counsel should have looked to other

sources of information rather than rely primarily on Rose.  Moreover, in line with the interviews

of the other family members, the questioning of Rose was narrow, focusing exclusively on

Robinson's adolescence in Arlington.  Rose was never probed about the early years of

Robinson's life.  Had trial counsel done so, they would have discovered that she drank

alcohol heavily during her pregnancy with Robinson, and had abandoned him when he was

two years old.

Based exclusively on his conversations with John Hollimon, Mr. Ball developed the

erroneous belief "that [Robinson's] upbringing by his grandparents was for the most part

69

functional" and "they provided a decent home for him."  (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 6.)  But John Hollimon had moved away from Dermott as a teenager and he certainly was not present when Robinson was growing up.  Accordingly, John Hollimon was not a reliable source for explicating the circumstances of Robinson's childhood.  Moreover, because John Hollimon was asked to render an opinion regarding his own parents, he had an obvious incentive to portray their home life in a positive light.  Once having learned that John Hollimon lacked the personal knowledge and objectivity to discuss Robinson's background, trial counsel had a duty to contact other witnesses.

In sum, this limited inquiry into Robinson's background did not even remotely qualify as the  "reasonably substantial, independent investigation" trial counsel was required to pursue. *Neal*, 286 F.3d at 236.  As discussed *supra*, numerous relatives and community members could have provided critical mitigation evidence.  Because trial counsel halted the investigation after obtaining only a rudimentary understanding of Robinson's life history, their performance was objectively unreasonable.  *Wiggins*, 539 U.S. at 527-28 ("counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible").

### 4. Trial Counsel Failed to Investigate the Aggravating Evidence Introduced at the Penalty Phase

#### a. Trial Counsel Did Not Investigate the Williams/"One Love" Incident

Where the prosecution seeks to introduce facts about a prior offense in aggravation, counsel has a "duty to make all reasonable efforts to learn what they [can] about the offense." *Rompilla*, 125 S. Ct. at 2465; *Moore,* 194 F.3d at 608 (articulating trial counsel's "affirmative

duty to identify the state's witnesses to extraneous conduct and to interview those witnesses if possible"); *Valdez v. Johnson*, 93 F. Supp. 2d 769, 780 (S.D. Tex. 1999) ("counsel has a duty to investigate the nature of defendant's prior criminal history, especially when evidence of these previous crimes is likely to be raised by the prosecution at trial.") *rev'd on other grounds*, 274 F.3d 941 (5th Cir. 2001)).

As trial counsel admits, none of the individuals involved in the Williams incident was ever interviewed by the defense. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 11.) Because trial counsel was on notice that the prosecution intended to introduce this violent act at the penalty phase, it was objectively unreasonable for failing to do so.

Contrary to trial counsel's assertions, their refusal to investigate the Williams incident does not qualify as a strategic decision. Trial counsel claims that, due to the weakness of the prosecution's evidence, "a decision not to focus time and attention on that evidence would be better than a fight that would likely give it more credence." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 11; Resp. Ex. B, Aff. of Jack V. Strickland, at p. 7 ("Mr. Ball and I decided that by far the better approach was to minimize "One Love's" testimony.").) Even accepting this contention as reasonable, such excuses goes only to the effectiveness of their tactics at trial, not whether trial counsel were reasonable in failing to investigate the matter entirely. Certainly, trial counsel saw the danger in allowing the jury to learn about the "Williams hit," which is why they tried to have the evidence excluded. (Resp. Ex. A., Aff. of Wessley T. Ball, at 11-12.) Whether trial counsel would have decided not to call the perpetrators of the "One Love" incident is irrelevant. (*Id.* at 11 (noting inconsistencies between their testimonies).) Quite simply, trial counsel "could not

71

make a valid strategic choice because he had made no investigation." *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984).

It appears that trial counsel took the same lackadaisical approach with the Tucker incident. Based upon a review of trial counsel's record, it does not appear that they ever made an attempt to obtain the court file regarding this offense. (Ex. 61, Decl. of Jesse Wallis.) Their failure to do so was *per se* ineffective. *Rompilla*, 125 S. Ct. at 2463 ("the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction.")

> **b.    Trial Counsel's Uninformed Decision to Ignore Certain Areas of Petitioner's Background Does Not Qualify as a Strategic Choice**

Lead trial counsel seeks to justify his failure to investigate as the result of "strategic choices." (*See* Resp. Ex. A, Aff. of Wessley T. Ball, at p. 2 ("strategy"), p. 6 ("strategy") p. 8 ("strategic choices"), p. 10 ("strategy"), p. 13 "strategy").) But the assertion of a "'strategic decision' must be rejected [if] no informed decision was made." *Lockett v. Anderson*, 230 F.3d 695, 715 (5th Cir. 2000). As the Fifth Circuit explained, "*Strickland* does not require . . . deference to decisions that are uninformed by an adequate investigation into the controlling facts and law." *United States v. Drones*, 218 F.3d 496, 500 (5th Cir. 2000). Because most of these decisions were based on inadequate information or no information at all, they are not entitled to any deference.

