**THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | **:** | **CAUSE NO. 4:00-CR-00260-2** |
| **aka Face, aka Scar, aka Scarface,** | **:** | **(Civil No. 4:05-CV-756-Y)** |
| **Defendant/Petitioner,** | **:** | |
| | **:** | **DEATH PENALTY CASE** |
| **vs.** | **:** | |
| | **:** | **Honorable Terry Means** |
| **UNITED STATES OF AMERICA,** | **:** | **United States District Judge** |
| | **:** | |
| **Plaintiff/Respondent.** | **:** | |

_____

**EXHIBIT NO. 56**

**SUBMITTED IN SUPPORT OF DEFENDANT'S REPLY TO GOVERNMENT'S
RESPONSE TO MOTION TO VACATE CONVICTION AND SENTENCE
AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255**

(Filed Electronically Under the Electronic Filing System Requirements)

_____

STATE OF TEXAS                              )
                                           )
COUNTY OF TARRANT                           )


AFFIDAVIT OF DANNY DUANE BURNS

       Before me, the undersigned Notary Public, personally appeared Mr. DANNY DUANE BURNS, who, being by me first duly sworn deposed and said:


"I, Danny Duane Burns, being first duly sworn, state and depose as follows:

1. I am an attorney and have been licensed to practice law in the State of Texas for over 28 years. I have been admitted to practice in the United States District Court for the Northern District of Texas, the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court as well as several other federal appellate and district courts. I have been representing criminal defendants at both trial and on appeal since May 15, 1978. Throughout my legal career, I have tried to jury trial approximately 450 cases, including capital cases. Of these capital cases, 3 actually went to trial, including through completion of the penalty phase with one resulting in a death penalty. A number of other cases started out as death eligible cases with death penalty preparation completed but the death penalty was waived prior to or during jury selection. I have worked with several other attorneys assisting them in preparation for capital cases as well.


2. In any capital case where the government (State or Federal) is seeking the death penalty, the facts of the case have to be throughly investigated. From all sides–guilt and punishment. A capital case requires a team effort between investigators, co-counsel, consulting counsels, and experts. Mitigation evidence must be explored. It has always been my practice to work on the punishment evidence first because a trial lawyer will convince himself he is going to win in the guilt phase and will not complete the punishment investigation. Talking with the client, family members, friends, former employers, teachers (if possible), church members (if any), and neighbors is essential. One must check the prior criminal history of the client, whether those arrests resulted in convictions or not and determine if the arrests may lead to either mitigation material or prosecution evidence which needs to be addressed. Visiting the scenes of events which are being prosecuted is always helpful.


3. I was originally appointed to represent Mr. L.J. Britt on a charge of marijuana and cocaine conspiracies. I had investigated the case on the basis of defending the marijuana charges and had traveled to Oklahoma to investigate some information regarding cars and car rentals. After the

1

Exhibit 56 - 1

Government decided to seek death, I filed for additional counsel and requested Mr. Read as co-counsel. Mr. Read and I had tried over 250 felony level jury trials together in the past, including handling some capital cases and I had consulted with him on some cases that went to trial on seeking a death verdict. We tried mini-caps (capital cases in which the death penalty had been waived) in the past and both were familiar with the obligations adequately to investigate the case in both guilt and mitigation and I knew John would have the commitment to do the traveling and work necessary to prepare for trial.

4. In the background investigation, we made numerous trips to meet with the various family members, friends, cooperating individuals, and fact witnesses connected to Mr. L.J. Britt. In my opinion, an attorney should not conduct these interviews over the phone. We made several trips to Arkansas, one trip to Mississippi, one to Oklahoma, one trip to El Paso, one trip to California for several days, and another trip to a different State for which we paid the expenses to avoid disclosing a possibly prejudicial witness to the Government.

