# THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | : | **CAUSE NO. 4:00-CR-00260-2** |
| **aka Face, aka Scar, aka Scarface,** | : | **(Civil No. 4:05-CV-756-Y)** |
| **Defendant/Petitioner,** | : | |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **UNITED STATES OF AMERICA,** | : | **United States District Judge** |
| | : | |
| **Plaintiff/Respondent.** | : | |

---

## EXHIBIT NO. 75

**SUBMITTED IN SUPPORT OF IN SUPPORT OF DEFENDANT'S AMENDED
MOTION TO VACATE CONVICTION AND SENTENCE AND FOR
NEW TRIAL PURSUANT TO 28 U.S.C. § 2255**

(Filed Electronically Under the Electronic Filing System Requirements)

---

## DECLARATION OF RUSSELL STETLER

I, Russell Stetler, declare as follows:

*Background and Qualifications*

1. In 2005, I joined the Federal Defender Program to fill a newly created position as National Mitigation Coordinator working with and through the Federal Death Penalty Resource Counsel, Capital Resource Counsel and Habeas Assistance and Training Counsel Projects. For the preceding ten years (1995 to 2005), I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases receive effective assistance of counsel. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco which coordinated appellate and postconviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with investigators, mitigation specialists, lawyers, and other professionals outside the office who were retained to assist counsel representing death-sentenced prisoners.

2. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial and on appeal. Most of these conferences were organized and attended by attorneys specializing in capital work.

3. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have been invited to lecture on these subjects in many death-penalty jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado,

1

Exhibit 75 - 000001

Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Missouri, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Virginia.  I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service.  Under the auspices of various defense bar programs, I have lectured on capital defense work in Texas several times, including Dallas (1997, 2006, and 2007), Houston (2000), Austin (2003), Plano (2003, twice in 2006, and twice in 2007), San Antonio (2004 and twice in 2006), and Galveston (2005).

4. I have lectured on mitigation investigation at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life").  At various times in the past decade and a half, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA).

5. I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA) since 1993.  This four-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on "Mitigation Evidence in Death Penalty Cases" and "Mental Disabilities and Mitigation" in *The Champion*, the monthly

2

Exhibit 75 - 000002

magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled "Why Capital Cases Require Mitigation Specialists" in *Indigent Defense*, published by the National Legal Aid and Defender Association. These and other articles of mine have been cited in the Commentary to the Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (available at www.abanet.org/deathpenalty). At the request of *Hofstra Law Review*, I wrote a commentary addressing particular sections of the Revised ABA Guidelines (31 Hofstra Law Review 1157 (Summer 2003)). Much of my material was incorporated in *Losch's Texas Capital Defender Manual*, 8th edition, published by the Texas Criminal Defense Lawyers Association in 2006. My latest article, "Mitigation Investigation: A Duty That Demands Expert Help But Can't Be Delegated," appeared in the March 2007 issue of *The Champion*.

6. I am the coauthor of chapters on psychiatric issues in death penalty cases in two recent books: "Dead Men Talking: Mental Illness and Capital Punishment," in Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds., *Forensic Mental Health: Working with Offenders with Mental Illness* (Kingston, New Jersey: Civic Research Institute, Inc., 2001) and "Punishment," in Richard Rosner, M.D., ed., *Principles and Practice of Forensic Psychiatry*, 2nd edition (London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press).

7. Over the years, I have been directly involved in hundreds of capital cases in California and New York, including dozens of trials and postconviction hearings. I have also been consulted on capital cases in numerous other jurisdictions around the country, and I have provided evidence on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in the state and federal courts of numerous jurisdictions, including

3

Exhibit 75 - 000003

Arizona, Arkansas, California, Mississippi, Missouri, New York, Oklahoma, Pennsylvania, Tennessee, Texas, and Wyoming. In 2004, I received the "Life in the Balance Achievement Award" from the National Legal Aid and Defender Association for my work in this field.

*Standard of Care in Capital Cases*

8. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar I have participated in since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases.

9. As early as 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." (Gary Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 New York University Law Review 299 (1983) at 323-324.)

10. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to

4

Exhibit 75 - 000004

determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors which may be disclosed beyond the fact of psychiatric disorder or organicity.

11. In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves. Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Thus, competent capital counsel retain a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." This report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." (*Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation,* Federal Judicial Conference, May 1998, available at http://www.uscourts/gov/dpenalty/1COVER.htm.)

12. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that

5

Exhibit 75 - 000005

may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.

13. The social history investigation should include a thorough collection of objective, reliable documentation about the client and her family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

14. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, her family, and others who may have important information to share about the client's history. It is well accepted that in-person, face-to-face, one-on-one interviews are required to build trust and to elicit sensitive information. Telephone or group interviews fall below the accepted standard in social history investigation. Even in person, it is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and

6

Exhibit 75 - 000006

defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

15. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. (One nationally recognized authority in mitigation investigation, Lee Norton, has stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. See Lee Norton, "Capital Cases: Mitigation Investigation," *The Champion* (May 1992), pp. 43-45.) Because of the time and expertise required, it is not appropriate to ask an investigator to investigate the factual allegations which constitute the capital charges and the biographical inquiry aimed at discovering mitigating evidence. Each investigative track needs someone's undivided attention. Mitigation investigation requires the ability to identify collateral evidence of symptoms of mental disorders and deficits, exposure to trauma, brain damage, and substance abuse history through a multigenerational inquiry into genetic predispositions, in utero exposures, and intergenerational patterns of behavior, including the historical influences of cultures and subcultures.

