THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | : | **CAUSE NO. 4:00-CR-00260-2** |
| **aka Face, aka Scar, aka Scarface,** | : | **(Civil No. 4:05-CV-756-Y)** |
| **Defendant/Petitioner,** | : | |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **UNITED STATES OF AMERICA,** | : | **United States District Judge** |
| | : | |
| **Plaintiff/Respondent.** | : | |

_____

**EXHIBIT "A" TO PETITIONER'S AMENDED MOTION FOR LEAVE TO AMEND MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

(Filed Electronically Under the Electronic Filing System Requirements)
_____

MICHAEL B. CHARLTON, No. 04144800
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, NV  89101
Telephone:  (702) 388-5106
Facsimile:  (702) 388 5103
E-Mail:  mike_charlton@fd.org

Attorney for Petitioner
JULIUS OMAR ROBINSON

SEAN K. KENNEDY, No. 145632
Federal Public Defender
CRAIG A. HARBAUGH, No. 194309
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
E-Mail sean_kennedy@fd.org
E-Mail craig_harbaugh@fd.org

Attorney for Petitioner
JULIUS OMAR ROBINSON

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | **:** | **CAUSE NO. 4:00-CR-00260-2** |
| **aka Face, aka Scar, aka Scarface,** | **:** | **(Civil No. 4:05-CV-756-Y)** |
| **Defendant/Petitioner,** | **:** | |
| | **:** | **DEATH PENALTY CASE** |
| **vs.** | **:** | |
| | **:** | **Honorable Terry Means** |
| **UNITED STATES OF AMERICA,** | **:** | **United States District Judge** |
| | **:** | |
| **Plaintiff/Respondent.** | **:** | |

_____

**EXHIBIT "A" TO PETITIONER'S AMENDED MOTION FOR LEAVE TO AMEND
MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL
PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE
FEDERAL RULES OF CRIMINAL PROCEDURE**

_____

On June 15, 2007, Robinson moved for leave to amend his motion to vacate his

conviction and sentence under Section 2255 of Title 28 of the United States Code ("2255

motion"). Robinson had intended to lodge the amended 2255 motion but lodgment is not an

available option under the electronic filing system. Because Robinson believed it was critical

that the Court had an opportunity to review the amended motion in making its determination,

Robinson filed the amended 2255 motion with the Court.

On June 24, 2007, the Court unfiled the amended 2255 pending the Court's resolution of

the motion for leave to amend.  Because the amended 2255 motion is essential to the Court's

determination of the issue, Robinson now supplements his original motion by adding the

document as an exhibit along with its supporting exhibits.

Dated:  July 2, 2007                         Respectfully submitted,


 s/ Sean K. Kennedy
SEAN K. KENNEDY
Federal Public Defender
CRAIG A. HARBAUGH
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
E-Mail sean_kennedy@fd.org
E-Mail craig_harbaugh@fd.org

ATTORNEY FOR PETITIONER
JULIUS OMAR ROBINSON

## CERTIFICATE OF CONFERENCE

This is to certify that Mr. Robinson's counsel has conferred with opposing counsel,

Susan Cowger of the United States Attorney's Office; she does not oppose the filing of this

supplemental exhibit.

Dated:  July 2, 2007          Respectfully submitted,


 s/ Sean K. Kennedy
SEAN K. KENNEDY
Federal Public Defender
CRAIG A. HARBAUGH
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
E-Mail sean_kennedy@fd.org
E-Mail craig_harbaugh@fd.org

ATTORNEY FOR PETITIONER
JULIUS OMAR ROBINSON

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **JULIUS ROBINSON** | : | **United States District Judge** |

---

**AMENDED MOTION TO VACATE CONVICTION AND SENTENCE
AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255
AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

(Filed Electronically Under the Electronic Filing System Requirements)

---

MICHAEL B. CHARLTON, No. 04144800
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
Telephone: (702) 388-5106
Facsimile: (702) 388-5103
mike_charlton@fd.org

SEAN K. KENNEDY, No. 145632
Federal Public Defender
CRAIG A. HARBAUGH, No. 194309
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
sean_kennedy@fd.org
craig_harbaugh@fd.org

Exhibit A - 000001

**TABLE OF CONTENTS**

**Page**

AMENDED MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW
TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF
CRIMINAL PROCEDURE

MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BRIEF IN SUPPORT OF AMENDED MOTION TO VACATE CONVICTION AND
SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF
THE FEDERAL RULES OF CRIMINAL PROCEDURE

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. Julius Robinson's Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Robinson Suffered a Horrendous Infancy and Was Raised by Violent,
        Drug-Addicted and Drug-Dealing Parents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Robinson Spent the Remainder of His Childhood Neglected by Disabled and
        Disinterested Grandparents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    Robinson Struggled Throughout His Adolescence and Early Adulthood
        To Support And Help his Drug-Addicted, Emotionally Absent Mother. . . . . . . . 17

II. Robinson's Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.    Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.    Guilt Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.    Prosecution's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        2.    Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    C.    Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.    Prosecution's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        2.    Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

**Table of Contents (cont'd)**                                                                    **Page**

GROUNDS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.      GROUND ONE:  TRIAL COUNSEL DEPRIVED ROBINSON OF HIS SIXTH
        AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT
        THE PENALTY PHASE OF HIS TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.     Trial Counsel's Performance Fell Below the Standard of Reasonably Competent
               Assistance Expected of Capital Defense Attorneys. . . . . . . . . . . . . . . . . . . . . . 23

               1.     Failure to Conduct a Complete and Mitigation Investigation. . . . . . . . . 24

                      a.     Failure to Investigate the Prosecution's Aggravating
                             Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                             i.      Trial Counsel Did Not Investigate the Williams/"One
                                     Love" Incident. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

                             ii.     Trial Counsel Did Not Investigate Robinson's
                                     Prior Conviction Involving Sara Tucker. . . . . . . . . . . . . 27

                             iii.    Trial Counsel Did Not Investigate Robinson's Alleged
                                     Gang Involvement. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                      b.     Failure to Conduct a Mitigation Investigation. . . . . . . . . . . . . . . 29

                             i      Trial Counsel Failed to Meet Regularly With the Client
                                    to Obtain Critical Information. . . . . . . . . . . . . . . . . . . . 33

                             ii.    Trial Counsel Failed to Conduct an Adequate
                                    Social History Investigation by Interviewing All
                                    Individuals Familiar with the Client and Obtain Social
                                    History Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

                      c.     Failure to Retain a Mitigation Specialist . . . . . . . . . . . . . . . . . . 39

                      d.     Failure to Retain a Qualified Professional to Screen for Mental
                             Health Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

                             i.      Drug and Alcohol Exposure *in Utero*. . . . . . . . . . . . . . . 46

                             ii.     Pesticide Exposure. . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Exhibit A - 000003

**Table of Contents (cont'd)**                                                        **Page**

iii.    Learning Disabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

iv.    Information Demonstrating Robinson's Cognitive
Impairments Warranted a Neurological Examination. . . . 49

v.    Trial Counsel's Post-Hoc Rationalizations As to
Whether They Would Have Introduced Evidence of
Neurological Impairments is Irrelevant. . . . . . . . . . . . . . . 53

c.    The Competent Representation Provided by Counsel for
Robinson's Co-defendant Underscores Trial Counsel's
Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B.    But for Trial Counsel's Deficient Performance, There Is a Reasonable Probability
That At Least One Juror Would Have Held Out for Life. . . . . . . . . . . . . . . . . . 55

1.    A Reasonable Investigation Would Have Allowed Defense Counsel To
Undermine the Prosecution's Evidence Supporting Future Dangerousness 57

a.    The Prosecution's Allegation That  Robinson Ordered a "Hit" Was
False. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

b.    Robinson's Alleged Involvement with a Notorious Street
Gang Was Nothing More Than a Group of Adolescent
Hoodlums . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

c.    Robinson Shot Into a Parked Truck Without Knowledge That
AnyoneWas Inside. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

d.    The Combined Effect of the Unrebutted Aggravating Evidence
Introduced at the Penalty Phase Contributed Substantially to the
Jury's Finding of Future Dangerousness. . . . . . . . . . . . . . . . . . 75

2.    The Defense Penalty Phase Presentation Distorted and Omitted Significant
Portions of Robinson's Life History That Could Have Engendered
Sympathy With the Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

a.    Trial Counsel Presented No Evidence About Robinson's
Difficult Childhood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

iii

Exhibit A - 000004

**Table of Contents (cont'd)** **Page**

    b.    Defense Counsel's Cursory Presentation Regarding Robinson's Care by his Grandparents Falsely Depicted His Chaotic Upbringing as "Stable". . . . . . . . . . . . . . . . . . . . . . 80

    c.    The Defense Presentation Provided an Incomplete and Inaccurate Depicted of Robinson's Life in Arlington. . . . . . . . . 82

    3.    The Penalty Phase Jury Was Never Apprised of Robinson's Significant Mental Impairments Which Would Have Extenuated His Crimes and Mitigated His Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    4.    The Penalty Phase Was Devoid of the Compelling Evidence of Robinson's Good Character Notwithstanding His Difficult Upbringing. .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

    5.    Balancing All Compelling Mitigating Evidence Against the Substantially Diminished Aggravating Evidence, There Is a Reasonable Probability that At Least One Juror Would Have Voted for Life. . . . . . . . . . . . . . . . . . . 91

    6.    The Positive Result Obtained in the Penalty Phase of Robinson's Co-Defendant Underscores the Prejudice in Robinson's Case. . . . . . . . . 95

II.    GROUND TWO:   THE PROSECUTOR VIOLATED EQUAL PROTECTION BY EXERCISING PEREMPTORY CHALLENGES BASED UPON A RACIALLY DISCRIMINATORY MOTIVE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

    A.    The Causal and Peremptory Strikes Against Black Jurors.. . . . . . . . . . . . . . . . 99

    B.    The Prosecutor's Strikes Violated Equal Protection. . . . . . . . . . . . . . . . . . . . . 100

    1.    Pattern of Strikes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

    2.    Comparison of White Jurors Seated. . . . . . . . . . . . . . . . . . . . . . . . . . 102

    3.    The Peremptory Strike of Ms. Amarh. . . . . . . . . . . . . . . . . . . . . . . . . 104

    4.    The Peremptory Strike of Dorothy Jean Debose. . . . . . . . . . . . . . . . . . 106

    5.    The Peremptory Strike of Charlene Boulet. . . . . . . . . . . . . . . . . . . . . . 107

Exhibit A - 000005

**Table of Contents (cont'd)**                                                                     **Page**

III.     GROUND THREE:  THE PROSECUTOR VIOLATED DUE PROCESS AND
         EQUAL PROTECTION BASED UPON THE ARBITRARY AND
         DISCRIMINATORY DECISION TO SEEK THE DEATH PENALTY . . . . . . . . . . . . 108

IV.      GROUND FOUR:  APPELLATE COUNSEL DEPRIVED ROBINSON
         OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE
         OF COUNSEL ON APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

         A.      Defense Counsel's Failure to Raise the *Batson* Issue on Appeal Was
                 Deficient Performance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

         B.      The Failure to Raise the *Batson* Issue Prejudiced Robinson's Case. . . . . . . . . . 113

V.       GROUND FIVE:  THE PROSECUTION VIOLATED DUE PROCESS
         BY PURSUING FUNDAMENTALLY INCONSISTENT THEORIES
         AT SERIATIM CAPITAL TRIALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

VI.      GROUND SIX:  THE PROSECUTION VIOLATED DUE PROCESS BY
         KNOWINGLY USING FALSE AND MISLEADING TESTIMONY DURING
         THE PENALTY PHASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

VII.     GROUND SEVEN:   THE INDICTMENT VIOLATED THE FIFTH
         AMENDMENT BY FAILING TO INCLUDE AGGRAVATING FACTORS
         FOR THE CAPITAL CHARGE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

Exhibit A - 000006

## TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Alcorta v. Texas*,
355 U.S. 28, 78 S. Ct. 103,
2 L. Ed. 2d 9 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*Anderson v. Johnson*,
338 F.3d 382 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Anderson v. Sirmons*,
476 F.3d 1131 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Apprendi v. New Jersey*,
530 U.S. 466, 120 S. Ct. 2348,
147 L. Ed. 2d 435 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Arizona v. Fulminante*,
499 U.S. 279, 111 S. Ct. 1246,
113 L. Ed. 2d 302 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252, 97 S. Ct. 555,
50 L. Ed. 2d 450 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Ex Parte Bain*,
121 U.S. 1, 7 S. Ct. 781,
30 L. Ed. 849 (1887). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*Banks v. Dretke*,
540 U.S. 668, 124 S. Ct. 1256,
157 L. Ed. 2d 1166 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Batson v. Kentucky*,
476 U.S. 79, 106 S. Ct. 1712,
90 L. Ed. 2d 69 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 102, 106, 108

*Bell v. Cone*,
535 U.S. 685, 122 S. Ct. 1843,
152 L. Ed. 2d 914 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Boyde v. California*,
494 U.S. 370, 110 S. Ct. 1190,
108 L. Ed. 2d 316 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Exhibit A - 000007

**Table of Authorities (cont'd)**                                                    **Page**

*Bradshaw v. Maryland*,
373 U.S. 83, 83 S. Ct. 1194,
10 L. Ed. 2d 215 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Bradshaw v. Stumpf*,
545 U.S. 175, 125 S. Ct. 2398,
162 L. Ed. 2d 143 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*Buckner v. Polk*,
453 F.3d 195, 203 (4th Cir. 2006), *reh'g denied*,
466 F.3d 280 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*California v. Brown*,
479 U.S. 538, 107 S. Ct. 837,
93 L. Ed. 2d 934 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Canaan v. McBride*,
395 F.3d 376 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cole v. Dretke*,
418 F.3d 494 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Crawford v. United States*,
212 U.S. 183, 29 S. Ct. 260,
53 L. Ed. 465 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Cuyler v. Sullivan*,
446 U.S. 335, 100 S. Ct. 1708,
64 L. Ed. 2d 333 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Dawson v. Delaware*,
503 U.S. 159, 112 S. Ct. 1093,
117 L. Ed. 2d 309 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 67

*Deck v. Missouri*,
544 U.S. 622, 125 S. Ct. 2007,
161 L. Ed. 2d 953 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 99, 101, 102, 103,117

*Dobbs v. Turpin*,
142 F.3d 1383 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Eddings v. Oklahoma*,
455 U.S. 104, 102 S. Ct. 869,
71 L. Ed. 2d 1 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**Table of Authorities (cont'd)**                                                    **Page**

*Felder v. Johnson*,
  180 F.3d 206 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Florida v. Nixon*,
  543 U.S. 175, 125 S. Ct. 551,
  160 L. Ed. 2d 565 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 31

*Foster v. Johnson*,
  293 F.3d 766 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Franklin v. Lynaugh*,
  487 U.S. 164, 108 S. Ct. 2320,
  101 L. Ed. 2d 155 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Fuller v. Johnson*,
  114 F.3d 491 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Georgia v. McCollum*,
  505 U.S. 42, 112 S. Ct. 2348,
  120 L. Ed. 2d 33 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Green v. Georgia*,
  442 U.S. 95, 99 S. Ct. 2150,
  60 L. Ed. 2d 738 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Hamblin v. Mitchell*,
  354 F.3d 482 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hedrick v. True*,
  443 F.3d 342 (4th Cir. 2006), *cert. denied*,
  127 S. Ct. 10, 165 L. Ed. 2d 992 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hernandez v. New York*,
  500 U.S. 352, 363, 111 S. Ct. 1859,
  114 L. Ed. 2d 395 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Jacobs v. Scott*,
  513 U.S. 1067, 115 S. Ct. 711,
  130 L. Ed. 2d 618 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115, 116

*Johnson v. California*,
  545 U.S. 162, 125 S. Ct. 2410,
  162 L. Ed. 2d 129 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit A - 000009

**Table of Authorities (cont'd)**            **Page**

*Jones v. United States*,
    526 U.S. 227, 119 S. Ct. 1215,
    143 L. Ed. 2d 311 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Jones v. United States*,
    527 U.S. 373, 119 S. Ct. 2090,
    144 L. Ed. 2d 370 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Jurek v. Texas*,
    428 U.S. 262, 96 S. Ct. 2950,
    49 L. Ed. 2d 929 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Kansas v. Marsh*,
    126 S. Ct. 2516,
    165 L. Ed. 2d 429 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Kelly v. South Carolina*,
    534 U.S. 246, 122 S. Ct. 726,
    151 L. Ed. 2d 670 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 76

*Knighton v. Maggio*,
    740 F.2d 1344 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kyles v. Whitley*,
    514 U.S. 419, 115 S. Ct. 1555,
    131 L. Ed. 2d 490 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56, 57

*Lewis v. Dretke*,
    355 F.3d 364 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 84

*Lockett v. Anderson*,
    230 F.3d 695 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Lockyer v. Andrade*,
    538 U.S. 63, 123 S. Ct. 1166,
    155 L. Ed. 2d 144 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Loyd v. Whitley*,
    977 F.2d 149 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*McClesky v. Kemp*,
    481 U.S. 279, 107 S. Ct. 1756,
    95 L. Ed. 2d 262 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Exhibit A - 000010

**Table of Authorities (cont'd)**                                                                 **Page**

*McKoy v. North Carolina*,
494 U.S. 433, 110 S. Ct. 1227,
108 L. Ed. 2d 369 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Miller-El v. Crockwell*,
537 U.S. 322, 123 S. Ct. 1029,
154 L. Ed. 2d 93 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Miller-El v. Dretke*,
545 U.S. 231, 125 S. Ct. 2317,
162 L. Ed. 2d 196 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Miller v. Dretke*,
420 F.3d 356 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Moore v. Johnson*,
194 F.3d 586 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 87

*Napue v. Illinois*,
360 U.S. 264, 79 S. Ct. 1173,
3 L. Ed. 1217 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*Neal v. Puckett*,
286 F.3d 230 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 39, 57, 89

*Neder v. United States*,
527 U.S. 1, 119 S. Ct. 1827,
144 L. Ed. 2d 35 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 121

*O'Neal v. Delo*,
44 F.3d 655 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Penry v. Lynaugh*,
492 U.S. 302, 109 S. Ct. 2934,
106 L. Ed. 2d 256 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 89

*Perez v. Dretke*,
393 F. Supp. 2d 443 (N.D. Tex. 2005),
app. denied, No. 05-70036. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Purkett v. Elem*,
514 U.S. 765, 115 S. Ct. 1769,
131 L. Ed. 2d 834 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

**Table of Authorities (cont'd)**                                              **Page**

*Ring v. Arizona*,
    536 U.S. 584, 122 S. Ct. 2428,
    153 L. Ed. 2d 556 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Roberts v. Dretke*,
    356 F.3d 632 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 77

*Robinson v. United States*,
    543 U.S. 1005, 125 S. Ct. 623,
    160 L. Ed. 2d 466 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Rompilla v. Beard*,
    545 U.S. 374, 125 S. Ct. 2456,
    162 L. Ed. 2d 360 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Roper v. Simmons*,
    543 U.S. 551, 125 S. Ct. 1183,
    161 L. Ed. 2d 1 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Rosales v. Cockrell*,
    220 F. Supp. 2d 593 (N. D. Tex. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Russell v. United States*,
    369 U.S. 749, 82 S. Ct. 1038,
    8 L. Ed. 2d 240 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

*Scheanette v. Quarterman*,
    482 F.3d 815 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Schriro v. Landrigan*,
    127 S. Ct. 1933,
    167 L. Ed. 2d 836 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Shields v. Dretke*,
    122 Fed. Appx. 133 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Simmons v. South Carolina*,
    512 U.S. 154, 114 S. Ct. 2187,
    129 L. Ed. 2d 133 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Skipper v. South Carolina*,
    476 U.S. 1, 106 S. Ct. 1669,
    90 L. Ed. 2d 1 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Exhibit A - 000012

**Table of Authorities (cont'd)**            **Page**

*Smith v. Dretke,*
    422 F.3d 269 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 77

*Smith v. Mullin,*
    379 F.3d 919 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Smith v. Murray,*
    477 U.S. 527, 106 S. Ct. 2661,
    91 L. Ed. 2d 434 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

*Smith v. Robbins,*
    528 U.S. 259, 120 S. Ct. 746,
    145 L. Ed. 2d 756 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

*Soffar v. Dretke,*
    368 F.3d 441 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sonnier v. Quarterman,*
    476 F.3d 349 (5th Cir. 2007), *reh'g denied,*
    2007 U.S. App. LEXIS 5683 (5th Cir., Mar. 9, 2007). . . . . . . . . . . . . . . . . . . . . 24, 37, 39

*Stirone v. United States,*
    361 U.S. 212, 80 S. Ct. 270,
    4 L. Ed. 2d 252 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 122

*Strickland v. Washington,*
    466 U.S. 668, 104 S. Ct. 2052,
    80 L. Ed. 2d 674 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 55, 57, 93, 95, 112

*Strickler v. Greene,*
    527 U.S. 263, 119 S. Ct. 1936,
    144 L. Ed. 2d 286 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Tennard v. Dretke,*
    542 U.S. 274, 124 S. Ct. 2562,
    159 L. Ed. 2d 384 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88

*United States v. Abel,*
    469 U.S. 45, 105 S. Ct. 465,
    83 L. Ed. 2d 450 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Agurs,*
    427 U.S. 97, 96 S. Ct. 2392,
    49 L. Ed. 2d 342 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**Table of Authorities (cont'd)**                                                    **Page**

*United States v. Bagley*,
    473 U.S. 667, 105 S. Ct. 3375,
    87 L. Ed. 2d 481 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Bernard*,
    299 F.3d 467 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Calandra*,
    414 U.S. 338, 94 S. Ct. 613,
    38 L. Ed. 2d 561 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*United States v. Cotton*,
    535 U.S. 625, 122 S. Ct. 1781,
    152 L. Ed. 2d 860 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. Cox*,
    342 F.2d 167 (5th Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

*United States v. Dionisio*,
    410 U.S. 1, 93 S. Ct. 764,
    35 L. Ed. 2d 67 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*United States v. Dominguez Benitez*,
    542 U.S. 74, 124 S. Ct. 2333,
    159 L. Ed. 2d 157 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Drones*,
    218 F.3d 496 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Gipson*,
    985 F.2d 212 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Gonzalez-Lopez*,
    126 S. Ct. 2557,
    165 L. Ed. 2d 409 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. Hall*,
    455 F.3d 508 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Henderson*,
    100 Fed. App. 302, 303 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Hoskins*,
    910 F.2d 309 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Exhibit A - 000014

**Table of Authorities (cont'd)**            **Page**

*United States v. Irvin*,
    87 F.3d 860 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Olano*,
    507 U.S. 725, 113 S. Ct. 1770,
    123 L. Ed. 2d 508 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. Resendiz-Ponce*,
    127 S. Ct. 782,
    166 L. Ed. 2d 591 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 123

*United States v. Robinson*,
    367 F.3d 278 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 119

*United States v. Webster*,
    392 F.3d 787 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Valdez v. Johnson*,
    93 F. Supp. 2d 769 (S.D. Tex. 1999), *rev'd on other grounds*,
    274 F.3d 941 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Vasquez v. Hillery*,
    474 U.S. 254, 106 S. Ct. 617,
    88 L. Ed. 2d 598 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 120, 121, 122

*Wainwright v. Lockhart*,
    80 F.3d 1226 (8th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68, 71

*Waller v. Georgia*,
    467 U.S. 39, 104 S. Ct. 2210,
    81 L. Ed. 2d 31 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Waters v. Thomas*,
    46 F.3d 1506 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Watts v. Quarterman*,
    448 F. Supp. 2d 786 (W.D. Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Wiggins v. Smith*,
    539 U.S. 510, 123 S. Ct. 2527,
    156 L. Ed. 2d 471 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Williams*,
    504 U.S. 36, 49, 112 S. Ct. 1735,

**Table of Authorities (cont'd)** **Page**

118 L. Ed. 2d 352 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*Williams (Terry) v. Taylor*,
529 U.S. 362, 398, 120 S. Ct. 1495,
146 L. Ed. 2d 389 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 92

*Wood v. Georgia*,
370 U.S. 375, 82 S. Ct. 1364,
8 L. Ed. 2d 569 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*Woodford v. Visciotti*,
537 U.S. 19, 123 S. Ct. 357,
154 L. Ed. 2d 279 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 93

*Yarborough v. Gentry*,
540 U.S. 1, 124 S. Ct. 1,
157 L. Ed. 2d 1 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Zant v. Stephens*,
462 U.S. 862, 103 S. Ct. 2733,
77 L. Ed. 2d 235 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

**State Cases**

*Roberts v. State*,
220 S.W.3d 521 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Ex parte Woods, NO. WR-62,627-01*,
2005 Tex. Crim. App. LEXIS 1859 (Tex. Crim. App. 2005). . . . . . . . . . . . . . . . . . 41

**Docketed Cases**

*State of Texas v. Carlis Jovonite Russell*,
Case No. 0676421A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Texas v. Julius Robinson*,
Case No. 0574361D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

*United States v. L.J. Britt*,
Case No. 4:00-CR-00260-15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

**Federal Statutes, Codes and Rules**

United States Constitution

**Table of Authorities (cont'd)**                                    **Page**

      Amendment V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118, 120
      Amendment XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

18 U.S.C.
      Section 824.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 13
      Section 841.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
      Section  924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
      Section 2255.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      Section 3592.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21 U.S.C.
      Section 846.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      Section 841.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      Section 848.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 17

28 U.S.C.
      Section 2254.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
      Section 2255.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 93
      Section 3591.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
      Section 3592.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
      Section 3593.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Federal Rules of Criminal Procedure
      Section 12.2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**State Statutes, Codes and Rules**

Texas Code of Criminal Procedure
      Article 42.12.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Texas Penal Code
      Section 22.05.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

**Miscellaneous**

Blume, John H., et al.,
      FUTURE DANGEROUSNESS IN CAPITAL CASES: ALWAYS "AT ISSUE,"
      86 Cornell L. Rev. 397, 398 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Garvey, Stephen P.
      AGGRAVATION AND MITIGATION IN CAPITAL CASES: WHAT DO JURORS THINK?,
      98 Colum. L. Rev. 1538, 1559-60 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 75

**Table of Authorities (cont'd)**                                                                                                    **Page**

McGee, C.L. & E.P. Riley,
    BRAIN IMAGING AND FETAL ALCOHOL SPECTRUM DISORDERS,
    Ann. Ist. Super. Sanita, 42(1):46-52 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Stoll, Stephen P.,  Roth MP, Dott B, Alembik Y,
    Study of 290 Cases of Polyhydramnios and Congenital Malformations in a Series of
    225,669 Consecutive Births,
    Community Genet, 2(1):36-42 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    THE CHAMPION,
    pp. 43-45 (May 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Subcomm. on Federal Death Penalty Cases, Comm. on Defender Services,
    Judicial Conference of the United States, Federal Death Penalty Cases:
    RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE
    REPRESENTATION (1998) (commentary). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ABA Guidelines
    Section 1.1 cmt (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Updated Guidelines
    Section 4.1 cmt.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 46

Exhibit A - 000018

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **JULIUS ROBINSON** | : | **United States District Judge** |

---

### <u>AMENDED MOTION TO VACATE CONVICTION AND SENTENCE<br>AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255<br>AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE</u>

(Filed Electronically Under the Electronic Filing System Requirements)

---

Julius Robinson (hereinafter "Robinson"), by and through his attorneys, Mike Charlton, Sean Kennedy and Craig Harbaugh, files this amended motion to set aside or correct judgment and sentence by a person in federal custody.  This amended motion continues to assert all of the claims contained in Robison's original 18 U.S.C. § 2255 motion.  All exhibits filed with the original motion and reply brief are hereby incorporated by reference as though set forth in full. Apart from formalistic changes to provide greater structure and clarity, the amended motion modifies Grounds One and Four, and adds Ground Seven.  Additional exhibits 72 through 82 are filed along with this amended motion.

<u>                                        **MOTION**                                        </u>

Name:  Julius Omar Robinson

Prison Number:  26190-177

Place of Confinement:  United States Penitentiary, Terre Haute, Indiana

1.    (a)    Name and location of court that entered the judgment of conviction you are

              challenging: Hon. Terry R. Means, United States District Court, Northern District

              of Texas, Ft. Worth Division.

      (b)    Criminal docket or case number: 4:00-CR-260-2.

2.    (a)    Date of the judgment of conviction: June 5, 2002 (jury verdict March 18, 2002).

      (b)    Date of the judgment of sentence: June 5, 2002

3.    Length of sentence: Death as to Counts 3, 7, 11; life sentence as to Counts 12, 15;

      300 months as to Count 17, to run consecutively to Counts 12 and 15.

4.    Nature of crime:

| Count No. | Offense | Title & Section |
|---|---|---|
| 1 | Conspiracy to Distribute More than 100 Kilograms of Marijuana | 21 U.S.C. §§ 846, 841(b)(1)(B) |
| 2 | Conspiracy to Distribute More than 5 Kilograms of Cocaine | 21 U.S.C. §§ 846, 841 (b)(1)(A) |
| 3 | Murder While Engaging in a Continuing Criminal Enterprise | 21 U.S.C. § 848(e) |
| 4, 8, 17 | Possession of a Firearm in Furtherance of a Drug Trafficking Crime | 18 U.S.C. §§ 924(c)(1)(A)(i), 824 (c)(1)(C)(i) |
| 5, 9, 13 | Carry/Use of a Firearm During a Drug Trafficking Crime | 18 U.S.C. § 924(c)(1)(A)(ii) |
| 6, 10, 14 | Carry/Use and Discharge a Firearm During a Drug Trafficking Crime | 18 U.S.C. § 924(c)(1)(C)(iii) |

2

Exhibit A - 000020

| | | |
|---|---|---|
| 7, 11, 15 | Murder in Course of Carrying/Using a Firearm During a Drug Trafficking Crime | 18 U.S.C. § 924(j) |
| 12 | Murder While Engaged in Possession of More than 5 Kilograms of Cocaine with Intent to Distribute | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 848(e) |

5.  (a)  What was your plea?  Not guilty

   (b)  If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?  Not applicable.

