# THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | : | **CAUSE NO. 4:00-CR-00260-2** |
| **aka Face, aka Scar, aka Scarface,** | : | **(Civil No. 4:05-CV-756-Y)** |
| **Defendant/Petitioner,** | : | |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **UNITED STATES OF AMERICA,** | : | **United States District Judge** |
| | : | |
| **Plaintiff/Respondent.** | : | |

_____

### EXHIBIT NO. 77

**SUBMITTED IN SUPPORT OF IN SUPPORT OF DEFENDANT'S AMENDED
MOTION TO VACATE CONVICTION AND SENTENCE AND FOR
NEW TRIAL PURSUANT TO 28 U.S.C. § 2255**

(Filed Electronically Under the Electronic Filing System Requirements)

_____

**Evaluation of Teratogenic Exposure
as Mitigating Evidence in the Case of
United States v. Julius Robinson**

**A Report Submitted by
Kate Allen, Ph.D.**

**3-14-07**

## Purpose

I was retained by the Office of the Federal Public Defender, Central District of California, to conduct an evaluation of Julius Robinson. It is my understanding that in 2001 Julius Robinson was convicted of murders committed in 2000 and was sentenced to death. I was asked to determine the evidence of substance exposure-in-utero (teratogens) and conduct an evaluation of its likely effects on the cognitive, emotional, and behavioral functioning of Mr. Robinson.

This report, therefore, is an application of the principles of behavioral teratology to the life circumstances of this defendant to enable the judgment of his capacity. In the task of sentencing, these documented developmental injuries are fundamental and significant components of a mitigation presentation.

## Background

For 32 years I have practiced as a clinical social worker and I have been licensed in Texas and California. I am currently a forensic consultant and clinical trainer. I am also Professor Emerita at California State University, Sacramento, having retired from the Department of Social Work. During my tenure as associate professor at CSUS, I taught clinical courses, including psychiatric diagnoses (DSM-IV-TR) and child abuse and neglect. I have also taught on a temporary basis in the graduate school at the University of Texas at Austin, Texas Tech University, and Baylor University. In addition to graduate instruction, I have also provided a variety of professional training, mostly in California, for child welfare and mental health professionals. From 1987 to the present, I have provided numerous clinical consultations and evaluations. My practice has included extensive clinical social work in hospital settings including Shoal Creek Psychiatric Hospital in Austin, Scott and White Hospital in Temple, Texas, and University of California, Davis Medical Center in Sacramento, California. As well, I have provided clinical supervision of other social workers. In recent years I have worked extensively in a forensic capacity. Specifically, I have worked on 18 capital murder cases. I have qualified as an expert witness in both civil and criminal courts in Texas, Nebraska, Oklahoma, California, and Georgia.

Through a combination of study, practice, and research over twenty years in social work, I have developed expertise in the field of Alcohol Related Neurodevelopmental Disorder (ARND). ARND is a spectrum disorder involving developmental disability and brain injury due to maternal use of alcohol while pregnant. Since 1992 I have conducted perhaps 100 day-long

Exhibit 77 - 000001

2

training workshops (and some conference presentations) in a number of child abuse and neglect areas, but principally specializing in fetal alcohol syndrome and attachment disorder. Federal Title 4-E funds to provide clinical training to child welfare workers have been the source of much of my sponsored trainings. In this capacity, social workers must acquire the skills to recognize ARND and its sequelae, much of which is explained in this report. A great number of children currently receiving services in the child welfare system meet the criteria for ARND; my expertise has long been utilized by California training units to transmit these skills. I have consulted with and provided training to foster parents and adoptive parents with children displaying signs of ARND.

An additional area of expertise I have utilized during the last 15+ years is in the area of attachment disorder. This condition—resulting in grave developmental injuries—is also ubiquitous in the child welfare field. A large number of my training activity has focused on the assessment of attachment disorder from infancy through adolescence. The two conditions—ARND and attachment disorder—are very often seen in tandem and specialized training in each and both areas are at the center of my training career. These two topics are the core of specialized clinical training in practice with abused and neglected children. My trainings have been extensively requested in the San Francisco Bay Area (Bay Area Training Academy), in the Sacramento/Chico/Fresno corridor, in the Humboldt County area. I have also trained social workers in Los Angeles and will be training in May in San Diego. Participants in my trainings have included social workers, psychologists, psychiatrists, attorneys, foster parents, and adoptive parents.

My expertise was also the center of the course offerings at the graduate level at CSUS in the program which sponsored the graduate training of future child welfare workers. I have a reputation as the expert in these clinical areas throughout Northern California.

**Sources**

The sources used in my review of the case file include the following:
- ❑ Declaration of Mark Cunningham, Ph.D. (a comprehensive review of the case covering all factors of mitigation interest)
- ❑ Statement of and discussion with Stephen Martin, Ph.D. (neuropsychological evaluation)
- ❑ Declarations of the following friends and family members:
  --Jamila Camp
  --Josephine Dotson
  --John Hollimon, Jr.
  --Robert Hollimon
  --Jana Hollimon
  --Rose Hollimon
  --Bernice Johnson
  --Beotha Moore
  --Jimmie Lee Robinson

Exhibit 77 - 000002

3

      --Marcus Robinson
      --Willie White
- ❑ School records of Julius Robinson
- ❑ Hospital birth records of Julius Robinson
- ❑ Interview with Julius Robinson (1-29-07)
- ❑ A number of research documents on behavioral teratology (a sample of which are listed in the Bibliography)

## Opinion

After a thorough review of his case files, a lengthy interview with the defendant, and an application of behavioral teratology knowledge to this case, it is my opinion that Mr. Robinson manifests an array of the negative sequelae of substance exposure-in-utero, specifically the eventual criminal consequences of brain injury due to alcohol-related neurodevelopmental disorder (ARND), a subset of Fetal Alcohol Spectrum Disorders, as well as the teratogens nicotine, cigarette smoke, and marijuana.  Because Julius's mother injured him in utero, he was at high risk for other maternal failures (impaired attachment) and was made particularly vulnerable to the dangerous challenges of high-risk environments (abuse, neglect, poverty, drugs, discrimination, violence).  These three causative factors (teratogenic exposure, poor attachment, severe neglect amidst danger)—the latter two a direct link or correlate to fetal toxic exposure—are ample explanations of how this defendant traveled the road to criminal behavior.

## Fetal Alcohol Spectrum Disorders

### 1.  History

Fetal Alcohol Spectrum Disorder is a permanent birth defect caused by maternal consumption of alcohol during pregnancy.  Alcohol is a teratogen that inhibits and disrupts fetal development by causing structural and functional damage to developing organs and systems, including the brain and central nervous system.  The damage starts at the cellular level, where alcohol can induce excessive cell death and disrupt cell responses to molecules that regulate neuron proliferation, migration, and differentiation.  Because alcohol causes widespread damage throughout the developing fetus, there is a broad array of physical anomalies and neurobehavioral defects.

