THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **JULIUS ROBINSON** | : | **United States District Judge** |

_____

**SUPPLEMENTAL PLEADING; EXHIBITS**

(Filed Electronically Under the Electronic Case Filing System Requirements)

_____

MICHAEL B. CHARLTON, No. 04144800
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
Telephone: (702) 388-5106
Facsimile: (702) 388-5103
E-Mail mike_charlton@fd.org

SEAN K. KENNEDY, No. 145632
Federal Public Defender
CRAIG A. HARBAUGH, No. 194309
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
E-Mail sean_kennedy@fd.org
E-Mail craig_harbaugh@fd.org

## TABLE OF CONTENTS

**Page**

SUPPLEMENTAL PLEADING; EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BRIEF IN SUPPORT OF SUPPLEMENTAL PLEADING. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENTS BASED UPON NEW EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    SUPPLEMENTAL ARGUMENT FOR GROUND 1 (THE COURT
      SHOULD VACATE THE PENALTY VERDICT BASED ON INEFFECTIVE
      ASSISTANCE OF COUNSEL FOR FAILURE TO INVESTIGATE
      AGGRAVATING FACTORS). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Trial Counsel Failed to Counter the False Allegation that Robinson Knew Tucker
            Was Hiding Inside the Abandoned Car When the Firearm Was Discharged. . . . . 8

      B.    Trial Counsel Was Ineffective For Failing to Refute the Prosecution's
            Expert Testimony that Robinson Posed a Future Danger Based Upon
            His Childhood Involvement With the "Dermott Crips". . . . . . . . . . . . . . . . . . . 12

II.   SUPPLEMENTAL ARGUMENT FOR GROUND 2 (THE COURT SHOULD
      VACATE THE PENALTY VERDICT BASED ON INEFFECTIVE
      ASSISTANCE OF COUNSEL AT THE PENALTY PHASE).. . . . . . . . . . . . . . . . . . . 14

      A.    Trial Counsel Failed to Communicate Regularly With Their Client
            Prior to Trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    Trial Counsel Failed to Hire a Mitigation Specialist. . . . . . . . . . . . . . . . . . . . . 16

      C.    Trial Counsel Failed to Conduct a Reasonably Thorough Mitigation
            Investigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.    Given Robinson's Substantial Exposure to Drugs and Alcohol *In Utero*,
            Trial Counsel Was Obligated to Retain and Present an Appropriate Mental
            Health Expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.  SUPPLEMENTAL ARGUMENT FOR GROUND 3 (THE FEDERAL DEATH
      PENALTY ACT, AS APPLIED IN TEXAS, VIOLATES EQUAL PROTECTION). . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

## TABLE OF AUTHORITIES

**Page**

**Federal**

*United States v. Hall*,
    2004 U.S. Dist. LEXIS 17089 (N. D. Tex. 2004),
    *aff'd*, 455 F.3d 508 (5th Cir. Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Hoskins*,
    910 F.2d 309 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**State Statutes, Codes and Rules**

Code of Criminal Procedure
    Article 42.12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Penal Code
    Section 22.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **JULIUS ROBINSON** | : | **United States District Judge** |

---

## SUPPLEMENTAL PLEADING; EXHIBITS

(Filed Electronically Under the Electronic Case Filing System Requirements)

---

Julius Robinson (hereinafter "Robinson"), by and through his attorneys, Michael Charlton, Sean Kennedy and Craig Harbaugh, files this supplemental pleading pursuant to this Court's order dated January 7, 2008. Petitioner hereby incorporates by reference all exhibits and argument set forth in Petitioner's Motion to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure filed on November 29, 2005. Petitioner supplements his original motion with the following exhibits:

Exh.
No.    Description

44.    Partial transcript of phone call between Julius Robinson and Marcus Robinson and Others (Government Trial Exhibit 929A, filed in *USA v. Julius Robinson*)

45.    Special Verdict Form filed in *USA v. Julius Robinson*

46.    Report of Psychological Evaluation of Rosie Mae Hollimon by Dr. James Barna

47.    Fetal Alcohol Syndrome:  Guidelines for Referral and Diagnosis, Center for

Disease Control

48.    Robert C. Vandenbosche & Jeffrey T. Kirchner, *Intrauterine Growth Retardation*,

American Family Physician. 1998 Oct 15;58(6):1384-90

49.    Jennifer R Butler, *Postterm Pregnancy*, Emedicine.com (2006)

50.    Medline Plus Medical Encyclopedia

51.    Stoll CG, Roth MP, Dott B, Alembik Y, *Study of 290 Cases of Polyhydramnios

and Congenital Malformations in a Series of 225,669 Consecutive Births*,

Community Genet. 2(1):36-42 (1999)

52.    C.L. McGee & E.P. Riley, *Brain Imaging and Fetal Alcohol Spectrum Disorders*,

Ann Ist Super Sanita, 42(1):46-52 (2006)

53.    Connor PD, Sampson PD, Bookstein FL, Barr HM, Streissguth AP. Related

Articles, *Direct and Indirect Effects of Prenatal Alcohol Damage on Executive

Function*., Dev Neuropsychol (2000) 18(3):331-54.)

