**Bureau of Prisons, Federal Medical Center, Fort Worth**
Recorded Telephone Call of JULIUS ROBINSON
12/28/2000
7:48 PM

**Partial transcript of phone call between JULIUS ROBINSON and MARCUS ROBINSON and others**

Telephone voice - Thank You

Ringing

Marcus - Hello.

Julius - Yeah.

Recorded telephone message - This call is from a federal prison

Criminal No.:   4:00-CR-260-Y

USA v. Nathan Henderson, et al

**GOVERNMENT EXHIBIT**



929a

Marcus - Hello

Julius - Yeah, yeah

Marcus - ...U/I   Man, hey look

Julius - Huh

Marcus - I ain't  ...U/I contact with your boy that's what ...U/I these days

Julius - Yeah but just tell him you know what I'm saying

Marcus - I know man I tried to call him last night, I guess he saw the number and just don't wanna talk to me

Julius - Don't talk to him on the phone.  His phone might be tapped but uh it probably is tapped but uh they, they recorded every conversation we had you know what I'm saying

Marcus - I haven't even talked to my um.  My homeboy he's gonna be gone till January um 3 or something, one

Julius - Oh, OK.  Well anyway call Joe back so I can talk to her for a minute

Marcus - Hold on

**Marcus places three way call to JOSEPHINE DOTSON residence**

Exhibit 44 - 1

**Miscellaneous conversation with JOSEPHINE including ROBINSON asking JOSEPHINE about her sons (three), particularly TERENCE**

## Conversation continues

**Julius- Hmm man Joe**

**Josephine- Huh**

**Julius- That dude ONE LOVE, Man that dude right there go hard Joe**

**In background**
**Marcus - He is lying and shit**

**Josephine- Uh huh**

**Julius- He still out he still down there ain't he**

**In background**
**Josephine- …Have any of y'all seen one love**

**Josephine - I haven't seen him.  I have not seen him.**

## Conversation Continues

**Julius- oh, so how's grandma doing**

**Exhibit 44 - 2**

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | ACTION NO. 4:00-CR-260-Y |
| | § | |
| JULIUS OMAR ROBINSON (2) | § | |

## SPECIAL VERDICT FORM

Question No. 1:

Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson was eighteen years of age or older at the time of the offenses alleged in the Second Superseding Indictment?

Answer "Yes" or "No."

Answer: __Y_____.

Instruction: If you answered "Yes" to Question No. 1, proceed to Question No. 2. If you answered "No" to Question No. 1, you are finished with your deliberations.

SPECIAL VERDICT FORM - Page 1
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 1**

<u>Question No. 2</u>--Count Three--Killing of Johnny Lee Shelton While Engaging in or Working in Furtherance of a Continuing Criminal Enterprise:

2(A).    <u>Threshold Eligibility Factors</u>

    <u>Instruction:</u> If you answer "Yes" to **any** of the four following questions, you may immediately proceed to Question No. 2(B) on the following page.  If you answer "No" to **all** of the four following questions, proceed to Question No. 3.

    (1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally killed Johnny Lee Shelton?

    Answer "Yes" or "No."

    Answer:____Y____.

    (2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally inflicted serious bodily injury that resulted in the death of Johnny Lee Shelton?

    Answer "Yes" or "No."

    Answer:____Y____.

    (3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct intending that Johnny Lee Shelton be killed or that lethal force be employed against Johnny Lee Shelton, which conduct resulted in the death of Johnny Lee Shelton?

    Answer "Yes" or "No."

    Answer:____Y____.

    (4) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct that he knew would create a grave risk of death to a person, other than one of the participants in the offense, which conduct resulted in the death of Johnny Lee Shelton?

    Answer "Yes" or "No."

    Answer:____Y____.

<u>SPECIAL VERDICT FORM - Page 2</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 2**

2(B).   <u>Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson knowingly created a grave risk of death to one or more persons in addition to the victim, Johnny Lee Shelton?

Answer "Yes" or "No."

Answer: ___Y___.


(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Johnny Lee Shelton after substantial planning and premeditation to cause the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer: ___Y___.


<u>Instruction:</u> If you answered "Yes" to **either** portion of Question No. 2(B), proceed to Question No. 2(C) on the following page. If you answered "No" to **both** portions of Question No. 2(B), proceed to Question No. 3.

<u>SPECIAL VERDICT FORM - Page 3</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 3**

2(C).  <u>Non-Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Johnny Lee Shelton, poor rehabilitative potential, specific threats, or acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.


(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.


<u>Instruction:</u> Proceed to Question No. 2(D) regardless of how you answered either part of Question No. 2(C).

**Exhibit 45 - 4**

2(D).    Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Johnny Lee Shelton?

Number of jurors who so find: _____0_____


(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Johnny Lee Shelton, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find: _____0_____


(3) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson could not reasonably have foreseen that his conduct in the course of the killing of Johnny Lee Shelton would cause, or would create a grave risk of causing, death to any person?

Number of jurors who so find: _____0_____


(4) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Johnny Lee Shelton, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____


SPECIAL VERDICT FORM - Page 5
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 5**

(5) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Johnny Lee Shelton, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____4_____

(6) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Johnny Lee Shelton, will not be punished by death?

Number of jurors who so find: _____9_____

(7) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____2_____

Instruction: Proceed to Question No. 2(E) regardless of how you answered any part of Question No. 2(D).

SPECIAL VERDICT FORM - Page 6
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 6**

2(E).  <u>Non-Statutory Mitigating Factors</u>

<u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: ____5____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: ____0____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: ____4____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Johnny Lee Shelton consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: ____3____

**Exhibit 45 - 7**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Johnny Lee Shelton, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____6_____

(6) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____1_____

(7) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| | 0 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Instruction: Proceed to Question No. 2(F) regardless of how you answered any part of Question No. 2(E).

SPECIAL VERDICT FORM - Page 8
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 8**

2(F).  Recommendation

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Johnny Lee Shelton while engaging in or working in furtherance of a continuing criminal enterprise:

_____X_____Death

_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence


Instruction: Proceed to Question No. 3 regardless of how you answered Question No. 2(F).

SPECIAL VERDICT FORM - Page 9
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 9**

Question No. 3--Count Three--Killing of Juan Reyes While Engaging in or Working in Furtherance of a Continuing Criminal Enterprise:

3(A). Threshold Eligibility Factors

Instruction: If you answer "Yes" to **any** of the four following questions, you may immediately proceed to Question No. 3(B) on the following page. If you answer "No" to **all** of the four following questions, proceed to Question No. 4.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally killed Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally inflicted serious bodily injury that resulted in the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct intending that Juan Reyes be killed or that lethal force be employed against Juan Reyes, which conduct resulted in the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(4) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct that he knew would create a grave risk of death to a person, other than one of the participants in the offense, which conduct resulted in the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

SPECIAL VERDICT FORM - Page 10
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 10**

3(B).  <u>Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson knowingly created a grave risk of death to one or more persons in addition to the victim, Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Juan Reyes after substantial planning and premeditation to cause the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Juan Reyes in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

<u>Instruction:</u> If you answered "Yes" to **any** portion of Question No. 3(B), proceed to Question No. 3(C) on the following page. If you answered "No" to **all** portions of Question No. 3(B), proceed to Question No. 4.

SPECIAL VERDICT FORM - Page 11
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 11**

3(C).   Non-Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Juan Reyes, poor rehabilitative potential, specific threats, or acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: Proceed to Question No. 3(D) regardless of how you answered either part of Question No. 3(C).

SPECIAL VERDICT FORM - Page 12
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 12**

3(D).    <u>Statutory Mitigating Factors</u>

<u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Juan Reyes?

Number of jurors who so find:_____0_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Juan Reyes, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find:_____0_____

(3) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson could not reasonably have foreseen that his conduct in the course of the killing of Juan Reyes would cause, or would create a grave risk of causing, death to any person?

Number of jurors who so find: _____0_____

(4) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Juan Reyes, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____

<u>SPECIAL VERDICT FORM - Page 13</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 13**

(5) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Juan Reyes, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____3_____

(6) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Juan Reyes, will not be punished by death?

Number of jurors who so find: _____12_____

(7) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____1_____

Instruction: Proceed to Question No. 3(E) regardless of how you answered any part of Question No. 3(D).

SPECIAL VERDICT FORM - Page 14
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 14**

3(E).   <u>Non-Statutory Mitigating Factors</u>

<u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____4_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Juan Reyes consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____1_____

<u>SPECIAL VERDICT FORM - Page 15</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 15**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Juan Reyes, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____ 2 _____

(6) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____ 3 _____

(7) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| | 0 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

_Instruction:_ Proceed to Question No. 3(F) regardless of how you answered any part of Question No. 3(E).

SPECIAL VERDICT FORM - Page 16
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 16**

3(F).    <u>Recommendation</u>

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Juan Reyes while engaging in or working in furtherance of a continuing criminal enterprise:

_____X_____Death

_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence


<u>Instruction:</u> Proceed to Question No. 4 regardless of how you answered Question No. 3(F).

<u>SPECIAL VERDICT FORM - Page 17</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 17**

Question No. 4--Count Three--Killing of Rudolfo Resendez While Engaging in or Working in Furtherance of a Continuing Criminal Enterprise:

4(A).  Threshold Eligibility Factors

Instruction: If you answer "Yes" to **either** of the following questions, you may immediately proceed to Question No. 4(B) on the following page.  If you answer "No" to **both** of the following questions, proceed to Question No. 5.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which conduct resulted in the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer:___*No*___.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct that he knew would create a grave risk of death to a person, other than one of the participants in the offense, which conduct resulted in the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer:___.

SPECIAL VERDICT FORM - Page 18
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 18**

4(B).  <u>Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson participated in the killing of Rudolfo Resendez as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value?

Answer "Yes" or "No."

Answer:_____✓_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Rudolfo Resendez after substantial planning and premeditation to cause the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer:_____✓_____.

<u>Instruction:</u> If you answered "Yes" to **either** portion of Question No. 4(B), proceed to Question No. 4(C) on the following page.  If you answered "No" to **both** portions of Question No. 4(B), proceed to Question No. 5.

**Exhibit 45 - 19**

4(C).  <u>Non-Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Rudolfo Resendez, poor rehabilitative potential, specific threats, or acts of violence?

Answer "Yes" or "No."

Answer: _____ / _____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer: _____ / _____.

<u>Instruction:</u> Proceed to Question No. 4(D) regardless of how you answered any part of Question No. 4(C).

<u>SPECIAL VERDICT FORM - Page 20</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 20**

4(D).    Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Rudolfo Resendez?

Number of jurors who so find:____0____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Rudolfo Resendez, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find:____6____

(3) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson could not reasonably have foreseen that his conduct in the course of the killing of Rudolfo Resendez would cause, or would create a grave risk of causing, death to any person?

