# MedlinePlus

Trusted Health Information for You

A service of the U.S. NATIONAL LIBRARY OF MEDICINE
and the NATIONAL INSTITUTES OF HEALTH

**Search MedlinePlus**

About MedlinePlus | Site Map | FAQs | Contact Us

Home | Health Topics | Drugs & Supplements | Encyclopedia | Dictionary | News | Directories | Other Resources

**español**

# Medical Encyclopedia

Other encyclopedia topics: A-Ag  Ah-Ap  Aq-Az  B-Bk  Bl-Bz  C-Cg  Ch-Co  Cp-Cz  D-Di  Dj-Dz  E-Ep  Eq-Ez  F  G  H-Hf  Hg-Hz  I-In  Io-Iz  J  K  L-Ln  Lo-Lz  M-Mf  Mg-Mz  N  O  P-Pl  Pm-Pz  Q  R  S-Sh  Si-Sp  Sq-Sz  T-Tn  To-Tz  U  V  W  X  Y  Z  0-9

# Small for gestational age (SGA)

**Printer-friendly version**   **E-mail to a friend**

## Contents of this page:

- Alternative names
- Definition

- Information

## Alternative names

Intrauterine growth restriction (IUGR); Low birth weight

## Definition   *Return to top*

The term "small for gestational age", or SGA, means a fetus or infant is smaller in size than is expected for the baby's gender, genetic heritage, and gestational age.

## Information   *Return to top*

Ultrasound is used to identify intrauterine growth restriction (a developing fetus that is smaller-than-normal for its age). The most widely used definition of SGA is birth weight below the 10th percentile.

Neonatal growth restriction is a syndrome that includes small size and specific metabolic abnormalities. These abnormalities include hypoglycemia (low blood sugar level), hypothermia (low body temperature), and polycythemia (increased level of red blood cells).

**Update Date: 8/8/2005**

Updated by: Sharon Roseanne Thompson, M.D., M.P.H., Clinical Fellow, Department of Obstetrics & Gynecology, Brighan and Women's Hospital, Boston, MA. Review provided by VeriMed Healthcare Network.

**ADAM**



A.D.A.M., Inc. is accredited by URAC, also known as the American Accreditation HealthCare Commission (www.urac.org). URAC's accreditation program is the first of its kind, requiring compliance with 53 standards of quality and accountability, verified by independent audit. A.D.A.M. is among the first to achieve this important distinction for online health information and services. Learn more about A.D.A.M.'s editorial process. A.D.A.M. is also a founding member of Hi-Ethics (www.hiethics.com) and subscribes to the principles of the Health on the Net Foundation (www.hon.ch).

The information provided should not be used during any medical emergency or for the diagnosis or treatment of any medical condition. A licensed physician should be consulted for diagnosis and treatment of any and all medical conditions. Call 911 for all medical emergencies. Adam makes no representation or warranty regarding the accuracy, reliability, completeness, currentness, or timeliness of the content, text or graphics. Links to other sites are provided for information only -- they do not constitute endorsements of those other sites. Copyright 2005, A.D.A.M., Inc. Any duplication or distribution of the information contained herein is strictly prohibited.

Home | Health Topics | Drugs & Supplements | Encyclopedia | Dictionary | News | Directories | Other Resources

Copyright | Privacy | Accessibility | Quality Guidelines

Exhibit 50 - 1

U.S. National Library of Medicine, 8600 Rockville Pike, Bethesda, MD 20894
National Institutes of Health | Department of Health & Human Services                    Page last updated: 11 August 2006

**Exhibit 50 - 2**

NCBI

**Pub Med**
www.pubmed.gov

A service of the National Library of Medicine
and the National Institutes of Health

My NCBI
[Sign In] [Regis

All Databases    PubMed    Nucleotide    Protein    Genome    Structure    OMIM    PMC    Journals    Bool

Search PubMed for    Go    Clear

Limits    Preview/Index    History    Clipboard    Details

Display AbstractPlus    Show 20    Sort by    Send to

All: 1    Review: 0

☐ **1:** Community Genet. 1999;2(1):36-42.    Links    Full Text

### Study of 290 cases of polyhydramnios and congenital malformations in a series of 225,669 consecutive births.

**Stoll CG, Roth MP, Dott B, Alembik Y**.

Service de Genetique Medicale, Centre Hospitalo-Universitaire, Strasbourg, France. Claude.Stoll@chru-strasbourg.fr

OBJECTIVES: To provide data on polyhydramnios associated with congenital anomalies in 225,669 consecutive pregnancies. MATERIAL AND METHODS: The information in this study came from births of known outcome recorded in our registry of congenital malformations. Routine ultrasonographic examination was performed. Polyhydramnios was diagnosed ultrasonographically. A case-control study allowed the examination of genetic and environmental causal factors of polyhydramnios associated with congenital malformations. RESULTS: The prevalence of this association was 1.28/1,000 (290 cases). Polyhydramnios associated with congenital malformations was diagnosed prenatally in 44.5% of the cases, 10.3% of the infants were stillborn. Forty-one percent of the cases had more than one malformation, 14.5% had a chromosomal aberration, and 20.0% had multiple malformations that do not constitute a syndrome. The more frequent malformations associated with polyhydramnios were cardiac, digestive, central nervous system, musculoskeletal, and urinary. There was increased parental consanguinity. The incidence of polyhydramnios and congenital anomalies among first-degree relatives was 4.1% and first-degree relatives had more malformations than controls (6.2 vs. 3.2%, p < 0.05). Threatened abortions and diabetes mellitus were significantly more frequent among mothers of children with congenital malformations associated with polyhydramnios than among controls. CONCLUSIONS: Our study demonstrated that careful fetal examination has to be performed when polyhydramnios is diagnosed as congenital malformations are often associated with polyhydramnios. We recommend the use of fetal chromosome analysis and careful ultrasonographic examination in every pregnancy complicated by polyhydramnios.

PMID: 15178961 [PubMed]

**Related Links**

Study of 224 cases of oligohydramnios and congenital malformations in a series of 225,669 consecutive births [Community Genet. 1998]

Study of 156 cases of polyhydramnios and congenital malformations in a series of 118,265 consecutive [Am J Obstet Gynecol. 1991]

Epidemiology of congenital eye malformations in 131,760 consecutive births [Ophthalmic Paediatr Genet. 1992]

Risk factors in internal urinary system malformations [Pediatr Nephrol. 1990]

Congenital eye malformations in 212,479 consecutive births [Ann Genet. 1997]

See all Related Articles...

Display  AbstractPlus         Show  20     Sort by        Send to

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

Aug 14 2006 08:07:58

Exhibit 51 - 2



A service of the National Library of Medicine
and the National Institutes of Health   My NCBI
[Sign In] [Regis

All Databases    PubMed    Nucleotide    Protein    Genome    Structure    OMIM    PMC    Journals    Bool

Search PubMed          for          [Go] [Clear]

Limits    Preview/Index    History    Clipboard    Details

Display AbstractPlus      Show 20    Sort by    Send to

All: 1    Review: 0

**1:** Ann Ist Super Sanita. 2006;42(1):46-52.                    **Full text**    Links

## Brain imaging and fetal alcohol spectrum disorders.

**McGee CL, Riley EP.**

Joint Doctoral Program in Clinical Psychology, San Diego State University, San Diego (CA), USA.

Over thirty years of research has revealed that prenatal exposure to alcohol has a devastating impact on the structure and function of the developing central nervous system. Imaging studies over the past ten years have improved our understanding of the structural alterations related to prenatal alcohol exposure and provided researchers with potential hypotheses for brain-behavior relationships. Structural alterations associated with prenatal alcohol exposure have been found in overall brain size, shape, and symmetry, along with regional decreases in white and gray matter. In addition, abnormalities have been noted in specific structures such as the cerebellum, basal ganglia, and corpus callosum. This review demonstrates that specific areas of the brain may be more vulnerable to prenatal exposure to alcohol.

PMID: 16801725 [PubMed - as supplied by publisher]

**Related Links**

A review of the neuroanatomical findings in children with fetal alcohol syndrome or prenatal exposure to alcohol.     [Alcohol Clin Exp Res. 1998]

Fetal alcohol spectrum disorders: an overview with emphasis on changes in brain and behavior. [Exp Biol Med (Maywood). 2005]

Teratogenic effects of alcohol: a decade of brain imaging. [Am J Med Genet C Semin Med Genet. 2004]

Regional brain shape abnormalities persist into adolescence after heavy prenatal alcohol exposure. [Cereb Cortex. 2002]

Interhemispheric transfer in children with heavy prenatal alcohol exposure. [Alcohol Clin Exp Res. 2002]

See all Related Articles...

Display AbstractPlus      Show 20    Sort by    Send to

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

Aug 14 2006 08:07:58

**Exhibit 52**

DEVELOPMENTAL NEUROPSYCHOLOGY, *18*(3), 331–354
Copyright © 2000, Lawrence Erlbaum Associates, Inc.

# Direct and Indirect Effects of Prenatal Alcohol Damage on Executive Function

## Paul D. Connor

*Department of Psychiatry and Behavioral Sciences*
*University of Washington*

## Paul D. Sampson

*Department of Statistics*
*University of Washington*

## Fred L. Bookstein

*Department of Biostatistics*
*University of Michigan*

## Helen M. Barr and Ann P. Streissguth

*Department of Psychiatry and Behavioral Sciences*
*University of Washington*

Patients with Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE) often have difficulty functioning appropriately in everyday life and seem to employ poor problem-solving strategies. Tests of executive function are relevant for quantifying the functional deficits and underlying real-life problems associated with prenatal alcohol exposure. This study considers two pathways for the effects of prenatal alcohol on executive function: a direct effect and an indirect effect through prenatal alcohol's effect on IQ. We compared 30 men who had been diagnosed with FAS or FAE with young adults participating in a longitudinal prospective study ($n = 419$) and 15 control participants that comprised a comparison group. This study is unique in its analysis of the same battery of assessments of executive function in both a large low dose longitudinal study sample and a clinically diagnosed group. Participants were evaluated on 9

Requests for reprints should be sent to Paul D. Connor, Department of Psychiatry and Behavioral Sciences, University of Washington, Fetal Alcohol and Drug Unit, 180 Nickerson Street, Suite 309, Seattle, WA 98109. E-mail: cingulum@u.washington.edu

**Exhibit 53 - 1**

332    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

tests (including 58 scores) of executive function. For some but not all of the tests in this executive function battery, the decrement in the alcohol exposure group is greater than would be predicted from their IQ scores. We found that 3 of 6 Stroop scores, 2 of 4 Trails scores, 9 of 16 Wisconsin Card Sorting scores, 1 of 2 Ruff's Figural Fluency scores, and 2 of 4 Consonant Trigrams scores appear to be particularly sensitive to the direct effects of prenatal alcohol damage for patients with FAS and FAE. The findings suggest that these executive function tests would be particularly useful in clinical evaluations of persons suspected of fetal alcohol damage because they would not simply reflect deficits in IQ or facial stigmata.

Patients with Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE) are often clinically characterized by behaviors resembling those for patients diagnosed with frontal lobe lesions. This is exemplified by descriptions of two individuals, one of a young man diagnosed with FAS and another of a young woman with known frontal lobe damage. RW is a 26-year-old man in our study who was born to a mother who abused alcohol during pregnancy. He was diagnosed with FAS at the age of 3. DT was 7 years old when she underwent surgery for a left frontal subarachnoid hemorrhage (Eslinger, Grattan, Damasio, & Damasio, 1992). When tested as adults, both RW and DT had IQ scores broadly within the average range. However, both RW and DT had difficulties with cognitive flexibility, maintaining set, planning and organizing information, utilizing feedback to alter behavior, and they displayed a perseverative response style. Behaviorally and socially, both had great difficulty maintaining employment because of poor judgement and inability to stay focused on tasks, and required assistance with many daily living skills including hygiene, structuring leisure time, and managing finances. Both RW and DT had great difficulty with relationships due to poor impulse control and decision-making skills. The pervasive impact of RWs disorder seems quite similar to that of DTs, no matter the difference in etiology, and a central theme appears to be an extensive deficit of executive function (EF), regardless of level of measured intelligence.

A number of researchers have defined EF as a group of cognitive abilities that include (a) self-regulation of behaviors, (b) sequencing of behaviors, (c) cognitive flexibility, (d) response inhibition, (e) planning, and (f) organization of behavior (Eslinger, 1996). Denckla (1996) suggested that executive functions are "future-oriented" processes. Most researchers agree that EFs are not basic cognitive processes such as motor activity, sensation, perception, attention, or memory, but instead involve the integration of the more basic cognitive processes and thus depend on their development. In other words, good EF depends on intact basic cognitive functioning. EF is of particular interest in evaluating people with prenatal alcohol effects because poor judgement and failure to consider consequences are often described clinically in this population.

According to Denckla (1996), EF is an integrative process, so it can sometimes be affected by performance on other tasks that reflect general intelligence and

**Exhibit 53 - 2**

Case 4:00-cr-00260-Y    Document 2432-3    Filed 01/17/08    Page 8 of 77    PageID 8306

other cognitive processes. For example, in the presence of high IQ, tasks of EF may be too easy and thus may not be sensitive to EF deficits that are subtle. Denckla described a complex overlap between general intelligence and EF, noting that Performance IQ, which emphasizes fluid intelligence and timed tasks, may be more closely related to EF than Verbal IQ, with its emphasis on more crystallized intelligence. In addition to the effects of IQ, individual tasks considered to tap EF, such as the Stroop task, can be impacted by other abilities, such as literacy.

EF deficits have been identified in many clinical populations (Arnett et al., 1994; Channon, 1996; Dise & Lohr, 1998; Eslinger et al., 1992; Foong et al., 1997; Hutton et al., 1998; Levin et al., 1997; Pantelis et al., 1997; Raskin & Rearick, 1996; Romans, Roeltgen, Kushner, & Ross, 1997; Shoqeirat, Mayes, MacDonald, Meudell, & Pickering, 1990). In addition, several studies have assessed EF deficits in populations of individuals prenatally exposed to alcohol. Kodituwakku and colleagues utilized the Wisconsin Card Sorting Test (WCST), Controlled Oral Word Association Test (COWAT), and a tower planning test with a small group of children with FAS and FAE (Kodituwakku, Handmaker, Cutler, Weathersby, & Handmaker, 1995). They found that children with FAS and FAE correctly identified significantly fewer categories and made significantly more perseverative errors on the WCST, generated significantly fewer words on the COWAT, and had significantly poorer performance on the tower test than did controls. A study using the D–KEFS (a battery of tests including versions of Trail Making, Stroop, Tower, and Word Context tests) was administered to children diagnosed with FAS or Prenatal Exposure to Alcohol and nonexposed controls (Mattson, Goodman, Caine, Delis, & Riley, 1999). This study found that alcohol-exposed participants, regardless of diagnosis, performed more poorly than control participants, with specific impairments in planning, response inhibition, abstract thinking, and flexibility. Another study compared performance on the WCST of children exposed to alcohol prenatally, children diagnosed with attention deficit hyperactivity disorder (ADHD), and control children (Coles et al., 1997). Children diagnosed with FAS or FAE completed significantly fewer categories than did either children with ADHD or controls. Adolescents and adults with FAS and FAE made many more bizarre responses than did control participants on a cognitive estimation task (Kopera-Frye, Dehaene, & Streissguth, 1996).

Very few of the studies we reviewed considered IQ effects and their complex overlap with EF (Denckla, 1996). However, we know from the literature that prenatal alcohol directly depresses IQ (Mattson, Riley, Grambling, Delis, & Jones, 1997; Streissguth et al., 1991; Streissguth, Barr, Sampson, Darby, & Martin, 1989) and thereby may indirectly depress EF. In addition, alcohol may directly affect at least some aspects of EF even more than would be predicted by the alcohol-related IQ deficit alone. Therefore, it is important to assess not only the indirect effects of EF through the mediation of IQ but also to determine the direct effects of alcohol damage on EF.

**Exhibit 53 - 3**

334    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

This study examines the direct effect of prenatal alcohol damage on EF, and also the indirect effect via IQ, in two groups of adult participants. One group, from a large population-based study, has available measures of prenatal alcohol exposure; the other group, from a clinic-based study, includes adults previously diagnosed with FAS or FAE, along with controls. All participants were examined on nine tests thought to be sensitive to EF and on a standardized IQ test. These nine tests yielded 58 EF outcome measures (Table 1). Each of these tests was examined with respect to IQ using data from both studies to compute coefficients reflecting the direct effects of prenatal alcohol damage as expressed in the FAS and FAE diagnosis according to a simple path model. These coefficients were used as weights to compute a composite EF outcome score embodying direct as well as indirect effects (Table 2).

## METHOD

### Participants

Participants from two studies who were administered an identical battery of tests were included in this analysis. The first study, a longitudinal prospective study, examined a cohort of 419 young adults between 20.8 and 23.4 years of age who had been followed since birth. Participants were originally selected based on maternal report of alcohol use during pregnancy. Pregnant women who were receiving prenatal care were interviewed in the 5th month of pregnancy about alcohol use patterns before pregnancy and during pregnancy. The participants from the prospective study have widely varying prenatal alcohol exposure levels, across the whole spectrum of use (Streissguth, Barr, Bookstein, Sampson, & Carmichael Olson, 1999), with relatively few at levels believed necessary for outcomes that can be diagnosed as FAS or FAE (Sampson et al., 1997). Only two members of this cohort had been identified at birth with FAS.

