## DECLARATION OF RICHARD SMART

I, Richard Smart, declare:

1.   I know Julius Robinson, we both went to Lamar High School in Arlington, Texas.

2.   In February of 1995, Julius was living in an apartment he shared with his mother in Arlington, but his mother was gone and had not paid the rent. The electricity in the apartment was turned off. Julius was angry and frustrated. He was anxious to finish his last year of high school, but was having a difficult time, coming home to a dark apartment every evening.

3.   I drove Julius to the apartment of Sara Tucker, a friend of his who owed him money. When we discovered that she was not home, we drove to her mother's house. In the parking lot, we saw the pickup truck owned by Sara Tucker. The truck appeared to be empty. I drove into the parking lot and past the truck. I was closest to the truck and no one was in the cab of the truck. I made a u-turn and drove back past the truck again. This time Julius, in the passenger seat, was the closest to the truck. Julius rolled his window down, took out a gun and fired shots into the truck. We did not see anyone inside it. We both believed the truck was empty. The incident happened in the night time when it was dark outside.

4.   No one from Julius Robinson's defense team ever contacted me, not before

R. S.

1

Exhibit 74 - 000001

or during his trial.  Had I been asked about the above information, I would have willingly discussed it.  I would have been willing to testify in court on Julius Robinson's behalf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27 day of September, 2006 in Chicago, Illinois.

Richard Smart

2

Exhibit 74 - 000002

## DECLARATION OF RUSSELL STETLER

I, Russell Stetler, declare as follows:

*Background and Qualifications*

1. In 2005, I joined the Federal Defender Program to fill a newly created position as National Mitigation Coordinator working with and through the Federal Death Penalty Resource Counsel, Capital Resource Counsel and Habeas Assistance and Training Counsel Projects. For the preceding ten years (1995 to 2005), I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases receive effective assistance of counsel. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco which coordinated appellate and postconviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with investigators, mitigation specialists, lawyers, and other professionals outside the office who were retained to assist counsel representing death-sentenced prisoners.

2. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial and on appeal. Most of these conferences were organized and attended by attorneys specializing in capital work.

3. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have been invited to lecture on these subjects in many death-penalty jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado,

1

Exhibit 75 - 000001

Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Missouri, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Virginia. I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Under the auspices of various defense bar programs, I have lectured on capital defense work in Texas several times, including Dallas (1997, 2006, and 2007), Houston (2000), Austin (2003), Plano (2003, twice in 2006, and twice in 2007), San Antonio (2004 and twice in 2006), and Galveston (2005).

4. I have lectured on mitigation investigation at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times in the past decade and a half, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA).

5. I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA) since 1993. This four-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on "Mitigation Evidence in Death Penalty Cases" and "Mental Disabilities and Mitigation" in *The Champion*, the monthly

2

Exhibit 75 - 000002

magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled "Why Capital Cases Require Mitigation Specialists" in *Indigent Defense*, published by the National Legal Aid and Defender Association. These and other articles of mine have been cited in the Commentary to the Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (available at www.abanet.org/deathpenalty). At the request of *Hofstra Law Review*, I wrote a commentary addressing particular sections of the Revised ABA Guidelines (31 Hofstra Law Review 1157 (Summer 2003)). Much of my material was incorporated in *Losch's Texas Capital Defender Manual*, 8th edition, published by the Texas Criminal Defense Lawyers Association in 2006. My latest article, "Mitigation Investigation: A Duty That Demands Expert Help But Can't Be Delegated," appeared in the March 2007 issue of *The Champion*.

6. I am the coauthor of chapters on psychiatric issues in death penalty cases in two recent books: "Dead Men Talking: Mental Illness and Capital Punishment," in Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds., *Forensic Mental Health: Working with Offenders with Mental Illness* (Kingston, New Jersey: Civic Research Institute, Inc., 2001) and "Punishment," in Richard Rosner, M.D., ed., *Principles and Practice of Forensic Psychiatry*, 2nd edition (London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press).

7. Over the years, I have been directly involved in hundreds of capital cases in California and New York, including dozens of trials and postconviction hearings. I have also been consulted on capital cases in numerous other jurisdictions around the country, and I have provided evidence on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in the state and federal courts of numerous jurisdictions, including

3

Exhibit 75 - 000003

Arizona, Arkansas, California, Mississippi, Missouri, New York, Oklahoma, Pennsylvania, Tennessee, Texas, and Wyoming. In 2004, I received the "Life in the Balance Achievement Award" from the National Legal Aid and Defender Association for my work in this field.

*Standard of Care in Capital Cases*

8. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar I have participated in since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases.

9. As early as 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." (Gary Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 New York University Law Review 299 (1983) at 323-324.)

10. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to

4

Exhibit 75 - 000004

determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors which may be disclosed beyond the fact of psychiatric disorder or organicity.

11. In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves. Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Thus, competent capital counsel retain a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." This report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." (*Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation,* Federal Judicial Conference, May 1998, available at http://www.uscourts/gov/dpenalty/1COVER.htm.)

12. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that

Exhibit 75 - 000005

may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.

13. The social history investigation should include a thorough collection of objective, reliable documentation about the client and her family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

14. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, her family, and others who may have important information to share about the client's history. It is well accepted that in-person, face-to-face, one-on-one interviews are required to build trust and to elicit sensitive information. Telephone or group interviews fall below the accepted standard in social history investigation. Even in person, it is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and

6

Exhibit 75 - 000006

defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

15. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. (One nationally recognized authority in mitigation investigation, Lee Norton, has stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. See Lee Norton, "Capital Cases: Mitigation Investigation," *The Champion* (May 1992), pp. 43-45.) Because of the time and expertise required, it is not appropriate to ask an investigator to investigate the factual allegations which constitute the capital charges and the biographical inquiry aimed at discovering mitigating evidence. Each investigative track needs someone's undivided attention. Mitigation investigation requires the ability to identify collateral evidence of symptoms of mental disorders and deficits, exposure to trauma, brain damage, and substance abuse history through a multigenerational inquiry into genetic predispositions, in utero exposures, and intergenerational patterns of behavior, including the historical influences of cultures and subcultures.

7

Exhibit 75 - 000007

16. Mitigation investigation is particularly important when the client does not share the attorney's cultural background. Cultural differences can include not only ethnicity and language, but all of the badges of social identity that define an individual's world and belief system, including politics, religion, and sexual orientation.

17. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many, many cases, defendants do suffer mental impairments that may not meet the legal definition of insanity or incompetency, but are nevertheless powerfully mitigating disabilities which are given great weight when juries are charged with assessing individualized culpability.

18. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted her judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same setting turn out so differently. It is an objective scientific fact. It does not reflect a choice made by the client.

19. Over the years, I have been involved in hundreds of capital cases, including dozens of trials and postconviction hearings. My personal experience of the effectiveness of mitigation evidence accords with the research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases. See, for example, Stephen P. Garvey, "Aggravation and Mitigation in Capital Cases: What Do Jurors Think?" 98 Columbia Law

8

Exhibit 75 - 000008

Review 1538 (1998) and "The Emotional Economy of Capital Sentencing," 75 New York

University Law Review 26 (2000) (concluding that mitigation does matter, especially mental

retardation and mental illness).

*Standard of Care in Capital Mental Health Evaluations*

20 The proper standard of care for a competent mental health evaluation also requires

an accurate medical and social history as its foundation. Because psychiatrically disordered

individuals are by definition likely to be poor historians, a reliable evaluation requires historical

data from sources independent of the client (for clinical, not simply forensic, reasons).

Additional components of a reliable evaluation will include a thorough physical examination

(including neurological examination) and appropriate diagnostic testing. The standard mental

status examination cannot be relied upon in isolation for reliable clinical assessments any more

than the expert can be relied upon in isolation in the courtroom context.

21. Except when clients exhibit such florid symptomatology that immediate clinical

intervention is patently warranted, capital defense counsel are well advised to conduct a thorough

social history investigation before retaining mental health experts. Only after the social history

data have been meticulously digested and the multiple risk factors in the client's biography have

been identified will counsel be in a position to determine what kind of culturally competent

expert is appropriate to the needs of the case, what role that expert will play, and what referral

questions will be asked of the expert. Psychiatrists and psychologists have different training and

expertise, and within each profession are numerous subspecialties including neuropsychology,

psychopharmacology, and the disciplines which study the effects of trauma on human

development. The potential roles of experts include consultants; fact gatherers needed to elicit,

9

Exhibit 75 - 000009

or assess the credibility of, client disclosures; and testifying witnesses, to name but a few. To make informed decisions about the kind of experts who may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

*Review of the Julius Robinson Case*

22. At the request of counsel for Julius Robinson, I was asked to address the standard of practice with respect to mitigation investigation at the time Mr. Robinson's case was prepared for trial, with particular attention to the use of mitigation specialists in investigating life history. As part of my assessment, I have reviewed the transcripts of the penalty phase of Mr. Robinson's trial in the United States District Court for the Northern District of Texas, Fort Worth Division (volumes 20-24, March 12 to 18, 2002); the Fifth Circuit's opinion affirming the conviction and death sentence on direct appeal (367 F.3d 278); and the Motion to Vacate Conviction and Sentence pursuant to 28 U.S.C. § 2255

23. The bifurcated nature of post-*Furman* death-penalty cases prompted capital defense lawyers to develop specialists in mitigation investigation before anyone had coined the term "mitigation specialist." In 1982, for example, a California lawyer hired a former *New York Times* reporter to investigate his client's life history and help outline the empathy-evoking story which ultimately saved that client's life. The journalist, the late Lacy Fosburgh, then wrote about the unusual role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process. Neither one was suited to the task at hand here – namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way. Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes and flaws, are rarely a matter of physical evidence. Instead they are both discovered and

10

Exhibit 75 - 000010

portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech – things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. This person should have nothing else to do but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience. (Lacey Fosburgh, "The Nelson Case: A Model for a New Approach to Capital Trials," in *California Death Penalty Manual*, 1982 Supplement, N6-N10, at N7)

24. By 1992, a Federal Death Penalty Resource Counsel project had been established to assist counsel in federal death-penalty cases, and the resource counsel have consistently advised counsel to engage the services of a mitigation specialist in all cases where the death penalty may be sought. As noted above at paragraph 11, by 1998 the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, had discussed the role of mitigation specialists in federal capital defense.

25. It is my professional conclusion that the performance of Mr. Robinson's trial counsel fell below the standard expected of federal death penalty counsel in 2001-2. Their failure to engage the services of a mitigation specialist denied Mr. Robinson of the opportunity to provide his jurors with the evidence that would have allowed them to make a reasoned moral decision about the appropriate sentence. It is apparent that no member of Mr. Robinson's trial team was qualified by training and experience to screen for the presence of mental disorders or impairments. A mitigation specialist could have played a crucial role in helping counsel choose appropriate experts to assist in the case. A mitigation specialist would also have had the knowledge and skill to obtain all relevant records and to identify, locate and interview in person,

11

Exhibit 75 - 000011

in a culturally competent manner, all the relevant sources of potential mitigating evidence.

26. I have provided this consultation and affidavit on a pro bono basis.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Date: May 21 2007

_____
Russell Stetler

12

Exhibit 75 - 000012

DECLARATION


I, Mandy Welch, under penalty of perjury, declare the following to be true:

1. I am an attorney, licensed to practice law in the State of Texas. For over 20 years, I have represented death sentenced prisoners in habeas corpus proceedings. From 1991 to 1995, I was the Litigation Director and Executive Director of the Texas Resource Center, one of 18 federally funded, non-profit defender organizations that provided training, consultation and assistance for attorneys representing death sentenced prisoners in habeas corpus proceedings. When federal funding for the Texas Resource Center was withdrawn in 1995, I founded and served as the director of the Texas Defender Service, a non-profit law firm that was formed in 1995 to provide training and consultation as well as representation in capital cases. I served as appointed counsel in one federal capital prosecution for Timothy James McVeigh. *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998).

2. I provide this affidavit at the request of Mr. Craig Harbaugh, attorney for Julius Robinson in Case # 2001 4:00-CR-260-Y (Civil No. 4:05-CV-756). I have been asked to offer my opinion on the following question: What impact did the prior Texas capital sentencing scheme, which precluded consideration of broad categories of mitigating evidence, have on the decision of some criminal defense attorneys to conduct a proper mitigation investigation in death penalty cases?

3. Before addressing the specific issue, I feel it is important to articulate my view regarding the standard of care for defense counsel in all capital cases. I have read John Niland's declaration and concur with the opinion espoused therein. It is clear that professional norms dictate a complete and thorough mitigation investigation in order to provide constitutionally adequate representation in a death-penalty case. This duty has been in effect since at least 1989, when the American Bar Association published its Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. It applies to all attorneys engaged in the representation of capital clients, including those practicing in Texas courts, both state and federal. Given this well-accepted norm, there is simply no justification for failing to conduct a proper investigation of all available mitigating evidence. The failure to do so is *per se* unreasonable.

4. While certainly not an excuse for such a glaring dereliction, the general failing of trial counsel to conduct a proper mitigation investigation may be a direct result of the now-defunct jury instructions in Texas state capital prosecutions. Pursuant to the previous Texas death penalty scheme, the jury were directed to answer three "special issues" at the conclusion of the penalty phase. Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981 and Supp. 1989)).

Exhibit 76 - 000001

These issues were extremely narrow, addressing only the circumstances of the crime, the future dangerousness of the defendant, and the reasonableness of the defendant's reaction to provocation by the victim. Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981 and Supp. 1989)). If the jury answered affirmatively to all three issues, the judge was required to sentence the defendant to death. Arts. 37.071(c)-(e). In *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*"), the Supreme Court held that the Texas special issues were inadequate to allow proper consideration of some types of mitigating evidence. In 1991, the Texas Legislature amended the special issues in response to *Penry I*, by inserting language instructing the jury to decide "whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." Tex. Code Crim. Proc. Ann., Art. 37.071, § 2(e)(1) (Vernon 2006).

5. Until the Texas death penalty statute was amended, many capital defense attorneys chose not to pursue mitigation evidence about a defendant's background and character that did not directly support a negative answer to the "future dangerousness" special issues. Despite the powerful mitigating potential of evidence that could explain why a defendant committed the capital crime, such evidence often supported an affirmative answer to the "future dangerousness" issue, and under the old statute, the jury was not permitted to consider the mitigating value of the evidence. Predictably, some defense attorneys came to view that type of evidence as aggravating only and not mitigating.

6. Unfortunately, even after the Texas statute was revised in 1991, skepticism regarding the value of mitigation evidence persisted within the capital defense community. Many practitioners, having been deprived of an appropriate vehicle to present mitigation evidence for so long, resigned themselves to the belief that a jury would never find the evidence persuasive, making an investigation futile. This misconception and flawed practice was reinforced by the fact that many attorneys who practiced under the old statute never developed an understanding and appreciation of the relevance such evidence has to a defendant's moral culpability. Nor did they develop the requisite knowledge regarding a proper penalty phase investigation. Because many attorneys appointed in federal capital prosecutions obtained their qualifications through their experience in state death-penalty cases under the old statute, this flawed approach has occasionally found its way into the defense of federal capital prosecutions in Texas.

7. The fact that Texas had a flawed sentencing scheme before 1991 did not absolve trial counsel of their constitutionally required duty of conducting a proper mitigation investigation as outlined in John Niland's affidavit. This is true for state cases after 1991 and certainly for federal

2

Exhibit 76 - 000002

cases which always allowed the jury to give meaning and effect to all defense mitigation evidence.  That said, the defeatist attitude that developed in the face of the Texas sentencing scheme had lasting effects and plagued both the state and federal capital defense community in Texas long after the statute was revised.  While not an excuse, this mentality can help explain why otherwise competent attorneys may have failed to satisfy such a fundamental obligation in a capital prosecution.

This declaration is made under penalty of perjury on this  11th  day of June, 2007.


_____
Mandy Welch

3

Exhibit 76 - 000003

**Evaluation of Teratogenic Exposure
as Mitigating Evidence in the Case of
United States v. Julius Robinson**

**A Report Submitted by
Kate Allen, Ph.D.**

**3-14-07**

## Purpose

I was retained by the Office of the Federal Public Defender, Central District of California, to conduct an evaluation of Julius Robinson. It is my understanding that in 2001 Julius Robinson was convicted of murders committed in 2000 and was sentenced to death. I was asked to determine the evidence of substance exposure-in-utero (teratogens) and conduct an evaluation of its likely effects on the cognitive, emotional, and behavioral functioning of Mr. Robinson.

This report, therefore, is an application of the principles of behavioral teratology to the life circumstances of this defendant to enable the judgment of his capacity. In the task of sentencing, these documented developmental injuries are fundamental and significant components of a mitigation presentation.

## Background

For 32 years I have practiced as a clinical social worker and I have been licensed in Texas and California. I am currently a forensic consultant and clinical trainer. I am also Professor Emerita at California State University, Sacramento, having retired from the Department of Social Work. During my tenure as associate professor at CSUS, I taught clinical courses, including psychiatric diagnoses (DSM-IV-TR) and child abuse and neglect. I have also taught on a temporary basis in the graduate school at the University of Texas at Austin, Texas Tech University, and Baylor University. In addition to graduate instruction, I have also provided a variety of professional training, mostly in California, for child welfare and mental health professionals. From 1987 to the present, I have provided numerous clinical consultations and evaluations. My practice has included extensive clinical social work in hospital settings including Shoal Creek Psychiatric Hospital in Austin, Scott and White Hospital in Temple, Texas, and University of California, Davis Medical Center in Sacramento, California. As well, I have provided clinical supervision of other social workers. In recent years I have worked extensively in a forensic capacity. Specifically, I have worked on 18 capital murder cases. I have qualified as an expert witness in both civil and criminal courts in Texas, Nebraska, Oklahoma, California, and Georgia.

