**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

---

| | | |
|---|---|---|
| **JULIUS OMAR ROBINSON,** | § | |
| | § | |
| **aka Face, aka Scar, aka Scarface** | § | |
| **Defendant-Petitioner,** | § | |
| | § | |
| **v.** | § | **NO. 4:00-CR-260-Y** |
| | § | **(Civil No. 4:05-CV-756-Y)** |
| | § | **DEATH PENALTY CASE** |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff-Respondent.** | § | |

---

**RESPONSE OF THE UNITED STATES TO**
**SUPPLEMENT TO 28 U.S.C. § 2255 MOTION**

**SUSAN COWGER**
**Assistant United States Attorney**
**Texas State Bar No: 08390150**
**1100 Commerce Street, Third Floor**
**Dallas, Texas 75242**
**Telephone: 214.659.8622**
**Facsimile: 214.767.2846**
**E-mail: susan.cowger@usdoj.gov**
**Attorneys for Respondent**

# TABLE OF CONTENTS

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Alleged Failure to Investigate Aggravating Factors. . . . . . . . . . . . . . . . . 2

1. Sara Tucker Incident.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2. The Dermott Crips. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. Alleged Failure to Investigate Mitigation and Personal History.. . . . . . . 4

1. Lawyer-Client Communications.. . . . . . . . . . . . . . . . . . . . . . . . . 4

2. Failure to Hire a Mitigation Specialist or to Investigate Mitigation Factors Sufficiently.. . . . . . . . . . . . . . . . . . . . . . . . . . 5

3. Failure to Present a Mental Health Expert. . . . . . . . . . . . . . . . . . . 6

II. Denial of Equal Protection.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON, aka Face, aka Scar, aka Scarface Defendant-Petitioner, | § § § § | |
| v. | § § § | NO. 4:00-CR-260-Y (Civil No. 4:05-CV-756-Y) **DEATH PENALTY CASE** |
| UNITED STATES OF AMERICA, Plaintiff-Respondent. | § § | |

**RESPONSE OF THE UNITED STATES TO SUPPLEMENT TO 28 U.S.C. § 2255 MOTION**

**Introduction**

The United States continues to oppose Robinson's motion to vacate his conviction and sentence and for a new trial. The additional arguments and evidence he offers in support of his claims of ineffective assistance and of a violation of his equal protection right are unpersuasive.

I. **Ineffective Assistance of Counsel**

Robinson first enlarges upon his reasons for contending that his lawyers were ineffective in the way they handled the penalty phase of the case. He focuses on his claims that counsel should have opposed the future-dangerousness evidence more aggressively, should have engaged a mitigation specialist, and should have generally done more investigation into his personal history. The government has responded at length on

this broad topic in its initial pleading, both factually and legally, and will not cover the same ground again. A few specific factual responses are in order, however.

A. Alleged Failure to Investigate Aggravating Factors[1]

1. Sara Tucker Incident (*See* Supplement at 8-11)

Robinson asserts that he did not attempt to murder – or even intend to hurt – Sara Tucker when he fired shots at her truck and her mother's apartment, and that his lawyers should have investigated further to find support for this scenario. As evidence, he attaches plea documents and police reports concerning that crime. First, as to his plea, it is not persuasive that his being allowed to plead to a lesser offense than attempted murder and obtain a lesser sentence means the greater offense did not occur. Negotiated pleas to reduce exposure are commonplace. Second, as to the police reports, they corroborate the pre-plea charge of attempted murder and directly contradict Richard Smart's new declaration suggesting that Sara Tucker was not visible in the truck when the shots were fired. (DX 78.) Tucker told police she was in the truck sitting up in the driver's seat when Robinson and Smart (not known to her) drove by, and that she did not

