THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CAUSE NO. 4:00-CR-00260-2** |
| | : | **DEATH PENALTY CASE** |
| **vs.** | : | |
| | : | **Honorable Terry Means** |
| **JULIUS ROBINSON** | : | **United States District Judge** |

---

## REPLY TO THE GOVERNMENT'S OPPOSITION TO PETITIONER'S SUPPLEMENTAL PLEADING

(Filed Electronically Under the Electronic Case Filing System Requirements)

---

MICHAEL B. CHARLTON, No. 04144800
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
Telephone: (702) 388-5106
Facsimile: (702) 388-5103
mike_charlton@fd.org

SEAN K. KENNEDY, No. 145632
Federal Public Defender
CRAIG A. HARBAUGH, No. 194309
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
sean_kennedy@fd.org
craig_harbaugh@fd.org

**TABLE OF CONTENTS**

ARGUMENT

    Contrary to Respondent's Contentions, Petitioner's Supplemental Pleading and

    Exhibits Bolster His Previous Showing of Ineffective Assistance of Counsel. . . . . . . . . 2

    A.    Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    Incident Involving "One Love" Williams. . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    Shooting of Tucker's Truck. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        3.    Gang Affiliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.    Mental Health Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.    Respondent Correctly Concedes That an Evidentiary Hearing is Appropriate

        in this Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

## TABLE OF AUTHORITIES

**Federal Cases**

*Cool v. United States*, 409 U.S. 100, 93 S. Ct. 354, 34 L. Ed. 2d 335 (1972). . . . . . . . . . . . . . . . 3

*United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Jolley*, No. 05-50086, 2007 U.S. App. LEXIS 25334, 3-4 (5th Cir. 2007). . . . . . 9

*United States v. Sheid*, 248 Fed. Appx. 543, 544 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 9

**State Codes**

Texas Code CIM. Procedure, art. 42.12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Texas Penal Code, § 22.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Miscellaneous**

ABA Guidelines § 4.1.A.2 cmt. (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fifth Circuit Pattern Jury Instruction 2001, 1.15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CAUSE NO. 4:00-CR-00260-2** |
| | **:** | **DEATH PENALTY CASE** |
| **vs.** | **:** | |
| | **:** | **Honorable Terry Means** |
| **JULIUS ROBINSON** | **:** | **United States District Judge** |

---

### REPLY TO THE GOVERNMENT'S OPPOSITION TO PETITIONER'S SUPPLEMENTAL PLEADING

(Filed Electronically Under the Electronic Case Filing System Requirements)

---

As reflected in Petitioner's supplemental pleading and the Government's opposition, there is much upon which the parties disagree. But there is one issue upon which the parties's positions are near uniform: the Court should grant an evidentiary hearing for Robinson's ineffective-assistance-of-counsel claim. Because the record does not conclusively establish that Robinson is entitled to no relief - and indeed, provides strong support that he is - Robinson should be afforded an opportunity to prove his claim at a hearing.

<u>ARGUMENT</u>

**Contrary to Respondent's Contentions, Petitioner's Supplemental Pleading and Exhibits Bolster His Previous Showing of Ineffective Assistance of Counsel**

Notwithstanding Respondent's concession that Robinson is entitled to an evidentiary hearing, discussed *infra*, Respondent challenges a number of assertions set forth in the Robinson's Supplemental Pleading. Robinson replies to only a few of the more glaring assertions here.

**A.    Deficient Performance**

Respondent dismisses the jail visitation logs and CJA vouchers out of hand, arguing that these documents fail to establish unequivocally that trial counsel provided deficient representation. Respondent's arguments are unavailing. First, Respondent contends that the jail visitation logs are not an accurate gauge of trial counsel's performance because "[w]hat is important is the quality of the lawyers' work on the case overall." (Government's Opposition to Supplemental Pleading ("Supp. Opp.") at p. 4). But there is no question that independent evidence of trial counsel's near total failure to visit with the client before trial reflects negatively on trial counsel's overall performance. Regular client contact would have allowed trial counsel to learn valuable information about Robinson's tragic life history as well as evidence to rebut aggravation. Second, Respondent argues "it is inappropriate to rely [ ] on nondetailed entries on CJA vouchers" and instead the Court should focus exclusively on trial counsel's affidavits. (Supp. Opp. at p. 5.) Respondent has it backwards. Written documentation of trial counsel's activities prepared at or near the time of trial is far more probative than self-serving declarations written to refute an ineffectiveness claim seven years later.