Mr. Ball claimed that he had some indication of Robinson "having a connection to a criminal street gang." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 6.) Nevertheless, Mr. Ball did not investigate the alleged gang affiliation, concluding that "gang evidence is almost always detrimental to a defendant as jurors are very frightened of gang." (*Id.*) While this reason might

72

have justified a decision not to proffer this evidence affirmatively, Mr. Ball was on notice that the prosecution had planned to call Terrence Hollimon to discuss Robinson's membership in the Dermott Crips. Accordingly, Mr. Ball had an obligation to investigate all evidence the prosecution intended to introduce in aggravation, including the gang evidence, and to determine if he could present evidence to rebut it. Trial counsel also had a duty to research the law which could have resulted in the exclusion of gang evidence in its entirety. *See Dawson*, 503 U.S. at 164 (holding that the introduction of gang affiliation at the penalty phase violated the defendant's First Amendment right of association).

Trial counsel chose not to seek a psychological evaluation for Robinson. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 8; Resp. Ex. B, Aff. of Jack V. Strickland, at pp. 3-4.) This decision also does not qualify as a strategic decision. First, the decision was ill-advised because trial counsel lacked the requisite qualifications to conduct mental health screenings. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 8; *see generally* Resp. Ex. B, Aff. of Jack V. Strickland (no mention of having a background in psychological evaluations).) Without specialized training and experience in screening for mental disorders or defects, trial counsel's opinions regarding Robinson's mental state, though relevant, is never enough to justify a decision not to have a defendant evaluated. ABA Guideline 4.1, commentary ("Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions . . . that could be of critical importance."). Trial counsel's limitations are underscored by the fact that they failed to recognize that Robinson's mother was mentally retarded. (Ex. 46, Dr. Barna Psych. Report for Rosie Mae Hollimon, at 4.)

73

Second, trial counsel's decision was ill-informed because they failed to conduct a proper investigation into Robinson's background.  Had they done so, they would have learned that Robinson was subjected to alcohol exposure *in utero*, pesticide exposure during his childhood, and had learning disabilities, as reflected in his school records.  This information would have prompted competent counsel to explore the possibility of cognitive impairments and to have Robinson examined by a mental health expert.  *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when [he] has not yet obtained the facts on which such a decision could be made.").

The decision not to have Robinson evaluated by a competent mental health professional also appears to have been based upon a misunderstanding of the law.  Trial counsel claim that they feared that a psychologist would diagnose Robinson with a "sociopathic personality" and "would correctly be considered aggravating."  (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 9; *see also* Resp. Ex. B, Aff. of Jack V. Strickland, at p. 4 (offering lay opinion that Robinson met the criteria for "antisocial personality disorder.").)  Assuming for the sake of argument that Robinson would have received an adverse diagnosis, none of this information would have been available to the prosecution until the defense indicated an intent to introduce expert evidence relating to the defendant's mental condition.  FED. R. CRIM. P. 12.2(c)(2) (mandating confidentiality of mental health reports unless "the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.").  In addition, trial counsel presumed that merely conducting a psychological evaluation "allows the government's expert to likewise examine your client."  (Resp. Ex. B, Aff. of Jack V. Strickland, at p. 4.)  But the prosecution is

74

never entitled to conduct an independent psychological evaluation of the client unless trial counsel files a notice of intent to introduce the evidence.  FED. R. CRIM. P. 12.2(c)(1)(B) (authorizing prosecution to conduct examination of defendant only after defendant provides notice of intent to introduce mental condition evidence).

Trial counsel imply that they would have never introduced evidence of Robinson's impoverished background, his chronic pesticide exposure, or his educational difficulties. (Resp. Ex. A, Aff. of Wessley T. Ball, at 8 (opining that the jury would have found the evidence "laughable or offensive").)  Regardless of how trial counsel would have ultimately used the information, however, the fact remains that trial counsel were unaware of these circumstances at the time they amandoned the background investigation.  In judging the defense's investigation, courts must look to "'counsel's perspective at the time' investigative decisions are made." *Rompilla*, 125 S. Ct. at 2462 (quoting *Strickland*, 466 U.S. at 689); *Dobbs v. Turpin*, 142 F.3d 1383, 1388 (11th Cir. 1998) (rejecting "the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").  Accordingly, trial counsel's retrospective criticism amounts to nothing more than "post-hoc rationalization," not a "strategic" decision.  *Wiggins*, 539 U.S. at 527 ("the 'strategic decision' . . . invoke[d] to justify counsel's limited pursuit of mitigating evidence resembles more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.")