5. In this case, we first started with talking with the family and determined what friends would need to be interviewed to find out what type of person Mr. L.J. Britt was inside. We found out that he had a couple of girlfriends (each of which knew about the other but each was o.k. with the situation) and he did a lot of babysitting for people. It they could afford to pay him, fine, if not, he would do it for free. In addition to babysitting, he sold some pot (small amounts) to get by. He also did odd jobs for people. He was a football hero in the area. We toyed with the idea of presenting him as a football star. The problem with that was his coaches and teammates knew about his misdemeanor fights and everybody talked about his aggression and how he liked to run over people as a football player. We interviewed the neighbors and attended the church in the same block with his house, talked to family members and members of the local sheriff's office. We talked with the family about L.J.'s past. He had no mental health issues nor any medical issues. We had a psychologist examine his records and talk with L.J. and he determined that he did not have any mental health issues we could use. We used our psychologist at that point to help us review the juror questionnaires and talked about how best to present our strategy. We also talked with the jailers who were watching Mr. Britt and found out that the head jailer in his sector wished "I had twenty like him in my pod." He told us of how L.J. was a calming influence and how he had started a bible study group in his group. We talked with the psychologist about how to present this testimony and how to argue it. In my experience "jailhouse religion" is a negative rather than a mitigator. We determined that, since we had a very friendly witness, we would present the testimony as a throw away statement by the witness. We had him answer a general question about what Mr. Britt was like as a prisoner and he told about how Mr. Britt was stopping fights and started his own Bible study group. We never argued that and we did not present it as a mitigation question. We decided to leave it to the jury to find that as a mitigator which a majority of them did . I worked up and presented most of the mitigation part of the trial and Mr. John Read and I worked up the defense to the charges and he presented most of the witnesses in guilt.

2

Exhibit 56 - 2

6. As in all capital cases I have handled, we looked for the classic mitigation evidence--sexual or physical abuse, bad upbringing, mental health problems, physical health problems, bad environment, etc.. There really was not any. He had a loving, close family. He had good friends as well as some criminal elements in his associations. He did average or better in school and was very popular in school. The only adverse elements of his background was his poverty, the racial segregation, whether de facto or governmentally imposed did not matter. But he adjusted and made the best of his situation which was something we could sell to the jury. Most of them have never lived in that kind of poverty but they heard their parents or grandparents talk about it and they turned out alright. We decided to show that L.J. Britt did alright as well, except for hanging around with some thugs. We talked to the witnesses and got what documents and evidence they could give us. The police helped us by providing the jail records (which the Government never had).

7. Traveling to the places where the mitigation witnesses lived helped us in many ways. First, we needed to see our witnesses and determine who would make a favorable impression, who could hold up under cross-examination, and who appeared to be telling the truth. Second, we were able to critical information to support our alibi defense. We were able to look at the photo albums, to see corroboration in the documents the witnesses had to show why they remembered L.J. Britt being with them when the killings occurred. If we had not been in the home of the one witness and talking about the items in her home we probably would never have found the guns which exculpated L.J. from the one shooting. Finally, being physically present in these areas enabled us to collect letters the family members, friends, teachers, and coaches. This allowed us to introduce some great character evidence from people who could not for one reason or another get to testify.

8. The background investigation was crucial in order to present a viable defense. Our defense and our mitigation theme was alibi (which we never abandoned even after the guilty verdict) and that Mr. L.J. Britt was "The Babysitter." We also determined before trial that we would never refer to our client as "Capone" and if a government witness answered us referring to "Capone" we asked if they meant Mr. L.J. Britt. We were prepared in the event (which did not come about) Judge Means noted that Mr. Britt's nickname was Capone, to respond that both Mr. Britt and Mr. Robinson had taken nicknames of Al Capone--Capone for Britt and Scarface for Robinson--and therefore, we needed the record clarified as to which "Capone" the witness may be referring. We also had to determine how our client should look in Court. His folks brought some really nice three piece "gangster" suits for him to wear. Goodwill appreciated the donations. Mr. Britt never appeared in a three piece suit. We had Mr. Britt dressed in suits one day a little too small and the next a little too big. It was our opinion that babysitters don't look good in suits.

3

**Exhibit 56 - 3**

5. During our first trip to Durmott, Arkansas, the witnesses we talked to kept asking why Julius' lawyers were not coming up there like we were and we simply told them that his lawyers were developing their case for Mr. Robinson. L.J.'s sister and the Deputy Sheriff we talked with that day asked if they could help Julius and we told them to call his lawyers. One day in the coffee area behind one of the Courts in State Court in Fort Worth, I talked with Wes Ball and told him that some of the witnesses we were talking to were asking about Julius and if they could help. I don't know if they did anything about it. I had told the witnesses in Dermott, Arkansas that they should call Wes Ball or Jack Strickland if they felt they could help Julius Robinson. I do not know if they did or not as we were on a busy schedule to defend L.J.

Further, affiant saith naught.

Sworn to and signed this 25th day of August, 2006.

Danny Duane Burns

Notary Public No.

My Commission Expires 4-20-10 .

**Exhibit 56 - 4**