7

Exhibit 75 - 000007

16. Mitigation investigation is particularly important when the client does not share the attorney's cultural background. Cultural differences can include not only ethnicity and language, but all of the badges of social identity that define an individual's world and belief system, including politics, religion, and sexual orientation.

17. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many, many cases, defendants do suffer mental impairments that may not meet the legal definition of insanity or incompetency, but are nevertheless powerfully mitigating disabilities which are given great weight when juries are charged with assessing individualized culpability.

18. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted her judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same setting turn out so differently. It is an objective scientific fact. It does not reflect a choice made by the client.

19. Over the years, I have been involved in hundreds of capital cases, including dozens of trials and postconviction hearings. My personal experience of the effectiveness of mitigation evidence accords with the research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases. See, for example, Stephen P. Garvey, "Aggravation and Mitigation in Capital Cases: What Do Jurors Think?" 98 Columbia Law

8

Exhibit 75 - 000008

Review 1538 (1998) and "The Emotional Economy of Capital Sentencing," 75 New York

University Law Review 26 (2000) (concluding that mitigation does matter, especially mental

retardation and mental illness).

*Standard of Care in Capital Mental Health Evaluations*

20  The proper standard of care for a competent mental health evaluation also requires

an accurate medical and social history as its foundation.  Because psychiatrically disordered

individuals are by definition likely to be poor historians, a reliable evaluation requires historical

data from sources independent of the client (for clinical, not simply forensic, reasons).

Additional components of a reliable evaluation will include a thorough physical examination

(including neurological examination) and appropriate diagnostic testing.  The standard mental

status examination cannot be relied upon in isolation for reliable clinical assessments any more

than the expert can be relied upon in isolation in the courtroom context.

21. Except when clients exhibit such florid symptomatology that immediate clinical

intervention is patently warranted, capital defense counsel are well advised to conduct a thorough

social history investigation before retaining mental health experts.  Only after the social history

data have been meticulously digested and the multiple risk factors in the client's biography have

been identified will counsel be in a position to determine what kind of culturally competent

expert is appropriate to the needs of the case, what role that expert will play, and what referral

questions will be asked of the expert.  Psychiatrists and psychologists have different training and

expertise, and within each profession are numerous subspecialties including neuropsychology,

psychopharmacology, and the disciplines which study the effects of trauma on human

development.  The potential roles of experts include consultants; fact gatherers needed to elicit,

9

Exhibit 75 - 000009

or assess the credibility of, client disclosures; and testifying witnesses, to name but a few.  To make informed decisions about the kind of experts who may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

*Review of the Julius Robinson Case*

22.  At the request of counsel for  Julius Robinson, I was asked to address the standard of practice with respect to mitigation investigation at the time Mr. Robinson's case was prepared for trial, with particular attention to the use of mitigation specialists in investigating life history.  As part of my assessment, I have reviewed the transcripts of the penalty phase of Mr. Robinson's trial in the United States District Court for the Northern District of Texas, Fort Worth Division (volumes 20-24, March 12 to 18, 2002); the Fifth Circuit's opinion affirming the conviction and death sentence on direct appeal (367 F.3d 278); and the Motion to Vacate Conviction and Sentence pursuant to 28 U.S.C. § 2255

23.  The bifurcated nature of post-*Furman* death-penalty cases prompted capital defense lawyers to develop specialists in mitigation investigation before anyone had coined the term "mitigation specialist."  In 1982, for example, a California lawyer hired a former *New York Times* reporter to investigate his client's life history and help outline the empathy-evoking story which ultimately saved that client's life.  The journalist, the late Lacy Fosburgh, then wrote about the unusual role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process.  Neither one was suited to the task at hand here – namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way.  Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes and flaws, are rarely a matter of physical evidence.  Instead they are both discovered and

Exhibit 75 - 000010

portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech – things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. This person should have nothing else to do but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience. (Lacey Fosburgh, "The Nelson Case: A Model for a New Approach to Capital Trials," in *California Death Penalty Manual*, 1982 Supplement, N6-N10, at N7)

24. By 1992, a Federal Death Penalty Resource Counsel project had been established to assist counsel in federal death-penalty cases, and the resource counsel have consistently advised counsel to engage the services of a mitigation specialist in all cases where the death penalty may be sought. As noted above at paragraph 11, by 1998 the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, had discussed the role of mitigation specialists in federal capital defense.

25. It is my professional conclusion that the performance of Mr. Robinson's trial counsel fell below the standard expected of federal death penalty counsel in 2001-2. Their failure to engage the services of a mitigation specialist denied Mr. Robinson of the opportunity to provide his jurors with the evidence that would have allowed them to make a reasoned moral decision about the appropriate sentence. It is apparent that no member of Mr. Robinson's trial team was qualified by training and experience to screen for the presence of mental disorders or impairments. A mitigation specialist could have played a crucial role in helping counsel choose appropriate experts to assist in the case. A mitigation specialist would also have had the knowledge and skill to obtain all relevant records and to identify, locate and interview in person,

11

Exhibit 75 - 000011

in a culturally competent manner, all the relevant sources of potential mitigating evidence.

26. I have provided this consultation and affidavit on a pro bono basis.

I declare under penalty of perjury under the laws of the State of California and the

United States of America that the foregoing is true and correct.

Date: May 21 2007                      _____
                                                   Russell Stetler

12

Exhibit 75 - 000012