6.  If you went to trial, what kind of trial did you have?  Jury.

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?  No.

8.  Did you appeal from the judgment of conviction?  Yes.

9.  If you did appeal, answer the following:

   (a)  Name of court: United States Court of Appeals for the Fifth Circuit.

   (b)  Docket or case number:  02-10717.

   (c)  Result: Affirmed.

   (d)  Date of result:  April 14, 2004.

   (e)  Citation to the case: *United States v. Robinson,* 367 F.3d 278 (5th Cir. 2004).

   (f)  Grounds raised:

   Issue 1:  The Indictment Did Not Include Aggravating Factors and Thus the Death Penalty Was Not Authorized under the Indictment Clause of the Fifth Amendment

   Issue 2:  The Federal Death Penalty Act Violates the Indictment and Due

3

Process Clauses of the Fifth Amendment Inasmuch as the Act

Requires That Prosecutors Rather than Grand Jurors Charge the

Aggravating Factor Elements of a Capital Offense

Issue 3:   The Trial Court Erred by Admitting Hearsay Statements of a

Witness under the Erroneous Belief That Such Statements Were

Admissible as Co-conspirator Statements

Issue 4:   The Federal Death Penalty Act Violates the Fifth and Eighth

Amendments to the United States Constitution

Issue 5:   The Trial Court Erred in Denying Appellant's Complaint That the

Government's Notice of Aggravating Factors Was Duplicitous, and

the Submission of Duplicitous Aggravating Factors Resulted in

Improper Double Counting

Issue 6:   The Trial Court Erred in Denial of Appellant's Motion to Dismiss

Non-statutory Aggravating Factors as Unauthorized by Statute

(g)   Did you file a petition for writ of certiorari in the United States Supreme Court?

Yes.

If "Yes," answer the following:

(1)   Docket or case number: 04-5930.

(2)   Result:  Denied.

(3)   Date of result:  November 29, 2004.

(4)   Citation to the case:  *Robinson v. United States*, 543 U.S. 1005, 125 S. Ct.

623, 160 L. Ed. 2d 466 (2004).

4

Exhibit A - 000022

(5)     Question Presented:  Whether in light of *Ring v. Arizona*, was the indictment, which failed to charge any statutory aggravating factors pursuant to 18 U.S.C. § 3592(c)(1)-(16), insufficient to charge a capital offense, and, if so, did the court of appeals err in finding this preserved violation of the Indictment Clause of the Fifth Amendment to be harmless error?

10.    Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?  No.

11.    If your answer to Question 10 was "Yes," give the following information: Not applicable.

12.    Grounds on which Robinson claims he is being held unlawfully:

GROUND ONE:  TRIAL COUNSEL DEPRIVED ROBINSON OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS TRIAL

GROUND TWO:   THE PROSECUTOR VIOLATED EQUAL PROTECTION BY EXERCISING PEREMPTORY CHALLENGES BASED UPON A RACIALLY DISCRIMINATORY MOTIVE

GROUND THREE:  THE PROSECUTOR VIOLATED DUE PROCESS AND EQUAL PROTECTION BASED UPON THE ARBITRARY AND DISCRIMINATORY DECISION TO SEEK THE DEATH PENALTY

GROUND FOUR:  APPELLATE COUNSEL DEPRIVED ROBINSON OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

GROUND FIVE:  THE PROSECUTION VIOLATED DUE PROCESS BY PURSUING FUNDAMENTALLY INCONSISTENT THEORIES AT SERIATIM CAPITAL TRIALS

GROUND SIX:  THE PROSECUTION VIOLATED DUE PROCESS BY KNOWINGLY USING FALSE AND MISLEADING TESTIMONY DURING THE PENALTY PHASE

5

GROUND SEVEN:   THE INDICTMENT VIOLATED THE FIFTH AMENDMENT BY FAILING TO INCLUDE AGGRAVATING FACTORS FOR THE CAPITAL CHARGE

The facts in support of these grounds are set forth in full in the attached memorandum of facts and law and the exhibits thereto, which are incorporated here by reference.

13.   With the exception of Ground Seven, each claim in this motion is based on evidence outside the trial record and thus could not have been raised on direct appeal.  To the extent that any claim in this motion was raised, or could have been raised, on direct appeal, Robinson asserts that his appellate counsel's failure in that regard constituted ineffective assistance in violation of the Constitution.

14.   Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment you are challenging?  No.

15.   Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a)   At preliminary hearing: Not applicable.

(b)   At arraignment and plea: Alex Tandy, 7700 Precinct Line Road, Ft. Worth, Texas 76180.

(c)   At trial:  Wes Ball, 4025 Woodland Park Blvd., Ste. 100, Ft. Worth, Texas 76013; Jack V. Strickland, 909 Throckmorton, Ft. Worth, Texas 76102.

(d)   At sentencing:  Wes Ball, 4025 Woodland Park Blvd., Ste. 100, Ft. Worth, Texas 76013; Jack V. Strickland, 909 Throckmorton, Ft. Worth, Texas 76102.

(e)   On appeal:  Wes Ball, 4025 Woodland Park Blvd., Ste. 100, Ft. Worth, Texas 76013; Jack V. Strickland, 909 Throckmorton, Ft. Worth, Texas 76102.

6

(f)   In any post-conviction proceeding:  Michael Charlton, 411 E. Bonneville, Ste. 250, Las Vegas, Nevada 89101; Sean K. Kennedy and Craig A. Harbaugh, 321 E. 2nd St., Los Angeles, California 90012.

16.   Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?  Yes.

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?  No.

Dated:  July 2, 2007                    Respectfully submitted,

 s/ Sean K. Kennedy
SEAN K. KENNEDY
Federal Public Defender
CRAIG A. HARBAUGH
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
E-Mail sean_kennedy@fd.org
E-Mail craig_harbaugh@fd.org

7

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | **(Civil No. 4:05-CV-756-Y)** |
| **Defendant/Petitioner,** | : | |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **UNITED STATES OF AMERICA,** | : | **United States District Judge** |
| | : | |
| **Plaintiff/Respondent.** | : | |

**BRIEF IN SUPPORT OF AMENDED MOTION TO VACATE
CONVICTION AND SENTENCE AND FOR NEW TRIAL
PURSUANT TO 28 U.S.C. § 2255 AND RULE 33
OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

## INTRODUCTION

In every respect, Julius Robinson was denied the basic representation required of competent counsel. Trial counsel met with Robinson only twice before his capital trial. Other than court appearances, lead trial counsel waited to meet with his client until almost five months after his appointment. Associate counsel waited to see Robinson just a week before the judge imposed the final sentence. The investigator met with Robinson for the first time after the jury rendered the death verdict. (Ex. 80, Bureau of Prisons Jail Logs re: Attorney Visits with Julius Robinson.)

Trial counsel's indifference to the case was not limited to the attorney-client relationship. It extended to every aspect of their capital representation. Specifically, trial counsel failed to conduct a reasonable investigation into Robinson's life history, failed to have Robinson

1

mentally evaluated despite his chronic exposure to alcohol in utero and pesticides as a child, and failed to investigate the prosecution's evidence regarding future dangerousness.

Due to their inadequate investigation, trial counsel were unprepared to rebut the prosecution's aggravating evidence, and were unprepared to present a compelling case for mitigation. Had trial counsel effectively discharged their constitutional obligations, they would have presented a wealth of evidence far more than sufficient to tip the scales in favor of life. A comparison of the actual penalty phase and the totality of available mitigating evidence makes this abundantly clear:

| PENALTY PHASE EVIDENCE PRESENTED | AVAILABLE PENALTY PHASE EVIDENCE FOLLOWING REASONABLE INVESTIGATION |
| --- | --- |
| **Future Dangerousness:** | |
| Robinson ordered a "hit" against prosecution witness Williams from prison. (20 RT 137-171; Ex.44.) | Robinson had nothing to do with the robbery and kidnaping of Williams. (Exs. 8, 19, 21, 28, 34, 62, 64.) |
| Robinson was affiliated with the "Crips of Dermott" Gang. (20 RT 47-49, 53, 68, 116, Pros. Exs. 629, 634.) | Robinson was not affiliated with any gang, and certainly not a notorious criminal syndicate. (Exs. 59, 72.) |
| Robinson attempted to murder Sara Tucker. (20 RT 12-20.) | At nighttime, Robinson fired shots at a parked truck without knowledge that Tucker was sitting inside; the trial court initially deferred adjudication of guilt and imposed community supervision instead. (Exs. 54, 74, 78, 79.) |
| **Life History:** | |
| No information about Robinson's early years. | Robinson was abandoned as a toddler by his drug-addicted, narcotics-dealing parents who were trapped in an endless cycle of violence and addiction. (Exs. 1, 13, 17, 18, 24, 29, 30, 46.) |

2

| | |
|---|---|
| Robinson was raised in a stable home by able-bodied grandparents. (21 RT 131-170.) | Robinson was neglected throughout his childhood and was exposed to a variety of negative influences because his grandparents were unable to care for him properly. (Exs. 1, 7, 12, 13, 18, 22, 23, 27, 29, 30, 33, 37.) |
| Robinson enjoyed playing football like most adolescents, though he was inconvenienced by his mother's temporary experimentation with drugs. (21 RT 2-18, 46-53, 74-80.) | Robinson juggled the demands of high school while struggling to support his destitute and drug-addicted mother, eventually forcing him into a life of drug dealing. (Exs. 5, 7, 14, 16, 29, 30, 36.) |

**Cognitive Impairments:**

| | |
|---|---|
| No information regarding Robinson's intellectual functioning, and thus the jury viewed him as normal and unimpaired. | Robinson suffered brain damage as the result of his mother drinking alcohol through her pregnancy with him, and through his chronic exposure to pesticides as a child. (Exs. 1, 2, 9, 12, 16, 17, 29, 30, 37, 38, 63, 77.) |

**Character:**

| | |
|---|---|
| Robinson was liked by his football coaches and did not cause any problems in jail other than placing an unauthorized phone call to order a "hit". (21 RT 18-43, 54-74, 81-120.) | Robinson was a kind and compassionate person as demonstrated by acting as a part-time father to his brother's children, assisting his mother with obtaining a fresh start to break her drug addiction, and helping his cousin turn his life around. (Exs. 5, 12, 25, 35.) |
| Robinson's only positive contribution was that once he turned in a lost wallet without taking any money first. (21 RT 43-46.) | |

Had trial counsel conducted the reasonably thorough life history investigation required in a capital case, they could have delivered a vastly different presentation of who Robinson was as a person. By disproving that Robinson directed the Williams robbery, that he attempted to kill Sara Tucker, and that he participated in a fearsome gang, trial counsel could have assuaged the jury's concern that Robinson posed a threat to society from prison. By offering psychological testimony regarding Robinson's brain damage and learning disabilities, trial counsel could have shown how his cognitive impairments shaped his life choices and made him less morally

3

culpable. By providing an accurate depiction of Robinson's life history, trial counsel could have explained how his oppressive background warranted sympathy. By elucidating Robinson's positive character traits, as exemplified by his many good deeds, trial counsel could have convinced the jury that Robinson was capable of redemption and worthy of sympathy notwithstanding his serious crimes. In sum, had trial counsel presented the jury with an accurate profile of Robinson's conduct and background, there is a reasonable probability that at least one juror would have voted for life.

A death sentence was not a foregone conclusion. The penalty verdict was foreordained by trial counsel's inadequate representation. Therefore, because the sentence is unreliable, the Court cannot have confidence in the outcome of this case, and Robinson's death sentence must be set aside.

## STATEMENT OF FACTS

**I. Julius Robinson's Background**

Julius Robinson grew up in poverty, racism, neglect, abuse and alcoholism. He was exposed *in utero* to alcohol and drugs and to toxic pesticides as a child. He grew up with learning disabilities that made it impossible for him to succeed and pull himself out of the quagmire that was Dermott, Arkansas.[1]

---

[1] According to current economic statistics, Dermott has about 3500 people, almost 75% of whom are black. The median income in 2000 was almost $18,000 per year and the average house value was almost $33,000.00. Only a third of the town's residents are married. Compared to the rest of Arkansas, its median income is significantly below the state average, as is its household value. Its unemployment rate of over 13% is well above the state average. The percentage of its population that is institutionalized is significantly above the state average and its percentage of those residents with a college education is well below the state average. Eighty-seven percent of the 635 students in its school system in 2003-04 were eligible for either a free or reduced price lunch program because of their parents' low incomes. It was and remains a very

4

### A.    Robinson Suffered a Horrendous Infancy and Was Raised by Violent, Drug-Addicted and Drug-Dealing Parents

From birth, Robinson never had a fair chance.  Both of his parents failed miserably at providing the safe, stable and nurturing environment critical to a child's development.  Instead, Robinson was subjected to a life of substance abuse, violence, and drug dealing.

Rose Hollimon, Robinson's mother, grew up in a rural town.  (Ex.7, Decl. of Josephine Dotson.)  She was one of eight children.  Her parents were very poor, forcing most of the children to work in the fields at a very young age.  Rose, however, lived a privileged life, in comparison to her siblings.  One of the neighbors, Sarah Pittman ("Ms. Pittman"), took a liking to Rose and wanted to keep Rose out of the fields.  Struggling to raise their other children, John and Margaret agreed to let Rose stay with Ms. Pittman.  (Ex. 7, Decl. of Josephine Dotson, at ¶ 5.)

Rose's special status did not help her.  While in school, Rose had a sexual relationship with one of her teachers.  (Ex. 7, Decl. of Josephine Dotson at ¶ 11.)  No action was taken against the teacher because Rose denied it to the school authorities but she began to sneak out of Ms. Pittman's home at night to meet with the teacher.  (*Id.*)  Even though her father intervened, it did no good.  Rose began drinking alcohol and smoking marijuana almost every day as early as age twelve or thirteen.  (Ex. 17, Decl. of Rose Hollimon, at ¶ 8.)

Rose quit school at age 16, after she became pregnant with Robinson's brother; she had barely attained majority age when her next child, Robinson, was born.  (Ex. 10, Decl. of Guffrie

poor community, a fact confirmed by the interview with Rodney White, Robinson's cousin. (Exhibit 32, Decl. of Rodney White.)

5

Gorins.)  Not surprisingly, Rose was too immature and ill-suited for the demands of motherhood.  Compounding matters was the fact that Rose was intellectually dull.  (Ex. 10, Decl. of Guffrie Gorins, at ¶ 2.)  Jimmie Lee Robinson, her husband, also noticed that "there was something off" with his wife.  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 37.)  Recent psychological testing establishes that Rose is mildly mentally retarded.  (Ex. 46, Dr. Barna, Psych. Report for Rosie Mae Hollimon, at p. 4.)  Rose's intelligent quotient (IQ) score is 65.  (*Id.* at p. 2.)  At the age of forty-seven, Rose had the reading and writing ability of an eight-year-old child.  (*Id.* at p. 3.)

Robinson's father, Jimmie Lee Robinson ("Jimmie Lee") lived near the Hollimon family and was in the same grade level as Rose's sister, Josephine.  (Ex. 7, Decl. of Josephine Dotson, at ¶ 12.)  Long before his tumultuous marriage to Rose, Jimmie Lee was a very violent young man.  (*Id.*)  He once attacked a girl named Miki simply because she said something that made him angry.  (*Id.*; Ex. 18, Decl. Bernice Johnson, at ¶ 5.)

Shortly after marrying Rose, Jimmie Lee joined the military and the couple moved to North Carolina.  (*Id.* at ¶ 14.)  Ms. Pittman, Rose's surrogate mother, moved with them as well, to serve as the caregiver for Marcus, Julius's older brother.  (*Id.*)

Given her intellectual handicaps, it is no surprise that Rose constantly made decisions that endangered Robinson's health and well-being.  (Ex. 1, Decl. of Dr. Cunningham, at p. 35 (opining that "Rose's intellectual limitations also provide some understanding for her poor family-related decision making.").)  Rose drank alcohol and abused drugs constantly, even after she found out she was pregnant with Robinson.  Jimmy Lee recalled that Rose "drank a minimum of two to three beers" and "smoked a half an ounce of marijuana" throughout her

6

pregnancy with Robinson.  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 17.)  Rose candidly

admitted as much:

> I got pregnant with Julius, but I didn't realize I was pregnant until I was into my sixth month and I fainted while I was at a barbeque some friends were having.  The next thing I knew, I woke up in the hospital.  Once I found out I was pregnant, I stopped smoking [marijuana].  The doctor said I should stop drinking beer, but I didn't.

(Ex. 17, Decl. of Rose Hollimon, at ¶ 13.)[2]

Because Rose was not aware that she was pregnant, she had not sought prenatal care until

her third trimester.  (*Id*.; *cf.* Ex. 38, Cape Fear Medical Records, at p. 7 (first prenatal record

dated May 6, 1976, at p. 3) (Robinson was born August 11, 1976.).)

The direct effects of the *in utero* alcohol exposure were apparent at Robinson's birth.

Growth retardation, such as low birth weight or height, is one of the diagnostic criterion for fetal

alcohol exposure.  (Ex. 77, Report of Dr. Kate Allen, at pp. 6-7; Ex. 47, FETAL ALCOHOL

SYNDROME: GUIDELINES FOR REFERRAL AND DIAGNOSIS, CENTER FOR DISEASE CONTROL.)

At delivery, Robinson weighed only five pounds, six ounces.  (Ex. 38, Medical Records, at

p. 14.)  Robinson's weight measurements would have been disconcerting for any newborn.

(Ex. 48, Robert C. Vandenbosche & Jeffrey T. Kirchner, INTRAUTERINE GROWTH RETARDATION,

Am. Fam. Physician. 1998 Oct 15:58(6):1384-90.)  The fact that Robinson was not premature

made these findings all the more worrisome.  Indeed, Robinson was beyond full term, having

been born after forty-two weeks of gestation.  (Ex. 38, Cape Fear Medical Records, at pp. 3, 18

("42½ wks, delivered"); *see* Ex. 49, Jennifer R. Butler, M.D., POSTTERM PREGNANCY,

---

[2]  Even outside the home, Rose continued to drink and use drugs while pregnant.  (Ex. 24, Decl. of Beotha Moore, at ¶ 4.)

7

Emedicine.com (2006), available on the internet at www.emedicine.com/med/topic3248.htm (Jun. 14, 2006) (defining postterm pregnancy as greater than 42 weeks of gestation).)  Given Robinson's extremely low birth weight, and lengthy gestational period, the doctors designated Robinson as "SGA," which is the abbreviation for "small for gestational age."  (Ex. 38, Cape Fear Medical Records, at p. 3; Ex. 50, MEDLINE PLUS MEDICAL ENCYCLOPEDIA, available on the internet at http://www.nlm.nih.gov/medlineplus/ ency/article/002302.htm (defining SGA).)

Complicating the delivery further was the fact that Rose had too much amniotic fluid in her uterus.  This phenomenon, known as "polyhydramnios," is correlative to congenital malformations, including birth defects affecting the central nervous system.[3]  (Ex. 51, Stoll CG, Roth MP, Dott B, Alembik Y, STUDY OF 290 CASES OF POLYHYDRAMNIOS AND CONGENITAL MALFORMATIONS IN A SERIES OF 225,669 CONSECUTIVE BIRTHS, Community Genet, 2(1):36-42 (1999) (mor common congenital malformations are associated with polyhydramnios were cardiac, digestive, central nervous system, musculoskeletal, and urinary).)  Alcohol exposure *in utero* is a common cause of such defects.  (Ex. 52, C.L. McGee & E.P. Riley, BRAIN IMAGING AND FETAL ALCOHOL SPECTRUM DISORDERS, Ann. Ist. Super. Sanita, 42(1):46-52 (2006) ("Over thirty years of research has revealed that prenatal exposure to alcohol has a devastating impact on the structure and function of the developing central nervous system.").)

Rose's chronic drug and alcohol abuse continued throughout Robinson's infancy and early childhood.  Rose drank alcohol and smoked marijuana practically every day.  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 19 ("Drugs, alcohol and violence were the order of the day in our

---

[3]  One of the reasons for polyhydramnios is that the fetus has underdeveloped motor skills, including swallowing.  As a result, the fetus cannot ingest as much amniotic fluid as a normal fetus, thus, leaving too much amniotic fluid remaining in the womb.  (Ex. 51.)

8

house.").)  Instead of caring for Robinson, Rose hosted "Soap Opera" parties, informal gatherings devoted to drug and alcohol consumption.  (*Id.* at ¶ 18.)  Eventually, Rose squandered their family savings to purchase cocaine for herself and her friends.  (*Id.*)

Fueled by their constant intoxication, Robinson's parents were hostile toward one another and frequently combative.  Jimmie Lee "hit Rose several times" and "push[ed] and shove[d] her."  (*Id.;*  Ex. 24, Decl. of Beotha Moore, at ¶ 2.)  Jimmie Lee beat Rose until she had "a black eye, a cut lip or bruises."  They fought in the streets of Dermott, often about Jimmie Lee's alcoholism and marital infidelity.  (Ex. 24, Decl. Bernice Johnson, at ¶ 4.)  One time, Jimmie Lee carried a gun and burst into the home of Bernice Johnson, a relative of Rose, looking for his wife to kill her.  (Ex. 18, Decl. Bernice Johnson, at ¶ 5.)  For her part, Rose "had a serious habit of picking things up and hitting [Jimmie Lee] with them."  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 19.)

During their time in North Carolina, Jimmie Lee and Rose's relationship was marred by violence.  (*Id.*)  It was common for their arguments to end with Jimmie Lee hitting, kicking and stomping Rose.  (*Id.*)  Even Ms. Pittman, who lived with them at the time, could not deter them from fighting.  When Ms. Pittman tried to intervene, Jimmie Lee yelled at her to leave them alone.  (*Id.*)  The violence went unabated, even when Rose was pregnant with Robinson.  (*Id.* at ¶ 6.)  Jimmie Lee continued to hit Rose in her face and throw her to the ground, often in the presence of Robinson's older brother, Marcus.  (*Id.;* Ex. 24, Decl. of Beotha Moore, at ¶ 4.)  As Marcus Robinson recalled, "[m]y parents were always arguing and when they fought, it was physical fights with hitting and punching."  (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 2.)

9

One argument became so violent that the police were called and Jimmie Lee was arrested. (*Id.* at ¶ 20.)

Fearing for Marcus's safety, Ms. Pittman removed Marcus from the dangerous Robinson home and raised him in Dermott. (*Id.*) Mildred Hollimon, Rose's sister, remembered when Ms. Pittman returned from North Carolina, and recounted to her the harrowing tales of Jimmie Lee's violence against Rose. (Ex. 12, Decl. of Mildred Hollimon, at ¶ 6.)

Once Robinson was born, Rose reclaimed Marcus from Ms. Pittman and returned to North Carolina. (Ex. 7, Decl. of Josephine Dotson, at ¶ 15.) However, Rose had no money for food and the military authorities could do nothing to help her. (*Id.*) Rose called her sister every other month to ask for money. (*Id.*) Rose also obtained money from her father to pay rent. (*Id.*) Instead of supporting Rose and his children during this time, Jimmie Lee lived with other women. *(Id.)*

Making matters worse, Robinson's parents eventually began selling drugs as a way to support themselves. (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 17.) Jimmie Lee sold marijuana and acid, and Rose dispensed other drugs out of the home. (*Id.*)

As their domestic quarrels grew more intense, the Robinsons feared that child protective services would try to remove the boys from the home. (Ex. 13, Decl. of Milton Hollimon, at ¶ 8 ("Rose and Jimmie Lee were fighting too much and the authorities were getting ready to take the children away from them.").)[4] Rather than mend their ways, Rose and Jimmie Lee decided to send Robinson and his brother 850 miles away to live with Rose's parents, the Hollimons,

---

[4] Even the Government grudgingly concedes that Robinson's parents provided "inadequate care." (Resp. at 42 n.11.)

10

in Dermott. (*Id.*; Ex. 7, Decl. of Josephine Dotson.)  Robinson was less than a year old when this occurred.

This temporary placement of the children turned into a permanent desertion.  Soon after Robinson was delivered to his grandparents, his parents separated.  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 25.)  Jimmie Lee had virtually no contact with his sons after that time.  (*Id.*)  He saw Robinson and his brother approximately two to three times and occasionally sent clothing.  (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 6.)  Rose had even less involvement with her children:

> Our father at least made an effort to do something for us.  Our mom wasn't doing anything.  She came to see us once or twice in all the time we lived with our grandparents and she never sent us anything.  When our mother visited Dermott, she was on the go all the time, partying and going out with her friends.  She really didn't spend the time with my brother and me.  I cried when she would go out partying.

(*Id.* at ¶ 6.)  As Jimmie Lee acknowledged, "the boys ended up without a mother or a father." (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 25.)

The neglect and maltreatment Robinson and Marcus Robinson suffered at the hands of their parents definitely took its toll.  As Marcus explained, "I felt our mother had abandoned us when we were kids."  As a result, Marcus "was a really angry young man."  Bertha Robinson, Robinson's paternal grandmother, noticed Robinson exhibiting signs of emotional disturbance at a very young age.  As she related to Jimmie Lee, Bertha noticed "something odd about Robinson.  When he became angry, he would sit in a corner and cry and stew for an inordinate amount of time for a child."  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 32.)  Bernice Johnson, an older relative, also noticed that there was something wrong:  "Julius always had a temper

11

when he was young, often over nothing.  If he wanted something and couldn't have it, he would have a tantrum and scream and cry." (Ex. 18, Decl. of Bernice Johnson, at ¶ 7.)  Robinson's behavior became even more intense as he got older, often resulting in temper tantrums.  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 33 (explaining that Robinson would "cry and cry and cry").)

**B.**     **Robinson Spent the Remainder of His Childhood Neglected by Disabled and Disinterested Grandparents**

Due to the psychological and emotional trauma Robinson experienced as an infant, he required more, not less, attention during his formative years.  Unfortunately, Robinson was passed off from grandparent to grandparent, each less capable than the other at providing the care essential for his development.

Robinson and his brother were foisted upon their maternal grandparents, Margaret and John Hollimon.  (Ex. 7, Decl. of Josephine Dotson, at ¶ 4.)  The couple had already struggled with raising their own children.  John Hollimon, Robinson's grandfather, attended school only as far as the fourth grade.  He worked as a field hand on farms surrounding Dermott until he injured his eye in an accident.[5]  He gradually lost the eyesight in the remaining eye, and, though he had surgery, he eventually was totally blind.  (Ex. 7, Decl. of Josephine Dotson, at ¶ 4.)  John Hollimon was a drunk for many years until he reformed and started attending church.  He drank whiskey with his friends; the children had to bring him home, and hold him up to keep him from falling into ditches.  (Ex. 13, Decl. of Milton Willis Hollimon, at ¶ 5.)  John Hollimon often came home late and fought with his wife.  He wanted to strike her but missed only because he was blind.

---

[5] Mr. Hollimon was chopping wood and a splinter flew into his eye, blinding it.

12

Robinson's grandmother, Margaret Hollimon, was and remains illiterate. She also worked as a field hand all of her life, chopping cotton and picking beans. Margaret was considered "on the slow side and didn't seem to be grounded enough to keep control of the family." (Ex. 33, Decl. of Willie White, at ¶ 9.) Like Robinson's mother, his grandmother was ill-equipped for motherhood. In addition to sending Rose to live with her neighbor, Margaret never really tended to the children stayed at home. (Ex. 13, Decl. of Milton Willis Hollimon, at ¶ 7 (confirming that his mother never applied discipline); (Ex. 12, Decl. of Mildred Hollimon, at ¶ 4 (same).)

By the time Robinson arrived in Dermott, John and Margaret Hollimon were older and even less qualified to handle the demands of parenthood. Although they provided the bare necessities of food and shelter, the grandparents struggled financially. Long before Robinson and Marcus arrived, John was blind and received welfare. The grandparents struggled even more with the addition of Robinson and Marcus. (Ex. 27, Decl. of Willie Parker, at ¶ 3 (noting that Robinson received the free lunch program at school.).)

Due to their own limited education, the grandparents were incapable of assisting Robinson with any problems in school. (*Id.* at ¶ 3 ("The grandparents were . . . ill-prepared to educate and care for their grandchildren").) This was a harmful environment for Robinson, who was considered by his teachers to be a "slow learner." (Ex. 27, Decl. of Willie Parker, at ¶ 5.) Like his grandmother, Robinson also struggled in the third grade -- he had to repeat the entire school year. (Ex. 37, School Records of Julius Robinson.). His grades were seldom above the "C" level.

13

Arlette Gorins taught Robinson in the seventh grade and her experience sheds some light on his academic performance. Robinson was in her Remedial English class. (Ex. 9, Decl. of Artlette Gorins, at ¶ 2.) "He was academically slow but was not a trouble maker. He received an F in my class. In looking at Robinson's grades, I noted he received a B in geography. I had observed that most students in that particular geography class received either an A or a B, whether they earned it or not." (*Id.*) Most telling is Ms. Gorins' description of the role sports played in Robinson's academic performance:

> If a student was good in sports but had a lot of difficulty in academic subjects, the coaches would request that he or she receive some special attention in the form of one-on-one help. The student, thereby, would be able to meet the grade requirements needed to participate in sports.