Diagnostic labels applied to fetal alcohol impairment have changed over time to reflect increasing diagnostic precision.  In 1996, the four broad diagnostic criteria for FAS were reaffirmed in a report by the Institute of Medicine that delineated five specific categories of diagnosis:
- Type 1: FAS With Confirmed Maternal Alcohol Exposure;
- Type 2: FAS Without Confirmed Maternal Alcohol Exposure;
- Type 3: Partial FAS With Confirmed Maternal Alcohol Exposure;
- Type 4: Alcohol-related Birth Defects (ARBD); and

Exhibit 77 - 000003

4

- Type 5: Alcohol-Related Neurodevelopmental Disorder (ARND).

(Institute of Medicine, *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment*, 1996).

FAS Type 1 is the "classic" FAS diagnosis and includes all four of the features typically associated with the syndrome:   a) confirmed maternal alcohol exposure, b) characteristic facial abnormalities or dysmorphology, c) pre- and/or postnatal growth retardation, and d) evidence of central nervous system neurodevelopmental abnormalities.  FAS Type 2 has all of these features except confirmed maternal alcohol exposure.  FAS Type 3 is differentiated from FAS Type 1 by virtue of the fact that only some of the facial abnormalities are present, and in addition to confirmed prenatal alcohol exposure, the individual manifests growth retardation, evidence of CNS neurodevelopmental abnormalities, and a complex pattern of behavioral or cognitive abnormalities that are inconsistent with developmental level and cannot be explained by familial background or environment alone (e.g., learning difficulties, deficits in school performance, poor impulse control, problems in social perception, language deficits, poor capacity for abstraction, specific deficits in mathematical skills, and problems in memory, attention, or judgment).  FAS Type 4 (Alcohol-Related Birth Defects, or ARBD) requires confirmed maternal alcohol exposure and one or more congenital defects including malformations and dysplasias of the heart, bone, kidney, vision, or hearing systems.  FAS Type 5 (Alcohol-Related Neurodevelopmental Disorder or ARND) requires confirmed maternal alcohol exposure, CNS neurodevelopmental abnormalities, and/or a complex pattern of behavioral or cognitive deficits.

In 2004, several federal agencies (National Institutes of Health, CDC, and Substance Abuse and Mental Health Services Administration) along with experts in the field were convened at a summit sponsored by the National Organization on FAS (NOFAS) developed a consensus definition of Fetal Alcohol Spectrum Disorders (FASD).

### 2.  Disabilities Resulting from Fetal Alcohol Exposure

According to research in the 1990s, disabilities stemming from FASD are categorized as either "primary" or "secondary" depending upon whether they are a direct manifestation of central nervous system malfunction (i.e., primary disabilities) or whether they are mediated by environmental influences (i.e., secondary disabilities).  "Primary disabilities" are defined as functional deficits that stem directly from structural brain damage and CNS dysfunction caused by prenatal ethanol exposure (e.g., Streissguth et al., 1996).   Individuals with FASD are typically born with some or many of these primary disabilities.  "Secondary disabilities" are behavioral deficits that an individual acquires over time that presumably could have been ameliorated if there had been early diagnosis and intervention in childhood.  Secondary disabilities include mental health problems, disrupted school experience, trouble with the law, confinement, inappropriate sexual behavior, alcohol/drug problems, dependent living, and problems with employment.  Postnatal environmental factors exert positive or negative influence on the expression of these secondary disabilities but have nothing to do with the expression of primary disabilities.  However, with effective treatment of primary disabilities, secondary disabilities can be prevented or at least reduced (Streissguth, 1997).   However, without accurate

Exhibit 77 - 000004

5

diagnosis and treatment, secondary disabilities manifest in adolescence and adulthood as extreme problems in psychosocial functioning that lead to adverse life outcomes.

### a. Primary Disabilities

The most serious and pervasive damage occurs in the central nervous system (CNS). Brain imaging studies over the last decade have shown that prenatal alcohol exposure causes significant malformation in structures throughout the brain (e.g., corpus callosum, basal ganglia, cerebellum) that are necessary for normal development and functioning. [See all Bookstein, et al articles.]

Research has shown that the frontal lobe of the brain, particularly the prefrontal cortex, is particularly sensitive to the effects of prenatal alcohol exposure (e.g., Bookstein et al., 2002). Alcohol seems to target the corpus callosum in particular (Bookstein et al., 2001), which is the brain structure that separates the two hemispheres and relays information (electrical impulses) between the right and left sides of the brain. When executive functions are compromised by prenatal alcohol exposure, an individual will:

- have difficulty perceiving, prioritizing, and storing information,
- have difficulty processing and retrieving that information,
- be unable to generalize and apply consequences from past actions to potential future actions,
- lack motivation and initiative,
- need external motivators such as frequent cues or guidance from others,
- be unable to perceive the effect of his/her actions on others or the social inappropriateness of those actions,
- display exaggerated emotions,
- be unable to control behaviors that stem from emotion-evoked urges, and, consequently,
- engage in a wide range of socially (and often legally) inappropriate behaviors.

### b. Secondary Disabilities

A large number of individuals with fetal alcohol impairment display secondary disabilities (Streissguth et al., 1996; Streissguth & O'Malley, 2000). For example, 60% of those in the large study sample (Streissguth et al., 1996) had been arrested, charged, and/or convicted of a crime; 50% had been in a confinement setting (i.e., psychiatric hospital, jail, prison, residential substance abuse treatment); and 30% had alcohol or drug abuse problems. The most prevalent secondary disability, experienced by 94% of those in the 1996 study, was mental health problems. For example, during childhood, 60% of children with FASD have attention deficit/hyperactivity disorder, and during adulthood, most adults with FASD become clinically depressed. The study also revealed that 23% of adults had attempted suicide, and 43% had threatened to commit suicide. Other common mental health diagnoses that co-occur with FASD include conduct disorders, oppositional defiant disorder, antisocial personality disorder, anxiety

Exhibit 77 - 000005

6

disorders, adjustment disorders, sleep disorders, and severe mental illness such as schizophrenia and bipolar disorder (Streissguth & O'Malley, 2000; Streissguth et al., 1996).

Trouble with the law (i.e., involvement with police or being charged and/or convicted of crime) was experienced by 60% of adolescents and adults in the secondary disabilities study (Streissguth et al., 1996). The most common crimes committed (by almost half of individuals with FASD ages 12-20) were crimes against persons (e.g., theft, burglary, assault, murder, domestic violence, child molestation, running away), followed by property damage, drug possession/selling, sexual assault, and vehicular crimes.