54.    Tarrant County Court records in *Texas v. Julius Robinson*, Case No. 0574361D

55.    Memo of Jesse Wallis, dated August 16, 2006

56.    Affidavit of Danny Duane Burns, dated August 25, 2006

57.    Declaration of Monica Giner, dated August 28, 2006

58.    Declaration of Brenda Hollimon, dated August 25, 2006

59.    Declaration of Jerry Melton, dated August 8, 2006

60. Declaration of John Niland, dated August 21, 2006

61. Declaration of Jesse Wallis, dated August 28, 2006

62. Supplemental Declaration of Josephine Dotson, dated August 22, 2006

63. Supplemental Statement of Stephen K. Martin, Ph.D., dated August 28, 2006

64. Supplemental Declaration of Marcus Robinson, dated August 18, 2006

65. Supplemental Declaration of Willie White, dated August 22, 2006

66. Declaration of James Morgan, dated August 28, 2006

67. Letter from Julius Robinson to U.S. Court of Appeals, Fifth Circuit, stamped received on July 14, 2003

68. Letter from U.S. Court of Appeals, Fifth Circuit to Julius Robinson, dated July 25, 2003

69. Letter from Julius Robinson to U.S. Court of Appeals, Fifth Circuit, dated July 30, 2003

70. Letter from U.S. Court of Appeals, Fifth Circuit, to Julius Robinson, dated August 6, 2003

71. U.S. Court of Appeals, Fifth Circuit Order denying motion to dismiss court-appointed counsel, dated September 30, 2003

72. Declaration of Dr. Malcolm Klein, dated May 18, 2007

73. Declaration of Margaret O'Donnell, dated June 15, 2007

74. Declaration of Richard Smart, dated September 27, 2006

75. Declaration of Russell Stetler, dated May 21, 2007

76. Declaration of Mandy Welch, dated June 11, 2007

3

77.    Report by Kate Allen, dated March 14, 2007

78.    Arlington Police Department reports re: Sarah Tucker incident (certified copies)

79.    Tarrant County Court records re: Sarah Tucker incident, *State of Texas v. Julius O. Robinson*, Case No. 0574361D (certified copies)

80.    United States Bureau of Prisons Legal Visitation Logs re: Julius Robinson

81.    December 8, 2000 Invoice by Vince Gonzales to Jack Strickland, in *State of Texas v. Carlis Jovonite Russell*, Case No. 0676421A; and,

82.    December 4, 2001 Memo to file by Wes Ball re: visit with Julius Robinson.

For the sake of brevity, Petitioner incorporates by reference all arguments set forth in the Reply Brief filed August 28, 2006 and provides additional argument for Exhibits 72 through 82 only.

Dated: January 17, 2007                    Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender


 s/ Sean K. Kennedy
SEAN K. KENNEDY
Federal Public Defender
CRAIG A. HARBAUGH
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
E-Mail sean_kennedy@fd.org
E-Mail craig_harbaugh@fd.org

4

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | **(Civil No. 4:05-CV-756-Y)** |
| **Defendant/Petitioner,** | : | |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **UNITED STATES OF AMERICA,** | : | **United States District Judge** |
| | : | |
| **Plaintiff/Respondent.** | : | |

_____

**BRIEF IN SUPPORT OF SUPPLEMENTAL PLEADING**
_____

**INTRODUCTION**

In every respect, Julius Robinson was denied the basic representation required of competent counsel. Trial counsel met with Robinson only twice before his capital trial. Other than court appearances, lead trial counsel waited to meet with his client almost five months after their introductory meeting. Associate counsel waited to see Robinson again until just a week before the judge imposed the final sentence. The investigator first met Robinson after the jury rendered the death verdict. (Ex. 80, United States Bureau of Prisons Legal Visitation Logs re: Julius Robinson.)

Trial counsel's apathy was not limited to the attorney-client relationship. It extended to every aspect of their capital representation. Specifically, trial counsel failed to conduct a easonable investigation into Robinson's life history, failed to have Robinson mentally evaluated despite his chronic exposure to alcohol *in utero* and pesticides as a child, and failed to investigate any of the prosecution's evidence in aggravation.

5

Due to their inadequate investigation, trial counsel were unprepared to rebut the prosecution's aggravating evidence, and were unprepared to present a compelling case for mitigation. Had trial counsel effectively discharged their constitutional obligations, they could have presented a wealth of evidence more than sufficient to tip the scales in favor of life. A juxtaposition of the actual penalty phase and the total of available rebuttal and mitigating evidence makes this abundantly clear:

| ACTUAL PENALTY PHASE | PENALTY PHASE FOLLOWING REASONABLE INVESTIGATION |
|---|---|
| **Future Dangerousness:** | |
| Robinson ordered a "hit" against prosecution witness Williams from prison. (20 RT 137-171; Ex.44.) | Robinson had nothing to do with the robbery and kidnaping of Williams. (Exs. 8, 19, 21, 28, 34, 62, 64.) |
| Robinson was affiliated a notorious gang that was extremely violent in prison. (20 RT 47-49, 53, 68, 116, Pros. Exs. 629, 634.) | Robinson was not affiliated with any gang, and certainly not a notorious criminal syndicate. (Exs. 59, 72.) |
| Robinson attempted to murder Sara Tucker. (20 RT 12-20.) | At nighttime, Robinson fired shots at a parked truck without knowledge that anyone was sitting inside; the trial court deferred adjudication of guilt and imposed community supervision instead. (Exs. 54, 74, 78, 79.) |
| **Life History:** | |
| No information about Robinson's early years. | As a toddler, Robinson was abandoned by his drug-addicted, narcotics-dealing parents who were trapped in an endless cycle of violence and addiction. (Exs. 1, 13, 17, 18, 24, 29, 30, 46.) |
| Robinson was raised in a stable home by able-bodied grandparents. (21 RT 131-170.) | Robinson was neglected throughout his childhood and was exposed to a variety of negative influences because his grandparents were unable to care for him properly. (Exs. 1, 7, 12, 13, 18, 22, 23, 27, 29, 30, 33, 37.) |

6

Robinson enjoyed playing football like most adolescents, though he was inconvenienced by his mother's temporary experimentation with drugs.  (21 RT 2-18, 46-53, 74-80.)