Number of jurors who so find: ____1____

(4) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: ____1____

SPECIAL VERDICT FORM - Page 21
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 21**

(5) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____3_____

(6) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Rudolfo Resendez, will not be punished by death?

Number of jurors who so find: _____12_____

(7) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____2_____

Instruction: Proceed to Question No. 4(E) regardless of how you answered any part of Question No. 4(D).

SPECIAL VERDICT FORM - Page 22
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 22**

4(E).    Non-Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____8_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Rudolfo Resendez consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____12_____

SPECIAL VERDICT FORM - Page 23
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 23**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Rudolfo Resendez, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: ___12___

(6) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: ___3___

(7) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
|  | 0 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Instruction: Proceed to Question No. 4(F) regardless of how you answered any part of Question No. 4(E).

SPECIAL VERDICT FORM - Page 24
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 24**

4(F).  <u>Recommendation</u>

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Rudolfo Resendez while engaging in or working in furtherance of a continuing criminal enterprise:

_____Death

____X____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence

<u>Instruction:</u> Proceed to Question No. 5 regardless of how you answered Question No. 4(F).

<u>SPECIAL VERDICT FORM - Page 25</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 25**

Question No. 5--Count Seven--Killing of Johnny Lee Shelton in the Course of Carrying or Using a Firearm During and in Relation to a Drug-Trafficking Crime:

5(A).    Threshold Eligibility Factors

Instruction: If you answer "Yes" to **any** of the four following questions, you may immediately proceed to Question No. 5(B) on the following page.  If you answer "No" to **all** of the four following questions, proceed to Question No. 6.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally killed Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally inflicted serious bodily injury that resulted in the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally participated in an act, contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Johnny Lee Shelton died as a direct result of the act?

Answer "Yes" or "No."

Answer:_____.

(4) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Johnny Lee Shelton died as a direct result of the act?

Answer "Yes" or "No."

Answer:_____.

SPECIAL VERDICT FORM - Page 26
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 26**

5(B).  <u>Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Johnny Lee Shelton, the victim of the offense?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Johnny Lee Shelton after substantial planning and premeditation to cause the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:_____Y_____.

<u>Instruction:</u> If you answered "Yes" to **either** portion of Question No. 5(B), proceed to Question No. 5(C) on the following page.  If you answered "No" to **both** portions of Question No. 5(B), proceed to Question No. 6.

**Exhibit 45 - 27**

5(C).  <u>Non-Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Johnny Lee Shelton, poor rehabilitative potential, specific threats, or acts of violence?

Answer "Yes" or "No."

Answer: _____Y_____.


(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer: _____Y_____.


<u>Instruction:</u> Proceed to Question No. 5(D) regardless of how you answered any part of Question No. 5(C).


<u>SPECIAL VERDICT FORM - Page 28</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 28**

5(D). <u>Statutory Mitigating Factors</u>

   <u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

   (1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Johnny Lee Shelton?

       Number of jurors who so find:_____0_____

   (2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Johnny Lee Shelton, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

       Number of jurors who so find:_____0_____

   (3) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Johnny Lee Shelton, will not be punished by death?

       Number of jurors who so find: ____10_____

   (4) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

       Number of jurors who so find: ____1_____

   <u>Instruction:</u> Proceed to Question No. 5(E) regardless of how you answered any part of Question No. 5(D).

<u>SPECIAL VERDICT FORM - Page 29</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 29**

5(E).   <u>Non-Statutory Mitigating Factors</u>

<u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:_____3_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Johnny Lee Shelton consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____1_____

<u>SPECIAL VERDICT FORM - Page 30</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 30**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Johnny Lee Shelton, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____10_____

(6) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Johnny Lee Shelton, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____

(7) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Johnny Lee Shelton, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____5_____

(8) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(9) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| <u>Mitigating Factor</u> | <u>Number of Jurors Who So Find</u> |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

<u>Instruction:</u> Proceed to Question No. 5(F) regardless of how you answered any part of Question No. 5(E).

**Exhibit 45 - 31**

5(F).  Recommendation

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Johnny Lee Shelton in the course of carrying or using a firearm during and in relation to a drug-trafficking crime:

_____X_____Death

_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence


Instruction: Proceed to Question No. 6 regardless of how you answered Question No. 5(F).

SPECIAL VERDICT FORM - Page 32
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 32**

<u>Question No. 6</u>--Count Eleven--Killing of Juan Reyes in the Course of Carrying or Using a Firearm During and in Relation to a Drug-Trafficking Crime:

6(A). <u>Threshold Eligibility Factors</u>

<u>Instruction:</u> If you answer "Yes" to **any** of the four following questions, you may immediately proceed to Question No. 6(B) on the following page. If you answer "No" to **all** of the four following questions, proceed to Question No. 7.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally killed Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally inflicted serious bodily injury that resulted in the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally participated in an act, contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Juan Reyes died as a direct result of the act?

Answer "Yes" or "No."

Answer:_____Y_____.

(4) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Juan Reyes died as a direct result of the act?

Answer "Yes" or "No."

Answer:_____Y_____.

<u>SPECIAL VERDICT FORM - Page 33</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 33**

6(B).  Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Juan Reyes, the victim of the offense?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Juan Reyes in an especially heinous, cruel, and depraved manner in that it involved torture or serious physical abuse to Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Juan Reyes after substantial planning and premeditation to cause the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(4) Do you unanimously find beyond a reasonable doubt that, during the killing of Juan Reyes, Julius Omar Robinson intentionally killed or attempted to kill more than one person in a single criminal episode?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: If you answered "Yes" to **any** portion of Question No. 6(B), proceed to Question No. 6(C) on the following page. If you answered "No" to **all** portions of Question No. 6(B), proceed to Question No. 7.

SPECIAL VERDICT FORM - Page 34
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 34**

6(C).  <u>Non-Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Juan Reyes, poor rehabilitative potential, and specific threats, and acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.


(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.


<u>Instruction:</u> Proceed to Question No. 6(D) regardless of how you answered any part of Question No. 6(C).

**Exhibit 45 - 35**

6(D). <u>Statutory Mitigating Factors</u>

    <u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

    (1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Juan Reyes?

    Number of jurors who so find: _____ 0 _____

    (2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Juan Reyes, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

    Number of jurors who so find: _____ 0 _____

    (3) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Juan Reyes, will not be punished by death?

    Number of jurors who so find: _____ 11 _____

    (4) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

    Number of jurors who so find: _____ 2 _____

    <u>Instruction:</u> Proceed to Question No. 6(E) regardless of how you answered any part of Question No. 6(D).

**Exhibit 45 - 36**

6(E).   Non-Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:_____3_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____4_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Juan Reyes consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____2_____

SPECIAL VERDICT FORM - Page 37
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 37**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Juan Reyes, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____ 0 _____

(6) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Juan Reyes, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____ 1 _____

(7) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Juan Reyes, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____ 5 _____

(8) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____ 3 _____

(9) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| | 0 |
| | |
| | |
| | |
| | |

Instruction: Proceed to Question No. 6(F) regardless of how you answered any part of Question No. 6(E).

SPECIAL VERDICT FORM - Page 38
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 38**

6(F).  <u>Recommendation</u>

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Juan Reyes in the course of carrying or using a firearm during and in relation to a drug-trafficking crime:

       X    Death

_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence


<u>Instruction:</u> Proceed to Question No. 7 regardless of how you answered Question No. 6(F).

**Exhibit 45 - 39**

Question 7--Count Fifteen--Killing of Rudolfo Resendez in the Course of Carrying or Using a Firearm During and in Relation to a Drug-Trafficking Crime:

7(A). Threshold Eligibility Factor

Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally participated in an act, contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Rudolfo Resendez died as a direct result of the act?

Answer "Yes" or "No."

Answer: ____Y____.

Instruction: If you answered "Yes" to the question above, proceed to Question No. 7(B) on the following page. If you answered "No" to question above, proceed to Question No. 8.

SPECIAL VERDICT FORM - Page 40
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 40**

7(B).    Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson, participated in the killing of Rudolfo Resendez as consideration for the receipt, or in the expectation of the receipt of anything of pecuniary value?

Answer "Yes" or "No."

Answer:_____✓_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Rudolfo Resendez after substantial planning and premeditation to cause the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer:_____✓_____.

Instruction: If you answered "Yes" to **either** portion of Question No. 7(B), proceed to Question No. 7(C) on the following page. If you answered "No" to **both** portions of Question No. 7(B), proceed to Question No. 8.

SPECIAL VERDICT FORM - Page 41
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 41**

7(C).  Non-Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Rudolfo Resendez, poor rehabilitative potential, and specific threats, and acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: Proceed to Question No. 7(D) regardless of how you answered any part of Question No. 7(C).

SPECIAL VERDICT FORM - Page 42
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 42**

7(D). <u>Statutory Mitigating Factors</u>

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Rudolfo Resendez?

Number of jurors who so find: _____0_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Rudolfo Resendez, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find: _____1_____

(3) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Rudolfo Resendez, will not be punished by death?

Number of jurors who so find: _____12_____

(4) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____12_____

Instruction: Proceed to Question No. 7(E) regardless of how you answered any part of Question No. 7(D).

**Exhibit 45 - 43**

7(E).    Non-Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:_____3_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____4_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Rudolfo Resendez consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____10_____

SPECIAL VERDICT FORM - Page 44
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 44**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Rudolfo Resendez, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____ 12 _____

(6) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____ 1 _____

(7) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____ 5 _____

(8) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____ 3 _____

(9) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| | 6 |
| | |
| | |
| | |
| | |

**Instruction:** Proceed to Question No. 7(F) regardless of how you answered any part of Question No. 7(E).

SPECIAL VERDICT FORM - Page 45
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 45**

7(F).    <u>Recommendation</u>

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Rudolfo Resendez in the course of carrying or using a firearm during and in relation to a drug-trafficking crime:

_____Death

\_\_\_\_\_X\_\_\_\_\_Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence


<u>Instruction:</u> Proceed to Question No. 8 regardless of how you answered Question No. 7(F).

<u>SPECIAL VERDICT FORM - Page 46</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 46**

<u>Question No. 8</u>--Count Twelve--Killing of Rudolfo Resendez While Engaging In Drug-Trafficking Crime:

8(A). <u>Threshold Eligibility Factors</u>

    <u>Instruction:</u> If you answer "Yes" to **either** of the following questions, you may immediately proceed to Question No. 8(B) on the following page. If you answer "No" to **both** of the following questions, proceed to the next-to-last page of this Special Verdict Form.

    (1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which conduct resulted in the death of Rudolfo Resendez?

    Answer "Yes" or "No."

    Answer:_____Y_____.

    (2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct that he knew would create a grave risk of death to a person, other than one of the participants in the offense, and that resulted in the death of Rudolfo Resendez?

    Answer "Yes" or "No."