The second study, a clinic-based study, examined 45 men, including 15 control participants, 15 participants who were diagnosed with FAS, and 15 who were diagnosed with FAE, by experienced dysmorphologists according to established criteria (Clarren & Smith, 1978). The diagnosis of FAS was made when the participant presented with a triad of symptoms including specific facial stigmata, growth deficiency, and evidence of central nervous system (CNS) dysfunction or damage in the presence of significant alcohol exposure during pregnancy. The facial stigmata of FAS include short palpebral fissures (smaller than normal eye openings), a thin upper lip, and an indistinct philtrum (ridges just above the middle of the upper lip; Stratton, Howe, & Battaglia, 1996). By contrast, FAE was diagnosed when there was evidence of significant prenatal alcohol exposure and the presence of CNS dysfunction or damage but there was not sufficient evidence of facial anomalies or

**Exhibit 53 - 4**

TABLE 1
Means and Standard Deviations of Executive Functioning Scores for the FAS and FAE Study (*N* = 45) and the Longitudinal Prospective Study

| | FAS and FAE Study | | | | | | Longitudinal Prospective Study[b] | |
| | FAS[a] | | FAE[a] | | Controls[a] | | | |
| Measures | M | SD | M | SD | M | SD | M | SD |
|---|---|---|---|---|---|---|---|---|
| Wechsler Adult Intelligence Scale–Revised (WAIS–R) | | | | | | | | |
| VIQ | 80.3 | 10.4 | 84.7 | 8.9 | 111.3 | 15.5 | 99.4 | 12.0 |
| PIQ | 91.7 | 17.1 | 93.7 | 14.9 | 111.1 | 16.3 | 104.8 | 13.6 |
| FSIQ | 83.9 | 12.9 | 87.1 | 9.8 | 112.7 | 16.6 | 101.9 | 12.5 |
| Wisconsin Card Sorting Test (WCST) | | | | | | | | |
| WCST1stCAT | 15.7 | 8.5 | 15.1 | 7.8 | 14.4 | 6.9 | 13.5 | 8.7 |
| WCSTSETFAIL | 0.9 | 1.6 | 1.2 | 1.5 | 1.1 | 1.3 | 0.8 | 1.1 |
| WCSTLTOL | −6.1 | 11.9 | −3.7 | 7.1 | 0.9 | 2.6 | −0.7 | 4.2 |
| WCST#CAT | 4.1 | 2.0 | 5.0 | 1.6 | 6.0 | 0.0 | 5.8 | 0.9 |
| WCST#COR | 70.3 | 19.1 | 73.8 | 12.4 | 75.3 | 10.8 | 71.7 | 9.6 |
| WCST#CONCEP | 58.6 | 27.1 | 64.5 | 15.7 | 72.3 | 10.3 | 68.0 | 10.0 |
| WCST#ERROR | 43.1 | 28.8 | 33.5 | 21.1 | 16.6 | 7.2 | 17.0 | 13.3 |
| WCST#NPERROR | 24.7 | 18.4 | 17.9 | 12.2 | 9.5 | 5.3 | 8.7 | 8.3 |
| WCST#PERROR | 18.4 | 13.5 | 15.6 | 11.0 | 7.1 | 3.6 | 8.3 | 5.8 |
| WCST#PRESP | 20.0 | 15.6 | 17.3 | 12.7 | 7.3 | 3.9 | 8.8 | 6.7 |
| WCST%CONCEP | 55.1 | 28.1 | 62.7 | 18.5 | 79.3 | 8.3 | 78.8 | 12.9 |
| WCST%ERROR | 35.6 | 20.6 | 29.6 | 14.7 | 17.5 | 5.9 | 17.7 | 9.2 |
| WCST%NPERROR | 20.4 | 13.5 | 15.7 | 8.7 | 9.9 | 4.6 | 8.9 | 6.1 |
| WCST%PERROR | 15.3 | 9.8 | 13.9 | 7.6 | 7.7 | 3.5 | 8.8 | 4.1 |
| WCST%PRESP | 16.6 | 11.3 | 15.5 | 9.0 | 7.9 | 3.8 | 9.3 | 4.8 |
| WCST#TRIALS | 113.4 | 20.0 | 107.3 | 18.8 | 91.9 | 15.1 | 88.6 | 18.0 |

(continued)

335

Exhibit 53 - 5

**Exhibit 53 - 6**

336

TABLE 1 (Continued)

| Measures | FAS and FAE Study | | | | | | Longitudinal Prospective Study[b] | |
| | FAS[a] | | FAE[a] | | Controls[a] | | | |
| | M | SD | M | SD | M | SD | M | SD |
|---|---|---|---|---|---|---|---|---|
| Cognitive Estimation (CE; folded rank scores) | | | | | | | | |
| CE–01 | 119.5 | 81.2 | 76.2 | 64.7 | 94.6 | 68.2 | 104.6 | 61.0 |
| CE–02 | 155.1 | 95.7 | 153.4 | 85.6 | 96.2 | 99.1 | 89.9 | 87.7 |
| CE–03 | 141.9 | 55.8 | 119.3 | 46.5 | 64.2 | 42.6 | 102.5 | 64.2 |
| CE–04 | 106.2 | 92.0 | 139.4 | 71.6 | 106.8 | 79.9 | 106.2 | 68.6 |
| CE–05 | 127.5 | 71.3 | 114.6 | 59.5 | 118.3 | 62.4 | 106.0 | 59.7 |
| CE–06 | 123.7 | 65.3 | 107.4 | 54.0 | 96.3 | 61.0 | 104.4 | 60.1 |
| CE–07 | 56.4 | 96.8 | 0.0 | 0.0 | 0.0 | 0.0 | 1.5 | 18.0 |
| CE–08 | 143.0 | 74.7 | 129.5 | 47.4 | 121.6 | 59.8 | 103.9 | 67.5 |
| CE–09 | 132.7 | 71.1 | 127.2 | 89.8 | 103.7 | 70.6 | 101.2 | 73.1 |
| CE–10 | 141.0 | 66.9 | 90.8 | 91.9 | 86.8 | 76.4 | 89.9 | 76.4 |
| CE–11 | 122.8 | 74.2 | 111.1 | 64.9 | 97.6 | 54.4 | 105.9 | 60.2 |
| CE–12 | 147.7 | 80.6 | 141.6 | 55.8 | 86.4 | 76.2 | 103.6 | 65.7 |
| CE–13 | 127.7 | 66.8 | 116.8 | 78.6 | 122.8 | 77.2 | 106.2 | 67.9 |
| CE–14 | 110.5 | 72.2 | 108.8 | 77.1 | 93.4 | 66.1 | 104.5 | 65.4 |
| CE–15 | 135.4 | 70.7 | 124.5 | 72.5 | 79.3 | 64.0 | 101.7 | 68.8 |
| Controlled Oral Word Association Test (COWAT) | | | | | | | | |
| COWATF | 9.2 | 3.8 | 11.7 | 5.0 | 15.3 | 3.9 | 13.9 | 4.3 |
| COWATA | 7.8 | 2.5 | 8.7 | 3.8 | 13.3 | 4.2 | 11.7 | 4.2 |
| COWATS | 11.3 | 4.4 | 11.6 | 3.6 | 16.9 | 5.5 | 15.4 | 4.5 |
| COWATTOT | 28.3 | 9.1 | 32.1 | 10.6 | 45.5 | 11.8 | 40.9 | 11.1 |
| COWATANIM | 17.9 | 5.0 | 19.5 | 5.5 | 24.4 | 4.6 | 23.1 | 5.2 |

**Exhibit 53 - 7**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ruff's Figural Fluency Test (RFF) | | | | | | | | |
| RFFPERSEV | 8.1 | 10.4 | 6.8 | 7.7 | 5.1 | 4.9 | 5.3 | 5.3 |
| RFFUNIQUE | 65.3 | 20.7 | 65.3 | 24.7 | 111.3 | 20.7 | 96.0 | 22.7 |
| Trail Making Test | | | | | | | | |
| TRLAERROR | 0.1 | 0.3 | 0.5 | 0.6 | 0.2 | 0.6 | 0.2 | 0.5 |
| TRLASECONDS | 38.1 | 15.9 | 36.1 | 11.6 | 23.3 | 6.6 | 25.0 | 8.1 |
| TRLBERROR | 0.9 | 1.8 | 1.1 | 1.2 | 0.1 | 0.3 | 0.4 | 0.8 |
| TRLBSECONDS | 100.2 | 51.2 | 103.1 | 28.4 | 55.2 | 20.5 | 57.8 | 24.6 |
| Stroop Color–Word Test | | | | | | | | |
| STROOPW | 85.5 | 16.2 | 80.1 | 13.8 | 105.7 | 14.6 | 103.2 | 15.5 |
| STROOPWERR | 0.7 | 1.2 | 1.1 | 1.0 | 0.5 | 0.8 | 0.5 | 0.9 |
| STROOPC | 60.8 | 16.4 | 57.7 | 12.0 | 74.5 | 9.7 | 74.8 | 12.4 |
| STROOPCERR | 1.8 | 1.7 | 1.4 | 1.8 | 0.9 | 0.9 | 1.0 | 1.1 |
| STROOPCW | 33.9 | 10.7 | 31.1 | 8.3 | 45.6 | 7.9 | 45.8 | 10.0 |
| STROOPCWERR | 2.2 | 1.7 | 2.5 | 2.7 | 1.2 | 1.1 | 1.6 | 1.5 |
| Consonant Trigrams Test (CTT) | | | | | | | | |
| CTT03 | 10.9 | 3.4 | 10.5 | 2.3 | 13.2 | 2.5 | 12.8 | 2.2 |
| CTT09 | 7.1 | 2.9 | 8.1 | 3.0 | 11.0 | 3.1 | 10.4 | 3.0 |
| CTT18 | 5.1 | 2.8 | 5.5 | 2.5 | 8.8 | 3.1 | 8.8 | 3.3 |
| CTTPOS | 32.9 | 8.1 | 33.2 | 6.3 | 44.7 | 8.6 | 43.3 | 8.0 |
| Digit Span (DS; WAIS–R) | | | | | | | | |
| DSSCALE | 7.0 | 2.9 | 7.5 | 2.2 | 12.0 | 2.9 | 10.5 | 2.6 |

*(continued)*

337

338

TABLE 1 (*Continued*)

| Measures | FAS and FAE Study | | | | | | Longitudinal Prospective Study[b] | |
|---|---|---|---|---|---|---|---|---|
| | FAS[a] | | FAE[a] | | Controls[a] | | | |
| | M | SD | M | SD | M | SD | M | SD |
| California Verbal Learning Test (CVLT) | | | | | | | | |
| CVLTPERSEV | 5.4 | 5.0 | 5.7 | 4.4 | 5.6 | 4.6 | 5.5 | 4.8 |
| CVLTASEM | 14.9 | 7.4 | 11.1 | 8.4 | 21.7 | 9.3 | 25.5 | 13.2 |
| CVLTLDSEM | 3.1 | 3.3 | 4.3 | 2.7 | 7.5 | 2.7 | 7.5 | 3.3 |
| CVLTSDSEM | 2.8 | 2.8 | 3.9 | 3.3 | 6.7 | 2.7 | 6.9 | 3.2 |
| CVLTINTRUS | 9.4 | 10.8 | 4.7 | 4.2 | 1.7 | 1.5 | 2.5 | 3.9 |

*Note.* FAS = Fetal Alcohol Syndrome; FAE = Fetal Alcohol Effects; VIQ = verbal IQ; PIQ = performance IQ; FSIQ = full scale IQ; WCST1stCAT = number of first category correctly identified; WCSTSETFAIL = number of set breaks; WCSTLTOL = the learning to learn factor; WCST#CAT = number of categories correctly identified; WCST#COR = number of correct responses; WCST#CONCEP = number of conceptual level responses; WCST#ERROR = number of errors; WCST#NPERROR = number of nonperseverative errors; WCST#PERROR = number of perseverative errors; WCST#PRESP = number of perseverative responses; WCST%CONCEP = percentage of conceptual level responses; WCST%ERROR = percentage of errors; WCST%NPERROR = percentage of nonperseverative errors; WCST%PERROR = percentage of perseverative errors; WCST%PRESP = percentage of perseverative responses; WCST#TRIALS = number of trials completed; COWATF = number of words: "F" trial; COWATA = number of words: "A" trial; COWATS = number of words: "S" trial; COWATTOT = total words generated from letters; COWATANIM = number of animal words generated; RFFPERSEV = total number of perseverative errors; RFFUNIQUE = number of unique designs; TRLAERROR = number of errors for the Trails A; TRLASECONDS = total amount of time to reach the goal; TRLBERROR = number of errors for the Trails B; TRLBSECONDS = total amount of time to reach the goal; STROOPW = number of correct responses in a 45-sec time period when reading colors; STROOPWERR = number of errors reading color words; STROOPC = number of correct responses naming color of ink; STROOPCERR = number of errors made naming colors; STROOPCW = number of correct responses when naming colors ignoring printed words; STROOPCWERR = number of errors naming colors ignoring printed words; CTT03 = total number of letters remembered, 3-sec delay; CTT09 = total number of letters remembered, 9-sec delay; CTT18 = total number of letters remembered, 18-sec delay; CTTPOS = total number of letters placed in the correct sequence; DSSCALE = scaled score of both conditions combined; CVLTPERSEV = number of perseverations; CVLTASEM = semantic clustering; CVLTLDSEM = long-delay semantic clustering; CVLTSDSEM = short-delayed semantic clustering; CVLTINTRUS = number of intrusions.

[a]$n = 15.$ [b]$n = 419.$

Exhibit 53 - 8

TABLE 2
Performance Versus Expectation Given IQ for 58 Executive Function Scores and
Their Weights

| Test Score | Better Than Expected | Worse Than Expected | Weight[a] |
|---|---|---|---|
| STROOPW | 5 | 24 | 0.71 |
| STROOPCW | 5 | 24 | 0.68 |
| TRLBSECONDS | 6 | 23 | 0.65 |
| TRLASECONDS | 9 | 20 | 0.65 |
| WCST#ERROR | 6 | 23 | 0.60 |
| WCST#NPERROR | 7 | 22 | 0.58 |
| WCST%ERROR | 6 | 23 | 0.57 |
| WCST%NPERROR | 7 | 22 | 0.55 |
| WCST#TRIALS | 9 | 20 | 0.55 |
| WCST%CONCEP | 6 | 23 | 0.55 |
| RFFUNIQUE | 8 | 21 | 0.54 |
| WCST#PERROR | 9 | 20 | 0.53 |
| STROOPC | 6 | 23 | 0.53 |
| CTTPOS | 7 | 22 | 0.52 |
| WCST#PRESP | 9 | 20 | 0.52 |
| WCST#CAT | 15 | 14 | 0.50 |
| CTT18 | 6 | 23 | 0.49 |
| WCST%PERROR | 9 | 20 | 0.46 |
| WCST%PRESP | 8 | 21 | 0.45 |
| CVLTASEM | 11 | 18 | 0.44 |
| CVLTSDSEM | 10 | 19 | 0.44 |
| CVLTLDSEM | 11 | 18 | 0.43 |
| DSSCALE | 8 | 21 | 0.43 |
| CVLTINTRUS | 12 | 17 | 0.41 |
| CE–08 | 10 | 19 | 0.38 |
| CE–15 | 8 | 21 | 0.36 |
| COWATTOT | 12 | 17 | 0.35 |
| CTT09 | 10 | 19 | 0.35 |
| WCSTLTOL | 7 | 22 | 0.32 |
| CE–05 | 12 | 17 | 0.31 |
| COWATS | 13 | 16 | 0.30 |
| COWATANIM | 10 | 19 | 0.26 |
| WCST1STCAT | 14 | 15 | 0.26 |
| COWATF | 11 | 18 | 0.25 |
| CE–07 | 25 | 4 | 0.23 |
| RFFPERSEV | 13 | 16 | 0.22 |
| CE–02 | 13 | 16 | 0.18 |
| COWATA | 13 | 16 | 0.17 |
| CE–12 | 13 | 16 | 0.16 |
| CTT03 | 9 | 20 | 0.14 |
| CE–11 | 14 | 15 | 0.11 |
| CE–03 | 12 | 17 | 0.11 |

*(continued)*

339

Exhibit 53 - 9

TABLE 2 (*Continued*)

| Test Score | Better Than Expected | Worse Than Expected | Weight[a] |
|---|---|---|---|
| CE–10 | 12 | 17 | 0.09 |
| STROOPWERR | 14 | 15 | 0.08 |
| STROOPCWERR | 14 | 15 | 0.07 |
| WCSTSETFAIL | 14 | 15 | 0.07 |
| CE–13 | 16 | 13 | 0.06 |
| WCST#CONCEP | 16 | 13 | 0.03 |
| TRLBERROR | 17 | 12 | 0.02 |
| CE–04 | 12 | 17 | 0.02 |
| CE–09 | 18 | 11 | 0.02 |
| WCST#COR | 20 | 9 | 0.01 |
| TRLAERROR | 22 | 7 | 0.01 |
| CE–14 | 14 | 15 | –0.03 |
| STROOPCERR | 17 | 12 | –0.03 |
| CE–06 | 19 | 10 | –0.25 |
| CVLTPERSEV | 20 | 9 | –0.42 |
| CE–01 | 21 | 8 | –0.62 |

*Note.* STROOPW = number of correct responses in a 45-sec time period when reading colors; STROOPCW = number of correct responses when naming colors ignoring printed words in a 45-sec time period; TRLBSECONDS = total amount of time to reach the goal; TRLASECONDS = total amount of time to reach the goal; WCST#ERROR = number of errors; WCST#NPERROR = number of nonperseverative errors; WCST%ERROR = percentage of errors; WCST%NPERROR = percentage of nonperseverative errors; WCST#TRIALS = number of trials completed; WCST%CONCEP = percentage of conceptual level responses; RFFUNIQUE = number of unique designs; WCST#PERROR = number of perseverative errors; STROOPC = number of correct responses in a 45-sec time period when reading color of ink; CTTPOS = total number of letters placed in the correct sequence; WCST#PRESP = number of perseverative responses; WCST#CAT = number of categories correctly identified; CTT18 = total number of letters remembered during 18-sec delay period; WCST%PERROR = percentage of perseverative errors; WCST%PRESP = percentage of perseverative responses; CVLTASEM = semantic clustering; CVLTSDSEM = short-delayed semantic clustering; CVLTLDSEM = long-delay semantic clustering; DSSCALE = scaled score of both conditions combined; CVLTINTRUS = number of intrusions; CE–08, CE–15, CE–05, CE–07, CE–02, CE–12, CE–11, CE–03, CE–10, CE–13, CE–04, CE–09, CE–14, CE–06, CE–01 = scoring in the Cognitive Estimation questionnaire; COWATTOT = total words generated from letters; WCSTLTOL = the learning to learn factor; COWATS = number of words: "S" trial; COWATANIM = number of animal words generated; WCST1stCAT = number of trials to first category correctly identified; COWATF = number of words: "F" trial; RFFPERSEV = total number of perseverative errors; COWATA = number of words: "A" trial; CTT03 = total number of letters remembered during 3-sec delay period; STROOPWERR = number of errors reading colors; STROOPCWERR = number of errors when naming colors ignoring printed words; WCSTSETFAIL = number of set breaks; WCST#CONCEP = number of conceptual level responses; TRLBERROR = number of errors for the trail; WCST#COR = number of correct responses; TRLAERROR = number of errors for the trail; STROOPCERR = number of errors made; CVLTPERSEV = number of perseverations.