Through a combination of study, practice, and research over twenty years in social work, I have developed expertise in the field of Alcohol Related Neurodevelopmental Disorder (ARND). ARND is a spectrum disorder involving developmental disability and brain injury due to maternal use of alcohol while pregnant. Since 1992 I have conducted perhaps 100 day-long

Exhibit 77 - 000001

2

training workshops (and some conference presentations) in a number of child abuse and neglect areas, but principally specializing in fetal alcohol syndrome and attachment disorder. Federal Title 4-E funds to provide clinical training to child welfare workers have been the source of much of my sponsored trainings. In this capacity, social workers must acquire the skills to recognize ARND and its sequelae, much of which is explained in this report. A great number of children currently receiving services in the child welfare system meet the criteria for ARND; my expertise has long been utilized by California training units to transmit these skills. I have consulted with and provided training to foster parents and adoptive parents with children displaying signs of ARND.

An additional area of expertise I have utilized during the last 15+ years is in the area of attachment disorder. This condition—resulting in grave developmental injuries—is also ubiquitous in the child welfare field. A large number of my training activity has focused on the assessment of attachment disorder from infancy through adolescence. The two conditions—ARND and attachment disorder—are very often seen in tandem and specialized training in each and both areas are at the center of my training career. These two topics are the core of specialized clinical training in practice with abused and neglected children. My trainings have been extensively requested in the San Francisco Bay Area (Bay Area Training Academy), in the Sacramento/Chico/Fresno corridor, in the Humboldt County area. I have also trained social workers in Los Angeles and will be training in May in San Diego. Participants in my trainings have included social workers, psychologists, psychiatrists, attorneys, foster parents, and adoptive parents.

My expertise was also the center of the course offerings at the graduate level at CSUS in the program which sponsored the graduate training of future child welfare workers. I have a reputation as the expert in these clinical areas throughout Northern California.

**Sources**

The sources used in my review of the case file include the following:
- ❑ Declaration of Mark Cunningham, Ph.D. (a comprehensive review of the case covering all factors of mitigation interest)
- ❑ Statement of and discussion with Stephen Martin, Ph.D. (neuropsychological evaluation)
- ❑ Declarations of the following friends and family members:
  --Jamila Camp
  --Josephine Dotson
  --John Hollimon, Jr.
  --Robert Hollimon
  --Jana Hollimon
  --Rose Hollimon
  --Bernice Johnson
  --Beotha Moore
  --Jimmie Lee Robinson

Exhibit 77 - 000002

3

> --Marcus Robinson
> --Willie White
> ❑ School records of Julius Robinson
> ❑ Hospital birth records of Julius Robinson
> ❑ Interview with Julius Robinson (1-29-07)
> ❑ A number of research documents on behavioral teratology (a sample of which are listed in the Bibliography)

## Opinion

After a thorough review of his case files, a lengthy interview with the defendant, and an application of behavioral teratology knowledge to this case, it is my opinion that Mr. Robinson manifests an array of the negative sequelae of substance exposure-in-utero, specifically the eventual criminal consequences of brain injury due to alcohol-related neurodevelopmental disorder (ARND), a subset of Fetal Alcohol Spectrum Disorders, as well as the teratogens nicotine, cigarette smoke, and marijuana. Because Julius's mother injured him in utero, he was at high risk for other maternal failures (impaired attachment) and was made particularly vulnerable to the dangerous challenges of high-risk environments (abuse, neglect, poverty, drugs, discrimination, violence). These three causative factors (teratogenic exposure, poor attachment, severe neglect amidst danger)—the latter two a direct link or correlate to fetal toxic exposure—are ample explanations of how this defendant traveled the road to criminal behavior.

## Fetal Alcohol Spectrum Disorders

### 1. History

Fetal Alcohol Spectrum Disorder is a permanent birth defect caused by maternal consumption of alcohol during pregnancy. Alcohol is a teratogen that inhibits and disrupts fetal development by causing structural and functional damage to developing organs and systems, including the brain and central nervous system. The damage starts at the cellular level, where alcohol can induce excessive cell death and disrupt cell responses to molecules that regulate neuron proliferation, migration, and differentiation. Because alcohol causes widespread damage throughout the developing fetus, there is a broad array of physical anomalies and neurobehavioral defects.

Diagnostic labels applied to fetal alcohol impairment have changed over time to reflect increasing diagnostic precision. In 1996, the four broad diagnostic criteria for FAS were reaffirmed in a report by the Institute of Medicine that delineated five specific categories of diagnosis:
- Type 1: FAS With Confirmed Maternal Alcohol Exposure;
- Type 2: FAS Without Confirmed Maternal Alcohol Exposure;
- Type 3: Partial FAS With Confirmed Maternal Alcohol Exposure;
- Type 4: Alcohol-related Birth Defects (ARBD); and

Exhibit 77 - 000003

4

- Type 5: Alcohol-Related Neurodevelopmental Disorder (ARND).

(Institute of Medicine, *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment*, 1996).

FAS Type 1 is the "classic" FAS diagnosis and includes all four of the features typically associated with the syndrome:   a) confirmed maternal alcohol exposure, b) characteristic facial abnormalities or dysmorphology, c) pre- and/or postnatal growth retardation, and d) evidence of central nervous system neurodevelopmental abnormalities.  FAS Type 2 has all of these features except confirmed maternal alcohol exposure.  FAS Type 3 is differentiated from FAS Type 1 by virtue of the fact that only some of the facial abnormalities are present, and in addition to confirmed prenatal alcohol exposure, the individual manifests growth retardation, evidence of CNS neurodevelopmental abnormalities, and a complex pattern of behavioral or cognitive abnormalities that are inconsistent with developmental level and cannot be explained by familial background or environment alone (e.g., learning difficulties, deficits in school performance, poor impulse control, problems in social perception, language deficits, poor capacity for abstraction, specific deficits in mathematical skills, and problems in memory, attention, or judgment).  FAS Type 4 (Alcohol-Related Birth Defects, or ARBD) requires confirmed maternal alcohol exposure and one or more congenital defects including malformations and dysplasias of the heart, bone, kidney, vision, or hearing systems.  FAS Type 5 (Alcohol-Related Neurodevelopmental Disorder or ARND) requires confirmed maternal alcohol exposure, CNS neurodevelopmental abnormalities, and/or a complex pattern of behavioral or cognitive deficits.

In 2004, several federal agencies (National Institutes of Health, CDC, and Substance Abuse and Mental Health Services Administration) along with experts in the field were convened at a summit sponsored by the National Organization on FAS (NOFAS) developed a consensus definition of Fetal Alcohol Spectrum Disorders (FASD).

## 2.  Disabilities Resulting from Fetal Alcohol Exposure

According to research in the 1990s, disabilities stemming from FASD are categorized as either "primary" or "secondary" depending upon whether they are a direct manifestation of central nervous system malfunction (i.e., primary disabilities) or whether they are mediated by environmental influences (i.e., secondary disabilities).  "Primary disabilities" are defined as functional deficits that stem directly from structural brain damage and CNS dysfunction caused by prenatal ethanol exposure (e.g., Streissguth et al., 1996).   Individuals with FASD are typically born with some or many of these primary disabilities.  "Secondary disabilities" are behavioral deficits that an individual acquires over time that presumably could have been ameliorated if there had been early diagnosis and intervention in childhood.  Secondary disabilities include mental health problems, disrupted school experience, trouble with the law, confinement, inappropriate sexual behavior, alcohol/drug problems, dependent living, and problems with employment.  Postnatal environmental factors exert positive or negative influence on the expression of these secondary disabilities but have nothing to do with the expression of primary disabilities.  However, with effective treatment of primary disabilities, secondary disabilities can be prevented or at least reduced (Streissguth, 1997).   However, without accurate

Exhibit 77 - 000004

5

diagnosis and treatment, secondary disabilities manifest in adolescence and adulthood as extreme problems in psychosocial functioning that lead to adverse life outcomes.

### a. Primary Disabilities

The most serious and pervasive damage occurs in the central nervous system (CNS). Brain imaging studies over the last decade have shown that prenatal alcohol exposure causes significant malformation in structures throughout the brain (e.g., corpus callosum, basal ganglia, cerebellum) that are necessary for normal development and functioning. [See all Bookstein, et al articles.]

Research has shown that the frontal lobe of the brain, particularly the prefrontal cortex, is particularly sensitive to the effects of prenatal alcohol exposure (e.g., Bookstein et al., 2002). Alcohol seems to target the corpus callosum in particular (Bookstein et al., 2001), which is the brain structure that separates the two hemispheres and relays information (electrical impulses) between the right and left sides of the brain. When executive functions are compromised by prenatal alcohol exposure, an individual will:

- have difficulty perceiving, prioritizing, and storing information,
- have difficulty processing and retrieving that information,
- be unable to generalize and apply consequences from past actions to potential future actions,
- lack motivation and initiative,
- need external motivators such as frequent cues or guidance from others,
- be unable to perceive the effect of his/her actions on others or the social inappropriateness of those actions,
- display exaggerated emotions,
- be unable to control behaviors that stem from emotion-evoked urges, and, consequently,
- engage in a wide range of socially (and often legally) inappropriate behaviors.

### b. Secondary Disabilities

A large number of individuals with fetal alcohol impairment display secondary disabilities (Streissguth et al., 1996; Streissguth & O'Malley, 2000). For example, 60% of those in the large study sample (Streissguth et al., 1996) had been arrested, charged, and/or convicted of a crime; 50% had been in a confinement setting (i.e., psychiatric hospital, jail, prison, residential substance abuse treatment); and 30% had alcohol or drug abuse problems. The most prevalent secondary disability, experienced by 94% of those in the 1996 study, was mental health problems. For example, during childhood, 60% of children with FASD have attention deficit/hyperactivity disorder, and during adulthood, most adults with FASD become clinically depressed. The study also revealed that 23% of adults had attempted suicide, and 43% had threatened to commit suicide. Other common mental health diagnoses that co-occur with FASD include conduct disorders, oppositional defiant disorder, antisocial personality disorder, anxiety

Exhibit 77 - 000005

6

disorders, adjustment disorders, sleep disorders, and severe mental illness such as schizophrenia and bipolar disorder (Streissguth & O'Malley, 2000; Streissguth et al., 1996).

Trouble with the law (i.e., involvement with police or being charged and/or convicted of crime) was experienced by 60% of adolescents and adults in the secondary disabilities study (Streissguth et al., 1996). The most common crimes committed (by almost half of individuals with FASD ages 12-20) were crimes against persons (e.g., theft, burglary, assault, murder, domestic violence, child molestation, running away), followed by property damage, drug possession/selling, sexual assault, and vehicular crimes.

Secondary disabilities associated with fetal alcohol impairment are not just modifiable but preventable if an individual is diagnosed early and receives appropriate intervention. According to the University of Washington secondary disabilities study (Streissguth et al., 1996), specific "risk factors" *increase* the probability that a fetal alcohol impaired individual will go on to develop secondary disabilities, and specific "protective factors" *reduce* that probability. The risk and protective factors apply to an individual's childhood up to 18 years of age and are mutually exclusive. These mediating factors include the following: living in a nurturing and stable home for at least 72% of childhood, receiving a diagnosis of fetal alcohol impairment prior to age six (which permits positive interventions to be applied early in life), never having experienced violence, living for at least 2.8 years in each household, experiencing a good quality home ("good quality" was operationally defined by 12 specific factors), and having basic needs met at least 13% of the time during childhood.

**Principles of Behavioral Teratology Which Apply to This Case**

Teratogens are substances known to cause adverse effects on offspring as a result of gestational exposure; those effects include death, malformation, growth deficiency, and functional deficits. Research into the consequences of teratogenic exposure must account for the effects of a wide range of variables, such as which substances, use-in-tandem, when ingested, how much, for how long, as well as a host of post-natal complications. Although death and physical birth defects are the most dramatic and easily recognizable results, society is most seriously affected when deficits in the neurological development, especially in executive functioning, handicap the fundamental thinking, judgment, and decision-making of a person-and when these deficits are permanent and have wide-ranging implications (as in the case of fetal alcohol spectrum disorder) (Chasnoff, 2001).

There are some common and significant misperceptions which need clarification.

❑ Teratogenic effects on a newborn can be mild, moderate, or severe.
❑ They may be temporary, reversible, or permanent.
❑ Fetal exposure to multiple teratogens strengthens the overall damage.
❑ All illegal and prescribed substances have the capacity to harm the newborn, but those which produce the most overall damage are, in this order: 1) alcohol; 2) nicotine/cigarette smoke (Chasnoff, 2001). Marijuana is arguably ranked third. Fetal alcohol damage causes *a variation of permanent mental retardation*. Nicotine, cigarette

Exhibit 77 - 000006

7

smoke, and marijuana have mostly indirect effects on development, but these effects, especially when taken with those of alcohol, can be severe.

❑ There is a dose/effects relationship for *each* outcome and *between* outcomes.  This means that a higher dose is required to produce malformation than that needed to produce growth deficiency (Streissguth, et al, 1988).  *Functional deficits can be produced at lower levels of exposure than those producing malformations and growth deficiency* (Connor, et al, 2000).

❑ Fetal alcohol damage which results in facial dysmorphology may reflect *higher use and/or use in the first trimester.*  Executive functioning (EF) capacity is *damaged at lower doses of use throughout the pregnancy, but more likely in the second and third trimesters.*

❑ Many women who use teratogenic substances do so *when they may not know they are pregnant* (in the first trimester or even later).

❑ Research on ARND (Connor, et al, 2001, and others) distinguishes the brain damage caused by fetal alcohol exposure as it differs from conventional IQ scores or disturbances in physical features , e.g.

   *--there is no correlation between executive functioning and*
       *facial dysmorphology (though these terms are falling out of use,*
       *Fetal Alcohol Syndrome has historically been used to refer to*
       *the presence of irregular facial features; Fetal Alcohol Effects*
       *has referred to functional deficits when facial features are more*
       *or less normal)*
   *--significant deficits in executive functioning are not correlated*
       *with standard measures of IQ*
   *--while there are direct effects of generally lowered IQ scores*
       *due to exposure (the average Full Scale IQ score of those with*
       *FAS is 79, while the FSIQ score of those with FAE is 90), there*
       *are also serious indirect effects which are, in fact, mediated*
       *through IQ (as evidenced in other cognitive tests such as*
       *WCST, Stroop Word-Color Test, Trail Making Test, Ruff's*
       *Figural Fluency Test, Consonant Trigrams Test)*

What is relevant is that the thinking and behavioral problems which arise from deficits in executive functioning are the most disturbing effects of the most damaging teratogen-alcohol. These deficits *occur at lower fetal alcohol exposure dosages* and are not correlated with IQ (which makes it not consistent with the normal mental retardation IQ criteria of FSIQ below 70) or with facial dysmorphology:  neither of these "hard" measures has bearing on the seriousness of the teratogenic effect on the frontal cortex.  *In summary, an individual can have a normal IQ score and still have significant deficits in thinking, learning, and judgment*.  To understand the full impact on an individual's cognitive and behavioral functioning, it is necessary to understand and apply these principles which are unique to ARND.

The group of cognitive abilities that are produced in the frontal cortex of the brain and referred to as executive functioning are the following:

Exhibit 77 - 000007

8

❑ self-regulation of behaviors
❑ sequencing of behaviors
❑ cognitive flexibility
❑ response inhibition
❑ planning
❑ organization of behavior

While these are judgment-related higher cognitive processes which have some direct measurability (though not necessarily by conventional IQ scores), they are also dependent on the integration of more basic processes such as motor activity, sensation, perception, attention, or memory. In brain damage due to fetal alcohol exposure, disturbances in each and all of these more basic areas is commonly found.

**Indicators of Teratogenic Damage of Julius Robinson**

A. Damage due to Marijuana Use in Pregnancy

It is reported that Rose Hollimon smoked 12 marijuana cigarettes a day during her pregnancy with Julius. Marijuana use in pregnancy constricts blood vessels in the uterus, cutting down on blood supply, oxygen, and nutrients available to the fetus. Neurophysiological research focuses on the number, kind, and place of receptor sites and binding sites (e.g., one of the major cannibinoid receptor sites in the human brain is in part of the forebrain associated with higher cognitive functions). Cannabinoids are able to affect the expression of key genes for neural development leading to neurotransmitter and behavioral disturbances. Specifically, it affects the process of cell proliferation and migration and synaptogenesis. *The effects are shown to be greater in males than in females*. Research also shows no major deficits in development until the child reaches 3 to 4 years (the time frame consistent with major development of executive functioning (Fried, et al, 2001).

In later childhood, prenatal marijuana use can cause the following effects which are present in the functioning history of Julius Robinson:
❑ attention and memory deficits
❑ visual analysis/hypothesis testing
❑ language comprehension
❑ poor ability to interpret alerting or threatening cognitive stimuli (results in poor emotional processing)
❑ greater rates of depression

B. Damage Due to Use of Nicotine/Exposure to Cigarette Smoking in Pregnancy

When a pregnant woman smokes cigarettes in pregnancy—a fact attested to by Rose, herself, as well as others (one pack a day in addition to the inhalation of smoke from many marijuana cigarettes daily)—the blood vessels to the uterus are constricted. This constriction causes a reduction of blood supply, oxygen, and nutrients that need to come to the fetus. Many of the affects of smoking on the fetus also occur in children born to mothers merely exposed to

Exhibit 77 - 000008

9

second-hand smoke.  Research, despite the presence of confounding variables, has been able to establish dose-response relationships (Ernst, et al, 2001).  As a matter of fact, research has documented effects of prenatal smoking in adults up to the age of 28 years old in a Skandinavian study of 15,000 subjects:  maternal prenatal smoking was a *robust* predictor of violent offenses and persistent offenses in boys and criminal outcomes in general (Ernst, et al, 2001). Abnormalities in cell proliferation and differentiation is a fundamental effect of this teratogen—a circumstance which underlies neurodevelopmental disorders of executive functioning.