[1] Robinson claims in passing, referring to declarations filed with his Reply in this matter, that his lawyers could have done more to establish that he was not responsible, while in prison pre-trial, for ordering that Michael "One Love" Williams be killed. He cites to declarations from Josephine Dotson and Marcus Robinson. (DX 62, 64.) Their declarations suffer from two major flaws. One is that they are close relatives of Robinson (aunt and brother, respectively) and therefore likely biased. Their credibility with the penalty jury would have been impaired for at least that reason. The second is that their alleged understanding of what Robinson was saying about "One Love" does not establish what Robinson's intent was. His intent was established much more directly by the testimony of Nathan Henderson, who told the penalty jury about Robinson's express wish to see someone "get" "One Love" and his pleasure at hearing something like that had happened. These remarks, coupled with Robinson's statements on the recorded phone conversation with Dotson and Marcus, were sufficient to establish a degree of future dangerousness. Dotson's and Marcus's further testimony at the penalty phase would not have had an impact on that conclusion.

duck down until after the shots began. She also said that Robinson looked directly at her. (DX 78 at 21.) Furthermore, the police reports cite the testimony of a bystander who saw Tucker in the truck, making it likely Robinson did, too. (DX 78 at p. 22.) Finally, Smart's declaration, in which he now admits that he and Robinson were in the car from which Robinson fired, is inconsistent with his prior statement to police that he and Robinson were elsewhere when that crime was committed. (DX 78 at 26.) Smart would not have been credible if he had tried to support a claim that Robinson intended Tucker no harm. In any event, the doubtful assertion that Smart did not see Tucker does not establish that Robinson did not see her.

In short, counsel's decision not to present evidence from the Tucker police reports and Robinson's plea in that case, or even a failure to investigate those matters if such a failure occurred, caused no prejudice.

2. The Dermott Crips (*See* Supplement at 12-14)

Robinson claims he was not affiliated with any gang or, if he was, it was not a "notorious criminal syndicate." (Supplement at 6.) Of course, Robinson's own declarant, Malcolm Klein, establishes that he was affiliated with a gang, the Dermott Crips. (DX 72.) The allegation that this gang was not recognized by an organization called the National Youth Gang Center does not mean it was not functionally a gang, or gang-like, and certainly does not mean that its members were fine and upstanding youngsters. One police officer's fuzzy recollection that the Dermott Crips and Bloods were relatively harmless back in the 1980's, (DX 59), would not have carried the day in

the penalty phase, where the evidence of Robinson's future dangerousness was built on many more important factors beyond his youthful involvement in that Arkansas gang. It is wholly inaccurate to say, as Robinson does, that the prosecution portrayed Robinson *for the first time at the penalty phase* as a notorious gang member. (Supplement at 12.) All the evidence of Robinson's charged murders presented during the guilt-innocence phase certainly portrayed him as the seriously dangerous leader of a deadly criminal conspiracy in his adulthood.

B. Alleged Failure to Investigate Mitigation and Personal History

1. Lawyer-Client Communications (*See* Supplement at 14-16)

Arguing that defense counsel did not have sufficient communication with him, Robinson attaches documentation he received from the Bureau of Prisons on visits by his lawyers and their assistants while he was incarcerated. (DX 80.) Whether or not these logs are both accurate and complete, it is inadequate merely to point to the number of times that lawyers and their assistants visited their client in prison and then to claim that the representation was ineffective because the number is, in the movant's view, too small.[2] A court must take into account a host of factors and look at the entire picture. What is important is the quality of the lawyers' work on the case overall, and whether that quality was so poor in some material respect that it prejudiced the defense in an important

[2] For example, the visitation logs say nothing about the time spent between lawyers and client while the client was at the courthouse for hearings or during the trial, and nothing about phone conversations that may have occurred.

way, enough to cause a factfinder to believe that the result would have been different if the lawyer's conduct had been different. That standard is far from met here.

2. <u>Failure to Hire a Mitigation Specialist or to Investigate Mitigation Factors Sufficiently (*See* Supplement at 16-22)</u>

The government has already negated the notion that a lawyer should be deemed *per se* ineffective if he does not hire a mitigation specialist, which is the principle Robinson asks this Court to adopt. (*See* initial Response at 34-35.) As in his first pleading, Robinson cites no law to support such a principle, and none exists. Furthermore, it does not ineluctably follow from the fact that Mr. Strickland had previously hired a mitigation specialist in another case that he is thus apparently being self-serving in this case when he disparages mitigation specialists. (*See* Supplement at 18; DX 81.) Instead, the reasonable conclusion is that Mr. Strickland learned he had little use for mitigation specialists having once tried employing one.