**B.    Prejudice**

Regarding a variety of evidence that trial counsel failed to investigate and introduce during the penalty phase, Respondent does not assert that trial counsel's performance was adequate.  Instead, Respondent merely contends that Robinson was not prejudiced.  Respondent is wrong.

**1.    Incident Involving "One Love" Williams**

Respondent derogates the accounts of Josephine Dotson and Marcus Robinson, alleging they were "likely biased" based upon their familial relationship with Robinson and because they "fail to establish what Robinson's intent was."  (Supp. Opp. at p. 2, n.1.)  Contrary to Respondent's assertions, the jury would have undoubtedly favored the testimony of Robinson's relatives over that of his Robinson's codefendant, Nathan Henderson.  While it is true that testimony from the defendant's family members may raise the specter of bias, accomplices testifying pursuant to a plea agreement, such as Henderson, presume bias as a matter of law. *(Cool v. United States*, 409 U.S. 100, 93 S. Ct. 354, 34 L. Ed. 2d 335 (1972); Fifth Circuit Pattern Jury Instruction 2001, 1.15 (instructing accomplice testimony must be "received with caution and weighed with great care").)  Based upon his guilty plea, Henderson faced a life sentence, which was a virtual certainty under the then-binding federal sentencing guidelines. (20 RT 108-09, 120.)  The only way Henderson could reduce his sentence was to garner favor with the prosecutor by testifying against Robinson.  (20 RT 109.)  Given Henderson's enormous

3

incentive to incriminate Robinson to save himself, he would have appeared far less credible than Robinson's forty-nine year-old aunt .[1]  (Ex. 7.)

The testimony of Dotson and Marcus Robinson would have been substantially more relevant than Henderson's speculation.  The prosecution argued that Robinson's alleged "hit" was issued during a recorded telephone conversation with Dotson and Marcus Robinson. (20 RT 85-86.)  Henderson repeatedly testified that he was not privy to the telephone conversation.  (20 RT 114, 129.)  The only thing Henderson knew for certain is that Robinson, while commiserating with several other co-defendants, complained about Williams and indicated his interest in something happening to him.  (20 RT 115.)  On the other hand, Dotson and Marcus could their understanding of Robinson's ambiguous, if not innocuous, assertion that One Love Williams "go hard."  (Ex. 62, Supp. Decl. of Josephine Dotson, at ¶ 6.)  Dotson could have also apprised the jury that she made no effort to relay the information to anyone.

## 2. Shooting of Tucker's Truck

Respondent does not dispute the fact that Robinson initially received no incarceration whatsoever for the discharge of a firearm involving Sara Tucker.  (Ex. 54; *see* TX. Pen. Code § 22.05(b).)  Nor does Respondent deny that the trial court "deferred adjudication," meaning that initially the judge did not even impose a conviction.  (Ex. 54; *see* Tex. Code CIM. Proc. art. 42.12.)  Instead, Respondent simply argues that the trial court's disposition is irrelevant because "[negotiated pleas to reduce exposure are commonplace."  (Supp. Opp. at p. 2.)  While it is true that most criminal prosecutions are resolved with plea agreements, the substantial

---

[1]  Josephine Dotson was born in 1953 and would have been forty-nine years old at the time of Robinson's trial in 2002.

leniency Robinson received went far beyond the ordinary case.  As part of the plea agreement, the prosecution dismissed the first count for attempted murder, subjecting him only to a firearm offense, a third degree felony.  As a result, Robinson faced a two to ten year sentence as opposed to a life sentence.  (Ex. 79, p. 30.)  Even then, the trial judge refused to impose the minimum sentence and took the extraordinary step of deferring adjudication resulting in community supervision.  (Ex. 79, p. 31.)  The minor disposition in this case clearly belied the prosecutor's sensational claim that Robinson attempted to kill Tucker.