75

c.    **Trial Counsel's Investigation Amounted To Only a Fraction of the Total Time Spent on This Case and Was Substantially Less Than the Investigation Conducted by Robinson's Co-Defendant's Attorneys**

Given trial counsel's dismal view of the guilt phase evidence against their client, they should have devoted more time to marshaling evidence to try to convince the jury to spare Robinson's life, not less. *Nixon*, 543 U.S. at 191 (finding trial counsel's strategy reasonable in focusing on penalty phase in light of overwhelming evidence). Nevertheless, trial counsel began their penalty investigation only weeks before trial, devoting only a fraction of their time to preparing for the penalty phase. The inadequacies are even more glaring when contrasted with the investigation conducted by Britt's defense attorneys.

Of the 1,318 hours that trial counsel devoted to this case, only 20 hours was devoted to mitigation investigation.[22] All of that investigation occurred either during trial or immediately before the trial began. (Ex. 55, Memorandum of Jesse Wallis.) Although Mr. Cummings conducted additional investigation, it appears that he began his investigation less than a month before trial started. According to the CJA Vouchers submitted by Mr. Ball to this Court, Mr. Ball's first contact with Mr. Cummings occurred on January 25, 2002, and the trial began on February 19, 2002. Not a single person from the defense team ever went to Dermott. (Resp. Ex. B, Aff. of Jack V. Strickland, at p. 6.) Further, Mr. Cummings conducted most of the background investigation by telephone. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 4.)

---

[22]Trial counsel also claimed five hours for research and work on jury instructions as well as preparing and faxing an investigative memorandum to Cummings. (Ex. 55, Memorandum of Jesse Wallis.) While it is unclear the amount of time that was devoted to this task, it does not appear to involve actual investigation.

In contrast, Britt's attorneys devoted the vast majority of their pretrial preparation to developing a case for mitigation.  Burns as well as his co-counsel, John Read III, conducted an extensive investigation to uncover any possible mitigating evidence.  Britt's trial counsel also had Britt evaluated by psychologist and provided him with various records.  (Ex. 56, Aff. of Danny Burns, ¶ 5.)  In addition to making several excursions to Britt's hometown in Dermott, Arkansas, Britt's attorneys traveled to Mississippi, Oklahoma, El Paso, Texas, and to California for several days.  (Ex. 56, Aff. of Danny Burns, ¶ 4.)  They even took an additional trip to an undisclosed location to avoid disclosing to the prosecution a possibly prejudicial witness.  Throughout their travels, the attorneys spoke to countless friends and family members to assist their client.  (*Id.*)

According to the attorneys, it would have been impossible to conduct an investigation over the telephone.  (Ex. 56, Aff. of Danny Burns, ¶ 4.)  As lead counsel explained, "we needed to see our witnesses and determine who would make a favorable impression, who could hold up under cross-examination, and who appeared to be telling the truth."  (*Id.* at ¶ 7.)  Beyond the testifying witnesses, trial counsel was able to obtain positive character statements from various relatives and community leaders who would have been unable to appear at trial.  (*Id.*)

The deficient investigation by Robinson's attorneys is even less explicable given the fact that they had been informed that several witnesses in Dermott were eager to assist with Robinson's case.  As Mr. Burns explained:

> During our first trip to Dermott, Arkansas, the witnesses we talked to kept asking why Julius' lawyers were not coming up there like we were and we simply told them that his lawyers were developing their case for Mr. Robinson. L.J.'s sister and the Deputy Sheriff we talked with that day asked if they could help Julius . . .

Ex. 56, Aff. of Danny Burns, ¶ 9.)  During a chance meeting in state court, Mr. Burns apprised

Mr. Ball of the situation.  (*Id.*)  Although Mr. Burns was unaware of whether Mr. Ball had done

anything based upon this information, the record indicates that nothing was done.  (*Id.*)

### 6.    Robinson Must Be Afforded an Opportunity to Cross-Examine the Defense Team About their Declarations

Trial counsel and their investigator make over 30 pages of allegations defending their

representation in this case.  While these statements fail to justify trial counsel's deficient

performance, Robinson nevertheless should be granted the opportunity to question these

witnesses under oath.

There are a number of areas of inquiry that can only be explored through cross-

examination.  Mr. Ball has described material that has never been provided to Robinson's habeas

counsel.  In his declaration, Mr. Ball states that "there may be written documentation of an

investigative activity, and in other instances the reports and instructions were purely oral."