(*Id.* at ¶ 3.)

John and Margaret Hollimon were also too feeble to provide the structure and discipline the young Robinson needed. Margaret "had a lot of memory loss and wasn't that aware of Robinson's problems." (Ex. 18, Decl. of Bernice Johnson, at ¶ 10; *see also* Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 36 ("Margaret is a simple person who could not deal with the difficulties [Robinson] had.").) Margaret maintained the same hands-off approach with Robinson she had with her own children. (Ex. 12, Decl. of Mildred Hollimon, at ¶ 8 ("I never saw or heard my parents disciplining the boys [Robinson and Marcus].").) John's physical handicap necessarily impaired his ability to monitor Robinson's activities. (Ex. 18, Decl. of Bernice Johnson, at ¶ 10 ("John was blind, so he wasn't always aware of what Julius was doing.").) At times, Robinson's care was assumed by his paternal grandmother, Bertha Scales Robinson. Although Bertha had greater mental acuity than Margaret, she was physically

14

an invalid.  (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 8.)[6]

The absence of any meaningful adult supervision meant that Robinson was exposed to a number of dangers, not least of which was the chronic exposure to pesticides.  Due to their proximity to a neighboring farm, the Hollimon property was constantly sprayed for pesticides by crop dusting aircraft.  (Ex. 7, Decl. of Josephine Dotson, at ¶ 17.)  The rows of soybeans in the fields behind the Hollimon house were sprayed with pesticides two to three times a week.  (*Id.*; Ex. 12, Decl. of Mildred Hollimon, at ¶ 7; Ex. 30, Decl. of Marcus Robinson, at ¶ 7.)  The harmful spraying went unabated even when children were playing in the fields.  Julius Robinson was exposed to the pesticides, along with his brother.  (Ex. 29, Decl. of Jimmie Robinson, at ¶ 2.)  No one realized the serious danger the pesticides posed to the children's health.  The children referred to the sinister mist as "Ocean Spray," likening the smell to the sweet fruit drink. *(Id.)*

The absence of strong parental support in Robinson's life also meant that he was vulnerable to a variety of societal dangers.  At age five, a neighbor touched Robinson's genitalia. (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 33.)  When his father tried to question Robinson about the incident, he became hysterical:  "[H]e pitched a fit the likes of which I had never seen anyone throw in my life.  Robinson thrashed about, hitting and throwing himself against things and screaming uncontrollably."  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 33.)  Apparently, nothing was done to the molester, and nothing was done to help Robinson.

---

[6]  Bertha Robinson had been crippled for life when her husband shot her.  Although the story given was that the shooting was an accident, most of the family members believed otherwise.  (*Id.* at ¶ 4.)

15

At age eight, Robinson had his first drink of alcohol, and he first got drunk at age twelve. (Ex. 1, Decl. of Mark Cunningham, at p. 22.)  By seventh grade, Robinson was consuming large quantities of liquor on a frequent basis.  (*Id.*)  Occasionally, Robinson went to school intoxicated.

By early adolescence, Robinson craved any sort of attention.  As one teacher observed, "[t]he attention Julius would have needed to come from his parents, he ended up getting from his peers."  (Ex. 27, Decl. of Willie Parker, at ¶ 4.)  But, the only person willing to provide such attention was his gang-affiliated cousin, Rodney White.  Rodney soon introduced Robinson to his friend, Johnny "John-John" Wright, who decided to instigate a pseudo-gang movement in Dermott.  (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 11.)  One by one, Rodney and John-John "initiated" Dermott youth, including Robinson, into the gangs through violent beatings.  (Ex. 23, Decl. of Carl McCree, at ¶ 5.)  "[T]he other kids had hit [Robinson] with bottles" and injured him so severely "that it took [ ] one month to cure him."  (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 35.)

Unfortunately, there was no one at home willing or able to look out for Robinson. Leroy Kennedy, Robinson's youth counselor, explained:

> "I remember being concerned that the grandparents' home was somewhat chaotic.  They had a revolving door policy, with young people coming and going all the time.  Friends and relatives seemed to live there for a few days, then disappear.  It was not a stable environment."

(Ex. 22, Decl. of Leroy Kennedy, at ¶ 5.)  Willie Parker, Robinson's childhood football coach, made a similar observation:

> Julius was a nice boy but he grew up in the streets without parental guidance.  I would see him around town on his own.  My years of experience with kids have taught me to recognize the ones who are

16

lacking TLC, tender loving care, and Julius was someone who was not getting it.

(Ex. 27, Decl. of Willie Parker, at ¶ 2.)

Not surprisingly, Robinson continued to do poorly academically in high school. Willie Parker, one of Robinson's football coaches during his time in Dermott, considered Robinson to be a "slow learner" and was aware that Robinson was a "Resource student," meaning that he received "special assistance with his school work." (Ex. 27, Decl. of Willie Parker, at ¶¶ 2-6.)

At one point, Robinson was told by his grandparents that he had to leave town at the insistence of the police. Most of the family believed that Robinson was being "set up" for an offense that he did not commit.[7] (Ex. 7, Decl. of Jospehine Dotson, at ¶ 18; Ex. 14, Decl. of John Hollimon, Jr., at ¶ 7.) Consistent with the Hollimon tradition of abdicating parental responsibility, Robinson was shipped off to live with his mother.

**C.      Robinson Struggled Throughout His Adolescence and Early Adulthood**

**To Support And Help his Drug-Addicted, Emotionally Absent Mother**

As bad as the situation was in Dermott, Robinson's life worsened when he moved in with his mother, at age 13. (Ex. 37, School Records of Julius Robinson.) Despite the passage of more than a decade since she had abandoned Robinson, Rose was still the same alcoholic and drug addict. Whenever payday arrived, Rose rewarded herself with a bottle of whiskey which lasted

---

[7] Counsel filed an Arkansas State Public Information Act request with the Chicot County District Attorney's office seeking every report of criminal activity that the police suspected of Robinson. No documents were provided because his name was never mentioned in any offense report. Counsel also talked with the Chicot County District Attorney who grew up in Dermott; he had never heard of Robinson.

17

"about four or five days." (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 15.) Rose also smoked marijuana joints, including ones laced with cocaine. (*Id.*, at ¶ 18; Ex. 16, Decl. of Jana Hollimon, at ¶ 4.) During these episodes, Rose's behavior fluctuated between stuporous and irate. (Ex. 14, Decl. of John Hollimon, Jr., at ¶ 9 (Rose was "really out of it" and had a "temper" when she drank too much).) John Hollimon, who visited his daughter Rose in Arlington, noted that Rose was "really out of it. She was often drunk. She would go to work and when she came home, she would begin drinking. . . . When she drank, you couldn't talk to her. She has a real temper." (*Id.*, at ¶ 9.)

Robinson loved his mother and it pained him to watch his mother destroy herself with drugs and alcohol. (Ex. 5, Decl. of Jamila Camp, at ¶ 12.) He often pleaded with his mother to quit using drugs and drinking, always to no avail. (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 16.) Rose denied her addictions were a problem:

> "I would say to her, Rose, you have been drinking too much and
> I think you should slow down. She would get really made at me,
> yell 'don't tell me how to live my life,' and walk out, slamming
> the door. She would be staggering drunk and slurring her words."

(Ex. 14, Decl. of John Hollimon, Jr., at ¶ 9.) In the grips of her illness, Rose had neither the inclination nor wherewithal to start acting as a parent to Robinson. This was evident to David York, one of Robinson's football coaches, who had "the impression that Robinson didn't really have anyone at home to care for him." (Ex. 36, Decl. of David York, at ¶ 2.)

Rose was incapable of meeting not only Robinson's emotional needs but also his basic necessities of food, clothing and shelter. Rose often called her father, complaining that "she didn't have any money for the rent or food." (Ex. 7, Decl. of Josephine Dotson, at ¶ 15.)

18

Although Rose's parents lived on public assistance, they sent Rose what little money they had.

Nevertheless, Robinson still did not have enough to eat.  As Marcus observed during the times

he stayed with Rose and Robinson in Arlington, the situation was quite bleak:

> I remember not having anything to eat but potatoes with ketchup or
> hot sauce for days, waiting for my mother to get her paycheck.  That's
> all the food there was in the house.

(Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 15.)

When Rose quit working, Robinson's situation became more dire.  Robinson loved his

mother and was very hurt by her drug abuse and behavior.  (Ex. 5, Decl. of Jamila Camp,

at ¶ 12.)  Robinson wanted to support his family, but the employment opportunities for a young

adolescent without a high school diploma were virtually nonexistent.  Desperate and destitute,

Robinson tried to earn money the only way he knew how:  illicit drug sales.  (Ex. 7, Decl. of

Josephine Dotson, at ¶ 19.)

Rose's poor parenting had a direct effect on the trajectory of Robinson's life.  As Coach

York observed, "[m]y experience working with kids has taught me to recognize the kids whose

home life is compromised.  I am convinced that if Robinson had grown up in a different

environment, he would have had another kind of life.  I say this because he tried so hard to do

well.  He showed a real need to take care of people."  (Ex. 36, Decl. of David York, at ¶ 2.)

As a result of his poor home life and his learning disabilities, Robinson's academic

progress continued to suffer in high school.  According to Carol Wilson, one of Robinson's

teachers from Lamar High School, "Julius was not a strong academic student as is borne out

by his transcripts.".  (Ex. 35, Decl. of Carol Wilson, at ¶ 5.)  As reflected in his academic records

in high school, Robinson had to repeat some classes in summer school or classes were modified

19

to make them easier for him to pass.  (*Id.* (noting that "R" in records indicated "repeat" and "M" indicated "modified").)  Robinson had a "C-" grade average and was in the lower third of his class.  His grades and class standing were inflated somewhat by his physical education grades.  Although Robinson eventually graduated from high school, he had to transfer to Venture Alternative School, an institution for students who have difficulty dealing with regular instruction methods, in order to graduate.  (Ex. 35, Decl. of David Wilson, at ¶ 5.)

Jamila Camp, Robinson's girlfriend, also noticed that he was not very bright.  She often teased Robinson about his spelling and writing skills.  (Ex. 5, Decl. of Jamila Camp, at ¶ 5.)  She thought he was dyslexic and that he had trouble speaking.  She also had a hard time understanding what he said.  (*Id.)*

## II.    Robinson's Trial

### A.    Voir Dire

Only eight black people in the venire were questioned during voir dire.  The prosecutor questioned the black potential jurors more aggressively than he questioned white potential jurors.  The prosecutor succeeded in striking four black potential jurors for cause.  The prosecutors exercised peremptory challenges against three of the four remaining black jurors.

The prosecutor's first peremptory against a black juror went unchallenged.  After the prosecutor exercised a second peremptory against another black veniremember, defense counsel tendered a *Batson* objection.  The prosecutor stated that he was striking the juror because he knew her family, which was false.  The court allowed the peremptory strike.  The prosecutor exercised a third peremptory against another black veniremember, and the defense again tendered

20

a *Batson* objection.  The prosecutor stated that the juror was reluctant to impose the death penalty.  The court allowed the peremptory strike.

The only black juror who remained was a black male whom the defense had unsuccessfully moved to strike for cause.  The jury that heard the case consisted of eleven white individuals and one black male.

### B.    Guilt Phase

#### 1.    Prosecution's Case

The prosecution presented evidence that federal agents became aware of an illicit drug distribution operation after the interception of a shipment of marijuana from Arkansas to Arlington, Texas.  The federal agents sought and received authority to conduct wiretaps on Robinson's telephone.  As a result of the wiretaps, surveillance, and information developed from other sources, federal agents intercepted numerous shipments of marijuana and cocaine associated with Robinson.

During the course of the investigation, the agents developed evidence linking Robinson with three drug-related murders in 1998 and 1999.  The Government relied on numerous co-defendants, who had pleaded guilty and cooperated in order to receive "5 K.1 motions,"[8] to establish Robinson's participation in the murders.

#### 2.    Defense Case

Defense counsel waived opening statement and presented testimony from Isaac Rodriguez, a witness to the shooting of Juan Reyes, the victim in the 1999 murder.  Rodriguez

---

[8]  Guideline §5 K.1 authorizes the government to move the court for a downward departure where "the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense."

21

identified Robinson as the man who shot Reyes and tried to shoot him, Rodriquez.  (18 RT 40.)
The defense then presented the testimony of case agent Andy Farrell to testify that Rodriguez
was shown a photo spread containing a photo of Robinson, but had not identified Robinson
as one of the shooters.  (18 RT 45-49.)

### C.   Penalty Phase

#### 1.   Prosecution's Case

The prosecution introduced evidence that Robinson shot at Sarah Tucker, a customer who
refused to pay for cocaine she had used.  The prosecution also introduced evidence that Michael
"One Love" Williams, a witness called by the Government at the guilt phase, had been abducted
and threatened by three assailants.  (20 RT 92-105, 137-71.)  The prosecution introduced tapes
of recorded telephone conversations between Robinson and family members purporting to show
that Williams' abduction was ordered by Robinson when Robinson was incarcerated in the
detention center.  (20 RT 99.)  Finally, the prosecution introduced evidence that Robinson was
a member of the "Playboy Hustler Crips," a gang based in Dermott.

#### 2.   Defense Case

The defense called several of Robinson's high school football coaches, who testified that
Robinson had always been hardworking and respectful.  The defense also called several guards
from the detention center, who testified that Robinson was a model inmate.  The defense called
Dr. Mark Cunningham, Ph.D., who testified that Robinson posed a low risk of future
dangerousness if he were sentenced to life in prison.[9]

---

[9]  Dr. Cunnningham was hired not at the request of defense counsel, but at the suggestion
and request of Death Penalty Resource Counsel Kevin McNally only two weeks before trial.

22

The defense also called Robinson's paternal uncle, John Hollimon, Jr., and his mother, Rose Hollimon Robinson.  John Hollimon, Jr. testified that his sister, Rose, had "problems" with alcohol; that Robinson had a stable environment when he lived with his grandparents in Dermott; and that Robinson's problems did not begin until he moved from Dermott, Arkansas, to Texas to live with his mother.  Rose testified that she left her children with her parents in Dermott, so they would have a "good home."  She admitted smoking "primos" – cocaine-laced marijuana cigarettes – but told the jury that she had conquered the addiction, and downplayed the effect of drug addiction on the life of her children.

## GROUNDS FOR RELIEF

**I.  GROUND ONE:  TRIAL COUNSEL DEPRIVED ROBINSON OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS TRIAL**

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel.  *Cuyler v. Sullivan*, 446 U.S. 335, 344-45, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).  In order to establish ineffective assistance of counsel, a petitioner must satisfy the familiar two-prong test: (1) deficient performance and (2) prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**A.    Trial Counsel's Performance Fell Below the Standard of Reasonably Competent Assistance Expected of Capital Defense Attorneys**

"To satisfy the first prong, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'"  *Soffar v. Dretke*, 368 F.3d 441, 472 (5th Cir. 2004) (quoting *Strickland*, 466 U.S. at 688).  Reasonableness of counsel's performance

23

is assessed by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *Rompilla v. Beard*, 545 U.S. 374, 375, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) ("we have long referred [to the ABA Standards for Criminal Justice] as guides to determining what is reasonable"); *see, e.g., Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) (upholding trial counsel's decision to concede guilt based upon the ABA Guidelines).  In line with Supreme Court precedent, the Fifth Circuit, along with several other circuits, refers to the ABA standards when evaluating trial counsel's performance.  *Sonnier v. Quarterman,* 476 F.3d 349, 358 n.3 (5th Cir. 2007), *reh'g denied*, 2007 U.S. App. LEXIS 5683 (5th Cir., Mar. 9, 2007); *United States v. Gipson*, 985 F.2d 212, 215 (5th Cir. 1993); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004); *Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006), *cert. denied*, 127 S. Ct. 10, 165 L. Ed. 2d 992 (2006).

Chief among the American Bar Association standards are the Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.  The guidelines, which were originally promulgated in 1989 and updated in 2003, "embody the current consensus about what is required to provide effective defense representation in capital cases." ABA Guidelines § 1.1 cmt (2003) (hereinafter "Updated Guidelines").[10]

---

[10]  Although the most recent version of the guidelines was published eight months after Robinson's trial, the Updated Guidelines reflect the prevailing professional norms in death penalty cases at the time.  Many courts, including the Supreme Court, have used the Updated ABA Guidelines for assessing trial counsel's performance in cases occurring often years before the 2003 revisions were published.  *Rompilla*, 545 U.S. at 374 (relying on 2003 ABA Guidelines as "later, and current, ABA Guidelines relating to death penalty defense" as applied to a 1988 trial); *Anderson v. Sirmons*, 476 F.3d 1131, 1142-43 (10th Cir. 2007) (relying on 2003 Guidelines in determining what was reasonable for 1997 trial); *Canaan v. McBride*, 395 F.3d 376, 384-85 (7th Cir. 2005) (relying on 2003 Guidelines to find trial counsel ineffective for failing to advise client regarding allocution right in trial); *see Hamblin v. Mitchell*, 354 F.3d 482, 487-88 (6th Cir. 2003) (2003 guidelines "simply explain with greater detail than the 1989

24

### 1.    Failure to Conduct a Complete and Mitigation Investigation

"At every stage of the proceedings, counsel has a duty to investigate the case thoroughly." Updated Guidelines § 10.7 cmt. (citations omitted).  Trial counsel must conduct "independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial." ABA Guideline 11.4.1 A (1989).  These investigations cannot be performed in succession: "[b]oth investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously."  *Id.*; *see also* Updated Guidelines 10.7 cmt  ("The mitigation investigation should begin as quickly as possible").

The Guidelines recommend careful preparation by counsel for the penalty phase through investigation, consultation with the client, analysis of the prosecution's case and evaluation of all reasonably available evidence in mitigation.  *See* Updated Guidelines § 11.4.1, § 11.8.3, § 11.8.5, and § 11.8.6.  Specifically, the Guidelines require counsel to conduct sufficient investigation "to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  ABA Guidelines § 11.4.1(C); *see also* § 11.8.6.  Indeed, at no time is the thoroughness of counsel's investigation into the client's background more critical than in preparation for the penalty phase of a capital case.  *See* ABA Guidelines § 11.4.1 cmt. ("The duty is intensified . . . by the unique nature of the death penalty[.]").

This obligation comports with the broad duty imposed on trial counsel by the Fifth Circuit.  As the appellate court has made clear, "in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent

---

Guidelines the obligations of counsel to investigate mitigating evidence.").

25

investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983).) Trial counsel may not limit the scope of their investigation unless it determined that further investigation would be "counterproductive or fruitless." *Lewis v. Dretke*, 355 F.3d 364, 367, (5th Cir. 2003); *Smith v. Dretke*, 422 F.3d at 280.

### a.  Failure to Investigate the Prosecution's Aggravating Evidence

"Counsel should seek information . . . to rebut the prosecution's sentencing case." Guidelines § 11.8.3.A.  The Guidelines require trial counsel to investigate two types of potentially aggravating evidence.  First, trial counsel must investigate the defendant's prior criminal history, including "the defendant's behavior" and "the circumstances of the conviction." Second, "if uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly must thoroughly investigate it . . . ."  Where the prosecution seeks to introduce facts about a prior offense in aggravation, counsel has a "duty to make all reasonable efforts to learn what they [can] about the offense." *Rompilla*, 125 S. Ct. at 2465; *Moore v. Johnson*, 194 F.3d 586, 608 (5th Cir. 1999) (articulating trial counsel's "affirmative duty to identify the state's witnesses to extraneous conduct and to interview those witnesses if possible"); *Valdez v. Johnson*, 93 F. Supp. 2d 769, 780 (S.D. Tex. 1999), *rev'd on other grounds*, 274 F.3d 941 (5th Cir. 2001) ("counsel has a duty to investigate the nature of defendant's prior criminal history, especially when evidence of these previous crimes is likely to be raised by the prosecution at trial.").

Despite having notice of the Government's intent to introduce prior bad acts, trial counsel failed to conduct any investigation of these incidents.

Exhibit A - 000051

### i.    Trial Counsel Did Not Investigate the Williams/"One Love"

### Incident

During the penalty phase, the prosecution introduced evidence that three young men had abducted "One Love" Williams, attempted to rob him, and threatened to kill him because he had informed against an "O.G."[11] in Texas.  (20 RT 92-105, 137-71.)  In addition, the prosecution offered tapes of recorded telephone conversations between Robinson and family members purporting to show that Williams' abduction was ordered by Robinson. (20 RT 99.)

As trial counsel admits, they never interviewed a single person connected to the Williams incident.  (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 11.)  Contrary to trial counsel's assertions, their refusal to investigate the Williams incident does not qualify as a strategic decision.  Trial counsel claims that, due to the weakness of the prosecution's evidence, "a decision not to focus time and attention on that evidence would be better than a fight that would likely give it more credence."  (Id.; Resp. Ex. B, Aff. of Jack V. Strickland, at p. 7 ("Mr. Ball and I decided that by far the better approach was to minimize 'One Love's' testimony.").)  Even accepting this contention as reasonable, this purported excuse goes only to the effectiveness of their tactics at trial, not whether trial counsel were reasonable in failing to investigate the matter entirely.  Clearly, trial counsel saw the danger in allowing the jury to learn about the "Williams hit," as evidenced by the fact that they tried to have the evidence excluded.  (Resp. Ex. A., Aff. of Wessley T. Ball, at pp. 11-12.)  Whether trial counsel would have decided not to call the perpetrators of the "One Love" incident is irrelevant.  (Id. at p. 11 (noting inconsistencies between their testimonies).)  Quite simply, trial counsel "could not make a valid strategic

---

[11]  "O.G." means "Original Gangster."

27

choice because he had made no investigation." *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984).

### ii.       Trial Counsel Did Not Investigate Robinson's Prior Conviction Involving Sara Tucker

It appears that trial counsel took the same lackadaisical approach with the Tucker incident.  A review of trial counsel's files does not contain a copy of the court file for Robinson's conviction nor does it reflect any attempt to otherwise investigate the incident.  (Ex. 61, Decl. of Jesse Wallis.)  Counsel's failure to do so was *per se* ineffective.  *Rompilla*, 125 S. Ct. at 2463 ("the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction.").

### iii.      Trial Counsel Did Not Investigate Robinson's Alleged Gang Involvement

Trial counsel admits that he never investigated whether, or to what extent, Robinson was involved in a gang.   Lead trial counsel seeks to justify his failure to investigate Robinson's alleged involvement in a gang as the result of "strategic choices."  (*See* Resp. Ex. A, Aff. of Wessley T. Ball, at p. 2 ("strategy"), p. 6 ("strategy") p. 8 ("strategic choices"), p. 10 ("strategy"), p. 13 "strategy").)  But the assertion of a "'strategic decision' must be rejected [if] no informed decision was made." *Lockett v. Anderson*, 230 F.3d 695, 715 (5th Cir. 2000).  As the Fifth Circuit explained, "*Strickland*  does not require . . . deference to decisions that are uninformed by an adequate investigation into the controlling facts and law." *United States v. Drones*, 218 F.3d 496, 500 (5th Cir. 2000).

28

Mr. Ball claimed that he had some indication of Robinson "having a connection to a criminal street gang." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 6.) Nevertheless, Mr. Ball did not investigate the alleged gang affiliation, concluding that "gang evidence is almost always detrimental to a defendant as jurors are very frightened of gangs." (*Id.*) While this reason might have justified a decision not to proffer this evidence affirmatively, Mr. Ball was on notice that the prosecution had planned to call Terrence Hollimon to discuss Robinson's membership in the Dermott Crips. Accordingly, Mr. Ball had an obligation to investigate all evidence the prosecution intended to introduce in aggravation, including the gang evidence, and to determine if he had evidence to rebut it. Trial counsel also had a duty to research the law which could have resulted in the exclusion of gang evidence in its entirety. *Dawson v. Delaware*, 503 U.S. 159, 165-67, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992) (holding that the introduction of gang affiliation at the penalty phase was unconstitutional).

### b. Failure to Conduct a Mitigation Investigation

To prepare effectively for the penalty phase, counsel should at a minimum explore all reasonably available sources of mitigation evidence. *See generally* Guidelines § 11.4.1. A reasonable background investigation for the penalty phase includes a review of all reasonably available documents and records. Updated Guidelines § 10.7 cmt.; *see also* ABA Guidelines § 11.4.1(D)(2)(c). The Guidelines advise that counsel should even "seek necessary releases for securing confidential records[.]" Updated Guidelines § 11.4.1(D)(2)(d). Those background "records - from courts, government agencies, the military, employers, etc. - can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witness' recollections." Updated Guidelines

29

§ 10.7 cmt. (citations omitted).

As the Guidelines further explain, sources of mitigation information for the penalty phase may include:  charging documents, interviews with the client, interviews with family members, interviews with witnesses, interviews with others familiar with the client's life history, police reports and other physical evidence in possession of the police, review of the scene, the client's background records, and expert witnesses.  Updated Guidelines § 11.4.1(D).  The Guidelines direct that counsel should research those sources to develop and consider all reasonably available mitigation evidence regarding the client in the following areas:

> medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma, and developmental delays); educational history (achievement, performance and behavior); special educational needs (including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and juvenile record; prior correctional experience (including conduct on supervision and in the institution, education or training, and clinical services); and religious and cultural influences.

Updated Guidelines § 11.4.1; *see also* § 11.8.6 (B).[12]

Trial counsel failed to conduct a constitutionally adequate investigation into Robinson's background.  Prior to conducting any investigation, lead trial counsel had resigned himself to the inevitability of a death sentence:

---

[12]  *See also* Updated Guidelines § 10.7 cmt. ("Counsel should use all appropriate avenues . . . to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members, including but not limited to:  a. school records, b. social service and welfare records, c. juvenile dependency or family court records, d. medical records, e. military records, f. employment records, g. criminal and correctional records, h. family birth, marriage, and death records, i. alcohol and drug abuse assessment or treatment records, and j. INS records").

30

> When I went into this case and began to review all of the evidence,
> I believed that if the government could prove [the murder charges],
> *saving Mr. Robinson's life would be likely an impossible task.*

(Resp. Ex. A, Aff. of Wessley T. Ball, p. 12) (emphasis supplied).  Given trial counsel's dismal view of the guilt phase evidence against their client before they did their own investigation, they should have devoted more time to marshaling evidence to try to convince the jury to spare Robinson's life, not less.  *Florida v. Nixon*, 543 U.S. at 191 (finding trial counsel's strategy reasonable in focusing on penalty phase in light of overwhelming evidence of guilt).  Nevertheless, trial counsel began their penalty investigation only weeks before trial, devoting only a fraction of their time to preparing for the penalty phase.

Of the 1,318 hours that trial counsel devoted to this case, just 20 hours were devoted to mitigation investigation.[13]  This number stands in stark contrast to the "hundreds of hours required to prepare an adequate social history, even for an "experienced mitigation specialist." (Ex. 75, Decl. of Russell Stetler (citing Lee Norton, "Capital Cases:  Mitigation Investigation," *The Champion*, pp. 43-45 (May 1992).)  Moreover, trial counsel's records reflect that all of the mitigation investigation occurred either during or immediately before trial.  (Ex. 55, Memorandum of Jesse Wallis.)  Based upon the payment vouchers submitted by Mr. Ball to this Court, Mr. Ball first contacted Mr. Cummings on January 25, 2002, less than a month before the February 19, 2002 trial date.  Not a single person from the defense team ever went to Dermott.  (Resp. Ex. B, Aff. of Jack V. Strickland, at p. 6; Resp. Ex. A, Aff. of Wessley T. Ball, at p. 4.)

---

[13]  Trial counsel also claimed five hours for research and work on jury instructions as well as preparing and faxing an investigative memorandum to Bruce Cummings, his investigator at trial.  (Ex. 55, Memorandum of Jesse Wallis.)  While it is unclear the amount of time that was devoted to this task, it does not appear to involve actual investigation.

31

Not surprisingly, the minimal time and resources devoted to the penalty phase investigation was grossly inadequate to fulfill trial counsel's constitutionally mandated obligations. Specifically, trial counsel failed to conduct a reasonable investigation into Robinson's life history, failed to have Robinson mentally evaluated despite indications of neurological impairments, and failed to probe the prosecution's evidence regarding future dangerousness. Instead, trial counsel confined their preparation to interviewing only those people their client could remember. Even then, trial counsel and their investigator conducted the most perfunctory of inquiries. Under any measure, trial counsel's performance was deficient.

While not an excuse, trial counsel's indifference to the penalty phase investigation may have been a byproduct of the prior state death penalty scheme which precluded the jury from considering mitigation evidence. (Ex. 76, Decl. of Mandy Welch, at ¶ 4.) Until 1991, state law only permitted juries to consider three special issues, none of which dealt with mitigation. As a result, many capital defense attorneys refused to conduct an investigation into the client's background, assuming the jury would either disregard the mitigation entirely or, worse, punish the defendant for presenting irrelevant evidence. (Ex. 76, Decl. of Mandy Welch, at ¶ 5.) Following the amendment to the statute, many criminal defense attorneys continued to resist mitigation investigation, despite a state and national consensus. (*Id.*) According to Mandy Welch, a Texas capital habeas attorney, this reluctance permeated both state and federal prosecutions:

> Unfortunately, even after the Texas statute was revised, skepticism regarding the value of mitigation evidence persisted within the capital defense community. Many practitioners, having been deprived of an appropriate vehicle to present mitigation evidence for so long, resigned themselves to the belief that a jury would never find the

32

> evidence persuasive, making an investigation futile.  Because most, if not all, attorneys appointed in federal capital prosecutions had obtained their qualifications through their experience in state death-penalty cases, this approach eventually percolated into the federal system.