Secondary disabilities associated with fetal alcohol impairment are not just modifiable but preventable if an individual is diagnosed early and receives appropriate intervention. According to the University of Washington secondary disabilities study (Streissguth et al., 1996), specific "risk factors" *increase* the probability that a fetal alcohol impaired individual will go on to develop secondary disabilities, and specific "protective factors" *reduce* that probability. The risk and protective factors apply to an individual's childhood up to 18 years of age and are mutually exclusive. These mediating factors include the following: living in a nurturing and stable home for at least 72% of childhood, receiving a diagnosis of fetal alcohol impairment prior to age six (which permits positive interventions to be applied early in life), never having experienced violence, living for at least 2.8 years in each household, experiencing a good quality home ("good quality" was operationally defined by 12 specific factors), and having basic needs met at least 13% of the time during childhood.

## Principles of Behavioral Teratology Which Apply to This Case

Teratogens are substances known to cause adverse effects on offspring as a result of gestational exposure; those effects include death, malformation, growth deficiency, and functional deficits. Research into the consequences of teratogenic exposure must account for the effects of a wide range of variables, such as which substances, use-in-tandem, when ingested, how much, for how long, as well as a host of post-natal complications. Although death and physical birth defects are the most dramatic and easily recognizable results, society is most seriously affected when deficits in the neurological development, especially in executive functioning, handicap the fundamental thinking, judgment, and decision-making of a person-and when these deficits are permanent and have wide-ranging implications (as in the case of fetal alcohol spectrum disorder) (Chasnoff, 2001).

There are some common and significant misperceptions which need clarification.

- ❑ Teratogenic effects on a newborn can be mild, moderate, or severe.
- ❑ They may be temporary, reversible, or permanent.
- ❑ Fetal exposure to multiple teratogens strengthens the overall damage.
- ❑ All illegal and prescribed substances have the capacity to harm the newborn, but those which produce the most overall damage are, in this order: 1) alcohol; 2) nicotine/cigarette smoke (Chasnoff, 2001). Marijuana is arguably ranked third. Fetal alcohol damage causes *a variation of permanent mental retardation*. Nicotine, cigarette

Exhibit 77 - 000006

7

smoke, and marijuana have mostly indirect effects on development, but these effects, especially when taken with those of alcohol, can be severe.

❑ There is a dose/effects relationship for *each* outcome and *between* outcomes.  This means that a higher dose is required to produce malformation than that needed to produce growth deficiency (Streissguth, et al, 1988).  *Functional deficits can be produced at lower levels of exposure than those producing malformations and growth deficiency* (Connor, et al, 2000).

❑ Fetal alcohol damage which results in facial dysmorphology may reflect *higher use and/or use in the first trimester.*  Executive functioning (EF) capacity is *damaged at lower doses of use throughout the pregnancy, but more likely in the second and third trimesters.*

❑ Many women who use teratogenic substances do so *when they may not know they are pregnant* (in the first trimester or even later).

❑ Research on ARND (Connor, et al, 2001, and others) distinguishes the brain damage caused by fetal alcohol exposure as it differs from conventional IQ scores or disturbances in physical features , e.g.

> --*there is no correlation between executive functioning and*
> > *facial dysmorphology (though these terms are falling out of use,*
> > *Fetal Alcohol Syndrome has historically been used to refer to*
> > *the presence of irregular facial features; Fetal Alcohol Effects*
> > *has referred to functional deficits when facial features are more*
> > *or less normal)*

> --*significant deficits in executive functioning are not correlated*
> > *with standard measures of IQ*

> --*while there are direct effects of generally lowered IQ scores*
> > *due to exposure (the average Full Scale IQ score of those with*
> > *FAS is 79, while the FSIQ score of those with FAE is 90), there*
> > *are also serious indirect effects which are, in fact, mediated*
> > *through IQ (as evidenced in other cognitive tests such as*
> > *WCST, Stroop Word-Color Test, Trail Making Test, Ruff's*
> > *Figural Fluency Test, Consonant Trigrams Test)*

What is relevant is that the thinking and behavioral problems which arise from deficits in executive functioning are the most disturbing effects of the most damaging teratogen-alcohol. These deficits *occur at lower fetal alcohol exposure dosages* and are not correlated with IQ (which makes it not consistent with the normal mental retardation IQ criteria of FSIQ below 70) or with facial dysmorphology:  neither of these "hard" measures has bearing on the seriousness of the teratogenic effect on the frontal cortex.  *In summary, an individual can have a normal IQ score and still have significant deficits in thinking, learning, and judgment.*  To understand the full impact on an individual's cognitive and behavioral functioning, it is necessary to understand and apply these principles which are unique to ARND.

The group of cognitive abilities that are produced in the frontal cortex of the brain and referred to as executive functioning are the following:

Exhibit 77 - 000007

8

- ❑ self-regulation of behaviors
- ❑ sequencing of behaviors
- ❑ cognitive flexibility
- ❑ response inhibition
- ❑ planning
- ❑ organization of behavior

While these are judgment-related higher cognitive processes which have some direct measurability (though not necessarily by conventional IQ scores), they are also dependent on the integration of more basic processes such as motor activity, sensation, perception, attention, or memory.  In brain damage due to fetal alcohol exposure, disturbances in each and all of these more basic areas is commonly found.

**Indicators of Teratogenic Damage of Julius Robinson**

A. Damage due to Marijuana Use in Pregnancy

It is reported that Rose Hollimon smoked 12 marijuana cigarettes a day during her pregnancy with Julius.  Marijuana use in pregnancy constricts blood vessels in the uterus, cutting down on blood supply, oxygen, and nutrients available to the fetus.  Neurophysiological research focuses on the number, kind, and place of receptor sites and binding sites (e.g., one of the major cannibinoid receptor sites in the human brain is in part of the forebrain associated with higher cognitive functions).  Cannabinoids are able to affect the expression of key genes for neural development leading to neurotransmitter and behavioral disturbances.  Specifically, it affects the process of cell proliferation and migration and synaptogenesis. *The effects are shown to be greater in males than in females*.  Research also shows no major deficits in development until the child reaches 3 to 4 years (the time frame consistent with major development of executive functioning (Fried, et al, 2001).

In later childhood, prenatal marijuana use can cause the following effects which are present in the functioning history of Julius Robinson:
- ❑ attention and memory deficits
- ❑ visual analysis/hypothesis testing
- ❑ language comprehension
- ❑ poor ability to interpret alerting or threatening cognitive stimuli (results in poor emotional processing)
- ❑ greater rates of depression

B.  Damage Due to Use of Nicotine/Exposure to Cigarette Smoking in Pregnancy

When a pregnant woman smokes cigarettes in pregnancy—a fact attested to by Rose, herself, as well as others (one pack a day in addition to the inhalation of smoke from many marijuana cigarettes daily)—the blood vessels to the uterus are constricted.  This constriction causes a reduction of blood supply, oxygen, and nutrients that need to come to the fetus.  Many of the affects of smoking on the fetus also occur in children born to mothers merely exposed to

Exhibit 77 - 000008

9

second-hand smoke.  Research, despite the presence of confounding variables, has been able to establish dose-response relationships (Ernst, et al, 2001).  As a matter of fact, research has documented effects of prenatal smoking in adults up to the age of 28 years old in a Skandinavian study of 15,000 subjects:  maternal prenatal smoking was a *robust* predictor of violent offenses and persistent offenses in boys and criminal outcomes in general (Ernst, et al, 2001).  Abnormalities in cell proliferation and differentiation is a fundamental effect of this teratogen—a circumstance which underlies neurodevelopmental disorders of executive functioning.