Robinson juggled the demands of high school while struggling to support his destitute and drug-addicted mother, eventually forcing him into a life of drug dealing.  (Exs. 5, 7, 14, 16, 29, 30, 36.)

### Cognitive Impairments:

No information regarding Robinson's intellectual functioning, and thus the jury viewed him as normal and unimpaired.

Robinson suffered brain damage as the result of his mother drinking alcohol through her pregnancy with him, and through his chronic exposure to pesticides as a child.  (Exs. 1, 2, 9, 12, 16, 17, 29, 30, 37, 38, 63, 77.)

### Character:

Robinson was liked by his football coaches and did not cause any problems in jail other than placing an unauthorized phone call to order a "hit".  (21 RT 18-43, 54-74, 81-120.)

Robinson's only positive contribution was that once he turned in a lost wallet without taking any money first.  (21 RT 43-46.)

Robinson was a kind and compassionate person as demonstrated by acting as a part-time father to his brother's children, assisting his mother with obtaining a fresh start to break her cycle of drug addiction, and helping his cousin turn his life around.  (Exs. 5, 12, 25, 35.)

Had trial counsel conducted the reasonably thorough life history investigation required in a capital case, they could have delivered an effective rebuttal to the State's evidence that Robinson presented a future danger and a vastly different presentation in mitigation.  By disproving that Robinson directed the Williams robbery, that he attempted to kill Sara Tucker, and that he participated in a fearsome gang, trial counsel could have assuaged the jury's concern that Robinson posed a threat to society from prison.  By offering psychological testimony regarding Robinson's brain damage and learning disabilities, trial counsel could have shown how his cognitive impairments shaped his life choices and made him less morally culpable.  By providing an accurate depiction of Robinson's life history, trial counsel could have explained

7

how his oppressive background warranted sympathy.  By elucidating Robinson's positive

character traits, as exemplified by his many good deeds, trial counsel could have convinced

the jury that Robinson was capable of redemption and worthy of sympathy notwithstanding

his serious crimes.  In sum, had trial counsel presented the jury with an accurate profile

of Robinson's conduct and background, in accordance with their obligations under the Sixth

Amendment, there is a reasonable probability that at least one juror would have voted for life.

A death sentence was not a foregone conclusion.  The penalty verdict was foreordained

by trial counsel's inadequate representation.  Therefore, because the sentence is unreliable under

the Eighth Amendment, the Court cannot have confidence in the outcome of this case, and

Robinson's death sentence must be set aside.

## ARGUMENTS BASED UPON NEW EVIDENCE

**I.     SUPPLEMENTAL ARGUMENT FOR GROUND 1 (THE COURT SHOULD VACATE THE PENALTY VERDICT BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO INVESTIGATE AGGRAVATING FACTORS)**

**A.     Trial Counsel Failed to Counter the False Allegation that Robinson Knew Tucker Was Hiding Inside the Abandoned Car When the Firearm Was Discharged**

The prosecution presented dubious testimony from Sara Tucker and raised the sinister

allegation that Robinson attempted to kill her over $120.  Trial counsel could easily refuted the

prosecutor's claim by reviewing readily available court records, interviewing the client, and the

only other percipient witness to the incident.  Not only was there significant, reliable evidence

establishing that Robinson was unaware of Tucker's presence inside the truck, the state trial court

8

considered the offense to be minor as it initially imposed community supervision instead of a conviction.

Tucker testified that Julius shot her truck seven times as she hid inside. (20 RT 20.) She claimed Robinson was trying to recover the money she had owed him for drugs. (20 RT 18-19.) She alleged that when she refused to answer the door at her apartment, Robinson hunted her down at her parent's residence. (20 RT 18-20.)

The court records that were available to trial counsel had they obtained them, provide a very different account of events. According to the court file, by the time that Robinson arrived to confront Tucker, her truck had been parked for ten minutes. Ex. 79, Tarrant County, Texas, Court records re: Sarah Tucker incident, *State of Texas v. Julius O. Robinson*, Case No. 0574361D (certified copies)). Thus, there was no chance that he would have seen her vehicle in motion. (*Id.*) Moreover, the brown car in which Robinson was riding had passed Tucker's stationary truck without any confrontation. (*Id.*) It was only after the brown car had turned around that shots were fired. (*Id.*) As soon as Tucker heard shots, she sunk down in her vehicle, making it even less likely that Robinson would have noticed her. (*Id.*) All of the bullets were found in the rear portions of the vehicle. (*Id.*). If Robinson were aware that Tucker was inside the vehicle and he truly intended to shoot her, it defies common sense that no bullet holes were found in the cab of the truck. This is especially true given that Robinson allegedly fired the shots when he was in close proximity to Tucker's truck. In addition, Robinson's vehicle departed the scene slowly after the shots were fired, further undermining the supposition that he was aware that he had shot at someone.