    Answer:_____Y_____.

**Exhibit 45 - 47**

8(B).   <u>Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson, participated in the killing of Rudolfo Resendez as consideration for the receipt, or in the expectation of the receipt of anything of pecuniary value?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Rudolfo Resendez after substantial planning and premeditation to cause the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer:_____Y_____.

<u>Instruction:</u> If you answered "Yes" to **either** portion of Question No. 8(B), proceed to Question No. 8(C) on the following page. If you answered "No" to **both** portions of Question No. 8(B), proceed to the next-to-last page of this Special Verdict Form.

<u>SPECIAL VERDICT FORM - Page 48</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 48**

8(C).  <u>Non-Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Rudolfo Resendez, poor rehabilitative potential, specific threats, and acts of violence?

Answer "Yes" or "No."

Answer:_____✓_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____✓_____.

<u>Instruction:</u> Proceed to Question No. 8(D) regardless of how you answered any part of Question No. 8(C).

<u>SPECIAL VERDICT FORM - Page 49</u>
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 49**

8(D).  <u>Statutory Mitigating Factors</u>

<u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Rudolfo Resendez?

Number of jurors who so find:_____0_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Rudolfo Resendez, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find:_____6_____

(3) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson could not reasonably have foreseen that his conduct in the course of the killing of Rudolfo Resendez would cause, or would create a grave risk of causing, death to any person?

Number of jurors who so find: _____0_____

(4) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____

**Exhibit 45 - 50**

(5) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____4_____

(6) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Rudolfo Resendez, will not be punished by death?

Number of jurors who so find: _____11_____

(7) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____1_____

Instruction: Proceed to Question No. 8(E) regardless of how you answered any part of Question No. 8(D).

SPECIAL VERDICT FORM - Page 51
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 51**

8(E).    Non-Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____2_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____1_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Rudolfo Resendez consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____9_____

SPECIAL VERDICT FORM - Page 52
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 52**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Rudolfo Resendez, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____11_____

(6) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(7) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| | 0 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Instruction: Proceed to Question No. 8(F) regardless of how you answered any part of Question No. 8(E).

SPECIAL VERDICT FORM - Page 53
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 53**

8(F).  Recommendation

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Rudolfo Resendez while engaging in a drug-trafficking crime:

_____Death

\_\_\_\_\_X\_\_\_\_Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence


Instruction: Proceed to the next page.

SPECIAL VERDICT FORM - Page 54
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 54**

The answers to the preceding questions represent the verdict of the jury.

_____/s/_____          _____318-02_____
Presiding Juror                        Date


Instruction: Proceed to the next page.

SPECIAL VERDICT FORM - Page 55
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 55**

Certification:

By signing below, each juror certifies that, in considering whether a sentence of death is justified, consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decisions, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim.

**SIGNATURES OF ALL JURORS:**

_/S/_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

PRESIDING JUROR

Date: _____3/1-0L_____

SPECIAL VERDICT FORM - Page 56
chr - 00cr260\robinson\vrdctpunish

**Exhibit 45 - 56**

JAMES DANIEL BARNA, PH.D., J.D.
FORENSIC CLINICAL PSYCHOLOGIST

7181 CHADBOURNE DRIVE    HUBER HEIGHTS, OHIO 45424-2630    937.236.2398    937.236.0085

CONFIDENTIAL - For Professional Use Only

PSYCHOLOGICAL EVALUATION
OF
ROSIE MAE HOLOMN aka HOLLIMON
DOB: MAY 16, 1958
SSN:  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

## REASON FOR REFERRAL

Ms. Rosie Mae Holomn is a 47 year old divorced, Black female who was referred to Dr. Barna by Deputy Federal Public Defender Sean K. Kennedy who wondered if Ms. Holomn was mentally retarded.

## EXAMINATION PROCEDURE

Ms. Holomn was initially interviewed and psychologically tested with the Wechsler Adult Intelligence Scale-Third Edition and the Letter-Word Identification subtest of the Woodcock-Johnson III Tests of Achievement, for 1.75 hours on March 2, 2006, at her home. With the Vineland-II Adaptive Behavior Scales this examiner, for 40 minutes interviewed Ms. Holomn's college educated son Marcus Jwain Robinson on March 15, 2006 at his and Rosie's home, and for 35 minutes interviewed Ms. Holomn's boyfriend Mack McCullough, age 60, on March 16, 2006. Finally Ms. Holomn was interviewed again and psychologically tested with the Passage Comprehension subtest of the Woodcock-Johnson III Tests of Achievement for 35 minutes on March 25, 2006.

Records reviewed included her 1999 psychiatric treatment records from Good Samaritan Hospital.

The nature and purpose of this examination plus the limits of confidentiality were explained to Ms. Holomn. She indicated that she comprehended the nature and purpose of the evaluation and the limits of confidentiality. Initially her cooperation was adequate, but subsequent to the first session it was difficult to recontact and reschedule with her.

## BRIEF BACKGROUND INFORMATION

Ms. Holomn twice gave the same information that she was born on May 16, 1958 (but only 46 years old now) in Dermott, Arkansas, the seventh born child, followed by fraternal twins. Her father farmed for others, and her mother was a housewife. She said that she left Dermott High School in the tenth grade, where she took "English, math, science, physical education and biologist," after "I got pregnant." She said that she should have graduated in 1975 and that in high school "I wanted to be a nurse." She married Jimmy Robinson for six years and they produced two sons, Narcus Robinson now age 31 and Julius Robinson now age 26.

**Exhibit 46 - 1**

Ms. Holomn and her military husband moved to Ft. Bragg, NC, but she left her family "to go to Texas" where she divorced. She said that she lived in Wichita Falls, Texas, "for some years; I don't remember how many," moved back to Dermott, Arkansas, then back to Texas, before moving to the Dayton, Ohio area where she had some friends in 1999. In the Dayton area she first found employment at the Hampton Inn in Englewood for 4 months, at Summerville Assisted Living for 3 months, and then at the Kettering Medical Center for the last six years, full time, as an OB technician. Her Good Samaritan Hospital records noted that in 1999 she had worked ten months as a receptionist at Your Ideal.

Recently she has moved to her current residence because her son Marcus and his three children moved in with her in December, 2005. She drives a 1997 white Pontiac, and she said that she has a valid driver's license and insurance on her car.

Ms. Holomn said that she had only one prior psychiatric hospitalization for depression for three days, that she was not given any psychotropic medication, and that she never received any outpatient mental health counseling. However, her Good Sam Hospital records report two brief psychiatric admissions in 1999. The first admission was on August 12, 1999 for 23 hours and her second was on December 12, 1999 for 24 hours. Both discharge diagnoses were for depression.

She said that she never had any arrests. She will "go to church a little bit, every other weekend when I'm off," at the Omega Baptist Church on Salem Avenue near her home. She said that in the past year she will "get a bottle" of champagne to celebrate, "not every day," but that she drinks approximately four cans of beer every day without her alcoholic consumption interfering with her daily functioning. She denied using street drugs during the past year. She said that she "quit smoking before they (her son and his three daughters) got here," but that she resumed smoking cigarettes on March 20, 2006 because of the stress of working 12 hour shifts and having to drive her son to and from work and her granddaughters to where they wanted to go.

## TEST RESULTS

On the Wechsler Adult Intelligence Scale, Third Edition, she obtained 68 verbal IQ, 68 performance IQ and 65 full scale IQ scores, all of which are in the Extremely Low Range. Both her Similarities (for her ability to abstract and generalize) subtest score and her Digit Span (for her ability to repeat nominal numbers forward and backwards) subtest score were at scaled 7 in the Low Average range and her strongest intellectual assets. Her other verbal reasoning subtest scores were in the Extremely Low range.

On the Woodcock-Johnson III Tests of Achievement her Letter-Word Identification was at the 3.4 grade level, while her Passage Comprehension was at the 4.0 grade level. When asked to write out a paragraph about what she did the day before, she produced a

2

**Exhibit 46 - 2**

print and cursive combination of twelve words/numbers with no period at the end of the passage.

On the Vineland-II Adaptive Behavior Scales her reading and writing subdomain score was in the Low range with an 8.0 year age equivalence. Her other subdomain scores were in the Average or Below Average range; however, this examiner questioned the veracity of the reports by her college educated son who has lived with her for six months in the past ten years, and her boyfriend of six years, because they seemed to simply say that she can do everything well and has no deficits of which they are aware.

## MENTAL STATUS EXAMINATION

Ms. Holomn was a Black female who said that she was 4'11" tall and weighed 118 pounds. She noted that she regularly weighed 110-111 pounds for years, but recently went up to 118 pounds. She said that her appetite was bad and that she only ate one meal a day with "no urge to eat no more." She said her elimination was regular. She said that her sleep was poor in the past two weeks, with frequently waking up every hour during the night.

She did not wear corrective eyeglasses, but she said had a pair in her purse which she used for both reading and driving. She was right handed when using a writing instrument. Hygiene and grooming were casual and adequate for being at home.

She denied thoughts of suicide, homicide, crying spells, severe depression, and mood swings for no reason, but she reported being depressed because of the burdens placed on her by her son and his three daughters moving in with her, and due to working long hours at her full time job. She denied and did not display any signs of any form of hallucinations or that people were working against her. She did serial threes to 40 with no errors. Her future goal was to enroll in a nursing training program and obtain her RN license; she anticipated checking that out through the local Job Center.

## CLINICAL FORMULATION

It is my professional opinion that Rosie Mae Holomn is mildly mentally retarded but is not mentally ill with any serious mood or thought disorder. Intellectually she has an Extremely Low range of cognitive functioning as defined by her 65-68 scores on the WAIS-III. For the record the WAIS-III uses the term extremely low in place of the term mentally retarded which was used in the earlier edition of the WAIS-R. While her son reported that she has and uses a debit card and that he helps her with her e-mail, she has a significant deficit or impairment in the adaptive functioning of reading and writing. Mild Mental Retardation is her appropriate diagnosis in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision.

3

**Exhibit 46 - 3**

## FORENSIC CONCLUSIONS

Ms. Rosie Mae Holomn aka Hollimon is a 47 year old divorced Black woman who is mildly mentally retarded but not mentally ill.