[a]Weights are computed as the mean of the deviations of Fetal Alcohol Syndrome and Fetal Alcohol Effects cases from the loess regression curves for each of the items, as illustrated for WCST%CONCEP and COWATA in Figure 2.

340

Exhibit 53 - 10

growth deficiency. All of the participants with FAS or FAE were selected from a study of secondary disabilities conducted in our lab for the Centers for Disease Control and Prevention (Streissguth, Barr, Kogan, & Bookstein, 1996). All of these diagnosed participants have been involved in follow-up studies in this lab for many years. Many of them were identified at birth, whereas others were identified later in life by the diagnostic clinic at the University of Washington, Seattle.

Control participants for the clinic-based study were recruited by advertisements placed at local universities, community colleges, and the University Medical Center. They were matched for age and ethnicity. Potential control participants were screened for prenatal alcohol exposure, head trauma involving loss of consciousness, history of neurological disturbances (i.e., seizures, Parkinson's disease, Alzheimer's disease, and birth defects involving damage to the brain), and current psychiatric problems (i.e. hearing voices, seeing visions, and alcohol or drug abuse problems). Control participants reporting any of these symptoms were not included in the study.

The participants from the longitudinal prospective study ($n = 419$) and control participants from the clinic-based study ($n = 15$) were compared with the participants diagnosed with either FAS or FAE from the clinic-based study. Demographic characteristics of the participants diagnosed with FAS or FAE, the 15 control participants from the clinic-based study, and 419 comparison participants from the longitudinal prospective study are presented in Table 3.

Participants from both studies were administered an identical group of neuropsychological tests. One of the 15 participants with FAS was unable to complete the EF battery; therefore the results reported are based on 29 patients with FAS or FAE, 15 control participants from the clinic-based sample, and 419 comparison participants from the longitudinal prospective study.

## Measures

Nine tests of EF with a total of 58 scores were recorded and administered under identical conditions to participants in both studies.

*Wisconsin Card Sorting Test (WCST)*.    The WCST (Heaton & Staff, 1993) is a computerized task which requires participants to match individual response cards to one of four key cards (one red triangle, two green stars, three yellow crosses, and four blue circles). The participant is required to correctly identify the sorting principle (i.e., color, shape, or number) on 10 consecutive trials at which point the sorting principle changes. The three different sorting principles are each repeated twice over the 128 possible trials. Some controversy is attached to the use of the computerized version of the WCST versus the standard administration. In one

**Exhibit 53 - 11**

342    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

TABLE 3

Comparison of Demographic Characteristics by Group: FAS and FAE Study (*N* = 45) and the Longitudinal Prospective Study

| Characteristics | FAS and FAE Study | | | Longitudinal Prospective Study[b] |
| | FAS[a] | FAE[a] | Control[a] | |
|---|---|---|---|---|
| Sex | | | | |
| Male | 15 (100%) | 15 (100%) | 15 (100%) | 220 (53%) |
| Female | — | — | — | 199 (47%) |
| Ethnicity | | | | |
| White | 9 (60%) | 9 (60%) | 10 (67%) | 347 (83%) |
| Black | — | 2 (13%) | 2 (13%) | 31 (7%) |
| Native American | 6 (40%) | 4 (27%) | 3 (20%) | 12 (3%) |
| Other | — | — | — | 29 (7%) |
| Age at exam | | | | |
| 18–24.9 years | 10 (67%) | 10 (67%) | 10 (67%) | 419 (100%) |
| 25–31.9 years | 4 (26%) | 4 (26%) | 4 (26%) | — |
| 32–38.9 years | 1 (7%) | 1 (7%) | 1 (7%) | — |
| Highest grade completed | | | | |
| High school incomplete | 6 (40%) | 5 (33%) | 1 (6%) | 48 (11%) |
| High school graduate | 7 (47%) | 9 (60%) | 1 (6%) | 92 (22%) |
| Beyond high school | 2 (13%) | 1 (6%) | 13 (87%) | 279 (67%) |

*Note.*    FAS = Fetal Alcohol Syndrome; FAE = Fetal Alcohol Effects.

[a]*n* = 15. [b]*n* = 419.

study of autistic and nonautistic children, the two forms of the test were found to have low to moderate alternate forms validity, and a somewhat attenuated effect was found with the computerized version (Ozonoff, 1995). In contrast, another study of neurologically intact participants found the two versions of the test to be quite comparable (Artiola-i-Fortuny & Heaton, 1996). Computerized administration offers the benefit that all of the tests are identically administered and reliably scored, thus removing much examiner error that could occur in hand administration. Scores for this task include the number of trials completed, number correct responses, number and percentage of errors, number and percentage of perseverative responses, number and percentage of perseverative errors, number and percentage of nonperseverative errors, number of categories correctly identified, number of trials to completion of the first category, number and percentage of conceptual level responses, number of set breaks (making an incorrect response after a run of six correct responses), and the "learning to learn" factor.

*Cognitive Estimation (CE).*    This 15-item questionnaire was originally based on the questionnaire developed by Shallice and Evans (Shallice & Evans,

Exhibit 53 - 12

1978). The current questions were derived from a previous study in our unit (Kopera-Frye et al., 1996). The participant is asked to make a reasonable guess about such questions as the length of a dollar bill, weight of the heaviest dog, and the height of the tallest tree in the world. The original scoring system devised by Shallice and Evans was a 4-point scale based on the extremeness of the response (Shallice & Evans, 1978). This method of scoring is quite dependent on the size of the normative group as extremeness was based on the response being outside the range of the full normative sample. Instead, in this study each participant's responses were rank ordered and the folded ranks (distance from the median rank) used for scoring.

*Controlled Oral Word Association Test (COWAT).*    This is a task of verbal fluency in which the participant is given 1 min to name as many words as possible beginning with the letters "F," "A," and "S," and as many animals as possible (Spreen & Strauss, 1991). Scores were the number of words generated for each condition in the 1-min period.

*Ruff's Figural Fluency Test (RFF).*    This nonverbal analog of COWAT requires the participant to create unique designs by connecting dots with and without distracting interference (Evans, Ruff, & Gualtieri, 1985). Scores recorded are the numbers of unique designs over the five trials and the total number of perseverative errors.

*Trail Making Test.*    This test, especially Trails B, is a measure of shifting attentional set (Spreen & Strauss, 1991). Trails B requires the participant to switch between numbers and letters when connecting dots to reach the goal. Scores for this test are the total amount of time to reach the goal and the number of errors for each of the trails.

*Stroop Color–Word Test.*    The three-part Golden version of the task (Golden, 1978) requires the participant to read the names of colors, name the color of ink, and name the color of ink when words printed are in contrast to the colored ink (interference task). The interference task is a measure of response inhibition. Scores for this test are the numbers of correct responses named in a 45-sec time period and the number of errors made.

*Consonant Trigrams Test (CTT).*    This is a test of letter memory in the presence of a distraction task and is a measure of working memory (Stuss, Stethem,

**Exhibit 53 - 13**

344    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

& Poirier, 1987). In this task the participant is given a string of three consonants and is asked to remember them while counting backward by threes for delay periods of 3, 9, and 18 sec. Scores recorded are the total number of letters remembered at each of the delay periods and the total number of letters placed in the correct sequence.

*Digit Span (DS).* This subtest from the Wechsler Adult Intelligence Scale–Revised (WAIS–R) is a rudimentary measure of working memory. On this task, the participant is required to repeat numbers presented first forwards and then backwards. The score recorded is the scaled score of both conditions combined.

*California Verbal Learning Test (CVLT).* This test of list learning over repeated trials (Delis, Kramer, Kaplan, & Ober, 1987) has a component that measures the number of items the participant clusters through semantic methods (items within the same category). The clustering of information can be seen as a form of working memory. The test also measures the number of intrusions and perseverations. Scores recorded for this test include List A semantic clustering, short-delayed semantic clustering, long-delay semantic clustering, number of intrusions, and the number of perseverations.

*Wechsler Adult Intelligence Scale–Revised(WAIS–R).* In addition to the EF tests, a measure of intellectual functioning was administered. For these studies a prorated form of the WAIS–R was utilized (Wechsler, 1981). This prorated form of the WAIS–R eliminated the vocabulary and comprehension verbal subtests to shorten administration times. Correlation between prorated Full Scale IQ (FSIQ) and the traditional FSIQ was .96 and correlation between the prorated Verbal IQ (VIQ) and traditional VIQ was .95. Scores recorded from this test included the prorated VIQ, Performance IQ, and the FSIQ.

Statistical Analysis

The analysis in this report utilizes a unique strategy for combining data from a population-based longitudinal prospective study with corresponding data from a comparative clinic-based study of FAS and FAE. We first studied the relation between IQ and the individual EF measures using a composite pool of "control" participants, taken to be the 15 control participants from the comparative study, together with those participants from the longitudinal prospective study not having the highest levels of prenatal alcohol exposure. Those participants in the top 10% on a composite prenatal alcohol exposure score (computed as an "alcohol latent variable" according to the method explained in Streissguth, Bookstein, Sampson, & Barr,

Exhibit 53 - 14

Case 4:00-cr-00260-Y    Document 2432-3    Filed 01/17/08    Page 20 of 77    PageID 8318

1993) were excluded. This exclusion of participants was to ensure that the IQ–EF relations observed were not influenced by participants who could be judged clinically to have FAE. The second stage of analysis combined the EF measures into a composite score that best expresses the alcohol-related deficits in EF that are not explained by corresponding deficits in IQ.

One convenient way of disentangling systems involving multiple causal systems like this is the method of path analysis originally developed by Sewall Wright for applications in genetics (Bookstein et al., 1985). A path analysis is an alternative to multiple regression analysis in which each of a variety of postulated causal mechanisms is examined with the others controlled as well as possible by explicit subtabulations. In view of the complex overlap between the constructs of IQ and EF (Denckla, 1996), two paths of effect can be identified (Figure 1). In one, prenatal alcohol damage would indirectly affect EF through the mediation of IQ, and in another, the effects of prenatal alcohol damage would directly affect EF irrespective of IQ. When the fact of alcohol damage is encoded as a binary indicator distinguishing the FAS and FAE patients from the comparison control group, the coefficient representing the direct effect of prenatal alcohol according to the path diagram of Figure 1 is just the difference between the mean of the IQ-adjusted EF scores for the FAS and FAE patients and the mean of the IQ-adjusted EF scores for the comparison group. This logic is identical with Wright's original strategy of controlling for the effect of "general factors" (Bookstein et al., 1985). For any given EF score, the IQ-adjusted scores are the differences between the EF score and a regression-based prediction of EF from IQ computed from the pooled comparison or control group. We compute this regression relation using only the composite comparison group (longitudinal study participants plus 15 control participants from the comparison study), for whom the mean IQ-adjusted score (the mean residual) will then be zero. The direct effect coefficient is then just the mean of the IQ-adjusted EF scores for the FAS and FAE patients.

To account for varying types of distributions of the 58 individual EF scores, including features such as skewness, outliers, and ceiling effects, we chose to replace the original EF scores by a transformation of their ranks known as "normal scores," except that we constrained the (nonlinear) predictions of each EF outcome



FIGURE 1    Path model for alcohol effect on executive function (EF). There is a direct effect of alcohol, and also an indirect effect through IQ. In the usual notation of path analysis, the direct effect is measured by $d_{AE}$, the indirect effect by the product of direct effects $i_{AQ}$ of alcohol exposure on IQ and $i_{QE}$ of IQ deficit on EF deficit.

**Exhibit 53 - 15**

346    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

not to exceed the 98th percentile of the actual outcome distribution because of occasional overextrapolation of unconstrained regressions due to "ceiling effects." This replaces, for example, the 40th lowest score by the equivalent Gaussian quantile: the 40th lowest score that would be expected under a Gaussian (normal) distribution. For each of the 58 EF measures, we plotted its normal scores against FSIQ, and to account for nonlinearity in the IQ–EF relations, estimated the regression relations for IQ adjustment using the fit of a nonlinear scatterplot smoother ("loess" in S-plus; StatSci, 1993).

For each of the 58 normal-equivalent EF measures, the computed nonlinear regression on IQ was used to adjust the scores of the FAS and FAE participants (by simple subtraction of the regression prediction, given IQ, from the normal scores of the EF measures). The direct effect of FAS and FAE, measure by measure, is then the average over the 30 cases of these IQ-adjusted normal scores. Any collection of direct effect coefficients like these can be used to form the estimate of a "latent variable" (Bookstein et al., 1985). We used the 58 direct effects here to generate a weighted combination of the 58 normal-equivalent EF items; a diagnosis-informed composite EF score that is explicitly controlled for IQ by the nature of its construction. A scatterplot of this EF composite against IQ lets us assess the variation of this net EF performance over the cases.

## RESULTS

Means and standard deviations of the 58 EF scores are presented in Table 1 for each of the three groups in the FAS and FAE study and the longitudinal prospective study. Note that, in nearly all cases, patients with FAS or FAE performed more poorly than either controls or participants in the longitudinal prospective study. Average IQ scores for each group were consistent with previous findings in which patients with FAS had a mean FSIQ score of 79 and patients with FAE had a mean score of 90 (Streissguth et al., 1996).

Scatterplots of FSIQ versus each of the 58 EF measures, each transformed to "normal scores" as previously explained, were examined in our analysis of the complex overlap between IQ and EF. Figure 2 shows two of the resulting 58 scatterplot analyses: for COWAT words named in the A condition (COWATA), and for the percentage of conceptual responses on the WCST (WCST%CONCEP). We show scatters for both the original measurement units and the normal score equivalents.

The regression predictions on the scatterplots generated residuals for each FAS and FAE patient, deviations from the regression curve indicating whether the patient's EF is better or worse than would be expected given his or her IQ. Table 2 tabulates this classification of FAS and FAE residuals for all 58 EF measures. The plot for

Exhibit 53 - 16

EXECUTIVE FUNCTION AND PRENATAL ALCOHOL    347



FIGURE 2    Examples of nonlinear regressions of executive function (EF) normal scores and raw scores on IQ. Controls, Fetal Alcohol Effects (FAE), and Fetal Alcohol Syndrome (FAS) participants are indicated by circles, triangles, and diamonds, respectively, as in the legend on Figure 3. The regression curve is based on 377 participants from the longitudinal study (dots) plus the 15 control participants for the FAS and FAE study (circles). Wisconsin Card Sorting Test percentage of conceptual responses was one of the best measures to identify worse than expected performance based on IQ and thus the direct effect of prenatal alcohol damage on EF. Controlled Oral Word Association Test letter "A" condition exemplifies one of the tasks in which almost half of the patients performed better than expected and half performed worse than

the variable COWATA (Figure 2c) shows that 13 patients lie below the regression curve of the performance expected given their IQ, and 16 lie above. In this sense, the COWATA EF score may be considered "uninformed by fetal alcohol diagnosis." By contrast, a typical Wisconsin outcome performance score, WCST%CONCEP, is better than expected for IQ in only six patients, versus 23 in which it is worse than expected (Figure 2a). As previously explained, the computation of a coefficient representing the direct effect of prenatal alcohol damage according to the simple diagram of Figure 1 ($d_{AE}$) is just the mean of the residuals of the FAS and FAE patients (because the mean of the residuals of the comparison participants is zero by fitting of the regression to just these cases). These coefficients appear as "weights" in the third column of Table 2. Table 2 orders the 58 EF measures by the mean residual score of the patients, the weights in the third column. As previously explained, we used these

**Exhibit 53 - 17**

348    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

weights to compute a diagnosis-informed EF composite score that emphasizes those EF measures, indicating the greatest direct effects of prenatal alcohol exposure. This composite is scattered against IQ in Figure 3. Shown here is the usual "complex overlap" (Denckla, 1996) between the constructs. The Fetal Alcohol diagnosed patients, however, are consistently in more extreme deficit as in the individual scatters for many of the Wisconsin, Stroop, Trails, RFF, and CTT measures. Note, in particular, that for IQ below 80 there seems to be no real possibility of acceptable performance on the EF composite. In addition, the results show that there is a complete intermingling of the patients with FAS and FAE, with no difference between the two groups on measures of EF. This can be seen in the similarity of group means for the patients with FAS and FAE displayed in Table 1 and in the intermingling of the two groups in Figure 3.