The documented evidence of sequelae of maternal use of nicotine and her exposure to smoke while pregnant which are found in the functioning of Julius Robinson are the following:

- lower birth weight (Julius's weight at birth was 5 lbs. 6 oz.; 6 lbs. is the beginning of the "normal" birth weight range) and the effect of such; lower birth weight usually recovers over time *except* when exposure to alcohol is present, which is true in this case)
- deficits in sustained attention
- lower verbal comprehension
- deficits in receptive language
- reduced auditory acuity; impaired auditory processing
- poorer reading scores, and in reading comprehension, especially the auditory-dependent aspects of reading:  all of these deficits have been found to be strongly dose-dependent
- increase in hyperactivity
- decrease in inhibiting responses
- deficits in short-term memory
- a decrease in IQ points
- some evidence of lower stress thresholds
- increased risk of conduct disorder
- increased risk of substance abuse

## C.  The Alcohol-Spectrum Disorder Effects of Prenatal Exposure

Julius Robinson qualifies as alcohol exposed-in-utero in the following cognitive and emotional functional areas:
- low birth weight (noted above);
- learning disabilities (Dr. Stephen Martin, who performed a neuropsychological evaluation of Julius, reports a number of mild to moderate language skills deficits (dysnomia, spelling apraxia, and central dysarthia).  Dr. Martin notes he met low-grade equivalence scores:  Reading—7th grade; Spelling—4th grade; Arithmetic—6th grade. Julius says that he had to study much harder for the grades he received.  Jamila Camp thought of him as having dyslexia and noted how confusing she found his writing;
- auditory processing (Dr. Martin found deficits involving sustained auditory attention);
- sensory proprioceptive disorder (Julius states he stuttered as a child, which may indicate a touch-feedback disorder; the psychological literature has also long documented the poor psychological effect on development in the presence of stuttering);
- perseveration:  difficulties in shifting tasks, in changing strategies, in moving on after the

Exhibit 77 - 000009

10

end of fruitful lines of thinking (Julius recounts a number of circumstances in which, as I describe this to him, this perseveration quality is a common experience, "I feel like I'm not being understood and I can't let it go," often coming across as argumentative.)  This results in inability to apply new options in coping.  Dr. Martin found deficits in mental flexibility;

- ability to maintain complex attention (Julius recalls having had longstanding problems with concentration and distractibility and complains of not being able to focus, of having a habit of "starting 5 or 6 things at the same time");
- short-term memory deficits (Julius reports he often experiences "blocks" of memory that force him to "just let go" for the time being of what he is trying to remember);
- poor response-inhibition and general impulse-control deficits (Julius likely has had difficulties with *confabulation*, a common fetal alcohol result (as well as alcoholic dementia in long-term alcoholics) in which elements of differing memories are spontaneously issued (confusion and fusion of time/event facts and imagination) during times of stress and fear and which appear to be lies, though there is actually no control or ego-based motivation for lying).  As well, Jamila Camp, his former girlfriend, described his confusion with words, appearing to be linked in his poor ability to communicate in writing;
- deficits in motor skills (Dr. Martin reported bilateral impairment on a measure assessing simple motor skills);
- inability to normally tolerate frustration;
- poor ability to self-soothe (as reported by family members as Julius, as a child, being unable to comfort himself, having extensive crying tantrums, "sitting in the corner and stewing for long periods."  Julius believes that he drank so much cognac as a way of self-regulating his negative emotions.  Sometimes he would feel the same comfort in the routine of gun-cleaning or video cleaning, but those more benign choices did not replace his alcoholism);
- poor ability to internally regulate negative feelings, producing a tendency to act out his frustration;
- loss of adaptation under stress;
- the above five deficits logically result in behavioral dyscontrol—especially externalizing of personal control as outside of oneself (external locus of control).

[Dr. Martin also states that Mr. Robinson's routine exposure to pesticides in his childhood playground is also known to cause learning disabilities.]

It must be noted that a simple view of these areas in and of themselves can render a quite invalid presentation.  The specific areas of abnormality correspond to the evidence-based enumeration of the documented use of teratogens in his mother's pregnancy with him and may not appear powerful when taken individually.  Yet it is the overall presentation of cognitive and emotional deficits we see with Mr. Robinson—and the obvious compromising of his executive functioning capacity—which we must use in understanding how he came to criminal actions.

Exhibit 77 - 000010

11

**Dr. Mark Cunningham's Evaluation**

Dr. Cunningham's lengthy exposition of the mitigation factors which should have been presented at Mr. Robinson's trial is comprehensive and well-documented.  In that bio-psycho-social evaluation, he reviews essentially the same sources I have used and explains how the many factors revealed by family members and relevant others are exactly those which social science has identified as causing critical developmental injuries.  When a child experiences such fundamental challenges to cognitive, emotional and behavioral development—and additionally is exposed to high-risks in the environment without parental protection—he is unable to take the same level of moral responsibility in decision-making as can an individual for whom these seriously accumulative injuries were absent.

In my report which focuses attention specifically on the sequelae of neurological damage experienced during the fetal period, I will not reproduce the body of work from Dr. Cunningham; yet I will make indirect referral to what is contained there and will, from time to time, specifically take from his evaluation.

**How Substance Exposure-in-Utero Can Lead to Criminality**

In order to demonstrate how Julius Robinson's experience of substance exposure-in-utero is connected to behaviors which resulted in the capital murder convictions, it will be necessary to examine the intervening variables of attachment disorder and early exposure to a highly toxic social environment (given his compromised neurology and psychological functioning).

First, I will present the connections between teratogenic exposure to impaired attachment capacity.  Second, I will connect resulting neurodevelopmental vulnerability with the lack of parental protection from and involvement with high-risk environments.  And last, I will document the particular research-identified elements of neurodevelopmental damage that has occurred in Julius's life and how such damage has affected his functioning in later adolescence and early adulthood.

A.  How prenatal damage affects earliest development of attachment

The "laying down" of attachment during infancy is, profoundly, the basis of emotional and behavioral self-control that begins in the toddler years and remains rather set (without effective intervention) into adulthood.  The process of acquiring attachment to the mother could be said to be the "psychological birth" which follows on the heels of the biological birth.  Within the first 9 months of life, the newborn is experiencing a critical cycle of bonding which occurs dozens, if not hundreds, of times a day (Siegel, 1999).  In a "good enough" attachment environment, not only does the mother need to be almost fully attentive to responding to the needs of the child, the baby also must have enough sound brain development—-regulatory, auditory processing, and memory capacity-to receive and store the consistent and relevant nurturing of the mother (Siegel, 1999, Shore, 2002).

Exhibit 77 - 000011

12

If a child is negatively impacted by being over-challenged in the fetal period, he is not ready to cope with and grow through the challenges of the human environment after birth. In such a case, an unusually attentive and stable maternal response is necessary in order to compensate for the lagging "hardware." This was not the mothering Julius received.

Rose Hollimon had begun drinking and smoking marijuana in the 7th or 8th grade. She was admonished about drinking during pregnancy, but (by Jimmie Lee Robinson's report) she claimed that her own mother had drunk alcohol while pregnant with her, so she thought there must be nothing wrong with it. [There are substantial indications that Rose Hollimon is intellectually impaired.] She has stated she didn't know she was pregnant with Julius until she was 6 months along. Rose verifies she both drank and smoked cigarettes throughout her pregnancy. [She reports that years later she began using crack cocaine, and when she quit crack use, she went back to drinking alcohol ranging from a 12-pack to a case of beer per day.] Julius' father, Jimmie Lee Robinson, remembers Rose as drinking a minimum of 2-3 beers per day, smoking cigarettes, and smoking an average of 12 marijuana joints per day. Beotha Moore, a family friend and neighbor in Dermott, also states she saw Rose drinking beer and smoking cigarettes during the pregnancy. Jimmie Lee also says Rose became a heavy cocaine abuser probably during her pregnancy with Julius, but certainly shortly afterward. And their neighbor, Beotha Moore, believed Rose was abusing cocaine at a minimum after Julius was born. This can easily be inferred because she was distributing it at the time during her "soap opera parties" and later developed a crack cocaine addiction. Further, Jimmie Lee found she "blew $12,000" in the first few months of Julius's life, with nothing to show for it.

From these reports, it is clear that his mother was seriously affected by chemical dependencies; it is only reasonable that she would have continued such use during the crucial attachment period. Therefore, not only was Julius in need of extraordinary nurturing, but Rose was not available to do even an average job of maternal bonding. Jimmie Lee Robinson, as well, failed Julius in his duties as a father and did not mitigate the damage done by Rose's lack of bonding.

An additional condition hindered Julius's early growth: there was much domestic violence in the Robinson household before and after his birth, as reported by Julius's father, mother, and other family members. [Jimmie Lee Robinson was also seriously chemically dependent; he reports that in Julius's toddler years, he was a "terrible alcoholic," smoked cigarettes and abused marijuana. Later he became addicted to crack cocaine for 15 years.] In fact, while pregnant with Julius, the parents relinquished Marcus, his older toddler brother, to the family friend, Sarah Pittman, who had mostly reared Rose from age four until she met Julius's father (about age 15). She could see the harm done to Marcus because of the parents' physical fighting. This violent domestic environment continued until the couple split up. With Julius's precarious developmental capacity, his exposure to child abuse-by-proxy (domestic violence has the same traumatic neurological consequences as does direct violence perpetrated on the child) sealed his already injured process of attaching. It is this vital course of being attached—first to the mother and later as a component of all relationships—that was compromised by the decisions and addictions of Julius's parents.

Exhibit 77 - 000012

13

Attachment disorder results from child neglect and abuse in crucial phases of development.  Infant mental health research has located attachment at the intersection of biology and psychology:  it begins as a result, but quickly moves into a cause of neurodevelopmental deficits (Siegel, 1999, 2001; Schore, 2002; LeDoux, 1996).  In this case, the impaired ability to attach-a result of the interplay of Julius's special needs due to prenatal substance damage and Rose's and Jimmie Lee's inability to provide for his needs-is the strongest intervening variable that paved the way for teratogenic damage to result in later criminal behavior in Julius's life.

B.  How Julius's Heightened Developmental Vulnerability Responded to Lack of Protection
     from a High-Risk Environment

Once again, Dr. Cunningham's report details extensively the science as it applies to Julius Robinson's life in a range of mitigation issues which should serve as the overall source of inferences in this report.  In order to draw the linkages of harmful prenatal toxic exposure to unhealthy behavioral responses in later years, it is necessary to identify 1) the effects of parental abandonment and 2) the pernicious childhood environment, both psychoactive factors which geometrically increase the morbidity from the prenatal injuries.

*Effects of parental abandonment*

Maternal deprivation refers to both the failure of attachment in the first 2 years of life, as well as the lack of emotional nurturing that a child needs in the next several years of psychological development.  Child abuse and neglect in these early years has a strong deleterious effect on brain development—both in cell proliferation and in the formation of synapses.  Between 24 and 36 months, after a rapid growth in brain cells and connections, one of the notable "pruning" events emerges in which the "states" of coping capacity become more enduring "traits" (Schore, 2002 and others).  Simply and forcefully stated:  cells which fire together wire together.  Therefore, thinking processes, behavioral habits and coping skills which errantly developed will become the backdrop for more advanced cognitive and personality development.  And though the human brain certainly remains flexible for many years, the pruning process insures that there is a reliable pattern of responses to fall back on and will require much attention to alter in future years.  In addition, this same rapid proliferation and cutting back process emerges once again in early adolescence:  what is happening in a child's life is eminently important in the developing years.  When the mothering response is so lacking, the child will not be able to developing critical judgment, relationship, and empathy in the areas of

- ❑   foundation for a stable identity;
- ❑   emotional self-regulation;
- ❑   capacity for empathy;
- ❑   capacity for intimacy and reciprocity;
- ❑   responsible social behavior.

Perhaps the most important loss due to maternal deprivation is the development of

Exhibit 77 - 000013

14

capacity to self-soothe, the prerequisite to emotional and behavioral self-control.  As well, one must be able to comfort oneself—not at the expense of another—in order to experience the empathy and intimacy that, in turn, enables relationships to reciprocally provide a hurting or frightened person with assurance, comfort, and nurturance.  Perhaps the highest level of human experience is the capacity for empathy, and infant mental health and behavioral science is replete with research that point in the direction of self-soothing ability as the cornerstone of empathic response.

Willie White, Julius's paternal uncle, described his memories of Rose's lack of attachment to her children:  "She showed no signs of caring and didn't treat them as if they were kids.  It was as if they were her little brothers and she didn't bear any responsibility for them."

*The effects of child abuse by proxy:  domestic violence*

The first 2+ years of Julius's life were dedicated to coping with his parents' unavailability and severe domestic violence.  Jimmie Lee Robinson states "drugs, alcohol, and violence were the order of the day in our house."  Milton Hollimon, a maternal uncle, stated, "the authorities were getting ready to take the children away from them" due to the extreme violence.  Of course, the provision of such a "safety net"—being placed in foster care—could well have resulted in a completely different outcome both for Julius and for the victims of these later crimes.

Instead both parents were either under the influence, preoccupied with drug-seeking, or engaged in primitive levels of violence.  [Though Julius would leave his parents' care until he returned to live with his mother in his mid-teens, when he did reunite with her, little had changed-she still engaged in abandonment of him, yet the roles had been reversed, Julius becoming the parent to his mother.]

Childhood trauma which replaced the attachment environment Julius should have been receiving finds many routes to produce later pathology, as stated by Cunningham,

frequently taking the form of Posttraumatic Stress Disorder (PTSD), depression, relationship disturbances, personality disorder, and/or antisocial behavior.  Traumatic experience in childhood from abuse or other insults can result in impairments of perception, judgment and behavior; vulnerability to poor role models and negative influences; chronic self-defeating behavior; chronic agitation; poor problem-solving skills; an inability to predict the consequences of one's behavior accurately; an inability to modulate or understand one's emotions; an inability to use emotions as guides for appropriate action; an inability to assign language to emotions; a constant state of internal and external fear; a foreshortened sense of future; chronic self-medication and substance addiction; a fragmented sense of self; an inability to successfully achieve developmental milestones; pervasive low self-esteem; a chronic and inescapable sense of shame and worthlessness; and behavioral misconduct and criminal conduct.  There is evidence that these symptoms and disorders stem from trauma-initiated changes in brain structure and metabolism that can be persistent.  Chronic victimization can also result in survival

Exhibit 77 - 000014

15

responses of attempting to emulate the toughness of those that perpetrated the victimization (i.e. identification with the aggressor).  The legacy of traumatic experience is strongly implicated in Julius's developmental trajectory and outcome (Cunningham, p. 45-46).

Dr. Cunningham documents the strong correlation in social science literature between maternal deprivation, teenage pregnancy, and paternal abandonment with criminal violence and murder.  In fact, these variables are stronger predictors of criminal violence and murder than are poverty and the ills that usually come with it.

*The effects of pervasive lack of parental supervision and household instability*

During his childhood, care of Julius shifted from his parents, to Miss Sarah, to his maternal grandparents, to his paternal grandmother off and on, and to his mother (though, clearly it was Julius who cared for his mother).  As well, when deaths occurred and Rodney White came to town, Julius was, effectively, turned over to the emerging gang in Dermott.  As is seen in so many cases such as Julius's, participation in a gang for a youthful adolescent often presents the first really stable and "protective" environment the child has experienced.

While still a toddler, Julius's parents completely abandoned him and he was sent to live within a constellation of three households, none of which could completely do the job of offering a stable, prosocial, supervised, and nurturing childhood home.  He also patently lacked male role models.  This long-term household instability was the least effective parenting environment possible to meet Julius's neurodevelopmental needs.  Providing the majority of his supervision, his maternal grandmother, Margaret, was illiterate and permissive.  Her daughter, Mildred, said, "I never saw or heard of my parents disciplining the boys."  Jimmie Lee reports that John, Julius's maternal grandfather, was blind and "couldn't really keep on top of things, either." Bernice Johnson, a maternal great aunt, noted that Julius was easily able to play both grandparents against each other.  Though wheelchair-bound, his paternal grandmother, Bertha, was interested in his learning, provided some structure, and was loving to Julius, but was also unable to control the environment.  Her death when Julius was 10 or 11 was a grievous loss.  [As Marcus said, "We lost a really strong person in our lives when she died."]  "Mama Sarah," perhaps the most effective maternal figure in his life, was a loving and helpful parent when she had responsibilities off and on for Julius, though she, too, was permissive (she introduced him to beer when he was 7).  All three of these women had reared both of Julius's parents and were getting older and ill by the time Julius needed them.  When Bertha and Sarah became ill and died, generally around the time Julius was becoming an adolescent, he lost the little structure and source of love that he had experienced in his childhood years.  Bertha was very sick with cancer for two years; Sarah's death was a severe loss to the entire community.  There is no sign that Julius had the opportunity to grieve; indeed, an older cousin, Rodney White and John-John (the California gang planter) arrived to take over when the two caregivers had died.  When children's lives are in such turmoil and instability that they are unable to grieve parental losses, many signs of distress—not the least of them being behavioral disturbances—will emerge and remain.