As for sufficient investigation, the affidavits that have already been filed by counsel and their private investigator show that a substantial amount of investigation into Robinson's personal history was in fact conducted. It is inappropriate to rely instead on nondetailed entries on CJA vouchers to establish that some inadequate number of hours was spent on that task. (*See* Dx 55.) It is likewise inappropriate to state as a blanket assertion that telephone interviews of witnesses, and other common practices of counsel working within a system that certainly does not allow for expenditure of unlimited time and money, fall below some imagined "accepted standard." (DX 75.) The only "standard" with which this Court need be concerned is the legal standard of whether

counsel rendered unreasonably deficient performance and whether their performance prejudiced Robinson. He has not established that proposition.

Furthermore, Robinson seeks to explain the historical "why" of Texas counsel not pursuing mitigation evidence more aggressively than an expert thinks they do. (DX 76.) This is an interesting theory, but it does not come into play unless the Court finds that the mitigation investigation counsel conducted in Robinson's case amounted to deficient performance in light of the whole record. Since the Court has no basis to make such a finding, it need not concern itself with that theory.

3. Failure to Present a Mental Health Expert (*See* Supplement at 22-24)

Robinson focuses here on the theory that he suffered some degree of injury to his brain *in utero* because of his mother's abuse of drugs and alcohol while pregnant. He cites the report of Dr. Allen, who goes on to opine that this history made Robinson more vulnerable to psychological and emotional problems throughout his life. (DX 77.)

Dr. Allen's declaration, however, does not account for the fact – described in the government's initial response and the supporting affidavits – that to all who observed him pre-trial, and to many who knew him in the period when he was committing the crimes for which he was prosecuted, Robinson appeared intelligent, personable, and relatively sophisticated. That assessment finds support in a good deal of the information Robinson has supplied this Court in connection with his § 2255 motion, which shows that he was not significantly mentally impaired and, in fact, was average and above-average in many areas of intellectual and social function. Thus, while an expert such as Dr. Allen

could have explained fetal alcohol syndromes to a penalty jury, it is unlikely that she could persuade them, in light of the other evidence, that Robinson suffered seriously – so much as to cause him to become a cold-blooded murderer – because of his mother's admittedly reprehensible conduct.

Additionally, it should be noted that Robinson blithely presents the Court with two diametrically opposed views of his adolescent involvement with a gang in Arkansas. As described above, he tries through the affidavit of the local police chief to make it seem as though the Dermott Crips were nothing but a bunch of youngsters ineffectually mimicking what they had seen on television, and not anything that should lead a jury to expect future danger from Robinson. Simultaneously, Dr. Allen paints his involvement with the Crips as a highly formative and important factor in his development as a serious criminal, (DX 77 at 18), and part of a "highly toxic social environment." (*Id.* at 11.) It cannot be both ways.

II. **Denial of Equal Protection**

Robinson's remaining supplemental argument concerns his claim that the Federal Death Penalty Act is applied in a discriminatory way to African-American defendants. (*See* Supplement at 24-26.) The government continues to maintain that this claim, which could have been raised on direct appeal but was not, is procedurally barred. *E.g., Massaro v. United States*, 538 U.S. 500, 504 (2003). Because of the procedural bar, Robinson should not be allowed to pursue the discovery he has requested on this issue,

nor should he be permitted to raise the matter at any evidentiary hearing the Court may convene.