Contrary to Respondent's suggestion, the police reports and Richard Smart's declaration seriously undermined Tucker's testimony that Robinson saw her in the truck.  (Supp. Opp. at p. 2-3.)  In stark contrast to her trial testimony, Tucker did not tell police that Robinson first confronted her at her own apartment and then followed to her parents' home.  (Ex. 78, pp. 19-22.)  Rather than fleeing from Robinson, Tucker had gone over to her mother's home "in hopes of being able to speak with her mother and staying with her" because they had an argument earlier that day and "she wanted to make up with her mother."  (Ex. 78, p. 20.) Moreover, Robinson had clearly not chased Tucker, as Tucker had been waiting  for at least ten minutes in the truck outside her parent's home before shots were fired.  (Ex. 78, p. 23). The crime scene investigation, also contained in the police report, further undermines Tucker's assertion that Robinson saw her inside the truck and attempted to shoot at her.  According to police, not a single bullet hole was found in the cab of the truck.  (Ex. 78, pp. 19, 23.) It defies common sense that Robinson would have fired indiscriminately at the truck had he truly seen Tucker and intended to kill her.

5

Richard Smart's account, while not unimpeachable, would have also undermined the prosecution's contention that Robinson tried to kill Tucker.  Not surprisingly, Smart initially downplayed Robinson's involvement in the shooting, claiming the two had been at Robinson's home at the time.  (Ex. 78, p. 26.)  Nevertheless, Smart later reported to Drug Enforcement Administration agents that Robinson "did not know anyone was in the truck."  (Ex. 83, DEA Report of Investigation dated June 25, 2001, p. 3).  Despite Smart's initial deception to avoid prosecution, Smart would still have enjoyed an air of credibility based upon his status as a government informant *against* Robinson.  Over the course of two separate interviews with the Drug Enforcement Agency, Smart implicated Robinson in Henderson's drug trafficking conspiracy, identifying several specific instances of Robinson's offenses in painstaking detail. Smart had previously told the DEA that Robinson.  (Ex. 83, pp. 1-8).

### 3.    Gang Affiliation

Respondent does not dispute the evidence contradicting the gang allegations.  Instead, the Government makes two alternative arguments in an effort to diminish its importance. First, the Government suggests that penalty phase evidence depicting Robinson was a notorious gang member was equivalent to evidence introduced during the guilt-innocence phase that "portrayed him as the seriously dangerous leader of a deadly criminal conspiracy."  (Supp. Opp. at p. 4.)  Obviously, gang affiliation is perceived far more dangerous than ordinary drug activity, a distinction trial counsel clearly recognized. (Resp. Ex. A, Off. of Wesley T. Ball, at p. 6.) (conceding that "gang evidence is almost always detrimental to a defendant as jurors are very

6

frightened of gangs" ). Indeed, the prosecution relied heavily upon Robinson's involvement with the Dermott Chips to argue that Robinson was a future danger in prison.  (22 RT 112-13.)[2]

Second, the Government distorts Robinson's presentation of the gang evidence, claiming he presents the Court with "two diametrically opposed views" of the Dermott group.  (Supp. Opp. at p. 7.)  While the Government correctly notes that Dr. Kate Allen characterized Robinson's upbringing as a " "highly toxic social environment," her evaluation was by no means limited to Robinson's involvement with the Dermott Hustler Chips.  (Ex. 77, p. 11.)  Dr. Allen identified and discussed a host of factors that contributed to the environment, such as the effects of "parental abandonment," "domestic violence," "early onset substance abuse," and "pervasive lack of parental supervision and household instability."  (Ex. 77, 13-17.)  Dr. Allen provided only a brief discussion about "the emergence of corruptive influences and early emancipation," which includes an explanation of Rodney White, Robinson's former gang member cousin, and White's attempt to organize youthful adolescents.  (Ex. 77, p. 18.)  In any event, there is no conflict between an discussion of White's corruptive influence and an explanation of how the Dermott group was not the prototypical gang feared in urban populations.