(Resp. Ex. A, Aff. of Wessley T. Ball, at 4.)  But none of this documentation was included in the

file handed over by trial counsel to habeas counsel.  (Ex. 31, Decl. of Jesse Wallis.)  Moreover,

the billing records indicate that Mr. Ball faxed an investigative memorandum to Mr. Cummings

but no such document has ever been provided to the defense.  (*Id.*)  Similarly, Mr. Ball mentions

"some notes" that he currently has in his possession which was never given to habeas counsel.

(Resp. Ex. A, Aff. of Wessley T. Ball, at p. 4.)  Mr. Ball also implies that he obtained "school

records" independent of the documents received in discovery but does not identify these records

other than those from the computer school.  (*Id.* at p. 8.)

Mr. Ball also refrains from giving any specific details about the investigation.  Although Mr. Ball claims to have interviewed "other relatives and acquaintances by telephone," he does not identify any names.  (*Id.* at p. 7.)  Mr. Ball takes a similar tack in describing interviews with members of the conspiracy:

> There were witnesses that might have provided some information useful at punishment, but they were involved in the conspiracy at issue in our case and we decided that what potential benefit they would offer was offset by their involvement in the criminal enterprise.

(Resp. Ex. A, Aff. of Wessley T. Ball, at p. 7.)

Mr. Ball also states his belief "that either Mr. Cummings or I spoke to a police official in Arkansas concerning this event and Mr. Robinson."  (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 11.)  But as Mr. Ball concedes, he could not find  "any notes concerning that contact."[23]  (*Id.*)

Finally, Robinson must be able to voir dire Mr. Ball about his professional qualifications. Mr. Ball admitted that he is not a mental health professional.  (*Id.* at p. 8.)  Nevertheless, Mr. Ball renders the following opinion regarding Mr. Robinson's mental/emotional condition:

> [I]t was my professional opinion that Mr. Robinson did not suffer any such condition to an extent and degree that would be considered mitigating by any jury that was likely to hear his case.

(*Id.*)  This opinion appears to be based not on any specialized training or clinical experience but on his "extensive experience with clients who have presented a variety of forms of mental health issues and concerns."  (*Id.*)  Mr. Ball also appears to have based his assessment on his decision to employ mental health professional on more than one occasion.  (Resp. Ex. B, Aff. of Jack V.

---

[23]In stark contrast to Mr. Ball's vague references concerning the investigation, Mr. Ball provided a highly detailed explanation of his purported "strategic" decisions.  (*See generally* Resp. Ex. A., Aff. of Wessley T. Ball.)

Strickland, at 8-9 ("I have used mental health professionals where I believed they were warranted.").)  But a review of Mr. Ball's capital cases reveals that he has used a mental health professional only once.  (*See* Ex. 57, Decl. of Monica Giner.)[24]

Another line of inquiry is Mr. Strickland's professional relationship with the retained expert, Dr. Cunningham.  Mr. Strickland had primary responsibility for preparing and presenting Dr. Cunningham at trial.  (Resp. Ex. B, Aff. of Jack V. Strickland, at 2.)  Mr. Strickland claims that he "spent considerable time with Dr. Cunningham reviewing Robinson's background and the details of his criminal offenses."  (*Id.* at 3.)  Based upon Mr. Strickland's comments about Dr. Cunningham, it is also necessary to explore Mr. Strickland's reasoning for retaining Dr. Cunningham as an expert in the first instance.  Throughout his declaration, Mr. Strickland criticizes Dr. Cunningham, describing him as "long-winded" "pedantic" and "frequently viewed as being arrogant" and "argumentative."  (Resp. Ex. B, Aff. of Jack V. Strickland, at 3.)  In discussing Dr. Cunningham's research, Mr. Strickland uses quotation marks around the term. (*Id.* at 5 ("I can state with some certainty that this is 'research' which Dr. Cunningham uses time and again to bolster his conclusions.").)

Finally, it is important to address any possible bias that Mr. Strickland may harbor toward Robinson's habeas attorneys or the habeas process in general.  In his declaration, Mr. Strickland criticizes habeas counsel for raising the claim of ineffectiveness:

---

[24]Mr. Strickland offers even less support for his opinion regarding Robinson's mental status.  He concludes that Robinson "unquestionably meets the diagnostic criteria for [ ] a diagnosis of "antisocial personality disorder."  (Resp. Ex. B, Aff. of Jack V. Strickland, at p. 4.) However, Mr. Strickland does not indicate whether he has any specialized knowledge or training which would have led him to that conclusion.  (*Id.* (relying on "Robinson's background and the circumstances of three homicides" as the basis for his opinion).)