(Ex. 76, Decl. of Mandy Welch, at ¶ 6.)

Whatever the basis for trial counsel's dereliction, it is clear that trial counsel failed to conduct a reasonably, thorough investigation required of trial counsel in a capital case.

### i.   Trial Counsel Failed to Meet Regularly With the Client to Obtain Critical Information

Routine and in-depth interviews with the client are the cornerstone of competent investigation.  Updated Guideline § 4.1 cmt ("Effective representation requires ongoing interactive contact with the client."); *see United States v. Hoskins*, 910 F.2d 309, 311 (5th Cir. 1990) (finding petitioner had failed to establish deficient performance under *Strickland* where trial counsel had met "regularly" with the defendant).  Trial counsel is obligated to "maintain close contact with the client throughout preparation of the case."  Guidelines § 11.4.2. This communication is important, not only for updating the client about the status of his case but to learn vital information to support the defense.  Updated Guideline § 10.5 & cmt. (noting "contact with the client is necessary.")  Indeed, "[t]he client is usually the lawyer's primary source of information for an effective defense."  (*Id.*)  The recent Guidelines dictate that "immediately" upon counsel's appointment, the client must be interviewed to address various matters, including  "the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors."  Updated Guidelines § 10.7 cmt.

Exhibit A - 000058

Due to the sensitive nature of the information relevant to capital sentencing, multiple interviews by counsel are essential.  Guidelines § 11.4.2 cmt.  ("One hurried interview with the client will not reveal to counsel all the facts counsel needs in order to prepare for a capital trial"); Updated Guidelines § 10.7 cmt. ("Obtaining such information typically requires overcoming considerable barriers, as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer.").

No member of the defense team met with Robinson on a regular basis.  According to the jail logs maintained by the Federal Correctional Institution - Fort Worth (FCI-Forth Worth),[14] Mr. Ball (lead trial counsel) only visited his client twice.  The first visit occurred on December 4, 2001, almost five months after his appointment.  The only other time Mr. Ball visited his client was on January 25, 2001, less than a month before Robinson's trial.  The defense investigator's first and only visit with the client occurred after the trial  (Ex. 80, Bureau of Prisons Records, at p. 2.) (entry that "Bruce Cummings" visited on March 19, 2002).   The only time Mr. Strickland visited Robinson in jail was on May 24, 2002 - a full two months after the jury sentenced him to death and a week before the judge imposed the sentence.  (*Id.* at p. 8.)

It is beyond cavil that trial counsel's failure to engage in lengthy discussions with the client prior to the guilt or penalty phase was wholly inadequate.  Even assuming trial counsel spoke to their client at the courthouse, such brief meetings do not satisfy trial counsel's obligation.

---

[14]  At the time of Robinson's trial, FCI-Fort Worth was known as the Federal Medical Center (FMC).

34

**ii.    Trial Counsel Failed to Conduct an Adequate Social History Investigation by Interviewing All Individuals Familiar with the Client and Obtain Social History Records**

While the client is certainly an important source of information, he should never be the sole source.  It is incumbent on trial counsel "to locate and interview the client's family members, and virtually everyone else who knew the client and his family."  Updated Guidelines, § 10.7 cmt. *see Wiggins v. Smith*, 539 U.S. 510, 516, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), (inadequacy of trial counsel's mitigation investigation demonstrated by post-conviction presentation of abuse as established through "state social services, medical, and school records, as well as interviews with petitioner and numerous family members").)  This includes "neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others."  Updated Guidelines § 10.7 cmt.  "The collection of corroborating information from multiple sources - a time consuming task - is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence."  (*Id.*)

Trial counsel unnecessarily limited the scope of his investigation to interviewing only those witnesses the client could remember.  (*See generally*, Resp. Ex. C., Aff. of Bruce Cummings.)[15]  With regard to his childhood, investigator Bruce Cummings relied entirely

---

[15]  Trial counsel and their investigator readily concede that Robinson was entirely cooperative in assisting trial counsel and the investigator with his case.  (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 8 (noting that Robinson never declined to provide information in response to our requests); Resp. Ex. B, Aff. of Jack V. Strickland, at p. 6 (describing Robinson's during trial as a "personable, congenial, cooperative client, fully involved in his defense"); Resp. Ex. C., Decl. of Bruce Cummings, at p. 1 ("It should be noted that at all times that I spoke to Mr. Robinson, I felt that he was providing accurate information to us.").)  Thus, this is not a case where trial counsel can shift blame to the client for hampering or stopping the investigation.  *Schriro v. Landrigan*, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007); *Roberts v.*

35

on Robinson to identify "who might make good fact witnesses for him." (Resp. Ex. C, Aff. of Bruce Cummings, at p. 1.) Cummings took the same approach with regard to character witnesses. (*Id.* at pp. 1-2 (asking Robinson to identify individuals who "might be willing to speak on his behalf."); *Id.* at p. 3 ("Other persons that Mr. Robinson directed me to were his football and track coaches at Lamar High School.").)

The rest of the information obtained by trial counsel was the result of happenstance, not because of any comprehensive investigation. Trial counsel's discovery of Robinson's positive adjustment to prison was entirely serendipitous. It was discovered on December 4, 2001, one of only two occasions where Mr. Ball went to visit his client before trial. (Ex. 82, Memorandum to File dated December 4, 2001.) As Mr. Ball was being escorted from the main entrance to the jail unit, Correctional Officer S. G. Sabolchick asked who Mr. Ball was going to see. When Mr. Ball told him Robinson, Officer Sabolchick "immediately commented that the defendant was well[-]behaved." (*Id.*) Officer Sabolchick even quipped that "if [the inmates] were all like [Robinson] in the jail unit, it would almost be fun working there."

Despite this glowing appraisal, trial counsel limited their investigation to those "guards that [Robinson] thought might speak for him on these issues." (Resp. Ex. C, Aff. of Bruce Cummings, at pp. 3-4.) A similar approach was taken with the football and track staff that Robinson identified. One of the witnesses, Landry Burdine, was called as a witness only after being discovered in the courtroom gallery during Robinson's trial. (Ex. 4, Decl. of Landry Burdine, at ¶¶ 3-4.)

---

*Dretke*, 356 F.3d 632, 638 (5th Cir. 2004).

36

The manner in which the remainder of the mitigation investigation was carried out was grossly inadequate.  As trial counsel admits, the few family members the investigator did contact were interviewed over the telephone.  (Ex. A, Affidavit of Wessley Ball, p. 4; Ex. 75, Decl. of Russell Stetler, at ¶ 14.)   Trial counsel never met with Robinson's coaches before trial and the investigator only interviewed them as a group rather than individually.  (Ex. 26, Decl. of Willie Nimmer, at  ¶ 4.)  According to Russell Stetler, a mitigation specialist who has been conducting social history investigations for over thirty years, "[t]elephone or group interviews fall below the accepted standard."  (Ex. 75, Decl. of Russell Stetler, at ¶ 14).  The reason is clear:

> [I]n-person, face-to-face, one-on-one interviews are required to build trust and to elicit sensitive information. . . . Even in person, it is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses . . . .These inquires invade the darkest, and most shameful secrets of the client's family, expose raw nerves and re-traumatize those being interviewed.

(*Id.*)   Even if trial counsel or their investigator were somehow able to overcome the significant barriers imposed by telephonic interviews, trial counsel failed to conduct the lengthy, in-depth inquiries essential for developing mitigation.  *Sonnier v. Quarterman*, 476 F.3d 349, 358 (5th Cir. 2007), *reh'g denied*, 481 F.3d 288 (5th Cir., Mar. 9, 2007) (finding trial counsel provided deficient performance for failing "to talk to [the defendant's] family and acquaintances at the length or in the depth required").  Josephine Dotson, Robinson's aunt, was only asked if she knew anything about Robinson's attendance in school.  (Ex. 62, Supp. Decl. of Josephine Dotson, at ¶ 3.)  Josephine informed Mr. Cummings that she lacked any information because she did not reside in Dermott when Robinson was growing up but she did direct Mr. Cummings to speak to "[her] mother's half-sister, Bernice Johnson, and [her] sister, Mildred, if he had

37

questions about Julius." (*Id.*)  Yet, Mr. Cummings never contacted these witnesses.  Josephine also warned Mr. Cummings that her mother, Margaret, had limited intellectual functioning and would be unable to provide him with relevant information.  (*Id.*)

A few of the witnesses Mr. Cummings claims to have interviewed for mitigation purposes were asked solely about the issue of guilt.  Willie White was questioned only about his knowledge of Robinson's drug activities.  (Ex. 65, Supp. Decl. of Willie White, at ¶ 2.) The same tack was taken with Robinson's brother, Marcus.  (Ex. 64,  Supp. Decl. of Marcus Robinson, at ¶ 2.)  Brenda Hollimon, the wife of Robinson's uncle, John Hollimon, was not asked anything about Robinson's background.  (Ex. 58, Decl. of Brenda Hollimon, at ¶ 4.)

Even though Rose and John Hollimon, Robinson's mother and uncle, were questioned about Robinson's background, these interviews concerned discrete time frames rather than any comprehensive social history.  Rose Hollimon was only asked about Robinson's adolescence in Arlington.  She was never probed about the formative years of Robinson's life, when she subjected him to drugs and alcohol *in utero* and then abandoned him at an early age.  Although the questioning of John Hollimon extended to Robinson's childhood in Dermott, John lacked any firsthand knowledge of Robinson's daily circumstances.  John had left Dermott as a teenager, long before Robinson had arrived.  (Ex. 14, Decl. of John Hollimon, Jr., at ¶ 5.)  As one would expect from a distant relative, John provided only a positive assessment of Robinson's situation.

Given the lack of any probative information developed during these limited meetings, trial counsel was obligated to contact other family members and individuals familiar with Robinson's background.  This was especially true concerning Rose.  Almost from the beginning, the defense team was aware Rose balked at admitting her own inadequacies as a mother.  As

38

Mr. Cummings explained, "Ms. Hollimon seemed [sic] to determine to paint a rosier picture of her role as a parent and to not take responsibility for the upbringing of Mr. Robinson." (Resp. Ex. C, Aff. of Bruce Cummings, at pp. 3-4.)  Mr. Ball held a similar concern that Rose "minimize[d] her dysfunction."  (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 6.)  Accordingly, trial counsel should have looked to other sources of information rather than relying primarily on Rose.

In sum, this limited inquiry into Robinson's background did not even remotely qualify as the  "reasonably substantial, independent investigation" trial counsel was required to pursue. *Neal*, 286 F.3d at 236.  The handful of interviews completed by Cummings did not even scratch the surface.  Updated Guidelines, § 10.7 cmt  (articulating trial counsel's duty "to locate and interview the client's family members, and virtually everyone else who knew the client and his family.").  As discussed *supra*, numerous relatives and community members could have provided critical mitigation evidence.  Because trial counsel halted the investigation after obtaining only a rudimentary understanding of Robinson's life history, their performance was objectively unreasonable.  *Sonnier*, 476 F.3d at 358 (finding trial counsel provided deficient performance by conducting only cursory interviews of some family members because "the trial attorneys stopped short of making a reasonable investigation for purposes of uncovering relevant mitigating evidence"); *Wiggins*, 539 U.S. at 527-28 ("counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible").

39

### c.      Failure to Retain a Mitigation Specialist

The Guidelines require defense counsel to retain a mitigation specialist as part of the capital defense team.  Updated Guidelines § 4.1.  Rather than articulating it an aspiration or ideal, the Guidelines explicitly deems the use of a mitigation specialist part of the existing  "standard of care" in capital cases.  Updated Guidelines § 4.1 cmt.

Mitigation specialists have been essential in providing effective representation in capital cases long before their use was expressly mandated in the Guidelines.  Although the Guidelines, first promulgated in 1989, had not adopted the nomenclature of "mitigation specialist," the Guidelines clearly acknowledged the importance of such persons to a capital defense.  Under the prior guidelines, it was incumbent upon defense counsel to employ "investigative, expert, and other services necessary to prepare and present an adequate defense" which includes the "presentation of mitigation."  Guidelines § 8.1  These guidelines stressed that "quality representation" required access to supporting services, including "personnel skilled in social work and related disciplines to provide assistance . . . at sentencings."  Moreover, the guidelines cautioned that trial counsel, who is charged with conducting "a thorough investigation of the defendant's life history and background . . . cannot adequately perform these and other crucial penalty phase tasks without the assistance of investigators and other assistants."  Indeed, the Guidelines suggested that a "social worker" (the professional commonly serving the role of mitigation specialist) "may be determinative as to outcome."  Guidelines § 8.1 cmt. (noting that trial counsel should retain all appropriate experts, including a social worker).

Regardless of whether capital defense attorneys were obligated to employ a mitigation specialist in 1989, there is no question that using a mitigation specialist was the standard of care

40

at the time of Robinson's federal capital trial in 2001 and 2002.  As outlined in a report adopted by the Judicial Conference of the United States, mitigation specialists were "frequently used in federal death penalty cases" as early as 1998.  Subcomm. on Federal Death Penalty Cases, Comm. on Defender Services, Judicial Conference of the United States, Federal Death Penalty Cases: *Recommendations Concerning the Cost and Quality of Defense Representation* (1998) (commentary).[16]  All lawyers interviewed for the report "stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase."  (*Id.*)  Moreover, the Federal Death Penalty Resource Counsel project, which was established in 1992 to assist counsel in federal death-penalty cases, had "consistently advised counsel to engage the services of a mitigation specialist in all cases where the death penalty may be sought."  (Ex. 75, Decl. of Russell Stetler, at ¶ 24.)

Finally, mitigation specialists had been commonly used in both federal and Texas cases at the time of Robinson's trial.  As John Niland, an attorney with the Texas Defender Service, explains, "the standard of practice in Tarrant County, Texas from 2001 to 2002" included "the hiring of a mitigation specialist."  (Ex. 60, Decl. of John Niland, at ¶ 9.)  Similarly, Russell Stetler, a nationally renowned mitigation specialist, opined that the failure to engage the services of a mitigation specialist "fell below the standard expected of federal death penalty counsel in 2001-2."  (Ex. 75, Decl. of Russell Stetler, at ¶ 25.)  A sampling of contemporary Texas cases demonstrate the prevalence of mitigation specialists before 2001.  *Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007) (mitigation specialist retained for 1996 trial); *United States v. Hall*, 455 F.3d 508, 517 (5th Cir. 2006), *cert. denied*, 2007 U.S. LEXIS 4024 (Apr. 16, 2007)

---

[16]  The report is available at http://www.uscourts.gov/dpenalty/4REPORT.htm#a037.

41

(mitigation specialist retained in 1995); *United States v. Webster*, 392 F.3d 787, 795 (5th Cir. 2004) (mitigation specialist retained for 1996 trial); *Rosales v. Cockrell*, 220 F. Supp. 2d 593, 611 (N. D. Tex. 2001); *Shields v. Dretke*, 122 Fed. Appx. 133, 136 (5th Cir. 2005) (use of a mitigation specialist in a 1995 trial).[17]

One of the worst derelictions by trial counsel was assembling Robinson's defense team without a mitigation specialist. "Defense attorneys cannot provide effective assistance of counsel in . . . death penalty cases [ ] without the assistance of a mitigation specialist." (Ex. 60, Decl. of John Niland, at ¶ 3; *see* Updated Guideline § 4.1, cmt. (identifying the mitigation specialist serves as an "indispensable member of the defense team.").) Both trial counsel admit they deliberately refused to hire a mitigation specialist in direct contravention of the Updated Guidelines. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 6; Resp. Ex. B, Aff. of Jack V. Strickland, at p. 6.) Mr. Ball has employed mitigation specialists since Robinson's case but does not explain why he failed to do so here. (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 5.) Mr. Ball considers mitigation specialists to be "another form of investigator, doing investigative work that had traditionally been done by ordinary investigators and the attorneys themselves." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 5.) Despite having hired mitigation specialists, Mr. Ball does not hold them in high regard suggesting "the current proliferation of the use of "mitigation specialists" is, in some instances, simply a response to the fear of "ineffective assistance" claims. Mr. Strickland appears to be opposed to ever using mitigation specialists:

---

[17] *See also Watts v. Quarterman*, 448 F. Supp. 2d 786, 796 (W.D. Tex. 2006) (defense introduced testimony of mitigation specialist in 2003 trial); *Ex parte Woods*, NO. WR-62,627-01, 2005 Tex. Crim. App. LEXIS 1859 (Tex. Crim. App. 2005) (trial counsel hired three mitigation specialists for 2002 trial); *Roberts v. State*, 220 S.W. 3d 521 (Tex. Crim. App. 2007)

42

> Mitigation experts may simply be another in an ever-expanding group of cottage industry self-proclaimed experts who have sprung up and carved out a niche for themselves in criminal prosecutions in general and death penalty litigation specifically.

(Resp. Ex. B, Aff. of Jack V. Strickland, at p. 6.)

But Mr. Strickland had hired a mitigation specialist *before* Robinson's case. In 1999, Mr. Strickland retained and presented Vince Gonzalez, a mitigation specialist, in a state capital case. (Ex. 81, Invoice of Vince Gonzales dated 12/8/2000 in *State of Texas v. Carlis Jovonite Russell*, Case No. 0676421A.)

Trial counsels' resistance to mitigation specialists appears to stem from a fundamental misunderstanding of the unique role that the mitigation specialists serve on the defense team. As a noted mitigation specialist explains, even competent defense counsel "generally lack the skill to conduct [mitigation] investigations." (Ex. 75, Decl. of Russell Stetler, at ¶ 15.) Because mitigation specialists "have extensive training and experience in the defense of capital cases," they are better equipped to conduct the "detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes." (*Id.* (noting that "an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history"). ) Moreover, because mitigation specialists possess "clinical and information-gathering skills and training that most lawyers simply do not have," they are better suited to "elicit sensitive, embarrassing and often humiliating evidence . . . that the defendant may have never disclosed." Updated Guidelines § 4.1 cmt. From a practical standpoint, the mitigation specialist performs a myriad of tasks that trial counsel has neither the time nor the ability to perform:

43

Exhibit A - 000068

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

(Updated Guidelines § 4.1 cmt.)  Perhaps most of important of all, the mitigation specialist "insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case." (*Id.*)  Contrary to Mr. Ball's belief, the duties of the mitigation specialist cannot be shouldered by the investigator:

> Because of the time and expertise required, it is not appropriate to ask an investigator to investigate the factual allegations which constitute the capital charges and the biographical attention.  Each investigative track needs someone's undivided attention.

(Ex. 75, Decl. of Russell Stetler, at ¶ 15.)

While it is doubtful that any investigator can serve as a substitute for a mitigation specialist, Investigator Cummings had neither the skills nor the experience to assume that role. According to trial counsel, Investigator Cummings' experience prior to Robinson's trial appears to have been investigating only "serious homicide cases," rather than capital cases.  (Ex Parte Motion for Authorization of Funds for Defense Investigator filed December 21, 2001, p. 2; Defendant's Motion for Authorization of Additional Funds for Defense Investigator filed March 7, 2002, p. 3.)[18]  Apart from Investigator Cumming's lack of qualifications, the paucity

---

[18]  Although Investigator Cummings claims in his declaration that he has worked as an investigator on capital murder cases, he does not indicate whether his experience occurred before or after Robinson's trial.  (Resp. Ex. C, Aff. of Bruce Cummings, at p. 1.)

44

of mitigation investigation in Robinson's case indicated he was not up to the task.

> **d.** **Failure to Retain a Qualified Professional to Screen for Mental Health Issues**

In addition to a mitigation specialist, the defense team must include a member "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." (Updated Guideline § 4.1.A.2 cmt.)  Because "the defendant's psychological and social and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase," it is axiomatic that "mental health experts are essential to defending capital cases." (Updated Guideline § 4.1.A.2 cmt.)

No member of the defense team had the training or experience to evaluate a client for mental or neurological impairments.  As lead trial counsel conceded, "I do not profess to be a mental health professional." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 8.)  Neither does Mr. Strickland appear to possess any specialized knowledge or training in mental health issues. (*See generally* Resp. Ex. B, Aff. of Jack V. Strickland).  Despite the absence of any professional qualifications, both trial counsel merely presumed that Robinson would be diagnosed with a negative personality disorder.  (Resp. Ex. A,  Aff. of Wessley T. Ball, at p. 9 (suggesting that based upon a single comment, Robinson might be deemed a "sociopath"); Resp. Ex. B, Aff. of Jack V. Strickland, at p. 4. (claiming Robinson "exhibits the classic symptoms of an antisocial personality disorder").)  The investigator, also lacking any expertise in examining a person for neurological impairments, observed that Robinson "was intelligent and fully aware of the circumstances that he was involved in." (Resp. Ex. C, Aff. of Bruce Cummings, at p. 2.)

These unskilled opinions as to whether Robinson suffered from a mental or neurological

impairment were grossly inadequate.  As the Guidelines make clear, "[c]ounsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions that could be of critical importance."  Updated Guidelines § 4.1 cmt.  Trial counsel's limitations are underscored by the fact that they failed to recognize that Rose Hollimon, one of two family members they relied upon in sentencing, is mentally retarded. (Ex. 46, Dr. Barna Psychiatric Report for Rosie Mae Hollimon, at p. 4.)

Second, trial counsel's decision was ill-informed because they failed to conduct a proper investigation into Robinson's background.  As the guidelines make clear, "mental health experts are essential to defending capital cases."  Updated Guidelines § 4.1 cmt.  However, before the client can even be evaluated, "counsel must compile extensive historical data."  (*Id.*; Ex. 75, Decl. of Russell Stetler, at ¶ 20 ("The proper standard of care for a competent mental health evaluation requires an accurate medical and social history as its foundation.").)  This substantial endeavor requires a "time-intensive process."  (Ex. 75, Decl. of Russell Stetler, at ¶ 13.)

Had trial consel conducted the detailed life history investigation required in a capital case, they would have learned that Robinson was subjected to alcohol, nicotine, and marijuana exposure *in utero*, exposed to toxic pesticides during childhood, and developed learning disabilities as a student.

### i.  Drug and Alcohol Exposure *in Utero*

As a direct result of trial counsel's inadequate investigation into Robinson's life history, trial counsel never had Robinson evaluated to determine the impact of his mother's tobacco smoking, alcohol abuse, and drug use during pregnancy.  In failing to do so, trial counsel had no idea of the physical and psychological impact this chronic exposure had on Robinson.

46

Exhibit A - 000071

"Alcohol has a well-established teratogenic impact on a developing embryo and fetus *in utero*." (Ex. 1, Decl. of Mark Cunningham, at p. 18; Ex. 77, Report of Dr. Kate Allen, at pp. 3-5.) Alcohol exposure to the extent that Robinson suffered produced significant neuropsychological deficits, including learning disabilities and attention-related problems.[19] (*Id.*) One of the most profound consequences would have been felt in the area of executive functioning.[20] (Ex. 77, Report of Dr. Kate Allen, at p. 3) ("thinking and behavioral problems which arise from deficits in executive functioning are the most disturbing effects of the most damaging teratogen - alcohol"); (Ex. 53, Connor PD, Sampson PD, Bookstein FL, Barr HM, Streissguth AP, DIRECT AND INDIRECT EFFECTS OF PRENATAL ALCOHOL DAMAGE ON EXECUTIVE FUNCTION, Dev. Neuropsychol. 18(3):331-54 (2000).) Just some of the negative sequelae resulting from alcohol exposure include learning disabilities, auditory processing, poor response-inhibition and general impulse-control deficits, and "perseveration," which is the difficulty in abandoning ineffective strategies. (Ex. 77, Report of Dr. Kate Allen, at pp. 6-7.)

### ii.    Pesticide Exposure

Again, trial counsel knew little about Robinson's exposure to pesticide, and, thus, had no incentive to explore its possible impact. Numerous family members familiar with Robinson confirmed that he was exposed to pesticides throughout his childhood. (*See* Ex. 12, Decl. of

---

[19] Dr. Martin's findings of cognitive impairments are entirely consistent with the effect of alcohol exposure *in utero*. (Ex. 1, Decl. of Mark Cunningham, at pp. 17-18.)

[20] Executive functioning refers to the group of cognitive abilities produced in the frontal cortex of the brain such as self-regulation of behaviors, sequencing of behaviors, cognitive flexibility, response inhibition, planning and organization of behavior. (Ex. 77, Report of Dr. Kate Allen, at p. 5.)

47

Mildred Hollimon; Ex. 16, Decl. of Jana Hollimon; Ex. 29, Decl. of Jimmie Lee Robinson; Ex. 30, Decl. of Marcus Jwain Robinson; Ex. 10, Decl. of Guffrie Gorins).  In addition to pesticide spraying in soybean fields, the entire area was also sprayed for mosquitos.

Minimal research would have alerted trial counsel to the fact that many of these pesticides were extremely dangerous.  According to Dr. Max Meisch of the University of Arkansas, the two most common pesticides used in Arkansas to control the mosquitos were Malathion and Fenthion, both of which are highly toxic and known to affect the human nervous system.  Groves RL, Dame DA, Meek CL, Meisch MV, *Efficacy of three synthetic pyrethroids against three mosquito species in Arkansas and Louisiana*, J Am Mosq Control Assoc. Jun;13(2):184-8 (1997); Groves RL, McAllistar JC, Meek CL, Meisch MV,  *Evaluation of aerial and ground-applied adulticides against mosquito species in Arkansas and Louisiana*.  J Am Mosq Control Assoc. Sep;10(3):407-12 (1994).  Malathion is an organophosphate or a cholinesterase inhibiting compound, the exposure to which can have a profound effect on a human's ability to control his aggression.  It is a known carcinogen.  It is suspected of causing learning disabilities in math, and reading, and short term memory damage, language and speech difficulties, aggression, irritability, depression and increased emotionality.  It should be noted that these effects are common to all organophosphates and the amount of exposure required to establish these effects, among others, is many times lower than that required to cause cancer, birth defects, organ damage and other physical effects.  Fenthion's approval by the FDA was withdrawn in 1999 because of an excessive number of poisoning deaths.  Like every other organophosphate, it is absorbed through the skin and affects the central nervous system. Repeated exposure can impair the memory and concentration, and can result in depression and

48

irritability as well as speech difficulties.  (Ex. 2, Statement Dr. Stephen K. Martin.)  The United

States Environmental Protection Agency concluded that it posed an unreasonable risk to human

health and the environment.[21]

### iii.  Learning Disabilities

Independent of information regarding Robinson's exposure to teratogens *in utero* and

toxic pesticides as a child, trial counsel should have been aware of Robinson's academic

difficulty throughout his life, encouraging them to explore his intellectual capabilities further.

Robinson had a history of academic problems in school.  Dermott Elementary School records

reflect that Robinson failed and repeated the third grade.  (Ex. 37, School Records of Julius

Robinson.)  Robinson was considered academically slow by nearly all of his elementary and high

school teachers.  (Ex. 9,  Decl. of Arlette Gorins, at ¶ 2 ("He was academically slow

---

[21]  According to a 1983 report on the use of pesticides in Arkansas soybean production, a number of chemicals were applied both prior to plant emergence and before harvest.  These chemicals and their toxicological effect are summarized:

| | |
|---|---|
| 2,4-DB | Affects nervous system, is considered a developmental toxin |
| Acifluorgen | Probable human carcinogen |
| Alachlor | Developmental toxin, can cause organ toxicity |
| Benomyl | Developmental toxicity |
| Bentazon | Can  cause apathy, incoordination etc. |
| Dinosseb | Risk of birth defects, a developmental toxin considered to be highly to extremely toxic |
| Fluchloralin | Risk unknown; no longer registered |
| Blyphosate, | Linked to Lymphomas |
| Linuron | Developmental Toxin, extra risk of exposure to children, ages 1-6. |
| Metolachlor | Possible human carcinogen |
| Metribuzin | Developmental Toxin |
| Maptalam | Unknown effects |
| Pendimethalin | Suspected carcinogen. Suspected endocrine, gratrointestinal and liver toxicant |
| Sethoxydim | Negative effects on liver and bone marrow and ocular toxicity |
| Trifluralin | Registration cancelled in 1982, possible human carcinogen. |

Exhibit A - 000074

but was not a trouble maker.  He received an F in my class.").)  Robinson was incapable

of completing the normal curriculum at high school and was transferred to an alternative school

for students with learning difficulties.  (Ex. 37, School Records of Julius Robinson.)

### iv. Information Demonstrating Robinson's Cognitive Impairments Warranted a Neurological Examination

This background information, whether in combination or individually, would have

prompted competent counsel to consider the possibility of cognitive impairments, and to have

Robinson examined by a mental health expert.  A untrained lawyer is simply incapable of

identifying subtle cognitive impairments, including those resulting from "fetal alcohol exposure"

and "pesticide exposure."  Updated Guidelines § 10.4 cmt.  Accordingly, upon learning of

Robinson's exposure to teratogens and his poor performance in school, trial counsel were

required to retain a competent mental health expert to evaluate their client.  Guidelines

§ 11.4.1.D.7 cmt (directing trial counsel to obtain a psychiatric and/or psychological evaluation).

At a minimum, trial counsel was required to commission a neurological evaluation.  Updated

Guidelines § 10.4 cmt.