The documented evidence of sequelae of maternal use of nicotine and her exposure to smoke while pregnant which are found in the functioning of Julius Robinson are the following:

- lower birth weight (Julius's weight at birth was 5 lbs. 6 oz.; 6 lbs. is the beginning of the "normal" birth weight range) and the effect of such; lower birth weight usually recovers over time *except* when exposure to alcohol is present, which is true in this case)
- deficits in sustained attention
- lower verbal comprehension
- deficits in receptive language
- reduced auditory acuity; impaired auditory processing
- poorer reading scores, and in reading comprehension, especially the auditory-dependent aspects of reading:  all of these deficits have been found to be strongly dose-dependent
- increase in hyperactivity
- decrease in inhibiting responses
- deficits in short-term memory
- a decrease in IQ points
- some evidence of lower stress thresholds
- increased risk of conduct disorder
- increased risk of substance abuse

## C.  The Alcohol-Spectrum Disorder Effects of Prenatal Exposure

Julius Robinson qualifies as alcohol exposed-in-utero in the following cognitive and emotional functional areas:
- low birth weight (noted above);
- learning disabilities (Dr. Stephen Martin, who performed a neuropsychological evaluation of Julius, reports a number of mild to moderate language skills deficits (dysnomia, spelling apraxia, and central dysarthia).  Dr. Martin notes he met low-grade equivalence scores:  Reading—7th grade; Spelling—4th grade; Arithmetic—6th grade. Julius says that he had to study much harder for the grades he received.  Jamila Camp thought of him as having dyslexia and noted how confusing she found his writing;
- auditory processing (Dr. Martin found deficits involving sustained auditory attention);
- sensory proprioceptive disorder (Julius states he stuttered as a child, which may indicate a touch-feedback disorder; the psychological literature has also long documented the poor psychological effect on development in the presence of stuttering);
- perseveration:  difficulties in shifting tasks, in changing strategies, in moving on after the

Exhibit 77 - 000009

10

end of fruitful lines of thinking (Julius recounts a number of circumstances in which, as I describe this to him, this perseveration quality is a common experience, "I feel like I'm not being understood and I can't let it go," often coming across as argumentative.)  This results in inability to apply new options in coping.  Dr. Martin found deficits in mental flexibility;

- ability to maintain complex attention (Julius recalls having had longstanding problems with concentration and distractibility and complains of not being able to focus, of having a habit of "starting 5 or 6 things at the same time");
- short-term memory deficits (Julius reports he often experiences "blocks" of memory that force him to "just let go" for the time being of what he is trying to remember);
- poor response-inhibition and general impulse-control deficits (Julius likely has had difficulties with *confabulation*, a common fetal alcohol result (as well as alcoholic dementia in long-term alcoholics) in which elements of differing memories are spontaneously issued (confusion and fusion of time/event facts and imagination) during times of stress and fear and which appear to be lies, though there is actually no control or ego-based motivation for lying).  As well, Jamila Camp, his former girlfriend, described his confusion with words, appearing to be linked in his poor ability to communicate in writing;
- deficits in motor skills (Dr. Martin reported bilateral impairment on a measure assessing simple motor skills);
- inability to normally tolerate frustration;
- poor ability to self-soothe (as reported by family members as Julius, as a child, being unable to comfort himself, having extensive crying tantrums, "sitting in the corner and stewing for long periods."  Julius believes that he drank so much cognac as a way of self-regulating his negative emotions.  Sometimes he would feel the same comfort in the routine of gun-cleaning or video cleaning, but those more benign choices did not replace his alcoholism);
- poor ability to internally regulate negative feelings, producing a tendency to act out his frustration;
- loss of adaptation under stress;
- the above five deficits logically result in behavioral dyscontrol—especially externalizing of personal control as outside of oneself (external locus of control).

[Dr. Martin also states that Mr. Robinson's routine exposure to pesticides in his childhood playground is also known to cause learning disabilities.]

It must be noted that a simple view of these areas in and of themselves can render a quite invalid presentation.  The specific areas of abnormality correspond to the evidence-based enumeration of the documented use of teratogens in his mother's pregnancy with him and may not appear powerful when taken individually.  Yet it is the overall presentation of cognitive and emotional deficits we see with Mr. Robinson—and the obvious compromising of his executive functioning capacity—which we must use in understanding how he came to criminal actions.

Exhibit 77 - 000010

11

**Dr. Mark Cunningham's Evaluation**

Dr. Cunningham's lengthy exposition of the mitigation factors which should have been presented at Mr. Robinson's trial is comprehensive and well-documented.  In that bio-psycho-social evaluation, he reviews essentially the same sources I have used and explains how the many factors revealed by family members and relevant others are exactly those which social science has identified as causing critical developmental injuries.  When a child experiences such fundamental challenges to cognitive, emotional and behavioral development—and additionally is exposed to high-risks in the environment without parental protection—he is unable to take the same level of moral responsibility in decision-making as can an individual for whom these seriously accumulative injuries were absent.

In my report which focuses attention specifically on the sequelae of neurological damage experienced during the fetal period, I will not reproduce the body of work from Dr. Cunningham; yet I will make indirect referral to what is contained there and will, from time to time, specifically take from his evaluation.

**How Substance Exposure-in-Utero Can Lead to Criminality**

In order to demonstrate how Julius Robinson's experience of substance exposure-in-utero is connected to behaviors which resulted in the capital murder convictions, it will be necessary to examine the intervening variables of attachment disorder and early exposure to a highly toxic social environment (given his compromised neurology and psychological functioning).

First, I will present the connections between teratogenic exposure to impaired attachment capacity.  Second, I will connect resulting neurodevelopmental vulnerability with the lack of parental protection from and involvement with high-risk environments.  And last, I will document the particular research-identified elements of neurodevelopmental damage that has occurred in Julius's life and how such damage has affected his functioning in later adolescence and early adulthood.