9

Perhaps the strongest ground for concluding that Robinson was unaware of Tucker's presence is the initial disposition of the case. Robinson had pled guilty to deadly conduct, which is the knowing discharge of a firearm. (Ex. 54, Tarrant County Court records in *Texas v. Julius Robinson*, Case No. 0574361D; *see* Tex. Pen. Code § 22.05(b).) This is a third-degree felony which carries a minimum sentence of two years. (*See* § 22.05(e) (classifying the offense of discharging a firearm as a "felony of the third degree").) Despite accepting Robinson's plea, the court withheld the imposition of both his conviction and sentence explaining that "the Court found that further proceedings should be deferred without making an adjudication of guilt." Under the "deferred adjudication" procedure, the court placed Robinson instead on community supervision. *See* Tex. Code Crim. Proc. art. 42.12. Community supervision is entirely discretionary. *Id.* (authorizing, but not requiring, community supervision "when in the judge's opinion the best interest of society and the defendant will be served."). Had the trial judge been seriously concerned about the safety of Tucker or society at large, he would not have ordered Robinson to supervised release.

Finally, trial counsel never investigated the person who drove the brown car on the night in question. As reflected in the police report, Tucker stated that another black male was driving the brown sedan. (Ex. 78, at p. 22.). Had counsel bothered to question Robinson about the incident, they would have learned that Richard Smart was the driver. Mr. Smart, who was already a prosecution witness in the case, would have submitted willingly to questioning about the Tucker incident. Mr. Smart could have testified on Robinson's behalf, confirming that neither of them knew that Tucker was hiding inside the truck. As Mr. Smart explains:

10

I drove Julius to the apartment of Sara Tucker, a friend of his who owed him money. When we discovered that she was not home, we drove to her mother's house. In the parking lot, we saw the pickup truck owned by Sara Tucker. The truck appeared to be empty. I drove into the parking lot and past the truck. I was closest to the truck and no one was in the cab of the truck. I made a u-turn and drove back past the truck again. This time Julius, in the passenger seat, was the closest to the truck. Julius rolled his window down, took out a gun and fired shots into the truck. We did not see anyone inside it. We both believed the truck was empty. The incident happened in the night time when it was dark outside.

(Ex. 74, Decl. of Richard Smart, at ¶ 3.) And because Mr. Smart was a witness for the prosecution for the underlying drug conspiracy, he would have enjoyed credibility with the jury.

Unfortunately, the jury was never apprised of the mitigating circumstances of Robinson's guilty plea to the firearm discharge offense or the initial court's disposition of the case to community supervision. Instead, the jury simply learned that Robinson was convicted of deadly conduct. (20 RT 11-12; Gov't Trial Ex. 925.) Without any rebuttal from the defense, the prosecution was able to use the Tucker incident to bolster the future dangerousness allegation. The prosecutor emphasized the shooting incident repeatedly throughout his closing argument. (23 RT63, 66-67, 99, 106.) Twice, the prosecution implied that Robinson attempted to murder Tucker over a petty debt:

> The significant thing about a prior criminal record is back from the time that he is 19 years of age, his problem solver, his gun, Sarah Lee Tucker owed him a $100 for crack cocaine. So she's a problem. We'll take care of that.

(23 RT 63; 23 RT 120 ("he is willing to shoot up that pickup truck with this little girl in it").)

11

**B.**     **Trial Counsel Was Ineffective For Failing to Refute the Prosecution's Expert Testimony that Robinson Posed a Future Danger Based Upon His Childhood Involvement With the "Dermott Crips"**

Trial counsel failed to investigated whether, or to what extent, Robinson was involved in a gang.  Had they done so, they would have been able to refute the prosecution's allegation that Robinson was a future danger in prison based upon supposed gang membership.

For the first time at the penalty phase, the prosecution portrayed Robinson as a notorious gang member.  (20 RT 45-69.)  Terrence Hollimon, Robinson's cousin, claimed that Robinson had admitted being a member of the "Crips," a well-known street gang. (20 RT 47-48.)  To corroborate his testimony, the prosecution asked Hollimon to view a series of photographs. (20 RT 48-49.)  For each one, Hollimon identified Robinson displaying hand gestures that Hollimon stated were gang signs.  (*Id.*)  Once the prosecution established that Robinson was affiliated with a gang, the prosecution relied on its own prison expert" to link Robinson to gang violence in prisons:

> Prison gangs do play a significant role in prison operations. Nearly all violence, serious violence, within a correctional setting, can be traced back to gang rivalries, racial rivalries that tie to the prison gangs, and to their continuing interactions with each other in looking for a balance of power between inmate groups.

(22 RT 112-13.)

Evidence of gang affiliation went unanswered by the defense.  Trial counsel's failure to hire a gang expert to refute the prosecution's expert, in addition to the failure to investigate Robinson's alleged gang involvement in the Crips, was deficient.

Had trial counsel fulfilled their constitutional duties, they could have presented testimony establishing that the Dermott Crips did not constitute the type of gang feared in society.

12

Pursuant to a study commissioned by the United States Department of Justice, Dr. Malcolm Klein, a sociologist specializing in gang research, established nationally recognized criteria for evaluating and categorizing gangs.  Generally, there are five categories of gangs:  (1) Traditional (2) Neo-traditional (3) Collective (4) Compressed and (5) Specialty.  Malcolm W. Klein, Cheryl L. Maxson, Gang Structures, Crime Patterns, and Police Responses: A Summary Report (2001), available at www.ncjrs.gov/pdffiles1/nij/grants/188510.pdf.  As the title connotes, Traditional gangs are long-standing, fairly large (consisting of 100 or more members), and have clear stratification based upon age or subgroup and fiercely territorial.  *Id*.  Neo-traditional are similar but have not been in existence as long traditional gangs.  Collective gangs are slightly smaller, less territorial, have less stratification based upon age, and generally in existence for a decade.  *Id*. Speciality gangs are similar to the other gangs but also resemble a criminal syndicate, usually focused on a single criminal activity.  *Id*.  The Dermott "Crips" did not meet the criteria for any of the four notorious gangs (Traditional, Neo-traditional, Collective or Specialty).  According to Dr. Klein, the so-called Dermott Crips can be most accurately described as a Compressed gang. (Ex. 72, Decl. of Malcolm Klein, at ¶ 4.)  Compressed gangs are characterized by their small size, total absence of stratification, and short life span.  (*Id*. at ¶ 3c.)