James Daniel Barna, Ph.D., J.D.
Forensic Clinical Psychologist
Ohio License No. 55
25 March 2006

4

**Exhibit 46 - 4**

# Fetal Alcohol Syndrome:



## Guidelines for Referral and Diagnosis

National Center on Birth Defects and Developmental Disabilities
Centers for Disease Control and Prevention
Department of Health and Human Services

in coordination with

National Task Force on
Fetal Alcohol Syndrome and Fetal Alcohol Effect







**Exhibit 47 - 1**

# Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis

National Center on Birth Defects and Developmental Disabilities
Centers for Disease Control and Prevention
Department of Health and Human Services

in coordination with

National Task Force on Fetal Alcohol Syndrome and Fetal Alcohol Effect
American Academy of Pediatrics
American College of Obstetricians and Gynecologists
March of Dimes
National Organization on Fetal Alcohol Syndrome

## July 2004

*(2nd printing, August 2004)*
*(3rd printing, May 2005)*

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention
*Julie Louise Gerberding, M.D., M.P.H., Director*

National Center on Birth Defects and Developmental Disabilities
*José Cordero, M.D. M.P.H., Director*

Division of Birth Defects and Developmental Disabilities
Fetal Alcohol Syndrome Prevention Team
*R. Louise Floyd, D.S.N., R.N., Team Leader*

**Exhibit 47 - 2**

*Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis*

---

**Table 3: Brief Outline of Diagnostic criteria for Fetal Alcohol Syndrome**

**Facial dysmorphia**
Based on racial norms, individual exhibits all three characteristic facial features:
- Smooth philtrum (University of Washington Lip-Philtrum Guide rank 4 or 5)
- Thin vermillion border (University of Washington Lip-Philtrum Guide rank 4 or 5)
- Small palpebral fissures (at or below 10th percentile )

**Growth problems**
Confirmed prenatal or postnatal height or weight, or both, at or below the 10th percentile, documented at any one point in time (adjusted for age, sex, gestational age, and race or ethnicity).

**Central Nervous System Abnormalities**
    **I. Structural**
        1) Head circumference (OFC) at or below the 10th percentile adjusted for age and sex.
        2) Clinically significant brain abnormalities observable through imaging.
    **II. Neurological**
        Neurological problems not due to a postnatal insult or fever, or other soft neurological signs outside normal limits.
    **III. Functional**
        Performance substantially below that expected for an individual's age, schooling, or circumstances, as evidenced by:
    1. *Global cognitive or intellectual deficits representing multiple domains of deficit (or significant developmental delay in younger children) with performance below the 3rd percentile (2 standard deviations below the mean for standardized testing)*
        *or*
    2. *Functional deficits below the 16th percentile (1 standard deviation below the mean for standardized testing) in at least three of the following domains:*
        a) cognitive or developmental deficits or discrepancies
        b) executive functioning deficits
        c) motor functioning delays
        d) problems with attention or hyperactivity
        e) social skills
        f) other, such as sensory problems, pragmatic language problems, memory deficits, etc.

**Maternal Alcohol Exposure**
    I. Confirmed prenatal alcohol exposure
    II. Unknown prenatal alcohol exposure

**Criteria for FAS Diagnosis**
Requires all three of the following findings:
    1 Documentation of all three facial abnormalities (smooth philtrum, thin vermillion border, and small palpebral fissures);
    2. Documentation of growth deficits
    3. Documentation of CNS abnormality

20

**Exhibit 47 - 3**

Case 4:00-cr-00260-Y    Document 2432-2    Filed 01/17/08    Page 66 of 82    PageID 8282



Advanced Search

ABOUT US | NEWS & PUBLICATIONS | MEMBERS | CME CENTER | CLINICAL & RESEARCH | PRACTICE MGMT | POLICY & ADVOCACY



American Family Physician

PUBLISHED ... 15, 1998

Articles | Departments | Patient Information

# Intrauterine Growth Retardation

ROBERT C. VANDENBOSCHE, M.D., and JEFFREY T. KIRCHNER, D.O.
Lancaster General Hospital,
Lancaster, Pennsylvania

○ A patient information handout on intrauterine growth retardation, written by the authors of this article, is provided on page 1393.

Intrauterine growth retardation (IUGR), which is defined as less than 10 percent of predicted fetal weight for gestational age, may result in significant fetal morbidity and mortality if not properly diagnosed. The condition is most commonly caused by inadequate maternal-fetal circulation, with a resultant decrease in fetal growth. Less common causes include intrauterine infections such as cytomegalovirus and rubella, and congenital anomalies such as trisomy 21 and trisomy 18. When IUGR is recognized, it is important to attempt to correct reversible causes, although many of the conditions responsible for IUGR are not amenable to antenatal therapy. Close fetal surveillance with delivery before 38 weeks of gestation is usually recommended. Some infants born with IUGR have cognitive and medical problems, although for most infants the long-term prognosis is good.

References in the medical literature to underweight infants date back to 1919, when it was suggested[1] that all newborns weighing less than 2,500 g (5 lb, 8 oz) should be classified as "premature." However, it was not until 1961 that the World Health Organization (WHO) acknowledged that many infants defined as "premature" were not born early but were simply of "low birth weight."[2] The current WHO criterion for low birth weight is a weight less than 2,500 g (5 lb, 8 oz) or below the 10th percentile for gestational age.

Low birth weight includes two pathologic conditions and one normal condition. The normal condition refers to the healthy but constitutionally small baby. The pathologic conditions include preterm delivery and intrauterine growth retardation (IUGR). Synonymous terms found in the literature to describe infants with IUGR include intrauterine growth restriction and fetal growth retardation. In the United States, IUGR

Exhibit 48 - 1

Case 4:00-cr-00260-Y   Document 2432-2   Filed 01/17/08   Page 67 of 82   PageID 8283

is linked to an increase of six to 10 times in perinatal mortality.[1,3]

## Epidemiology

According to the common definition of IUGR as a birth weight under the 10th percentile, the expected incidence of IUGR should be 10 percent. The actual incidence, however, is only about 4 to 7 percent. About one fourth of infants who are below the 10th percentile have a normalized birth weight when it is corrected for low maternal weight, paternal phenotype or residence at higher altitudes.[4] Some regional variations in birth weight may exist within the United States and Canada. Previously published standards found variations of 100 to 200 g (3.5 to 7 oz) when comparing 10th-percentile infants of the same gestational age who were born in Canada with those born in Denver or California.[3]

The approximately 3.5 million annual births in the United States translate to about 350,000 infants who are born weighing less than 2,500 g (5 lb, 8 oz).[1] Approximately one third of these infants (about 100,000) have true IUGR, and the remaining two thirds (about 250,000) are constitutionally small.[3] Some authors apply the term "small for gestational age" to the latter group of infants.

Most authorities prefer to maintain the strict and more inclusive definition of IUGR as less than 10 percent of predicted fetal weight for gestational age. Using the 10th percentile as a standard results in overdiagnosis of IUGR. Other authors, however, have suggested using the 5th percentile to define IUGR infants.[1] The counter argument in favor of a strict definition is that birth weight is probably the single most important factor affecting neonatal morbidity and mortality and should be aggressively screened for.[5] A lack of consensus among perinatologists makes it difficult to fully define the extent of IUGR and the subsequent effectiveness of interventions.

## Etiology

Many different factors cause IUGR, but they may be divided into two large categories, based on etiology. These categories include fetoplacental factors and maternal factors. Within the categories of maternal and fetoplacental factors are many specific causes (*Table 1*).

### TABLE 1
#### Conditions Associated with Intrauterine Growth Retardation

| Medical | Maternal | Infectious |
|---|---|---|
| Chronic hypertension | Smoking | Syphilis |
| Preeclampsia early in gestation | Alcohol use | Cytomegalovirus |
| | Cocaine use | Toxoplasmosis |
| Diabetes mellitus | Warfarin (Coumadin, Panwarfin) | Rubella |
| Systemic lupus erythematosus | Phenytoin (Dilantin) | Hepatitis B |
| | Malnutrition | HSV-1 or HSV-2 |
| Chronic renal disease | Prior history of pregnancy with | HIV-1 |

**Exhibit 48 - 2**

Case 4:00-cr-00260-Y    Document 2432-2    Filed 01/17/08    Page 68 of 82    PageID 8284

| Inflammatory bowel disease<br>Severe hypoxic lung disease | intratuterine growth retardation<br>Residing at altitude above 5,000 feet | **Congenital**<br>Trisomy 21<br>Trisomy 18<br>Trisomy 13<br>Turner's syndrome |
| --- | --- | --- |

HSV=herpes simplex virus; HIV=human immunodeficiency virus.

Information from references 1 and 3.

Historically, IUGR has been categorized as symmetric or asymmetric. Symmetric IUGR refers to fetuses with equally poor growth velocity of the head, the abdomen and the long bones. Asymmetric IUGR refers to infants whose head and long bones are spared compared with their abdomen and viscera. It is now believed that most IUGR is a continuum from asymmetry (early stages) to symmetry (late stages).

Maternal causes of IUGR account for most uteroplacental cases. Chronic hypertension is the most common cause of IUGR. Moreover, the infants of hypertensive mothers have a three-fold increase in perinatal mortality compared with infants with IUGR who are born of normotensive mothers. Because of their significant risk, one author[6] recommends delivering these infants by 37 weeks of gestational age.

Preeclampsia causes placental damage that results in uteroplacental insufficiency. The pathogenic mechanism is thought to be a failure of trophoblastic invasion by maternal spiral arterioles by 20 to 22 weeks of gestation.[1] This failure causes luminal narrowing and medial degeneration, leading to diminished blood flow to the developing infant. Consequently, these infants fail to grow normally.

Infectious causes of fetal growth delay account for about 10 percent of all cases of IUGR. These causes include the "TORCH" group: Toxoplasma gondii, rubella, cytomegalovirus and herpes simplex virus types 1 and 2. Other potential pathogens include hepatitis A and hepatitis B, parvovirus B19, human immunodeficiency virus (HIV) and Treponema pallidum (syphilis).

Maternal prepregnancy weight and weight gain during pregnancy are considered strong indicators of birth weight.[7] During World War II, a population of women in Leningrad who underwent prolonged malnutrition delivered infants with an average birth weight of 400 to 600 g (14 to 21 oz) less than expected.[5] In a later study of Guatemalan Indians,[8] it was found that protein malnutrition occurring before 26 weeks of gestation resulted in IUGR. The current consensus is that a maternal weight gain of less than 10 kg (22 lb) by 40 weeks of gestation is clearly a risk factor for IUGR.[3]

> Head circumference that does not change over a four-week period is worrisome and may be an indication for prompt delivery.

**Exhibit 48 - 3**

Case 4:00-cr-00266-Y Document 2432-2 Filed 01/17/08 Page 69 of 82 PageID 8285

Maternal smoking may be the cause of 30 to 40 percent of U.S. cases of IUGR. One study[9] found a dose-dependent decrease in fetal weight with an increasing number of cigarettes smoked each day (a 7.4 g [0.26 oz] decrease for each cigarette smoked per day). Another study[10] found that women who smoked 11 or more cigarettes daily had infants weighing 330 g (11.5 oz) less than predicted and measuring 1.2 cm shorter than control subjects.

Early use of alcohol by the pregnant mother may lead to fetal alcohol syndrome, while second- or third-trimester use may result in IUGR. As little as one to two drinks per day have been shown to result in a growth-delayed child.[11] Not surprisingly, maternal cocaine use has been linked to IUGR, as well as to reduced head circumference. Other drugs associated with IUGR include steroids, warfarin (Coumadin, Panwarfin) and phenytoin (Dilantin).