## DISCUSSION

In view of the complex overlap between the constructs of IQ and EF (Denckla, 1996), two paths of effect can be identified (Figure 1). In one, prenatal alcohol dam-



**FIGURE 3**    Summary of alcohol sensitive executive function (EF) composite score by IQ. Most of the participants with Fetal Alcohol Syndrome and Fetal Alcohol Effects have EF performance worse than expected based on the IQ regression curve.

Exhibit 53 - 18

age would indirectly affect EF through the mediation of IQ, and in another, the effects of prenatal alcohol damage would directly affect EF irrespective of IQ. We have in effect sorted the EF block based on a path analysis model of direct versus indirect effects. For more on path analysis, see Bookstein et al., 1985, section 4.2.

In this way we have sorted the EF outcome block along a continuum of apparent direct effects of alcohol. The EF scores most specific to alcohol damage, those appearing first in Table 2's ordination of the EF outcome battery, all seem to pertain to the WCST, the Stroop performance scores, Trails, RFF production, or CTT. This is analogous to the better known phenomenon that adaptive behavior scores such as the Vineland are in deficit in patients with FAS and FAE to an extent even greater than is predicted by their deficits in IQ (Streissguth et al., 1996). By contrast, the EF deficits in patients with FAS and FAE shown by the COWAT scores, the Stroop error scores, CVLT and RFF perseveration scores, Trails error scores, and cognitive estimation scores, can be wholly explained by IQ deficit.

EFs have long been associated with frontal lobe integrity. Patient DT (discussed earlier) presented with left frontal subarachnoid hemorrhaging and had concomitant EF deficits (Eslinger et al., 1992). Functional neuroimaging studies of working memory have consistently shown dorsolateral prefrontal cortex (DLFPC) activation in control participants (Cohen et al., 1994; Mellers et al., 1995; Smith & Jonides, 1999). Using this same working memory paradigm, Weinberger and colleagues found that participants with schizophrenia had significantly less activation of the DLFPC compared to controls (Weinberger et al., 1996). Although, to our knowledge, no studies of participants with FAS or FAE, in either humans or animal models, have demonstrated structural damage to the frontal lobe, it seems reasonable to predict that in accordance with the EF deficits evidenced, participants with FAS and FAE will have structural or functional changes to the frontal lobes or to pathways that link frontal lobe functions with the rest of the brain.

Several studies have addressed plasticity of the frontal lobes following early lesions in a rat model (Kolb & Gibb, 1993; Kolb & Whishaw, 1985). In one study, rats were given medial frontal lesions on postnatal day 1 or postnatal day 10 (Kolb & Gibb, 1993). Both groups of rats performed equally poorly on the Morris water task shortly after surgery. However, the rats receiving surgery on day 10 improved their performance on this task after longer recovery, whereas the rats receiving surgery on day 1 did not improve their performance postsurgery. In addition, rats with later lesions showed generation of more dendritic spines per unit dendritic length in the parietal layer II to III pyramidal cells than did rats undergoing surgery on postnatal day 1. This suggests that early damage to the brain, as is caused by prenatal alcohol exposure, may not result in significant brain plasticity and recovery of function as might be seen after lesions acquired later in childhood.

**Exhibit 53 - 19**

350    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

The results of this study suggest a lack of relation between EF performance and the facial features of FAS. The performance of participants with FAS and FAE on EF measures in this study was completely intermingled, suggesting that the facial features of FAS do not and should not indicate that the damage caused by prenatal alcohol exposure to patients with FAS is any more severe than the damage caused to patients with FAE. This has been noted in a number of studies (Mattson et al., 1997; Mattson, Riley, Gramling, Delis, & Jones, 1998).

Findings from previous studies in our laboratory have not consistently demonstrated deficits on WCST performance in participants exposed to alcohol in utero (Carmichael et al., 1998; Sampson, Streissguth, Barr, & Bookstein, 1989; Streissguth et al., 1999). However, those reports with one exception (Carmichael et al., 1998), were based on a longitudinal prospective study of participants exposed to "social" levels of drinking during pregnancy. In that study, very few participants were diagnosed with FAS and only a small subset can be classified as FAE or Alcohol Related Neurodevelopmental Disorder (Sampson et al., 1997). The relative inability of WCST to correctly identify participants exposed to lower doses of alcohol suggests that this test is not as sensitive at measuring EF functions in relatively "normal" populations with subtle alcohol effects. In addition, the version of the WCST used previously in our labs was unable to calculate some of the scores that may be more sensitive to these subtle effects.

Despite Denckla's (1996) admonition that intelligence must be taken into account when assessing EFs because of the complex overlap with IQ, the majority of studies we reviewed did not address this issue. Previous studies of EF in FAS and FAE populations did not specifically assess the complex overlap between general intelligence and EF (Coles et al., 1997; Kodituwakku et al., 1995; Kopera-Frye et al., 1996), and so were not able to determine which EF tasks are directly affected by alcohol exposure, and which are only indirectly affected through the mediation of IQ. Several studies assessing EF in a variety of other disorders have made some attempts to address the overlap between EF and IQ (Foong et al., 1997; Rumsey, 1985; Welsh, Pennington, Ozonoff, Rouse, & McCabe, 1990). However, in each case statistical errors precluded identification of both the direct effects of the disorder on EF and the indirect effects through the mediation of IQ. For instance, it is inappropriate to adjust an alcohol–EF regression coefficient for IQ (as one of the other studies in another population did), as this is actually the partialling of a correlation for a mediating variable.

This study emphasizes that one cannot assess alcohol-affected patients (diamonds vs. triangles in Figure 3) by only focusing on the degree of mental retardation. In fact, very few of the participants in this study had IQs within the borderline to mentally retarded range. Instead, it is important when assessing alcohol-affected patients to measure the full range of EF skills, emphasizing those representing the direct effects of exposure, as this study demonstrates those are the tests for which FAS and FAE performance is typically worse than would be predicted from the concomitant IQ deficit alone.

Exhibit 53 - 20

The tests that are directly affected by prenatal alcohol damage appear to be assessing the ability to shift tasks, maintain complex attention, perform visuospatially mediated tasks, and maintain and manipulate information in working memory despite distraction. EF tasks that are mediated by the effects of IQ appear to reflect errors.

Patients with FAS and FAE who present the specific EF deficits of direct effects of alcohol have difficulties shifting or changing strategies, especially when there is uncertainty about which rules to employ. They may have difficulty maintaining important information in distracting situations and may need to be reminded frequently. Patients who present with EF deficits that are mediated by IQ will likely be seen as performing commensurate with their IQ and are likely to be more error prone. Employment settings in which there is a pressure for rapid production and in which tasks shift frequently with some uncertainty about the requirements of the task would not be a good fit for a person with these deficits. In interpersonal situations, patients with these problems may have difficulties with the subtle and complex interactions that underlie personal relationships. Thus, these participants may feel isolated or may be prone to inappropriate behaviors that could get them into trouble both socially and legally. It is therefore important to take EF deficits into account when working with patients with FAS and FAE. Discussions and instructions should be concrete with little ambiguity. Information will probably need to be repeated several times, and multiple modalities of presentation should be considered. Also, because of the problems of abstraction, planning, and problem solving with which these patients present, it is important to plan out contingencies for many possible problems that they may face during the course of their daily lives. This suggests that many patients with FAS and FAE who display EF deficits will have great difficulties with independent living and will often need a caretaker to assist them with many life activities.

## ACKNOWLEDGMENTS

This research was supported by National Institute of Alcohol Abuse and Alcoholism Grants AA01455–01–25 and AA10836.

We acknowledge Kaylin Anderson and Julia Kogan for patient outreach, Michael Hampton for testing most of the participants from both of these samples, Kieran O'Malley for assistance with interpretation of results, and Susan Toth for comments on earlier drafts of this article.

## REFERENCES

Arnett, P. A., Rao, S. M., Bernardin, L., Grafman, J., Yetkin, F. Z., & Lobeck, L. (1994). Relationship between frontal lobe lesions and Wisconsin Card Sorting Test performance in patients with multiple sclerosis. *Neurology, 44*, 420–425.

Exhibit 53 - 21

352    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

Artiola-i-Fortuny, L., & Heaton, R. (1996). Standard versus computerized administration of the Wisconsin Card Sorting Test. *Clinical Neuropsychologist, 10,* 419–424.

Bookstein, F. L., Chernoff, B., Elder, R., Humphries, J., Smith, G., & Strauss, R. (1985). *Morphometrics in evolutionary biology.* Philadelphia: Academy of Natural Sciences of Philadelphia.

Carmichael Olson, H., Feldman, J. J., Streissguth, A. P., Sampson, P. D., & Bookstein, F. L. (1998). Neuropsychological deficits in adolescents with Fetal Alcohol Syndrome: Clinical findings. *Alcoholism: Clinical and Experimental Research, 22,* 1998–2012.

Channon, S. (1996). Executive dysfunction in depression: The Wisconsin Card Sorting Test. *Journal of Affective Disorders, 39,* 107–114.

Clarren, S. K., & Smith, D. W. (1978). The Fetal Alcohol Syndrome. *New England Journal of Medicine, 298,* 1063–1067.

Cohen, J. D., Forman, S. D., Braver, T. S., Casey, B. J., Servan-Schreiber, D., & Noll, D. C. (1994). Activation of the prefrontal cortex in a nonspatial working memory task with functional MRI. *Human Brain Mapping, 1,* 293–304.

Coles, C. D., Platzman, K. A., Raskind-Hood, C. L., Brown, R. T., Falek, A., & Smith, I. E. (1997). A comparison of children affected by prenatal alcohol exposure and attention deficit, hyperactivity disorder. *Alcoholism: Clinical and Experimental Research, 21,* 150–161.

Delis, D. C., Kramer, J. H., Kaplan, E., & Ober, B. A. (1987). California Verbal Lerning Test Research Edition, adult version. San Antonio, TX: The Psychological Corporation.

Denckla, M. B. (1996). A theory and model of executive function: A neuropsychological perspective. In G. R. Lyon & N. A. Krasnegor (Eds.), *Attention, memory, and executive function* (pp. 263–278). Baltimore: Brookes.

Dise, J. E., & Lohr, M. E. (1998). Examination of deficits in conceptual reasoning abilities associated with spina bifida. *American Journal of Physical Medicine and Rehabilitation, 77,* 247–251.

Eslinger, P. J. (1996). Conceptualizing, describing, and measuring components of executive function: A summary. In G. R. Lyon & N. A. Krasnegor (Eds.), *Attention, memory, and executive function* (pp. 367–395). Baltimore: Brookes.

Eslinger, P. J., Grattan, L. M., Damasio, J., & Damasio, A. R. (1992). Developmental consequences of childhood frontal lobe damage. *Archives of Neurology, 49,* 764–769.

Evans, R. W., Ruff, R. M., & Gualtieri, C. T. (1985). Verbal fluency and figural fluency in bright children. *Perceptual and Motor Skills, 61,* 699–709.

Foong, J., Rozewicz, R. G., Quaghebeur, G., Davie, C. A., Kartsounis, L. D., Thompson, A. J., Miller, D. H., & Ron, M. A. (1997). Executive function in multiple sclerosis: The role of frontal pathology. *Brain, 120,* 15–26.

Golden, C. J. (1978). *Stroop Color and Word Test.* Wood Dale, IL: Stoelting Company.

Heaton, R. K., & Staff, P. (1993). Wisconsin Card Sorting Test: Computer Version–2 [Computer software].Odessa, FL: Psychological Assessment Resources.

Hutton, S. B., Puri, B. K., Duncan, L. J., Robbins, T. W., Barnes, T. R. E., & Joyce, E. M. (1998). Executive function in first-episode schizophrenia. *Psychological Medicine, 28,* 463–473.

Kodituwakku, P. W., Handmaker, N. S., Cutler, S. K., Weathersby, E. K., & Handmaker, S. D. (1995). Specific impairments in self-regulation in children exposed to alcohol prenatally. *Alcoholism: Clinical and Experimental Research, 19,* 1558–1564.

Kolb, B., & Gibb, R. (1993). Possible anatomical basis of recovery of function after neonatal frontal lesions in rats. *Behavioral Neuroscience, 107,* 799–811.

Kolb, B., & Whishaw, I. Q. (1985). Early is not always better: Behavioral dysfunction and abnormal cerebral morphogenesis following neonatal cortical lesions in the rat. *Behavioral Brain Research, 17,* 25–43.

Kopera-Frye, K., Dehaene, S., & Streissguth, A. P. (1996). Impairments of number processing induced by prenatal alcohol exposure. *Neuropsychologia, 34,* 1187–1196.

Levin, H. S., Song, J., Scheibel, R. S., Fletcher, J. M., Harward, H., Lilly, M., & Goldstein, F. (1997). Concept formation and problem-solving following closed head injury in children. *Journal of the International Neuropsychological Society, 3,* 598–607.

Exhibit 53 - 22

Case 4:00-cr-00260-Y    Document 2432-3    Filed 01/17/08    Page 28 of 77    PageID 8326

Mattson, S. N., Goodman, A. M., Caine, C., Delis, D. C., & Riley, E. P. (1999). Executive functioning in children with heavy prenatal alcohol exposure. *Alcoholism: Clinical and Experimental Research, 23,* 1808–1815.

Mattson, S. N., Riley, E. P., Grambling, L., Delis, D. C., & Jones, K. L. (1997). Heavy prenatal alcohol exposure with or without physical features of Fetal Alcohol Syndrome leads to IQ deficits. *Journal of Pediatrics, 131,* 718–721.

Mattson, S. N., Riley, E. P., Gramling, L., Delis, D. C., & Jones, K. L. (1998). Neuropsychological comparison of alcohol-exposed children with or without physical features of Fetal Alcohol Syndrome. *Neuropsychology, 12,* 146–153.

Mellers, J. D. C., Bullmore, E., Brammer, M., Williams, S. C. R., Andrew, C., Sachs, N., Andrews, C., Cox, T. S., Simmons, A., Woodruff, P., David, A. S., & Howard, R. (1995). Neural correlates of working memory in a visual letter monitoring task: An fMRI study. *NeuroReport, 7,* 109–112.

Ozonoff, S. (1995). Reliability and validity of the Wisconsin Card Sorting Test in studies of autism. *Neuropsychology, 9,* 481–500.

Pantelis, C., Barnes, T. R. E., Nelson, H. E., Tanner, S., Weatherley, L., Owen, A. M., & Robbins, T. W. (1997). Frontal-striatal cognitive deficits in patients with chronic schizophrenia. *Brain, 120,* 1823–1843.

Raskin, S. A., & Rearick, E. (1996). Verbal fluency in individuals with mild traumatic brain injury. *Neuropsychology, 10,* 416–422.

Romans, S. M., Roeltgen, D. P., Kushner, H., & Ross, J. L. (1997). Executive function in girls with Turner's syndrome. *Developmental Neuropsychology, 13,* 23–40.

Rumsey, J. M. (1985). Conceptual problem-solving in highly verbal, nonretarded autistic men. *Journal of Autism and Developmental Disorders, 15,* 23–36.

Sampson, P. D., Streissguth, A. P., Barr, H. M., & Bookstein, F. L. (1989). Neurobehavioral effects of prenatal alcohol: Part II. Partial least squares analysis. *Neurotoxicology and Teratology, 11,* 477–491.

Sampson, P. D., Streissguth, A. P., Bookstein, F. L., Little, R. E., Clarren, S. K., Dehaene, P., Hanson, J. W., & Graham, J. M. (1997). Incidence of Fetal Alcohol Syndrome and prevalence of alcohol-related neurodevelopmental disorder. *Teratology, 56,* 317–326.

Shallice, T., & Evans, M. E. (1978). The involvement of the frontal lobes in cognitive estimation. *Cortex, 14,* 294–303.

Shoqeirat, M. A., Mayes, A., MacDonald, C., Meudell, P., & Pickering, A. (1990). Performance on tests sensitive to frontal lobe lesions by patients with organic amnesia: Leng and Parkin revisited. *British Journal of Clinical Psychology, 29,* 401–408.