Exhibit 77 - 000015

16

As Leroy Kennedy, The Delta Youth and Family Services caseworker who checked in on Julius during his 14th year said:

> I remember being concerned that the grandparents' home was somewhat chaotic. They had a revolving door policy, with young people coming and going all the time. Friends and relatives seemed to live there for a few days, then disappear. It was not a stable environment (Dr. Cunningham, p. 53).

*The effects of early onset substance abuse-*

During his growing up years, parental supervision was sorely lacking as evidenced by his heavy use of alcohol by the age of 11 or 12. Indeed, it had been Mama Sarah who had introduced him to beer at the age of 7. He was drinking heavily during his pre-adolescence, another neurodevelopmental marker—a time when cell proliferation and synapse wiring experience another pruning process, resulting in the imprinting of existing damage. At this time, his earlier cognitive, emotional and behavioral deficit traits experienced the infusion of addiction to alcohol. There was already a readiness for alcoholism to manifest at a very early age, and with Julius's history of developmental trauma, alcohol abuse can be conceptualized an as attempt at self-medication of emotional pain, of cognitive processing difficulties, of learning disabilities, and the anxiety and depression that was guaranteed with parental abandonment and the death of his surrogate parents.

Overlaid with impaired attachment, "wired in" traumatic memories, and early onset of alcohol abuse, Julius's teenage development was fraught with risk. From Dr. Cunningham (p. 33),

> Maladaptive behaviors, including criminal activity and violence, may also be the result of sequential emotional damage. In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources . . . Sequential generational neglect is particularly damaging. . . The problematic effects of early abandonment and disrupted primary parental attachment may not be evident until adolescence or early adulthood.

When Julius found his way back to Texas to try living with his mother when he was entering high school, he found his own drinking problem in ironic relationship to the frenzy of drug and alcohol use by his mother. Jamila Camp, Julius's former girlfriend described how Rose was unable to stop with just one drink; she would get "falling down drunk" if Julius didn't stop her. Marcus was amazed that Rose could get up each day and go to work at her nursing home aide job each morning after the drunken binges of the night before. Rose had also become addicted to crack cocaine. One of Julius's run ins with the law occurred when he assaulted Vernon, a crack addict then living with Rose, in a effort to get his mother off crack. Rose used each non-working hour of the day to alter her mood with a steady use of marijuana, alcohol, and crack cocaine. Julius made consistent but ineffective efforts to halt his mother's addiction. It is safe to say that, although Julius didn't seem to express them, his feelings about the state of his

Exhibit 77 - 000016

17

parents—now the only people left as adult models—and the loss of his childhood were likely those of depression and anger.

And, before Julius's incarceration as an adult, he reported that he drank approximately a fifth of cognac per day.

*How the maturational process was compromised*

Adolescence is typically a time of exposed immaturity:  uneven cognitive capability; poor judgment; unreliable impulse control; instability of emotions and their expression; self-centeredness which hinders moral development.  However, in Julius's life, the elements of the "container" for developing maturity were all but completely missing.  The *container* refers both to 1) the internal neurological development that advances the appropriate expression and self-control of emotions and behaviors as well as 2) the external structure of the authoritative environment which monitors, gives feedback, and serves as a corrective mechanism for experiments in adult challenges.  Julius entered his adult-making years without the benefit of either an intact internal or external container.  As Mark Cunningham points out (p. 26), there are two lines of evidence supporting this assertion:

1.  The neuropsychological deficits and learning problems exhibited by Julius point to mild nervous system dysfunction that would serve to reduce the effectiveness of cognitive processes associated with 'maturity.'
2.  The adverse developmental factors in Julius's childhood would act to delay functional emotional maturity.  These are factors associated with disrupted developmental trajectory.

*In essence, Julius had mildly compromised "hardware" with which to negotiate a severely compromised "software program" during a developmental window presenting a major challenge to growing the maturity necessary for adulthood.*

Dr. Cunningham details the science of brain immaturity in adolescence (pp. 24-26).  There are clear neurological reasons for the kinds of immature judgment and behaviors we see in youth and, under conditions of compromised neurology-due to brain damage in utero and/or early brain-damaging abuse of drugs/alcohol-adults who pose criminal problems for society.  The elements of neurological immaturity are many of the very same areas of damage caused by ARND:  functions of "executive functioning" (EF) that emanate from the frontal and pre-frontal cortex of the brain.  In short, when damaged in utero, processes designed to bring an immature brain into mature functioning cannot fulfill that developmental imperative.

From Dr. Cunningham (p. 25):

Executive functions associated with frontal lobe functioning include insight, judgment, impulse control, frustration tolerance, recognition and

Exhibit 77 - 000017

18

appreciation of the emotional reactions of others, and recognition of
consequences.   Significant age-related growth in these capabilities,
conventionally referred to as 'maturing' or 'growing up,'
occurs even between the ages of 18 and 22 in all individuals.  While
the age-related endpoint of adolescence varies by function or role,
neurologically it can be considered to continue through this full
frontal lobe mylenization in the early to mid-twenties.  All individuals
less than 22 years old are thus 'immature' in brain development and
in relation to adults.  This neurological immaturity is reflected in
limitations in psychological functioning and behavior control, and
accounts for the poor decision-making and poor impulse control often
observed in adolescents, even in their late teens.

Compounding the judgment and behavior control problems associated
with frontal lobe immaturity, the adolescent male brain is experiencing
markedly rising levels of testosterone, and subject to the aggression-
inducing effects of this hormone.

*The emergence of corruptive influences and early emancipation*

During this time in Julius's life, without the effective functioning of a healthy brain and a
healthy social environment, he was, nevertheless, exposed to a number of corruptive male
models and influences.  Rodney White and others who shaped his entry into the new gang of
about 30 African American males in Dermott, Arkansas provided the container which had been
abdicated by his parents.  This is usually a process by which the maternal figure—weary of and
critically ineffective in controlling a young male—will unconsciously allow the "informal"
adoption of that child by the neighborhood gang.  It is the only obvious answer to what to do
with a young man who is not ready to be a man but has no alternatives.  He was "beaten in" to
gang membership at the age of 14.  Though Julius, himself, plays it down, Margaret has said he
needed medical care (which she provided at home) for one month.  If nothing else, gang
dynamics must surround the acquisition of drugs and money.

This is where Rose and Jimmie Lee served well as models—they had spent their lives not
only as addicts, but were often *drug traffickers*.  Julius had advance knowledge of how to
manage himself in the drug business.  And certainly, acquiring large amounts of money and the
power and status that accompanies having money provided a structure and guidelines for
survival like none Julius had ever known before.  That these activities inherently involved a
willingness to be violent was an accepted, if unconscious, cost.

*The dynamics of criminal violence within this constellation*

Again, Mark Cunningham (pp. 20-21) ably describes the research that links
neuropsychological deficits—by now the background of all of Julius's functioning—to the
emergence of a lifestyle of violence and criminality.

Exhibit 77 - 000018

19

> There is a growing body of psychological, psychiatric, and
> neurological literature which identifies that brain damage is
> present in disproportionately high incidence among violent
> offenders. . . . evidence of frontal lobe dysfunction in 64%"
> (from a study of persons with murder convictions).

There is obviously much research which chronicles the relationship of substance abuse and dependence to criminality and violence. And, Cunningham aptly explains that it is not necessary to be intoxicated at the moment of the crime to have compromised judgment directly due to the state of addiction (p. 24).

But perhaps one of the most significant elements of cognitive deficits due to brain damage is the perception of threat and the resultant lack of impulse inhibition. It is well documented that young males with this neurological deficit presentation are unable to "read" others' cues accurately. For example, they will have difficulty in making use of peripheral information and will often screen out too much in their perceptions. This produces a lack of planful thought and sound judgment. As well, they will tend to attend selectively to aggressive cues, interpreting ambiguous and benign situations in aggressive ways. When imprecise interpretation of cues—with a bias toward interpretation of threat—is coupled with a rigid response capacity and a predisposition to poor impulse control and frustration tolerance, it is easy to see how violent responses can ensue (Gabardino, 1999; Meloy, 1992; Dutton, 1998 and others). These are brain functioning deficiencies that are commonly observed both in those who have been affected by fetal alcohol syndrome as well as organic brain damage due to alcohol abuse of the child/youth, himself. These are the kinds of impacts as Julius's own prenatal exposure.

*The capacity for conforming behavior legally within a pernicious social environment*

Dermott, Arkansas was not a positive environment for African-American young men in recent years and perhaps in the historical past. The legacy of racial prejudice and discrimination is a toxic element in the lives of these men which is not exactly measurable and is often socially invisible in its effects. Jimmie Lee Robinson eloquently states how a black man perceived his changes in that town. There exists within Julius's many relatives memories and passed along stories of racially-motivated violence, social degradation, and economic hardship. This legacy does not endure without taking a toll on the generations of young males growing up in Dermott.

Dr. Cunningham's lengthy review of the literature-based explanation of community dangers present in Julius Robinson's youth needs not be replicated here. Yet these many pernicious factors, which this defendant found himself facing, presented an overall environmental challenge to his development—again under already challenged conditions—and he failed to adequately negotiate this mine field. These factors are:

Exhibit 77 - 000019

20

- ❑ The consistent threat of racially motivated violence, economic hardship and social desperation which was Dermott's legacy for African-American males like Julius. The intergenerational transmission of post-traumatic stress disorder is a condition we are just beginning to understand in the social science and psychiatric literature.
- ❑ The positive aspects of his extended family could not protect him from the critical influence of his cousin, Rodney White and others brought in to the mix in his early teen years.
- ❑ Gang recruitment and its promises of structure, protection, and movement into manhood—not to mention its ability to offer a way to make a living to young, disenfranchised, unskilled men—was the only path Julius had presented to him at this time in his life when two of his maternal caregivers had died and the role of men in the gang was the substitute for paternal abandonment in his life
- ❑ The life of drugs, criminal theft, drug use and drug dealing was the manner of "higher education" that was offered to Julius.  Simply put, with parents who modeled drug trafficking and no other family members or friends who could model any other lawful route to adulthood, Julius simply did what he was taught.

There is no way to fully account for and measure the combustible combination of this young man who suffered the worst forms of parental neglect and an impoverished moral environment coming into young adulthood with such an overwhelmingly negative and criminal container.

**Conclusion**

The evidence of substance exposure-in-utero at the very beginning of Julius Robinsons's life is clear, as documented by reports of his mother, his father, and other family members and friends.  The three teratogens, amply documented to have affected the pregnancy, are marijuana, cigarettes, and alcohol.  Cocaine may well have also been used.  The literature on behavioral teratology is clear in specifying that of all the substances which can harm the fetus, it is alcohol and cigarettes—especially used in tandem—which are known to cause the most pernicious and overall damaging effects, first in area cognitive functioning and then the derivation to emotional and behavioral functioning

Because the injury to the "hardware" at the beginning of his life rendered him at high risk for injuries to his attach—the process of his psychological birth—his mother's inability to meet his basic needs meant this meaningfully damage affected every other developmental stage necessary to normal child growth.  The moves and changes in caregivers, the ineffectiveness of caregivers, abandonment by both parents, and finally, exposure restricted to the most degraded of social environments for adolescent development were variables which ensured Mr. Robinson would find no other non-criminal passage to adulthood.  The interplay of these forces begun in a prenatal life that went terribly wrong is the most valid explanation of how the crimes for which he has been convicted could occur.

This explanation is also the most compelling route to constructing an effective mitigation argument, had one been presented in his original trial.

Exhibit 77 - 000020

21

# Bibliography

Bookstein, F.L.,  Sampson, P.D.,  Streissguth, A.P.,  & Connor, P.D.   "Geometric morphometrics of corpus callosum and sub-cortical structures in the fetal-alcohol-affected brain," in *Teratology*, 62:4-32; 2001.

Bookstein, F.L.,  Streissguth, A.P.,  Sampson, P.D.,  Connor, P.D.,  &  Barr, H.M. [a.]   "Corpus collosum shape and neurophysiological deficits in adult males with heavy fetal alcohol exposure," in  *NeuroImage*, 15:233-25l;  2002.

Bookstein, F.L.,  Sampson, P.D.,  Connor, P.D.,  &  Streissguth, A.P. [b.] "Midline corpus collosum is a neuroanatomical focus of fetal alcohol damage," in *The Anatomical Record*, 269: 162-174; 2002.

Chasnoff, Ira. *The Nature of Nurture:  Biology, Environment, and the Drug-Exposed Child.* Chicago:  NTI Publishing (childstudy.org),  2001.

Connor, Paul,  Paul Sampson,  Fred Bookstein,  Helen Barr and Ann Streissguth.  "Direct and indirect effects of prenatal alcohol damage on executive function," in *Developmental Neuropsychology,* 18 (3), 331-354.

Dutton, Donald. *The Abusive Personality.*  New York:  Guilford Press, 1998.

Ernst, Monique,  Eric Moolshan,  Miqun Robinson.  "Behavioral and neural consequences of prenatal exposure to nicotine," in *Journal of the American Academy of Child and Adolescent Psychotherapy,* 40:6, June, 2001.

Fried, P. A. and A. M. Smith.  Invited Review:  "A l iterature review of the consequences of prenatal marijuana exposure:  an emerging theme of a deficiency in aspects of executive function," in *Neurotoxicology and Teratology.*  23:1-22, 2001.

Gabardino, James. *Lost Boys:  Why Our Sons Turn Violent and How We Can Save Them.*  New York:  Anchor Books, 1999.

Institute of Medicine.  *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment*, 1996.

James, Beverley. *Handbook for Treatment of Attachment-Trauma Problems in Children.*  New York:  Lexington Books, 1994.

Kopera-Frye,  K.,  Dehaene,  S.,  Streissguth,  A.P.  *Impairments of Number Processing Induced by Prenatal Alcohol Exposure*, 1996.

Exhibit 77 - 000021

22

LeDoux, Joseph. *The Emotional Brain: Why It Can Matter More than IQ.* New York: Simon and Shuster, 1996.

Meloy, J. Reid. *The Psychopathic Mind: Origins, Dynamics, and Treatment.* Northvale, NJ: Jason Aronson Press, 1992.

Olson, H.C., Streissguth, A.P., Sampson, .PD., Barr, H.M., Bookstein, F.L., Thiede, K. "Association of prenatal alcohol exposure with behavioral and learning problems in early adolescence," in *Journal of American Academy of Child and Adolescent Psychiatry,* 36(9):1187-94, 1997.

Sampson, P.D., Streissguth, A.P., Bookstein, F.L., Little, R.E., Clarren, S.K., Dehaene, P., Hanson, J.W., Graham, J.M. "Incidence of fetal alcohol syndrome and prevalence of alcohol-related neurodevelopmental disorder" in *Teratology*, 56(5):317-26 , 1997.

Schore, Allan. "Dysregulation of the right brain: a fundamental mechanism of traumatic attachment and the psychopathogenesis of posttraumatic stress disorder," in *Australian and New Zealand Journal of Psychiatry,* 36:9-20, 2002.

Siegel, Daniel. *The Developing Mind: Toward a Neurobiology of Interpersonal Experience.* New York: Guilford Press, 1999.

Siegel, Daniel and Mary Hartzell. *Parenting from the Inside Out.* New York: Jeremy Tarcher, 2003.

Streissguth A.P., O'Malley K. "Neuropsychiatric implications and long-term consequences of fetal alcohol spectrum disorders" in *Seminar in Clinical Neuropsychiatry,* 5(3):177-90, 2000.

Streissguth, Ann P., Robin LaDue, and Sandra Randels. *A Manual on Adolescents and Adults with Fetal Alcohol Syndrome (with Special Reference to American Indians).* Seattle, WA: University of Washington, Department of Psychiatry and Behavioral Sciences (Indian Health Services Grant), 1988.

Exhibit 77 - 000022

STATE OF TEXAS            )

                                                                              **AFFIDAVIT**

COUNTY OF TARRANT     )


Before me, the undersigned authority, personally appeared **Walter S. Roach** who, after being by me duly sworn, deposed as follows:

My name is **Walter S. Roach**. I am over 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the Records Custodian of the City of Arlington, Texas, Police Department, and as such I am the custodian of records of said Police Department.

Attached hereto are 25 pages of records from the Arlington Police Department. These said 25 pages of records are pertaining to Arlington Police Department report 950019017.

These are kept by the Arlington Police Department in the regular course of business, and it was the regular course of business in the Arlington Police Department for an employee or representative of the Arlington Police Department with knowledge of the act, event, condition, opinion, or diagnosis recorded to make or receive memorandum or record or to transmit information thereof to be included in such memorandum or record; and the memorandum or record was received or made at or near the time of the act, event, condition, opinion, or diagnosis recorded or reasonably soon thereafter.

The record attached hereto is an exact duplicate of the original and it is a rule of the Arlington Police Department to not permit the original to leave the Arlington Police Department.

_____
AFFIANT'S SIGNATURE

SUBSCRIBED AND SWORN TO BEFORE ME BY _WALTER S. ROACH_ ,

on this the _30th_ day of _November_ , _2006_ .