Furthermore, the additional evidence that Robinson provides on this issue adds no weight to the claim. He cites and attaches the affidavit of Margaret O'Donnell, who introduces certain death-penalty statistics from the period of 2001 to 2005. (DX 73.) These statistics do not change the legal import of statistical evidence generally, which the government briefed fully in its initial response. Under applicable precedent, and in "the context of capital sentencing, statistics about the general operation of a death penalty scheme are insufficient to support an inference of discriminatory purpose." *United States v. Taylor*, 2008 WL 217115 at *6 (E.D. Tenn. 2008), citing *McCleskey v. Kemp*, 481 U.S. 279, 292-99 (1987).

That conclusion remains unchanged. No matter what Ms. O'Donnell's statistics are, they do not overcome the fact, studiously ignored in her affidavit and in Robinson's pleading, that death penalty decisions in the Attorney General's office are made on a color-blind basis. *See* footnote 32 in government's initial response. Thus, regardless of the percentage of black defendants vs. white defendants vs. Hispanic defendants ultimately authorized for death-penalty prosecution, there can be no inference of purposeful racial discrimination when those deciding whether to authorize do not know the race of the defendants.

This is true regardless of the fact that the U.S. Attorney staff who knew the race of the defendant (black) and his victims (black and Hispanic, not white) participated in the

death penalty process by charging and presenting the case as they did. Robinson surmises that these people were discriminating against him on the basis of his race. In support of such a notion, he cites only to his claim that the prosecutors acted in a racially discriminatory manner when they questioned members of the jury panel during voir dire, asking tougher questions of black venire members than they asked of white ones. That factual allegation is belied by the record, as was fully described in the government's initial § 2255 response, at pages 69-70.

Furthermore, the statistics described do not support an inference of discriminatory purpose or effect.[3] For one thing, Ms. O'Donnell ignores the fact that the Attorney General, in the period she cites as in earlier periods, approved a higher percentage of death-eligible whites for the death penalty than of death-eligible blacks.[4] She also does not address the meaning – or lack of it – of the fact that more black defendants were charged with death-eligible offenses than whites. This fact could support an inference of racial discrimination only if there were information that many white defendants who actually committed death-eligible offenses were not so charged. No such information has been provided.

---

[3] Additionally, there are inconsistencies in the numbers. For one, the cases making up the purported total of 144 described in paragraph 5 of O'Donnell's affidavit actually add up to only 139. For another, Ms. O'Donnell states that white defendants in the group of 626 death-eligible defendants committed 12 murders against non-whites. She also says, however, that 12 **percent** of the 626 cases involved a white defendant killing non-whites. *See* DX 73, ¶¶ 6-7. Twelve out of 626 is not the same as 12% of 626 (which is about 75). Regardless of these problems, the Court need not concern itself with the claim, which lacks any semblance of legal or factual support.

[4] There were 34 white defendants approved out of 113 eligible, or about 30%, while there were 74 black defendants approved out of 275 eligible, or only about 27%. *See also* government's initial response at pages 75-76 and footnote 32.

Robinson has not come close to meeting his burden on this claim, which is in any event procedurally barred, and it should be rejected without further inquiry.

**Conclusion**

As the government stated in its initial response, it would be appropriate for the court to hold a limited evidentiary hearing to resolve any purely factual disputes raised by the pleadings on the ineffectiveness issue. Ultimately, the Court should deny Robinson's motion for collateral relief in its entirety, and should also deny any request for a certificate of appealability.

Respectfully submitted,

RICHARD B. ROPER
United States Attorney

/s/ Susan Cowger
SUSAN COWGER
Assistant United States Attorney
Texas State Bar No. 08390150
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: 214.659.8622
Facsimile: 214.767.2846
E-mail: susan.cowger@usdoj.gov
Attorneys for Respondent

**CERTIFICATE OF SERVICE**

I certify that I filed this response electronically on March 6, 2008, using the court's electronic case filing (ECF) system. The ECF system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept such Notice as service of this document by electronic means:

Michael B. Charlton
Assistant Federal Public Defender
411 E. Bonneville, Suite 250
Las Vegas, Nevada, 89101

Sean Kennedy
Assistant Federal Public Defender
321 E. 2nd Street
Los Angeles, California, 90012

/s/ Susan Cowger
SUSAN COWGER
Assistant United States Attorney