---

[2]  Once the prosecution established that Robinson was affiliated with a gang, the prosecution relied on a prison expert to link Robinson to gang violence in prisons:

> Prison gangs do play a significant role in prison operations.  Nearly all violence, serious violence, within a correctional setting, can be traced back to gang rivalries, racial rivalries that tie to the prison gangs, and to their continuing interactions with each other in looking for a balance of power between inmate groups.

(*Id.*)

7

### 3.    Mental Health Evidence

Respondent acknowledges that evidence of Robinson's mother's drug and alcohol abuse during her pregnancy  was "reprehensible."  (Opp. At p. 7.)  Nevertheless, Respondent indirectly disputes Dr. Kate Allen's conclusion that Robinson suffered from alcohol-related neurodevelopmental disorder in light of trial counsel's perception of Robinson as "intelligent, personable, and relatively sophisticated."  Based upon the minimal times that trial counsel interacted with Robinson, their observations ring hollow.  In any event, trial counsel's personal observations, however well- informed, "can hardly be expected to be sufficient to detect the array of conditions that could be of critical importance."  (ABA Guidelines § 4.1.A.2 cmt. (2003) (hereinafter "Updated Guidelines").)  Given the fact that most defendants, including Robinson, do not appear overtly to be mentally impaired, it is imperative that the defense team employ an expert qualified to conduct mental health screening.  (Updated Guidelines § 4.1 cmt.) Remarkably, the Updated Guidelines specifically identify "fetal alcohol syndrome" as one of the mental impairments that typically elude trial counsel's untrained mind.  *Id.*  By their own admissions, no one on Robinson's defense team possessed the requisite training and experience to conduct this critical assessment.  (Resp. Ex. A, Off. of Wesley T. Ball, at p. 8., ("I do not profess to be a mental health professional.").)  Thus, Dr. Allen had no occasion to "account for" trial counsel's observation; professional expertise always trumps lay opinion.

### C.    Respondent Correctly Concedes That an Evidentiary Hearing is Appropriate in this Case

In both its initial opposition and current response, the Government concedes that Robinson is entitled to an evidentiary hearing to resolve his IAC claim.   (Opp. at p. 82,

("Because there are factual disputes raised by the pleadings on the ineffectiveness issue, and because this is a death penalty case, the Court should probably schedule a limited evidentiary hearing"); Supp. Opp. at p. 10 ("As the government stated in its initial response, it would be appropriate for the court to hold a limited evidentiary hearing to resolve any purely factual disputes raised by the pleadings on the ineffectiveness issue").)

The Government's view is not merely reasonable but dictated by Fifth Circuit precedent. "A hearing is required on § 2255 review unless the 'motions, files, and records of the case conclusively show that the prisoner is entitled to no relief.'" (*United States v. Sheid*, 248 Fed. Appx. 543, 544 (5th Cir. 2007) (quoting *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992)).) Unless affidavits are supported by independent evidence in the record, "contested fact issues ordinarily may not be decided on affidavits alone." (*United States v. Jolley*, No. 05-50086, 2007 U.S. App. LEXIS 25334, 3-4 (5th Cir. 2007); *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. 1981).)

Based upon the record before the Court, Respondent cannot establish conclusively that Robinson is entitled to no relief. On the other hand, Robinson has provided substantial documentary evidence and declarations to support his contention that his trial counsel provided deficient performance. Because Robinson's trial counsel and trial investigator provided declarations disputing his evidence, the case presents contested factual issues that cannot be resolved without a hearing. Therefore, because all of the requirements have been met, the Court should grant an evidentiary hearing to resolve Robinson's ineffective-assistance-of-counsel claim.