80

I greatly resent lawyers with limited or no trial experience casually slandering the efforts and reputations of lawyers who labor in the trenches, doggedly defending extremely difficult and unpleasant cases against often overwhelming evidence. Although it has become an all-too common tactic to do so during the writ process, it is an abusive practice which often achieves little good for applicants, while imposing considerable harm on the legal process.

(Resp. Ex. B, Aff. of Jack V. Strickland, at p. 8.)[25]

## II.    THE GOVERNMENT'S NEW EVIDENCE OF RACE-NEUTRAL REASONS REQUIRES AN EVIDENTIARY HEARING OF THE *BATSON* CLAIM.

In his original motion, Robinson identified three Black potential jurors who were stricken by the prosecutors for reasons that were contrary to the record or inconsistent with the prosecutors' approach to non-Black jurors.  It is undisputed that the prosecutors' exercise of these three peremptories resulted in a petit jury with only one Black person on the panel. Consequently, Robinson alleged that the prosecutors violated his right to equal protection under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

In response, the Government filed the declaration of AUSA Fred Schattman, the prosecutor who exercised the peremptories against the Black potential jurors and offered the original race-neutral reasons for two of them.  (Resp. Ex. D, Aff. of Fred Schatmann.) Schattman's declaration explains his race-neutral reasons for one previously unchallenged peremptory and enhances his previously offered race-neutral reasons for the two challenged peremptories.  (*Id*.)  The Government also filed the declaration of Wes Ball, who was lead

---

[25]In defending the decision not to have Robinson psychologically evaluated, Mr. Strickland again alludes to inexperienced counsel challenging his decisions. (Resp. Ex. B, Aff. of Jack V. Strickland, at 6 ("I do acknowledge however that such a tactic might seem perfectly logical to lawyers . . . who have limited or no trial experience.).)

trial counsel for the defense, to corroborate some of Schattman's new race-neutral reasons. (Resp. Ex. A, Aff. of Wessley T. Ball, at pp. 13-14.)

The Government initially argues that Robinson is procedurally barred from litigating the *Batson* claim because he could have, but failed to, raise the issue on direct appeal. (Resp. at 71. ) Robinson concedes that under some circumstances the failure to raise an issue at trial and on appeal results in a procedural bar during section 2255 proceedings. *See, e.g., United States v. Frady*, 456 U.S. 152, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) (holding that defendant who failed to object to defective jury instructions at trial and on appeal was procedurally barred from litigating the issue in a 2255 petition). In this case, Robinson objected to two of the prosecutors' three peremptories against Black potential jurors, so he did not completely fail to raise the issue. However, as the Government points out, his counsel failed to appeal the denial of his *Batson* objections. Even if *Frady* applies, the defendant who can show both "cause" and "prejudice" will escape application of the procedural bar. 456 U.S. at 167-68. In this case, trial counsel's refusal to raise the issue on appeal over their condemned client's objections constitutes both cause and prejudice.

Both trial counsel's declarations, which the Government itself solicited and filed, reveal that their relationship with Robinson broke down precisely because they refused to honor his request to litigate all viable issues on appeal. (*See* Resp. Ex. A, Aff. of Wessley T. Ball, at p. 15 (acknowledging conflict in the attorney/client relationship during the appeal process); Resp. Ex. B, Aff. of Jack V. Strickland, at p. 7 (agreeing that matters deteriorated on appeal). In July of 2003, Robinson wrote the Fifth Circuit asking the court to "halt [his] appeal" because he "believe[ed] that there [were] more issue [sic] that could be raise[d] on appeal" and he didn't

82

"want this to hurt [his] chances on [his] other appeals because [his] lawyers didn't raise them now." (*See* Ex. 67, Letter from Julius Robinson to Fifth Circuit.)  The clerk of the court replied that no action would be taken because the court only accepted motions from counsel of record. (Ex. 68, Letter from Fifth Circuit to Robinson, dated July 25, 2003.)  On July 30, 2003, Robinson wrote the Fifth Circuit again, claiming his counsel were ineffective and stating, "my issue is with my attorney on that fact that he 'isn't' filing issues in my brief that may later be denied by this court because I didn't raise them at the proper time."  (Ex. 69, Letter from Robinson to Fifth Circuit, dated July 30, 2003.)  Once again, on August 16, 2006, the clerk of the court replied that no action would be taken because the court only accepted motions from counsel of record. (Ex. 70, Letter from Fifth Circuit to Robinson, dated August 6, 2003.)  On September 30, 2003, the Fifth Circuit formally denied Robinson's motion for new appointed counsel, stating, "Robinson has failed to demonstrate a level of incompatibility which would warrant the appointment of substitute counsel."  (Ex. 71, Fifth Circuit Order, dated September 30, 2003.)