The decision not to have Robinson evaluated by a competent mental health professional

was based, at least in part, upon a misunderstanding of the law.  Trial counsel claim that they

feared that a psychologist would diagnose Robinson with a "sociopathic personality" and

"would correctly be considered aggravating."  (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 9;

*see also* Resp. Ex. B, Aff. of Jack V. Strickland, at p. 4 (offering lay opinion that Robinson

met the criteria for "antisocial personality disorder.").)  Assuming for the sake of argument that

Robinson would have received an adverse diagnosis, none of this information would have been

50

available to the prosecution until the defense indicated an intent to introduce expert evidence relating to the defendant's mental condition. FED. R. CRIM. P. 12.2(c)(2) (mandating confidentiality of mental health reports unless "the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition."). In addition, trial counsel presumed that merely conducting a psychological evaluation "allows the government's expert to likewise examine your client." (Resp. Ex. B, Aff. of Jack V. Strickland, at p. 4.) But the prosecution is never entitled to conduct an independent psychological evaluation of the client unless trial counsel files a notice of intent to introduce the evidence. FED. R. CRIM. P. 12.2(c)(1)(B) (authorizing prosecution to conduct examination of defendant only after defendant provides notice of intent to introduce mental condition evidence).

In any event, Robinson would not have received an adverse diagnosis. Dr. Stephen Martin, a neuropsychologist, administered a series of neuropsychological tests. After completing the tests, Dr. Martin concluded that Robinson suffers from "subtle cognitive deficits" and "general learning disabilities." (Ex. 2, Statement of Dr. Stephen K. Martin, at p. 3.) On the Wide Range Achievement Test (WRAT-3), Robinson's reading level was at the 7th grade level, or bottom 12%; his spelling was at the third grade level, or bottom 3%; and his math skills were at the 6th grade level, or bottom 9%. Dr. Martin found that these results were associated with chronic exposure to organophosphate pesticides. As Dr. Martin explained, prolonged exposure "can have negative behavioral effects involving learning capacity as well as other cognitive abilities." (Ex. 2, Statement of Dr. Stephen K. Martin, at p. 3.)

Dr. Martin also found significant overlap between the cognitive impairments due to fetal alcohol exposure and pesticide exposure. As Dr. Martin explains, "The neuropsychological

51

profile associated with pesticide exposure can share common neurocognitive characteristics with the neuropsychological profile associated with the teratogenic effects of fetal alcohol and fetal cannibis exposures." (Ex. 63, Supp. Statement of Dr. Stephen K. Martin.)  At the time Dr. Martin issued his report, he had not received any material addressing possible drug or alcohol use by Rose during her pregnancy with Robinson.  (*Id.*)  "Although it remains [his] opinion that the results of Mr. Robinson's testing are generally consistent with subtle cognitive deficits associated with chronic exposure to organophosphate pesticides," Dr. Martin has also concluded that "fetal alcohol and cannabis exposure could serve as an additional etiological basis for Mr. Robinson's neuropsychological impairments." (*Id.*)

Kate Allen, a licensed clinical social worker and expert in alcohol related neurodevelopmental disorder, provided further confirmation that Robinson suffered cognitive impairments from fetal exposure to drugs and alcohol.  According to Dr. Allen, it was "obvious" that Robinson's executive functioning was comprised by the chronic exposure to teratogens, especially alcohol.  (Ex. 77, Report of Dr. Kate Allen, at p. 8.).  As the following chart demonstrates, each teratogen would have inflicted Robinson with its own set of cognitive deficits:

52

| Alcohol | Nicotine | Marijuana |
|---|---|---|
| Low birth weight<br>Learning disabilities<br>Auditory processing<br>Sensory proprioceptive disorder<br>Perserveration:<br>Inability to maintain attention<br>Short-term memory deficits<br>General impulse-control deficits<br>Deficits in motor skills<br>Inability to normally tolerate frustration<br>Poor ability to self-soothe<br>Poor ability to internally regulate negative feelings<br>Loss of adaptation under stress | Lower birth weight<br>Deficits in sustained attention<br>Lower verbal comprehension<br>Deficits in receptive language<br>Auditory processing:<br>Poorer reading comprehension<br>Increase in hyperactivity<br>Decrease in inhibiting responses<br>Short-term memory deficits<br>Lower stress thresholds<br>Increased risk of conduct disorder<br>Increased risk of substance abuse | Attention and memory deficits<br>Visual analysis/hypothesis testing<br>Language comprehension<br>Poor emotional processing<br>Greater rates of depression |

In addition to the direct effects of the tertagenic exposure, Dr. Allen (or an expert like her) could have explained how his fetal injury made Robinson more vulnerable to psychological and emotional problems throughout his life, making him less morally culpable. As Dr. Allen explains,

> Because Julius's mother injured him *in utero*, he was at high risk for other maternal failures (impaired attachment), and was made particularly vulnerable to the dangerous challenges of high-risk environments (abuse, neglect, poverty, drugs, discrimination, violence). These three causative factors (teratogenic exposure, poor attachment, severe neglect amidst danger) - the latter two being correlated to fetal toxic exposure - are ample explanations of how this defendant traveled the road to criminal behavior.

(Ex. 77, Report of Dr. Kate Allen, at p. 3.)

53

**v.      Trial Counsel's Post-Hoc Rationalizations As to Whether**

**They Would Have Introduced Evidence of Neurological**

**Impairments is Irrelevant**

Trial counsel imply that they would have never introduced some of the evidence of Robinson's background, such as his abject poverty, his chronic pesticide exposure, or his learning disabilities.  (Resp. Ex. A, Aff. of Wessley T. Ball, at 8 (opining that the jury would have found the evidence "laughable or offensive").)  But "counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when [he] has not yet obtained the facts on which such a decision could be made."  *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003).  Regardless of how trial counsel would have ultimately used the information, the fact remains that trial counsel were unaware of these circumstances at the time they abandoned the background investigation.  In judging the defense's investigation, courts must look to "'counsel's perspective at the time' investigative decisions are made."  *Rompilla*, 125 S. Ct. at 2462 (quoting *Strickland*, 466 U.S. at 689); *Dobbs v. Turpin*, 142 F.3d 1383, 1388 (11th Cir. 1998) (rejecting "the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").  Accordingly, trial counsel's retrospective criticism amounts to nothing more than "post-hoc rationalization," not a "strategic" decision.  *Wiggins*, 539 U.S. at 527 ("the 'strategic decision' . . . invoke[d] to justify counsel's limited pursuit of mitigating evidence resembles more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.")

54

> **c.      The Competent Representation Provided by Counsel for Robinson's**
>
> **Co-defendant Underscores Trial Counsel's Deficient Performance**

Trial counsel's inadequacies are even more glaring when contrasted with the investigation conducted by the defense attorneys for Robinson's co-defendant, L.J. Britt.  In contrast to Robinson's defense team, Britt's attorneys devoted the vast majority of their pretrial preparation to developing a case for mitigation.  Danny Burns, as well as his co-counsel, John Read III, conducted an extensive investigation to uncover any possible mitigating evidence.  Britt's trial counsel also had Britt evaluated by a psychologist.  (Ex. 56, Aff. of Danny Burns, at ¶ 5.) In addition to making several excursions to Britt's hometown in Dermott, Arkansas, Britt's attorneys traveled to Mississippi, Oklahoma, El Paso, Texas, and to California to conduct mitigation investigation.  (Ex. 56, Aff. of Danny Burns, ¶ 4.)[22]  Throughout their travels, the attorneys interviewed countless friends and family members to assist their client.  (*Id.*)

According to Britt's attorneys, it would have been impossible to conduct an investigation over the telephone.  (Ex. 56, Aff. of Danny Burns, ¶ 4.)  As lead counsel explained, "we needed to see our witnesses and determine who would make a favorable impression, who could hold up under cross-examination, and who appeared to be telling the truth."  (*Id.* at ¶ 7.)  Beyond the testifying witnesses, trial counsel was able to obtain positive character statements from various relatives and community leaders who would have been unable to appear at trial.  (*Id.*)

The deficient investigation by Robinson's attorneys is even less explicable given the fact that they were informed that several witnesses were eager to assist with Robinson's case.

---

[22]  Counsel even took an additional trip to an undisclosed location to avoid disclosing to the prosecution a possibly prejudicial witness.

Exhibit A - 000080

As Mr. Burns explained:

> During our first trip to Dermott, Arkansas, the witnesses we talked to kept asking why Julius' lawyers were not coming up there like we were and we simply told them that his lawyers were developing their case for Mr. Robinson.  L.J.'s sister and the Deputy Sheriff we talked with that day asked if they could help Julius . . .

(Ex. 56, Aff. of Danny Burns, ¶ 9.)  During a chance meeting in court, Mr. Burns apprised Mr. Ball of the witnesses in Dermott eager to help Robinson.  (*Id.*)  Although Mr. Burns was unaware of whether Mr. Ball had done anything based upon this information, the record indicates that nothing in fact was done.  (*Id.*)

## B.      But for Trial Counsel's Deficient Performance, There Is a Reasonable Probability That At Least One Juror Would Have Held Out for Life

The prejudice standard for ineffective assistance of counsel claims is a "reasonable probability" standard.  *Strickland*, 466 U.S. at 694.  This standard is "identical" to the materiality standard for undisclosed exculpatory evidence.  *Felder v. Johnson*, 180 F.3d 206, 214 (5th Cir. 1999); *Strickland*, 466 U.S. at 694.  Under both standards, a "reasonable probability" is merely "a probability sufficient to undermine the confidence in the outcome."  *Strickland*, 466 U.S. at 694; *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (discussing prejudice standard as whether the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."); *accord United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (Blackmun, J.) (plurality opinion).

Because the reasonable probability standard is "inevitably imprecise," it is important to establish what the burden does not entail.  *United States v. Agurs*, 427 U.S. 97, 108, 96 S. Ct.

56

2392, 49 L. Ed. 2d 342 (1976).  First, the determination does not equate to a preponderance of the evidence test.  *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9, 124 S. Ct. 2333, 159 L. Ed. 2d 157 (2004).  As such, a petitioner need not show it is "more likely than not that the outcome would have been altered," had the omitted evidence been presented.  *Woodford v. Visciotti*, 537 U.S. 19, 22, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002); *see also Strickler v. Greene*, 527 U.S. 263, 289, 119 S. Ct. 1936; 144 L. Ed. 2d 286 (1999) (rejecting the preponderance standard for *Brady* claims).

Second, the reasonable probability standard does not constitute a "sufficiency of the evidence" test.  *Kyles*, 514 U.S. at 435.  Thus, relief is proper even if there remains a mere possibility "that a jury could have heard [the mitigating evidence] and still have decided on the death penalty."  *Rompilla*, 545 U.S. at 374.

Third, the petitioner need not establish that the entire jury would have changed its mind. Rather, it is sufficient that one juror may have voted for life imprisonment.  *Wiggins,* 539 U.S. at 537 (relief required when "there is a reasonable probability that at least one juror would have struck a different balance"); *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006), *reh'g denied,* 466 F.3d 280 (4th Cir. 2006) ("A reasonable probability that . . . one juror considering the original and newly raised evidence together would have voted for life imprisonment satisfies this [prejudice] standard."); *Foster v. Johnson*, 293 F.3d 766, 784 (5th Cir. 2002) (discussing whether the defense mitigation evidence "would have altered at least one juror's balancing determination in favor of life").

In assessing the prejudice of the failure to present mitigation evidence, the court must "reweigh the evidence in aggravation against the totality of available mitigating evidence."

Exhibit A - 000082

*Miller v. Dretke*, 420 F.3d 356, 364 (5th Cir. 2005) *mandate issued* (quoting *Wiggins*, 539 U.S. at 534); *Neal*, 286 F.3d at 241; *see also Kyles*, 514 U.S. at 437 (noting that the omitted evidence must be evaluated "collectively, rather than item-by-item"). A defendant satisfies the reasonable probability standard by proving that the "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [his] moral culpability." *Wiggins,* 539 U.S. at 538 (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 398, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).

Here, in reweighing the totality of the available mitigating evidence against the aggravating evidence, there is a reasonable probability that the defense could have convinced at least one juror to hold out for life. At Robinson's trial, because of his counsel's failures, there was a paucity of evidence presented that militated against the death penalty. From the lack of any rebuttal to the prosecution's allegations of future dangerousness to the absence of any mitigating circumstances from Robinson's background and character, the penalty phase was barren of reasons to justify a lesser sentence. On the other hand, informed counsel, following a reasonable investigation, could have "alter[ed] the entire evidentiary picture." *Strickland*, 466 U.S. at 696.

        **1.    A Reasonable Investigation Would Have Allowed Defense Counsel To Undermine the Prosecution's Evidence Supporting Future Dangerousness**

The aggravating evidence introduced at the penalty phase was met with little resistance by the defense. Had trial counsel investigated these matters, the defense could have refuted the prosecution's contention that Robinson posed a future danger from prison.

"Consideration of a defendant's past conduct as indicative of his probable future behavior

58

is an inevitable . . . element of criminal sentencing." *Skipper v. South Carolina*, 476 U.S. 1, 5, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986); *Jurek v. Texas*, 428 U.S. 262, 275, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976), *overruled in part by Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007). "A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free . . . ." *Kelly v. South Carolina*, 534 U.S. 246, 253-54, 122 S. Ct. 726, 731, 151 L. Ed. 2d 670 (2002). Where evidence of prior acts goes unchallenged by the defense, it is expected that the jury will defer to the prosecution's claim of future dangerousness. *Rompilla*, 125 S. Ct. at 2465 n.5 ("We may reasonably assume that the jury could give more relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest.").

The Government relied on three incidents to support an allegation of future dangerous: (1) ordering of a hit on Michael "One Love" Williams; (2) prior affiliation with the "Crips" gang; and (3) discharging a firearm at Sara Tucker. Had trial counsel conducted a reasonable investigation into these events, they could have substantially undermined the prosecution's contention of future dangerousness.

### a. The Prosecution's Allegation That Robinson Ordered a "Hit" Was False

The prosecution introduced evidence through the case agent and Williams that three young men had abducted Williams, attempted to rob him, and threatened to kill him because he had informed against an "O.G." in Texas. (20 RT 92-105, 137-71.) The prosecution introduced

59

tapes of recorded telephone conversations between Robinson and family members purporting to show that the abduction was ordered by Robinson from the detention center.  (20 RT 99.)

If trial counsel had investigated the incident, they would have learned that all witnesses to the incident deny that Robinson orchestrated any so-called "hit" on Williams.  The alleged co-conspirators in the kidnaping of Michael Williams admitted to kidnaping and robbing Williams – declarations against their own penal interest – and denied any connection whatsoever with Robinson.  Keith Edington, who was present during the offenses, has declared:

> I recall the December 28, 2000 incident involving Michael "One Love" Williams.  I have been told that the prosecutor in Julius Robinson's capital case argued that Kentrel Pitts, Wayne Jordan and I received an order from Julius Robinson to kill One Love.  That is not true.  We were seventeen years old at the time and had no relationship with Julius, other than being from the same town.  We did not take orders from him.

(Ex. 8, Decl. of Keith Edington, at ¶ 2.)  Another participant, Wayne Jordan, has stated that the incident arose from a dispute between Alquantis Kentrel Pitts ("Kentrel") and One Love over a drug deal.  Jordan disavowed any notion that the group acted at the direction of Robinson:

> At no time during the entire incident did I hear anyone threaten to kill One Love, nor did I hear anyone make any comment about One Love providing information or giving testimony against Julius Robinson.

(Ex. 21, Decl. of Wayne Jordan, at ¶ 15.)

Alquantis Kentrel Pitts has candidly admitted he could not afford to repair his car and that "[he] decided to rob One Love to get money to get [his] car back."  (Ex. 28, Decl. of Alquantis Pitts, at ¶ 3.)  However, Pitts denied that his criminal actions had anything to do with Robinson:

60

> On the way to [One Love's] grandfather's house, Keith [Eddington] said something about One Love snitching on people in Texas and that he [One Love] ought to be killed for it. Keith was just talking. We had not been given any order to kill One Love. Keith was just stating his opinion. I have never had any business dealing with Julius Robinson, nor have I ever received any kind of order from him.

(Ex. 28, Decl. of Alquantis Kentrel Pitts, at ¶ 9.)

As these statements make clear, the kidnappers acted for their own reasons; the incident had nothing to do with a hit ordered by Robinson. Even the victim of the scheme, Michael Williams, has expressed skepticism of the Government's claim at trial that Robinson ordered "a hit" against him. Williams has declared:

> I believe that the young men wanted money from me, and this was the cause of the incident. I do not believe that they had really been ordered by Julius Robinson to kill me. If they had been ordered to kill me, or if they had wanted to kill me for some other reason, I would have been killed on that date. It was three against one, and they had a gun.

(Ex. 34, Decl. of Mike Williams, at ¶ 3.)

All witnesses to the incident deny that Robinson orchestrated any so-called "hit" on Williams. It was nothing more than a hasty robbery attempt originating with Alquantis Kentrel Pitts. Pitts denied that Robinson had anything to do with his criminal actions. (Ex. 28, Decl. of Alquantis Kentrel Pitts, at ¶ 3.) Pitts' cohorts also confirmed that Robinson had no hand whatsoever in the botched robbery. (Ex. 8, Decl. of Keith Edington, at ¶ 2 (explaining they "had no relationship with Julius, other than being from the same town. We did not take orders from him."); Ex. 21, Decl. of Wayne Jordan, at ¶ 15.) Even the victim and his companion confirm the story of their attackers. Louis Johnson never heard Robinson's name mentioned,

61

much less thought that the incident was a botched vengeance killing as alleged by the prosecution.  (Ex. 19, Decl. of Louis Johnson, at ¶ 7; Ex. 34, Decl. of Mike Williams, at ¶ 3 ("I do not believe that they had really been ordered by Julius Robinson to kill me.").)

The testimony of Nate Henderson would have had no impact on their testimony.  A review of the trial transcript shows that Henderson's testimony consisted of nothing more than meaningless speculation.  Henderson never heard Robinson tell anyone to carry out a hit on "One Love."  (20 RT 129-31.)  Instead, Henderson engaged in conjecture as to whether Robinson had directed someone to injure Williams.  (20 RT 115 ("if someone is snitching in Dermott and there is a message gave to them [sic] down there, that means get them.").)  Because Henderson was speaking from his own experience rather than any personal knowledge of Robinson's communication habits, Henderson was incapable of discerning what Robinson meant.  Certainly, Henderson had no way of knowing how the aunt might have interpreted the information, much less whether she actually relayed it.

Assuming Henderson's lay opinion was enough, his credibility was undermined by his inherent untrustworthiness.  Accomplice testimony is necessarily viewed "with the very greatest care and caution."  *Crawford v. United States*, 212 U.S. 183, 204, 29 S. Ct. 260, 53 L. Ed. 465 (1909).  Henderson was not only one of Robinson's co-defendants, he had originally been charged with being the mastermind behind the criminal enterprise until he was offered the plea agreement.  (20 RT 108.)  He was allowed to plead guilty to conspiracy to distribute marijuana in violation of 18 U.S.C. §§ 841(b)(1)(B) and 846, and to possession of firearms in furtherance of a drug-trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A).  *United States v. Henderson*, 100 Fed. App. 302, 303 (5th Cir. 2004).  In exchange for Henderson's testimony

62

against Robinson, the prosecution even agreed to petition the judge for a reduction in Henderson's sentence.  (20 RT 109-10.)  Henderson would have felt enormous pressure to support the prosecution's theory that Robinson ordered the hit, especially based on the prospect of a lifetime in prison without the deal.  (20 RT 108 (acknowledging prospect that he was facing a sentence of ten years to life).)

Not surprisingly, the Government glosses over the troublesome aspect of Henderson's character and instead emphasizes the criminal history of the participants in the "One Love" robbery as grounds for discounting their testimony.  (Resp. at p. 50.)  Admittedly, each of the perpetrators had a lengthy criminal record.  (*See* Resp. at p. 50; Resp. Exs. H-J.)  Far more compelling than their relative criminal histories, however, is the absence of any incentive for Pitts, Eddington and Jordan to exculpate Robinson in the attack.  Based on the seriousness of the allegations made by Williams, each had an obvious incentive to garner favor with law enforcement by shifting blame to Robinson.  The fact that they accept full responsibility, regardless of the consequences, enhances their credibility.

Second, the Government seizes upon minor inconsistencies to urge the Court to reject their accounts outright, on paper and without a hearing.  Specifically, the Government suggests that because the witnesses provided differing reasons for carrying out the robbery, they all must be lying.  (Resp. at pp. 52-53.)  There are a variety of explanations for conflicting details, none of which impugns the witnesses' veracity.  Given the passage of five years since the incident, it is understandable, if not expected, that discrepancies would exist.  *Vasquez v. Hillery*, 474 U.S. 254, 280, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (noting that with the "passage of time . . . memories fade").  In addition, based upon Williams' unsavory reputation, it is entirely

63

reasonable to assume that Pitts and his cohorts harbored a multitude of reasons for wanting to accost him, least of which would have been to retaliate against Williams for his cooperation with law enforcement.  Even if some of the participants were motivated by a desire to avenge Robinson, they universally deny operating pursuant to some cryptic message conveyed by Robinson's aunt about a "hit."  Any impeachment aside, their testimonies would have certainly cast doubt on the prosecution's purely circumstantial case.

In addition to the participants in the "One Love" incident, other witnesses could have been presented to dispute Robinson's involvement.  The sole basis for the alleged incident was a three-way telephone conversation that Robinson had with his aunt, Josephine Dotson, and his brother, Marcus.  (20 RT 85-86.)  According to the prosecution's theory, Robinson's request for a hit was reflected in the following statement:  "That dude ONE LOVE, Man that dude right there go hard."  (Ex. 44, Partial transcript of phone call between Julius Robinson and Marcus Robinson and Others (Gov't Trial Ex. 929A).)   According to Marcus, the phrase "go hard" simply means that a person "would do anything, say anything."  (Ex. 64, Supp. Decl. of Marcus Jwain Robinson, at ¶ 4.)  In any event, Marcus did not believe that Robinson was asking him to convey a message and he certainly did not tell anyone about the conversation.  (*Id.*)  Neither did Josephine believe that her nephew was asking her to relay a hit to someone in Dermott.  (Ex. 62, Supp. Decl. of Josephine Dotson, at ¶ 6.)  Their testimony alone would have been sufficient to undermine the prosecution's implication.

In stark contrast to the information presented in this habeas proceeding, the evidence offered by trial counsel in no way refuted the powerful "hit" allegation.  Similar to the presentation of the high school football staff, trial counsel called several jail staff personnel

64

to express their limited views on Robinson's behavior as a pretrial inmate. "No problem," and "one of the better inmates," was the opinion of one of the correctional officers. (21 RT 29.) Another officer reiterated Robinson's lack of disciplinary problems and found him to be "respectful" and "quiet." (21 RT 59.) Yet another found that Robinson had "adjusted well" and considered him to be a "better than average" inmate. (21 RT 72.) The jail unit manager mostly concurred with these opinions, stating that Robinson had caused no problems at the facility. (21 RT 97-98.)

Whatever the value of the jail evidence, it is clear that absent any specific rebuttal to the "One Love" hit allegation, such evidence did more harm than good. In emphasizing Robinson's lack of disciplinary record in jail, the defense opened the door to questioning about Robinson's improper use of the telephone. On cross-examination, the jail unit manager was forced to concede that jail regulations forbid three-way telephone calls by inmates. (21 RT 109.) Despite this prohibition, and the continuous surveillance of inmate telephone calls, the jail manager was still unaware that Robinson had made the prohibited call. (21 RT 106-08.) Because Robinson was alleged to have issued the "hit" through this unauthorized procedure, the prosecution was able to imply that Robinson may have committed other regulatory violations without detection. Worse still, the evidence permitted the prosecutor in his closing argument to rely on the inadequacies of the jail phone system as further support that Robinson could place other menacing calls in the future:

> Mr. McCauley, their witness, told you the general population out at the jail unit, where he ordered this hit on Michael Williams, is the same kind of set up that he's going to face [in post-trial confinement].

(23 RT 102-03.)

65

The expert testimony regarding the lack of future dangerousness was equally ineffective at overcoming the perception created by the "One Love" hit. As trial counsel conceded, the defense deliberately circumscribed Dr. Cunningham's testimony to discuss only future dangerousness for death row inmates generally. (Resp. Ex. B, Decl. of Jack V. Strickland, at p. 3 ("[I]t was my decision to cut his presentation dramatically").) In the absence of any specific information about a defendant's behavior during incarceration, such garden-variety information only would have been helpful in providing an understanding of the low risk of violence among death row inmates generally. But the jury had already been told that *this* inmate had solicited a murder while in jail. Jurors would have rightly rejected (and possibly have been offended by) any hypothesis to the contrary.

There is no question that evidence of the "One Love" hit was devastating to Robinson's chances for a life sentence. The alleged hit against Williams was the "centerpiece of the [ ] prosecution's penalty-phase case." *Banks v. Dretke*, 540 U.S. 668, 710, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004) ("reasonable probability" standard met where the suppressed evidence related to testimony that was relied upon heavily by the prosecutor during penalty phase closing argument). Throughout his penalty phase closing argument, the prosecutor repeatedly invoked this incident as veritable proof that Robinson would continue to pose a risk of violence notwithstanding his incarceration:

> So when you ask yourself whether or not Julius Robinson is a future danger, ladies and gentlemen the overwhelming evidence is that he is, because with the telephone available to him as will be available to him at any prison setting, he is prepared to carry out whatever it takes to seek revenge on anybody.

(23 RT 105.) The prosecutor also argued that Robinson had both the motivation and ability

Exhibit A - 000091

to continue issuing death threats from prison:

> So I would submit to you, ladies and gentlemen, that the overwhelming evidence on that future dangerousness issue sadly is that Julius Robinson will always be a future danger, and his target environment just got a little bit bigger because [Nate Henderson] and every one of the courageous individuals who came down here to testify against him is now a target. They have got a target sign on their chest to anyone that he can get word to to take care of.

(23 RT 102.)

Due to the lack of any challenge to the "One Love" incident and the inflammatory argument by the prosecution, the jury had little choice but to impose a sentence of death. Having been informed that Robinson was able to orchestrate outside attacks from his jail cell, the only logical conclusion for the jury to draw was that no prison could protect society from Robinson. And because the jury was told of Robinson's fierce determination to retaliate against those responsible for his predicament, the jurors quite possibly assumed that they were next on the list.

Trial counsel now seeks to justify their performance by characterizing the prosecution's contention as "relatively weak." (Resp. Ex. A, Aff. of Wessley T. Ball, at p. 10.) But immediately after trial, Robinson's attorneys held a much more dismal view of the "One Love" evidence:

> '[E]vidence' that Robinson was capable of ordering criminal activity outside his place of confinement would necessarily affect a punishment verdict – which in this case was death. The harm of the error was direct, obvious and ultimately life-ending.

(App. Op. Brief at p. 21.)

### b. Robinson's Alleged Involvement with a Notorious Street Gang Was Nothing More Than a Group of Adolescent Hoodlums

For the first time at the penalty phase, the prosecution sought to portray Robinson as

67

a notorious gang member.  (20 RT 45-69.)  Terrence Hollimon, Robinson's cousin, claimed that Robinson had admitted being a member of the "Crips."  (20 RT 47-48.)  To corroborate his testimony, the prosecution asked Hollimon to view a series of photographs.  (20 RT 48-49.)  For each one, Hollimon identified Robinson displaying hand gestures that were consistent with gang signs.  (*Id.*)

Once the prosecution established that Robinson was affiliated with a gang, the prosecution relied on its own prison expert to link Robinson to gang violence in prisons:

> Prison gangs do play a significant role in prison operations. Nearly all violence, serious violence, within a correctional setting, can be traced back to gang rivalries, racial rivalries that tie to the prison gangs, and to their continuing interactions with each other in looking for a balance of power between inmate groups.

(22 RT 112-13.)

As with the "One Love" incident, evidence of gang affiliation went unanswered by the defense.  The introduction of gang membership evidence in a capital proceeding amounts to a constitutional error where the membership is not relevant to any of the issues being decided. *Dawson v. Delaware*, 503 U.S. 159, 165-67, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992) (finding constitutional error where the prosecution introduced irrelevant evidence of defendant's membership in the Aryan Brotherhood at sentencing); *Wainwright v. Lockhart*, 80 F.3d 1226, 1234 (8th Cir. 1996) (finding error where the state introduced evidence of gang membership at sentencing without linking it to any issues in the sentencing phase); *O'Neal v. Delo*, 44 F.3d 655, 661 (8th Cir. 1995);  *Perez v. Dretke*, 393 F. Supp. 2d 443, 448 (N.D. Tex. 2005), *app. denied*, 2006 U.S. App. LEXIS 12672 (5th Cir. 2006).  Generally, gang membership may be introduced only if it relates to one of four areas:

68

(1)     motive for committing the offense; *Perez*, 393 F. Supp. 2d at 448 (finding no error

when defendant's membership in the San Antonio Mexican Mafia formed the

motive and reason for the underlying murders as part of a gang rivalry);

(2)     future dangerousness of the defendant when violent history of the gang is

introduced; *Fuller v. Johnson,* 114 F.3d 491, 497-98 (5th Cir. 1997) (finding

defendant's membership in Aryan Brotherhood relevant to future dangerousness

where the prosecution introduced evidence that the gang "had committed unlawful

or violent acts, including homicides, multiple stabbings, drug dealing, and

aggravated assaults");

(3)     impeachment of defense witnesses based upon common gang affiliation; *United

States v. Abel*, 469 U.S. 45, 52, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984)

(upholding the introduction of gang affiliation of defense witness "because

it supported the inference that his testimony was slanted or perhaps fabricated

in respondent's favor."); and

(4)     rebuttal to mitigation evidence.  *Cf. Wainwright*, 80 F.3d at 1234.