A.  <u>How prenatal damage affects earliest development of attachment</u>

The "laying down" of attachment during infancy is, profoundly, the <u>basis of emotional and behavioral self-control</u> that begins in the toddler years and remains rather set (without effective intervention) into adulthood.  The process of acquiring attachment to the mother could be said to be the "psychological birth" which follows on the heels of the biological birth.  Within the first 9 months of life, the newborn is experiencing a critical cycle of bonding which occurs dozens, if not hundreds, of times a day (Siegel, 1999).  In a "good enough" attachment environment, not only does the mother need to be almost fully attentive to responding to the needs of the child, the baby also must have enough sound brain development—-regulatory, auditory processing, and memory capacity-to receive and store the consistent and relevant nurturing of the mother (Siegel, 1999, Shore, 2002).

Exhibit 77 - 000011

12

If a child is negatively impacted by being over-challenged in the fetal period, he is not ready to cope with and grow through the challenges of the human environment after birth. In such a case, an unusually attentive and stable maternal response is necessary in order to compensate for the lagging "hardware." This was not the mothering Julius received.

Rose Hollimon had begun drinking and smoking marijuana in the 7th or 8th grade. She was admonished about drinking during pregnancy, but (by Jimmie Lee Robinson's report) she claimed that her own mother had drunk alcohol while pregnant with her, so she thought there must be nothing wrong with it. [There are substantial indications that Rose Hollimon is intellectually impaired.] She has stated she didn't know she was pregnant with Julius until she was 6 months along. Rose verifies she both drank and smoked cigarettes throughout her pregnancy. [She reports that years later she began using crack cocaine, and when she quit crack use, she went back to drinking alcohol ranging from a 12-pack to a case of beer per day.] Julius' father, Jimmie Lee Robinson, remembers Rose as drinking a <u>minimum</u> of 2-3 beers per day, smoking cigarettes, and smoking an average of 12 marijuana joints per day. Beotha Moore, a family friend and neighbor in Dermott, also states she saw Rose drinking beer and smoking cigarettes during the pregnancy. Jimmie Lee also says Rose became a heavy cocaine abuser probably during her pregnancy with Julius, but certainly shortly afterward. And their neighbor, Beotha Moore, believed Rose was abusing cocaine at a minimum after Julius was born. This can easily be inferred because she was distributing it at the time during her "soap opera parties" and later developed a crack cocaine addiction. Further, Jimmie Lee found she "blew $12,000" in the first few months of Julius's life, with nothing to show for it.

From these reports, it is clear that his mother was seriously affected by chemical dependencies; it is only reasonable that she would have continued such use during the crucial attachment period. Therefore, not only was Julius in need of extraordinary nurturing, but Rose was not available to do even an average job of maternal bonding. Jimmie Lee Robinson, as well, failed Julius in his duties as a father and did not mitigate the damage done by Rose's lack of bonding.

An additional condition hindered Julius's early growth: there was much domestic violence in the Robinson household before and after his birth, as reported by Julius's father, mother, and other family members. [Jimmie Lee Robinson was also seriously chemically dependent; he reports that in Julius's toddler years, he was a "terrible alcoholic," smoked cigarettes and abused marijuana. Later he became addicted to crack cocaine for 15 years.] In fact, while pregnant with Julius, the parents relinquished Marcus, his older toddler brother, to the family friend, Sarah Pittman, who had mostly reared Rose from age four until she met Julius's father (about age 15). She could see the harm done to Marcus because of the parents' physical fighting. This violent domestic environment continued until the couple split up. With Julius's precarious developmental capacity, his exposure to child abuse-by-proxy (domestic violence has the same traumatic neurological consequences as does direct violence perpetrated on the child) sealed his already injured process of attaching. It is this vital course of being attached—first to the mother and later as a component of all relationships—that was compromised by the decisions and addictions of Julius's parents.

Exhibit 77 - 000012

13

Attachment disorder results from child neglect and abuse in crucial phases of development. Infant mental health research has located attachment at the intersection of biology and psychology: it begins as a result, but quickly moves into a cause of neurodevelopmental deficits (Siegel, 1999, 2001; Schore, 2002; LeDoux, 1996). In this case, the impaired ability to attach-a result of the interplay of Julius's special needs due to prenatal substance damage and Rose's and Jimmie Lee's inability to provide for his needs-is the strongest intervening variable that paved the way for teratogenic damage to result in later criminal behavior in Julius's life.

B. How Julius's Heightened Developmental Vulnerability Responded to Lack of Protection from a High-Risk Environment

Once again, Dr. Cunningham's report details extensively the science as it applies to Julius Robinson's life in a range of mitigation issues which should serve as the overall source of inferences in this report. In order to draw the linkages of harmful prenatal toxic exposure to unhealthy behavioral responses in later years, it is necessary to identify 1) the effects of parental abandonment and 2) the pernicious childhood environment, both psychoactive factors which geometrically increase the morbidity from the prenatal injuries.

*Effects of parental abandonment*

Maternal deprivation refers to both the failure of attachment in the first 2 years of life, as well as the lack of emotional nurturing that a child needs in the next several years of psychological development. Child abuse and neglect in these early years has a strong deleterious effect on brain development—both in cell proliferation and in the formation of synapses. Between 24 and 36 months, after a rapid growth in brain cells and connections, one of the notable "pruning" events emerges in which the "states" of coping capacity become more enduring "traits" (Schore, 2002 and others). Simply and forcefully stated: cells which fire together wire together. Therefore, thinking processes, behavioral habits and coping skills which errantly developed will become the backdrop for more advanced cognitive and personality development. And though the human brain certainly remains flexible for many years, the pruning process insures that there is a reliable pattern of responses to fall back on and will require much attention to alter in future years. In addition, this same rapid proliferation and cutting back process emerges once again in early adolescence: what is happening in a child's life is eminently important in the developing years. When the mothering response is so lacking, the child will not be able to developing critical judgment, relationship, and empathy in the areas of
- ❑ foundation for a stable identity;
- ❑ emotional self-regulation;
- ❑ capacity for empathy;
- ❑ capacity for intimacy and reciprocity;
- ❑ responsible social behavior.

Perhaps the most important loss due to maternal deprivation is the development of

Exhibit 77 - 000013

14

capacity to self-soothe, the prerequisite to emotional and behavioral self-control.  As well, one must be able to comfort oneself—not at the expense of another—in order to experience the empathy and intimacy that, in turn, enables relationships to reciprocally provide a hurting or frightened person with assurance, comfort, and nurturance.  Perhaps the highest level of human experience is the capacity for empathy, and infant mental health and behavioral science is replete with research that point in the direction of self-soothing ability as the cornerstone of empathic response.

Willie White, Julius's paternal uncle, described his memories of Rose's lack of attachment to her children:  "She showed no signs of caring and didn't treat them as if they were kids.  It was as if they were her little brothers and she didn't bear any responsibility for them."

*The effects of child abuse by proxy:  domestic violence*

The first 2+ years of Julius's life were dedicated to coping with his parents' unavailability and severe domestic violence.  Jimmie Lee Robinson states "drugs, alcohol, and violence were the order of the day in our house."  Milton Hollimon, a maternal uncle, stated, "the authorities were getting ready to take the children away from them" due to the extreme violence.  Of course, the provision of such a "safety net"—being placed in foster care—could well have resulted in a completely different outcome both for Julius and for the victims of these later crimes.