Employing a gang expert during the penalty phase, such as Dr. Klein, would have been essential to counter any visceral reaction the jury might have had to this inflammatory evidence. Critically, trial counsel could have used an expert opinion to distinguish the Dermott Crips from the traditional gangs, which are commonly found and feared in urban areas.  This was all the more important given the fact that the venire was chosen from the metropolitan area of Fort Worth. Moreover, trial counsel could have refuted the dubious insinuation by the prosecution's prison

expert that Robinson's prior involvement with the Dermott Crips - a disorganized and insignificant organization - somehow posed a danger for greater violent activity in prison.

## II.    SUPPLEMENTAL ARGUMENT FOR GROUND 2 (THE COURT SHOULD VACATE THE PENALTY VERDICT BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE)

### A.    Trial Counsel Failed to Communicate Regularly With Their Client Prior to Trial

Routine and in-depth interviews with the client are the cornerstone of competent investigation. Updated Guideline § 4.1 cmt ("Effective representation requires ongoing interactive contact with the client."); *see United States v. Hoskins*, 910 F.2d 309, 311 (5th Cir. 1990) (finding petitioner had failed to establish deficient performance under *Strickland* where trial counsel had met "regularly" with the defendant). Trial counsel is obligated to "maintain close contact with the client throughout preparation of the case." Guidelines § 11.4.2. This communication is important, not only for updating the client about the status of his case but to learn vital information to support the defense. Updated Guideline § 10.5 & cmt. (noting "contact with the client is necessary.") Indeed, "[t]he client is usually the lawyer's primary source of information for an effective defense." (*Id.*) The recent Guidelines dictate that "immediately" upon counsel's appointment, the client must be interviewed to address various matters, including "the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors." Updated Guidelines § 10.7 cmt. Due to the sensitive nature of the information relevant to capital sentencing, multiple interviews by counsel are essential.

14

Guidelines § 11.4.2 cmt. ("One hurried interview with the client will not reveal to counsel all the facts counsel needs in order to prepare for a capital trial"); Updated Guidelines § 10.7 cmt. ("Obtaining such information typically requires overcoming considerable barriers, as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer.").

No member of the defense team met with Robinson on a regular basis. According to the jail visitation logs maintained by the Federal Correctional Institution - Fort Worth (FCI-Forth Worth),[1] Mr. Ball (lead trial counsel) only visited his client twice. Other than the introductory meeting following his appointment, the first visit occurred on December 4, 2001, almost five months. The only other time Mr. Ball visited his client was on January 25, 2001, less than a month before Robinson's trial. The defense investigator's first and only visit with the client occurred after the trial. (Ex. 80, Bureau of Prisons Records, at p. 2.) (entry that "Bruce Cummings" visited on March 19, 2002). Other than the initial visit, the only time Mr. Strickland visited Robinson in jail was on May 24, 2002 - a full two months after the jury sentenced him to death and a week before the judge imposed the sentence. (*Id.* at p. 8.)

It is beyond cavil that trial counsel's minimal communication with their client prior to the guilt or penalty phase was wholly inadequate. The lack of adequate visitation with the client is corroborated by trial counsel's own records. A survey of trial counsel's files reveals only a single document pertaining to a visit with Mr. Robinson on December 4, 2001.

---

[1] At the time of Robinson's trial, FCI-Fort Worth was known as the Federal Medical Center (FMC).

Had trial counsel adequately consulted with and interviewed their client, they could have learned substantial information about Robinson's tragic life history as well as learn critical information about the evidence introduced in aggravation.  For example, trial counsel could have learned from Robinson about the circumstances of the incident involving Tucker, including the identify of the driver that evening.

**B.      Trial Counsel Failed to Hire a Mitigation Specialist**

The Guidelines require defense counsel to retain a mitigation specialist as part of the capital defense team.  Updated Guidelines § 4.1.  Rather than articulating it an aspiration or ideal, the Guidelines explicitly deems the use of a mitigation specialist part of the existing  "standard of care" in capital cases.  Updated Guidelines § 4.1 cmt.

Mitigation specialists have been essential in providing effective representation in capital cases long before their use was expressly mandated in the Guidelines.  Although the Guidelines, first promulgated in 1989, had not adopted the nomenclature of "mitigation specialist," the Guidelines clearly acknowledged the importance of such persons to a capital defense.  Under the prior guidelines, it was incumbent upon defense counsel to employ "investigative, expert, and other services necessary to prepare and present an adequate defense" which includes the "presentation of mitigation."  Guidelines § 8.1  These guidelines stressed that "quality representation" required access to supporting services, including "personnel skilled in social work and related disciplines to provide assistance . . . at sentencings."  Moreover, the guidelines cautioned that trial counsel, who is charged with conducting "a thorough investigation of the defendant's life history and background . . . cannot adequately perform these and other crucial penalty phase tasks without the assistance of investigators and other assistants."  Indeed, the

16

Guidelines suggested that a "social worker" -- the professional commonly serving the role of mitigation specialist -- "may be determinative as to outcome."  Guidelines § 8.1 cmt. (noting that trial counsel should retain all appropriate experts, including a social worker).