Intrauterine growth retardation occurs 10 times more frequently in twin deliveries than in single gestations. The incidence of IUGR in twins is about 15 to 25 percent.[5] Decreased birth weight is second only to respiratory distress syndrome as a cause of infant mortality in twins. Reasons for IUGR in twin pregnancies include poor placental implantation, placental crowding and twin-to-twin transfusion.

## Diagnosis

Before the development of ultrasonography, delayed fetal growth was indicated by low maternal weight gain, Leopold maneuvers and fundal height measurement. Currently, IUGR is still often suspected on the basis of fundal height measurements. A significant lag in fundal height is a 4-cm or greater difference than expected for gestational age. However, even carefully performed fundal height measurements only have a 26 to 76 percent sensitivity in predicting IUGR.[12] IUGR is frequently detected in a pregnancy with a less-than-expected third-trimester weight gain (100 to 200 g [3.5 to 7 oz] per week) or as an incidental finding on ultrasound examination when fetal measurements are smaller than expected for gestational age.

The main prerequisite for determining IUGR is precise dating. The most accurate dating method uses ultrasound examination at eight to 13 weeks. Later ultrasound examinations are helpful, but the margin of error is increased. The date of the last menstrual period, early uterine sizing and detection of fetal heart tones are helpful ways to accurately date the pregnancy. Most cases of IUGR present during the third trimester, which makes them difficult to accurately diagnose. This is especially true if the patient has presented for prenatal care at a late stage. The physician must determine if the dating is incorrect and the fetal size is actually normal or if the mother truly needs further evaluation for IUGR.

When the suspicion of IUGR is strong, a complete assessment of maternal risk factors should be undertaken. This includes past medical and obstetric history, medication use, recent infections, occupational or toxic exposures, and a history of tobacco, alcohol or illicit drug use.

Ultrasonography is normally the first study done to assess IUGR. This test loses its accuracy as the pregnancy progresses, but the sensitivity and positive predictive

**Exhibit 48 - 4**

Case 4:06-cr-00260-Y    Document 2432-2    Filed 01/17/08    Page 70 of 82    PageID 8286

value can be improved if several variables are combined.[13] These variables include estimated fetal weight, head circumference and abdominal circumference.

Estimated fetal weight is the most common screen. It is based on the measurements of head circumference, abdominal circumference and femur length. These measurements are plotted on a preexisting standardized chart. In about 95 percent of cases, ultrasound examination allows an estimation of fetal weight with a 15 to 18 percent variance.[13] An estimated fetal weight of less than the sixth percentile strongly correlates with growth retardation, and an estimated fetal weight of greater than the 20th percentile virtually rules out IUGR. An estimated fetal weight at the 15th percentile or less, or a decreasing estimated fetal weight as determined by serial ultrasound examination, is suggestive of IUGR.

In all growth-retarded fetuses, the abdominal circumference is the first biometric measure to change. This translates to an increased ratio of head circumference to abdominal circumference. The ratio of head circumference to abdominal circumference is normally one at 32 to 34 weeks and falls below one after 34 weeks. A ratio of greater than one detects about 85 percent of growth-restricted fetuses.[14]

The first radiographic sign of IUGR may be decreased amniotic fluid volume. About 85 percent of IUGR infants have oligohydramnios.[15] This condition occurs because blood flow from peripheral organs (kidneys) is diverted to the brain. Renal perfusion and urinary flow rates are commonly reduced in infants with IUGR.[16] An amniotic fluid index of less than 5 cm increases the risk of IUGR. A vertical pocket of amniotic fluid less than 1 cm, regardless of gestational age, is found in about 39 percent of cases of IUGR.[14]

Maternal arterial umbilical blood flow increases from 50 mL per minute early in pregnancy to about 700 mL per minute at term. The increase is secondary to a gradual decrease in vessel resistance to blood flow throughout the pregnancy. Doppler velocimetry uses ultrasound to measure peak-systolic and end-diastolic blood flow through the umbilical artery. Three measurements are averaged as the systolic/ diastolic ratio. As the pregnancy progresses, diastolic flow increases, and the systolic/diastolic ratio should

---

**TABLE 2**
**Indications for Delivery Based on the Biophysical Profile**

BPP<2

BPP=4 at >32 weeks

BPP=4<32 weeks; repeat same day; induce if <6

BPP=6 with normal AFI, >36 weeks with favorable cervix

BPP=8 with oligohydramnios

BPP=6 at <36 weeks and cervix unfavorable; repeat in 24 hours; induce if <6; follow if >6

BPP=biophysical profile; AFI=amniotic fluid index.

---

NOTE: The biophysical profile consists of five components, including fetal breathing movements, gross body movements, tone,

**Exhibit 48 - 5**

Case 4:00-cr-00260-Y   Document 2432-2   Filed 01/17/08   Page 71 of 82   PageID 8287

gradually decrease. In a large number of IUGR pregnancies, an alteration in placental blood flow occurs. As a result, researchers have correlated an increased systolic/diastolic ratio with IUGR. The ratio is increased in about 80 percent of cases of IUGR diagnosed by ultrasound examination.[17] An average systolic/ diastolic ratio greater than three at 30 or more weeks of gestation has a sensitivity of 78 percent and a specificity of 85 percent in predicting IUGR.[18]

amniotic fluid index and a nonstress test. Each component is scored as either zero or 2, with a maximum score of 10.

Information from reference 21.

Ultrasonographic placental grading has been studied with respect to IUGR. Normally, a grade 3, or mature, placenta would not be detected before 36 weeks of gestation. The presence of a grade 3 placenta before 36 weeks, along with an estimated fetal weight of less than 2,700 g (5 lb, 14 oz), carries a four-fold risk of IUGR.[19]

## Antenatal Surveillance

When the diagnosis of IUGR has been established, it is helpful to determine a specific etiology. Therapy may be nonspecific but should try to address the underlying cause. Many infants thought to be growth-retarded are, in retrospect, found to be constitutionally small. The key management issues are the gestational age of the pregnancy at the time of diagnosis and the urgency to expedite delivery. Most fetal deaths involving IUGR occur after 36 weeks of gestation and before labor begins.[1] The clinician must balance the risk of delivering a premature infant against the potential for intrauterine demise.

Ultrasonography at three- to four-week intervals is recommended to assess fetal growth.[1,5] It is important that the physician communicate with the ultrasonographer, indicating that suspected IUGR is the reason for the serial examinations. Appropriate attention must be given to estimated fetal weight, biparietal diameter, head circumference, abdominal circumference and amniotic fluid volume. Third-trimester fetal weight gain should be 100 to 200 g (3 lb, 8 oz to 7 lb) per week. Head circumference that does not change over a four-week period is worrisome and may be an indication for prompt delivery.[1]

Twice-weekly nonstress testing (NST) is an appropriate surveillance method in following a fetus with IUGR. A reactive NST (two accelerations in fetal heart rate of more than 15 beats per minute lasting for more than 15 seconds in a 20-minute span) has been shown to correlate with fetal well-being.[1] Spontaneous variable decelerations in fetal heart rate on the NST may indicate oligohydramnios and an increased risk of perinatal

## TABLE 3
Diagnostic Studies for Evaluation of Possible Intrauterine Growth Retardation

Chemistry panel

Exhibit 48 - 6

Case 4:00-cr-00260-Y    Document 2432-2    Filed 01/17/08    Page 72 of 82    PageID 8288

mortality.[20] A nonreactive NST indicates possible fetal hypoxemia and should be followed by a contraction stress test or a biophysical profile. The biophysical profile includes an NST, fetal breathing movements, gross body movements, fetal tone and amniotic fluid index. Two large studies[21,22] found the biophysical profile to be predictive of fetal well-being, fetal distress and ultimate perinatal mortality. Guidelines for antepartum management are based on biophysical profile scoring (*Table 2*).

Doppler velocimetry, previously discussed as a diagnostic technique for IUGR, has not found a place in routine antenatal surveillance. It has helped

> Complete blood count
>
> Maternal antibody titers ("TORCH" titers--IgM, IgG)
>
> Ultrasound examination
>
> Biophysical profile
>
> Doppler velocimetry
>
> Amniocentesis (to check fetal maturity before induction)
>
> _____
>
> TORCH=Toxoplasma gondii, rubella, cytomegalovirus and herpes simplex virus types 1 and 2.

physicians understand the pathophysiology of IUGR with regard to diminished blood flow. Results of this procedure correlate with increased fetal morbidity and mortality: an absent or reversed end-diastolic umbilical flow is an ominous finding and necessitates aggressive intervention. As a screening test, however, the procedure appears to be lacking in benefit; some studies[23] have shown that 40 to 60 percent of infants with IUGR had normal Doppler velocimetry results just before birth. Currently, the American College of Obstetrics and Gynecology[24] classifies fetal Doppler studies as investigational. *Table 3* summarizes diagnostic studies used in the evaluation of IUGR.

## Treatment

Treatment of the mother and the growth-restricted fetus is, when possible, dictated by the etiology of the condition. As previously noted, many of the conditions responsible for IUGR are not amenable to antenatal therapy.

**Prenatal Management**
Maternal hyperoxygenation has been evaluated in several studies, but only limited data prove its efficacy. In one study,[25] nasal oxygen at 2.5 L per minute administered to mothers at 27 to 28 weeks of gestation improved neonatal blood gas measurements but resulted in an increased incidence of hypoglycemia and thrombocytopenia in the infants. One report[1] suggests that supplemental oxygen may have a role in short-term prolongation of pregnancy, while steroids can be administered to accelerate fetal lung maturity.

Low-dose aspirin (150 mg per day) as a treatment for IUGR has been studied over the past several years. One study[26] found that when aspirin was given to women in the third trimester who had abnormal umbilical Doppler indices, fetal weight and head circumference parameters were improved compared with a placebo group. In a second trial,[27] aspirin, given in a dosage of 150 mg per day with dipyridamole in a dosage of 225 mg per day and administered at 15 to 18 weeks of gestation in

**Exhibit 48 - 7**

Case 4:00-cr-00266-Y Document 2432-2 Filed 01/17/08 Page 73 of 82 PageID 8289

high-risk patients, resulted in a lower incidence of still-birth, placental abruption and IUGR. Birth weight was improved, and no excess of maternal or fetal aspirin-related side effects occurred. It would seem prudent to consider low-dose aspirin therapy in selected patients with risk factors for IUGR (*Table 1*).