Smith, E. E., & Jonides, J. (1999). Storage and executive processes in the frontal lobes. *Science, 283,* 1657–1661.

Spreen, O., & Strauss, E. (1991). *A compendium of neuropsychological tests: Administration, norms, and commentary.* New York: Oxford University Press.

StatSci. (1993). S-Plus (Version 3.2) [Computer software]. Seattle, WA: MathSoft, Inc.

Stratton, K., Howe, C., & Battaglia, F. (1996). *Fetal Alcohol Syndrome: Diagnosis, epidemiology, prevention, and treatment.* Washington, DC: National Academy Press.

Streissguth, A. P., Aase, J. M., Clarren, S. K., Randels, S. P., LaDue, R. A., & Smith, D. F. (1991). Fetal Alcohol Syndrome in adolescents and adults. *Journal of the American Medical Association, 265,* 1961–1967.

Streissguth, A. P., Barr, H. M., Bookstein, F. L., Sampson, P. D., & Carmichael Olson, H. (1999). The long-term neurocognitive consequences of prenatal alcohol exposure: A 14-year study. *Psychological Science, 10,* 186–190.

Streissguth, A. P., Barr, H., Kogan, J., & Bookstein, F. L. (1996). *Understanding the occurrence of secondary disabilities in clients with Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE). Final report to the Centers for Disease Control and Prevention* (Grant No. R04/CCR008515). Seattle: University of Washington School of Medicine.

Exhibit 53 - 23

354    CONNOR, SAMPSON, BOOKSTEIN, STREISSGUTH

Streissguth, A. P., Barr, H. M., Sampson, P. D., Darby, B. L., & Martin, D. C. (1989). IQ at age 4 in relation to maternal alcohol use and smoking during pregnancy. *Developmental Psychology, 25,* 3–11.

Streissguth, A. P., Bookstein, F. L., Sampson, P. D., & Barr, H. M. (1993). *The enduring effects of prenatal alcohol exposure on child development: Birth through 7 years, a partial least squares solution.* Ann Arbor: University of Michigan Press.

Stuss, D. T., Stethem, L. L., & Poirier, C. A. (1987). Comparison of three tests of attention and rapid information processing across six age groups. *The Clinical Neuropsychologist, 1,* 139–152.

Wechsler, D. (1981). *Wechsler Adult Intelligence Scale–Revised.* San Antonio, TX: Psychological Corporation.

Weinberger, D. R., Mattay, V., Callicott, J., Kotrla, K., Santha, A., van Gelderen, P., Duyn, J., Moonen, C., & Frank, J. (1996). fMRI applications in schizophrenia research. *NeuroImage, 4,* S118–S126.

Welsh, M. C., Pennington, B. F., Ozonoff, S., Rouse, R., & McCabe, E. R. B. (1990). Neuropsychology of early-treated phenylketonuria: Specific executive function deficits. *Child Development, 61,* 1697–1713.

Exhibit 53 - 24

OFFICER NO. 1476
OFFICER NAME
JORJANI, NICKOLAS A.

OFFENSE REPORT
CRIMINAL ATTEMPT - MURDER
LAKE O WOODS APARTMENTS

CASE NO. 95001876
VICTIM 001 OF 001
PAGE 0008

CONTINUATION NARRATIVE..# 01

STATED SHE RAN INTO APT 904, TO NOTIFY THE POLICE DEPT. THE ARL POLICE DEPT DID RECEIVE SEVERAL CALLS ABOUT THE SHOOTING. AT THAT TIME, I ASKED THE W/M TO HAVE THE W/F SUBJECT COME OUT OF APT 904, AND COME TALK TO THIS OFFICER.

AT THAT TIME WHILE THE SUBJECT WENT TO GET THE FEMALE SUBJECT WHO WAS INSIDE THE VEHICLE, I CONTINUED TO INVESTIGATE THE AREA WHERE THE SHOOTING OCCURRED. I NOTICED THAT THE SUSPECT FIRED ONE ROUND IN THE TAIL GATE OF THE BLUE FORD RANGER, WHICH THE W/F SUBJECT WAS IN. THAT BULLET WENT THROUGH THE TAILGATE AND THROUGH THE BACK PORTION OF THE BED OF THE PICKUP TRUCK, BUT THE BULLET DID NOT PENETRATE THROUGH THE CAB OF THE VEHICLE. I NOTICED ANOTHER HOLE ON THE RIGHT SIDE OF THE FORD RANGER PICKUP TRUCK, RIGHT ABOVE THE RIGHT REAR TIRE. THERE WAS ANOTHER BULLET HOLE JUST INCHES AWAY FROM THE PASSENGER DOOR TO THE FORD PICKUP TRUCK. I NOTED THERE WERE SEVERAL BULLET CASINGS ON THE GROUND, APPROX 60 TO 75 FEET SPREAD OUT. I DID NOT FIND ANY OTHER BULLET HOLES IN ANY OF THE VEHICLES THAT WERE PARKED NEXT TO THE FORD RANGER, THAT THE FEMALE OCCUPANT WAS IN.

I OBSERVED APPROX 8 CASINGS ON THE GROUND. BY THIS TIME, THE FEMALE WHO WAS INSIDE THE FORD RANGER PICKUP CAME OUT; SHE WAS LATER IDENTIFIED AS SARAH TUCKER, W/F, DOB 02/07/76. MS TUCKER TOLD ME THAT SHE WAS INSIDE HER PICKUP TRUCK WHEN THE SHOOTING OCCURRED. SHE TOLD ME THE REASON SHE WAS INSIDE THE PICKUP TRUCK WAS BECAUSE SHE WAS WAITING ON HER MOTHER, WHO LIVES APT 902, BUILDING 2401, TO ARRIVE HOME. MS TUCKER STATED SHE WAS IN HER VEHICLE APPROX 10 MINUTES WHEN SHE OBSERVED A BROWN CAR TRAVELING EASTBOUND THROUGH THE PARKING LOT. MS TUCKER SAID SHE THEN NOTICED THAT THE VEHICLE MADE A U-TURN. MS TUCKER STATED WHEN THE VEHICLE CAME BACK WESTBOUND IN THE LOT, SHE SAID SHE HEARD SOME SHOOTING. SHE SAW THE SUSPECT ON THE PASSENGER SIDE OF THE BROWN VEHICLE SHOOTING. SHE STATED SHE DUCKED DOWN IN THE DRIVERS SEAT TO KEEP FROM GETTING HIT BY ONE OF THE BULLETS. SHE STATED THE SUSPECT CONTINUED TO FIRE WHEN SHE LAID DOWN IN THE SEAT OF HER PICKUP TRUCK. SHE STATED THE SUSPECT CONTINUED TO FIRE AND SHE NOTICED THE SUSPECT LEAVING THE AREA, BUT THEY LEFT VERY SLOWLY, AS THOUGH THEY WERE NOT IN A HURRY TO LEAVE THE APARTMENT COMPLEX AFTER SHOOTING SEVERAL ROUNDS IN THE AREA. MS TUCKER STATED WHEN SHE NOTICED THE SUSPECTS WERE GONE, SHE RAN TO, AND KNOCKED ON HER MOTHER'S DOWNSTAIR NEIGHBOR'S DOOR TO GET INSIDE, WHICH WAS APT 904. I ADVISED MS TUCKER THAT I BELIEVED THE SUSPECT WAS SHOOTING AT HER, DUE TO THE FACT THAT THERE WERE NO OTHER VEHICLES IN THE PARKING LOT WITH BULLET HOLES IN THEM, AND THAT HER VEHICLE WAS THE ONLY ONE THAT HAD BULLET HOLES IN IT. MS TUCKER THEN TOLD ME THAT SHE DID NOT HAVE ANY ENEMIES AND SHE COULD NOT ADVISE ME OF ANYONE WHO MIGHT WANT TO SHOOT AT HER. MOMENTS LATER SHE TOLD ME THAT HER FATHER HAD AN IDENTICAL FORD RANGER PICKUP TRUCK AS SHE DOES, BUT SHE ALSO STATED THAT HER FATHER DID NOT HAVE ANY ENEMIES. I THEN ASKED MS TUCKER IF THERE WAS ANYONE WHO PROBABLY WOULD

**Exhibit 54 - 1**

NO. 0574361D

| | | |
|---|---|---|
| THE STATE OF TEXAS | {} | IN THE 213TH JUDICIAL |
| | {} | |
| VS. | {} | DISTRICT COURT OF |
| | {} | |
| JULIUS O. ROBINSON | {} | TARRANT COUNTY, TEXAS |

## PETITION TO PROCEED TO ADJUDICATION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, the State of Texas by and through Tim Curry, Criminal District Attorney of Tarrant County, Texas, and would respectfully show the Court that on March 11, 1996, JULIUS O. ROBINSON, hereinafter styled Defendant, appeared in Court with his or her attorney and the Court heard evidence in the above entitled and numbered cause and found that evidence substantiated the Defendant's guilt on a charge of Deadly Conduct; however, the Court found that further proceedings should be deferred without making an adjudication of guilt and the Court placed the Defendant on probation as set out in the order setting conditions of probation, for a term of five (5) years.

Your petitioner would show to the Court that said Defendant thereafter, during the effective period of said probation, violated the terms and conditions of said probation in that:

1. The Defendant, JULIUS O. ROBINSON, was ordered by the Court to commit no offense against the laws of this State or of any other State or of The United States. In violation of this condition the Defendant on or about the 9th day of May, 1998 , in the County of Hopkins and State of Texas, did then and there intentionally and knowingly possess a usable quantity of marihuana in an amount of less than two ounces.

2. The Defendant, JULIUS O. ROBINSON, was ordered by the Court to remain within Tarrant County, Texas, unless the Court or Supervision Officer authorizes Defendant to leave. In violation of this condition the Defendant on or about May 8, 1998, left Tarrant County without permission from the Court or Supervision Officer and went to Hopkins County.

PETITION TO PROCEED TO ADJUDICATION - PAGE 1 OF 3

Exhibit 54 - 2

WHEREFORE, your Petitioner prays that this Honorable Court order and direct that the District Clerk forthwith issue an alias capias (or if Defendant is on good bond in this cause, the Clerk is ordered to issue a precept to serve), herein directing that the Defendant be arrested and brought before this Honorable Court to show cause, if he or she has any, why said probated sentence entered herein should not be set aside and why the Court should not proceed to adjudication of said case; that the Court further direct said District Clerk to serve upon said Defendant, as soon as possible, a true copy of this petition; and for such other orders the Court may direct.

Respectfully submitted,

TIM CURRY
CRIMINAL DISTRICT ATTORNEY
TARRANT COUNTY, TEXAS

Assistant Criminal District Attorney
Tarrant County, Texas

DATE: _____6/12/18_____

_____X___ ALIAS CAPIAS ORDERED

_____ DEFENDANT TO REMAIN ON BOND
PRECEPT TO SERVE PETITION ORDERED.

BOND SET AT:_____

PETITION TO PROCEED TO ADJUDICATION - PAGE 2 OF 3

Exhibit 54 - 3

# MEMORANDUM
**FEDERAL PUBLIC DEFENDER**
**CENTRAL DISTRICT OF CALIFORNIA**

**TO:** Craig Harbaugh; Sean Kennedy; Mike Charlton          **DATE:** August 16, 2006

**FROM:** Jesse Wallis

**RE:** <u>**USA v. Robinson**</u> - CJA Fee Voucher Analysis

I have reviewed the CJA Vouchers and timesheets submitted by Wes Ball and Jack Strickland. The following is a breakdown of the investigative-related hours and expenses incurred by Ball and Strickland before and during the trial:

| WES BALL ANALYSIS | | | |
|---|---|---|---|
| **DATE** | **DESCRIPTION** | **HOURS** | **AMOUNT** |
| 01/25/2002 | Tel. Conf. investigator. Memo to investigator, Research and Work on Jury Instructions[1] | 5.4 | $    675.00 |
| 01/25/2002 | Fax to investigator | .3 | $    37.50 |
| 01/25/2002 | Correspondence for investigator re: access | .4 | $    50.00 |
| 02/07/2002 | Telephone conference with client's niece | .3 | $    37.50 |
| 02/13/2002 | Telephone conference with John Hollimon | 1.6 | $    200.00 |
| 02/19/2002 | Conference with J. Strickland, investigator | 1.8 | $    225.00 |
| 02/20/2002 | Tel. Conf with client's mother | 1.0 | $    125.00 |
| 02/20/2002 | Conference with J. Strickland, investigator | 1.0 | $    125.00 |
| 02/20/2002 | Tel. Conf with client's mother | 1.2 | $    150.00 |
| 03/12/2002 | Tel. Conf. with witness Landry Burdine & defense witnesses/coaches | 4.2 | $    525.00 |
| **TOTAL SPENT BY WES BALL:** | | 17.2[2] | $    2,150.00 |

---

[1]The voucher does not indicate how the total time was divided between the various tasks.

[2]According to the CJA Voucher submitted by Wes Ball, his hours were broken down by categories, including "Witness Interviews" and "Consultation with Investigators & Experts." For the "Witness Interviews" category, he noted 19.5 hours billed; for the "Investigators & Experts" category, he billed 54.9. I have reviewed his timesheets for any investigative entries, and the 13.8 hours listed here is all I could find based on the descriptions.

**Exhibit 55 - 1**

Memo re: Fee Voucher Analysis
August 16, 2006
Page 2

| DATE | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|
| JACK STRICKLAND ANALYSIS | | | |
| 01/22/2002 | t/c x 2: witnesses | .3 | $ 37.50 |
| 01/27/2002 | Conf - witnesses | 4.3 | $ 537.50 |
| 01/30/2002 | Conf witnesses | .7 | $ 87.50 |
| 02/20/2002 | Conf - witness | 1.0 | $ 125.00 |
| 03/09/2002 | EXPENSE: Plane ticket - grandmother | | $ 122.50 |
| 03/11/2002 | EXPENSE: Plane ticket - mother | | $ 310.50 |
| 03/12/2002 | Conf - witness | 1.0 | $ 125.00 |
| TOTAL SPENT BY JACK STRICKLAND: | | 7.3[3] | $ 1,345.50 |

## SUMMARY OF INVESTIGATIVE HOURS/EXPENSES

### WES BALL

TOTAL HOURS BILLED................ 777.5
TOTAL PAID.................................. $97,529.50 (@ $125/hour + expenses)
TOTAL INVESTIGATIVE
    HOURS SPENT...........................17.2 (2.2% of total hours billed)
TOTAL INVESTIGATIVE
    EXPENSES................................. $2,150

### JACK STRICKLAND

TOTAL HOURS BILLED................ 540.6
TOTAL PAID.................................. $88,991.45 (@ $125/hour + expenses)
TOTAL INVESTIGATIVE
    HOURS SPENT...........................7.3 (1.4% of total hours billed)
TOTAL INVESTIGATIVE
    EXPENSES................................. $1,345.50

_____

[3]According to the CJA Voucher submitted by Jack Strickland, he noted 6.3 hours billed in the "Witness Interviews" category, and he noted 44.0 hours in the "Investigators & Experts" category. I have reviewed his timesheets for any investigative entries, and the 7.3 hours listed here is all I could find based on the descriptions.

**Exhibit 55 - 2**

STATE OF TEXAS     )
            )
COUNTY OF TARRANT    )

AFFIDAVIT OF DANNY DUANE BURNS

   Before me, the undersigned Notary Public, personally appeared Mr. DANNY DUANE BURNS, who, being by me first duly sworn deposed and said:

"I, Danny Duane Burns, being first duly sworn, state and depose as follows:

1. I am an attorney and have been licensed to practice law in the State of Texas for over 28 years. I have been admitted to practice in the United States District Court for the Northern District of Texas, the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court as well as several other federal appellate and district courts. I have been representing criminal defendants at both trial and on appeal since May 15, 1978. Throughout my legal career, I have tried to jury trial approximately 450 cases, including capital cases. Of these capital cases, 3 actually went to trial, including through completion of the penalty phase with one resulting in a death penalty. A number of other cases started out as death eligible cases with death penalty preparation completed but the death penalty was waived prior to or during jury selection. I have worked with several other attorneys assisting them in preparation for capital cases as well.

2. In any capital case where the government (State or Federal) is seeking the death penalty, the facts of the case have to be throughly investigated. From all sides–guilt and punishment. A capital case requires a team effort between investigators, co-counsel, consulting counsels, and experts. Mitigation evidence must be explored. It has always been my practice to work on the punishment evidence first because a trial lawyer will convince himself he is going to win in the guilt phase and will not complete the punishment investigation. Talking with the client, family members, friends, former employers, teachers (if possible), church members (if any), and neighbors is essential. One must check the prior criminal history of the client, whether those arrests resulted in convictions or not and determine if the arrests may lead to either mitigation material or prosecution evidence which needs to be addressed. Visiting the scenes of events which are being prosecuted is always helpful.

3. I was originally appointed to represent Mr. L.J. Britt on a charge of marijuana and cocaine conspiracies. I had investigated the case on the basis of defending the marijuana charges and had traveled to Oklahoma to investigate some information regarding cars and car rentals. After the

1

Exhibit 56 - 1

Government decided to seek death, I filed for additional counsel and requested Mr. Read as co-counsel. Mr. Read and I had tried over 250 felony level jury trials together in the past, including handling some capital cases and I had consulted with him on some cases that went to trial on seeking a death verdict. We tried mini-caps (capital cases in which the death penalty had been waived) in the past and both were familiar with the obligations adequately to investigate the case in both guilt and mitigation and I knew John would have the commitment to do the traveling and work necessary to prepare for trial.