_____
Notary Public in and for
The State of Texas

(notary seal)

JOYCE A. MANSHIP
Notary Public
STATE OF TEXAS
My Comm. Exp. 08/14/2009

**OR**

_____
Officer's Signature

_____
Printed Rank, Name and ID #

*Authorized to administer oaths by Texas Government Code Sec. 602.002*


Exhibit 78 - 000001

02/14/95                    ARLINGTON POLICE DEPARTMENT                    18:11

                              ARREST REPORT

            PIN #:        0151484

            CALL #:       950019017

        DEFENDANT:  ROBINSON JULIUS O

Exhibit 78 - 000002

ADULT ARREST REPORT

ARREST #: 0151484                          CALL SHEET:  950019017
RELATED OFFENSE #: _____                P.C. REVIEW : 00690

MUGSHOT: X  FINGERPRINT: X                     IL REVIEW BY ID #: _____

DEFENDANT: ROBINSON         JULIUS          O ___
           LAST NAME       FIRST NAME      MI  SUFFIX

RACE: BLACK      (NEG SEX: M  DATE OF BIRTH: 08/08/76   CLASS: MG1
************************************************************************
************************************************************************
************************************************************************

PHYSICAL DESCRIPTORS

HEIGHT: 6'00  WEIGHT: 175  FACIAL HAIR: NONE          GLASSES: N
 HAIR: BLACK              EYES: BROWN

LAST FINGERPRINT DATE: 02/08/95  LAST MUG SHOT DATE: 02/08/95

SCARS/MARKS/TATOOS:

BODY PART        DESCRIPTION

*** NO SCARS/MARKS/TATOOS ON FILE ***

CLOTHING REMARKS:

BLUE PANTS/BLK TEE SHIRT/BLK/WHI TENNIS SHOES

VISIBLE INJURY:

*** NO REMARKS ON FILE ***

INJURY OCCURED: _____
************************************************************************
************************************************************************
************************************************************************

PERSON BIOGRAPHICAL

POB CITY/STATE: FAYETVILLE              NC  CITIZEN: Y JAILER ID: 01477

Exhibit 78 - 000003

```
RES ADDR: 1413 N COOPER CI                   PHONE: _____
   APT #: A
     CITY: ARL                   STATE: TX  ZIP: 76011 ____


BUS NAME: VENTURES
 BUS ADDR: _____ PHONE: 817-460-5115
  SUITE #: _____
     CITY: _____ STATE: __ ZIP: _____ ____
OCCUPATION: ATTENDANT


DRIVERS LICENSE: ███████    STATE: TX  YEAR: 1996  SSN: ███████
MARITAL STATUS : SINGLE          RELIGIOUS PREFERENCE: NO PREFERENCE
MISCELLANEOUS  : _____


ALIAS                              ALIAS BIRTHDAY


*** NO ALIASES ON FILE ***
*******************************************************************
*******************************************************************
*******************************************************************


                 FRIEND/RELATIVE/EMERGENCY CONTACT



FRIEND
  NAME: ORAL HOLMES                    PHONE: 817 460-3932
  ADDRESS: _____ SUITE: _____
  CITY: _____ STATE: __ ZIP: 00000-00000
*******************************************************************
*******************************************************************
*******************************************************************


                     BOOKING REMARKS


 PHONE CALL STATUS: Y   DATE: 02/08/95   TIME: 0001453


*** NO BOOKING REMARKS FOUND ***
*******************************************************************
*******************************************************************
*******************************************************************


                  CHARGES/ARRAIGNMENT


-------------------------------------------------------------------
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A77349      AGENCY: ARL
```

Exhibit 78 - 000004

CHARGE AMOUNT:          110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102513
DISP. ID  :          01227
DOLLARS RECEIVED:              0.00
RECEIPT NUMBER       ------
CREDIT EARNED:               110.00
BOND AMOUNT:                   0.00
SURETY:
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

----------------------------------------------------------------------

VIOL/PENAL DESC: FAIL TO MAINTAIN FINANCIAL RESPONSIBILIT
TICKET/WARRANT: 090627      AGENCY: ARL
CHARGE AMOUNT:          340.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102517
DISP. ID  :          01227
DOLLARS RECEIVED:              0.00
RECEIPT NUMBER       ------
CREDIT EARNED:               340.00
BOND AMOUNT:                   0.00
SURETY:
SUPERVISOR ID:       09059                    ** VOIDED CHARGE **
COURT DATE:          02/09/95
COURT-TIME:          00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

DISP. TYPE:          TS
DISP. DATE:          02/10/95
DISP. TIME:          001905
DISP. ID  :          09070
DOLLARS RECEIVED:              0.00
RECEIPT NUMBER       ------
CREDIT EARNED:               340.00

Exhibit 78 - 000005

```
BOND AMOUNT:                    0.00
SURETY:              _____
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000
```

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

----------------------------------------------------------------

```
VIOL/PENAL DESC: NO VALID INSPECTION CERTIFICATE
TICKET/WARRANT: 076632       AGENCY: ARL
CHARGE AMOUNT:        105.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000
```

DISPOSITIONS:

```
DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102523
DISP. ID  :          01227
DOLLARS RECEIVED:             0.00
RECEIPT NUMBER       _____
CREDIT EARNED:              105.00
BOND AMOUNT:                 0.00
SURETY:              _____
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000
```

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

----------------------------------------------------------------

```
VIOL/PENAL DESC: REGISTRATION VIOLATION-CAR OR TRUCK
TICKET/WARRANT: 076631       AGENCY: ARL
CHARGE AMOUNT:        105.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000
```

DISPOSITIONS:

```
DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102529
DISP. ID  :          01227
DOLLARS RECEIVED:             0.00
RECEIPT NUMBER       _____
CREDIT EARNED:              105.00
BOND AMOUNT:                 0.00
SURETY:              _____
SUPERVISOR ID:       00000
```

Exhibit 78 - 000006

```
COURT DATE:          02/09/95
COURT-TIME:          00000                    1

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

----------------------------------------------------------------------------
VIOL/PENAL DESC: FAIL TO MAINTAIN FINANCIAL RESPONSIBILIT
TICKET/WARRANT: 076630      AGENCY: ARL
CHARGE AMOUNT:          340.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

   DISPOSITIONS:

   DISP. TYPE:          TS
   DISP. DATE:          02/09/95      1
   DISP. TIME:          102536
   DISP. ID  :          01227
   DOLLARS RECEIVED:          0.00     1
   RECEIPT NUMBER       _____
   CREDIT EARNED:            340.00
   BOND AMOUNT:               0.00
   SURETY:              _____
   SUPERVISOR ID:       09059                    ** VOIDED CHARGE **
   COURT DATE:          02/09/95
   COURT-TIME:          00000

   REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

   DISP. TYPE:          TS
   DISP. DATE:          02/10/95      1
   DISP. TIME:          001914
   DISP. ID  :          09070
   DOLLARS RECEIVED:          0.00     1
   RECEIPT NUMBER       _____
   CREDIT EARNED:            340.00
   BOND AMOUNT:               0.00
   SURETY:              _____
   SUPERVISOR ID:       00009
   COURT DATE:          02/09/95
   COURT-TIME:          00000

   REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

----------------------------------------------------------------------------
```

Exhibit 78 - 000007

VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73700        AGENCY: ARL
CHARGE AMOUNT:          110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


    DISPOSITIO

    DISP. TYPE:          TS
    DISP. DATE:          02/09/95      1
    DISP. TIME:          102540
    DISP. ID :           01227
    DOLLARS RECEIVED:           0.00
    RECEIPT NUMBER       ------
    CREDIT EARNED:              110.00
    BOND AMOUNT:                  0.00
    SURETY:              -----------------------------------------
    SUPERVISOR ID:       00000
    COURT DATE:          02/09/95
    COURT-TIME:          00000


    REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

------------------------------------------------------------------------

VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73699        AGENCY: ARL
CHARGE AMOUNT:          110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


    DISPOSITIONS:

    DISP. TYPE:          TS
    DISP. DATE:          02/09/95
    DISP. TIME:          102544
    DISP. ID :           01227
    DOLLARS RECEIVED:           0.00
    RECEIPT NUMBER       ------
    CREDIT EARNED:              110.00
    BOND AMOUNT:                 0.00
    SURETY:              -----------------------------------------
    SUPERVISOR ID:       00000
    COURT DATE:          02/09/95
    COURT-TIME:          00000


    REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

------------------------------------------------------------------------

VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73698        AGENCY: ARL
CHARGE AMOUNT:          110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

Exhibit 78 - 000008

DISPOSITIONS:

DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102551
DISP. ID:            01227
DOLLARS RECEIVED:              0.00
RECEIPT NUMBER       ------
CREDIT EARNED:              110.00
BOND AMOUNT:                 0.00
SURETY:              ----------------------------------
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

----------------------------------------------------------------
VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73697      AGENCY: ARL
CHARGE AMOUNT:        110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102555
DISP. ID:            01227
DOLLARS RECEIVED:              0.00
RECEIPT NUMBER       ------
CREDIT EARNED:              110.00
BOND AMOUNT:                 0.00
SURETY:              ----------------------------------
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

----------------------------------------------------------------
VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73696      AGENCY: ARL
CHARGE AMOUNT:        110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

Exhibit 78 - 000009

```
DISP. TYPE:            TS
DISP. DATE:            02/09/95
DISP. TIME:            102559
DISP. ID :             01227
DOLLARS RECEIVED:              0.00
RECEIPT NUMBER         ------
CREDIT EARNED:              110.00
BOND AMOUNT:               0.00
SURETY:                ------------------------------------
SUPERVISOR ID:         00000
COURT DATE:            02/09/95
COURT-TIME:            00000
```

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

-----------------------------------------------------------------------

VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73695      AGENCY: ARL
CHARGE AMOUNT:         110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

```
DISP. TYPE:            TS
DISP. DATE:            02/09/95
DISP. TIME:            102604
DISP. ID :             01227
DOLLARS RECEIVED:              0.00
RECEIPT NUMBER         ------
CREDIT EARNED:              110.00
BOND AMOUNT:               0.00
SURETY:                ------------------------------------
SUPERVISOR ID:         00000
COURT DATE:            02/09/95
COURT-TIME:            00000
```

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

-----------------------------------------------------------------------

VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A72487      AGENCY: ARL
CHARGE AMOUNT:         110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

```
DISP. TYPE:            TS
DISP. DATE:            02/09/95
```

Exhibit 78 - 000010

```
DISP. TIME:            102610
DISP. ID   :           01227
DOLLARS RECEIVED:             0.00      1
RECEIPT NUMBER         ------
CREDIT EARNED:                110.00
BOND AMOUNT:                  0.00
SURETY:                ------------------------------------------
SUPERVISOR ID:         00000
COURT DATE:            02/09/95
COURT-TIME:            00000


REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

---

```
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A68444      AGENCY: ARL
CHARGE AMOUNT:         110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:            TS
DISP. DATE:            02/09/95
DISP. TIME:            102643
DISP. ID   :           01227
DOLLARS RECEIVED:             0.00      1
RECEIPT NUMBER         ------
CREDIT EARNED:                110.00
BOND AMOUNT:                  0.00
SURETY:                ------------------------------------------
SUPERVISOR ID:         00000
COURT DATE:            02/09/95
COURT-TIME:            00000


REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

---

```
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A68443      AGENCY: ARL
CHARGE AMOUNT:         110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:            TS
DISP. DATE:            02/09/95
DISP. TIME:            102657
DISP. ID   :           01227
DOLLARS RECEIVED:             0.00      1
```

Exhibit 78 - 000011

```
RECEIPT NUMBER       -------
CREDIT EARNED:            110.00
BOND AMOUNT:               0.00
SURETY:              ------------------------------------
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000


REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


------------------------------------------------------------------
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A68442      AGENCY: ARL
CHARGE AMOUNT:          110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102703
DISP. ID :           01227
DOLLARS RECEIVED:         0.00
RECEIPT NUMBER       -------
CREDIT EARNED:           110.00
BOND AMOUNT:              0.00
SURETY:              ------------------------------------
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000


REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


------------------------------------------------------------------
VIOL/PENAL DESC: REGISTRATION VIOLATION-CAR OR TRUCK
TICKET/WARRANT: 090629      AGENCY: ARL
CHARGE AMOUNT:          105.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102748
DISP. ID :           01227
DOLLARS RECEIVED:         0.00
RECEIPT NUMBER       -------
CREDIT EARNED:           105.00
BOND AMOUNT:             0.00
```

Exhibit 78 - 000012

```
SURETY:                  --------------------------------
SUPERVISOR ID:           00000
COURT DATE:              02/09/95
COURT-TIME:              00000


REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

-----------------------------------------------------------------------

```
VIOL/PENAL DESC: NO VALID INSPECTION CERTIFICATE
TICKET/WARRANT: 090628      AGENCY: ARL
CHARGE AMOUNT:        105.00   PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:              TS
DISP. DATE:             02/09/95
DISP. TIME:             102754
DISP. ID :              01227
DOLLARS RECEIVED:                0.00
RECEIPT NUMBER          ------
CREDIT EARNED:                 105.00
BOND AMOUNT:                     0.00
SURETY:                 --------------------------------
SUPERVISOR ID:          00000
COURT DATE:             02/09/95
COURT-TIME:             00000


REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

-----------------------------------------------------------------------

```
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A77348      AGENCY: ARL
CHARGE AMOUNT:        110.00   PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:             TS
DISP. DATE:             02/09/95
DISP. TIME:             102801
DISP. ID :              01227
DOLLARS RECEIVED:                0.00
RECEIPT NUMBER          ------
CREDIT EARNED:                 110.00
BOND AMOUNT:                     0.00
SURETY:                 --------------------------------
SUPERVISOR ID:          00000
COURT DATE:             02/09/95
```

Exhibit 78 - 000013

```
COURT-TIME:            00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

-------------------------------------------------------------------

VIOL/PENAL DESC: CRIMINAL ATTEMPT - MURDER
TICKET/WARRANT: _____ AGENCY: ARL
CHARGE AMOUNT:    500,000.00  PLEA: N ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

DISP. TYPE:         TCSO J
DISP. DATE:         02/14/95
DISP. TIME:         090909
DISP. ID :          09064
DOLLARS RECEIVED:          0.00
RECEIPT NUMBER      _____
CREDIT EARNED:             0.00
BOND AMOUNT:               0.00
SURETY:             _____
SUPERVISOR ID:      00000
COURT DATE:         _____
COURT-TIME:         00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


*********************************************************************
*********************************************************************
*********************************************************************


                    BOOKIN-IN/OUT INFORMATION


BOOK-IN DATE : 02/08/95  TIME: 01410  CELL: A06  JAILER: 01477
BOOK-OUT DATE: 02/14/95  TIME: 00913  JAILER: 01055  PROB REVKD: _


PROPERTY BIN : 007  DRAWER: 045


ARRESTING OFFICER: 01157  DATE: 02/08/95  TIME: 01320
PROBABLE CAUSE ID: 00690  CONT SHEETS: 00001  EVIDENCE REPORT: N
OFFENSE/PROPERTY RPT: N   PULL CARD: N  FI CARD: N  PREMISE: 1

*** NO ASSISTING OFFICERS ON FILE ***
```

Exhibit 78 - 000014

ADDRESS OF ARREST:

1400 W LAMAR BL                              SUITE: _____
CITY: AR                           STATE: TX _____-____


ADDRESS OF OFFENSE:

1400 W LAMAR BL                              SUITE: _____
CITY: AR                            STATE: TX _____-____


RELATED OFFENSE:
    AGENCY HOLDS
    PC WARRANTS

*** NO AGENCIES ON FILE ***
************************************************************************************
************************************************************************************
************************************************************************************


ARREST REMARKS


    ON 02-08-95 AT APPROXIMATELY 1300HRS, I OFFICER L JONES ID 1157,
ASSIGNED TO THE SCHOOL SERVICES DIVISION, WAS CONTACTED BY DETECTIVE
J STANTON ID 0743 REGARDING THE LISTED ARRESTEE, JULIUS ROBINSON.
DETECTIVE STANTON ADVISED THAT MR ROBINSON HAD APPROXIMATELY 18
OUTSTANDING TRAFFIC WARRANTS AND REQUESTED THAT I ARREST ROBINSON AND
BRING HIM TO JAIL.
    I CONTACTED MR GREG YOUNG, THE ASSISTANT PRINCIPAL AT LAMAR HIGH
SCHOOL. MR YOUNG TOOK ME TO ROBINSON'S CLASS. THERE I CONTACTED HIM
AND PLACED HIM UNDER ARREST FOR THE OUTSTANDING WARRANTS. I HANDCUFFED
ROBINSON PURSUANT TO DEPARTMENT POLICY AND DOUBLE LOCKED THE HANDCUFFS.
ROBINSON RELEASED HIS SCHOOL BOOKS TO MR YOUNG.
    THE FOLLOWING TRAFFIC WARRANTS WERE CONFIRMED: #077349, #090627,
#076632, #076631, #076630, #A73700, #A73699, #A73698, #A73697, #A73696,
#A73695, #A72487, #A68444, #A68443, #A68442, #090629, #090628, AND
#A77348. ALL 17 WARRANTS WERE CONFIRMED. THE SUBJECT WAS PROCESSED
IN AND RELEASED TO THE JAILERS.
    I NOTIFIED DETECTIVE STANTON THAT THE SUBJECT WAS NOW IN THE
ARLINGTON JAIL.
    NO FURTHER. NORTH##    JD  1424  02-08-95  1620HRS
************************************************************************************
************************************************************************************
************************************************************************************