## **CONCLUSION**

For all the foregoing reasons, the Court should vacate the verdicts.  In the alternative,

the court should grant an evidentiary hearing for each of Robinson's claims.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

Dated: March 26, 2008

   /s/ Sean K. Kennedy
CRAIG A. HARBAUGH
Deputy Federal Public Defender
Federal Public Defender's Office
321 E. 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7865
Facsimile:  (213) 894-7566
E-Mail sean_kennedy@fd.org
E-Mail craig_harbaugh@fd.org

# EXHIBIT 83

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 8

| 1. Program Code | 2. Cross File | Related Files | 3. File No. MW-99-0077 | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: S/A Andrew P. Merlino At: Fort Worth, TX | | | 6. File Title ████████ ▓▓an | |
| 7. ☐ Closed  ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 06/07/01 | |

9. Other Officers: DEA S/A T. McAuliffe, DEA S/A B. Finney, FBI S/A A. Farrell

10. Report Re: Debriefing of Richard SMART on 05-11-01 (10:30 am) and 05-16-01 (11:00 am)

### SYNOPSIS

On 05-11-01 and 05-16-01, Agents interviewed Richard SMART at the U.S. Attorney's Office in Ft. Worth, Texas regarding SMART's knowledge of the Nathan HENDERSON Drug Trafficking Organization. Present during the 05-11-01 interview were Richard SMART, Atty. Jeff Kearney, S/A McAuliffe, S/A Farrell, AUSA Fred Schattman, and S/A Merlino. Present during the second interview on 05-16-01 were Richard SMART, Atty. Jeff Kearney, S/A Brian Finney, S/A Farrell, AUSA Schattman and S/A Merlino. These interviews ere conducted based on a "free talk letter" provided to SMART and his attorney.

### DETAILS

1. In 1994, SMART met Julius ROBINSON through SMART's sister, while attending Lamar High School. While there he sold marijuana with ROBINSON and was arrested in the summer of 1995 for possession of marijuana. ROBINSON was selling mostly quarter and half pounds of marijuana to customers, which were older than SMART and ROBINSON.

2. In December 1998, while SMART was residing in Chicago, SMART knew ROBINSON was selling marijuana in Arlington, Texas. He received 5 pounds of marijuana from him, which was mailed by Leteisha BARNETT. This package was mailed to his mother's residence located at 1714 N. Laramie, Chicago, IL. 60639. Approximately two months later, he Express Mailed $2,500, which he wrapped in a magazine to ROBINSON's house. Also, in

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division Dallas FDO | IRS S/A Andrew P. Merlino | 6/22/01 |
| District AUSA Schattman | 14. Approved (Name and Title) Tim Stover, G/S | 15. Date 6/25/01 |
| Other HQ/SARI | | |

DEA Form - 6
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Debriefing of SMART on 5-11 and 5-16

ENTERED CAST
BY: JB

rans'd - SARI
)ate: 6-26-01
nitials: ___

Exh. 83, p. 12

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. MW-99-0077 | 2. G-DEP Identifier ▬▬▬ |
|---|---|---|
| (Continuation) | 3. File Title ▬▬▬▬▬ | |
| 4. Page 2 of 8 | | |
| 5. Program Code | 6. Date Prepared 06/07/01 | |

approximately February 1998, 3 more pounds of marijuana from ROBINSON came to the same residence.

3. In March 1998, SMART moved in with his sister in Arlington, Texas.

4. SMART has received money from ROBINSON to give to BARNETT at "That Sounds Good". Further, ROBINSON has asked SMART about business decisions regarding the clothing business ROBINSON maintained. SMART stated that ROBINSON did not assist in the burning of this business. In fact, SMART stated several boxes of clothing were destroyed that ROBINSON was gathering the purchase invoices for, in order to process the insurance claim for reimbursement. Specifically, $200,000 of inventory was on display and located in unopened boxes in the back room. ROBINSON stated this to SMART subsequent to the fire. Further, ROBINSON did his own bookkeeping.

. On one occasion, SMART has gone with HENDERSON to pick up five boxes at the "Packaging Store" located at Lamar and Collins in Arlington, TX. These boxes were then taken to HENDERSON's residence and put in his living room. Also at this store, SMART has been with ROBINSON on three occasions to pick up two boxes during each occasion.