Given Robinson's documented unsuccessful attempts to fire his counsel for failure to consult with him and to raise all viable issues on appeal in order to avoid the procedural bar now asserted by the Government, he cannot now be faulted for failing to raise issues that he desired to raise, but was affirmatively prevented from raising by counsel who unreasonably failed to raise non-frivolous issues on appeal in a capital case. *Murray v. Carrier,* 477 U.S. 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986) ("[I]f the procedural default [for failure to raise issue on direct appeal] is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the state."); *Coleman v. Thompson*, 501 U.S. 722,

754, 111 S. Ct. 2456,  115 L. Ed. 2d 640 (1991) ("Attorney error [regarding direct appeal] that constitutes ineffective assistance of counsel is cause.").

The Government substantively argues that AUSA Schattman's and trial counsel's declarations reveal that the prosecutors did not act with racial animus when they struck the three black potential jurors.  (Resp. at 58.)  The introduction of so much new evidence in support of steps two and three of *Batson* requires an evidentiary hearing.  If the court intends to rely on Schattman's new and improved race-neutral reasons, at the very least it should afford Robinson the opportunity to cross-examine him.  The same is true of Ball's statement that he "does not believe either of the prosecutors in Mr. Robinson's trial engaged in [racial discrimination during voir dire] in his trial, nor has [he] seen or heard of them doing it in any other criminal trial." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 15.)  The need to cross examine Ball about this sworn statement is particularly important where, as here, the statement is wholly inconsistent with trial counsel's tendering of *Batson* objections at trial and arguing that the same prosecutors had stricken at least two jurors because they were black.

III.    **ROBINSON HAS MADE A *PRIMA FACIE* SHOWING OF DISCRIMINATORY APPLICATION OF THE FEDERAL DEATH PENALTY IN TEXAS.**

Prior to trial, Robinson moved to dismiss the prosecution's request for the death penalty because "the prosecution engaged in a systematic pattern of racial discrimination in requesting the death penalty pursuant to the federal death penalty statutes."  *(See* Motion to Dismiss, filed Dec. 21, 2001, at p. 1.)  Robinson also requested discovery regarding who the federal prosecutors have sought the death penalty against in order to prove his equal protection claim.  (*Id*. at 2.) The prosecution opposed both discovery and dismissal, arguing, *inter alia*, that "a statistical

showing of disparate impact is insufficient" and that "a pattern is not enough."  (Resp. at 2.)
The court denied the motion, noting that the defendant asserted in "conclusory fashion and
without citation any supporting evidence" that 70% of death penalty approvals were against
African-Americans.  (Order, filed Jan. 10, 2002, at p. 2.)

Robinson raised the equal protection claim again in his motion to vacate and alleged that
80% of the defendants prosecuted in federal capital trials in Texas are black.  (See Ex. 66,
Declaration of James Morgan and Table of Federal Death Row Defendants.)  He also alleged that
this was far in excess of the statistical proportion of black people in the population of Texas,
which, according to the U.S. Census, is approximately 12%.

In an attempt to avoid being "conclusory," Robinson gave the names and racial and ethnic
breakdown of all federal death row inmates from Texas in the post-*Furman* era.   He also did not
rely solely on a general statistical proffer regarding Texas federal capital prosecutions; he
specifically alleged that the statistics, coupled with the prosecutors' discriminatory exercise of
peremptories to strike black potential jurors, betrayed purposeful discrimination in his particular
case.

 The Government, in its opposition, does not dispute that of the ten people who have been
sentenced to the federal death penalty in Texas, eight are or were Black, one was Latino and one
is white. Thus, it is undisputed that 80% of the defendants sentenced to death in federal courts in
Texas are or were Black.  The Government also did not dispute that the proportion of blacks in
the general Texas population is approximately 12%.

The statistics for the Northen District of Texas are even worse.  All four defendants
from this district who have been sentenced to the federal death penalty are Black.  (*See* Ex. 66,

Decl. of James Morgan and Table of Federal Death Row Defendants.)  The federal prosecutors from this district unsuccessfully sought the death penalty against a fifth defendant,  L. J. Britt.  Mr. Britt is also black.  Thus, the evidence uncovered to date reveals that 100% of all federal capital prosecutions in the Northern District of Texas have been against Black defendants.

As with the *Batson* claim, the Government initially argues that this equal-protection claim is procedurally bar because it was not raised on direct appeal.  (Resp. at 71.)  Robinson, however, has shown that counsel's refusal to raise all viable issues on appeal over his objection constitutes "cause" and "prejudice" for the purposes of the procedural bar rule.