Here, evidence of Robinson's involvement with the Dermott Crips was not relevant to

any issue at the penalty phase.  The crimes were not motivated or related in any way to gang

activity.[23]  Nor was there any evidence that involvement with the Crips supported a finding

of future dangerousness.  Other than establishing Robinson's possible association with a Crips

set in Dermott, the prosecution provided no information that the Crips supported criminal

---

[23]  Because none of the defense witnesses were alleged to have been a gang member, the
evidence was not even admissible to show bias.

69

wrongdoing, much less violent activity.  Although Hollimon mentioned that the Crips engaged

in "gang banging," this fairly benign ritual consisted of "riding around throwing your little signs

up" or "hollering and doing a whole lot of crazy stuff."  (20 RT 65.)  Moreover, Hollimon denied

that the "Crip" activities entailed "beating up on people or drug activity."  *(Id.)*  In fact, Hollimon

conceded that Robinson was not even in Dermott at the time this alleged gang activity took place.

(20 RT 66.)

Assuming *arguendo* that gang evidence would have been admitted over defense

objection, there was substantial evidence that the Dermott Crips was nothing more than a band

of small town teenage truants.  Jerry Melton, the Chief of Police of Dermott at the time the

"Crips" would have been active, scoffed at the suggestion that it was a fearsome gang:

> There were some kids who called themselves the Crips and others
> claimed to be the Bloods.  They would wear blue or red colors
> accordingly.  They didn't fight each other though and I looked at them
> as kids trying to imitate what they saw on television.  They were little
> wannabes.

(Ex. 59, Decl. of Jerry Melton, at ¶ 4.)  In addition to addressing the factual background of the

purported gangs, trial counsel should have consulted an expert to assess the gang situation in

Dermott.  Pursuant to a study commissioned by the Department of Justice, gang are generally

classified into five categories: (1) Traditional (2) Neo-traditional (3) Collective (4) Compressed

and (5) Specialty.  Malcolm W. Klein, Cheryl L. Maxson, *Gang Structures, Crime Patterns, and

Police Responses: A Summary Report* (2001), available at www.ncjrs.gov/pdffiles1/nij/grants/

188510.pdf.  As the title connotes, Traditional gangs are long-standing, fairly large (consisting of

100 or more members), and have clear stratification based upon age or subgroup and fiercely

territorial.  *Id.*  Neo-traditional are similar but have not been in existence as long traditional

70

gangs. Collective gangs are slightly smaller, less territorial, have less stratification based upon age, and generally in existence for a decade. *Id.* Speciality gangs are similar to the other gangs but also resemble a criminal syndicate, usually focused on a single criminal activity. *Id.*

The Dermott "Crips" did not meet the criteria for any of the four notorious gangs. According to Dr. Malcolm Klein, the so-called Dermott Crips can be most accurately described as a Compressed gang. (Ex. 72, Decl. of Malcolm Klein, at ¶ 4.) Compressed gangs are characterized by their small size, total absence of stratification, and short life span. (*Id.* at ¶ 3c.)

Employing a gang expert during the penalty phase, such as Dr. Klein, would have been essential to counter any visceral reaction the jury might have had to this inflammatory evidence. Critically, trial counsel could have used an expert opinion to distinguish the Dermott Crips from the traditional gangs, which are commonly found and feared in urban areas. This was all the more important given the fact that the venire was chosen from the metropolitan area of Fort Worth. Moreover, trial counsel could have refuted the dubious insinuation by the prosecution's prison expert that Robinson's prior involvement with the Dermott Crips - a disorganized and insignificant organization, somehow posed a danger for greater violent activity in prison.

There is no doubt that Robinson's supposed gang affiliation would have factored heavily into the penalty phase deliberations. *United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002) (relying in part on defendant's gang membership as supporting future dangerousness finding). Courts have "long recognized the substantial risk of unfair prejudice attached to gang affiliation evidence." *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996); *Wainwright*, 80 F.3d at 1234 (recognizing that gang evidence generates fear in the jury "thereby making [the defendant] himself appear more dangerous and threatening."). Even trial counsel concedes that "gang

71

evidence is almost always detrimental to a defendant as jurors are very frightened of gangs."

(Resp. Ex. A, Aff. of Wessley T. Ball, at p. 6.)

      c.      **Robinson Shot Into a Parked Truck Without Knowledge That Anyone Was Inside**

The prosecution presented dubious testimony from Sara Tucker and raised the sinister implication that Robinson attempted to kill her over $120.  Available court records could have substantially undermined the prosecution's theory.  Not only was there significant evidence establishing that Robinson was unaware of Tucker's presence inside the truck, the state trial court considered the offense to be minor by initially imposing community supervision instead of a conviction.

Tucker testified that Robinson shot her truck seven times as she hid inside.  (20 RT 20.) She claimed Robinson was trying to recover the money she had owed him for drugs.  (20 RT 18-19.)  She alleged that when she refused to answer the door at her apartment, Robinson hunted her down at her parent's residence.  (20 RT 18-20.)

The public court file provided a very different account of events.  Perhaps the strongest support for the proposition that Robinson was unaware of Tucker's presence was the initial disposition of the case.  Robinson had pled guilty to deadly conduct, which is the knowing discharge of a firearm.  (Ex. 79, Tarrant County Court records in *Texas v. Julius Robinson*, Case No. 0574361D; *see* Texas Penal Code § 22.05(b).)  This is a third-degree felony which carries a minimum sentence of two years.  (*See* § 22.05(e) (classifying the offense of discharging a firearm as a "felony of the third degree").)  Despite accepting Robinson's plea, the court withheld the imposition of both his conviction and sentence, explaining that the imposition of the sentence

Exhibit A - 000097

was "suspended" and that "further proceedings should be deferred without entering an adjudication of guilt." (Ex. 79, at p. 4.) Under the "deferred adjudication" procedure, the court placed Robinson instead on community supervision. *See* Tex. Code Crim. Proc. art. 42.12. Community supervision is entirely discretionary. *Id.* (authorizing, but not requiring, community supervision "when in the judge's opinion the best interest of society and the defendant will be served.").) Had the trial judge been concerned about the safety of Tucker or society at large, it is highly doubtful that he would have extended Robinson supervised release.

Trial counsel should have also obtained the police reports which could have been used to impeach Ms. Tucker and further minimize the severity of the incident. (*See* Ex. 78, Arlington County Police Department records re: Sarah Tucker incident.) In her initial account to police, Ms. Tucker claimed that she had parked in front of her mother's house at 8:30 p.m. to stay with her mother because she wanted to reconcile based upon an argument they had earlier in the day. (*Id.* at p. 22.) Ms. Tucker stated that she had been parked for ten minutes when she saw the brown car. (*Id.*) At no time did she claim the brown car followed her from her apartment. (*See, generally,* Ex. 78, at pp. 20-25.) And because the truck had been stationary for so long, there is no way that anyone just arriving on the scene would have known Tucker was still in the vehicle. Moreover, the brown car in which Robinson was riding in had passed Tucker's truck without any confrontation. (*Id.* at p. 24.) It was only after the brown car had turned around that shots were fired. (*Id.*) As soon as Tucker heard shots, she sunk down in her vehicle, making it even less likely that Robinson would have noticed her. (*Id.* at p. 24.)

Crime scene investigators confirmed that all of the bullets were found in the rear portions of the vehicle and none were fired directly into the passenger cab. (Ex. 78, at p. 20 (noting that 2

73

rounds fired into the rear right quarter panel, one in the truck mid-section, and 2 in the tailgate).)

If Robinson was aware that Tucker was present in the vehicle and was intending to shoot her, it

seems highly unlikely that no shots were fired into the cab.[24]  (*Id.*)  This is especially true given

the fact that Robinson apparently drove directly past the vehicle.  Tucker also stated that

Robinson's vehicle departed the scene "very slowly, as though they were not in a hurry to leave

the apartment complex after shooting several rounds in the area."  (*Id.* at p. 24.)  If, as Tucker

claimed, Robinson actually made eye contact with Tucker and intended to shoot her, it is more

likely that he would have made a fast getaway to avoid identification by Tucker or any other

witness.  Their slow departure is more consistent with someone who had been unsuccessful in

their search but continued to make a last ditch survey while exiting the area.

Finally, trial counsel never bothered to investigate the person who was driving for

Robinson on the night in question.  As reflected in the police report, Sara Tucker stated that

another black male was driving the brown sedan.  (Ex. 78, at p. 22.)  Had they bothered to

question Robinson about the incident, they would have discovered that Richard Smart was the

driver.

Mr. Smart, who was already a witness in the case, would have willingly submitted to

questioning about his involvement in the Tucker incident.  Mr. Smart could have taken the stand

on Robinson's behalf, confirming that neither of them knew that Tucker was hiding in the truck.

As Mr. Smart explains:

> I drove Julius to the apartment of Sara Tucker, a friend of his who
> owed him money. When we discovered that she was not home, we
> drove to her mother's house. In the parking lot, we saw the pickup

---

[24]  One of the rounds fired into the tailgate had passed through and hit the back seat.

74

truck owned by Sara Tucker. The truck appeared to be empty. I drove into the parking lot and past the truck. I was closest to the truck and no one was in the cab of the truck. I made a u-turn and drove back past the truck again. This time Julius, in the passenger seat, was the closest to the truck. Julius rolled his window dovm, took out a gun and fired shots into the truck. We did not see anyone inside it. We both believed the truck was empty. The incident happened in the night time when it was dark outside.

(Ex. 74, Decl. of Richard Smart, at ¶ 3.)  And because Mr. Smart was a witness for the prosecution for the underlying drug conspiracy, he would have enjoyed credibility with the jury.

Unfortunately, the jury was never apprised of the mitigating circumstances of the firearm offense or the initial disposition.  Instead, the only evidence that the jury received was the ultimate judgment of conviction and the testimony of Tucker and her mother.  (20 RT 11-12; Gov't Trial Ex. 925.)  Tucker blatantly lied about the circumstances leading up to the shooting. For the first time, Tucker claimed that Robinson had went to her apartment initially and then followed Tucker to her parents' apartment.  (20 RT 17-18.)  None of her previous statements to police mention this earlier encounter, much less that Robinson followed her.  As her statement indicates, Tucker had been parked for ten minutes before Robinson ever arrived.  Unfortunately, Tucker was never confronted with her earlier statements.

Without any explanation from the defense, the prosecution was able to use the Tucker incident to bolster the future dangerousness allegation.  The prosecutor hammered the shooting incident throughout his closing argument.  (23 RT63, 66-67, 99, 106.)  Twice, the prosecution implied that Robinson attempted to murder Tucker over a petty debt:

> The significant thing about a prior criminal record is back from the time that he is 19 years of age, his problem solver, his gun, Sarah Lee Tucker owed him a $100 for crack cocaine.  So she's a problem. We'll take care of that.

75

Exhibit A - 000100

(23 RT 63, 120 ("he is willing to shoot up that pickup truck with this little girl in it").)

>              d.    **The Combined Effect of the Unrebutted Aggravating Evidence Introduced at the Penalty Phase Contributed Substantially to the Jury's Finding of Future Dangerousness**

In any capital case, the issue of whether the defendant is a "danger to the community is . . . nearly always a relevant factor in jury decision making, even where the [prosecution] does not specifically argue the point." *Deck v. Missouri*, 544 U.S. 622, 633, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005). Surveys of capital jurors provide ample support for this conclusion. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559-60 (1998) (noting "the pervasive role future dangerousness plays in and on the minds of capital sentencing jurors"); John H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue*," 86 Cornell L. Rev. 397, 398 (2001) (observing, on the basis of interviews with over 100 capital jurors, that "future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials, no matter what the prosecution says or does not say").

Future dangerousness was certainly an important issue for the jury deciding Robinson's fate. As part of the penalty phase verdict, the jury was required to answer whether Robinson "is a future danger to the lives and safety of other persons." (Ex. 45, Special Verdict Form, at p. 4.) Even if the jury initially had been reluctant to place primary emphasis on future dangerousness, Robinson's trial counsel made it the "key consideration" in the case. (23 RT 82.) As trial counsel explained: "when it comes right down to the [sic] lick law, if one factor needs to be carved out, [future dangerousness is] the one that's most important to most jurors."

76

(23 RT 83.)  What's more, trial counsel highlighted the possibility that Robinson could receive a sentence of less than life in prison.  In argument, trial counsel emphasized the "three choices" available to the jury:  life, death, and "the last one, a sentence of something less than life that would be determined by the Court."  (23 RT 70.)  Based upon trial counsel's careless reminder, the jury would have been naturally afraid that Robinson may be released in society at some future date.

The combined effect of the uncontested aggravating evidence would have been truly devastating to Robinson's chances of avoiding a death sentence.  The mere inference that Robinson had been involved in a gang, tried to kill someone over drug money, and ordered a "hit" from prison would have been enough to incite the fears of the jurors.   The visceral, highly prejudicial impact of this evidence was exacerbated by the closing argument of the prosecution as well as Robinson's own attorneys.  Once trial counsel had established future dangerousness as the key consideration, the prosecutor capitalized on these incidents as definitively resolving the issue.  In the end, the jury would have felt compelled to vote for death - if for nothing else than self-preservation.  *See Kelly*, 534 U.S. at 255 (noting that where evidence of acts in violence in prison went unchallenged, "the imposition of the death penalty was an act of 'self-defense'"); *Simmons v. South Carolina,* 512 U.S. 154, 157, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994).

### 2.    The Defense Penalty Phase Presentation Distorted and Omitted Significant Portions of Robinson's Life History That Could Have Engendered Sympathy With the Jury

"[A] defendant's background is unquestionably relevant to the jury's determination of whether a sentence less than death is warranted."  *Smith v. Dretke*, 422 F.3d at 282-83; *Cole v. Dretke*, 418 F.3d 494, 501 (5th Cir. 2005), *rev'd on other grounds Abdul-Kabir v. Quarterman,*

77

127 S. Ct. 1654, 167 L. Ed. 2d 1654 (2007) (identifying evidence of family history and emotional disturbance as relevant mitigation); *Roberts*, 356 F.3d at 641 ("defendant's troubled history is relevant to deciding his moral culpability").  Background evidence is critical to the life and death calculus "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."  *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989).  Even if there is strong evidence of future dangerousness, background evidence alone may be sufficient to tip the balance in favor of life.  *Williams (Terry)*, 529 U.S. at 398 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").

A realistic appraisal of the two presentations exposes the extreme contrast between the true life story of Robinson and the version that the jury received.  The jury heard virtually nothing about Robinson's difficult life.  As discussed below, the evidence trial counsel did present only served to portray Robinson's background in a false light, making him less worthy of mercy.

**a.**   **Trial Counsel Presented No Evidence About Robinson's Difficult Childhood**

The defense presentation hardly broached the topic of Robinson's early childhood and certainly glossed over the painful details.  Although Robinson's mother Rose explained that she married at age fifteen, she did not tell the jury that she was still a teenager at the time she gave birth to both Marcus and Robinson.  Neither did she inform the jury that she dropped out of high school immediately after becoming pregnant. (21 RT 156.)  Rose also failed to discuss her abuse

78

and neglect of Robinson during this time, including drinking alcohol and using drugs while she was pregnant.

Rose's testimony also left out significant compelling details of her combative marriage with Jimmie Lee and its harmful effects on Robinson. Beyond stating that their marriage ended after six years (21 RT 158-59), Rose failed to mention the pervasive domestic violence and drug addiction and the attendant impact on her children. Even when describing the divorce, Rose made it appear that the marriage ended amicably rather than after an abrupt split following another bout of violence and Jimmie Lee's arrest.

In addition to omitting critical aspects of Robinson's childhood, Rose also downplayed the abandonment of her children. Rose testified that after the marriage ended, she lived with Robinson and Marcus in Wichita Falls for the next few years until Robinson was four years old. (21 RT 159.) In reality, Rose gave up her children when Robinson was only two. Rose also tried to make it appear as if she was forced to give up her children due to financial hardship. Contrary to her trial testimony, Rose was not forced to leave her children because Jimmie Lee failed to provide adequate support. (21 RT 159-60.) Rose chose to give up her children to avoid intervention by social services. (Ex. 13, Decl. of Milton Hollimon, at ¶ 8.)

Not only was the jury deprived of any information about Robinson's maltreatment as a child, the jury was never provided with an explanation of how his background affected him as an adult. Dr. Cunningham, an expert retained by defense counsel solely for the purposes of discussing future dangerousness, could have readily discussed the long term effects of this extreme form of deprivation. According to Dr. Cunningham, the type of neglect that Robinson suffered has been linked to "psychological disorders behavior disturbances and violent and

79

criminal conduct." (Ex. 1, Decl. of Mark Cunningham, at p. 49.) The fact that the abuse was not physical is irrelevant. (*See* Resp. at p. 42 ("Nothing in Jimmie Lee's statement supports the idea that Robinson was physically abused for the short time he lived with his own parents . . . .").) According to the scientific data, "neglect has been identified as more psychologically and developmentally damaging than physical abuse." (Ex. 1, Decl. of Mark Cunningham, at p. 49); (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 16 (describing the anger he felt from his mother's abandonment).)

An expert could have also explained to the jury the long term impact of the prenatal injuries, neglect, and ultimate abandonment Robinson suffered at the hands of his parents. As Dr. Allen explains:

> Mr. Robinson manifests an array of the negative sequelae of substance exposure-in-utero, specifically the eventual criminal consequences of brain injury due to alcohol-related neurodevelopmental disorder (ARND), as well as the teratogens nicotine, cigarette smoke, and marijuana. Because Julius's mother injured him *in utero*, he was at high risk for other maternal failures (impaired attachment) and was made particularly vulnerable to the dangerous challenges of high-risk environments (abuse, neglect, poverty, drugs, discrimination, violence). These three causative factors (teratogenic exposure, poor attachment, severe neglect amidst danger)-the latter two a direct link or correlate to fetal toxic exposure-are ample explanations of how this defendant traveled the road to criminal behavior.

(Ex. 77, Report of Dr. Kate Allen, at p. 3.)

**b.    Defense Counsel's Cursory Presentation Regarding Robinson's Care by his Grandparents Falsely Depicted His Chaotic Upbringing as "Stable"**

Trial counsel relied on the least knowledgeable person to describe for the jury Robinson's childhood with his grandparents in Dermott. As a result, the jury was left with the

80

false impression that Robinson "led a relatively normal upbringing." *Bell v. Cone*, 535 U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

John Hollimon, Jr., his uncle, was the only witness to testify regarding Robinson's childhood in Dermott. John, one of the older sons of John, Sr. and Margaret, left Dermott as teenager, long before Robinson had arrived. (Ex. 14, Decl. of John Hollimon, Jr., at ¶ 5.) Because John lacked any firsthand knowledge of the day-to-day circumstances of Robinson's home life in Dermott, he gave the only answers one would expect from a distant relative. He testified that Robinson lived in a "stable environment" in a "decent home" run by grandparents who "raised [him] right." (21 RT 142, 151.)

Many other relatives and neighbors, much more familiar with Robinson's home life in Dermott, would have been able to provide a true picture of a much different reality. These witnesses could have testified that John and Margaret Hollimon were so constrained by their physical and mental limitations, they were unable to provide the guidance that Robinson required. (Ex. 33, Decl. of Willie White, at ¶ 9.) Far from stable, Robinson's home life is described as "chaotic," with people coming and going. (Ex. 22, Decl. of Leroy Kennedy, at ¶ 5.) It was the opinion of some that Robinson left to fend for himself, often seen roaming the streets at an early age. (Ex. 27, Decl. of Willie Parker, at ¶ 2.) Even his teachers noticed that Robinson was in serious need of parental guidance. (Ex. 36, Decl. of David York, at ¶ 2; Ex. 37, School Records of Julius Robinson.)

The problem with relying exclusively on John Hollimon's testimony is that it failed to explain how Robinson was neglected by his grandparents after being abandoned by his parents. By presenting the testimony of other witnesses who were much more familiar

81

with Robinson's upbringing in Dermott, the jury would have learned how the grandparents'

inadequate supervision contributed to Robinson's slide into juvenile delinquency.

As with his early childhood, an expert was also needed to place Robinson's formative

years in proper context.  Again, Dr. Allen explains:

> The "laying down" of attachment during infancy is, profoundly, the basis of emotional and behavioral self-control that begins in the toddler years and remains rather set (without effective intervention) into adulthood.  The process of acquiring attachment to the mother could be said to be the "psychological birth" which follows on the heels of the biological birth.  Within the first 9 months of life, the newborn is experiencing a critical cycle of bonding which occurs dozens, if not hundreds, of times a day.  In a "good enough" attachment environment, not only does the mother need to be almost fully attentive to responding to the needs of the child, the baby also must have enough sound brain development-regulatory, auditory processing, and memory capacity-to receive and store the consistent and relevant nurturing of the mother.
>
> If a child is negatively impacted by being overchallenged in the fetal period, he is not ready to cope with and grow through the challenges of the human environment after birth.  In such a case, an unusually attentive and stable maternal response is necessary in order to compensate for the lagging "hardware."  This was not the mothering Robinson received.

(Ex. 77, Report of Dr. Kate Allen, at pp. 8-9 (internal citations omitted).)

### c.    The Defense Presentation Provided an Incomplete and Inaccurate Portrayal of Robinson's Life in Arlington

The only discussion of Robinson's difficult home life at his penalty trial consisted

of his mother's half-hearted discussion of her drug and alcohol use.  (21 RT 167.)  As a result,

the jury never learned of Robinson's difficult adolescence, much less told how his miserable

home life and poverty lead to his drug dealing.

82

Although defense counsel had significant concerns about calling Robinson's mother as a witness, they nevertheless presented Rose as a witness and relied on her as the primary source of information regarding Robinson's life in Arlington.   In her brief testimony regarding her drug and alcohol use (21 RT 167-68), Rose grudgingly admitted to drinking "all the time," but she was deliberately vague about the details, such as the quantities and frequency with which she drank.  She was certainly unwilling to discuss the impact of her behavior on Robinson.  (*Id.*)

Friends and family members could have explained that the situation was far worse than Rose would allow.  The only time Rose uttered a sober breath was "when she woke up in the morning."  (Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 16.)  Rose "wasn't the kind of person that could have just one drink."  Instead, "[s]he would get falling down drunk."  (Ex. 5, Decl. of Jamila Camp, at ¶ 12.)  Rose was also quite belligerent when she drank, especially when someone attempted to stop her.  (Ex. 14, Decl. of John Hollimon, Jr., at ¶ 9.)  Not surprisingly, Rose refrained from discussing the impact that her drinking had on her children.  (Ex. 5, Decl. of Jamila Camp, at ¶ 12.)

Rose was even less forthcoming in her testimony when addressing her drug use.  According to Rose, it was her co-workers in Arlington who first exposed her to a marijuana and cocaine concoction known as "primos."  (21 RT 167.)  Rose made it seem as if she really had no intention of using drugs, she "just got caught up in the drug scene."  Rose was adamant that she only "continued for a little while, and then [she] beat it."  (21 RT 168.)  Ultimately, Rose convinced the jury that her drug use was recreational and fleeting.

In reality, Rose had been a drug addict most of her life.  As a teenager, Rose smoked marijuana and inhaled cocaine on a regular basis.  Rose's addiction was so severe that she did not

83

have the self-control to quit or at least curtail her drug use during her pregnancy with Robinson. (Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 17.)  Even the few times Rose visited Robinson in Dermott, she was too preoccupied with smoking marijuana with friends to visit with her children. (Ex. 30, Decl. of Marcus Jwain Robinson, at  ¶ 6.)  Whether or not Rose's first introduction to smoking "primos" was made by her co-workers, Rose quickly embraced the habit and took it to another level.  Practically every weekend, Rose smoked primos -- not with her co-workers -- but with a cousin who lived nearby.  (Ex. 16, Decl. of Jana Hollimon, at ¶ 4.)  Because her addiction had escalated so dramatically, Rose was unable to "beat" her addiction, as she claimed.  Rose was only able to stop through the aid of her son, Julius Robinson, who helped her "get a fresh start" in Ohio.  (Ex. 5, Decl. of Jamila Camp at ¶ 12.)

Although John Hollimon testified regarding his observations of Robinson's home life in Arlington, he was unable to shed any light on day-to-day struggle.  John visited his sister, Rose, only "a couple of times" when she lived in Arlington.  (21 RT 142.)  Thus, John's opinion that it was a "very dangerous environment" or that Rose was "not as strong as she need[ed] to be," would have carried little weight with the jury because he had only a modest opportunity to view the daily saga Robinson suffered at his mother's household.  At base, such "skeletal" testimony "contained none of the details" which other witnesses could have provided.  *Lewis*, 355 F.3d at 368.

A much more logical choice to provide a true picture of Robinson's adolescence was his brother, Marcus.  *Lewis*, 355 F.3d at 368.  Marcus lived with Rose and Robinson for five months in Arlington.  He had extensive firsthand knowledge of the horrific cycle of substance abuse and parental neglect:

84

> When she came home from work, she smoked marijuana.  She
> smoked every day.  She also drank. When she drank, her speech
> would become slurred and she would yell.  Sometimes she would
> leave the apartment and sometimes she would just go to bed.  I was
> always amazed that she could get up the next morning and go to work
> after how much she had been drinking the night before.

(Ex. 30, Decl. of Marcus Jwain Robinson, at ¶ 18.)[25]

Not only did the testimonies of Rose and John, Jr. provide the jury with a false and inadequate depiction of Robinson's adolescence in Arlington, this presentation implicitly signaled the lack of any sympathetic circumstances in Robinson's background generally. Throughout the penalty phase presentation,  the jury was told the importance of background information in deciding whether to mitigate the sentence.  Accordingly, the jury would have naturally expected to learn about some sympathetic mitigation evidence.  The jury was no doubt disappointed when it was told that the first and only hardship Robinson suffered was his mother's experimentation with drugs in his late adolescence.  Without knowing that this event was only the latest in a lifetime of tragedies that befell Robinson, the jury would have considered his mother's drug use an aberration in an otherwise normal life.

The remainder of the defense evidence regarding Robinson's background served only to fuel the jury's misconception on this point.  Trial counsel devoted the lion's share of the

---

[25]  Jana Hollimon also witnessed Rose's behavior:

> One summer when I was about ten or eleven years old, I went to stay
> with Julius and his mother, Rose, in their apartment in Arlington,
> Texas.  I remember staying with them for several months. . . .  Rose
> would come home from work every day and go into her room or else
> the bathroom and smoke marijuana . . . .

(Ex. 16, Decl. of Jana Hollimon, at ¶ 4.)

defense presentation to discussing Robinson's high school football career.  Five witnesses testified solely to discuss their observations of Robinson on the gridiron.  "Quiet, respectful, no problems" was the opinion of one coach.  (21 RT 49.)  Another coach described Robinson as having "played hard" and having a "good attitude" (21 RT 77), while another characterized him as being "well-liked" and never causing any problems.  (21 RT 5-6.)  Still another coach found that Robinson was "quiet" and "respectful."  (21 RT 49.)  The only teammate to testify expressed a similar view, characterizing Robinson as a "good player" who was "well-respected."  (21 RT 14.)  At best, the jury would have ignored evidence of Robinson's positive demeanor in football practice, finding it trivial and irrelevant to the sentence consideration.  At worst, the jury would have relied upon Robinson's involvement in football as further confirmation that he enjoyed a normal or perhaps even privileged existence.

Ironically, had trial counsel questioned any of these witnesses regarding Robinson's background, counsel could have placed his football experience in proper context.  Instead of portraying Robinson as a typical student engaged in extracurricular activities, the defense could have conveyed Robinson's remarkable determination to participate in the football program notwithstanding his difficult home life.  As one of the testifying coaches recently explained:

> Although Julius never mentioned anything about his family, I had the impression that Julius didn't really have anyone at home to care for him.  My experience working with kids has taught me to recognize the kids whose home life is compromised.  I am convinced that if Julius had grown up in a different environment, he would have had another kind of life.  I say this because he tried so hard to do well . . . .  Many kids drop out or don't get enough preparation to live a stable and productive life.

(Ex. 36, Decl. of David York, at ¶ 2.)

86

**3.    The Penalty Phase Jury Was Never Apprised of Robinson's Significant Mental Impairments Which Would Have Extenuated His Crimes and Mitigated His Punishment**

In addition to the disturbing circumstances of Robinson's life, the jury was never allowed to consider Robinson's significant mental impairments.  Robinson suffered brain damage from his exposure to alcohol *in utero* and to pesticides throughout his childhood.  Far from "hogwash," as the Government contends, this mental health evidence could have further tipped the scale in favor of life.  (Resp. at p. 40.)

Dr. Martin concludes that Robinson's mental impairments are generally consistent with chronic exposure to organophosphate pesticides.  (Ex. 2, Statement of Stephen K. Martin, at p. 3.)  The Government's numerous attacks on Dr. Martin's opinion are unavailing.  Significantly, the Government has offered no expert opinion that Robinson does not suffer from brain damage.  Thus, there is no competent attack on Dr. Martin's methodology or his ultimate conclusion, just counsel's verbal pot shots.