Instead both parents were either under the influence, preoccupied with drug-seeking, or engaged in primitive levels of violence.  [Though Julius would leave his parents' care until he returned to live with his mother in his mid-teens, when he did reunite with her, little had changed-she still engaged in abandonment of him, yet the roles had been reversed, Julius becoming the parent to his mother.]

Childhood trauma which replaced the attachment environment Julius should have been receiving finds many routes to produce later pathology, as stated by Cunningham,

frequently taking the form of Posttraumatic Stress Disorder (PTSD), depression, relationship disturbances, personality disorder, and/or antisocial behavior.  Traumatic experience in childhood from abuse or other insults can result in impairments of perception, judgment and behavior; vulnerability to poor role models and negative influences; chronic self-defeating behavior; chronic agitation; poor problem-solving skills; an inability to predict the consequences of one's behavior accurately; an inability to modulate or understand one's emotions; an inability to use emotions as guides for appropriate action; an inability to assign language to emotions; a constant state of internal and external fear; a foreshortened sense of future; chronic self-medication and substance addiction; a fragmented sense of self; an inability to successfully achieve developmental milestones; pervasive low self-esteem; a chronic and inescapable sense of shame and worthlessness; and behavioral misconduct and criminal conduct.  There is evidence that these symptoms and disorders stem from trauma-initiated changes in brain structure and metabolism that can be persistent.  Chronic victimization can also result in survival

Exhibit 77 - 000014

15

responses of attempting to emulate the toughness of those that perpetrated the victimization (i.e. identification with the aggressor). The legacy of traumatic experience is strongly implicated in Julius's developmental trajectory and outcome (Cunningham, p. 45-46).

Dr. Cunningham documents the strong correlation in social science literature between maternal deprivation, teenage pregnancy, and paternal abandonment with criminal violence and murder. In fact, these variables are stronger predictors of criminal violence and murder than are poverty and the ills that usually come with it.

*The effects of pervasive lack of parental supervision and household instability*

During his childhood, care of Julius shifted from his parents, to Miss Sarah, to his maternal grandparents, to his paternal grandmother off and on, and to his mother (though, clearly it was Julius who cared for his mother). As well, when deaths occurred and Rodney White came to town, Julius was, effectively, turned over to the emerging gang in Dermott. As is seen in so many cases such as Julius's, participation in a gang for a youthful adolescent often presents the first really stable and "protective" environment the child has experienced.

While still a toddler, Julius's parents completely abandoned him and he was sent to live within a constellation of three households, none of which could completely do the job of offering a stable, prosocial, supervised, and nurturing childhood home. He also patently lacked male role models. This long-term household instability was the least effective parenting environment possible to meet Julius's neurodevelopmental needs. Providing the majority of his supervision, his maternal grandmother, Margaret, was illiterate and permissive. Her daughter, Mildred, said, "I never saw or heard of my parents disciplining the boys." Jimmie Lee reports that John, Julius's maternal grandfather, was blind and "couldn't really keep on top of things, either." Bernice Johnson, a maternal great aunt, noted that Julius was easily able to play both grandparents against each other. Though wheelchair-bound, his paternal grandmother, Bertha, was interested in his learning, provided some structure, and was loving to Julius, but was also unable to control the environment. Her death when Julius was 10 or 11 was a grievous loss. [As Marcus said, "We lost a really strong person in our lives when she died."] "Mama Sarah," perhaps the most effective maternal figure in his life, was a loving and helpful parent when she had responsibilities off and on for Julius, though she, too, was permissive (she introduced him to beer when he was 7). All three of these women had reared both of Julius's parents and were getting older and ill by the time Julius needed them. When Bertha and Sarah became ill and died, generally around the time Julius was becoming an adolescent, he lost the little structure and source of love that he had experienced in his childhood years. Bertha was very sick with cancer for two years; Sarah's death was a severe loss to the entire community. There is no sign that Julius had the opportunity to grieve; indeed, an older cousin, Rodney White and John-John (the California gang planter) arrived to take over when the two caregivers had died. When children's lives are in such turmoil and instability that they are unable to grieve parental losses, many signs of distress—not the least of them being behavioral disturbances—will emerge and remain.

Exhibit 77 - 000015

16

As Leroy Kennedy, The Delta Youth and Family Services caseworker who checked in on Julius during his 14th year said:

> I remember being concerned that the grandparents' home was somewhat chaotic. They had a revolving door policy, with young people coming and going all the time. Friends and relatives seemed to live there for a few days, then disappear. It was not a stable environment (Dr. Cunningham, p. 53).

*The effects of early onset substance abuse-*

During his growing up years, parental supervision was sorely lacking as evidenced by his heavy use of alcohol by the age of 11 or 12. Indeed, it had been Mama Sarah who had introduced him to beer at the age of 7. He was drinking heavily during his pre-adolescence, another neurodevelopmental marker—a time when cell proliferation and synapse wiring experience another pruning process, resulting in the imprinting of existing damage. At this time, his earlier cognitive, emotional and behavioral deficit traits experienced the infusion of addiction to alcohol. There was already a readiness for alcoholism to manifest at a very early age, and with Julius's history of developmental trauma, alcohol abuse can be conceptualized an as attempt at self-medication of emotional pain, of cognitive processing difficulties, of learning disabilities, and the anxiety and depression that was guaranteed with parental abandonment and the death of his surrogate parents.

Overlaid with impaired attachment, "wired in" traumatic memories, and early onset of alcohol abuse, Julius's teenage development was fraught with risk. From Dr. Cunningham (p. 33),

> Maladaptive behaviors, including criminal activity and violence, may also be the result of sequential emotional damage. In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources . . . Sequential generational neglect is particularly damaging. . . The problematic effects of early abandonment and disrupted primary parental attachment may not be evident until adolescence or early adulthood.

When Julius found his way back to Texas to try living with his mother when he was entering high school, he found his own drinking problem in ironic relationship to the frenzy of drug and alcohol use by his mother. Jamila Camp, Julius's former girlfriend described how Rose was unable to stop with just one drink; she would get "falling down drunk" if Julius didn't stop her. Marcus was amazed that Rose could get up each day and go to work at her nursing home aide job each morning after the drunken binges of the night before. Rose had also become addicted to crack cocaine. One of Julius's run ins with the law occurred when he assaulted Vernon, a crack addict then living with Rose, in a effort to get his mother off crack. Rose used each non-working hour of the day to alter her mood with a steady use of marijuana, alcohol, and crack cocaine. Julius made consistent but ineffective efforts to halt his mother's addiction. It is safe to say that, although Julius didn't seem to express them, his feelings about the state of his

Exhibit 77 - 000016

17

parents—now the only people left as adult models—and the loss of his childhood were likely those of depression and anger.