Regardless of whether capital defense attorneys were obligated to employ a mitigation specialist in 1989, there is no question that using a mitigation specialist was the standard of care at the time of Robinson's federal capital trial in 2002.  As outlined in a report adopted by the Judicial Conference of the United States, mitigation specialists were "frequently used in federal death penalty cases" as early as 1998.  Subcomm. on Federal Death Penalty Cases, Comm. on Defender Services, Judicial Conference of the United States, Federal Death Penalty Cases: *Recommendations Concerning the Cost and Quality of Defense Representation* (1998) (commentary).[2]  All lawyers interviewed for the report "stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase."  (*Id.*)  Moreover, the Federal Death Penalty Resource Counsel project, which was established in 1992 to assist counsel in federal death-penalty cases, had "consistently advised counsel to engage the services of a mitigation specialist in all cases where the death penalty may be sought."  (Ex. 75, Decl. of Russell Stetler, at ¶ 24.)

Trial counsel failed to retain a mitigation specialist as part of the standard of care required in a capital case.  Drawing upon his extensive experience serving as a mitigation specialist in capital cases, Russell Stetler describes the unique purpose of the mitigation specialist, the various functions they perform, and the professional responsibility of trial counsel to employ a mitigation specialist in a capital case.  (Ex. 75, Declaration of Russell Stetler).  Mr. Stetler opined that trial

---

[2]  The report is available at http://www.uscourts.gov/dpenalty/4REPORT.htm#a037.

counsel's failure to engage the services of a mitigation specialist "fell below the standard expected of federal death penalty counsel in 2001-2." (*Id.*)

Trial counsel, particularly Mr. Strickland, disparaged mitigation specialists generally. But an invoice from one of Mr. Strickland's cases verify that he previously hired a mitigation specialist. In 1999, two years before Robinson's trial, Mr. Strickland retained and presented Vince Gonzalez, a mitigation specialist, in a state capital case. (Ex. 81.)

Why trial counsel were resistant to mitigation specialists in Mr. Robinson's trial appears to stem from a fundamental misunderstanding of the unique role that the mitigation specialists serve on the defense team. As Mr. Stetler explains, even competent defense counsel "generally lack the skill to conduct [mitigation] investigations." (Ex. 75) Because mitigation specialists "have extensive training and experience in the defense of capital cases," they are better equipped to conduct the "detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes." (*Id.*) Mr. Stetler also contradicts Mr. Ball's belief that the duties of the mitigation specialist can be shouldered by the investigator:

> Because of the time and expertise required, it is not appropriate to ask an investigator to investigate the factual allegations which constitute the capital charges and the biographical attention. Each investigative track needs someone's undivided attention.

(*Id.*)

A mitigation specialist could have undertaken the in-depth social history investigation that was so conspicuously absent from this case. At a minimum, the mitigation specialist could have traveled to Dermott to interview knowledgeable family members, obtain critical social

18

history records, including Robinson's special education and birth records, and coordinate with an expert familiar with teratogenic effects of pesticides and fetal alcohol and drug exposure. There is no question that trial counsel's failure to hire a mitigation specialist, coupled with trial counsel's failure to conduct a reasonably substantial and independent mitigation investigation, handicapped Robinson's penalty phase presentation. *See, e.g., United States v. Hall*, 2004 U.S. Dist. LEXIS 17089 (N. D. Tex. 2004), *aff'd*, 455 F.3d 508 (5th Cir. Tex. 2006) (concluding trial counsel provided effective assistance of counsel by conducting a thorough mitigation investigation and hiring a mitigation specialist whose "investigation included traveling to Arkansas and . . . interviewing numerous people there" over a six-week period).

**C.      Trial Counsel Failed to Conduct a Reasonably Thorough Mitigation Investigation**

In addition to failing to hire a mitigation specialist, trial counsel failed to conduct a competent investigation into Robinson's background. "[m]ental health experts are essential to defending capital cases." ABA Guidelines § 4.1.A.2 cmt. However, before the client can even be evaluated, "counsel must compile extensive historical data." This substantial endeavor requires a "time-intensive process." Of the 1,318 hours that trial counsel devoted to this case, only 20 hours was devoted to mitigation investigation.[3]   (Ex. 55, Memorandum of Jesse Wallis.) All of that investigation occurred either during trial or immediately before the trial began. (*Id.*)

Mr. Stetler also characterizes the manner in which mitigation investigation was done as "grossly inadequate." As trial counsel admits, the few family members Cummings did contact

---

[3] Trial counsel also claimed five hours for research and work on jury instructions as well as preparing and faxing an investigative memorandum to Cummings. (Ex. 55, Memorandum of Jesse Wallis.) While it is unclear the amount of time that was devoted to this task, it does not appear to involve actual investigation.

were interviewed over the telephone.  According to Stetler, "[t]elephone or group interviews fall below the accepted standard."  (Ex. 75).  The reason is clear:

> [I]n-person, face-to-face, one-on-one interviews are required to build trust and to elicit sensitive information. . . .  Even in person, it is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses . . . .  These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves and re-traumatize those being interviewed.