**Labor and Delivery Management**
Approximately one half of infants with IUGR have intrapartum asphyxia and lower Apgar scores than control subjects. A higher incidence of meconium aspiration has also been noted in these infants. Therefore, continuous monitoring of fetal heart rate throughout labor is recommended in cases of IUGR.[1,3] Amnioinfusion may also have a role in these cases, especially in the presence of olgihydramnios. Late decelerations are more predictive of fetal hypoxia and a resultant adverse outcome in this group of high-risk infants. A lower threshold for the choice of cesarean section is therefore recommended. Neonatal resuscitation and subsequent care of the growth-restricted infant should follow in the same manner used with other newborns. Problems to closely watch out for in infants with IUGR include hypoglycemia, hypocalcemia, polycythemia secondary to intrauterine hypoxia and hypothermia due to decreased body fat.[1,5]

# Neonatal Outcomes

In most cases, infants with IUGR ultimately have good outcomes, with a reported mortality rate of only 0.2 to 1 percent.[1] These infants often exhibit fast catch-up growth in the first three months of life and attain normal growth curves by one year of age. Some early studies[28,29] have found a variety of long-term complications in infants with IUGR. These complications include hyperactivity, clumsiness and poor concentration. Other studies[30,31] have found growth-restricted infants to be at increased risk for development of hypertension, abdominal obesity and type 2 (noninsulin-dependent) diabetes as adults.

In a recent British study,[32] records of 1,576 men and women born between 1920 and 1943 for whom birth weight and anthropomorphic measurements were recorded in detail after birth were examined. No definite association was found between cognitive function (intelligence quotient and vocabulary) and birth weight, head circumference or ratio of head circumference to abdominal circumference. Collectively, developmental studies demonstrate that many factors contribute to the ultimate intellectual development of infants with IUGR, including birth weight, time of onset of IUGR, head circumference, gestational age at delivery, etiology of the IUGR and postnatal environment. Most infants with IUGR have an excellent long-term prognosis.

## The Authors

ROBERT C. VANDENBOSCHE, M.D.,
is currently on staff at St. Clair Medical Center, Morehead, Ky. He completed a residency in family practice at Lancaster General Hospital, Lancaster, Pa. He is a graduate of the University of Maryland School of Medicine, Baltimore.

**Exhibit 48 - 8**

Case 4:00-cr-00260-Y    Document 2432-2    Filed 01/17/08    Page 74 of 82    PageID 8290

JEFFREY T. KIRCHNER, D.O.,
is associate director of the family practice residency program at Lancaster General Hospital. He is a graduate of the Philadelphia (Pa.) College of Osteopathic Medicine. Dr. Kirchner completed a rotating internship at the Osteopathic Medical Center of Philadelphia and a residency in family practice at Abington (Pa.) Memorial Hospital.

Address correspondence to Jeffrey T. Kirchner, D.O., Lancaster General Hospital, 555 N. Duke St., Lancaster, PA 17604. Reprints are not available from authors.

## REFERENCES

1. Bernstein I, Gabbe SG. Intrauterine growth restriction. In: Gabbe SG, Niebyl JR, Simpson JL, Annas GJ, eds. Obstetrics: normal and problem pregnancies. 3d ed. New York: Churchhill-Livingstone, 1996;863-86.
2. Dunn PM. The search for perinatal definitions and standards. Acta Paediatr Scand Suppl 1985;319:7-16.
3. Creasy RK, Resnik R. Intrauterine growth restriction. In: Creasy RK, Resnik R, eds. Maternal-fetal medicine: principles and practice. 3d ed. Philadelphia: Saunders, 1994;558-74.
4. Gardosi J, Chang A, Kalyan B, Sahota D, Symonds EM. Customized antenatal growth charts. Lancet 1992;339(8788);283-7.
5. McCormick MC. The contribution of low birth weight to infant mortality and childhood morbidity. N Engl J Med 1985;312:82-90.
6. Piper JM, Langer O, Xenakis EM, McFarland M, Elliott BD, Berkus MD. Perinatal outcome in growth-restricted fetuses: do hypertensive and normotensive pregnancies differ? Obstet Gynecol 1996;88:194-9.
7. Abrams BF, Laros RK Jr. Prepregnancy weight, weight gain, and birth weight [published erratum appears in Am J Obstet Gynecol 1986;155:918]. Am J Obstet Gynecol 1986;154:503-9.
8. Lechtig A, Yarbrough C, Delgado H, Martorell R, Klein RE, Behar M. Effect of moderate maternal malnutrition on the placenta. Am J Obstet Gynecol 1975;123;191-201.
9. Dougherty CR, Jones AD. The determinants of birth weight. Am J Obstet Gynecol 1982;144:190-200.
10. Nilsen ST, Sagen N, Kim HC, Bergsjo P. Smoking, hemoglobin levels, and birth weights in normal pregnancies. Am J Obstet Gynecol 1984;148;752-8.
11. Mills JL, Graubard BI, Harley EE, Rhoads GG, Berendes HW. Maternal alcohol consumption and birth weight. How much drinking during pregnancy is safe? JAMA 1984;252:1875-9.
12. Calvert JP, Crean EE, Newcombe RG, Pearson JF. Antenatal screening measurements by symphysis-fundal height. BMJ [Clin Res] 1982;285:846-9.
13. Doubilet PM, Benson CB. Sonographic evaluation of intrauterine growth retardation. AJR Am J Roentgenol 1995;164:709-17.
14. Hadlock F. Ultrasound evaluation of fetal growth. In: Callen P, ed. Ultrasonography in obstetrics and gynecology. 3d ed. Philadelphia: Saunders, 1994; 129-42.
15. Queenan JT, ed. Management of high-risk pregnancy. 3d ed. Boston: Blackwell Scientific, 1994:402-12.
16. Veille JC, Kanaan C. Duplex Doppler ultrasonographic evaluation of the fetal renal artery on normal and abnormal fetuses. Am J Obstet Gynecol 1989;161(6 Pt 1):1502-7.
17. Ferrazzi E, Bellotti M, Vegni C, Barbera A, Della Peruta S, Ferro B, et al. Umbilical flow waveforms versus fetal biophysical profile in hypertensive pregnancies. Eur J Obstet Gynecol Reprod Biol 1989;33:199-208.
18. Fleischer A, Schulman H, Farmakides G, Bracero L, Blattner P, Randolph G. Umbilical artery velocity waveforms and intrauterine growth retardation. Am J Obstet Gynecol

**Exhibit 48 - 9**

Case 4:00-cr-00260-Y    Document 2432-2    Filed 01/17/08    Page 75 of 82    PageID 8291

1985;151:502-5.

19. Kazzi GM, Gross TL, Sokol RJ, Kazzi NJ. Detection of intrauterine growth retardation: a new use for sonographic placental grading. Am J Obstet Gynecol 1983;145:733-7.

20. Pazos R, Vuolo K, Aladjem S, Leuck J, Anderson C. Association of spontaneous fetal heart decelerations during antepartum nonstress testing and intrauterine growth retardation. Am J Obstet Gynecol 1982;144:574-7.

21. Manning FA, Morrison I, Harman CR, Lange IR, Menticoglou S. Fetal assessment based on fetal biophysical profiling scoring: experience in 19,221 referred high-risk pregnancies. II. An analysis of false-negative fetal deaths. Am J Obstet Gynecol 1987;157(4 Pt 1):880-4.

22. Manning FA, Snijders R, Harman CR, Nicolaides K, Menticoglou S, Morrison I. Fetal biophysical profile score. VI. Correlation with antepartum umbilical venous fetal pH. Am J Obstet Gynecol 1993;169: 755-63.

23. Divon MY, Hsu HW. Maternal and fetal blood flow velocity waveforms in intrauterine growth retardation. Clin Obstet Gynecol 1992;35:156-71.

24. American College of Obstetricians and Gynecologists. Antepartum fetal surveillance. ACOG Technical Bulletin no. 188; January 1994.

25. Ribbert LS, van Lingen RA, Visser GH. Continuous maternal hyperoxygenation in the treatment of early fetal growth retardation. Ultrasound Obstet Gynecol 1991;1:331-6.

26. Trudinger BJ, Cook CM, Thompson RS, Giles WB. Low-dose aspirin therapy improves fetal weight in umbilical placental insufficiency. Am J Obstet Gynecol 1988;159:681-5.

27. Uzan S, Beaufils M, Breart G, Bazin B, Capitant C, Paris J. Prevention of fetal growth retardation with low-dose aspirin: findings of the EPREDA trial. Lancet 1991;337 (8755):1427-31.

28. Lipper E, Lee K, Gartner LM, Grellong B. Determinants of neurobehavioral outcome in low-birth-weight infants. Pediatrics 1981;67:502-5.

29. Robertson CM, Etches PC, Kyle JM. Eight-year school performance and growth of preterm, small for gestational age infants: a comparative study with subjects matched for birth weight or for gestational age. J Pediatr 1990;116:19-26.

30. Barker DJ, Hales CN, Fall CH, Osmond C, Phipps K, Clark PM. Type 2 (non-insulin-dependent) diabetes mellitus, hypertension and hyperlipidaemia (syndrome X): relation to reduced fetal growth. Diabetologica 1993;36:62-7.

31. Phipps K, Barker DJ, Hales CN, Fall CH, Osmond C, Clark PM. Fetal growth and impaired glucose tolerance in men and women. Diabetologica 1993; 36:225-8.

32. Martyn CN, Gale CR, Sayer AA, Fall C. Growth in utero and cognitive function in adult life: follow-up study of people born between 1920 and 1943. BMJ 1996;312:1393-6.

Copyright © 1998 by the American Academy of Family Physicians.
This content is owned by the AAFP. A person viewing it online may make one printout of the material and may use that printout only for his or her personal, non-commercial reference. This material may not otherwise be downloaded, copied, printed, stored, transmitted or reproduced in any medium, whether now known or later invented, except as authorized in writing by the AAFP.