4. In the background investigation, we made numerous trips to meet with the various family members, friends, cooperating individuals, and fact witnesses connected to Mr. L.J. Britt. In my opinion, an attorney should not conduct these interviews over the phone. We made several trips to Arkansas, one trip to Mississippi, one to Oklahoma, one trip to El Paso, one trip to California for several days, and another trip to a different State for which we paid the expenses to avoid disclosing a possibly prejudicial witness to the Government.

5. In this case, we first started with talking with the family and determined what friends would need to be interviewed to find out what type of person Mr. L.J. Britt was inside. We found out that he had a couple of girlfriends (each of which knew about the other but each was o.k. with the situation) and he did a lot of babysitting for people. It they could afford to pay him, fine, if not, he would do it for free. In addition to babysitting, he sold some pot (small amounts) to get by. He also did odd jobs for people. He was a football hero in the area. We toyed with the idea of presenting him as a football star. The problem with that was his coaches and teammates knew about his misdemeanor fights and everybody talked about his aggression and how he liked to run over people as a football player. We interviewed the neighbors and attended the church in the same block with his house, talked to family members and members of the local sheriff's office. We talked with the family about L.J.'s past. He had no mental health issues nor any medical issues. We had a psychologist examine his records and talk with L.J. and he determined that he did not have any mental health issues we could use. We used our psychologist at that point to help us review the juror questionnaires and talked about how best to present our strategy. We also talked with the jailers who were watching Mr. Britt and found out that the head jailer in his sector wished "I had twenty like him in my pod." He told us of how L.J. was a calming influence and how he had started a bible study group in his group. We talked with the psychologist about how to present this testimony and how to argue it. In my experience "jailhouse religion" is a negative rather than a mitigator. We determined that, since we had a very friendly witness, we would present the testimony as a throw away statement by the witness. We had him answer a general question about what Mr. Britt was like as a prisoner and he told about how Mr. Britt was stopping fights and started his own Bible study group. We never argued that and we did not present it as a mitigation question. We decided to leave it to the jury to find that as a mitigator which a majority of them did . I worked up and presented most of the mitigation part of the trial and Mr. John Read and I worked up the defense to the charges and he presented most of the witnesses in guilt.

2

Exhibit 56 - 2

6. As in all capital cases I have handled, we looked for the classic mitigation evidence–sexual or physical abuse, bad upbringing, mental health problems, physical health problems, bad environment, etc.. There really was not any. He had a loving, close family. He had good friends as well as some criminal elements in his associations. He did average or better in school and was very popular in school. The only adverse elements of his background was his poverty, the racial segregation, whether de facto or governmentally imposed did not matter. But he adjusted and made the best of his situation which was something we could sell to the jury. Most of them have never lived in that kind of poverty but they heard their parents or grandparents talk about it and they turned out alright. We decided to show that L.J. Britt did alright as well, except for hanging around with some thugs. We talked to the witnesses and got what documents and evidence they could give us. The police helped us by providing the jail records (which the Government never had).

7. Traveling to the places where the mitigation witnesses lived helped us in many ways. First, we needed to see our witnesses and determine who would make a favorable impression, who could hold up under cross-examination, and who appeared to be telling the truth. Second, we were able to critical information to support our alibi defense. We were able to look at the photo albums, to see corroboration in the documents the witnesses had to show why they remembered L.J. Britt being with them when the killings occurred. If we had not been in the home of the one witness and talking about the items in her home we probably would never have found the guns which exculpated L.J. from the one shooting. Finally, being physically present in these areas enabled us to collect letters the family members, friends, teachers, and coaches. This allowed us to introduce some great character evidence from people who could not for one reason or another get to testify.

8. The background investigation was crucial in order to present a viable defense. Our defense and our mitigation theme was alibi (which we never abandoned even after the guilty verdict) and that Mr. L.J. Britt was "The Babysitter." We also determined before trial that we would never refer to our client as "Capone" and if a government witness answered us referring to "Capone" we asked if they meant Mr. L.J. Britt. We were prepared in the event (which did not come about) Judge Means noted that Mr. Britt's nickname was Capone, to respond that both Mr. Britt and Mr. Robinson had taken nicknames of Al Capone–Capone for Britt and Scarface for Robinson–and therefore, we needed the record clarified as to which "Capone" the witness may be referring. We also had to determine how our client should look in Court. His folks brought some really nice three piece "gangster" suits for him to wear. Goodwill appreciated the donations. Mr. Britt never appeared in a three piece suit. We had Mr. Britt dressed in suits one day a little too small and the next a little too big. It was our opinion that babysitters don't look good in suits.

3

Exhibit 56 - 3

5. During our first trip to Durmott, Arkansas, the witnesses we talked to kept asking why Julius' lawyers were not coming up there like we were and we simply told them that his lawyers were developing their case for Mr. Robinson. L.J.'s sister and the Deputy Sheriff we talked with that day asked if they could help Julius and we told them to call his lawyers. One day in the coffee area behind one of the Courts in State Court in Fort Worth, I talked with Wes Ball and told him that some of the witnesses we were talking to were asking about Julius and if they could help. I don't know if they did anything about it. I had told the witnesses in Dermott, Arkansas that they should call Wes Ball or Jack Strickland if they felt they could help Julius Robinson. I do not know if they did or not as we were on a busy schedule to defend L.J.

Further, affiant saith naught.

Sworn to and signed this 25th day of August, 2006.

_____
Danny Duane Burns

_____
Notary Public No _____

My Commission Expires 4-20-10 .

**Exhibit 56 - 4**

## DECLARATION OF MÓNICA GINER

I, Mónica Giner, declare:

1.    I am an investigator employed with the Office of the Federal Public Defender in the Central District of California.  The facts set forth herein are true and correct, of my own personal knowledge and if called upon as a witness, I could testify thereto.

2.    On August 10th and 11th, 2006, I accessed the Tarrant County District Court's Justice Information Management System in Fort Worth, Texas, and reviewed the case files of capital cases where Mr. Wessley T. Ball was the attorney of record.

3.    I reviewed case numbers: 0434173, *State of Texas v. Ringo John Davila*; 0480853, *State of Texas v. Brian Keith Williams*; 0563022, *State of Texas v. Benny W. Allen*; and 0741568, *State of Texas v. Henry Lee McDonald*.  The file for Case Number 0741568, *State of Texas v . Henry Lee McDonald* contained a motion for the appointment of a mental health professional.  This was the sole case file which reflected a request for the services of a mental health professional.

4.    Subsequent to the review of the above records, I identified three other


MG

Exhibit 57 - 1

capital cases tried by Mr. Ball, *State of Texas v. Cary Kerr*, *State of Texas v. Frank Allen Montgomery* and *State of Texas v. Aaron C. Foust*.  I found these cases online and have not yet obtained the files for these cases.

I declare under penalty of perjury under the laws of the United States of America this 28th day of August, 2006.

Mónica Giner

**Exhibit 57 - 2**

## DECLARATION OF BRENDA HOLLIMON

I, Brenda Hollimon, declare:

1.    I am John Hollimon's wife.  My husband is Julius Robinson's maternal uncle.

2.    Before Julius's trial started, I received a telephone call from the office of Julius's attorneys.  The person was phoning to make an appointment with my husband and me.  The attorney wanted us to go to his office to talk about Julius's case and to bring the clothes Julius would be wearing in court.  I had been expecting a phone call because my husband told me they would be contacting us.

3.    On the day of the appointment, my husband and I went to an office located at 4025 Woodland Park in Arlington.  We brought Julius's clothes which his girlfriend Jamila had dropped off.  I do not remember the name of the attorney we saw.

4.    The attorney directed his questions to my husband.  I did not provide any information to that man, nor anyone else in his legal team during the trial.  No one ever asked me about Julius's background or life in Dermott.

5.    The only times I spoke with Julius's attorneys or anyone associated

1

BH

**Exhibit 58 - 1**

with them was when someone called my home to set up the appointment and when John and I went to the attorney's office.

6.    On August 11, 2006, my husband and I met with an investigator from the Office of the Federal Public Defender and I provided the above information.

I declare under penalty of perjury under the laws of the United States of America this 25th day of August, 2006.

Brenda Hollimon

2

**Exhibit 58 - 2**

## DECLARATION OF JERRY MELTON

I, Jerry Melton, declare:

1.  I was the Chief of Police for the City of Dermott, Arkansas, from 1978 until February of 1999. I do not remember Julius Robinson nor do I recognize his face in a photograph.

2.  The people I recall are John and Margaret Hollimon. I have been informed that they are Julius Robinson's grandparents. The Hollimons were at the Dermott Police Station often, picking up their grandson Spyri who was always getting in trouble. I locked him up several times. I would have remembered Julius Robinson if he had been getting into trouble. John Hollimon was blind and used a white cane, Margaret Hollimon helped him get around. I never could convince the Hollimons that their grandson Spyri had done anything wrong. John and Margaret didn't have any idea what they were doing; they had no control over the kids. Besides being old for reining in kids, Margaret was uneducated and on the slow side and John missed a lot on account of his blindness. I have a vague recollection of their house. I would say it was very poor. They lived on either Deer Street or Wolf Street in east Dermott.

3.  A guy from California came to Dermott in the eighties. The name John John Wright sounds familiar but I couldn't remember the name until it was mentioned to me. This guy tried to organize a gang. We kept an eye on him but we could see he



JM

**Exhibit 59 - 1**

wasn't making much headway.

4.     There were some kids who called themselves the Crips and others claimed to be Bloods.  They would wear blue or red colors accordingly.  They didn't fight each other though and I looked at them as kids trying to imitate what they saw on television.  They were little wannabes.  One time I bought red and blue bandanas and had my officers wear the bandanas in their back pockets, just to poke fun at their silliness.

6.     On August 8, 2006, and some time last year I was contacted by investigators from the Office of the Federal Public Defender who informed me that their office represented a man named Julius Robinson.  Had anyone asked me before, I would have provided the information contained herein and would have been willing to testify in court.  I have read and reviewed this two page declaration.

I declare under penalty of perjury under the laws of the United States of America this 8th day of August, 2006.

Jerry Melton

2

JM

**Exhibit 59 - 2**

STATE OF TEXAS                          )
                                        )
COUNTY OF TRAVIS                        )
                                        )
                                        )


AFFIDAVIT OF JOHN P. NILAND

I, John P. Niland, being first duly sworn, state and depose as follows:

1. I am an attorney, licensed to practice law in the State of Texas. I am the director of the Capital Trial Project of Texas Defender Service, a private, non-profit law firm. Texas Defender Service represents inmates on death row, and provides training and no cost consulting services to trial lawyers who are defending those charged with capital crimes. My office address is 510 S. Congress, Suite 304, Austin, Texas, 78704. I have been a licensed attorney for over 34 years and have been involved in the defense of those charged with capital crimes since 1993.

2.      I provide this affidavit at the request of Mr. Mike Charlton, attorney for Julius Robinson in Case # 2001 4:00-CR-260-Y (Civil No. 4:05-CV-756). Mr. Charlton has requested my opinion on the following question: What was the prevailing standard of practice among Tarrant County, Texas lawyers who were providing effective assistance of counsel in developing and presenting mitigating evidence in death penalty cases in March of 2002?

3.      Defense attorneys cannot provide effective assistance of counsel in most felony cases generally, and death penalty cases specifically, without the assistance of a mitigation specialist. The mitigation specialist is most critical in a death penalty case.

THE NATIONAL NORMS

4. It is important to first determine what the national norms are with respect to developing and presenting mitigation evidence in capital cases. The *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (February ,1989) (hereafter1989 Guidelines) establish such norms. The 1989 Guidelines also address eligibility, training, support services, trial preparation and the sentencing phase and appeals for counsel in death penalty cases. The word "should" is used throughout the 1989 and the later 2003 Guidelines as a mandatory term. The practices described in both editions of the Guidelines are minimum requirements of lawyers who are defending in death penalty cases . Courts have for years looked to guidelines to evaluate counsel's performance in death penalty cases. *Wiggins v. Smith*, 123 S.Ct. 2527 (2003).

The standards contained in the 1989 GUIDELINES did not represent the first efforts by the ABA, and others, to provide guides and standards to those defending people charged with

1

**Exhibit 60 - 1**

capital murder and other serious crimes. The other national standards cited by the 1989 GUIDELINES included ABA Standards, "Providing Defense Services", 5-1.4; National Advisory Commission, Courts, 13.14; NLADA, National Study Commission on Defense Services, Guidelines for Legal Defense Systems, 3.1, 3.4; NLADA, Standards for Defender Services 4.3.

The ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) "The Defense Function" was cited in in 1984 as a "prevailing norm of practice to...determine what is reasonable." *Strickland v. Washington*, 466 U.S. 668 (1984).

The 1989 Guidelines speak to the need for trial counsel in a death penalty case to fully develop and present mitigating evidence during the punishment phase of a capital trial. The Guidelines provide:

> Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence.

It should be noted that counsel cannot make that strategic decision unless and until a thorough mitigation investigation has been completed and the evidence produced is properly analyzed.

Among the topics counsel should consider presenting are:

a. Medical history (including mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays);

b. Educational history (including achievement, performance and behavior, special educational needs including cognitive limitations and learning disabilities) and opportunity or lack thereof;

c. Military service, (including length and type of service, conduct and special training)

d. Employment and training history (including skills and performance, and barriers to employability);

e. Family and social history (including physical, sexual or emotional abuse, neighborhood surroundings and peer influence; and other cultural or religion influence, professional intervention (by medical personnel, social workers, law enforcement personnel, clerks or others) or lack thereof; prior correctional experience (including conduct on supervision and in institutions, education or training and clinical services);

2

**Exhibit 60 - 2**

f. Rehabilitative potential of the client;

g. Record of prior offenses (adult and juvenile), especially where there is no record, a short record, or a record of non-violent offenses.

h. Expert testimony concerning any of the above and the resulting impact on the client relating to the offense and to the client's potential at the time of sentencing.

5.      The American Bar Association revised the 1989 Guidelines in February of 2003.  While the latest version of the Guidelines were not adopted until after the 2002 trial of Robinson, the text and Commentary of the 2003 Guidelines carry forward the concepts embodied in the 1989 Guidelines.  The policy of both the 1989 and the 2003 Guidelines is the same: counsel must perform a thorough social history as a part of a mitigation investigation in order to hope to provide effective assistance of counsel.

6.      The United States Supreme Court, in April of 2000, found trial counsel ineffective for failing to conduct a thorough mitigation investigation in a case tried in 1986 in the Commonwealth of Virginia, *Williams v. Taylor,* 529 U.S. 362 (2000).  This need for a mitigation specialist to perform a mitigation investigation, beginning with a thorough social history, has been reaffirmed recently by the United States Supreme Court in the case of *Wiggins v. Smith,* 123 S.Ct. 2527 (2003)..   In the *Wiggins* state habeas corpus proceeding, held in April of 1994, the state judge was quoted as saying "not to do a social history (of the defendant) at least to see what you have got, to me is absolute error.  I just -I would be flabbergasted if the Court of Appeals said anything else."   The Supreme Court in *Wiggins* ruled that the *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (February, 2003) establish reasonable norms for the defense of one charged with a capital crime.  Capital murder convictions across the country are now being set aside because the Guidelines were not followed with respect to the development of mitigating evidence.  Both the 1989 and 2003 versions of the Guidelines can be accessed at the ABA's web site, www.aba net.org/death penalty.

Following *Wiggins,*  United States Circuit Courts of Appeal, including the 5th Circuit in two Texas cases, have granted relief where the mitigation investigation in a capital case was not adequate. *Lewis v. Dretke,* 355 F.3d 364 (5th Cir. 2003) and *Roberts* v. Dretke, 381 F.3d 491 (5th Cir. 2005).  These cases were followed up with the important decision by the United States Supreme Court which held that counsel's failure to conduct a complete social history investigation was deficient representation "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available". *Rompilla v. Beard,* 545 U.S. 374 (2005).

It is important to note that (1)  the various guidelines are not adopting new standards, but are recognizing reasonable practices that are already in place and (2) the recent cases are evaluating attorney representation in cases that preceded the trial of Mr. Robinson.

3

**Exhibit 60 - 3**

7.   The 2003 Guidelines discuss the role of the mitigation specialist as a critical  member of the capital defense team.

> A mitigation specialist is also an indispensable member of
> the defense team throughout all capital proceedings.  Mitigation
> specialists possess clinical and information-gathering skills and
> training that most lawyers simply do not have.  They have the
> time and the ability to elicit sensitive, embarrassing and often
> humiliating evidence (e.g. family sexual abuse) that the defendant
> may have never disclosed.  They have the clinical skills to recognize
> such things as congenital, mental or neurological conditions,
> to understand how these conditions may have affected the defendant's
> development and behavior, and to identify the most appropriate
> experts to examine the defendant or testify on his behalf.