Exhibit 78 - 000015

```
              A R L I N G T O N   P O L I C E   D E P A R T M E N T

 OFFICER NO. 1476              OFFENSE REPORT              CASE NO. 950018762
 OFFICER NAME                  CRIMINAL ATTEMPT - MURDER        VICTIM 001 OF 001
 JORJANI, NICKOLAS A.          LAKE O WOODS APARTMENTS              PAGE 0001
-------------------------------------------------------------------------------
 OFFENSE OCCURRED AT:               DATE OF OFFENSE: 02/07/95 TO
 2401 SPILLWAY LN
                                    TIME OF OFFENSE: 21:05     TO
-------------------------------------------------------------------------------
 VICTIM NAME                   RACE   SEX    DOB       OCCUPATION
 TUCKER, SARA M.                W      F    02/07/76
                               ------------------------------------------------
 VICTIM ADDRESS                     BUSINESS NAME AND ADDRESS
 1375 E JUAN PENICLE CIR
 APARTMENT 523
 EULESS, TX 76040                   WORK HOURS        TO
 VICTIM HOME PHONE                  VICTIM BUSINESS PHONE
 (000) 267-8999                     (000) 000-0000 EXT 0000
-------------------------------------------------------------------------------
 BRIEF NARRATIVE: KNOWN SUSPECT KNOWINGLY FIRED A WEAPON AT THE VICTIM WITH
 THE INTENT TO CAUSE HER DEATH.



-------------------------------------------------------------------------------
                              ** PROPERTY **
  ,9 SEIZED NO BRAND AMMUNITION
 SERIAL:                       OAN:
 DESCRIPTION:  9 MM SHELL CASINGS
                                                    VALUE:          $0

  1 DAMAGED,
 BLUE OVER GRAY FORD TRUCK PICKUP
 LICENSE: TX 8052WM     EXP: 00 TRUCK LICENSE PLATE
 VIN:
 DESCRIPTION: FORD RANGER PICKUP TRUCK
                                                    $          0
-------------------------------------------------------------------------------
 CRIME SCENE CALLED- YES    PROSECUTE- Y    DISP- ACTIVE
-------------------------------------------------------------------------------
```

Exhibit 78 - 000016

```
A R L I N G T O N   P O L I C E   D E P A R T M E N T
```

| OFFICER NO. 1476 | OFFENSE REPORT | CASE NO. 950018762 |
|---|---|---|
| OFFICER NAME, | CRIMINAL ATTEMPT - MURDER | VICTIM 001 OF 001 |
| JORJANI, NICKOLAS A. | LAKE O WOODS APARTMENTS | PAGE 0002 |

```
REPORTEES NAME                    RACE   SEX    DOB      RELATIONSHIP
                                             00/00/00   NO RELATION

                ID SUSPECT   FORGERY AFFIDAVIT   ACCT.HOLDER CONTACT
                    N               N                    N

REPORTEE ADDRESS                  BUSINESS NAME AND ADDRESS
2401 SPILLWAY LN
APARTMENT 907
ARL, TX 00000
HOME PHONE: (000) 000-0000        BUS. PHONE: (000) 000-0000 EXT 0000

WITNESS NAME                      RACE   SEX    DOB      RELATIONSHIP
BECKHAM, TIM L.                    W      M    12/26/51   NO RELATION

                ID SUSPECT   FORGERY AFFIDAVIT   ACCT.HOLDER CONTACT
                    N               N                    N

WITNESS ADDRESS                   BUSINESS NAME AND ADDRESS
2318 STREAMBED CT.
APARTMENT 101
ARL, TX 00000
HOME PHONE: (000) 633-7448        BUS. PHONE: (214) 315-0020 EXT 0000

SUSPECT NAME                      RACE   SEX    DOB      OCCUPATION
JULIUS                             B      M    00/00/77   STUDENT

              ID CODE/DESCRIPTION              ID CODE/DESCRIPTION
                    0                                0

SUSPECT ADDRESS          DESC. BLACK MALE 5FT. 08", WEIGHT IS 175 LBS.,
ADDRESS IS UNKNOWN.            EYE COLOR IS UNKNOWN, BLACK HAIR
                              PARTS OF THE BODY / DESCRIPTION
                              FACE / SCAR




                         CLOTHING: ALSO KNOWN AS 'SCARFACE', APTS ON SE COO
                                   PER AND RD TO 6 FLAG

SUSPECT HOME PHONE               SUSPECT BUSINESS PHONE
(000) 828-4042      ARRESTED- NO

*** SUSPECT VEHICLE      ***
80 BROWN OVER BROWN DATSUN B-210 SEDAN, 2D(SIDE WINDOW FRAME)
LICENSE:                 EXP:    LICENSE:
DESCRIPTION:  80'S MODEL, POSSIBLY A B210


                            **EVIDENCE**
```

Exhibit 78 - 000017

ARLINGTON   POLICE   DEPARTMENT

OFFICER NO. 1476                          OFFENSE REPORT                    CASE NO. 950018762
OFFICER NAME                       CRIMINAL ATTEMPT - MURDER            VICTIM 001 OF 001
JORJANI, NICKOLAS A.                LAKE O WOODS APARTMENTS                     PAGE 0003
---------------------------------------------------------------------------------------
  PREMISE CODE:                                        POINT OF ENTRY
  APT/TOWNHOUSE/CONDO                                  NOT APPLICABLE
  METHOD OF ENTRY                                      TOOL OR WEAPON.
  NOT APPLICABLE                                       PISTOL

  SUSPECT ACTIONS
  KNEW/DATED VICTIM
  SHOT/DRUGGED VICTIM

---------------------------------------------------------------------------------------

   OFFICER NARRATIVE...........# 01
ON TUESDAY   , FEB  07, 1995 AT 2108 HOURS.: N. JORJANI            , ID 1476,
AND OFFICER D GLENN, ID 1348, WERE DISPATCHED TO 2401 SPILLWAY LN #902.  UPON
ARRIVAL, I MET WITH OFFICER GLENN, WHO HAD ARRIVED ON SCENE A FEW MINUTES PRIOR
THAN I.  OFFICER GLENN WAS SPEAKING TO A LARGE GROUP OF PEOPLE WHO WERE
GATHERED OUT IN THE PARKING LOT AND WAS GETTING STATEMENTS FROM THEM.  I
APPROACHED OFFICER GLENN AND AFTER SPEAKING WITH HIM, WAS INFORMED THE SHOOTING
HAD TAKEN PLACE RIGHT THERE, WHICH WAS THE APARTMENT COMPLEX PARKING LOT,
DIRECTLY SOUTH OF APTS 902, 904, 905, AND 901, ALL OF WHICH ARE AT 2401
SPILLWAY LN.  AFTER MAKING SURE THAT NOBODY WAS HURT, DOING SO BY CHECKING EACH
APARTMENT IN WHICH THE FIRE OF THE HANDGUN SEEMED TO BE DIRECTED IN, OFFICER
GLENN AND I COMMENCED TO SECURE THE CRIME SCENE.  THIS CONSISTED OF
PROTECTING THE 9 SHELL CASINGS WHICH WE HAD FOUND IN THE PARKING LOT DIRECTLY
SOUTH OF 2401, AND RIGHT NEXT TO THE VEHICLES PARKED IN FRONT OF THAT BUILDING.
   AFTER SECURING THE CRIME SCENE, I CONTACTED CRIME SCENE TO COME OUT TO THE
LOCATION FOR FURTHER INVESTIGATION AND DOCUMENTATION OF EVIDENCE.  FROM THE
LOOKS OF THE CRIME SCENE, IT WAS OBVIOUS THAT THE INTENDED TARGET WAS A BLUE
AND SILVER FORD RANGER PICKUP, LICENSE PLATE ████████.  ALSO, THERE SEEMED TO
HAVE BEEN SHOTS FIRED DIRECTLY IN FRONT OF APT 902.  OFFICERS WERE SPEAKING TO
WITNESSES, BUT ONE HAD ONLY HEARD THE SHOTS AND HAD NOT SEEN THE VEHICLE OR ANY
OF THE SUSPECTS.  THE CONSENSUS BETWEEN THE WITNESSES WERE THERE WERE 7-10
SHOTS FIRED.  A VOLLEY OF 4-6 SHOTS WITH A SHORT PERIOD IN BETWEEN, THEN
ANOTHER VOLLEY OF 3-4 SHOTS FIRED.
   ONE WITNESS DID NOTICE A BROWN OLDER MODEL COMPACT ECONOMY TYPE CAR,
LEAVING THE SCENE ALMOST IMMEDIATELY AFTER THE SHOTS WERE FIRED IN FRONT OF
THOSE APARTMENTS.  THE WITNESS WAS TIM BECKHAM, W/M, 12/26/51, WHO LIVED
DIRECTLY ACROSS THE PARKING LOT, SOUTH OF THE RESIDENCE AND THE TRUCK WHICH
WAS FIRED UPON.  I FOUND WHO THE DRIVER OF THE TRUCK WAS.  THE DRIVER OF THE
TRUCK WAS A W/F, WHO WAS LATER IDENTIFIED AS SARA ANN TUCKER, W/F, 2/7/76.
I ASKED SARA TUCKER WHAT HAD TAKEN PLACE, AND TUCKER STATED SHE HAD NO IDEA
WHAT HAD HAPPENED.  TUCKER DID SAY THAT WAS HER TRUCK THAT WAS HIT BY THE
BULLETS; THE APARTMENT THAT WAS HIT WAS HER PARENT'S APARTMENT, AND SHE HAD
BEEN WAITING IN APT 904 FOR HER MOTHER TO ARRIVE.  THEY WERE SUPPOSED TO MEET

Exhibit 78 - 000018

ARLINGTON  POLICE  DEPARTMENT

OFFICER NO. 1476                    OFFENSE REPORT                    CASE NO. 950018762
OFFICER NAME                  CRIMINAL ATTEMPT - MURDER           VICTIM 001 OF 001
JORJANI, NICKOLAS A.          LAKE O WOODS APARTMENTS                     PAGE 0004
-----------------------------------------------------------------------------

OFFICER NARRATIVE........# 01
EACH OTHER.

OFFICER GLENN ALSO WALKED UP TO SARA TUCKER IN MY PRESENCE, AND ASKED HER IF SHE KNEW WHAT WAS GOING ON, IF SHE KNEW OF ANYBODY THAT MIGHT BE MAD AT HER, OR MIGHT CONSIDER HER AN ENEMY THAT MIGHT WANT TO HURT HER. TUCKER QUICKLY STATED THAT SHE HAD NO ENEMIES. THIS WAS HER PARENT'S HOUSE, AND HER FATHER HAS AN IDENTICAL TRUCK TO HERS, YET SHE DID NOT KNOW OF ANYBODY THAT WOULD BE HER FATHER'S ENEMY EITHER. AFTER A FEW MOMENTS OF SPEAKING WITH SARA TUCKER, HER MOTHER, OZLA ANN TUCKER, W/F, 3/7/52, ARRIVED ON SCENE AND APPROACHED THE OFFICERS AND HER DAUGHTER, SARA TUCKER. OZLA TUCKER WAS SLIGHTLY HYSTERICAL, AND WHEN SHE ARRIVED SHE WAS YELLING, MUMBLING, AND BASICALLY IN A PANICKY STATE. I DID NOTICE THAT SHE WAS STATING, "WHAT IS IT THIS TIME... WHAT HAVE YOU DONE NOW." AT THAT POINT MRS OZLA TUCKER ALLOWED US TO GO INTO HER RESIDENCE, IN ORDER TO SEE IF THERE HAD BEEN ANY DAMAGE INSIDE THE RESIDENCE. BEFORE GOING IN, I OBSERVED WHAT SEEMED TO BE 5 OR 6 ROUNDS THAT HAD HIT THE FORD PICKUP TRUCK. THERE WERE 2 ROUNDS FIRED TOWARDS THE REAR RIGHT QUARTER PANEL AND THE RIGHT MID-SECTION OF THE TRUCK, AND THERE WAS ONE SHOT THAT FIRED THROUGH THE TAILGATE, WHICH PENETRATED THE TAILGATE, AND WENT ALL THE WAY THROUGH HITTING THE BACK PART OF THE CAB DIRECTLY BEHIND THE PASSENGER SIDE SEAT. ANOTHER ROUND HIT THE FRONT LEFT TIRE, CAUSING IT TO GO FLAT. THERE WAS ALSO ANOTHER ROUND DIRECTLY IN FRONT OF THE TRUCK IN THE WALL OF APT 904. THERE WERE 3 OTHER ROUNDS THAT WERE FOUND TO HAVE PENETRATED AT THE POINTS OF APT 902, WHICH WAS THE TUCKER'S RESIDENCE BEDROOM WINDOW, AS WELL AS THE WALL THAT FACED THE LIVING ROOM.

AFTER BEING ALLOWED TO ENTER THE TUCKER RESIDENCE, I NOTICED THAT MS TUCKER WAS CONTINUOUSLY ASKING SARA TUCKER, "WHO WAS IT THIS TIME. WHAT DO YOU KNOW ABOUT THIS. WHAT HAVE YOU GOT US INTO THIS TIME", AND THAT TYPE QUESTIONING ON AND ON. I SEPARATED SARA TUCKER FROM HER MOTHER AND SPOKE WITH SARA WHILE OFFICER GLENN TOOK THE MOTHER'S STATEMENT. AS I SPOKE TO SARA TUCKER, SHE SEEMED TO BE CHANGING HER STORY AND HINTING IN A WAY THAT SHE KNEW WHO THE SUSPECT WAS THAT HAD FIRED UPON HER WAS. THIS WAS DONE BY HER STATEMENT OF, "THERE'S NOTHING YOU GUYS CAN REALLY DO ABOUT WHO DID THIS, THESE GUYS KNOW WHAT THEY'RE DOING AND THEY'RE SERIOUS. YOU GUYS CANNOT PROTECT ME." I WAS CONTINUING TO SPEAK WITH SARA TUCKER WHEN HER MOTHER ENTERED THE BEDROOM WHERE WE WERE SPEAKING, AND WALKED TOWARDS THE ANSWERING MACHINE AND TURNED IT ON. ON THE ANSWERING MACHINE, THERE WAS A MESSAGE FROM SARA TUCKER'S EX-BOYFRIEND, TIM J TAYLOR, W/M, 3/1/69 OF RICHARDSON, TEXAS, PHONE NUMBER OF 214-234-1722. HE IS A MANAGER AT JACKSON PADRE IN DALLAS. THE PHONE NUMBER THERE IS 214-350-9200. THE MESSAGE ON THE ANSWERING MACHINE SAID, "THIS MESSAGE IS FOR SARA. SARA, I'M GLAD THAT YOU AND YOUR FAMILY ARE OUT OF MY LIFE. YOU'RE ALL CRAZY. I DON'T EVER WANT TO SEE YOU AGAIN, AND I HOPE THAT YOU ALL GO TO HELL."

I ASKED SARA WHAT THAT STATEMENT WAS ALL ABOUT. ONCE AGAIN, SARA STARTED TO BE UNCOOPERATIVE BY NOT ANSWERING ANY OF THE OFFICERS QUESTIONS. AT THIS TIME HER MOTHER INTERFERRED BY STATING TO THE OFFICERS THIS WAS HER BOYFRIEND WHO WAS HATEFUL AND HAD THREATENED THEIR FAMILY BEFORE. HE HAD KNOWN SARA FOR APPROX A YEAR, AND SINCE THEIR BREAKUP, HAD BEEN MAKING HARASSING PHONE CALLS TO THE SAME EFFECT OF THIS MESSAGE ON THE ANSWERING MACHINE FOR A COUPLE OF WEEKS NOW. ONCE AGAIN, SARA AND HER MOTHER WERE SEPARATED, AND I CONTINUED

Exhibit 78 - 000019

ARLINGTON   POLICE   DEPARTMENT

| OFFICER NO. 1476 | OFFENSE REPORT | CASE NO. 950018762 |
|---|---|---|
| OFFICER NAME | CRIMINAL ATTEMPT - MURDER | VICTIM 001 OF 001 |
| JORJANI, NICKOLAS A. | LAKE O WOODS APARTMENTS | PAGE 0005 |

------------------------------------------------------------------------

OFFICER NARRATIVE........ 01
QUESTIONING SARAH, REFERENCE THIS PRESENT SITUATION.

SARA AT THIS TIME ADMITTED THAT SHE HAD BEEN HAVING PROBLEMS WITH HER BOYFRIEND, AND THE PROBLEM BEGAN FROM THE FACT THAT SHE HAD BECOME PREGNANT IN EARLY JANUARY AND HAD DECIDED TO HAVE AN ABORTION. HER BOYFRIEND, TAYLOR, HAD DISAGREED WITH THE ABORTION, WANTED TO MARRY HER, AND SHE REFUSED TO MARRY HIM. AT THIS POINT, TAYLOR HAD BECOME ANGRY WITH HER AND WANTED TO PUSH HER INTO A MARRIAGE OR SOME TYPE OF FURTHER RELATIONSHIP, AND SARA HAD DECIDED TO CUT IT OFF TOTALLY BETWEEN THEM. SHE STARTED REFUSING TO ANSWER HIS CALLS OR HAVE ANY THING TO DO WITH HIM, WHICH RESULTED IN HIS CONTINUOUS PHONE CALLS TO HER APARTMENT, AS WELL AS HER PARENT'S APARTMENT. AT THIS TIME I INFORMED SARA THAT HER CHANCES WERE GOOD THAT HER BOYFRIEND TAYLOR WOULD BE OUR PRIMARY SUSPECT IN THIS SHOOTING, CONSIDERING THE TONE OF THE THREAT, AS WELL AS THE TIMING OF THE MESSAGE ON THE ANSWERING MACHINE AND THE SHOOTING. SARA IMMEDIATELY BECAME DEFENSIVE AND WAS STATING THAT HER BOYFRIEND TAYLOR HAD NOTHING TO DO WITH THE SHOOTING, AND SHE KNEW THIS AS A FACT.