6. SMART stated on one occasion he was contacted by ROBINSON to assist him in picking up marijuana from Javier AGUILAR. SMART let ROBINSON drive to AGUILAR's residence in his girlfriend's white Nissan Altima car. SMART remained in the car, while ROBINSON dealt with AGUILAR in his residence. Subsequently, ROBINSON returned to the car and proceeded to drive around the corner from the residence. At this time, an unknown male put marijuana in the trunk of the car. They then proceeded to drive west on Interstate 30 and exited off of Interstate 30 near Six Flags in Arlington, TX. ROBINSON then drove to Jamila CAMP's residence to drop the marijuana off. They then drove to ROBINSON's residence and SMART proceeded to pick up his girlfriend. SMART stated that the police had followed him and ROBINSON, for they saw the same truck on the highway that they also saw at Collins and Arkansas Ln. near the Church's Fried Chicken in Arlington, TX. ROBINSON also saw another car parked that he believed was the police, and ROBINSON believed that this officer was listening to his telephone call he was having with HENDERSON. SMART stated that he heard ROBINSON state to

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Exh. 83, p. 13

U.S. **Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. <br> MW-99-0077 | 2. G-DEP Identifier |
| *(Continuation)* | 3. File Title | |
| 4. <br> Page 3 of 8 | ▆▆▆▆▆▆▆▆▆▆ | |
| 5. Program Code | 6. Date Prepared <br> 06/07/01 | |

HENDERSON over the telephone that he had 70 "pieces" or 70 "CD's", which he knew to mean 70 pounds of marijuana.

7. SMART stated on a second occasion, he and ROBINSON went to Victor JIMENEZ' house to provide JIMENEZ money and to pick up 20 pounds of marijuana from him. This 20 pounds of marijuana was taken from the trunk of an older model maroon car with a white top. They drove to JIMENEZ' residence in the white Altima.

8. SMART stated that when they were in high school, ROBINSON stated to SMART that he merely intended to shoot at the truck for he did not know anyone was in the truck. He did not intend to shoot at the girl that was in the truck; however, the female that was in the truck owed ROBINSON money for the narcotics ROBINSON sold her.

9. ROBINSON told him about the robbery at the McDonald's in Dallas, in which the pick-up he and Quinton KNOX were in was stolen, along with the $25,000 to $30,000. This money was intended to be used to purchase marijuana.

10. In December 1997, SMART was visiting HENDERSON's residence and saw at least 10 pounds of marijuana and several bundles of currency. On this occasion, HENDERSON, ROBINSON and two other males were present. In addition, in the summer of 1999, SMART stated he has seen 200 pounds of marijuana at HENDERSON's residence on Lost Creek. Also, SMART has seen 10 pounds of marijuana on four or five occasions and another 50 pounds on another occasion, all at HENDERSON's Lost Creek residence.

11. In the early part of December 1998, SMART came to town from Chicago. He stayed at a hotel in Arlington with a relative named George MITCHELL. ROBINSON picked up SMART and his relative at "That Sounds Good" in the green Acura and they went to the "Spy Club" in Dallas, TX to see "Gangster Boo". Jason GEHRING was at the Club, who SMART knew to be in the narcotics trafficking business with Johnatan SMITH aka "John Tan". Nathan HENDERSON was also present for this concert.

12. SMART stated he has known Dakari WARNER aka "DK" and "Dakari Sells" since high school. ROBINSON or L. J. BRITT aka "Capone" stated to SMART

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Exh. 83, p. 14

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No.<br>MW-99-0077 | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4.<br>**Page  4  of  8** | | |
| 5. Program Code | 6. Date Prepared<br>06/07/01 | |

that L.J. BRITT came to the Dallas area and provided WARNER money to purchase cocaine for him.  Subsequently, WARNER alleged that he was robbed for the several thousand dollars BRITT brought with him to purchase the narcotics.  SMART stated that ROBINSON was not in the Dallas area at this time.  SMART stated that ROBINSON does not believe WARNER stole this money.

13.   SMART stated ROBINSON and Angelo HARRIS aka "Step" had a drug relationship, in which HARRIS would come from Oklahoma to purchase cocaine for resale in Oklahoma.  On one occasion, Angelo HARRIS came to Dallas-Ft. Worth from Oklahoma to purchase cocaine.  Upon returning to Oklahoma, HARRIS discovered that the narcotics were actually a block of wood.  SMART heard of this drug transaction approximately two or three days after it occurred.