In its substantive response, the Government does not, and cannot, dispute any of Robinson's statistical proffers.  Rather, the Government resurrects its original argument that, under *McCleskey v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), a statistical proffer demonstrating a racial disparity in capital prosecutions, standing alone, can never support an inference of purposeful discrimination.  (Resp. at 76.)  This is somewhat of a red herring because, as already stated, Robinson does not rely on a statistical proffer standing alone.  The prosecutors's conduct during voir dire is independent, case-specific evidence of intent to discriminate that buttresses and complements the statistical proffer.  Moreover, the Government has overstated the holding of *McCleskey* and ignored the most recent Supreme Court pronouncements from the *Miller-El* holdings.

In *McCleskey* the district court granted a Georgia habeas petitioner an evidentiary hearing on his equal protection claim that the state's capital punishment scheme discriminated against Blacks.  At the hearing, McCleskey presented a statistical study conducted by Professor David Baldus that showed "defendants charged with killing white victims were 4.3 times as likely to

86

receive a death sentence and defendants charged with killing blacks" and "black defendants were 1.1 times as likely to receive a death sentence as other defendants."  481 U.S. at 287.  The district court held that the statistical proffer, standing alone, did not demonstrate that the Government engaged in purposeful discrimination.  *Id.* at 288.  The Supreme Court agreed, writing:

> "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused. The unique nature of the decisions at issue in this case also counsels against adopting such an inference from the disparities indicated by the Baldus study.  Accordingly, we hold that the Baldus study is clearly insufficient to support an inference that any of the decision makers in McCleskey's case acted with discriminatory purpose."

*Id.* at 287.

While *McCleskey* stands for the proposition that a habeas petitioner who has been afforded an evidentiary hearing and presents only statistical evidence in support of his equal protection claim will be subject to a demanding standard such as "exceptionally clear proof," nothing in the opinion supports the notion that a petitioner should be deprived of a hearing because he has proffered only statistical evidence or because no "smoking gun" has been unearthed.

In fact, recent Supreme Court authority suggests just the opposite.  In *Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003), the district court granted an evidentiary hearing on the petitioner's equal protection claim that Dallas prosecutors discriminated against African-Americans during jury selection.  At the evidentiary hearing, *Miller-El* presented evidence that the prosecutors engaged in disparate questioning of African-Americans and exercised peremptory strikes against 10 out of 11 African-Americans in the venire.  The petitioner also presented evidence that the Dallas District Attorney's Office

had a historical policy to keep minorities off juries and that the prosecutors used a "jury shuffle"

to avoid seating more black people on the jury.  The district court held that Miller-El failed

to state a *prima facie* case and declined to grant a certificate of appealability, which the

Fifth Circuit affirmed.  The Supreme Court reversed and remanded with instructions to grant

a certificate of appealability.   In holding that a certificate of appealability should issue,

the Court gave significant weight to the statistical evidence showing that the prosecutors struck

91% of the Black potential jurors.  Justice Kennedy wrote:

> In this case, the statistical evidence *alone* raises some debate as to whether the
> prosecution acted with a race-based reason when striking prospective jurors.
> The prosecutors used their peremptory strikes to exclude 91% of the eligible African-
> American venire members, and only one served on petitioner's jury.  In total 10
> of the prosecutor's 14 peremptory strikes were used against African-Americans.
> Happenstance is unlikely to produce this disparity.

537 U.S. at 342 (emphasis added).  The Court eventually held that *Miller-El* had proved that

Dallas prosecutors had engaged in racial discrimination during voir dire and granted habeas

relief.  *See Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).

The instant case raises the same concerns based on a statistical showing that were at issue

in *Miller-El*.  Prosecutors in the Northern District of Texas have uniformly selected Black people

to be prosecuted for capital offenses.  This results in Blacks constituting 100% of the capital

defendants in the district.  This unexplained statistical disparity is far more troubling than the

disparities at issue in *McCleskey*.  Indeed, it is hard to imagine a starker statistical disparity

involving race.  As the Supreme Court has stated:  "A person may demonstrate that the

administration of a criminal statute is 'directed so exclusively against a particular class of

persons . . . with a mind so unequal and oppressive' that the system of prosecution amounts to a

88

'practical denial' of equal protection of the law." *United States v. Armstrong*, 517 U.S. 456, 464-65, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996), *quoting Yick Wo v. Hopkins*, 118 U.S. 356, 373, 6 S. Ct. 1064, 30 L. Ed. 220 (1886).  Robinson has shown that in the Northen District of Texas the federal death penalty has been directed exclusively at Blacks.