In addition, the Government is simply erroneous in arguing that evidence of mental impairments would not have been admissible as mitigating evidence.  (Resp. at p. 39.)  To be material in the penalty phase of a capital proceeding, the evidence need only "tend[ ] logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990)).  Evidence of Robinson's mental impairments would have clearly been admissible at the penalty phase. *Zant v. Stephens*, 462 U.S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) (mental illness militates in favor of a lesser penalty).   Indeed, evidence

87

of psychological disorders or mental deficits is often compelling to a jury. *Loyd v. Whitley*, 977 F.2d 149, 157 (5th Cir. 1992) (granting relief where counsel failed to develop independent evidence of mental disease or defect); *see, e.g., Moore*, 194 F.3d at 613 (discussing "substantial evidence of impaired mental development and functioning, and some evidence of organic brain damage resulting from severe trauma."); ABA Guidelines § 4.1 cmt ("the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment.").

Trial counsel could have used evidence of Robinson's neurological deficits to mitigate the punishment in this case. Specifically, trial counsel could have explained how Robinson's cognitive impairments contributed to his ultimate involvement in selling drugs. In light of his significant learning disabilities, coupled with the limited opportunities available to someone in Robinson's socio-economic situation, Robinson would never have been able to attain any level of accomplishment. Although Robinson desperately tried to support himself and his family through menial labor, this was never enough. When his financial situation became dire, it is understandable that he would resort to selling drugs to support his family. Therefore, evidence of Robinson's brain damage would have not only met the minimum admissibility threshold, it would have served as important evidence in mitigation.

### 4. The Penalty Phase Was Devoid of the Compelling Evidence of Robinson's Good Character Notwithstanding His Difficult Upbringing

In discounting the available mitigating evidence that the defense could have presented, the Government ignores significant evidence of Robinson's good character. But, as the recent submission establishes, in the face of overwhelming oppression and limited guidance, Robinson

Exhibit A - 000113

nevertheless managed to express genuine kindness where he had been shown none.  Whether this would have served as an independent ground for negating a death sentence, it would have undoubtedly contributed to titling the scales in favor of life.

Positive aspects of a defendant's character are relevant to the sentence determination. *Tennard*, 542 U.S. at 285; *Franklin v. Lynaugh*, 487 U.S. 164, 186, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988) (O'Connor, J., joined by Blackmun, J., concurring in judgment) (referring to "positive character traits that might mitigate against the death penalty").  Evidence of a defendant's good character despite a difficult background supports the notion that the defendant is not beyond redemption.  *Boyde v. California*, 494 U.S. 370, 382, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); *Penry*, 492 U.S. at 306 ("a defendant who commits crimes attributable to a disadvantaged background or emotional and mental problems may be less culpable than one who has no such excuse.").  At the very least, good character evidence "humaniz[es the defendant] by demonstrating that there were people along the way who saw some worth in him and befriended him."  *Neal*, 286 F.3d at 236 (finding prejudice based upon trial counsel's failure to investigate available mitigation evidence).  The sheer number of witnesses willing to testify positively on a defendant's behalf might be enough to persuade the jury to spare his life. *Waters v. Thomas*, 46 F.3d 1506, 1519 (11th Cir. 1995) (en banc) (noting that just having a witness on the stand can humanize the defendant in the eyes of the jury).

As the habeas investigation demonstrates, Robinson performed a variety of generous acts despite his difficult background.  Most striking was Robinson's support of his mother.  Given the physical abandonment and emotional neglect Rose had inflicted upon her son, one could

89

hardly expect Robinson to be civil towards her, much less express compassion.  Despite it all, Robinson loved his mother unconditionally.  As his girlfriend explained:

> Julius loved his mother more than I ever could have, given the circumstances.  He was very hurt and embarrassed by her substance abuse and her behavior, but he always tried to include her in his life.

(Ex. 5, Decl. of Jamila Camp, at ¶ 12.)  In addition to providing financial support for himself and his mother while attending high school, Robinson ultimately saved his mother from her addiction.  Realizing that she lacked the willpower to stop using drugs in Arlington, Robinson paid for Rose to get a "fresh start" in Ohio.[26]  (*Id.*)

Another example of Robinson's positive contributions was his efforts to shield his younger cousin from negative influences.  When Antonio Ford started to get into legal trouble in Dermott, Robinson brought him to live with him in Arlington.  (Ex. 12, Decl. of Mildred Hollimon, at ¶ 9.)  Robinson enrolled Tony at his alma mater, Lamar High School, and petitioned the coaches to let him play football.  The staff was more than impressed by Robinson's efforts. (Ex. 25, Decl. of Willie Michael Nelson, at ¶ 3.)  As one teacher noted:

> "I thought it was amazing that Julius was [helping his cousin]. He was a child himself and yet he was taking on the role of caretaker."

(Ex. 35, Decl. of Carol Wilson, at ¶ 3.)  What made his act of kindness further remarkable was that Robinson never had anyone in his life looking after his welfare, yet he was willing to care for a cousin.

Robinson's compassion extended to caring for other people's children as well.  Robinson helped babysit and even assumed the role of part-time father for his brother's children.  Robinson

---

[26]  Robinson also provided for his older brother.  (Ex. 5, Decl. of Jamila Camp, at ¶ 11.)

90

also assisted with babysitting for newborn babies.  As his girlfriend explained,

> Julius loved babies and children. . . . I offered to babysit [my niece] and give my sister a break when the baby was two or three months old.  Julius helped me.  He changed and burped the baby, did everything.

(Ex. 5, Decl. of Jamila Camp, at ¶ 9.)

Nothing in the defense penalty presentation came close to depicting Robinson's positive attributes.  The only evidence presented was a single incident where Robinson had turned in a lost wallet without taking any money.  (21 RT 44-46.)  Such an insignificant, isolated example of positive character was likely completely ignored by the jury.  Not surprisingly, the prosecution seized upon the wallet evidence as further support for Robinson's lack of positive attributes.  (23 RT 66-67  ("He returns the wallet.  At the same time, he is willing to shoot up that pickup truck with this little girl in it, shoot up her parents' house because they have his $130."); 23 RT 120 ("Sure he gave $120 back to one of those coaches, but he was expecting $120 from Sarah when she wasn't paying it, pumped her truck full of holes and a couple of rounds in her mother's apartment for good measure.").)

### 5.    Balancing All Compelling Mitigating Evidence Against the Substantially Diminished Aggravating Evidence, There Is a Reasonable Probability that At Least One Juror Would Have Voted for Life.

Following a reasonable investigation, trial counsel could have influenced at least one juror to vote for a life sentence.  Reasonable trial counsel would have discovered and offered strong evidence of Robinson's troubled background and refrained from presenting the false depiction of Robinson as someone who enjoyed a normal upbringing.  Moreover, trial counsel would have shown that Robinson suffered brain damage as a result of his mother drinking

91

Exhibit A - 000116

alcohol through her pregnancy and from his constant exposure to toxic pesticides during his childhood. Trial counsel could have shown how Robinson displayed positive qualities. To counter the prosecution's evidence in aggravation, trial counsel could have been able to provide direct testimony to rebut the claim that Robinson ordered a hit against "One Love" Williams. Trial counsel would have also discounted the dubious claim that Robinson was affiliated with a notorious street gang. Finally, trial counsel would have shown that Robinson unknowingly fired shots at a parked truck when Tucker was inside. Given the totality of the available evidence in mitigation and the available evidence to rebut the case in aggravation, competent counsel would have succeeded in tipping the balance in favor of life.

To support its contention that Robinson was not prejudiced as a result of trial counsel's deficient investigation, the Government argues that Robinson's life history is not equivalent to the mitigating evidence present in the Supreme Court's recent trilogy addressing ineffective of assistance of counsel claims. (Resp. at p. 48 (contrasting Robinson's case with *Williams*, *Wiggins* and *Rompilla*, *supra*.).) But the Government misconstrues the facts upon which these cases depend and misapprehends the principle upon which these cases stand. Similar to Robinson's life, all of these cases dealt with information regarding the defendant's sympathetic background and mental impairments. And, just as in Robinson's case, the court found trial counsel ineffective for failing to investigate the client's life history. The fact that the Supreme Court found the prejudice prong was satisfied in those cases, in no way delineated these showings as the minimum threshold. Moreover, none of these cases dealt with the failure to rebut powerful evidence in aggravation, which was a critical issue at Robinson's penalty phase.

92

Finally, it is important to note that the Supreme Court was forced to apply a much more stringent standard in those cases than in the instant one.  Because the Supreme Court was dealing with habeas petitions filed by state prisoners, relief could only be granted if the state courts engaged in an "unreasonable application" of "clearly established federal law."  *See* 28 U.S.C. § 2254(d)(1) (2006).  Under this deferential standard, it is not enough the state ruling is "incorrect or erroneous," the decision must be "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1; 157 L. Ed. 2d 1 (2003).   Concerns for comity are not implicated when a federal prisoner seeks collateral relief, and AEDPA's onerous standards do not apply to this case. *Visciotti*, 537 U.S. at 24 (identifying the 2254 as a "highly deferential standard for evaluating state-court rulings . . . which demands that state court decisions be given the benefit of the doubt").  A federal prisoner need only establish "the sentence was imposed in violation of the Constitution or law of the United States."  28 U.S.C. § 2255 (2006).

Adopting the same reasoning that trial counsel advances to excuse their ineffective investigation, the Government also argues that the death verdict was inescapable given the severity of the crimes.  (Resp. at pp. 48-49.)  The Government's argument rests on the untenable assumption that the jury completely abdicated its responsibility at the penalty phase.  As the Supreme Court has cautioned, "the assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  *Strickland*, 466 U.S. at 695.  In this case, once the jury found Robinson was eligible for the death penalty, it still "had to decide whether he should receive a death sentence."  *Jones v. United States*, 527 U.S. 373, 377, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999).

93

Before deciding on the death sentence, federal law "requires that the sentencing jury consider all of the aggravating and mitigating factors and determine whether the former outweigh the latter." (*Id.*) (citing 28 U.S.C. §§ 3591(a), 3592, 3593(e)).  Without more, it is preposterous to assume that the jury would have decided to "shirk its constitutional duty to render a reasoned, moral decision." *Kansas v. Marsh*, 126 S. Ct. 2516, 2528, 165 L. Ed. 2d 429 (2006); *Strickland*, 466 U.S. at 694 ("a court should presume . . . that the judge or jury acted according to law").

Even assuming the jury relied substantially on the underlying crimes in deciding to impose death, the record establishes that the verdict was also based on the penalty phase evidence.[27]  As outlined in the special verdict form, the jury was to determine several statutory and nonstatutory mitigating and aggravating factors before conducting the weighing calculus. (Ex. 45, Special Verdict Form.)  Although many of these issues dealt with the relative culpability and punishment of the co-defendants, two factors were concerned exclusively with Robinson. In each instance, the jury ruled against him.

First, the jury unanimously concluded beyond a reasonable doubt that Robinson "is a future danger to the lives and safety of other persons." (Ex. 45, Special Verdict Form, at p. 4.)  While the instruction listed lack of remorse as a possible basis, the aggravating factor was concerned essentially with Robinson's conduct, such as "specific threats" and "acts of violence." (*Id.*)  Given the intense focus that the prosecution placed on the Williams "hit", gang membership and the Tucker shooting, these matters served as a significant basis for the jury's finding of future dangerousness.

---

[27]  Nevertheless, if the Government's assumption is correct, then that provides a basis for relief.  To that end, the court should permit Robinson leave to interview the jurors, in order to put this issue to the test.

94

Second, none of the jurors found anything in Robinson's background that militated against the death penalty. The special verdict form asked the following question:

> Do any of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

(Ex. 45, Special Verdict Form, at p. 7.) Not one of the jurors concluded that Robinson's background justified a lesser sentence. (*Id.* (reflecting "0").)

Based upon these predicate findings, the jury would have been hard pressed to conclude that the aggravating factors did not outweigh the mitigating factors. Indeed, in light of the disparity between aggravating and mitigating findings, the jury would have been forced to resort to "nullification" in order to reach a life sentence. *Strickland*, 466 U.S. at 695 ("An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.") Consequently, because the aggravating and mitigating findings were dictated by the inadequate presentation at the penalty phase, there is no question that trial counsel's performance directly affected the death verdict.

6. **The Positive Result Obtained in the Penalty Phase of Robinson's**

**Co-Defendant Underscores the Prejudice in Robinson's Case**

The likelihood that trial counsel's deficient performance prejudiced Robinson's sentence is underscored by the result reached in the companion case of *United States v. L.J. Britt*, Case No. 4:00-CR-00260-15. Though not identical, there are numerous similarities between their cases. Both Robinson and Britt had been charged with personally killing two individuals and with participating extensively in the interstate drug trafficking operation. Both had been linked

95

to the Dermott Crips.  Both were accused of committing prior acts of violence, in addition to the

capital crimes.  Brit had been accused of twice burglarizing and then robbing a family at

gunpoint.  The second time, he fired a warning shot in the presence of four young children when

the frantic wife failed to produce some money.  (Volume 24, Reporter's Transcript from *United

States v. L. J. Britt*, Case No. 4:00-CR-00260-15, at pp. 9-18 (hereinafter "BRT").)   Robinson

had been accused of shooting at the truck of one of his drug customers as well as the home of her

parents.  Robinson was also implicated, albeit falsely, in the Williams assault.[28]  Notwithstanding

the many similarities, Britt's life was spared, Robinson was sentenced to die.[29]

Unlike Robinson's trial counsel, the defense attorneys for Britt presented a multitude

of character and background witnesses on his behalf.  The evidence offered at Britt's trial

consisted of introducing residual doubt and highlighting Britt's good character.  Britt's younger

sister, Felicia, characterized him as a kind and loving brother who had been positive influence

on her life, including encouraging her to graduate from high school. (24 BRT 73-91.)  Britt's

first cousin recounted his generosity when she was confined to a wheelchair, including cooking,

babysitting for her children, and even the un-glamorous task of emptying her commode.

(24 BRT 92-105.)  A close friend explained the attention Britt had shown towards her eight

children and had often babysat for them.  (24 BRT 114-25.)  Kimmy Burnett, his current

---

[28]  Each were known by a menacing nickname, Robinson was called "Scar Face" while Britt was called "Capone."

[29]  Obviously, there are some differences, too.  Robinson had been implicated in an additional drug-related murder although there was no allegation that he was involved personally in the shooting.  Britt had an extensive record of felony convictions, Robinson did not.  But the most dramatic distinction by far was the amount and quality of mitigating evidence presented during their respective penalty phases.

Exhibit A - 000121

girlfriend, testified about his constant moral support.  He inspired her to remain in college when she was determined to quit and spent significant time with her nephew practically raising him as his own son.  (24 BRT 158-67.)  Zadrian Johnson talked about how Britt was a positive role model in his life, dissuading him from hanging out in the streets.  (24 BRT 168-74.)  All of these witnesses expressed disbelief as to Britt's guilt.  Despite overwhelming evidence to the contrary, each witness insisted that he was not involved in drug dealing, robberies, and certainly not murder.[30]

To further elucidate Britt's positive attributes, the defense called two jailers who guarded Britt following his arrest and confinement.  The first officer confirmed that Britt had no record of disciplinary infractions throughout his entire thirteen-month incarceration.  (24 BRT 6.)  The other officer listed positive contributions that Britt had made during his detention.  Just some examples of his good deeds included helping prevent a potential suicide, thwarting a potential inmate attack, quelling fights between inmates and guards, and even spoiling an escape plot. (24 BRT 6.)  In addition, the guard discussed how Britt regularly participated in Bible study and helped distribute laundry to inmates.  (*Id.*)

Apart from character witnesses, Britt's stepfather and mother testified on his behalf. Larry Robinson[31] discussed the privation that Britt suffered in his life.  (24 BRT 155-57.) He described how the family was poor and considered every day a struggle to survive. According to Larry Robinson, there were too few jobs in Dermott.  Although he suspected that

---

[30]  The defense also presented numerous letters from coaches, teachers, and friends vouching for Britt's good character.

[31]  Larry Robinson is unrelated to Robinson.

97

Britt sold marijuana, it was how he supported himself when he could not find work. (*Id.*)

Larry Robinson also offered his opinion as to Britt's character. He found Britt to be great with kids, patient and never violent. (24 BRT 137-50.) By way of example, Larry Robinson explained how Britt showed enormous restraint following his brother's murder by not trying to avenge his death. He never considered Britt much trouble and certainly not a bully to the other kids, despite his size. Larry Robinson, who had worked for the Arkansas Department of Corrections for ten years, was familiar with convicted murderers and was certain that Britt was not like them. (24 BRT 182-214.)

The defense presentation concluded with Britt's mother, Betty Jean. She related her struggle to raise Britt as a single mother when he was only two years old. Working two jobs, Betty rarely saw her children. As Britt got older, he tried to alleviate his mother's burden, whether he was repairing the house, cooking and cleaning, or babysitting for his brothers and sisters. Britt even performed well in school until he decided to drop out to take care of his son. Britt was very close to his son and had never been known to hurt him. In the end, Betty Jean made a passionate plea for his life. (24 BRT 182-214.)

While Britt's evidence was strong, the presentation paled in comparison to the wealth of available mitigating evidence in Robinson's background. According to Britt's trial counsel, Britt's mitigation presentation consisted of a lingering "alibi" defense and that Mr. L. J. Britt was "The Babysitter." (Ex. 56, Aff. of Danny Burns, at ¶ 8.) Despite an extensive investigation, Burns uncovered none of the traditional mitigating factors. (*Id.* at ¶ 6.) Britt came from a very loving close-knit family and was raised by his father and stepmother. (*Id.*) A psychologist, evaluated Britt, as well as examined his records but determined that Britt did not have any mental

98

health issues. (*Id*. at ¶ 5.) Moreover, Britt did average or better than average in school and had no apparent neurological or cognitive impairments. (*Id*.)

Unlike Britt, Robinson had many of the traditional areas of mitigation. While Britt came from a loving and supportive home, Robinson "had been deprived of the care, concern, and paternal attention that children deserve." *Eddings v. Oklahoma*, 455 U.S. 104, 116, 102 S. Ct. 869, 877, 71 L. Ed. 2d 1 (1982). While Britt had no mental problems and did well in school, Robinson suffered from brain damage and did poorly in school. Finally, evidence of Robinson's good character was at least on par with the examples of babysitting and moral support introduced on Britt's behalf. If Britt's penalty phase case was enough to convince the jury to spare his life, it follows *a fortiori* that a presentation reflecting all available mitigating evidence from Robinson's background would have also succeeded.

Of course, it is impossible to divine precisely what the jury relied upon in deciding Robinson's fate. The ultimate penalty in a capital case is not simply the answer to a technical equation but instead "reflects a reasoned *moral* response to the defendant's background, character, and crime." *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (O'Connor, J., concurring) (emphasis in original). In determining whether a defendant deserves death, a jury must weigh considerations "which are often unquantifiable and elusive." *Deck v. Missouri*, 544 U.S. 622, 633, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005). That said, given the gross disparity between the compelling mitigating evidence that could have been presented between what actually was presented, Robinson was harmed by counsel's deficient performance. Even if it cannot be conclusively proven that the entire jury would not have been dissuaded from

99

a sentence of death, there is a reasonable probability that at least one juror would have held out for life.  Consequently, Robinson has adequately satisfied the prejudice standard.

## II.   GROUND TWO:   THE PROSECUTOR VIOLATED EQUAL PROTECTION BY EXERCISING PEREMPTORY CHALLENGES BASED UPON A RACIALLY DISCRIMINATORY MOTIVE

Robinson's capital trial fell far short of the Fourteenth Amendment's guarantee to "equal protection under the law."  U.S. Const. Amend. XIV.  As set forth below, the jury that decided his case was selected in a racial discriminatory manner.  The selection of Robinson for prosecution under the Federal Death Penalty Act was also the product of institutional discrimination against Black people, who are prosecuted for federal capital crimes in Texas at a grossly higher rate than in the rest of the United States.

### A.   The Causal and Peremptory Strikes Against Black Jurors

Robinson's 125-person venire panel contained nine black females and one black male. Of  the eight black jurors that were questioned on voir dire, only one black female was selected to serve. (Voir Dire of Sheila Rayfield, 7 RT 92.)  The prosecution struck four black jurors for cause, citing the venirepersons' opposition to the death penalty.  (Voir Dire of Mary Hicks, 3 RT 10; Voir Dire of Frankie Vanzetta Johnson, 4 RT 134; Voir Dire of Carnesia Hall, 7 RT 61; Voire Dire of Jerrie Lee Small, 7 RT 134.)  The defense objected to the causal strike of Carnesia Hall on the grounds that although "she doesn't like the death penalty," Ms. Hall indicated on two or three occasions that she could impose it, given the proper circumstances.  (*Id.*; 7 RT 61-62.) Of the remaining four black jurors, three were the subject of peremptory strikes by the Government.  (Voir Dire of Charlene Boulet, 3 RT 155; Voir Dire of Dorothy Jean Debose, 4 RT 164, Voir Dire of Marchesa Amarh, 7 RT 101.)  Robinson brought *Batson* challenges to the

100

peremptory strikes of Ms. Debose and Ms. Amarh which were overruled by the court.  The Government used a combination of for cause and peremptory strikes to eliminate seven out of eight black veniremembers.

### B.  The Prosecutor's Strikes Violated Equal Protection

The Equal Protection Clause of the Constitution prohibits racial discrimination by the State in jury selection.  *Georgia v. McCollum*, 505 U.S. 42, 49, 112 S. Ct. 2348, 2354, 120 L. Ed. 2d 33 (1992);  *Batson v. Kentucky*, 476 U.S. 79, 93-94, 106 S. Ct. 1712, 1721, 90 L. Ed. 2d 69 (1986).  *Batson* held that equal protection forbids prosecutors from using peremptory challenges on the basis of a juror's race.  476 U.S. at 89.  *Batson* established a three-step test for evaluating claims that a prosecutor used a peremptory strike in violation of equal protection.  *Miller-El v. Cockrell*, 537 U.S. 322, 328, 123 S. Ct. 1029, 154 L. Ed. 2d 93, (2003) ("*Miller-El I*").  "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'"  *Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410, 2416, 162 L. Ed. 2d 129 (2005).  "Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes."  *Johnson*, 125 S. Ct. at 2416.  "'At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation'"  *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (*per curiam*).  This step "does not demand an explanation that is persuasive, or even plausible."  (*Id.*)

Third, if the State provides a race-neutral justification, "[T]he trial court then will have the duty to determine if the defendant has established purposeful discrimination."  *Batson*, 476 U.S. at 98 (footnote omitted).  "[T]he critical question in determining whether a prisoner has

101

proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El I*, 537 U.S. at 338-39. At step three, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

"In deciding if the defendant has carried his burden of persuasion, a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available'" and consider all relevant circumstances. *Batson*, 476 U.S. at 93; *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005) ("*Miller-El II*"); *Hernandez v. New York*, 500 U.S. 352, 363, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (plurality opinion) ("'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts"). Thus, "*Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El II*, 125 S. Ct. at 2331.

### 1.    Pattern of Strikes

The statistics regarding the Government's use of peremptory strikes raise a strong inference of purposeful discrimination. Of the nine black members on Robinson's 125-person venire panel, only one was selected to serve. While four black members were excluded for cause and one was never subjected to voir dire, three of the four black members who remained were peremptorily struck by the prosecution. The Government therefore used its peremptory strike power to eliminate 75% of eligible black venire members from service on the jury.[32] Black

---

[32]    The combination of Government-initiated causal strikes and peremptory strikes resulted in the elimination of seven out of eight, or 87.5%, of black jurors who were subjected to voir dire.

Exhibit A - 000127

members constituted only 7.2% of the venire panel but were the target of three out of twelve, or 25%, of the Government's peremptory strikes. The disparity between black members presence on the venire and their subsequent removal is not likely the product of chance.

### 2.    Comparison of White Jurors Seated

"If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination at *Batson's* third step." *Miller-El II*, 125 S. Ct. at 2325. Opposition to the death penalty was the basis of the Government's causal strikes against Mary Hicks (3 RT 10); Frankie Vanzetta Johnson (4 RT 134); Carnesia Hall, (7 RT 61); Jerrie Lee Small, (7 RT 134) as well as the peremptory strikes against Ms. Debose (4 RT 164) and Ms. Amarh (7 RT 103). A review of the jurors who were seated[33], however, reveals that the Government did not seek to eliminate white jurors who expressed reservations about capital punishment.

Jimmy Broome, a white male, stated on voir dire that he would only use the death penalty in "extreme cases" (2 RT 75), that it would be "very hard" (2 RT 75) for him to participate in the penalty process, that he was "certainly uncomfortable" (2 RT 76) with capital punishment and that he thought it was good that the law puts so many hurdles in the path of the death penalty. (2 RT 86.) Shirley Mills, a white woman who was seated, stated it would "bother her a great deal" (3 RT 139) to participate in a process where the ultimate result may be execution, that although she could vote for the death penalty, it would be "very difficult" (3 RT 145) and that "the thought of being responsible for someone's death is something that would not be an easy

---

[33]    The Government seated one black juror, eleven white jurors and two alternate jurors, both of whom were also white.

103

decision" for her. (Voir Dire of Shirley Mills, 3 RT 148.)  David Tribout, a white juror, stated that he was "very sorry" the death penalty had to exist (4 RT 5), that the imposition had to be done "amazingly carefully" (4 RT 5) and that he "had a hard time" saying he was for capital punishment though he was not against it either.  (Voir Dire of David Tribout, 4 RT 13.)  Finally, Dana Banser, a white woman who was seated, indicated that she would always vote for life imprisonment over the death penalty (4 RT 109-110), that as a Christian she believed that imposing the death penalty is a decision she would carry with her the rest of her life (4 RT 110) and that she considered life without parole a death sentence as well.  (Voir Dire of Dana Banser, 4 RT 117.)  The fact that the Government allowed white, but not black, venire members who had reservations about the death penalty to serve is evidence of purposeful discrimination.

### 3.    The Peremptory Strike of Ms. Amarh

The Government's aggressive questioning of Marchesa Amarh, a 40-year-old black female, also supports a finding of purposeful discrimination. Ms. Amarh was peremptorily stricken based on the Government's assertion that she "expressed great reluctance" to impose the death penalty.  (Voir Dire of Marchesa Amarh, 7 RT 103.)  Like many white jurors, Ms. Amarh gave ambiguous answers on her jury questionnaire regarding her views on the death penalty.  She indicated that she was not in favor of the death penalty, but explained that "it depend (sic) on the circumstances of the crime."  (Ex. 40, Juror Questionnaire of Marchesa Amarh.)   She further indicated she believed "that the death penalty is appropriate for some crimes involving murder and I could return a verdict which assessed the death penalty in a proper case."  (*Id.* at 46.)  During voir dire, immediately after Ms. Amarh stated "there are some circumstances (sic) that do deserve the death penalty," (7 RT 88) the prosecutor told Ms. Amarh that he got the impression

104

Exhibit A - 000129

she was a "conscientious objector."  (7 RT 89.)  After Ms. Amarh again indicated that she did not

support the death penalty but could impose it depending on the circumstances, (7 RT 89), the

prosecutor then engaged in an extended narrative, stating

> ...there are some people who out of a sense of goodness, justice,
> mercy, faith, whatever it may be, know in their heart of hearts that if
> it came down to that and in any case, they know they would say 'let
> God choose the time.' I just can't do that.  And I suppose the question
> is, does that describe Marchesia Amarh?

(Voir Dire of Marchesa Amarh, 7 RT 91.)

Ms. Amarh declined to make an affirmative response and reiterated for the third time that

her decision to impose the death penalty would depend on the circumstances of the case.  (*Id.*)

A review of the entire voir dire reveals that none of the white jurors who were peremptorily

stricken were subjected to the "conscientious objector" colloquy, despite the fact that some of

them expressed hesitation about imposing the death penalty.  (Voir Dire of William Watson,

2 RT 6; Voir Dire of Buddy James, 2 RT 200; Voir Dire of Kristie Kate Martinets, 3 RT 27;

Voir Dire of Carolyn Sue Mooney, 4 RT 59, Voir Dire of Margaret Susan Kahler, 5 RT 120,

Voir Dire of Tracey Neal Smith, 6 RT 21; Voir Dire of Johnny Lloyd Cryer, 6 RT 30, Voir Dire

of Brenda Kay Broadwell, 7 RT 66; Voir Dire of Bill Bear, 8 RT 58.)

The Government's claim that it struck Ms. Amarh for the same, race-neutral reasons that

white jurors were stricken does not withstand scrutiny.  In justifying the peremptory strike of

Ms. Amarh, the Government referenced its prior strike of Brenda Broadwell, a 45-year-old white

woman "whose views on the death penalty were quite similar, if not congruent, with those

expressed by Ms. Amarh."  (Voir Dire of Brenda Broadwell, 7 RT 103.)  In her jury

questionnaire, Ms. Broadwell indicated that she was in favor of the death penalty, that the death

105

penalty says "certain types of behaviors will not be tolerated," and that she could impose a sentence of death even when life without the possibility of parole was an option." (Ex. 41, Juror Questionnaire of Brenda Broadwell, Nos. 45-46, 52a.) When asked how she felt about the death penalty as a punishment, Ms. Broadwell replied "I personally do believe in the death penalty" (7 RT 70) and that she "would not have a problem" making the decision between life and death. (Voir Dire of Brenda Broadwell, 7 RT 72.) The Government's questioning of Ms. Broadwell then focused on the fact that Ms. Broadwell had been molested as a child (7 RT 72) and that she had expressed an unusual interest in serving on the jury. (*Id.*) Given Ms. Broadwell's clear, unambiguous support of the death penalty, the Government's claim that it struck Ms. Amarh and Ms. Broadwell for similar reasons is not credible. The Government's use of Ms. Amarh's views on the death penalty is a pretext for purposeful discrimination.