And, before Julius's incarceration as an adult, he reported that he drank approximately a fifth of cognac per day.

*How the maturational process was compromised*

Adolescence is typically a time of exposed immaturity:  uneven cognitive capability; poor judgment; unreliable impulse control; instability of emotions and their expression; self-centeredness which hinders moral development.  However, in Julius's life, the elements of the "container" for developing maturity were all but completely missing.  The *container* refers both to 1) the internal neurological development that advances the appropriate expression and self-control of emotions and behaviors as well as 2) the external structure of the authoritative environment which monitors, gives feedback, and serves as a corrective mechanism for experiments in adult challenges.  Julius entered his adult-making years without the benefit of either an intact internal or external container.  As Mark Cunningham points out (p. 26), there are two lines of evidence supporting this assertion:

1.  The neuropsychological deficits and learning problems exhibited by Julius point to mild nervous system dysfunction that would serve to reduce the effectiveness of cognitive processes associated with 'maturity.'
2.  The adverse developmental factors in Julius's childhood would act to delay functional emotional maturity.  These are factors associated with disrupted developmental trajectory.

*In essence, Julius had mildly compromised "hardware" with which to negotiate a severely compromised "software program" during a developmental window presenting a major challenge to growing the maturity necessary for adulthood.*

Dr. Cunningham details the science of brain immaturity in adolescence (pp. 24-26).  There are clear neurological reasons for the kinds of immature judgment and behaviors we see in youth and, under conditions of compromised neurology-due to brain damage in utero and/or early brain-damaging abuse of drugs/alcohol-adults who pose criminal problems for society.  The elements of neurological immaturity are many of the very same areas of damage caused by ARND:  functions of "executive functioning" (EF) that emanate from the frontal and pre-frontal cortex of the brain.  In short, when damaged in utero, processes designed to bring an immature brain into mature functioning cannot fulfill that developmental imperative.

From Dr. Cunningham (p. 25):

Executive functions associated with frontal lobe functioning include insight, judgment, impulse control, frustration tolerance, recognition and

Exhibit 77 - 000017

18

appreciation of the emotional reactions of others, and recognition of consequences.   Significant age-related growth in these capabilities, conventionally referred to as 'maturing' or 'growing up,' occurs even between the ages of 18 and 22 in all individuals.  While the age-related endpoint of adolescence varies by function or role, neurologically it can be considered to continue through this full frontal lobe mylenization in the early to mid-twenties.  All individuals less than 22 years old are thus 'immature' in brain development and in relation to adults.  This neurological immaturity is reflected in limitations in psychological functioning and behavior control, and accounts for the poor decision-making and poor impulse control often observed in adolescents, even in their late teens.

Compounding the judgment and behavior control problems associated with frontal lobe immaturity, the adolescent male brain is experiencing markedly rising levels of testosterone, and subject to the aggression-inducing effects of this hormone.

*The emergence of corruptive influences and early emancipation*

During this time in Julius's life, without the effective functioning of a healthy brain and a healthy social environment, he was, nevertheless, exposed to a number of corruptive male models and influences.  Rodney White and others who shaped his entry into the new gang of about 30 African American males in Dermott, Arkansas provided the container which had been abdicated by his parents.  This is usually a process by which the maternal figure—weary of and critically ineffective in controlling a young male—will unconsciously allow the "informal" adoption of that child by the neighborhood gang.  It is the only obvious answer to what to do with a young man who is not ready to be a man but has no alternatives.  He was "beaten in" to gang membership at the age of 14.  Though Julius, himself, plays it down, Margaret has said he needed medical care (which she provided at home) for one month.  If nothing else, gang dynamics must surround the acquisition of drugs and money.

This is where Rose and Jimmie Lee served well as models—they had spent their lives not only as addicts, but were often *drug traffickers*.  Julius had advance knowledge of how to manage himself in the drug business.  And certainly, acquiring large amounts of money and the power and status that accompanies having money provided a structure and guidelines for survival like none Julius had ever known before.  That these activities inherently involved a willingness to be violent was an accepted, if unconscious, cost.

*The dynamics of criminal violence within this constellation*

Again, Mark Cunningham (pp. 20-21) ably describes the research that links neuropsychological deficits—by now the background of all of Julius's functioning—to the emergence of a lifestyle of violence and criminality.

Exhibit 77 - 000018

19

> There is a growing body of psychological, psychiatric, and
> neurological literature which identifies that brain damage is
> present in disproportionately high incidence among violent
> offenders. . . . evidence of frontal lobe dysfunction in 64%"
> (from a study of persons with murder convictions).

There is obviously much research which chronicles the relationship of substance abuse and dependence to criminality and violence.  And, Cunningham aptly explains that it is not necessary to be intoxicated at the moment of the crime to have compromised judgment directly due to the state of addiction (p. 24).

But perhaps one of the most significant elements of cognitive deficits due to brain damage is the perception of threat and the resultant lack of impulse inhibition.  It is well documented that young males with this neurological deficit presentation are unable to "read" others' cues accurately.  For example, they will have difficulty in making use of peripheral information and will often screen out too much in their perceptions.  This produces a lack of planful thought and sound judgment.  As well, they will tend to attend selectively to aggressive cues, interpreting ambiguous and benign situations in aggressive ways.  When imprecise interpretation of cues—with a bias toward interpretation of threat—is coupled with a rigid response capacity and a predisposition to poor impulse control and frustration tolerance, it is easy to see how violent responses can ensue (Gabardino, 1999; Meloy, 1992; Dutton, 1998 and others).  These are brain functioning deficiencies that are commonly observed both in those who have been affected by fetal alcohol syndrome as well as organic brain damage due to alcohol abuse of the child/youth, himself.  These are the kinds of impacts as Julius's own prenatal exposure.

*The capacity for conforming behavior legally within a pernicious social environment*

Dermott, Arkansas was not a positive environment for African-American young men in recent years and perhaps in the historical past.  The legacy of racial prejudice and discrimination is a toxic element in the lives of these men which is not exactly measurable and is often socially invisible in its effects.  Jimmie Lee Robinson eloquently states how a black man perceived his changes in that town.  There exists within Julius's many relatives memories and passed along stories of racially-motivated violence, social degradation, and economic hardship.  This legacy does not endure without taking a toll on the generations of young males growing up in Dermott.