*Id.*

Trial counsel's lackadaisical approach to mitigation is perhaps best exemplified by the manner in which Robinson's positive prison adjustment was actually revealed.  Rather than forming a part of a thoughtful strategy to discover all potentially mitigating evidence, the decision to investigate Robinson's good behavior while in prison before trial was precipitated by a chance encounter with one of the correctional officers guarding Robinson.  As reflected in a file memorandum, Mr. Ball went to visit his client on December 4, 2001.  While Mr. Ball was being escorted from the main entrance to the jail unit, Correctional Officer S. G. Sabolchick asked who Mr. Ball was going to see.  When Mr. Ball said he was there to visit Robinson, Officer Sabolchick "immediately commented that the defendant was well[-]behaved." (*Id.*)  Had it not been for the officer's spontaneous declaration, trial counsel might never discovered Robinson's positive adjustment to prison.

Ms. Welch, a seasoned capital habeas practitioner in Texas, offers her insight into one possible reason why trial counsel might have failed to conduct an adequate mitigation

investigation.  (Ex. 76, Decl. of Mandy Welch.)  Ms. Welch explains how, despite the existing

standard of care requiring a thorough mitigation investigation, many capital habeas practitioners

often continued to shirk their responsibility in this area.  (*Id.*)  In recounting the history of the

previous Texas capital sentencing procedure, Ms. Welch describes the general malaise of trial

counsel in failing to pursue critical mitigation evidence, long after the state death penalty statute

had been revised.  According to Ms. Welch, trial counsel's indifference to the penalty phase

investigation may have been a byproduct of the prior state death penalty scheme which precluded

the jury from considering mitigation evidence.  (Ex. 76, Decl. of Mandy Welch, at ¶ 7.)  Until

1991, state law only permitted juries to consider three special issues, none of which dealt with

mitigation. As a result, many capital defense attorneys refused to conduct an investigation into

the client's background, assuming the jury would either disregard the mitigation entirely or,

worse, punish the defendant for presenting irrelevant evidence.  Following the amendment

to the statute, many criminal defense attorneys continued to resist mitigation investigation,

despite a state and national consensus.  (*Id*.)  According to Ms. Welch, this reluctance permeated

both state and federal prosecutions:

> Unfortunately, even after the Texas statute was revised, skepticism regarding the
>
> value of mitigation evidence persisted within the capital defense community.
>
> Many practitioners, having been deprived of an appropriate vehicle to present
>
> mitigation evidence for so long, resigned themselves to the belief that a jury would
>
> never find the evidence persuasive, making an investigation futile.   Because most,
>
> if not all, attorneys appointed in federal capital prosecutions had obtained their

qualifications through their experience in state death-penalty cases, this approach eventually percolated into the federal system.

(Ex. 76.)

> ### D.    Given Robinson's Substantial Exposure to Drugs and Alcohol *In Utero*, Trial Counsel Was Obligated to Retain and Present an Appropriate Mental Health Expert

As discussed in the 2255 motion, trial counsel failed to conduct an adequate investigation into Robinson's life history.  Had trial counsel done so, they would discovered strong evidence the pervasive drug and alcohol abuse by Mr. Robinson's mother during her pregnancy with Julius. (Original Motion, at pp. 40-41; Ex. 29, Decl. of Jimmie Lee Robinson, at ¶ 17.)

The direct effects of the *in utero* alcohol exposure were apparent at Robinson's birth. Growth retardation, such as low birth weight or height, is one of the diagnostic criterion for fetal alcohol exposure.  (Ex. 77, Report of Dr. Kate Allen, at pp. 6-7.)  At delivery, Robinson weighed only five pounds, six ounces.  (Ex. 38, Medical Records, at p. 14).  Robinson's height and weight measurements would have been disconcerting for any newborn.  (Ex. 48.)  The fact that Robinson was not premature made these findings all the more worrisome.  Indeed, Robinson was beyond full term, having been born after forty-two weeks of gestation.  (Ex. 38, Cape Fear Medical Records, p. 3, 18 ("42½ wks, delivered"); (*see* Ex. 49, Jennifer R. Butler, MD, Postterm Pregnancy, Emedicine.com (Jun. 14, 2006) (defining postterm pregnancy as greater than 42 weeks of gestation).)  Given Robinson's extremely low birth weight, and lengthy gestational period, the

/ / /

/ / /

doctors designated Robinson as "SGA," which is the abbreviation for "small for gestational age." (Ex. 38, Cape Fear Medical Records, at p. 3; Ex. 50, Medline Plus Medical Encyclopedia).[4]

Had trial counsel conducted a reasonably thorough investigation into Robinson's life history, they could have presented a qualified expert to discuss the impact of prenatal drug and alcohol exposure on Robinson.  Dr. Kate Allen is a licensed clinical social worker who specializes in alcohol related neurodevelopmental disorder (ARND) and attachment disorder.  Her report discusses the teratogenic effects of alcohol, nicotine, and marijuana on Mr. Robinson while in the womb.  (Ex. 77.)  In addition, Dr. Allen explains the long-term impact of the neuropsychological deficits resulting from this exposure in *utero*.  Her report also contains an explanation of this fetal injury made Mr. Robinson more to susceptible to other psychological and behavioral problems, including attachment disorder.  (Ex. 77.)