October 15, 1998 Contents | Subscribe | Search | *AFP* Home Page

**Exhibit 48 - 10**




You are in: eMedicine Specialties > Medicine, Ob/Gyn, Psychiatry, and Surgery > Obstetrics/gynecology

# Postterm Pregnancy

| Rate this Article |
| Email to a Colleague |
| Get CME/CE for article |

**Last Updated:** June 19, 2006

**Synonyms and related keywords:** postterm pregnancy, postmaturity syndrome, due date, calculated gestational age, crown-rump length, CRL, composite biometry, biparietal diameter, BPD, head circumference, abdominal circumference, femur length, transcerebellar diameter, fetal monitoring, post date pregnancy

---

### AUTHOR INFORMATION          Section 1 of 7          Next ⟩

Author Information Introduction Timing Of Delivery Cervical Ripening And Intrapartum Management Antepartum Fetal Surveillance Summary Bibliography

---

**Author: Jennifer R Butler, MD, FACOG**, Assistant Director, Department of Obstetrics and Gynecology, Division of General Obstetrics and Gynecology, Carolinas Medical Center

Coauthor(s): **Paul T Wilkes, MD**, Assistant Professor, Department of Obstetrics and Gynecology, University of Nevada School of Medicine; **Henry Galan, MD**, Fellowship Director of Maternal and Fetal Medicine, Assistant Professor, Department of Obstetrics and Gynecology, University of Colorado Health Science Center

Jennifer R Butler, MD, FACOG, is a member of the following medical societies: Alpha Omega Alpha, American College of Obstetricians and Gynecologists, American Medical Association, and Association of Professors of Gynecology and Obstetrics

Editor(s): **Bryan D Cowan, MD**, Director, Division of Reproductive Endocrinology, Professor, Department of Obstetrics and Gynecology, University of Mississippi College of Medicine; **Francisco Talavera, PharmD, PhD**, Senior Pharmacy Editor, eMedicine; **Richard S Legro, MD**, Professor, Department of Obstetrics and Gynecology, Division of Reproductive Endocrinology, Milton S Hershey Medical Center, Pennsylvania State University College of Medicine; **Frederick B Gaupp, MD**, Consulting Staff, Department of Family Practice, Assumption Community Hospital; and **Lee P Shulman, MD**, Professor of Obstetrics and Gynecology, Feinberg School of Medicine, Northwestern University; Chief, Division of Reproductive Genetics, Department of Obstetrics and Gynecology, Prentice Women's Hospital, Northwestern Memorial Hospital

Disclosure

---

**Pregnancy and Reproduction Resource Center**

Pregnancy and Reproduction Resource Center

View all Pregnancy and Reproduction Articles

Pregnancy and Reproduction CME

Pregnancy and Reproduction Multimedia Library

---

**Quick Find**

Author Information
Introduction
Timing Of Delivery
Cervical Ripening And Intrapartum Management
Antepartum Fetal Surveillance
Summary
Bibliography

Click for related images.

---

**Continuing Education**

CME available for this topic. Click here to take this CME.

---

**Patient Education**

Click here for

Exhibit 49 - 1

Case 4:09-cr-00260-Y   Document 2432-2   Filed 01/17/08   Page 77 of 82   PageID 8293

Author Information Introduction Timing Of Delivery Cervical Ripening And Intrapartum Management Antepartum Fetal Surveillance Summary Bibliography

Postterm pregnancies define pregnancies extending up to or after 42 weeks. The reported frequency is approximately 3-12%. The most frequent cause of postterm pregnancy is inaccurate dating criteria. Additional risk factors include primiparity, prior postterm pregnancy, male gender of the fetus, and genetic factors. Laursen et al studied monozygotic and dizygotic twins and their subsequent development of prolonged pregnancies. They found that maternal but not paternal genetic factors influenced the rate of postterm pregnancies and accounted for the etiology in as many as 30% of these pregnancies.

Although the last menstrual period (LMP) has been traditionally used to calculate the estimated due date (EDD), many inaccuracies exist using this method in women who have irregular cycles, have been on recent hormonal birth control, or who have first trimester bleeding. Ultrasonographic dating early in pregnancy can improve the reliability of the EDD; however, it is necessary to understand the margin of error reported at various times during each trimester. A calculated gestational age by composite biometry from a sonogram must be considered an estimate and must take into account the range of possibilities.

For example, crown-rump length (CRL) is 3-5 days, ultrasonography performed at 12-20 weeks of gestation is 1 week, at 20-30 weeks is 2 weeks, and after 30 weeks is 3 weeks. Thus, a pregnancy that is 35 weeks by a 31-week ultrasound could actually be anywhere from 32 weeks to 38 weeks (35 wk +/- 3 wk). If the calculated ultrasonographic gestational age varies from the LMP more than the respective range of error, it is used instead to establish the final EDD. The importance of determining by what method a pregnancy is dated cannot be overemphasized because this may have significant consequences if the physician delivers a so-called term pregnancy that is not or observes a so-called term pregnancy that is very postterm.

When determining a management plan for an impending postterm pregnancy (>40 wk of gestation but <42 wk), the first decision is whether to deliver a patient and, if so, when and by what route. If the physician decides not to deliver, the decision whether to institute antepartum fetal surveillance and what method(s) of surveillance to use must be discussed with the patient.

Note that if the pregnancy is at risk for an adverse outcome from an underlying condition, either maternal or fetal, inducing labor may proceed without documented lung maturity. Also, an elective induction of labor may proceed at or after 39 weeks of gestation in the absence of documented lung maturity provided that 36 weeks have elapsed since documentation of a positive human chorionic gonadotropin (+hCG) test finding, 20 weeks of fetal heart tones have been established by a fetoscope or 30 weeks by a Doppler examination, or 39 weeks' gestation have been established by a CRL or by an ultrasound performed before 20 weeks of gestation consistent with dates by the patient's LMP.



Review the role of the endocannabinoid system in abdominal obesity.

Learn how CB₁ receptor blockade may help manage metabolic and CVD risk.

LEARN MORE ▶

**emedicine** Continuing Education

## TIMING OF DELIVERY      Section 3 of 7 [Back Top Next]

Author Information Introduction Timing Of Delivery Cervical Ripening And Intrapartum Management Antepartum Fetal Surveillance Summary Bibliography

The first decision that must be made when managing an impending postterm pregnancy is whether to deliver. In certain cases (eg, nonreassuring surveillance, oligohydramnios, growth restriction, certain maternal diseases), the decision is

**Exhibit 49 - 2**

pregnant begin to outweigh the risks of delivery may come at an earlier gestational age. However, there are frequently several options to consider when determining a course of action in the low-risk pregnancy. The certainty of gestational age, cervical examination findings, estimated fetal weight, patient preference, and past obstetric history must all be considered when mapping a course of action.

Perinatal morbidity and mortality do not increase appreciably between 40 and 41 weeks of gestation; however, the perinatal mortality rate at gestational ages greater than 42 weeks is double that at term and increases 6-fold at 43 weeks. In addition, pregnancies extending up to or beyond 42 weeks (postterm pregnancies) are at risk for macrosomia, shoulder dystocia, cephalopelvic disproportion, and dysmaturity syndrome. Dysmaturity syndrome affects 20% of postterm fetuses and is thought to be caused by chronic uteroplacental insufficiency resulting in oligohydramnios, meconium aspiration, and reversible neonatal complications. Maternal risks include an increase in labor dystocia, perineal injuries, and cesarean deliveries. These complications support the idea that well dated pregnancies should not be allowed to progress beyond 42 weeks of gestation, but the question of how a pregnancy between 41 and 42 weeks should be managed remains.

Delivery versus expectant management of low-risk pregnancies at 41 weeks of gestation has recently been addressed in the literature. The main argument against a policy of routine induction of labor at 41-42 weeks has been that induction increases the rate of cesarean delivery without decreasing maternal and/or neonatal morbidity. Some of the studies that failed to show a reduction in fetal/neonatal morbidity were diluted by poorly dated pregnancies that were not necessarily postterm. In addition, the potential for increasing the risk for cesarean delivery with a failed induction is far less likely in the era of safe and effective cervical ripening agents.



In a retrospective review of 18,055 singleton pregnancies, Yeast et al found no differences in cesarean delivery rates in women entering spontaneous labor and those who had induced labor. Herabutya et al, the National Institute of Child Health and Human Development, and the Canadian Multicenter Postterm Pregnancy Trial have completed 3 prospective randomized studies. No increase in the rate of cesarean delivery was found in patients who were randomized to routine induction of labor. In fact, more cesarean deliveries were performed in the noninduction groups, and the most frequent indication was fetal distress. The neonatal outcomes were similar in both the routine induction and noninduction groups. All 3 trials concluded that the incidence of adverse perinatal outcomes in low-risk pregnancies at or after 41 weeks' gestation is very low with either induction or expectant management.

Further data suggest that induction may actually be more beneficial than expectant management in patients at 41 weeks of gestation. A meta-analysis by Grant reviewed 11 trials and concluded that a policy of routine induction had a lower rate of perinatal morbidity and cesarean delivery, demonstrating both fetal and maternal benefit compared to expectant management. In addition, a recent review in the Cochrane Library concluded that routine induction in low-risk pregnancies at or after 41 weeks' gestation is associated with a reduction in perinatal mortality, with no increase in the rate of instrument deliveries or cesarean delivery.

In summary, routine induction at 41 weeks' gestation does not increase the cesarean delivery rate, and may decrease it, without negatively affecting perinatal morbidity or mortality. In fact, there may be both maternal and neonatal benefits to a policy of routine induction of labor in well-dated low-risk pregnancies at 41 weeks' gestation. A policy of routine induction at 40 weeks' has few benefits, and there are multiple reasons not to allow a pregnancy to progress beyond 42 weeks.

**Exhibit 49 - 3**

Case 4:00-cr-00260-Y   Document 2432-2   Filed 01/17/08   Page 79 of 82   PageID 8295

CERVICAL RIPENING AND INTRAPARTUM
MANAGEMENT

Section 4 of 7   ❮Back   Top
Next❯

Author Information Introduction Timing Of Delivery Cervical Ripening And Intrapartum Management Antepartum Fetal
Surveillance Summary Bibliography

Once the decision to deliver a patient has been made, the route of delivery and the specifics of intrapartum management depend on individual obstetric circumstances, and a brief review of cervical ripening agents and potential complications of induction of labor is appropriate. A comprehensive review of all available methods for cervical ripening, indications, contraindications, and dosing is beyond the scope of this article.

As many as 80% of patients who reach 42 weeks' gestation have an unfavorable cervical examination (ie, Bishop Score <7). Many options are available for cervical ripening. The different preparations, indications, contraindications, and multiple dosing regimes of each require practitioners to familiarize themselves with several of the preparations.

Prostaglandin E2 gel and suppositories for vaginal application were used extensively until the late 1990s, when many pharmacies stopped manufacturing them because of the advent of commercially available and less labor-intensive preparations. Currently available chemical preparations include prostaglandin E1 tablets for oral or vaginal use (misoprostol), prostaglandin E2 gel for intracervical application (Prepidil), and a prostaglandin E2 vaginal insert (Cervidil). Cervidil contains 10 mg of dinoprostone and has a lower constant release of medication than Prepidil. In addition, this vaginal insert device allows for easier removal in the event of uterine hyperstimulation.

Many studies have compared the efficacy and risks of various prostaglandin cervical ripening agents. Rozenburg et al performed a randomized trial comparing intravaginal misoprostol and dinoprostone vaginal insert in pregnancies at high risk of fetal distress. They found that both methods were equally safe for the induction of labor and misoprostol was actually more effective.

Another method for ripening the cervix is by mechanical dilation. These devices may act by a combination of mechanical forces and by causing release of endogenous prostaglandins. Membrane sweeping or stripping, Foley balloon catheters placed in the cervix, extra-amniotic saline infusions, and laminaria have all been studied and have been shown to be effective.