8.   Training in the field of mitigation was made available to lawyers in the Tarrant County area in April of 2001.  Specifically, affiant as Capital Trial Project Director for Texas Defender Service planned and presented a training program held at the Southern Methodist School of Law in Dallas, Texas, a short distance from Tarrant.  The program was attended by lawyers across the state, including at least one from Tarrant County.  The presentations made at the seminar included:

> "Why Do We Care About Mitigation?  What Happens if We Don't?".
>
> "The Relationship with the Client and Family, "Alpha Personality", Time Lines and Genograms"
>
> Records: Public/Private and in Between: What They Are, Whey They Are aand How to Get Them".
>
> "Brainstorming Mitigation Theories–Using the Client History, Records, Time Lines, Genograms and Interviews to Humanize the Client."
>
> "Dysfunctional Families and Substance Abuse"
>
> "Social and Cultural Factors in Mitigation"
>
> "Anti-Social Personality Disorder and Psychopathy"
>
> "Good Person Evidence and Adaptability to Prison"

4

**Exhibit 60 - 4**

"Psychological and Neurological Impairment"

"Mitigation Law in Texas"

"Using Mental Health and Other Experts in Mitigation"

"The Team Approach and Theories to a Capital Defense Strategy"

"Developing Themes from Voir Dire Through Closing"

"Litigating Motions for Funding"

"Penalty Phase Closing Argument Demonstration"


The registration records on file do not indicate that neither counsel for Mr. Robinson attended this program.

## 9. THE STANDARD OF PRACTICE IN TARRANT, COUNTY, TEXAS

The standard of practice in Tarrant County, Texas in 2001-2002, among those lawyers who were providing effective assistance of counsel to their capital clients, included:

(a) the hiring of a mitigation specialist;

(b) the mitigation specialist conducting a thorough social history;

(c) the mitigation specialist conducting interviews of those significant people suggested by the social history;

(d) the mitigation specialist gathering those records that were suggested by the social history investigation;

(e) helping the trial lawyers to develop, and present, a cohesive and persuasive mitigation case.


Further, affiant saith naught.

Sworn to and signed this 21st day of August, 2006.


5

**Exhibit 60 - 5**

John P. Niland

Notary Public No.

My Commission Expires  01/21/2009 .

6

**Exhibit 60 - 6**

## <u>DECLARATION OF JESSE WALLIS</u>

I, Jesse Wallis, declare:

1.      I am employed as the Chief Paralegal with the Office of the Federal Public Defender in the Central District of California.  The facts set forth herein are true and correct of my own personal knowledge and if called upon as a witness, I could testify thereto.

2.      On August 21, 2006, I searched our electronic copy of the records from Wes Ball and Jack Strickland to determine whether their files contained school records from Dermott Public Schools or Arlington Independent School District (Exh. 37, pp. 46-135).  I was unable to locate these records in either Mr. Ball's or Mr. Strickland's files.

3.      On August 28, 2006, I again searched our electronic copy of the records to determine whether their files contained the prior conviction file for *State of Texas v. Julius O. Robinson*, Case No. 0574561D (deadly conduct charge on February 7, 1995).  I was unable to locate these records in either Mr. Ball's or Mr. Strickland's files.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed this 28th day of August, 2006, in Los Angeles, California.

JESSE WALLIS

1

**Exhibit 61**

## SUPPLEMENTAL DECLARATION OF JOSEPHINE DOTSON

I, Josephine Dotson, declare:

1.    I am Julius Robinson's maternal aunt.

2.    Around the time of Julius's trial, I received one phone call from someone on my nephew's legal team at my home in Dermott. I think it was before the trial began but I don't know for certain. I thought it was an attorney but it could have been an investigator. The phone call lasted around fifteen minutes.

3.    The man asked me a question about Julius and his school in Dermott. I do not remember what the question was. I told him that I wasn't living in Dermott when Julius was growing up and I just returned to live in Dermott after Julius had left town. I suggested to him that he contact my mother's half-sister, Bernice Johnson, and my sister, Mildred, if he had questions about Julius. They told me he never called. I told him my mother and father, Margaret and John Hollimon, had raised Julius but my father was deceased and my mother would not be really any help because she didn't remember a lot.

4.    The man asked me if I would be willing to travel to Texas to testify if they sent me the plane ticket. He asked me this question more than once although I told him I did not know Julius very well because I hadn't been around him when he was growing up in Dermott. I found it odd that he kept asking that I go to Texas to testify when I

1

JD

Exhibit 62 - 1

knew just a little.  The man told me that he would get back in touch with me if he needed more information.

5.    Apart from the question relating to Julius's school, I was not asked any questions about our family.  Specifically, I was not asked about any of the areas addressed in my previous declaration.  Also, I was not asked about any telephone calls I had with Julius from jail.

6.    Had I been asked, I would have told the investigator what I remembered about a telephone call I had with Julius where the name "One Love" came up.   The only thing that I can recall is that Julius mentioned his name.  I didn't believe at the time, and I don't believe now, that Julius was asking me to convey a message to anyone about "One Love."  Anyway, I certainly did not do anything following that conversation or talk anyone about it.

7.    On August 8th, 2006, I was contacted by an investigator from the Office of the Federal Public Defender.  The information above was provided at that time and on a subsequent phone call.

I declare under penalty of perjury under the laws of the United States of America on this _22_ day of August, 2006.

_Josephine Dotson_ 9/22/06
Josephine Dotson

2

**Exhibit 62 - 2**

Supplemental Statement of Stephen K. Martin, Ph.D.

State of Texas                    *

County of Smith                    *       .

BEFORE ME, the undersigned official, personally appeared Stephen K. Martin, Ph.D., a person known to me, who, after being sworn upon his oath, deposed and stated:

On November 23, 2005, I issued a statement discussing the observations and results from my neuropsychological evaluation of Julius Omar Robinson. At that time, I had not been provided any material addressing possible drug or alcohol use by Mr. Robinson's mother during her pregnancy with Mr. Robinson.

Since that time, I have had the opportunity to review the following documents:

Declaration of Rosa Mae Hollimon
Declaration of Jimmie Lee Robinson
Declaration of Beotha Moore

Based upon my review, it is my opinion that Mr. Robinson suffered chronic exposure to cannabis and alcohol in utero.

The neuropsychological profile associated with pesticide exposure can share common neurocognitive characteristics with the neuropsychological profile associated with the teratogenic effects of fetal alcohol and fetal cannabis exposures. Although it remains my opinion that the results of Mr. Robinson's testing are generally consistent with subtle cognitive deficits associated with chronic exposure to organophosphate pesticides, fetal alcohol and cannabis exposure could serve as an additional etiological basis for Mr. Robinson's neuropsychological impairments.

FURTHER AFFIANT SAYETH NOT.


Stephen K. Martin, Ph. D.
Clinical Neuropsychologist

SWORN TO AND SUBSCRIBED before me, the undersigned official on this the 28th day of August, 2006.


Notary Public in and for
THE STATE OF TEXAS
My comm., Exp. 4-6-10

LOUELLEN HANNA
Notary Public, State of Texas
My Commission Expires 04-06-10

**Exhibit 63**

## SUPPLEMENTAL DECLARATION OF MARCUS JWAIN ROBINSON

I, Marcus Jwain Robinson, declare:

1.   I have been infomed that Mr. Bruce Cummings provided a declaration indicating that he had spoken to me during the course of his pre-trial investigation. On August 14, 2006, I spoke with an investigator from the Office of the Federal Public Defender representing Julius Robinson and I was asked to respond to this allegation.

2.   Shortly before Julius Robinson's trial started, I met with two people working on his case. We met at Colter's Restaurant and ate lunch there. My brother's attorney, Mr. Wes Ball and another gentleman whose name I don't remember, asked me some questions. They wanted to know what I knew about Julius' drug business. They also asked me what I had heard about the shootings. Those were the only things that they asked me about, no more than that.

3.   Mr. Ball did not ask me any background questions about Julius or what his life was like. Specifically, he didn't ask me any questions about our upbringing or my memories of our father and mother. He did not ask me about what life was like in Dermott. He didn't ask about the conditions of the places where we played. He did not ask me about any of my relatives. He did not ask me any questions about my mother or her drug use. He never asked me about the conditions at my mother's

1

M.J.R.

**Exhibit 64 - 1**

house in Arlington when she and Julius were living together there.  We spoke for no more than thirty or thirty-five minutes.

4.   Mr. Ball never asked me about a telephone conversation that I had with Julius and my Aunt Josephine when Julius was in jail before his trial.  I do not recall exactly what was said during this conversation.  I was informed that during this phone call, Julius said "That dude "One Love," man that dude right there go hard Joe."  I did not think Julius was asking me and our aunt to do anything to "One Love" Williams.  That's crazy.  I thought he was saying that "One Love" would do anything, say anything.  Anyway, I did not talk to anyone about this conversation.  Mr. Ball never asked me what I understood Julius to mean by that.

5.   Had Mr. Ball and his associate asked me about any of the things mentioned above and in my declaration, I would have willingly provided them with that information.  I have read and reviewed this _1_ page declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _18_ day of August, 2006 in Dayton, Ohio.

Marcus /R——

Marcus Jwain Robinson

2

**Exhibit 64 - 2**

## SUPPLEMENTAL DECLARATION OF WILLIE WHITE

I, Willie White, declare:

1.     Before his trial began, my nephew, Julius Robinson, told me to expect a call from his attorneys.  He had given them my phone number and had told them to call me.  Sometime later, I received a telephone call here in Little Rock from a man who identified himself as the investigator in Julius's case.  I do not remember the man's name, nor did I write it down.  The trial was going to start "real soon", the man said.  It was my impression that it was to begin in a couple of weeks but I don't know if that was the time frame the investigator gave.

2.     The investigator told me that they might have to talk with me and perhaps have me come out to Texas.  He asked me if I knew what kinds of activities Julius was involved in.  I told him that I knew that Julius was taking clothes and jeans to Dermott and selling them there.  The man asked questions about this topic, which I understood to mean Julius's possible  participation in criminal activities.  He asked about nothing else.

3.     I asked the investigator if the charges against Julius were serious.  He said, "I tell you right now, they want to kill him."

4.     It was a brief conversation, ten to fifteen minutes.  The investigator

1

*Willie E White*
WW

**Exhibit 65 - 1**

gave me his phone number, (817) 946-1588, which I wrote down in my address book. He also said that they would contact me if they needed anything else and if they decided to have me testify, though he did not mention the purpose of my testimony.

5.     Julius's investigator did not seek information about Julius's family history. I was not told that I could provide information which could be used to seek a lower sentence for Julius. Had I been informed of this, I would have told him what I knew and would have given the names and contact information of persons who could provide more details, for example, my brother Jimmy Lee Robinson, Julius's father.

6.     On August 9th, 2006, I was contacted by an investigator from the Office of the Federal Public Defender to whom I provided the information contained herein. I have reviewed and signed this two page declaration.

I declare under penalty of perjury under the laws of the United States of America this 22 day of August, 2006.

Willie White

2

**Exhibit 65 - 2**

## DECLARATION OF JAMES W. MORGAN

I, James W. Morgan, declare:

1.     I am a research and writing specialist with the Office of the Federal Public Defender in the Central District of California.  The facts set forth herein are true and correct of my own personal knowledge and if called upon as a witness, I could testify thereto.

2.     I am an attorney duly licensed to practice law in the State of North Carolina.  In 2000, I obtained a master's degree in information studies from the University of California-Los Angeles.  I have been working as a research and writing specialist for the past seven years with the Federal Public Defender.  I am proficient in internet research, including computer-assisted legal research.  I am familiar with both Westlaw and Lexis databases.

3.     On August 25, 2006, I was asked to determine the ethnicity of each defendant in federal capital cases resulting in a death sentence since the Supreme Court lifted the constitutional moratorium on the death penalty in 1972.

4.     I obtained a list of both current and former federal capital cases from the website of the Death Penalty Information Center.  I then cross-referenced all cases with the Westlaw database to verify the accuracy of each case, including the imposition of a death sentence.  The results of my research are reflected in the attached table, which is

1

**Exhibit 66 - 1**

entitled, "Federal Capital Convictions Post-*Furman*," and included herein.

5.    Of the 50 capital convictions nationwide, 26 (52%) of the defendants are Black, 21 (42%) are White, 1 (2%) is Asian, 1 (2%) is Native American, and 1 (2%) is Hispanic.  Of the 10 convictions in federal district courts in Texas, 8 (80%) of the defendants were Black.  In the Northern District of Texas, all (100%) of the defendants sentenced to death were Black.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed this 28th day of August, 2006, in Los Angeles, California.

JAMES W. MORGAN

2

**Exhibit 66 - 2**

# FEDERAL CAPITAL CONVICTIONS POST-*FURMAN*

SOURCE: DEATH PENALTY INFORMATION CENTER

| | NAME | RACE | DISTRICT |
|---|---|---|---|
| 1 | SHANNON AGOFSKY | WHITE | EASTERN DISTRICT OF TEXAS |
| 2 | BILLIE J. ALLEN | BLACK | EASTERN DISTRICT OF MISSOURI |
| 3 | AGILLIA BARNETTE | BLACK | WESTERN DISTRICT OF N.C. |
| 4 | BRANDON BASHAM | WHITE | DISTRICT OF SOUTH CAROLINA |
| 5 | ANTHONY BATTLE | BLACK | NORTHERN DISTRICT OF GEORGIA |
| 6 | KENNETH E. BARRETT | WHITE | EASTERN DISTRICT OF OKLAHOMA |
| 7 | BRANDON BERNARD | BLACK | WESTERN DISTRICT OF TEXAS |
| 8 | ROBERT BOLDEN | BLACK | EASTERN DISTRICT OF MISSOURI |
| 9 | ALFRED BOUGEOIS | BLACK | SOUTHERN DISTRICT OF TEXAS |
| 10 | MEIER J. BROWN | BLACK | SOUTHERN DISTRICT OF GEORGIA |
| 11 | DAVID R. CHANDLER** | WHITE | NORTHERN DISTRICT OF ALABAMA |
| 12 | BOUTAEM CHANTHADARA** | ASIAN | DISTRICT OF KANSAS |
| 13 | ODELL CORLEY | BLACK | NORTHERN DISTRICT OF INDIANA |
| 14 | LEN DAVIS | BLACK | EASTERN DISTRICT OF LOUISIANA |
| 15 | DONALD FELL | WHITE | DISTRICT OF VERMONT |
| 16 | EDWARD FIELDS | WHITE | EASTERN DISTRICT OF OKLAHOMA |
| 17 | SHERMAN L. FIELDS | BLACK | WESTERN DISTRICT OF TEXAS |
| 18 | CHADRICK E. FULKS | WHITE | DISTRICT OF SOUTH CAROLINA |
| 19 | MARVIN GABRION II | WHITE | WESTERN DISTRICT OF MICHIGAN |
| 20 | JUAN RAUL GARZA* | HISPANIC | SOUTHERN DISTRICT OF TEXAS |
| 21 | ORLANDO HALL | BLACK | NORTHERN DISTRICT OF TEXAS |
| 22 | DAVID P. HAMMER | WHITE | MIDDLE DISTRICT OF PENNSYLVANIA |
| 23 | PAUL HARDY | BLACK | EASTERN DISTRICT OF LOUISIANA |
| 24 | DUSTIN HIGGS | BLACK | DISTRICT OF MARYLAND |
| 25 | NORRIS HOLDER | BLACK | EASTERN DISTRICT OF MISSOURI |
| 26 | DUSTIN HONKEN | WHITE | NORTHERN DISTRICT OF IOWA |
| 27 | RICHARD JACKSON | WHITE | WESTERN DISTRICT OF N.C. |
| 28 | ANGELA JOHNSON | WHITE | NORTHERN DISTRICT OF IOWA |
| 29 | COREY JOHNSON | BLACK | EASTERN DISTRICT OF VIRGINIA |
| 30 | DARRYL L. JOHNSON | BLACK | NORTHERN DISTRICT OF ILLINOIS |
| 31 | LOUIS JONES* | BLACK | NORTHERN DISTRICT OF TEXAS |
| 32 | WILLIAM LECROY JR. | WHITE | NORTHERN DISTRICT OF GEORGIA |
| 33 | DANIEL L. LEE | WHITE | EASTERN DISTRICT OF ARKANSAS |
| 34 | KENNETH LIGHTY | BLACK | DISTRICT OF MARYLAND |
| 35 | JOHN McCULLAH** | WHITE | EASTERN DISTRICT OF OKLAHOMA |
| 36 | TIMOTHY McVEIGH* | WHITE | DISTRICT OF COLORADO |
| 37 | RONALD MIKOS | WHITE | NORTHERN DISTRICT OF ILLINOIS |
| 38 | LEZMOND MITCHELL | NATIVE AM. | DISTRICT OF ARIZONA |
| 39 | KEITH NELSON | WHITE | WESTERN DISTRICT OF MISSOURI |
| 40 | ARBOLEDA ORTIZ | COLUMBIAN BLACK | WESTERN DISTRICT OF MISSOURI |
| 41 | JEFFREY PAUL | WHITE | WESTERN DISTRICT OF ARKANSAS |
| 42 | WESLEY PURKEY | WHITE | WESTERN DISTRICT OF MISSOURI |
| 43 | JAMES ROANE JR. | BLACK | EASTERN DISTRICT OF VIRGINIA |
| 44 | JULIUS ROBINSON | BLACK | NORTHERN DISTRICT OF TEXAS |
| 45 | GARY SAMPSON | WHITE | DISTRICT OF MASSACHUSETTS |
| 46 | GERMAN SINISTERRA | COLUMBIAN BLACK | WESTERN DISTRICT OF MISSOURI |
| 47 | RICHARD STITT | BLACK | EASTERN DISTRICT OF VIRGINIA |
| 48 | RICHARD TIPTON | BLACK | EASTERN DISTRICT OF VIRGINIA |
| 49 | CHRISTOPHER VIALVA | BLACK | WESTERN DISTRICT OF TEXAS |
| 50 | BRUCE WEBSTER | BLACK | NORTHERN DISTRICT OF TEXAS |

* DENOTES SENTENCED TO DEATH AND EXECUTED

** DENOTES RESENTENCED TO LIFE IN PRISON AFTER CLEMENCY OR REVERSAL ON APPEAL

**Exhibit 66 - 3**

Mr.Julius O. Robinson
26190-177
Post Office Box33
Terre Haute, Indiana 47808



Mr, Charles R. Fulbruge, Clerk
United States Court of Appeals
Fifth Circuit
600 Camp Street
New Orleans, LA 70130

ATTN: Court of Appeal & Clerk

> RE: 02-10717 U.S.A. vs Julius Omar Robinson
> USDC No. 4:00-CR-260-2-Y

Dear Mr. Fulbruge:

I'm writing this court to ask if you could halt my appeal that my lawyers just file on June 21,2003. The reason am asking this is because I just found out what my lawyers file on my appeal. Before they file my appeal I had little or no communication between us and I had been writing them letters,telling them I needed my trial record and never receive them as of yet.(July, 1 2003) I believe that there are some more issue that could be raise on my appeal, but without my court records I can't find out and don't want this to hurt my chance on my other appeals because my lawyers didn't raise them now or ask me if I wanted them raise.