AT THIS POINT, I REALIZED SARA DID KNOW WHO DID THE SHOOTING. FROM THAT POINT ON, I DIRECTED THE QUESTIONING IN THAT DIRECTION. AFTER CLOSE TO 2 HOURS OF CONTINUOUS QUESTIONING OF SARA, THROUGH MUCH OF WHICH SARA REFUSED TO ANSWERED. AT SOME POINT SHE STATED THAT SHE WAS NOT WILLING TO PRESS CHARGES, AND IN FACT THAT SHE HAD NEVER MADE A PHONE CALL TO 911, AND HAD THE NEIGHBORS NOT CALLED, SHE WOULD HAVE NEVER CALLED. I LEFT AT THIS POINT TO GET WITH CRIME SCENE, WHICH ARRIVED ON SCENE, AND WAS BRIEFING THEM AND WORKING WITH CRIME SCENE WHILE OFFICER GLENN SWITCHED PLACES WITH MYSELF AND THE QUESTIONING OF SARA.

AFTER SOME TIME, OFFICER GLENN AND MYSELF SWITCHED PLACES AGAIN. AFTER CONFERRING WITH EACH OTHER, I WAS TOLD THAT OFFICER GLENN HAD TOLD SARA THAT HER PARENT'S LIVES WERE IN DANGER NOW, BECAUSE OF HER ACTIONS, AND IT WAS INPERATIVE THAT SHE TELL US WHO WAS INVOLVED. ONCE AGAIN SHE REFUSED TO DO SO TO OFFICER GLENN. AT THIS POINT, OFFICER GLENN AND I ONCE AGAIN SWITCHED ROLLS, AND OFFICER GLENN STEPPED OUT TO HELP CRIME SCENE, AS WELL AS QUESTION THE MOTHER SOME MORE. ONCE AGAIN, I ENGAGED IN QUESTIONING WITH SARA TUCKER, STILL PRESSING THE ISSUE THAT IT WAS IMPERATIVE THAT SHE TELL THIS OFFICER EXACTLY WHAT SHE KNEW, AND THAT BY KEEPING INFORMATION, SHE NOT ONLY WAS ENDANGERING HER LIFE, BUT HER PARENT'S LIVES AS WELL. SARA TUCKER FINALLY AGREED TO GIVE ME THE INFORMATION I WAS REQUESTING.

SARA TUCKER STATED THAT AT APPROX 2030 HRS, SHE ATTEMPTED TO CONTACT HER MOTHER. AFTER BEING UNABLE TO CONTACT HER MOTHER, HAD DRIVEN FROM HER APARTMENT TO HER MOTHER'S APARTMENT, IN HOPES OF BEING ABLE TO SPEAK WITH HER MOTHER AND STAY WITH HER MOTHER. HER REASONING FOR THIS WAS THEY HAD AN ARGUMENT EARLIER ON, AND SHE WISHED TO MAKE UP WITH HER MOTHER. SHE ARRIVED ON SCENE SHORTLY AFTER 2030 HRS, AND PARKED HER FORD RANGER PICKUP IN A PARKING SPOT IN FRONT AND TO THE RIGHT OF HER MOTHER'S APARTMENT. SARA STATED THAT SHE WAS SITTING IN HER TRUCK WAITING FOR HER MOTHER TO ARRIVE, WHEN SHE NOTICED IN HER REAR VIEW MIRROR, THAT A BROWN OLDER TYPE EARLY 80'S MODEL DATSUN, POSSIBLY A B210 TYPE, DROVE PAST HER TRUCK, HEADING EASTBOUND IN THE PARKING LOT. SARA WAS IMMEDIATELY FRIGHTENED DUE TO THE FACT SHE RECOGNIZED THE VEHICLE AS BELONGING TO JULIUS 'SCARFACE', B/M, APPROX 18 YOA, WHO SARA KNEW THROUGH DRUG DEALINGS. SARA LATER ADMITTED TO ME THAT SHE HAD HAD SOME DRUG DEALINGS

Exhibit 78 - 000020

A R L I N G T O N   P O L I C E   D E P A R T M E N T

OFFICER NO. 1476                    OFFENSE REPORT              CASE NO. 950018762
OFFICER NAME                    CRIMINAL ATTEMPT - MURDER       VICTIM 001 OF 001
JORJANI, NICKOLAS A.            LAKE O WOODS APARTMENTS                 PAGE 0006
----------------------------------------------------------------------------------

OFFICER NARRATIVE........# 01
WITH THIS JULIUS PERSON.  SHE STATED THAT AFTER RECOGNIZING THE CAR AS IT DROVE
PAST THE BACK OF HER TRUCK, SHE PANICKED AND STARTED LOOKING AROUND TO SEE IF
HE WAS GETTING OUT OF THE VEHICLE TO APPROACH HER.  SARA STATED THE VEHICLE DID
NOT STOP AND JUST DROVE BY DOWN THE DRIVEWAY EASTBOUND.  AFTER REACHING THE
MAILBOX AREA, DIRECTLY TO THE EAST OF THE DRIVEWAY, HE DID A UTURN, AND STARTED
DRIVING BACK TOWARDS HER FORD RANGER TRUCK.  SARA, WHILE LOOKING OUT OF THE
BACK WINDOW OF HER CAB AND TRUCK, NOTICED THAT THE PASSENGER OF THE VEHICLE
LOOKED DIRECTLY AT HER, AND SHE ASSUMED HE RECOGNIZED HER AT THAT POINT.  SHE
STATED AT THAT POINT SHE NOTICED HE DREW UP A WEAPON AND STARTED FIRING TOWARDS
THE BACK OF THE CAB, THROUGH THE BACK WINDOW, TOWARDS THE DRIVERS SEAT WHERE
SHE WAS SITTING.  SARA IMMEDIATELY DUCKED DOWN AND STAYED DOWN, WHILE THE
SUSPECT FIRED A TOTAL OF APPROX 6 ROUNDS TOWARDS THE FORD RANGER PICKUP.  AFTER
DRIVING BY THE TRUCK, THE SUSPECT ALSO FIRED, WHAT SEEMED TO BE 3 ROUNDS,
TOWARDS THE APARTMENT BUILDING WHERE SARA'S PARENTS LIVE.  SARA STATED THAT AT
POINT, SHE JUMPED OUT OF THE VEHICLE AND AS SHE WAS LEAVING HER VEHICLE, SHE
NOTICED THAT THE VEHICLE WAS A BROWNISH COLORED DATSUN B210 (POSSIBLY) EARLY
80'S MODEL.  ONCE AGAIN, SHE STATED TO THIS OFFICER SHE RECOGNIZED THAT VEHICLE
AND KNEW WHAT THE ORDEAL WAS ABOUT.
        SARA STATED TO ME THAT SHE HAD A DRUG DEALING WITH THIS JULIUS "SCARFACE"
GUY IN EARLY JANUARY.  SHE HAD BOUGHT $130 WORTH OF CRACK COCAINE FROM HIM, AND
HAD NOT PAID HIM FOR IT.  FOLLOWING THAT, JULIUS HAD CONTINOUSLY CALLED HER
RESIDENCE AND HER PARENT'S RESIDENCE REQUESTING THE MONEY.  SARA STATED THAT
SHE NEVER CALLED HIM BACK, DUE TO THE FACT THAT SHE DID NOT HAVE THE MONEY, AND
THOUGHT IF SHE JUST IGNORNED HIM, HE WOULD STOP BOTHERING HER.  LET IT BE NOTED
THAT SARA STATED THAT SHE KNEW JULIUS SINCE SHE WAS IN THE 7TH GRADE, EVEN
THOUGH THEY HAD NOT BEEN FRIENDS, SHE KNEW OF HIM AND HE KNEW OF HER.  SARA
ALSO STATED THAT SHE KNEW THE VEHICLE DID NOT BELONG TO JULIUS, AND THAT HE HAD
A FRIEND, ANOTHER B/M WHO WAS SKINNY AND TALL, DO THE DRIVING.  SARA STATED
THIS WAS DUE TO THE FACT THAT JULIUS HAD SOMEWHERE IN THE NEIGHBORHOOD OF 18
OUTSTANDING WARRANTS, AS WELL AS HIS DEALINGS WITH DRUGS AND GUNS.  HE DID NOT
WISH TO DRIVE A VEHICLE, BUT EVERYTIME SHE DEALT WITH HIM IN BUYING DRUGS OR IN
ANY OTHER MANNER, JULIUS ALWAYS WAS IN THE PASSENGER SEAT OF THIS BROWN B210
TYPE VEHICLE, EARLY 80'S MODEL, WHICH BELONGED TO THE THIN B/M DRIVER (UNKNOWN
NAME).
        AFTER SARA MADE THE STATEMENT TO THE OFFICER, I ATTEMPTED TO CONTACT THE
GANG UNIT, IN ORDER TO FIND MORE INFORMATION ON JULIUS, BUT WAS UNABLE TO DO
SO.  SARA STATED TO THIS OFFICER THAT SHE EXTREMELY AFRAID THAT THEY WOULD TRY
TO KILL HER AGAIN.  THEY, BEING JULIUS AND HIS UNKNOWN DRIVER.  SHE STATED THAT
JULIUS WENT TO LAMAR HIGH SCHOOL AND WAS ON THE FOOTBALL TEAM, AS WELL AS THE
TRACK TEAM, AND IS 18 YOA.  THIS IS WHAT SHE KNEW OF HIM, OTHER THAN HE LIVED
IN THE APARTMENTS THAT SAT IN THE SOUTHEAST CORNER OF COOPER AND ROAD TO SIX
FLAGS.  SHE DID NOT KNOW WHICH APARTMENT BY NUMBER, BUT TOLD OFFICERS SHE COULD
SHOW WHOEVER NEEDED TO KNOW, THE EXACT LOCATION BY BEING TAKEN OUT THERE.
        AT THIS POINT, CRIME SCENE HAD FINISHED THEIR INVESTIGATION, AND OFFICER
GLENN AND MYSELF HAD GATHERED ALL THE INFORMATION WE NEEDED FROM WITNESSES AND
THE VICTIM.  IT SHOULD BE NOTED THAT OZLA TUCKER, SARA'S MOTHER, TOLD ME THAT
SARA HAD BEEN INTO DRUGS AND SEMI-GANG ACTIVITY FOR QUITE A WHILE NOW.  SHE
STATED THAT SARA'S BEEN THROWN OUT OF SEVERAL SCHOOLS, AND THE REASON SHE WAS

Exhibit 78 - 000021

ARLINGTON  POLICE  DEPARTMENT

OFFICER NO. 1476                    OFFENSE REPORT                 CASE NO. 950018762
OFFICER NAME                  CRIMINAL ATTEMPT - MURDER          VICTIM 001 OF 001
JORJANI, NICKOLAS A.          LAKE O WOODS APARTMENTS                    PAGE 0007
-----------------------------------------------------------------------------

OFFICER NARRATIVE........# 01
MADE TO MOVE OUT OF HER HOUSE, WAS BECAUSE, SHE WOULD STEAL AND PAWN HER GOODS
IN ORDER TO PAY FOR DRUGS.
     AT THE END OF THE EVENING, BEFORE THESE OFFICERS LEFT, OZLA TUCKER AND
SARA TUCKER TOLD THESE OFFICERS THAT THEY WOULD BE STAYING IN A HOTEL, UNKNOWN
LOCATION, AND THEY WOULD CONTACT DETECTIVES IN THE MORNING, INCASE THEY NEEDED
TO CONTACT THEM.  THE MOTHER LEFT A PAGER NUMBER OF 669-0770, AND SARA'S PAGER
NUMBER IS 214-408-1665.
     BASED ON MY INVESTIGATION, THE REPORTS FROM WITNESSES AND THE STATEMENTS
MADE BY SARAH TUCKER HERSELF, AND HER MOTHER, A KNOWN SUSPECT, THAT GOES BY
THE NAME OF JULIUS OR "SCARFACE", B/M, APPROX 18 YOA, A STUDENT AT LAMAR HIGH
SCHOOL, ALSO A KNOWN GANG MEMBER, ALONG WITH A DRIVER THAT DROVE AN EARLY
MODEL BROWN DATSUN B210 TYPE, DID IN FACT DRIVE BY SARA TUCKER'S BLUE FOR
RANGER PICKUP, KNOWING THAT SHE WAS IN THE VEHICLE.  THE SUSPECT JULIUS, DID IN
FACT RAISE A WEAPON, POINT IT TOWARDS SARA'S HEAD AREA, WITH THE INTENT TO
CAUSE THE DEATH OF SARA.  AFTER FIRING 6 ROUNDS TOWARDS THE TURK, HITTING THE
TRUCK, JULIUS DROVE UP A FEW MORE FEET AND FIRED 3 OR 4 ADDITIONAL ROUNDS
TOWARDS THE BUILDING WHERE TUCKER'S PARENTS LIVE.  THESE ROUNDS ENTERED INTO
THE WINDOW, AS WELL AS ENTERING A WALL IN THE LIVING ROOM, AND PENETRATING
THROUGH THE COUCH, IN WHICH OZLA ANN TUCKER USUALLY SITS.  THE SUSPECTS AT THIS
TIME DROVE OFF.  THIS SHOOTING WAS BASED UPON A DRUG TRANSACTION WHERE SARA
TUCKER OWED $130 TO THIS JULIUS, FOR THE PURCHASE OF SOME CRACK COCAINE BACK IN
EARLY JANUARY.  BOTH ON HER NON-PAYMENT, JULIUS ATTEMPTED TO CAUSE THE DEATH OF
SARA TUCKER.  PLEASE FORWARD A COPY OF THIS REPORT TO THE DETECTIVES AT CRIME
AGAINST PERSONS.  ALSO, A COPY OF IT SHOULD BE FORWARDED TO THE GANG UNIT.
NO FURTHER.  NORTH    #1490


CONTINUATION NARRATIVE..# 01
     ON TUESDAY, 2/7/95, AT APPROX 2108 HRS, I, OFFICER GLENN, ID 1348, ALONG
WITH OFFICER JORJIANI, ID 1476, WAS DISPATCHED TO 2401 SPILLWAY LN APT 907,
LAKE O THE WOODS APARTMENTS, IN REFERENCE TO AN INVESTIGATION.  I ARRIVED ON
THE SCENE PRIOR TO OFFICER JORJANI.  WHILE I WAS RIDING IN THE PARKING LOT, I
OBSERVED SEVERAL SUBJECTS STANDING OUT IN THE PARKING LOT JUST SOUTH OF BLDG
2401.  I WAS WAY DOWN BY ONE OF THE SUBJECTS STANDING IN THE PARKING LOT.  WHEN
I PARKED MY VEHICLE AND GOT OUT, I WAS CONTACTED BY AN UNIDENTIFIED W/M, WHO
STATED TO ME THAT SOMEONE WAS SHOOTING IN THE PARKING LOT.  THE W/M STATED TO
ME THAT HE LIVED IN 2401, APT 905.  HE SHOWED ME SOME BULLET CASINGS THAT WERE
IN THE PARKING LOT, THAT THE SUSPECT LEFT BEHIND IN THE PARKING LOT.  THE W/M
WHO LIVES IN APT 905, POINTED OUT A BLUE FORD RANGER PICKUP TRUCK DISPLAYING
1995 TEXAS PLATES, 8052WM.  THE SUBJECT STATED TO ME THAT THE FRONT TIRE TO
THIS VEHICLE WAS FLAT, WHICH OCCURRED DURING THE SHOOTING.  THE SUBJECT ALSO
SHOWED THIS OFFICER THAT THE SUSPECT ALSO SHOT THE RIGHT SIDE OF THE FORD
RANGER PICKUP TRUCK.  HE ALSO STATED TO ME THAT THERE WAS A FEMALE DRIVING THE
VEHICLE DURING THE SHOOTING.  WHEN I ASKED THE W/M WHERE WAS THE W/F DRIVER, HE

Exhibit 78 - 000022

A R L I N G T O N   P O L I C E   D E P A R T M E N T

OFFICER NO. 1476                   OFFENSE REPORT              CASE NO. 950018762
OFFICER NAME                  CRIMINAL ATTEMPT - MURDER        VICTIM 001 OF 001
JORJANI, NICKOLAS A.           LAKE O WOODS APARTMENTS                PAGE 0008
------------------------------------------------------------------------------