14.   SMART has never been told about the altercation at the Spy Club, which occurred during the later part of the month in December 1998. However, SMART stated he briefly heard HENDERSON speak about a "fat guy" from a strip club to which he sold a truck.

15.   SMART stated that ROBINSON provided Marcus ROBINSON and his girl friend Sharnita LEWIS aka "Tarvett", 20 pounds of marijuana in March 2000. This was around the time he flew into Dallas and he and ROBINSON drove to the Kappa Beach Party.

16.   SMART has known Tyrone BRYANT since high school.  In fact, SMART previously purchased marijuana from him while in high school.  Further, ROBINSON and Tyrone BRYANT sold narcotics together.

17.   SMART stated he has met Hank TUNSTALL on one or two occasions.  On one of these occasions, he met TUNSTALL at Julius ROBINSON's residence. At this time, TUNSTALL had just been released from jail.

18.   SMART does not know Christian MORALES or Edy Sonia ZAMUDIO aka "Big Mama".

DEA Form      - 6a
(Jul. 1996)                                **DEA SENSITIVE**
                             Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

| | 1. File No. MW-99-0077 | 2. G-DEP Identifier ▇▇▇ |
|---|---|---|
| 4. Page 5 of 8 | 3. File Title ▇▇▇ | |
| 5. Program Code | 6. Date Prepared 06/07/01 | |

19.   SMART knows Reginald POLK aka "Pork Chop" and "Reggie". He believes that he is ROBINSON's cousin. SMART has met him in Arkansas. SMART picked out his picture in a photo line up displayed to him by S/A Farrell.

20.   SMART knew Randy PERPALL to work at the Toyota dealership. SMART knew PERPALL to purchase marijuana from HENDERSON and he always had large sums of money on his person. SMART overheard a conversation at the "Classique Barber Shop" that PERPALL was killed, because he ripped off some guys from out of town that sent him money for cocaine that he did not deliver. SMART stated he did not participate in this conversation. Also, SMART stated associates believed him to be a "cop".

21.   PERPALL told SMART about the shooting incident involving Ronald L. WASHINGTON aka "Blue". (Note: After, previously stating he never heard of "Blue", the incident described in detail by AUSA Schattman, PERPALL recalled the name "Blue" and the violent acts involved.)

22.   SMART stated that the term "lick" means to sell something to make a large amount of money and/or to rob someone.

23.   SMART knows John TURNER. Further, in approximately July 1998, he drove down from Chicago, IL and met TURNER, HENDERSON, and ROBINSON in St. Louis, MO.

24.   SMART identified "Tawall" and "Mon" in the picture displayed for his inspection.

25.   SMART has known L.J. BRITT since 1995 when SMART was arrested. At this time, BRITT was smoking marijuana.

26.   SMART met Cantral HUGGINS aka "Crumb" on one occasion on 8/8/1999. SMART stated that ROBINSON knew him from Arkansas and that he bought marijuana from ROBINSON.

27.   SMART has never met Jewell EWING aka "Duke".

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
| --- | --- | --- |
| (Continuation) | MW-99-0077 | |
| | 3. File Title | |
| 4. | ██████████ | |
| Page  6  of  8 | | |
| 5. Program Code | 6. Date Prepared | |
| | 06/07/01 | |

28.  SMART met Terrence HOLIMON aka "Bones" in 1995.  In fact, SMART got him a job at Taco Bell in 1995.  SMART knew him to have been arrested for possessing 10 pounds of marijuana.

29.  SMART does not know Steve TOSTON.

30.  SMART had a 380 caliber hand gun which he purchased in Chicago, IL. SMART never let HENDERSON or ROBINSON use this gun, nor has he held any hand guns for them.  SMART knew ROBINSON had a 9mm, 357, and an Uzi. Further, he has never purchased a gun for anyone other than himself.  In addition, ROBINSON kept drugs and guns at Jamila CAMP's residence.