The Government in its opposition does not even address this issue.  It cites Department of Justice (DOJ) statistics for all federal capital prosecutions in all districts during a period of several years.  (Resp. at 71.)  This national survey, which hardly evidences even-handed application of the federal death penalty on a national level, misses the point.  Similar to *Miller-El*, Robinson has alleged that Texas federal prosecutors – not federal prosecutors throughout the nation – violated his right to equal protection under the law.  He has submitted Texas-specific statistics in support of his claim that the Texas federal prosecutors have applied the federal death penalty statutes in a racially discriminatory manner.  The Government should not be allowed to hide behind national DOJ statistics to mask highly discriminatory enforcement of the federal death penalty in the State of Texas.

The Government also argues that the Fifth Circuit essentially decided this issue in its favor in *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).  In *Webster*, a black defendant moved to dismiss the prosecution's notice te seek the death penalty based upon an affidavit showing that 66% of all federal death penalty cases involved black defendants.  *Id.* at 334.  The Fifth Circuit affirmed the trial court's denial of the motion because Webster failed to that the federal prosecutors had failed to prosecute similarly situated non-black defendants.  *Id*. However, as the court noted, Webster could not truly show a statistical pattern of discrimination in his selective-prosecution claim because at that time there had been no other prosecutions under

the Federal Death Penalty Act to compare with his case. *Id*. ("[Webster] has not even attempted to show that other similarly situated individuals committing similar acts were not prosecuted. Such a showing would be challenging under FDPA, as no one had yet been prosecuted under that Act when Webster was indicted.")

In contrast to *Webster*, in this case Robinson does not rely on generalized statistics about all federal death penalty prosecutions throughout the nation; he has shown a stark pattern of racial discrimination based on all of the federal capital cases in Texas that have proceeded to verdict. Although the 10-case sample is relatively small (11 cases if one counts the prosecution's unsuccessful attempt to win a death verdict against L. J. Britt), it is important to note this sample constitutes more than 20% of all federal death penalty verdicts in the United States in the post-*Furman* era.

More specifically, Robinson has shown that *all* federal capital trials in the Northern District of Texas have been against Black defendants. This strongly suggests that Black defendants are being treated differently than similarly situated non-Black defendants. The Governments' own national DOJ statistics, proffered in its response, reveal that a host of capital murders are committed by non-black defendants throughout the nation; yet, in the Northern District of Texas no non-black person has been prosecuted for capital murder. While the 100% showing may not definitively prove that federal prosecutors are failing to prosecute similarly situated non-black defendants in the Northen District of Texas, it should be enough to draw an inference of selective prosecution for *prima facie* case purposes. The facts laid out by Robinson in his section 2255 motion far exceed the generalized, bald assertions of racial discrimination in *Webster*.

90

The unexplained racial disparity, including 100% of capital prosecutions against Blacks in the Northern District of Texas, is within the realm of "exceptionally clear proof" as required by *McCleksey* and is not likely to be produced by "happenstance" as discussed in *Miller-El*. Moreover, it is unfair to characterize Robinson's equal protection argument as based solely on a statistical proffer disconnected to the specifics of his case.  Robinson has alleged that the statistical proffer, coupled with discrete acts of racial discrimination by the prosecutors during voir dire, violated his right to equal protection.  At the very least, Robinson has demonstrated a *prima facie* case of an equal protection violation, justifying discovery and an evidentiary hearing.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

For all the foregoing reasons, the Court should vacate the verdicts.  In the alternative, the court should grant an evidentiary hearing on all of Robinson's claims.

Respectfully submitted,

Dated:  August 28, 2006

s/ Michael B. Charlton
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, NV 89101
Telephone:  (702) 388-5106
Facsimile:   (702) 388 5103
E-Mail:  mike_charlton@fd.org
State Bar of Texas # 04144800

SEAN K. KENNEDY
Acting Federal Public Defender
CRAIG A. HARBAUGH
Deputy Federal Public Defender

Dated:  August 28, 2006

s/ Craig A. Harbaugh
Federal Public Defender's Office
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-5063
Facsimile: (213) 894-0081
E-mail: sean_kennedy@fd.org
E-mail: craig_harbaugh@fd.org

Attorneys for Defendant/Petitioner,
JULIUS ROBINSON

92

## CERTIFICATE OF SERVICE

I, Jesse Wallis, hereby certify that on August 28, 2006, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

SUSAN COWGER
Assistant United States Attorney
U.S. Attorney's Office
1100 Commerce Street, 3rd Fl.
Dallas, Texas  75242

I, Jesse Wallis, hereby certify that on November 29, 2005, I served the foregoing document by mailing a copy to the following individuals.

JULIUS OMAR ROBINSON
BOP NO. 26190-177
USP - Terre Haute
P.O. Box 33
Terre Haute, Indiana 47808

Dated:  August 28, 2006                              s/ Jesse Wallis
                                                     JESSE WALLIS