### 4.    The Peremptory Strike of Dorothy Jean Debose

The prosecutor's inability to state a "a clear and reasonably specific explanation," (*Batson*, 476 U.S. at 98, n. 20) of his race-neutral reason for striking Dorothy Jean Debose, demonstrates that he intended to exclude black jurors on account of race. When asked to justify its peremptory strike of Ms. Debose, a 56-year-old black female, the prosecutor initially stated that she was "known to members of [his] family" and that he had "reputation information concerning Ms. Debose." (Voir Dire of Dorothy Jean Debose, 4 RT 164.) He then added that he had reviewed the cases of both Ms. Debose's husband and brother for drug offenses and felt that "a woman [such as Ms. Debose] who has had that experience" and "who would be of the same age as the defendant's mother, would not be a juror acceptable to the state." (*Id.*; 7 RT 165.) When the trial court asked for specific information, the prosecutor claimed "only a vague

106

recollection ... in my early days in this office" that there was a "writ of habeas corpus" for "some relative of the defendant Debose." (*Id.*; 4 RT 166.)  Finally the prosecutor claimed that Ms. Debose's husband had pleaded guilty to a federal drug trafficking crime before another judge in that district. (4 RT 166-67.)  When the court's questioning persisted, the prosecutor conferred with co-counsel and altered his reason for the peremptory strike, stating the Government has a "general feeling that Ms. Debose expressed what I perceived to be a reluctance regarding the death penalty."  (4 RT 167.)  The Government's willingness to shift its rationale based on the court's questioning suggests a discriminatory motive.

Moreover, none of the reasons cited by the Government–Ms. Debose's "reputation," age, connection to a federal drug case and her views on the death penalty–are credible.  First, Ms. Debose stated that she did not know and had never heard of the prosecutor, thereby undermining his claim that she was "known to members of [his] family."  (Ex. 42, Juror Questionnaire of Dorothy Jean Debose, at No. 110; Voir Dire of Dorothy Debose, 4 RT 164.)  Second, the Government's concern about the possibility that Ms. Debose would be impartial because she may be the same age as Robinson's mother is not only speculative, but incredible given that Ms. Debose is not herself a mother.  (Ex. 42, Juror Questionnaire of Dorothy Debose, at p. 13.)  Third, the PACER system of the Northern District of Texas does not reveal there ever having been a federal case involving Luster K. Debose, Ms. Debose's husband.  (*Id.* at p. 10.)  Given that Ms. Debose's jury questionnaire stated her spouse was convicted of drug possession, not trafficking, before their marriage (*Id.* at pp. 73-74), the Government's failure to question Ms. Debose on the nature and effect of any prior conviction suggests that the proffered reason was not truly of concern to the Government.  It should also be noted that the Government did not

107

strike Michael Chatham, a white man whose stepson was in prison, despite the fact that the same rationale would apply to him as well. (Voir Dire of Michael Chatham, 3 RT 67.)  Finally, the Government's claim that Ms. Debose's expressed reluctance on the death penalty is not credible, since she stated she could assess the death penalty under the proper set of circumstances (Ex. 42, Juror Questionnaire at 47), could recommend a sentence of death even if life without parole was an option (*Id.* at No. 52a), and agreed that "we must have the death penalty for some crimes." (*Id.* at No. 29.)

### 5.    The Peremptory Strike of Charlene Boulet

Though the Government was not forced to justify its peremptory strike of Ms. Boulet, nothing in her jury questionnaire or voir dire would indicate that she would be an unacceptable juror for the Government.  Ms. Boulet is a 40-year-old black female who expressed firm support for the death penalty, stating "it serves its purpose" and that she "ha[s] no problem with it" so long as the evidence proved the defendant guilty.  (Voir Dire of Charline Boulet, 3 RT 71.) Furthermore, Ms. Boulet revealed that her cousin was murdered by an ex-girlfriend who was sentenced to only a few years in prison, a punishment Ms. Boulet felt was too lenient.  (*Id.*; 3 RT 73.)  Much of the Government's questioning of Ms. Boulet was focused on non-substantive matters, including her work as a restaurant manager (3 RT 73), her love of basketball (3 RT 74), and her admiration for Dr. Phil, a regular guest on the Oprah Winfrey Show.  (*Id.*; 3 RT 75.) After reaffirming that she could listen to the evidence and has no qualms or reservations about sitting on a capital case (3 RT 76), the Government peremptorily struck Ms. Boulet without explanation.  (*Id.*; 3 RT 155.)  Because the defense is permitted to rely on the fact that peremptory strikes permit those to "discriminate who are of a mind to discriminate," (*Batson*,

476 U.S. at 96), the prosecutor's elimination of Ms. Boulet supports a finding that the

Government excluded jurors from service on Robinson's jury on account of race.

### III.    GROUND THREE:  THE PROSECUTOR VIOLATED DUE PROCESS AND EQUAL PROTECTION BASED UPON THE ARBITRARY AND DISCRIMINATORY DECISION TO SEEK THE DEATH PENALTY

The Equal Protection violation that Robinson suffered is not limited to the prosecutors'

exercise of their peremptory challenges in a racially discriminatory manner.  The Federal Death

Penalty Act, as applied to Robinson, violates his right to Equal Protection because federal

authorities in Texas have applied the Act in a racially discriminatory manner.  A defendant who

raises an Equal Protection violation has the burden of proving the existence of "purposeful

discrimination."  *McClesky v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1986).

The Court in *McCleskey* also stated, "a corollary to this principle is that a criminal defendant

must prove that the purposeful discrimination 'had a discriminatory effect' on him."  *McClesky*,

481 U.S. at 293, 107 S. Ct. at 1756 (citations omitted).  The Court "has accepted statistics as

proof of  intent to discriminate . . . Although the statistical proof normally must present a 'stark'

pattern to be accepted as the sole proof of discriminatory intent under the Constitution."  *Id.*

(quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555,

50 L. Ed 2d 450 (1977)).

The statistics  regarding application of the death penalty in Texas bespeak a prima facie

case of "discriminatory effect."  Federal death penalty trials in the state of Texas have resulted

in ten death penalty verdicts.  Texas has sent more defendants to federal death row than any other

state in the nation.  Texas has sent 10 men to federal death row.[34]  Eight are Black.  One is

Latino.  And one is White.  Thus, 80% of the federal death row defendants from the state of

Texas are Black.  The percentage of Black people sentenced to death in Texas under the Act is

substantially higher than the percentage of Black people sentenced to death under the Act in the

nation as a whole.  The national average, which is often criticized as rationally discriminatory,

is approximately 57%.  The percentage of Black people in Texas sentenced to death under

the Act far exceeds the percentage of Black people in the general population of the state.

According to the 2000 Census, 12.3% of the population is black.  Yet 80 % of the federal death

row inmates from Texas are Black.  The statistics for the Northen District of Texas are even

worse.  All four defendants from this district who have been sentenced to the federal death

penalty are Black.  (*See* Ex. 66, Decl. of James Morgan and Table of Federal Death Row

Defendants.)  The federal prosecutors from this district unsuccessfully sought the death penalty

against a fifth defendant, L. J. Britt.  Mr. Britt is also black.  The evidence uncovered to date

reveals that 100% of all federal capital prosecutions in the Northern District of Texas have been

against Black defendants.  Thus, the statistics in Texas create a "stark pattern" of racial

discrimination in the use of the federal death penalty.

In addition to demonstrating the discrepancies in the imposition of the death penalty,

Robinson can also point to the racial disparity in the federal government's decision to pursue a

capital prosecution.  From February 2001 to February 2005, John Ashcroft served as the United

States Attorney General.  During that time, he reviewed 626 "death-eligible" cases  and

---

[34]  They are: Orlando Hall, Bruce Webster, Christopher Vialva, Brandon Bernard, Julius Robinson, Alfred Bourgeois, Sherman Fields, Shanon Agostky.  Two others, Juan Garza and Louis Jones, have already been executed.

110

authorized 144 for the death penalty.  (Ex. 73, Decl. of Margaret O'Donnell, at ¶ 5.)  Based

solely on the defendant's race, USAO's were more than twice as likely to charge Blacks (275

out of 626 or 44%) with a capital qualifying offense than Whites (113 out of 626 or 18%).

(Ex. 73, Decl. of Margaret O'Donnell, at ¶ 4.)

The racial disparity is only heightened when the race of the victim is taken into

consideration.  Among the cases forwarded for review by the USAO's, there were 71 interracial

murders involving Whites (12 murders against non-White victims), Blacks (51 murders against

White victims), and Hispanics (8 murders against White victims). (Ex. 73, Decl. of Margaret

O'Donnell, at ¶ 6.)  Among the cases authorized for the death penalty by the DOJ, there were

27 interracial murders total (four White defendants committing murders against non-White

victims, 22 Black defendants committing murder against White victims, and one Hispanic

defendant committing a murder against a White victim).  (*Id.* at ¶ 6.)   For White defendants,

only 12% of the cases forwarded for review involved a non-White victim and, of those, only 33%

were authorized.  (*Id.* at ¶ 6.)  In contrast, for Black defendants, 22% of the cases forwarded for

review involved a white victim with 42% of those cases being authorized for the death penalty.

(*Id.*)

Robinson concedes that at this point he has not proven discriminatory intent within the

meaning of *McCleskey*.  However, the statistics raise an strong inference of intentional racial

discrimination.  Nor does Robinson rely "solely" on statistics to prove his claim of racial

discrimination.  The prosecutors who tried his case participated in the DOJ death penalty

protocols that resulted in the authorization to seek the death penalty against Robinson.  These

same prosecutors engaged in disparate questioning of Black potential jurors during voir dire,

which stands as further evidence of discriminatory intent that is unrelated to the statistical proof.

The general Texas statistics, coupled with the *Batson* challenges in this particular case, constitute

a prima facie case that the Federal Death Penalty Act, as applied in the state of Texas,

discriminates against Black people, and that Robinson himself has been discriminated against.

Robinson requests discovery and an evidentiary hearing to develop evidence that the disparate

impact of the Federal Death Penalty Act on Black People in Texas is the result of purposeful

discrimination.

## IV.    GROUND FOUR:  APPELLATE COUNSEL DEPRIVED ROBINSON OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

The Supreme Court has held that a criminal defendant has the right to effective assistance

of counsel on appeal.  *Smith v. Robbins*, 528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000);

*Smith v. Murray*, 477 U.S. 527, 535-36, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986).

The Court in *Robbins* has held that the standard for evaluating ineffective assistance

of appellate counsel is the same as is used in any other ineffective-assistance-of-counsel claim:

> [T]he proper standard for evaluating Robbins' claim that appellate counsel was ineffective in failing to file a merits brief is that enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1980). . . Respondent must first show that his counsel was objectively unreasonable, *see Strickland*, 466 U.S. at 687-691, 104 S. Ct. 2052, in failing to find arguable issues to appeal . . .  If Robbins succeeds in such a showing, he then has the burden of demonstrating prejudice.  That is, he must show a reasonable probability that, but for his counsel's failure to file a merits brief, he would have prevailed on his appeal. (*See Id.* at 69, 104 S. Ct. 2052.)

*Robbins*, 528 U.S. at 285-86.  The Court also held that ineffective assistance of

appellate counsel can be "based on counsel's failure to raise a particular claim" as long as

112

Robinson demonstrates deficient performance and prejudice. *Id.* at 288.

The same lawyers who represented Robinson in the trial court represented him on appeal. Robinson urged the lawyers to attack the jury instruction regarding continuing criminal enterprise (CCE) and other issues. Defense counsel refused to do so. Robinson asked his lawyers to provide him with a copy of trial transcripts. The lawyers refused to do so. Against this background, Robinson filed a *pro se* request for new appointed counsel on appeal, which was denied. The Fifth Circuit also denied Robinson's request to the court to provide him with a copy of the reporter's transcript. All of this is indicative of a major breakdown of the attorney-client relationship and raises questions of further ineffective assistance of counsel on appeal.

A.    **Defense Counsel's Failure to Raise the *Batson* Issue on Appeal Was Deficient Performance.**

Counsel's failure to raise the *Batson* issue on direct appeal is one example of their deficient performance on appeal. The facts and circumstances of the *Batson* issue demonstrate that it was a strong potential appellate issue. The 125-person venire panel included only nine Black women and one Black man. Of the ten Black venire persons, eight made it into the jury box as prospective jurors. The prosecution then used causal and peremptory strikes to remove seven of the eight Black potential jurors. The final jury that was seated was composed of 11 Whites and 1 Black. Both alternate jurors were also White.

Given the prosecution's aggressive use of for-cause challenges against Black people, its use of peremptory challenges to strike three of the four remaining Black jurors, and the racial composition of the seated jury, it was "objectively unreasonable" for counsel to fail to raise the *Batson* issue on appeal.

Exhibit A - 000138

At the time counsel was researching and preparing Appellant's Original Brief, it was well known that the United States Supreme Court had expressed concerns that the Fifth Circuit had failed to seriously consider a claim that the prosecutors used peremptory challenges against Black people in a racially discriminatory manner. Four months before the filing of Robinson's brief, on February 25, 2003, the Supreme Court issued its opinion in *Miller-El II*. As the ABA guidelines note, appellate counsel was under a duty to familiarize himself with the pending law and to apply it to Robinson's case.

### B.    The Failure to Raise the Batson Issue Prejudiced Robinson's Case

The Supreme court's opinion in *Miller-El II* demonstrates the prejudice to Robinson's case. The Court in *Miller-El II*, held that the Texas courts' determination that the prosecutors had not engaged in racial discrimination was objectively unreasonable and granted habeas relief. Many of the factors discussed in *Miller-El* apply to this case. As in *Miller-El II*, the prosecutor engaged in disparate questioning of black jurors. As in *Miller-El II*, the prosecutors struck all but one Black potential juror from the jury. As in *Miller-El II*, the prosecutor's offered race-neutral reasons cannot survive a comparative analysis.

If the petitioner in *Miller-El II*, who was on collateral review and subject to the restraints of AEDPA, prevailed on his *Batson* claim, there is certainly a "reasonable probability" that Robinson would have prevailed on his direct appeal in the Fifth Circuit. The failure to even raise the issue precluded Robinson from appealing a strong legal issue.

114

Exhibit A - 000139

V.    GROUND FIVE:  THE PROSECUTION VIOLATED DUE PROCESS BY
        PURSUING FUNDAMENTALLY INCONSISTENT THEORIES AT
        SERIATIM CAPITAL TRIALS

Robinson and a co-defendant, L.J. Britt, were tried separately in seriatim capital trials. Robinson was tried first. The prosecutor argued at Robinson's trial that Robinson was primarily responsible for the murders. The prosecutor portrayed Robinson as the leader and most culpable participant in the murder of Shelton. The prosecutor emphasized Robinson's participation in and responsibility for the murders. L.J. Britt was tried second. At Britt's trial, the prosecution argued that L.J. Britt was the leader and most culpable participant in the murders.

The use of inconsistent theories at seriatim trials violates due process. In the context of capital trials, the use of inconsistent theories also violates the Eighth Amendment because it interjects unreliability into capital sentencing.

The Supreme Court has addressed prosecutorial inconsistency three times – always in the context of a prosecutor taking inconsistent positions about the actual killer in seriatim capital trials. In each case, members of the Court have expressed deep concerns about a prosecutor tendering inconsistent evidence and arguments in capital trials. In *Green v. Georgia*, 442 U.S. 95, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979) (*per curiam*), two defendants, Moore and Green, were prosecuted for rape and murder in separate trials. At Moore's trial, the prosecutor elicited testimony from a witness that Moore had admitted shooting the victim twice after ordering Green to run an errand. Moore was convicted and sentenced to death. At the second trial, Green sought to admit the prior testimony of the witness who had testified at Moore's trial that Moore admitted shooting the victim himself while Green was gone. The trial court excluded the witness's prior testimony based on state hearsay rules. The prosecutor then argued that "in the absence of direct

115

evidence as to the circumstances of the crime, [the jury] could infer that [Green] participated directly in [the victim's] murder from the fact that more than one bullet was fired into her body." *Green*, 442 U.S. at 95. The Court held that the exclusion of the witness's prior testimony violated due process because it "denied petitioner a fair trial on this issue of punishment." *Id.* at at 97.

In the second case, *Jacobs v. Scott*, 513 U.S. 1067, 115 S. Ct. 711, 130 L. Ed. 2d 618 (1995), two Justices dissented from the denial of certiorari and condemned prosecutorial inconsistency as "fundamentally unfair." *Jacobs,* 513 U.S. at 1068. Jacobs and his sister, Bobbie Hogan, were each charged with kidnaping and murdering a woman in the woods. At Jacobs' trial, the prosecution introduced Jacobs' confession that he had abducted and fatally shot the victim and testimony that Jacobs had led investigators to the body. Jacobs, however, testified that the confession was false and that he had made it in hopes of getting the death penalty rather than life imprisonment. He testified that he had kidnaped the victim and brought her to a cabin in the woods, but it was Hogan who shot the victim. According to Jacobs, he had not known that Hogan was armed and was not present when the killing occurred. The prosecutor argued to the jury that "the simple fact of the matter is that Jesse Jacobs and Jesse Jacobs alone killed the victim." Jacobs was convicted and sentenced to death.

At Hogan's subsequent trial, the prosecutor abandoned his theory that Jacobs had killed the victim and instead called Jacobs as a prosecution witness to testify that Hogan was the killer. The prosecutor told the jury that he had "changed my mind about what actually happened . . . And I'm convinced that Jesse Jacobs is telling the truth when he says that Bobbie Hogan is the one that pulled the trigger." Justice Stevens wrote:

116

> For a sovereign state represented by the same lawyer to take flatly inconsistent positions – and to insist on imposition of the death penalty after repudiating the factual basis for that sentence – surely raises a serious question of prosecutorial misconduct. In my opinion, it would be fundamentally unfair to execute a person on the basis of factual determination the State has formally disavowed.

*Jacobs,* 513 U.S. at 1068.

Most recently, in *Bradshaw v. Stumpf*, 545 U.S. 175, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005), the Court revisited the issue of prosecutorial inconsistency. In this case, the prosecutor argued inconsistent theories at two capital trials. At the first trial, Stumpf pleaded guilty to capital murder, but the case proceeded to penalty phase before a three-judge panel. At the penalty phase, the prosecutor argued that Stumpf fatally shot the victim and that, as the actual killer, he deserved the death penalty. The panel found that Stumpf was the principal and sentenced him to death.

At the second capital trial, the same prosecutor argued that Wesley actually shot and killed the victim. The jury convicted Wesley but recommended 20 years to life rather than the death penalty.

The Court held that the prosecutorial inconsistency was "immaterial" to Stumpf's conviction, but remanded the case to the court of appeals to determine whether the prosecutorial inconsistency rendered his death sentence unconstitutional. In his concurring opinion, Justice Souter acknowledged that several "remedial questions" about a due process violation based on prosecutorial inconsistency remained unanswered. *Bradshaw,* 125 S. Ct. at 2409. "May the death sentence stand if the State declines to repudiate its inconsistent position in the codefendant's case? Would it be sufficient simply to reexamine the original sentence and if so,

117

which party would have the burden of persuasion?  If more would be required, would a *de novo* sentencing hearing suffice?" *Bradshaw,* 125 S. Ct. at 2409.

Given the above, the court should find that the prosecution's pursuit of inconsistent theories regarding participation in the murders and relative culpability at the seriatim trials violated Robinson's right to due process and the Eighth Amendment.

## VI.    GROUND SIX:  THE PROSECUTION VIOLATED DUE PROCESS BY KNOWINGLY USING FALSE AND MISLEADING TESTIMONY DURING THE PENALTY PHASE

The Supreme Court has held that the prosecution's presentation of false evidence at trial violates due process. *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 1217 (1959) (presentation of material false evidence violates due process if the prosecutor knew or should have known of the falsity).  The prosecutor cannot sit silent while false testimony is given, even if he is not directly responsible for the false testimony.  *Alcorta v. Texas*, 355 U.S. 28, 78 S. Ct. 103, 2 L. Ed. 2d 9 (1957).  Due process also requires the prosecution to disclose material exculpatory evidence to the defense.  *Bradshaw v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

As noted above, one of the Government's principal arguments for death was the allegation that Robinson ordered others in Dermott, Arkansas to kill Michael Williams in order to prevent his testimony. Louis Johnson, however, told the FBI that the assault against Williams occurred because he had sold Jordan, Eddington, and Pitts some bad "dope" and that they wanted their money back.  Despite having information that the abduction was unrelated to Robinson, the Government persisted in its efforts to paint Robinson as a dangerous murderer even while incarcerated.  The prosecution made no effort either to correct the misapprehension in front of

118

the jury or to tell defense counsel about Johnson's perspective.

**VII.    GROUND SEVEN:   THE INDICTMENT VIOLATED THE FIFTH AMENDMENT BY FAILING TO INCLUDE AGGRAVATING FACTORS FOR THE CAPITAL CHARGE**

The Grand Jury Clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . ." U.S. CONST. amend. V; *see also United States v. Calandra*, 414 U.S. 338, 343, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974) (citation omitted) ("In this country the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by a 'presentment or indictment of a Grand Jury'"). This requirement extends to every element of the offense as well as "any fact ... that increases the maximum penalty for a crime must be charged in an indictment." *Jones v. United States*, 526 U.S. 227, 243 n.6, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999); *Apprendi v. New Jersey*, 530 U.S. 466, 476, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Finally, aggravating factors which render a defendant eligible for the death penalty must also be presented to the grand jury. *Ring v. Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

At both trial and on appeal, Robinson alleged that the failure to submit the capital charge to the grand jury violated the Indictment Clause of the Fifth Amendment. Even though the Fifth Circuit found the omission rose to constitutional error, the Court held the error was susceptible to harmless error analysis. *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004). In reaching its conclusion, the Fifth Circuit relied predominantly on the Supreme Court's decision in *United States v. Cotton* as support for its holding. *United States v. Cotton*, 535 U.S. 625, 634, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002). There, the Supreme Court concluded that the failure to include

119

the amount of drugs in the indictment did not constitute plain error.  But the *Cotton* Court, contrary to the Fifth Circuit's suggestion, never definitively resolved whether the omission from the indictment constituted structural error.  Instead, the *Cotton* Court assumed, without deciding, that the defendant's substantial rights were affected.  Ultimately, the *Cotton* Court found it unnecessary to address the issue of structural error because the omission did not "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" (quoting *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)).  At best, this dicta from *Cotton* only supports the proposition that indictment error *is* structural.

Assuming *arguendo* the Fifth Circuit correctly interpreted *Cotton,* it is clear that recent decisions of the Supreme Court cast doubt on the Fifth Circuit's holding.  In *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006), the Supreme Court concluded that the erroneous deprivation of the defendant's counsel of choice constituted structural error.  Initially, the *Gonzalez-Lopez* Court reaffirmed the traditional structural error definition announced in *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991): "those that 'affec[t] the framework within which the trial proceeds,' and are 'not simply an error in the trial process itself.'"  But the *Gonzalez-Lopez* also concluded that structural error may be based upon "the difficulty of assessing the effect of the error" and "the irrelevance of harmlessness"  Gonzalez-Lopez, 126 S. Ct. at 2564 & n.4; *Waller v. Georgia*, 467 U.S. 39, 49 n.9, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (violation of the public-trial guarantee is not subject to harmlessness review because "the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance"); *Vasquez v. Hillery*, 474 U.S. 254, 263, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) ("[W]hen a petit jury has been selected upon improper criteria or has been

120

exposed to prejudicial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained").

Applying the rationale of *Gonzalez-Lopez*, it is clear that the failure to present the capital charge, including the aggravating circumstances to the jury, amounted to structural error.  The indictment error that occurred here falls into the latter two categories identified in *Gonzalez-Lopez*.  First, it is difficult - if not impossible - to assess the effect of failing to present the capital charge to the grand jury.  Even assuming the grand jury would have found probable cause to support the aggravating circumstances, there is no way of knowing whether the grand jury would have forwarded the capital charge for prosecution.  Second, speculation as to what a hypothetical grand jury might have done is irrelevant.  Because the grand jury did not sanction a capital charge against Robinson, a capital prosecution could not have proceeded.  U.S. CONST. amend. V ("No person shall be held to answer for a *capital*, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . .")

The fundamental defect in the Fifth Circuit's analysis is its failure to recognize the dual purpose of the grand jury.  Relying on *Neder v. United States*, 527 U.S. 1, 7-9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), the Fifth Circuit likened the failure to present a capital charge to a grand jury to the failure to include an element of the crime in petit jury instructions.  In one respect, this simplistic comparison is appropriate because the grand jury's determination of probable cause is similar to a petit jury's determination of guilt.

But the grand jury's role is not confined to determining probable cause alone.  *Vasquez*, 474 U.S. at 263 ("The grand jury does not determine *only* that probable cause exists to believe that a defendant committed a crime") (emphasis added).  Apart from its fact-finding role, the

121

defining feature of the grand jury is its independence. *Stirone v. United States*, 361 U.S. 212, 218, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960) (emphasizing that independence of the grand jury is essential to the "very purpose" of the grand jury right); *accord Wood v. Georgia*, 370 U.S. 375, 390, 82 S. Ct. 1364, 8 L. Ed. 2d 569 (1962) (recognizing "[t]he necessity to society of an independent and informed grand jury." Such independence of the grand jury derives directly from the constitution itself: *United States v. Williams, 504 U.S. 36, 49, 112 S. Ct. 1735, 118 L. Ed. 2d 352 (1992)* (quoting *United States v. Dionisio*, 410 U.S. 1, 16, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973) ("the Fifth Amendment's 'constitutional guarantee presupposes an investigative body acting independently of either the prosecuting attorney or judge.'") (emphasis in original; internal quotations omitted).

A manifestation of that independence is the Supreme Court's recognition that no court can speculate as to whether or not a grand jury would return an indictment on a particular set of facts. Thus, in *Ex Parte Bain*, 121 U.S. 1, 7 S. Ct. 781, 30 L. Ed. 849 (1887), the Court declined to speculate whether the grand jury would have adopted an amended form of the indictment created when the district court struck a portion of it: "it is not for the court to say whether [the grand jury would have returned the amended indictment] or not." *Id*. at 9; *accord Stirone*, 361 U.S. at 217 ("neither this court nor any other can know that the grand jury would have been willing to charge [a theory not contained in the indictment]"); *see also Russell v. United States*, 369 U.S. 749, 770, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962) ( "To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the grand jury was designed to secure").

122

It is precisely because of this constitutional independence that the grand jury is free to decline to return an indictment, even in the face of probable cause:

> In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts.

*Vasquez*, 474 U.S. at 263. As Judge John Minor Wisdom aptly noted:

> By refusing to indict, the grand jury has the unchallengeable power to defend the innocent from government oppression by unjust prosecution. And it has the equally unchallengeable power to shield the guilty, should the whims of the jurors or their conscious or subconscious response to community pressures induce twelve or more jurors to give sanctuary to the guilty.

*United States v. Cox*, 342 F.2d 167, 189-90 (5th Cir. 1965) (Wisdom, J., concurring specially).

The Supreme Court's recent decision in *Resendiz-Ponce* provides further support that the omission of the aggravating circumstance is structural error. *United States v. Resendiz-Ponce*, 127 S. Ct. 782, 787-88, 166 L. Ed. 2d 591 (2007). There, the Supreme Court granted certiorari to consider whether the failure to allege an overt act in an indictment charging attempted illegal reentry was subject to harmless error analysis or constituted structural error. Later, the high court sought supplemental pleading on whether this omission even rose to the level of constitutional error. In the end, Supreme Court never broached the issue of the appropriate treatment of the error. Reasoning that the word "attempt" carries with it an implied allegation of an overt act in furtherance of the charged attempt, the Court concluded that the indictments were constitutional.

Writing in dissent, Justice Scalia addressed the certified question directly. *Resendiz-Ponce*, 127 S. Ct. at 793. In his view, the omission was not only error, but structural error. *Id.* If structural error arises where the jury has not been provided with an element of the

123

Exhibit A - 000148

offense, it follows *a fortiori* that structural error results when the defendant is deprived of an opportunity for the grand jury to consider the capital charge in the first instance.

In conclusion, based upon the holding of *Gonzalez-Lopez* and the persuasive dissent in *Resendiz-Ponce*, it is clear that the Fifth Circuit's previous decision is no longer valid. Therefore, because the indictment violation defies harmless error analysis, automatic reversal of the death sentence is required.

## **CONCLUSION**

For all the foregoing reasons, the Court should vacate the verdicts.  In the alternative, the court should grant an evidentiary hearing for each of Robinson's claims.


Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender


Dated:  July 2, 2007

s/ Sean K. Kennedy
Federal Public Defender's Office
321 East 2nd Street
Los Angeles, California 90012
Telephone: (213) 894-5063
Facsimile: (213) 894-0081
E-mail: sean_kennedy@fd.org
Attorney for Defendant

Exhibit A - 000149

## CERTIFICATE OF SERVICE

I, Jesse Wallis, hereby certify that on July 2, 2007, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

SUSAN COWGER
Assistant United States Attorney
U.S. Attorney's Office
1100 Commerce Street, 3rd Fl.
Dallas, Texas  75242


 s/ Jesse Wallis
JESSE WALLIS