Dr. Cunningham's lengthy review of the literature-based explanation of community dangers present in Julius Robinson's youth needs not be replicated here.  Yet these many pernicious factors, which this defendant found himself facing, presented an overall environmental challenge to his development—again under already challenged conditions—and he failed to adequately negotiate this mine field.  These factors are:

Exhibit 77 - 000019

20

- ❑ The consistent threat of racially motivated violence, economic hardship and social desperation which was Dermott's legacy for African-American males like Julius. The intergenerational transmission of post-traumatic stress disorder is a condition we are just beginning to understand in the social science and psychiatric literature.
- ❑ The positive aspects of his extended family could not protect him from the critical influence of his cousin, Rodney White and others brought in to the mix in his early teen years.
- ❑ Gang recruitment and its promises of structure, protection, and movement into manhood—not to mention its ability to offer a way to make a living to young, disenfranchised, unskilled men—was the only path Julius had presented to him at this time in his life when two of his maternal caregivers had died and the role of men in the gang was the substitute for paternal abandonment in his life
- ❑ The life of drugs, criminal theft, drug use and drug dealing was the manner of "higher education" that was offered to Julius.  Simply put, with parents who modeled drug trafficking and no other family members or friends who could model any other lawful route to adulthood, Julius simply did what he was taught.

There is no way to fully account for and measure the combustible combination of this young man who suffered the worst forms of parental neglect and an impoverished moral environment coming into young adulthood with such an overwhelmingly negative and criminal container.

**Conclusion**

The evidence of substance exposure-in-utero at the very beginning of Julius Robinsons's life is clear, as documented by reports of his mother, his father, and other family members and friends.  The three teratogens, amply documented to have affected the pregnancy, are marijuana, cigarettes, and alcohol.  Cocaine may well have also been used.  The literature on behavioral teratology is clear in specifying that of all the substances which can harm the fetus, it is alcohol and cigarettes—especially used in tandem—which are known to cause the most pernicious and overall damaging effects, first in area cognitive functioning and then the derivation to emotional and behavioral functioning

Because the injury to the "hardware" at the beginning of his life rendered him at high risk for injuries to his attach—the process of his psychological birth—his mother's inability to meet his basic needs meant this meaningfully damage affected every other developmental stage necessary to normal child growth.  The moves and changes in caregivers, the ineffectiveness of caregivers, abandonment by both parents, and finally, exposure restricted to the most degraded of social environments for adolescent development were variables which ensured Mr. Robinson would find no other non-criminal passage to adulthood.  The interplay of these forces begun in a prenatal life that went terribly wrong is the most valid explanation of how the crimes for which he has been convicted could occur.

This explanation is also the most compelling route to constructing an effective mitigation argument, had one been presented in his original trial.

Exhibit 77 - 000020

21

# Bibliography

Bookstein, F.L.,  Sampson, P.D.,  Streissguth, A.P.,  & Connor, P.D.   "Geometric morphometrics of corpus callosum and sub-cortical structures in the fetal-alcohol-affected brain," in *Teratology*, 62:4-32; 2001.

Bookstein, F.L.,  Streissguth, A.P.,  Sampson, P.D.,  Connor, P.D.,  &  Barr, H.M. [a.]  "Corpus collosum shape and neurophysiological deficits in adult males with heavy fetal alcohol exposure," in *NeuroImage*, 15:233-25l;  2002.

Bookstein, F.L.,  Sampson, P.D.,  Connor, P.D.,  &  Streissguth, A.P. [b.] "Midline corpus collosum is a neuroanatomical focus of fetal alcohol damage," in *The Anatomical Record*, 269: 162-174; 2002.

Chasnoff, Ira.  *The Nature of Nurture:  Biology, Environment, and the Drug-Exposed Child.* Chicago:  NTI Publishing (childstudy.org),  2001.

Connor, Paul,  Paul Sampson,  Fred Bookstein,  Helen Barr and Ann Streissguth.  "Direct and indirect effects of prenatal alcohol damage on executive function," in *Developmental Neuropsychology,* 18 (3), 331-354.

Dutton, Donald.  *The Abusive Personality.*  New York:  Guilford Press, 1998.

Ernst, Monique,  Eric Moolshan,  Miqun Robinson.  "Behavioral and neural consequences of prenatal exposure to nicotine," in *Journal of the American Academy of Child and Adolescent Psychotherapy,* 40:6, June, 2001.

Fried, P. A. and A. M. Smith.  Invited Review:  "A l iterature review of the consequences of prenatal marijuana exposure:  an emerging theme of a deficiency in aspects of executive function," in *Neurotoxicology and Teratology.*  23:1-22, 2001.

Gabardino, James.  *Lost Boys:  Why Our Sons Turn Violent and How We Can Save Them.*  New York:  Anchor Books, 1999.

Institute of Medicine.   *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment*, 1996.

James, Beverley.  *Handbook for Treatment of Attachment-Trauma Problems in Children.*  New York:  Lexington Books, 1994.

Kopera-Frye,  K.,  Dehaene,  S.,  Streissguth,  A.P.  *Impairments of Number Processing Induced by Prenatal Alcohol Exposure*, 1996.

Exhibit 77 - 000021

22

LeDoux, Joseph.  *The Emotional Brain:  Why It Can Matter More than IQ.*  New York:  Simon and Shuster, 1996.

Meloy, J. Reid.  *The Psychopathic Mind:  Origins, Dynamics, and Treatment.*  Northvale, NJ: Jason Aronson Press, 1992.

Olson, H.C., Streissguth, A.P., Sampson, .PD., Barr, H.M., Bookstein, F.L., Thiede, K. "Association of prenatal alcohol exposure with behavioral and learning problems in early adolescence," in *Journal of  American  Academy of  Child and  Adolescent Psychiatry,* 36(9):1187-94, 1997.

Sampson, P.D.,  Streissguth, A.P.,  Bookstein, F.L.,  Little, R.E., Clarren, S.K., Dehaene, P., Hanson, J.W.,  Graham, J.M.  "Incidence of fetal alcohol syndrome and prevalence of alcohol-related neurodevelopmental disorder" in *Teratology*, 56(5):317-26 , 1997.

Schore, Allan.  "Dysregulation of the right brain:  a fundamental mechanism of traumatic attachment and the psychopathogenesis of posttraumatic stress disorder," in *Australian and New Zealand Journal of Psychiatry,* 36:9-20, 2002.

Siegel, Daniel.  *The Developing Mind:  Toward a Neurobiology of Interpersonal Experience.* New York:  Guilford Press, 1999.

Siegel, Daniel and Mary Hartzell.  *Parenting from the Inside Out.*  New York:  Jeremy Tarcher, 2003.

Streissguth A.P.,  O'Malley K.  "Neuropsychiatric implications and long-term consequences of fetal alcohol spectrum disorders" in *Seminar in Clinical Neuropsychiatry,* 5(3):177-90,  2000.

Streissguth, Ann P., Robin LaDue, and Sandra Randels.  *A Manual on Adolescents and Adults with Fetal Alcohol Syndrome (with Special Reference to American Indians).*  Seattle, WA: University of Washington, Department of Psychiatry and Behavioral Sciences (Indian Health Services Grant), 1988.

Exhibit 77 - 000022