According to Dr. Allen, it was "obvious" that Robinson's executive functioning was comprised by the chronic exposure to teratogens, especially alcohol.  In addition to the direct effects of the tertagenic exposure, Dr. Allen explained how his fetal injury made Robinson more vulnerable to psychological and emotional problems throughout his life, making him less morally culpable.  As Dr. Allen explains,

---

[4] Complicating the delivery further was the fact that Rose had too much amniotic fluid. This phenomenon, known as "polyhydramnios," is correlative to congenital malformations, including birth defects affecting the central nervous system.  (Ex. 51, Stoll CG, Roth MP, Dott B, Alembik Y, *Study of 290 Cases of Polyhydramnios and Congenital Malformations in a Series of 225,669 Consecutive Births*, Community Genet. 2(1):36-42 (1999) (concluding that more frequent congenital malformations are associated with polyhydramnios were cardiac, digestive, central nervous system, musculoskeletal, and urinary).)  Alcohol exposure in utero is a common cause of such defects.  (Ex. 52, C.L. McGee & E.P. Riley, *Brain Imaging and Fetal Alcohol Spectrum Disorders*, Ann Ist Super Sanita, 42(1):46-52 (2006) ("Over thirty years of research has revealed that prenatal exposure to alcohol has a devastating impact on the structure and function of the developing central nervous system.").)

Because Julius's mother injured him in utero, he was at high risk for other maternal failures (impaired attachment), and was made particularly vulnerable to the dangerous challenges of high-risk environments (abuse, neglect, poverty, drugs, discrimination, violence). These three causative factors (teratogenic exposure, poor attachment, severe neglect amidst danger) - the latter two being correlated to fetal toxic exposure - are ample explanations of how this defendant traveled the road to criminal behavior.

(Ex. 77.)

The absence of this mitigating evidence clearly had a devastating impact on Robinson's penalty phase. The jury found nothing mitigating about Robinson's background. Dr. Allen (or an expert like her) could have explained to the jury that Robinson eventual involvement with drug dealing and the concomitant lifestyle, was precipitated by a constellation of factors that affected Robinson from childhood and even before he was born. While not an excuse, it would have dispelled the prosecution's assertion that Robinson was simply a bad person. Given that none of the jurors found anything mitigating about Robinson's background, there is a reasonable probability that at least one juror might have changed their mind and voted for life.

III.    **SUPPLEMENTAL ARGUMENT FOR GROUND 3 (THE FEDERAL DEATH PENALTY ACT, AS APPLIED IN TEXAS, VIOLATES EQUAL PROTECTION)**

Under Ground Three of the original motion, Robinson provided statistical data which raises an inference of racial discrimination. Ms. O'Donnell's declaration provides further statistical support that the capital charging decision was racially motivated. Relying on charts tracking all capital cases addressed by the Department of Justice during the death penalty

authorization process, Ms. O'Donnell offers a statistical comparison based upon the race of the defendant.

From February 2001 to February 2005, John Ashcroft served as the United States Attorney General. During that time, he reviewed 626 "death-eligible" cases and authorized 144 for the death penalty. Based solely on the defendant's race, USAO's were more than twice as likely to charge Blacks (275 out of 626 or 44%) with a capital qualifying offense than Whites (113 out of 626 or 18%).

The racial disparity is only heightened when the race of the victim is taken into consideration. Among the cases forwarded for review by the USAO's, there were 71 interracial murders involving Whites (12 murders against non-White victims), Blacks (51 murders against White victims), and Hispanics (8 murders against White victims). Among the cases authorized for the death penalty by the DOJ, there were 27 interracial murders total (four White defendants committing murders against non-White victims, 22 Black defendants committing murder against White victims, and one Hispanic defendant committing a murder against a White victim). (*Id.* at ¶ 6.) For White defendants, only 12% of the cases forwarded for review involved a non-White victim and, of those, only 33% were authorized. (*Id.* at ¶ 6.) In contrast, for Black defendants, 22% of the cases forwarded for review involved a white victim with 42% of those cases being authorized for the death penalty. (*Id.*)

Robinson concedes that at this point he has not proven discriminatory intent within the meaning of *McCleskey*. However, the statistics raise an strong inference of intentional racial discrimination. Nor does Robinson rely "solely" on statistics to prove his claim of racial discrimination. The prosecutors who tried his case participated in the DOJ death penalty

25

protocols that resulted in the authorization to seek the death penalty against Robinson. These same prosecutors engaged in disparate questioning of Black potential jurors during voir dire, which stands as further evidence of discriminatory intent that is unrelated to the statistical proof. The general Texas statistics, coupled with the *Batson* challenges in this particular case, constitute a prima facie case that the Federal Death Penalty Act, as applied in the state of Texas, discriminates against Black people, and that Robinson himself has been discriminated against. Robinson requests discovery and an evidentiary hearing to develop evidence that the disparate impact of the Federal Death Penalty Act on Black People in Texas is the result of purposeful discrimination.

<div align="center">

**CONCLUSION**

</div>

For all the foregoing reasons, the Court should vacate the verdicts. In the alternative, the court should grant an evidentiary hearing for each of Robinson's claims.

<div style="margin-left:50%">

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

</div>

Dated: January 17, 2007

<div style="margin-left:50%">

s/ Sean K. Kennedy
SEAN K. KENNEDY
Federal Public Defender
CRAIG A. HARBAUGH
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile: (213) 894-7566
E-Mail sean_kennedy@fd.org
E-Mail craig_harbaugh@fd.org

</div>

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on January 17, 2007, I electronically filed the

foregoing document with exhibits with the clerk of the court for the U.S. District Court, Northern

District of Texas, using the electronic case filing system of the court.  The electronic case filing

system sent a "Notice of Electronic filing" to the following attorneys of record who have

consented in writing to accept this Notice as service of this document by electronic means:

SUSAN COWGER
Assistant United States Attorney
U.S. Attorney's Office
1100 Commerce Street, 3rd Fl.
Dallas, Texas  75242


Dated: January 17, 2007                          s/Patricia Jacobson
                                                 PATRICIA JACOBSON