Regardless of what method is chosen for cervical ripening, the practitioner must be aware of the potential hazards surrounding the use of these agents in the patient with a scarred uterus. In addition, the potential for uterine tachysystole and subsequent fetal distress requires that care be taken to avoid using too high a dose or too short a dosing interval in an attempt to get a patient delivered rapidly. Care should also be taken when using combinations of mechanical and pharmacologic methods of cervical ripening.

Once an induction of labor has begun, it is necessary to watch for the major potential complications associated with inductions beyond 41 weeks' gestation and to have a plan for dealing with each. Complications include the presence of meconium, macrosomia, and fetal intolerance to labor.

The farther pregnancy progresses beyond 40 weeks, the more likely it is that significant amounts of meconium will be present. This is due to increased uteroplacental insufficiency, which leads to hypoxia in labor and activation of the

**Exhibit 49 - 4**

Traditionally, saline amnioinfusion and aggressive nasopharyngeal and oropharyngeal suctioning at the perineum were used to decrease the risk of meconium aspiration syndrome. Recent studies contradict this standard practice. Fraser et al performed a prospective randomized multicenter study evaluating the risks and benefits of amnioinfusion for the prevention of meconium aspiration syndrome. They concluded that in clinical settings, which have peripartum surveillance, amnioinfusion of thick, meconium-stained amniotic fluid did not decrease the risk of moderate-to-severe meconium aspiration syndrome, perinatal death, or other serious neonatal disorders compared with expectant management. In addition, other recent studies have shown that deep suctioning of the airway at the perineum does not effectively prevent meconium aspiration syndrome, contrary to popular belief.

Fetal macrosomia can lead to maternal and fetal birth trauma and to arrest of both first- and second-stage labor. Recognizing the limitations of ultrasound at term, it is still advisable to obtain an estimated fetal weight prior to induction of the postdate pregnancy. An acceptable alternative to ultrasound is estimation of fetal weight by abdominal palpation by an experienced practitioner, but an estimated fetal weight should be documented prior to beginning a postdate induction. In addition, mid-pelvic instrument deliveries should not be attempted. Perhaps the most important part of a delivery plan is being prepared for shoulder dystocia in the event that this unpredictable, anxiety-provoking, and potentially dangerous condition arises.

Finally, intrapartum fetal surveillance in an attempt to document fetal intolerance to labor before it leads to acidosis is critical. Whether continuous fetal monitoring or intermittent auscultation is used, interpretation of the results by a well-trained clinician is of paramount importance. If the fetal heart rate tracing is equivocal, fetal scalp stimulation and/or fetal scalp blood sampling may provide the reassurance necessary to justify continuing the induction of labor. If the practitioner cannot find reassurance that the fetus is tolerating labor, cesarean delivery is recommended.

---

**ANTEPARTUM FETAL SURVEILLANCE**                    Section 5 of 7  〔Back  Top  Next〕

Author Information Introduction Timing Of Delivery Cervical Ripening And Intrapartum Management Antepartum Fetal Surveillance Summary Bibliography

---

Antepartum fetal surveillance is suggested in postterm pregnancies when delivery is not performed. Although no randomized prospective trials exist demonstrating a benefit of fetal monitoring, no proof exists that it negatively affects postterm pregnancies either. Despite a lack of evidence, antepartum fetal surveillance of postterm pregnancies has become an accepted standard of care despite a lack of consensus as to a specific regimen of surveillance to be offered.

The perinatal mortality rate increases gradually throughout pregnancy, with the greatest risk affecting pregnancies continuing past 41 weeks. Therefore, although no evidence can prove that routine monitoring between 40 and 42 weeks improves perinatal outcome, ACOG states that it is reasonable to begin antepartum testing after 41 weeks gestation.

No single method of antenatal surveillance has been shown to be superior to any other. Options include a nonstress test, contraction stress test, full biophysical profile, modified biophysical profile (nonstress test and amniotic fluid index), or a combination of these modalities. Evaluation of the amniotic fluid level has been shown to be especially important because of demonstrated increased adverse pregnancy outcomes. Therefore, delivery should be implemented in the event of oligohydramnios with or without other nonreassuring tests. Doppler ultrasonography has been shown to provide no proven advantage for

**Exhibit 49 - 5**

Case 4:00-cr-00260-Y   Document 2433-2   Filed 01/17/08   Page 81 of 82   PageID 8297

A modified biophysical profile has been shown to be as sensitive as a full biophysical profile. Boehm et al demonstrated that twice-weekly testing of patients at risk for fetal distress was superior to weekly testing, decreasing the rate of stillbirth from 6.1 per 1000 live births to 1.9 per 1000.

In summary, the use of a nonstress test and an amniotic fluid index 2 times per week for pregnancies continuing past 41 weeks is reasonable. In addition, if any indication during antepartum surveillance leads the practitioner to question the intrauterine environment, delivery should be expedited.

| **SUMMARY** | Section 6 of 7 〔Back  Top  Next〕 |
|---|---|

Author Information Introduction Timing Of Delivery Cervical Ripening And Intrapartum Management Antepartum Fetal Surveillance Summary Bibliography

The management of postterm pregnancies is complicated and fraught with complex issues. The decision of whether to induce labor or to proceed with expectant management with or without antepartum fetal surveillance is not taken lightly. Data support inducing labor at 41 weeks' gestation in an accurately dated, low-risk pregnancy, regardless of cervical examination findings. This strategy, although not without its critics, averts the need for antepartum fetal surveillance and does not increase the cesarean delivery rate; in fact, it may decrease the cesarean delivery rate.

| **BIBLIOGRAPHY** | Section 7 of 7 〔Back  Top〕 |
|---|---|

Author Information Introduction Timing Of Delivery Cervical Ripening And Intrapartum Management Antepartum Fetal Surveillance Summary Bibliography

- Alexander JM, McIntire DD, Leveno KJ: Forty weeks and beyond: pregnancy outcomes by week of gestation. Obstet Gynecol 2000 Aug; 96(2): 291-4[Medline].
- American College of Obstetricians and Gynecologists: ACOG Practice Bulletin: Management of Postterm Pregnancy. Number 55. Obstet Gynecol 2004; 104: 649-646.
- Bennett KA, Crane JMG, O'Shea P: First trimester ultrasound screening is effective in reducing postterm labor induction rates: A randomized controlled trial. Am J Obstet Gynecol 2004 Apr; 190(4): 1077-1081.
- Boehm FH, Salyer S, Shah DM: Improved outcome of twice weekly nonstress testing. Obstet Gynecol 1986 Apr; 67(4): 566-8[Medline].
- Crowley P: Interventions for preventing or improving the outcome of delivery at or beyond term. Cochrane Database Syst Rev 2000; (2): CD000170[Medline].
- Foong LC, Vanaja K, Tan G: Membrane sweeping in conjunction with labor induction. Obstet Gynecol 2000 Oct; 96(4): 539-42[Medline].
- Fraser WD, Hofmeyr J, Lede R: Amnioinfusion for the prevention of the meconium aspiration syndrome. N Engl J Med 2005 Sep 1; 353(9): 909-17[Medline].
- Grant JM: Induction of labour confers benefits in prolonged pregnancy. Br J Obstet Gynaecol 1994 Feb; 101(2): 99-102[Medline].
- Guinn DA, Goepfert AR, Christine M: Extra-amniotic saline, laminaria, or prostaglandin E(2) gel for labor induction with unfavorable cervix: a randomized controlled trial. Obstet Gynecol 2000 Jul; 96 (1): 106-12[Medline].
- Hannah ME, Hannah WJ, Hellmann J: Induction of labor as compared with serial antenatal monitoring in post- term pregnancy. A randomized controlled trial. The Canadian Multicenter Post-term Pregnancy Trial Group. N Engl J Med 1992 Jun 11; 326(24): 1587-92[Medline].
- Harman JH, Kim A: Current trends in cervical ripening and labor induction. Am Fam Physician 1999 Aug; 60(2): 477-84[Medline].
- Harris BA Jr, Huddleston JF, Sutliff G: The unfavorable cervix in prolonged pregnancy. Obstet Gynecol 1983 Aug; 62(2): 171-4[Medline].
- Herabutya Y, Prasertsawat PO, Tongyai T: Prolonged pregnancy: the management dilemma. Int J Gynaecol Obstet 1992 Apr; 37(4): 253-8[Medline].
- Laursen M, Bille C, Olesen AW: Genetic influence on prolonged gestation: a population-based Danish twin study. Am J Obstet Gynecol 2004 Feb; 190(2): 489-94[Medline].
- Mannino F: Neonatal complications of postterm gestation. J Reprod Med 1988 Mar; 33(3): 271-6 [Medline].

**Exhibit 49 - 6**

- NICHD: A clinical trial of induction of labor versus expectant management of postterm pregnancy. The National Institute of Child Health and Human Development Network of Maternal-Fetal Medicine Units. Am J Obstet Gynecol 1994 Mar; 170(3): 716-23[Medline].
- Roach VJ, Rogers MS: Pregnancy outcome beyond 41 weeks gestation. Int J Gynaecol Obstet 1997 Oct; 59(1): 19-24[Medline].
- Rozenberg P, Chevret S, Senat MV: A randomized trial that compared intravaginal misoprostol and dinoprostone vaginal insert in pregnancies at high risk of fetal distress. Am J Obstet Gynecol 2004 Jul; 191(1): 247-53[Medline].
- Sullivan CA, Benton LW, Roach H: Combining medical and mechanical methods of cervical ripening. Does it increase the likelihood of successful induction of labor? J Reprod Med 1996 Nov; 41(11): 823-8[Medline].
- Yeast JD, Jones A, Poskin M: Induction of labor and the relationship to cesarean delivery: A review of 7001 consecutive inductions. Am J Obstet Gynecol 1999 Mar; 180(3 Pt 1): 628-33[Medline].
- Yudkin PL, Wood L, Redman CW: Risk of unexplained stillbirth at different gestational ages. Lancet 1987 May 23; 1(8543): 1192-4[Medline].

**NOTE:**

Medicine is a constantly changing science and not all therapies are clearly established. New research changes drug and treatment therapies daily. The authors, editors, and publisher of this journal have used their best efforts to provide information that is up-to-date and accurate and is generally accepted within medical standards at the time of publication. However, as medical science is constantly changing and human error is always possible, the authors, editors, and publisher or any other party involved with the publication of this article do not warrant the information in this article is accurate or complete, nor are they responsible for omissions or errors in the article or for the results of using this information. The reader should confirm the information in this article from other sources prior to use. In particular, all drug doses, indications, and contraindications should be confirmed in the package insert. FULL DISCLAIMER

Postterm Pregnancy excerpt

**About Us | Privacy | Terms of Use | Contact Us | Advertise | Institutional Subscribers**

 We subscribe to the HONcode principles of the Health On the Net Foundation

© 1996-2006 by WebMD
All Rights Reserved

**Exhibit 49 - 7**