I hope that you could take this in consideration so that my lawyer & I could properly go over this together.

Thank you for your assistance.

Sincerely,

Julius O. Robinson

W/R/P

**Exhibit 67**

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**CHARLES R. FULBRUGE III**
**CLERK**

**TEL. 504-310-7700**
**600 CAMP STREET**
**NEW ORLEANS, LA 70130**



July 25, 2003

Mr Julius O Robinson
#26190-177
PO BOX 33 Building
Terre Haute, IN  47808


No. 02-10717 USA v. Robinson
        USDC No.  4:00-CR-260-2-Y


We will take no action on your request to "halt your appeal". Only
your attorney can file motions or other documents on your behalf.
Your motion is being forwarded to your attorneys' for whatever action
they deem necessary.


Sincerely,

CHARLES R. FULBRUGE III, Clerk


By: _____
        Debbie Kranz, Deputy Clerk
        504-310-7698

cc:  Ms Susan B Cowger
     Mr Jack V Strickland
     Mr Wessley Thompson Ball

BR-9

**Exhibit 68**

July 30, 2003

Mr. Julius O Robinson
#26190-177
P.O. BOX 33
Terre Haute, IN    47808

Mr. Charles R. Fulbruge III Clerk
United States Court of Appeals
Fifth Circuit, office of the clerk
600 CAMP STREET
NEW ORLEANS, LA 70130



RE: No. 02-10717 USA v. Robinson
USDC No.  4:00-CR-260-2-Y

Mr. Fulbruge:

I recieved your response to my letter where you stated that you will take no action on my request to halt my appeal. My issue is with my attorney on the fact that he "isn't" filing issues in my brief that may later be denied by this court because I didn't raise them at the proper time. I'm also being denied " effective" counsel by my counsels failure to work with his client, which is me. I haven't recieved my transcripts, all my F.B.I. 302 forms which I need to help put on a defense for myself.

In U.S. v Greig 967 F.2d 1018,1022(5th Cir.1992) the court stated that it was a (violation of right to effective assistance of counsel when trial "court" knew of conflict of interest but failed to conduct further inquiry.) I understand that we are past the trial stage of this process, but what makes my case more important is that my life is on the line and if something doesn't get filed I'm the one that suffers. The conflict between my attorney and I is effecting not only my case but also my right to a fair appeal. If I can't turn to the courts, than I can"t turn to nobody.

Sincerely,
Julius O Robinson

W/R/P

Signed Before Me
July 30, 2003
Rivera, Juea -Notary
State of Indiana, Vigo Co
exp. Aug. 28, 2010

**Exhibit 69**

# United States Court of Appeals

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**CHARLES R. FULBRUGE III**
**CLERK**

**TEL. 504-310-7700**
**600 CAMP STREET**
**NEW ORLEANS, LA 70130**

August 6, 2003



Mr Julius O Robinson
#26190-177
PO BOX 33
Terre Haute, IN 47808

> No. 02-10717 USA v. Robinson
> USDC No.  4:00-CR-260-2-Y

We will take no action on your letter dated July 30, 2003.  Only
your attorney can file motions or other documents on your behalf.
Your motion is being forwarded to your attorney for whatever action
he deems necessary.

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: _____
Debbie Kranz, Deputy Clerk
504-310-7698

cc:  Mr Jack V Strickland
     Mr Wessley Thompson Ball
     Ms Susan B Cowger

P.S. To Mr Ball and Mr Strickland:  Please discuss the enclosed letter
     with your client and advise the court as needed.

BR-9

**Exhibit 70**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 02-10717
USDC No. 4:00-CR-260-2-Y

———————————————

U.S. COURT OF APPEALS
**FILED**
SEP 3 0 2003
CHARLES R. FULBRUGE III
CLERK

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

versus

JULIUS OMAR ROBINSON, also known as Face, also known as Scar,
also known as Scarface,

                              Defendant-Appellant.

———————————————
Appeal from the United States District Court
for the Northern District of Texas
———————————————

O R D E R:

   Julius Omar Robinson moves the court to dismiss his court-appointed attorney and to appoint substitute counsel to represent him on appeal.  Robinson has failed to demonstrate a level of incompatibility which would warrant the appointment of substitute counsel.  Fifth Circuit Plan under the Criminal Justice Act §§ 2, 5.

   MOTION DENIED.

FOR THE COURT:

ANTHONY J. BONFANTI
DEPUTY CLERK

**Exhibit 71**

## DECLARATION OF MALCOLM W. KLEIN

I, Malcolm W. Klein, Ph.D., declare as follows:

1. I am currently a Professor Emeritus of the University of Southern California and an independent consultant on street gang issues. While at USC, I served 13 years as the chairman of the sociology department and was the founder and director of the University's Social Science Research Institute. My research on gangs has been supported by sixty grants and contracts from major foundations and from government agencies, including federal funding from the U.S. Department of Justice. I have published my research in over one hundred articles and invited chapters, as well as written eighteen books. I am continuing my research consultations for various groups, including the National Youth Gang Center, The Eurogang Program, and the International Self-Report Delinquency Program. Over the course of my career, I have served as a consultant to scores of local, state, national and international private and public agencies and commissions. I have also served as a consultant or expert witness in over one hundred court cases involving gang matters. (See attached resume).

2. Referral Question

I was contacted by Julius Robinson's counsel, and asked to conduct an assessment of the gang situation in Dermott, Arkansas, as well as Mr. Robinson's

1

M.K.

Exhibit 72 - 000001

personal involvement in gang activity during his childhood and adolescent years. As part of my assessment, I reviewed over 2,500 pages of material, including trial transcripts, indictments, witness statements, school records, medical records, prison records, media reports, and the like.

### 3. Gang Research

As a result of my research, I developed a classification system identifying five general types of street gangs within the United States. Malcolm W. Klein, Cheryl L. Maxson, *Gang Structures, Crime Patterns, and Police Responses: A Summary Report* (2001).

### a. Traditional Gangs

Traditional gangs have generally been in existence for twenty or more years and continue to regenerate themselves. They contain fairly clear subgroups, usually separated by age, though occasionally by neighborhood. More than other gangs, traditional gangs tend to have a wide age range, ranging from nine or ten years of age into the thirties. These are usually very large gangs, numbering one hundred or even several hundred members. They are almost always territorial in the sense that they identify strongly with their "turf," and claim it as theirs alone. Generally, their turf includes the vicinity of their immediate neighborhood but may also extend to the surrounding area. In sum, this is a large, enduring, territorial gang with a wide range

2

M.K.

Exhibit 72 - 000002

and several internal cliques based on age or area.

### b. Neotraditional Gangs

The Neotraditional gang resembles the Traditional form, but has not been in existence as long, probably no more than ten years, and often less. It is usually medium size, between fifty to one hundred members, but may also extend into the hundreds. The Neotraditional gang most likely has developed subgroups or cliques based on age or area, but sometimes may not. The age range is usually smaller than the Traditional gangs. The Neotraditional gang is also very territorial, claiming turf and defending it. The Neotraditional gang often engages in subgrouping, but may or may not have achieved the size and wide age range of the Traditional gang. In sum, the neotraditional gang is a newer territorial gang and its subgrouping, temporality, and size, suggests that it is evolving into the Traditional form.

### c. Compressed Gangs

The compressed gang is small, usually in the size range of up to fifty members, and has not formed subgroups. The age range is probably narrow, ten or fewer years between the younger and older members. The small size, absence of subgroups, and narrow age range may reflect the newness of the group, in existence less than ten years and maybe for only a few years. Some of these Compressed gangs have become territorial, but many have not. In sum, compressed gangs have a relatively

3

M.K.

Exhibit 72 - 000003

short history, short enough that by size, duration, subgrouping and territoriality, it is unclear whether they will grow and solidify into the more traditional forms, or simply remain as less complex groups.

### d. Collective Gangs

The collective gang looks like the compressed form, but bigger and with a wider age range, approximately ten or more years between younger and older members. Size can be under a hundred, but is probably larger. Surprisingly, given these numbers, it has not developed subgroups, and may or may not be a territorial gang. It probably has a ten to fifteen-year existence. In sum, the collective gang resembles a kind of shapeless mass of adolescent and young adult members that has not developed the distinguishing characteristics of other gangs.

### e. Specialty Gangs

Unlike these other gangs that engage in a wide variety of criminal offenses, crime in this type of group is narrowly focussed on a few offenses; the group comes to be characterized by the specialty. The Specialty gang tends to be small, usually fifty or fewer members without any subgroups in most cases but there are exceptions. It probably has a history of less than ten years, but has developed a well-defined territory. The territory of the Speciality gang may be either residential or based on the opportunities, for the particular form of crime in which it specializes. The age

4

M.K.

Exhibit 72 - 000004

range of most Specialty gangs is narrow, but may be broad in others. In sum, the specialty gang is crime-focused in a narrow way. Its principal purpose is more criminal than social, and its smaller size and form of territoriality may be a reflection of this focused crime pattern.

4. <u>Opinion</u>

Of the five sub-types of street gangs in the U.S., the Dermott street gang of which Mr. Robinson was a member, the so-called "Playboy Hustler Crips," can be most accurately described as a Compressed gang. The Dermott street gang bore all of the common characteristics of Compressed gang, (short duration, small size, narrow age range, with no clear subgroups). The size of the group was relatively small, limited to individuals living in the small town of Dermott, Arkansas, with a population of less than 3,300. Moreover, the group was limited predominantly to preteen and teenage age males. Finally, the gang appears to have had an extremely short life-span. Although witness statements reflect that the Dermott Crips had been in existence during Mr. Robinson's preteen years, beginning in 1987, the gang has never been recognized by the National Youth Gang Center (N.Y.G.C.), an organization which has identified gang activity in 4,000 gang-involved jurisdictions.

5. Additional characteristics of the Dermott gang distinguish it from other more significant types of gangs. First, the criminal involvement of the Dermott Crips

5

M.K.

Exhibit 72 - 000005

was versatile without emphasis on violence or other serious offenses, thus, distinguishing the gang from Specialty gangs. Although there was evidence to indicate that drug use was fairly common, there was little evidence to indicate that the Dermott gang was involved in drug trafficking. Although one police officer noted that serious assaults, thefts, and drug activity increased around the time the Dermott Crip gang was formed, there was no indication that this activity was pervasive or continued over a significant period of time.

6. Finally, the assessment by local law enforcement dispels the notion that the Dermott gang resembled anything like Traditional gangs. According to then-Dermott Chief of Police Jerry Melton, although there was a group of teenagers that called themselves "Crips" and "Bloods," they were simply emulating what they saw on television. As Chief Melton observed, the Dermott gangs were nothing more than "little wannabes." In contrast to often bloody rivalry between Crips and Bloods often seen in urban areas, there was no fighting between the gangs in Dermott.

Apart from the limited danger that the Dermott Crips posed to the rural community, Mr. Robinson's role in the group was also quite limited. Mr. Robinson's activity in the Dermott gangs seems to derive from the particular vulnerabilities of his personal deficiencies and dysfunctional family situations, within the context of a segregated and poverty stricken community within Dermott. There is no evidence to

6

M.K.

Exhibit 72 - 000006

indicate that he played a leadership role in his Crips gang. Indeed, Mr. Robinson seemed more of a follower who role modeled on several older youth, including the gang initiator known as "John-John." Finally, even though drug activity may have increased as a result of the gang, one of the local officers was not aware that Mr. Robinson had been involved in drug trafficking. The limitations on Mr. Robinson's involvement were essentially dictated by his young age, having been jumped into the gang between twelve and thirteen years old.

7. Conclusion

In sum, the Dermott Crip gang during Mr. Robinson's youth did not qualify as a Traditional gang. At most, the group of preteen and teenage youth resembled a Compressed gang of short duration. Although there was an initial rise in criminal conduct, this activity differed in both scope and severity from that of Traditional gangs. Finally, Mr. Robinson appears to have served only a minimal role in the

///

///

///

///



7

M.K.

Exhibit 72 - 000007

Dermott gang, as evidenced by his young age and his narrow involvement with criminal activity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of May, 2007 in Los Angeles, California.

Malcolm W. Klein

8

M.K.

Exhibit 72 - 000008

## DECLARATION OF MARGARET O'DONNELL

Margaret O' Donnell hereby declares under penalty of perjury, 28 U.S.C. § 1746, that the following is true and correct:

1. I serve as Federal Death Penalty Resource Counsel. This Project assists court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have assisted formally with the Project since 2003 and have served as Resource Counsel since October 2006. The Project is funded and administered under the Criminal Justice Act by the Defender Services Division of the Administrative Office of the United States Courts.

2. The Federal Death Penalty Resource Counsel Project's responsibilities include the monitoring of all federal capital prosecutions throughout the Unites States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases.[1] In the course of our duties, the Project collects information regarding all federal death penalty prosecutions pursuant to 21 U.S.C. § 848(e) *et seq.* and 18 U.S.C. §3591, *et seq.*

3. I have been asked by counsel for Julius Robinson to provide information regarding data the Project has collected. I am prepared to testify as a witness as well. The areas about which I was asked to provide data concern the race of defendants and victims in federal capital cases reviewed during the tenure of former United States Attorney General John Ashcroft.

---

[1] The work of the Federal Death Penalty Resource Counsel Project is described in the report prepared by the Subcommittee of the Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . ., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *Id.* at 50.

Exhibit 73 - 000001

4. The Project has gathered data about the race of defendants and victims in all cases reviewed during former Attorney General Ashcroft's tenure, from February 2001 to February 2005. During this period, the United States Department of Justice reviewed 626 "death-eligible" cases (i.e., charges included one or more offenses with death as a potential penalty). Of those 626 cases reviewed during former Attorney General Ashcroft's tenure, 113 cases involved White defendants, 192 cases involved Hispanic defendants, 275 cases involved Black defendants and 46 cases involved defendants from other minorities, consisting of Native Americans, Pacific Islanders, and Asians. Of the 626 cases reviewed 44% of the defendants were Black, while only 18% were White.

5. Of the 626 cases reviewed, former Attorney General Ashcroft authorized 144 cases for capital prosecution. Of those 144 cases authorized, 34 cases involved White defendants, 26 cases involved Hispanic defendants and 74 cases involved Black defendants, with the remaining 5 defendants belonging to other minority groups.

6. Of the 626 cases reviewed, White defendants were alleged to have committed 12 murders against non-White victims, Black defendants were alleged to have committed 51 murders against White victims, and Hispanic defendants were alleged to have committed 8 murders against White victims. Among the 144 cases authorized for capital prosecutions, 4 White defendants killed non-White victims, 22 Black defendants killed White victims, and 1 Hispanic defendant killed a White victim. Only 12% of the 626 cases reviewed involved a White defendant alleged to have killed a non-White victim. In contrast, 19% of the 626 cases reviewed involved a Black defendant alleged to have killed a White victim. While the authorization rate for White defendants charged with killing non-White victims remained constant (between potential and authorized cases) at 12%, the authorization rate rose to 30% for Black defendants charged with killing non-Whites.

Exhibit 73 - 000002

7.  Of the 12 White defendants alleged to have killed non-White victims and who were considered for capital prosecution by former Attorney General Ashcroft, only 4 or 33% were authorized for the death penalty.  On the other hand, of the 51 Black defendants alleged to have killed White victims and who were considered for capital prosecution by former Attorney General Ashcroft, 22 or 43%  were authorized for the death penalty.

8.  This information was compiled in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge.

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed on June 15, 2007.

Margaret O'Donnell

MARGARET O'DONNELL

Page 3 of  3

Exhibit 73 - 000003