CONTINUATION NARRATIVE..# 01
STATED SHE RAN INTO APT 904, TO NOTIFY THE POLICE DEPT.  THE ARL POLICE DEPT
DID RECEIVE SEVERAL CALLS ABOUT THE SHOOTING.  AT THAT TIME, I ASKED THE W/M
TO HAVE THE W/F SUBJECT COME OUT OF APT 904, AND COME TALK TO THIS OFFICER.
     AT THAT TIME WHILE THE SUBJECT WENT TO GET THE FEMALE SUBJECT WHO WAS
INSIDE THE VEHICLE, I CONTINUED TO INVESTIGATE THE AREA WHERE THE SHOOTING
OCCURRED. I NOTICED THAT THE SUSPECT FIRED ONE ROUND IN THE TAIL GATE OF THE
BLUE FORD RANGER, WHICH THE W/F SUBJECT WAS IN. THAT BULLET WENT THROUGH THE
TAILGATE AND THROUGH THE BACK PORTION OF THE BED OF THE PICKUP TRUCK, BUT THE
BULLET DID NOT PENETRATE THROUGH THE CAB OF THE VEHICLE. I NOTICED ANOTHER
HOLE ON THE RIGHT SIDE OF THE FORD RANGER PICKUP TRUCK, RIGHT ABOVE THE
RIGHT REAR TIRE. THERE WAS ANOTHER BULLET HOLE JUST INCHES AWAY FROM THE
PASSENGER DOOR TO THE FORD PICKUP TRUCK. I NOTED THERE WERE SEVERAL BULLET
CASINGS ON THE GROUND, APPROX 60 TO 75 FEET SPREAD OUT. I DID NOT FIND ANY
OTHER BULLET HOLES IN ANY OF THE VEHICLES THAT WERE PARKED NEXT TO THE
FORD RANGER, THAT THE FEMALE OCCUPANT WAS IN.
     I OBSERVED APPROX 8 CASINGS ON THE GROUND. BY THIS TIME, THE FEMALE WHO
WAS INSIDE THE FORD RANGER PICKUP CAME OUT; SHE WAS LATER IDENTIFIED AS
SARAH TUCKER, W/F, DOB 02/07/76. MS TUCKER TOLD ME THAT SHE WAS INSIDE HER
PICKUP TRUCK WHEN THE SHOOTING OCCURRED. SHE TOLD ME THE REASON SHE WAS INSIDE
THE PICKUP TRUCK WAS BECAUSE SHE WAS WAITING ON HER MOTHER, WHO LIVES APT
902, BUILDING 2401, TO ARRIVE HOME. MS TUCKER STATED SHE WAS IN HER VEHICLE
APPROX 10 MINUTES WHEN SHE OBSERVED A BROWN CAR TRAVELING EASTBOUND THROUGH
THE PARKING LOT. MS TUCKER SAID SHE THEN NOTICED THAT THE VEHICLE MADE A
U-TURN. MS TUCKER STATED WHEN THE VEHICLE CAME BACK WESTBOUND IN THE LOT,
SHE SAID SHE HEARD SOME SHOOTING. SHE SAW THE SUSPECT ON THE PASSENGER SIDE
OF THE BROWN VEHICLE SHOOTING. SHE STATED SHE DUCKED DOWN IN THE DRIVERS
SEAT TO KEEP FROM GETTING HIT BY ONE OF THE BULLETS. SHE STATED THE SUSPECT
CONTINUED TO FIRE WHEN SHE LAID DOWN IN THE SEAT OF HER PICKUP TRUCK.
SHE STATED THE SUSPECT CONTINUED TO FIRE AND SHE NOTICED THE SUSPECT LEAVING
THE AREA, BUT THEY LEFT VERY SLOWLY, AS THOUGH THEY WERE NOT IN A HURRY
TO LEAVE THE APARTMENT COMPLEX AFTER SHOOTING SEVERAL ROUNDS IN THE AREA.
MS TUCKER STATED WHEN SHE NOTICED THE SUSPECTS WERE GONE, SHE RAN TO AND
KNOCKED ON HER MOTHER'S DOWNSTAIR NEIGHBOR'S DOOR TO GET INSIDE, WHICH
WAS APT 904. I ADVISED MS TUCKER THAT I BELIEVED THE SUSPECT WAS SHOOTING
AT HER, DUE TO THE FACT THAT THERE WERE NO OTHER VEHICLES IN THE PARKING
LOT WITH BULLET HOLES IN THEM, AND THAT HER VEHICLE WAS THE ONLY ONE THAT
HAD BULLET HOLES IN IT. MS TUCKER THEN TOLD ME THAT SHE DID NOT HAVE ANY
ENEMIES AND SHE COULD NOT ADVISE ME OF ANYONE WHO MIGHT WANT TO SHOOT AT
HER. MOMENTS LATER SHE TOLD ME THAT HER FATHER HAD AN IDENTICAL FORD RANGER
PICKUP TRUCK AS SHE DOES, BUT SHE ALSO STATED THAT HER FATHER DID NOT HAVE
ANY ENEMIES. I THEN ASKED MS TUCKER IF THERE WAS ANYONE WHO PROBABLY WOULD
BE MAD AT HER, THAT WOULD POSSIBLY SHOOT AT HER AND SHE STATED "NO." AT THIS
TIME OFFICER JORJANI ARRIVED AT THE SCENE. I ADVISED OFFICER JORJANI WHAT I
FOUND AND HAD DISCOVERED.
     OFFICER JORJANI AND I THEN TOOK OUT THE TRAFFIC CONES AND STARTED COVERING
UP THE BULLET CASINGS THAT WERE ON THE GROUND. I THEN ADVISED OFFICER JORJANI
TO CALL CRIME SCENE OUT, TO TAKE PHOTOGRAPHS OF THE CASINGS. THERE WAS A BULLET
FOUND IMBEDDED INTO THE WOOD OF BUILDING 2401, NEAR APT 904. OFFICER JORJANI

Exhibit 78 - 000023

ARLINGTON POLICE DEPARTMENT

OFFICER NO. 1476      OFFENSE REPORT      CASE NO. 950018762
OFFICER NAME      CRIMINAL ATTEMPT - MURDER      VICTIM 001 OF 001
JORJANI, NICKOLAS A:      LAKE O WOODS APARTMENTS      PAGE 0009
-----------------------------------------------------------------------

CONTINUATION NARRATIVE..0 01
AND I THEN STARTED CHECKING ALL THE APARTMENTS IN THE AREA AND MAKING SURE
THAT NO ONE HAD BEEN SHOT. I KNOCKED ON SOME DOORS THAT I DID NOT GET ANY
ANSWER. I CHECKED THE WINDOWS TO EACH APARTMENT (UPSTAIRS & DOWNSTAIRS) TO MAKE
SURE NO BULLET HAD GONE THROUGH THE WINDOWS OR THE WALLS. I THEN WALKED NEAR
APT 902 (ON THE SOUTH SIDE) AND I NOTED THERE WAS A BULLET THAT HAD GONE
THROUGH ONE OF THE SCREENS, RIGHT INTO THE WINDOW THAT LED ONE OF THE BEDROOMS.
MS TUCKER TOLD ME THAT THIS APARTMENT BELONGS TO HER MOTHER.
MOMENTS LATER, MS TUCKER'S MOTHER ARRIVED AT THE SCENE. I THEN ASKED MS
TUCKER'S MOTHER, LATER IDENTIFIED AS OZELA ANN TUCKER, W/F, DOB 03/07/52,
IF WE COULD ENTER HER HOUSE (APARTMENT) AND MAKE SURE THAT NO BULLETS HAD
ENTERED. I THEN WENT TO THE BACK BEDROOM AND OBSERVED WHERE A BULLET HAD
ENTERED THE BEDROOM WINDOW, HITTING THE BLINDS.
WHEN CRIME SCENE TECHNICIAN JOEL STEPHENSON ID 1297 ARRIVED, I ADVISED
HIM WHERE THE BULLETS WE FOUND WERE LOCATED INSIDE OF MS OZELA TUCKER'S
APARTMENT. WE ADVISED CRIME SCENE TECHNICIAN STEPHENSON WHERE THE BULLET
WAS LOCATED OUTSIDE OF APT 904, WHICH WAS IMBEDDED INSIDE THE WOOD OUTSIDE.
I WAS INVITED INSIDE APT 904, TO MAKE SURE THAT NO BULLETS HAD GONE
THROUGH THE WALLS, TO WHICH I DID NOT FIND ANYTHING.
WHILE CRIME SCENE TECHNICIAN STEPHENSON WAS GETTING HIS EQUIPMENT
TOGETHER, I FOUND TWO MORE BULLET HOLES THAT WENT THROUGH THE WALL FROM
THE OUTSIDE, TO THE INSIDE OF OZELA TUCKER'S LIVING ROOM. I OBSERVED THAT
BOTH BULLET HOLES WERE APPROX 12 INCHES FROM ONE ANOTHER. I NOTICED THERE
WAS ONE BULLET THAT WENT THROUGH THE WALL, LAYING ON THE FLOOR NEXT TO
THE BIG SCREEN TELEVISION, IN THE LIVING ROOM, AND CRIME SCENE TECHINICIAN
STEPHENSON FOUND THE OTHER BULLET THAT TRAVELED THROUGH THE WALL, THEN WENT
THROUGH A PILLOW, THEN THROUGH THE COUCH ON THE NORTH WALL IN THE LIVING
ROOM. THE BULLET THEN TRAVELED THROUGH A WALL, WHERE IT FINALLY RESTED IN
A CLOSET INSIDE OF THE LIVING ROOM.
I ASKED SARAH TUCKER IF THERE WAS MORE TO THIS SITUATION THAN SHE WAS
TELLING US, AND THEN OFFICER JORJANI WENT INSIDE THE BEDROOM AND STARTED
TALKING TO SARAH TUCKER. OZELA TUCKER LET OFFICER JORJANI LISTEN TO A
MESSAGE THAT WAS LEFT ON THE ANSWERING MACHINE. APPARENTLY IT WAS SARAH
TUCKER'S EX-BOYFRIEND, WHO WAS UPSET WITH HER ABOUT THE SITUATION THAT THEY
BROKE UP. OFFICER JORJANI AND I THEN ASKED SARAH TUCKER WHY SHE DID NOT
TELL US AT THE BEGINNING THAT HER BOYFRIEND AND HER WERE HAVING SOME TYPE
OF FEUD AGAINST ONE ANOTHER? SHE TOLD OFFICER JORJANI AND MYSELF THAT IT
WAS NOT HER BOYFRIEND WHO DID THE SHOOTING. SHE THEN ONLY TOLD ME THAT IT
WAS "TWO BLACK GUYS WHO DONE THE SHOOTING." WHEN I ASKED HER WHY SHE DID NOT
TELL ME AT THE BEGINNING AT THE INTERVIEW WHAT OCCURRED, SHE STATED SHE WAS
AFRAID AND THERE WAS NOTHING THAT THE POLICE COULD DO TO THE TWO SUBJECTS
THAT WERE SHOOTING AT HER. SHE LATER TOLD ME THAT SHE KNEW WHO THE TWO
SUSPECTS WERE, BUT SHE WOULD NOT GIVE THEIR NAME OR ANY IDENTIFICATION. SHE
STATED SHE OBSERVED THE DRIVER OF THE VEHICLE AND SHE BELIEVES SHE KNOW THE
SUSPECT WELL. WHILE I WAS ASSISTING TECHNICIAN STEPHENSON IN LOCATING ONE
OF THE BULLETS THAT WENT INSIDE OF THE BEDROOM, THE VICTIM, WHO WAS VERY
UNCOOPERATIVE WITH OFFICERS AT FIRST, STARTED TALKING TO OFFICER JORJANI.
SHE TOLD OFFICER JORJANI WHO THE SUSPECTS WERE AND WHY THEY CAME TO HER
MOTHER'S APARTMENT AND STARTED SHOOTING AT HER AND AT THE APARTMENT. REFER

Exhibit 78 - 000024

A R L I N G T O N   P O L I C E   D E P A R T M E N T

OFFICER NO. 1476                    OFFENSE REPORT                  CASE NO. 950018762
OFFICER NAME                   CRIMINAL ATTEMPT - MURDER             VICTIM 001 OF 001
JORJANI, NICKOLAS A.           LAKE O WOODS APARTMENTS                  PAGE 0010
-----------------------------------------------------------------------------------

CONTINUATION NARRATIVE..# 01
TO OFFICER JORJANI'S REPORT ON SARAH TUCKER'S VERBAL STATEMENT THAT SHE
GAVE.
     NO FURTHER. NORTH SIDE  01490/1381  AM/RAW


INVESTIGATOR NARRATIVE..# 01
VICTIM: TUCKER, SARA                        DET. ASSIGNED: J.T. STANTON #743
OFFENSE: ATT. MURDER                        DATE ASSIGNED: 2-8-95

I WAS ASSIGNED THIS CASE INVOLVING THE SHOOTING OF VICTIM ON 2-7-95. THE VICTIM
AND HER PARENTS CALLED THE C.I.D. AND ASKED FOR HELP WITH THE VICTIM SINCE THEY
WERE AFRAID TO GO HOME. THE VICTIM WAS SCARED THAT THE SUSPECT WOULD TRACK HER
DOWN AND KILL HER OR HAVE SOME OF HIS FRIENDS KILL HER. THE PARENTS WERE
SECRETING THE VICTIM IN A LOCAL HOTEL AND THEY WERE TOLD BY SGT. SIMONDS TO
COME TO THE POLICE STATION AND THE INVESTIGATION WOULD GET STARTED.
     STANTON WAS ASSIGNED TO CONTACT THE PARENTS AND THE VICTIM. PRIOR TO THE
VICTIM'S ARRIVAL, STANTON REVIEWED THE CASE AND NOTED THAT THE SUSPECT WAS A
BLACK MALE WHO WAS KNOWN TO THE VICTIM AS 'JULIUS' AND WHO HAD THE STREET NAME
OF 'SCARFACE'. THE VICTIM TOLD THE REPORTING OFFICERS THAT JULIUS GOES TO LAMAR
HIGH AND IS ON THE FOOTBALL AND TRACK TEAMS. STANTON CALLED LAMAR AND SPOKE TO
ASST. PRINCIPAL GREG JUNG. THE ASST PRIN. STATED THAT MY SUSPECT WOULD BE
JULIUS O. ROBINSON, B/M, 8-8-76 WITH AN ADDRESS OF 1413 N. COOPER APT.#A. THE

Exhibit 78 - 000025

A R L I N G T O N   P O L I C E   D E P A R T M E N T

```
OFFICER NO. 1476                OFFENSE REPORT           CASE NO. 950018762
OFFICER NAME                 CRIMINAL ATTEMPT - MURDER    VICTIM 001 OF 001
JORJANI, NICKOLAS A.          LAKE O WOODS APARTMENTS.          PAGE 0011
```

---

INVESTIGATOR NARRATIVE..# 01

SUSPECT WAS FOUND TO HAVE A RECENT ARREST RECORD IN THE APD AND HIS MUG PHOTO WAS OBTAINED. STANTON COMPOSED THE PHOTO SPREAD AND THEN MET WITH THE VICTIM AND HER FAMILY IN THE LOBBY. STANTON ARRANGED FOR THE GROUP TO MEET WITH THE VICTIM'S ASSISTANCE COORDINATOR AND A STATEMENT WAS SCHEDULED TO BE TAKEN. THE VICTIM WAS SHOWN THE COMPOSED SPREAD AND MADE AN IMMEDIATE AND POSITIVE IDENTIFICATION OF THE PHOTO OF JULIUS O. ROBINSON AS THE MAN WHO SHOT AT HER AND TRIED TO KILL HER. THE VICTIM'S SWORN STATEMENT WAS TAKEN AND SHE ADMITTED THAT SHE DID OWE MR. ROBINSON $130.00 FOR SOME DRUGS (CRACK COCAINE) THAT SHE HAD BOUGHT FROM HIM. THE VICTIM STATED THAT ROBINSON HAD BEEN CALLING AND LEAVING MESSAGES ON HER HOME ANSWERING MACHINE AND LEAVING A "COUNTDOWN" ON HER BEEPER. STANTON ASKED THE VICTIM WHAT A "COUNTDOWN" WAS AND SHE REPLIED THAT IT WAS A PAGE THAT SHE WOULD GET EVERYDAY AND EACH DAY WOULD BE ONE NUMBER LESS THAN THE DAY BEFORE. THE VICTIM STATED THAT THE COUNTDOWN HAD GOTTEN TO TODAY BEING THE ZERO DAY, BUT THE CODE WAS "19" ON THE DAY OF THE SHOOTING. THE 19 WOULD SYMBOLIZE THE VICTIM'S 19TH BIRTHDAY, WHICH WAS ON THE DAY OF THE SHOOTING. THE VICTIM AND HER FAMILY PROVIDED WHERE THEY WOULD BE STAYING, OUT OF TOWN, TO STANTON.

-THIS CASE WAS PRESENTED TO THE D.A. AND MR. PRICE ADVISED THAT THE CASE WOULD STILL BE FILEABLE EVEN IF IT WAS OVER A DRUG DEBT. STANTON RAN ROBINSON AND FOUND THAT HE HAD 17 OUTSTANDING WARRANTS OUT OF THE ARLINGTON COURT FOR HIS ARREST. STANTON CALLED SCHOOL RESOURCE OFFICER L. JONES AND ASKED JONES IF MR. ROBINSON WAS IN SCHOOL. THE SRO REPLIED THAT ROBINSON WAS INDEED IN CLASS ON THAT DAY. I ADVISED THE SRO OF THE OUTSTANDING WARRANTS AND OFFICER JONES TOOK ROBINSON INTO CUSTODY FROM LAMAR HIGH. STANTON FINISHED THE NECESSARY CASE REPORT FOR THE ATT. MURDER AND ADDED THE CHARGE TO THE SEVENTEEN ALREADY ON MR. ROBINSON IN THE JAIL. THE CASE WAS FILED WITH THE D.A. AND ROBINSON HAD A BOND SET AT $500,000.00

STANTON HAD A BRIEF INTERVIEW WITH ROBINSON IN THE JAIL. ROBINSON DENIED HAVING BEEN ANYWHERE NEAR THE VICTIM'S APARTMENTS ON THE PREVIOUS NIGHT. HE CLAIMED TO HAVE BEEN WITH FRIENDS AT HIS APARTMENT WATCHING VIDEOS. ROBINSON GAVE STANTON THE PHONE NUMBERS FOR HIS FRIENDS THAT WERE WITH HIM AND STANTON WAS ABLE TO TALK TO ONE OF THEM NAMED RICHARD SMART. MR. SMART GAVE THE SAME INFO AS MR. ROBINSON ABOUT THEM WATCHING VIDEOS AT ROBINSON'S APARTMENT. THE OTHER FRIENDS GIVEN BY ROBINSON COULD NOT BE LOCATED. THIS CASE WILL BE CLEARED BY DETECTIVE ARREST WITH THE CASE OF ATT. MURDER FILED ON MR. ROBINSON WHILE HE WAS IN CUSTODY IN THE ARLINGTON JAIL.

```
JTS #743                    CBA (DET)                        2-10-95
```

---

```
DATE ENTERED - 02/08/95          ENTERED BY -
REVIEWED BY -                    DET. ASSGN - STANTON, JOHN T.
```

---

Exhibit 78 - 000026