31.  In approximately September 1999, ROBINSON provided SMART $26,000 to hold for him in a safe SMART and ROBINSON purchased at a Wal-Mart.  This safe was maintained above the ceiling in the garage at SMART's sister's residence.  ROBINSON periodically would request portions of the money.  On two of these occasions, SMART provided Leteisha BARNETT approximately $1,200 and $1,500 to purchase money orders; on up to six occasions, he provided the money directly to ROBINSON; and on one occasion SMART wired $1,000 to BRITT in Dermott, AR. from the Western Union located in the Winn Dixie at Interstate 20 and Little Rd.

32.  SMART stated HENDERSON started burning compact music disc in March 1999.  These discs were purchased at Fry's Electronics.

33.  SMART stated TURNER, HENDERSON and ROBINSON spent $18,000 for the band to perform and another $18,000 for other expenses to promote a concert at the Bronco Bowl in December 1998.  In addition, SMART stated HENDERSON made $10,000 to $20,000 for the Chippendale concert he promoted.

34.  SMART is not aware of any counterfeit currency other than what has been discussed after his arrest, which is outlined in the indictment.

35.  SMART stated from his discussion in jail,  HENDERSON owes Iris WADE $2,000.  WADE is a source of supply for HENDERSON and ROBINSON.

36.  ROBINSON met a man from Portland, OR in Las Vegas, NV at a clothes convention.  This individual is in the clothing business.  He is a

DEA Form    - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Exh. 83, p. 17

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. MW-99-0077 | 2. G-DEP Identifier |
|---|---|---|
| (Continuation) | 3. File Title | |
| 4. Page 7 of 8 | | |
| 5. Program Code | 6. Date Prepared 06/07/01 | |

distributor of "hydro" aka "sticky icky" marijuana.  SMART stated this was high potency marijuana.  However, SMART is not aware of any drug transaction occurring between ROBINSON and this individual.

**INDEXING**

AGUILAR, Javier – NADDIS ▬▬

BARNETT, Leteisha – NADDIS ▬▬

BRITT, L. J., AKA: "Capone" – NADDIS ▬▬

BRYANT, Tyrone – NADDIS ▬▬▬▬

CAMP, Jamila – NADDIS ▬▬

EWING, Jewell, AKA: "Duke" – NADDIS ▬▬

GEHRING, Jason – NADDIS ▬▬

HARRIS, Angelo, AKA: "Step" – NADDIS ▬▬

HENDERSON, Nathan – NADDIS ▬▬

HOLIMON, Terrence, AKA: "Bones" – NADDIS ▬▬

HUGGINS, Cantral – AKA: "Crumb" – NADDIS ▬▬

JIMENEZ, Victor – NADDIS ▬▬

KNOX, Quinton – NADDIS ▬▬

LEWIS, Sharnita, AKA: "Tarvett" – NADDIS ▬▬

MITCHELL, George – NADDIS negative

MORALES, Christian – NADDIS ▬▬

PERPALL, Randy – NADDIS ▬▬

POLK, Reginald, AKA: "Pork Chop", "Reggie" – NADDIS pending

ROBINSON, Julius – NADDIS ▬▬

ROBINSON, Marcus – NADDIS ▬▬

SMART, Richard – NADDIS ▬▬

SMITH, Johnatan, AKA: "John Tan" – NADDIS pending

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Exh. 83, p. 18

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No.<br>MW-99-0077 | 2. G-DEP Identifier ▬▬ |
|---|---|---|
| | 3. File Title ▬▬▬▬ | |
| 4.<br>Page 8 of 8 | | |
| 5. Program Code | 6. Date Prepared<br>06/07/01 | |

TOSTON, Steve - NADDIS ▬▬▬

TUNSTALL, Hank - NADDIS ▬▬▬▬▬

TURNER, John - NADDIS ▬▬▬

WADE, Iris - NADDIS ▬▬▬

WARNER, Dakari, AKA: "DK", "Dakari Sells" - NADDIS pending

WASHINGTON, Ronald L., AKA: "Blue" - NADDIS ▬▬▬

ZAMUDIO, Edy Sonia, AKA: "Big Mama" - NADDIS ▬▬▬

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Exh. 83, p. 19