THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON, | : | CAUSE NO. 4:00-CR-00260-2 |
| aka Face, aka Scar, aka Scarface, | : | (Civil No. 4:05-CV-756-Y) |
| Defendant/Petitioner, : | | |
| | : | **DEATH PENALTY CASE** |
| vs. | : | |
| | : | Honorable Terry Means |
| UNITED STATES OF AMERICA, | : | United States District Judge |
| | : | |
| Plaintiff/Respondent. : | | |

---

**EXHIBITS 84-86 IN SUPPORT OF MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO VACATE SENTENCE WITHOUT AN EVIDENTIARY HEARING**

---

SEAN K. KENNEDY, No. 145632
Federal Public Defender
CRAIG A. HARBAUGH, No. 194309
Deputy Federal Public Defender
Federal Public Defender's Office
321 East 2nd Street
Los Angeles, CA 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-7566
E-Mail: Sean_Kennedy@fd.org
           Craig_Harbaugh@fd.org

Attorneys for Petitioner
JULIUS ROBINSON

MICHAEL CHARLTON, No. 04144800
Deputy Federal Public Defender
Federal Public Defender's Office
411 East Bonneville Avenue, Suite 250
Las Vegas, NV   89101-6632
Telephone: (702) 388-6577
Facsimile: (702) 388-6261
E-Mail: mike_charlton@fd.org

Attorneys for Petitioner
JULIUS ROBINSON

## EXHIBITS IN SUPPORT OF MOTION FOR RECONSIDERATION

84.    Affidavit of Steven Toston, 11/21/2008

85.    Brief for the United States in Opposition, *Darryl Jackson v. United States of America*, Case No. 00-8520

86.    Affidavit of Michael L. Gregory, 11/24/2008

## CERTIFICATE OF SERVICE

I, Patricia Jacobson, hereby certify that on November 24, 2008, I electronically filed the

foregoing document with the clerk of the court for the U.S. District Court, Northern District of

Texas, using the electronic case filing system of the court.  The electronic case filing system sent

a "Notice of Electronic filing" to the following attorneys of record who have consented in writing

to accept this Notice as service of this document by electronic means:

SUSAN COWGER
Assistant United States Attorney
U.S. Attorney's Office
1100 Commerce Street, 3rd Fl.
Dallas, Texas  75242


/s/  Patricia Jacobson
PATRICIA JACOBSON

# EXHIBIT 84

STATE OF ARKANSAS )
)
COUNTY OF WASHINGTON )
)
)

## AFFIDAVIT OF STEVEN TOSTON

I, Steven Toston, being first duly sworn, state and depose as follows:

1. I currently reside at 1303 Silent Grove, Springdale, Arkansas. Julius Robinson is one of my distant relatives.

2. In 2000, I was charged, along with several other co-defendants, with drug offenses in the case *United States of America v. Nathan Henderson, et al* Case No. 4:00-CR-260. Since my conviction in that case, I spoke with an investigator from the Office of the Federal Public Defender representing Julius Robinson. The investigator informed me that Nathan Henderson testified at Robinson's trial. According to the investigator, Nate said that Julius spoke to Nate about Michael "One Love" Williams while they were incarcerated together at the Federal Medical Center in Fort Worth, Texas. According to the investigator, Nate testified that Julius said he hoped someone would get Williams and that he, Julius, called to his hometown telling someone to do something to Williams. Nate said that Julius's conversation about "One Love" took place in the cell where Nate and I were staying. Nate also said that I was present when the conversation took place. I was asked to respond to this allegation.

3. After my arrest for federal drug offenses on November 8, 2000, I was placed in the same cell as Nate Henderson. At the time we were incarcerated, Nate, Julius and I used to hang out a lot and we would often talk generally about life. Julius used to come over to our cell and we used to go to his cell or we would meet in the day room to play dominoes. The only time all of three of us talked about our cases was after we filed the motion for discovery and obtained statements from the witnesses. One of the statements was from "One Love." I remember being angry about One Love's statement because he claimed to know things about me and my brother and I barely even said hello to him before I was arrested. I felt like One Love was trying to save himself and give the DEA whatever they wanted. I remember Julius thought it was funny and even laughed about what One Love said. It seemed like Julius was not even worried about it because he thought once we got to court no one would be believe one Love.

$\underline{\text{ST}}$
ST

1

Ex. 84, p. 1

4. At no time did Julius ever say to Nate in my presence that Julius intended to harm or "get" One Love or anyone else, or that he intended to ask someone in Dermott to harm One Love. Even when I was by myself without Nate present, Julius never told me that he, Julius, intended to harm or "get" One Love or anyone else or intended to ask someone to get One Love.

5. The Office of the Federal Public Defender were the first attorneys for Julius Robinson to ever contact me. Had I been asked previously, I would have supplied the foregoing information and would have testified thereto.

Further, affiant saith naught.

I swear under penalty of perjury under the laws of the United States of America this 21 day of November, 2008.

_Steven Toston_

Steven Toston

"NOTARY SEAL"
Debra P. Anderson, Notary Public
Washington Co, State of Arkansas
My Commission Expires July 28, 2014.

_Debra P. Anderson_
Notary Public No._____

My Commission Expires __28 July 2014__.

2

# EXHIBIT 85

No. 00-8520

IN THE SUPREME COURT OF THE UNITED STATES

DARRYL LAMONT JOHNSON, PETITIONER

v.

UNITED STATES OF AMERICA

ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

(CAPITAL CASE)

BRIEF FOR THE UNITED STATES IN OPPOSITION

THEODORE B. OLSON
Solicitor General
Counsel of Record

MICHAEL CHERTOFF
Assistant Attorney General

THOMAS E. BOOTH
Attorney

Department of Justice
Washington, D.C.   20530-0001
(202) 514-2217

## QUESTIONS PRESENTED

1.  Whether petitioner is entitled to a new capital sentencing hearing based on his contention that a government witness presented false testimony at his initial sentencing hearing.

2.  Whether petitioner waived his right to self-representation at trial after his motion for self-representation was lost and never acted on by the district court.

3.  Whether it was plain error for the district court to replace an absent juror with an alternate at the start of petitioner's capital sentencing hearing.

(I)

Ex. 85, p. 2

05/10/2001 17:29 FAX 202 514 0049    DOJ OSG    ☒006

IN THE SUPREME COURT OF THE UNITED STATES

No. 00-8520

DARRYL LAMONT JOHNSON, PETITIONER

v.

UNITED STATES OF AMERICA

ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

BRIEF FOR THE UNITED STATES IN OPPOSITION

OPINION BELOW

The opinion of the court of appeals (Pet. App. 1-19) is reported at 223 F.3d 665.

JURISDICTION

The judgment of the court of appeals was entered on August 3, 2000. A petition for rehearing was denied on September 12, 2000. On November 24, 2000, Justice Stevens extended the time within which to file a petition for a writ of certiorari to and including February 9, 2001, and the petition was filed on that date. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

STATEMENT

Following a jury trial in the United States District Court for the Northern District of Illinois, petitioner was convicted of two

08/10/2001  17:25  FAX 202 514 3544    DOJ USG    ⓐ002

2

murders and various other crimes arising out of a drug distribution enterprise. Specifically, he was convicted of ordering the murder of a person assisting a federal criminal investigation in order to further a continuing criminal enterprise, in violation of 18 U.S.C. 1121(a)(2) and 21 U.S.C. 848(e)(1)(A); causing the murder of another person through the use of a firearm during and in relation to a drug trafficking offense and in order to further a continuing criminal enterprise, in violation of 18 U.S.C. 924(i)(1) and 21 U.S.C. 848(e)(1)(A); engaging in a continuing criminal enterprise, in violation of 21 U.S.C. 848(c); using a person under eighteen years of age to further a drug trafficking offense, in violation of 21 U.S.C. 861(a)(1); using a person under eighteen years of age to avoid apprehension for a drug trafficking offense, in violation of 21 U.S.C. 861(a)(2); multiple counts of distribution of cocaine and possession of cocaine with intent to distribute it, in violation of 21 U.S.C. 841(a)(1); multiple counts of using a telephone to facilitate a drug trafficking offense, in violation of 21 U.S.C. 843(b); making a false statement on a record maintained by a firearms dealer, in violation of 18 U.S.C. 924(a)(1)(A); and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. 924(c). Petitioner was sentenced to death for the murder charges under Sections 924(i)(1) and 1121(a)(2). He was sentenced to life imprisonment without parole, a five-year consecutive term of imprisonment, and various lesser concurrent prison terms on the other charges. The court of appeals affirmed. Pet. App. 1-19.

uo 10 2001 17:20 FAX 202 514 0000          DO. 000          @00

3

1.   Petitioner was a high-ranking official of the Gangster
Disciples, a notorious and long-operating street gang that sold
cocaine and other drugs in the Chicago, Illinois, area.  See Pet.
App. 1; United States v. Jackson, 207 F.3d 910 (7th Cir.), vacated
on other grounds, 121 S. Ct. 376 (2000).  In 1994, petitioner began
to fear that gang members Charlie Banks and Darryl "Blunt" Johnson
were cooperating with the authorities after their arrests on drug
charges.   In fact, Banks had been cooperating with police
investigators since 1992.  Petitioner directed other gang members
to kill Banks and Johnson.  On May 7, 1995, a gang member killed
Johnson by shooting him twice from close range in the back of the
head.  On June 9, 1995, gang members killed Banks by shooting him
twice in the back of the head and four times in the face.  Gov't
C.A. Br. 18-23.

a.   On October 9, 1997, two weeks before his trial was
scheduled to begin, petitioner, who was represented by two
attorneys, filed a pro se motion to represent himself at trial.
Petitioner contended that his attorneys' performance had been
ineffective and stated that, although he "knows absolutely nothing
about the law," he felt that "he can do more for his defense than
his attorney's have so far."  Pet. App. 2.  The motion was docketed
and forwarded to the district court judge by a court official.
Later that month, the district court held two pretrial conferences.
No one mentioned petitioner's self-representation motion at the
conferences.   At trial, petitioner was represented by his two
attorneys.   Neither petitioner nor his attorneys mentioned the

08/10/2001 17:26 FAX 202 514 8644          DOJ OSG                                      Ø00

4

motion, and petitioner did not move to discharge his attorneys. The district court never ruled on the motion. Pet. App. 2; Gov't C.A. Br. 34-35.

The lost self-representation motion was discussed after the trial concluded, at a hearing that the district court held in response to petitioner's post-trial request to amend the record on appeal to include documents connected with the lost motion. At the hearing, the district court judge stated that she did not receive a copy of petitioner's pro se motion during the trial and had no recollection of it. 2/29/00 Tr. 6, 9. She further noted that petitioner was "rather assertive if he had a complaint about something. * * * So it's kind of strange to me that something like this would happen and he wouldn't bring it to my attention rather forcefully." Id. at 11.

b.    During the guilt phase of the trial, the prosecutor informed the district court that the parties had reached a stipulation about use of alternate jurors during the penalty phase of the trial. The district court stated that the alternate jurors would be kept available if needed during the penalty phase. After the jury began its deliberations at the guilt stage, the court instructed the alternate jurors that they were to remain as an "insurance policy" in case they were needed for further proceedings. The court added that the parties wanted the alternates to continue to participate as jurors and that they might have to serve as jurors in future proceedings. Petitioner did not dispute the district court's statement that the parties had agreed

Ex. 85, p. 6

US 10-2001 17:20 FAX 202 514 8544       DOJ USO                                    ᾱ001

5

to that procedure. Gov't C.A. Br. 55-56; Tr. 1148, 1562-1563, 1711-1713. The original jurors found petitioner guilty of all the charges against him. Pet. C.A. Br. App. 4.

Two days later, a special jury sentencing hearing was held on the two murder counts for which the government sought the death penalty in accordance with the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. 3591 et seq. One of the jurors who had served during the guilt phase failed to appear. The district court immediately replaced the no-show juror with an alternate. Petitioner did not object to the replacement of the tardy juror with the alternate. Pet. App. 5; Gov't. C.A. Br. 56; Tr. 1763.

c. The jury found unanimously and beyond a reasonable doubt two statutory aggravating factors in connection with the Johnson murder: first, the jury found that petitioner caused Johnson's killing after substantial planning and premeditation; and, second, the jury found that petitioner caused Johnson's killing in the course of engaging in a continuing criminal enterprise involving the distribution of drugs to persons under the age of 21. Pet. C.A. Br. App. 7-8; see 18 U.S.C. 3592(c)(9) and (13). The jury also found unanimously and beyond a reasonable doubt three non-statutory aggravating factors in connection with Johnson's murder: first, that petitioner would commit serious acts of violence in the future and therefore would be a continuing and serious threat to society; second, that petitioner ordered the killing to obstruct justice by preventing Johnson from testifying; and, third, that petitioner caused permanent harm to Johnson's family by killing

DOJ

6

him.   Pet. C.A. Br. 9-10; see 18 U.S.C. 3592.   Some of the individual jurors found by a preponderance of the evidence some of the 24 mitigating factors proposed by petitioner, but only five mitigating factors were found by more than half of the jurors.[1] The jury unanimously found that the aggravating factors proved sufficiently outweighed the mitigating factors to justify sentencing petitioner to death for the Johnson murder.   Pet. C.A. Br. App. 15.

The jury found unanimously and beyond a reasonable doubt three statutory aggravating factors in connection with the Banks murder: first, the jury found that petitioner caused Banks' killing after substantial planning and premeditation; second, the jury found that petitioner caused Banks' killing in the course of engaging in a continuing criminal enterprise involving the distribution of drugs to persons under the age of 21; and, third, the jury found that petitioner caused the killing after a previous state conviction for voluntary manslaughter using a firearm.   Pet. C.A. Br. App. 17-18; see 18 U.S.C. 3592(c)(2), (9), and (13).   The jury also found unanimously and beyond a reasonable doubt the non-statutory aggravating factor that petitioner would commit serious acts of violence in the future and therefore would be a continuing and

_____

[1]   Eight jurors found that petitioner was exposed to violence in his neighborhood as a young child; ten jurors found that he was exposed to numerous risk factors as a young child that negatively affected his functioning and development; eight jurors found that he has had a close and loving relationship with his daughters; 11 jurors found that his mother would suffer emotional trauma if he was executed; and nine jurors found that his daughters would suffer such trauma.   See Pet. C.A. Br. App. 11-14.

7

serious threat to society. Pet. C.A. Br. 13. Some of the individual jurors found by a preponderance of the evidence some of the 25 mitigating factors proposed by petitioner, but only one mitigating factor (that petitioner's mother would suffer emotional trauma if he was executed) was found by more than half of the jurors. The jury unanimously found that the aggravating factors proved sufficiently outweighed the mitigating factors to justify sentencing petitioner to death for the Banks murder. Id. at 24.

In its effort to prove that petitioner posed a future danger, the government argued that the leaders of the Gangster Disciples had been known to continue to conduct gang affairs while in prison and that petitioner himself, while in jail awaiting trial, had threatened a co-defendant. In response, a defense psychologist testified that he had toured the federal government's highest maximum-security prison in Florence, Colorado (ADX Florence); that security arrangements in the control unit there caused prisoners to be kept in virtually solitary confinement; and that, if petitioner were sentenced to life without parole, he would no longer be a threat, because he could be sentenced to spend the rest of his life in the control unit at ADX Florence. Pet. App. 8-9.

In rebuttal, John Vanyur, the former associate warden at ADX Florence, testified as a government witness. In particular, Vanyur testified that ADX Florence has a limited capacity, and the control unit has only 68 beds; that more than 90% of the inmates at ADX Florence had been transferred from other prisons; that the remaining inmates who came directly from a sentencing court were

us 10 2001 17:27 FAX 202 514 6014          DOJ ...          ☑01.

8

not usually gang leaders; and that, while he was at ADX Florence, no gang member was directly assigned to that prison. Vanyur also testified that, under Bureau of Prison (BOP) policy, inmates are not placed permanently in prison control units, and that prisoners in the control unit have one fifteen-minute phone call and up to five non-contact visits each month. Vanyur also testified that an inmate can still commit crimes after placement in a control unit and that he had heard that an inmate at ADX Florence had successfully ordered the killing of two inmates at another prison. Vanyur concluded that petitioner would probably be assigned to the general population in a high security prison based on his crime and his criminal history. Vanyur testified that prisoners in an open population setting are generally permitted extensive visits and telephone calls, which, under BOP policy, are limited only if a prisoner tries to use phone calls or visits to violate prison rules. Pet. App. 9-10; Gov't C.A. Br. 26-27 & App.

Once during Vanyur's testimony, government counsel asked Vanyur about _legal_ limits on BOP authority to place a prisoner in a control unit. Tr. 2484. Defense counsel objected to Vanyur's interpreting the law, but the court overruled the objection. _Ibid._ In response to the question, Vanyur stated that, under 28 C.F.R. Part 541, an inmate cannot be placed in a control unit directly from a court because assignment to a control unit may not be made solely on the basis of offenses committed before confinement. _Id._ at 2484-2485. Vanyur was not asked about and did not refer to any other law or regulation at any other point in his testimony.

9

Vanyur was also asked "Why isn't it an option for you simply to place the defendant in administrative detention or segregation for the rest of his life?" Vanyur answered that "litigation would more than likely show that it would be considered cruel and unusual punishment" to keep a prisoner in administrative detention or segregation for the rest of his life, "[a]nd so it is not permissible, by the Bureau of Prisons policy, to keep an inmate in that status indefinitely." Tr. 2483.

After trial, petitioner moved for a new sentencing hearing. He contended that Vanyur had provided false testimony about BOP's ability to prevent inmates from committing future crimes. In particular, petitioner contended that, under 18 U.S.C. 3582(d), and consistent with 28 C.F.R Part 541, courts have the legal authority to sentence defendants "directly to the control unit of federal prison" and "to spend the rest of their lives in solitary confinement without any outside communication." Pet. Reply to. Gov't Resp. Regarding Count II of the Motion to Vacate the Jury's Death-Penalty Phase Verdicts 2.

On June 12, 1998, the district court denied petitioner's motion for a new sentencing hearing. The district court specifically rejected petitioner's claim that Vanyur had testified falsely about assignment to ADX Florence in general and to its control unit in particular. Pet. App. 20-29. On July 27, 1998, the district court denied petitioner's motion to reconsider its earlier ruling. The court concluded that Vanyur's testimony was

10

reliable, it did not mislead the jury, and it "certainly was not false." Id. at 30-31.

2.  The court of appeals affirmed. Pet. App. 1-19.

a.  The court first rejected petitioner's claim that he was denied the right to represent himself at his trial, because the court concluded that he had waived his right to self-representation. The court explained that, although petitioner filed a pro se motion for self-representation, the district court did not rule on it because it was lost and never submitted to the judge for a ruling. Id. at 2. The court noted that petitioner had stated in the motion that he knew "absolutely nothing about the law" but felt that nonetheless "he can do more for his defense than his attorney's have so far." Ibid. The court considered it unlikely that any rational person who knew absolutely nothing about the law would want to represent himself in a capital case. Id. at 4. The court further explained that, after the court failed to act on the motion, petitioner did not renew it or otherwise move to have his lawyers replaced. Ibid. The court therefore inferred that petitioner had filed the motion not because he actually wanted to represent himself but "to express in the most dramatic possible fashion his current dissatisfaction with his lawyers," which soon passed. Ibid. The court concluded that, under those circumstances, by failing to renew the motion, petitioner "deliberately relinquished his right of self-representation." Ibid. The court added that petitioner had not stated that he would represent himself at a new trial if one were ordered. Id. at 4-5.

us/10/2001 17:25 FAX 202 514 3044          DOJ OSG                                      @014

11

b. The court of appeals next held that the district court did not violate 18 U.S.C. 3593(b) when it replaced the tardy juror with the alternate during the sentencing hearing. Pet. App. 5-8. The court noted that petitioner's attorneys had not objected to the substitution at trial. Id. at 5. The court therefore concluded that petitioner had waived the issue. Id. at 6-7.

In the alternative, the court held that the juror substitution did not violate Section 3593(b). Pet. App. 7. The court concluded that the statute does not address the issue of juror substitution, but it found guidance concerning the proper procedure to be followed in a 1999 amendment to Federal Rule of Criminal Procedure 24. Under that provision, a trial court is authorized to replace a regular juror with an alternate during deliberations. See Fed. R. Crim. P. 24(c)(3). The court reasoned that the procedure employed in this case was closely analogous to the use of an alternate juror during jury deliberations: there were deliberations at both the guilt and sentencing phases, and the alternate missed the guilt phase but participated in the sentencing phase. Although the entire deliberations did not recommence, the issues of guilt and punishment were sufficiently distinct that the alternate did not have to participate in the former to participate meaningfully in the latter. The important factor was that the alternate had sat through the entire trial. Pet. App. 7-8.

c. The court of appeals also ruled that Warden Vanyur did not present false testimony at petitioner's sentencing hearing. Pet. App. 8-14. The court noted that, to the extent that Vanyur

12

testified about the meaning of formal policies codified in statutes or regulations, the testimony was improper because a witness may not testify as to the law. Id. at 9. But the court also stated that petitioner had waived any objection to the testimony on that ground by failing to raise that claim on appeal. Ibid.

The court explained, in any event, that Vanyur's testimony was essentially factual. Pet. App. 9-10. The court rejected petitioner's contention that Vanyur's testimony was false, and instead concluded that the "impression that he conveyed of practice and legal policy was correct." Id. at 11. Reviewing applicable BOP regulations, the court held that Vanyur's testimony that BOP policy does not authorize a prison to keep an inmate in a control unit indefinitely was consistent with the regulations. Id. at 10-11. The court further concluded that the implication of Vanyur's testimony that "there can be no assurance that if [petitioner] were sentenced to life in prison he could not commit future serious crimes" was also correct. Id. at 11. The court noted that its own cases demonstrated that prisoners have committed crimes in control units. The court stated further that no law authorizes a sentencing court to sentence a prisoner to life in a control unit and that a prison control unit is not designed as punishment for the underlying crime. Id. at 11-12.

Finally, the court of appeals rejected petitioner's argument that Vanyur's testimony was false because it was inconsistent with 18 U.S.C. 3582(d) and cases that have interpreted that provision. Pet. App. 13-14. The court explained that Section 3582(d)

10/...... 17:.. .AX 2.. .14 8...        DOJ ...        ⓩ01.

13

authorizes a sentencing court to include as part of its sentence for certain crimes an order that requires the defendant not to communicate with people for the purpose of committing further crimes. Id. at 14. The court expressed its view that, in United States v. Felipe, 148 F.3d 101 (2d Cir.), cert. denied, 525 U.S. 907 (1998), the Second Circuit "stretched the statute" in upholding an order barring a sentenced defendant from associating with everyone except designated family members. Pet. App. 14. The court also considered it "doubtful whether the statute authorizes indefinite confinement in the control unit, as distinct from limitations on visits, phone calls, or association with specified other inmates." Ibid. The court held, however, that it "need not decide" that question because petitioner "did not argue in the district court that he could be sentenced under Section 3582(d)." Ibid.[2]

## ARGUMENT

1. Petitioner first contends (Pet. 14-24) that he is entitled to a new sentencing hearing because, he claims, Warden Vanyur gave false testimony to the sentencing jury. Petitioner contends that the testimony was "grossly inaccurate" because "[f]ederal courts have the power to order restrictive conditions of confinement and

---

[2]   The court of appeals further held that Vanyur's hearsay testimony concerning the murders ordered by a prisoner at Florence met the standard for admissibility at a capital sentencing hearing under Section 3592(c). Pet. App. 14-15. In addition, the court rejected petitioner's contention that his sentence should be set aside because of inconsistencies in the number of jurors who found particular mitigating factors with respect to each of the two murders. Id. at 16-18. Petitioner does not raise those claims in this Court.

us 10/2001 17:49 FAX 202 514 8044          DOJ OJU                                    @017

14

the BOP most certainly has the flexibility to house dangerous inmates under conditions that will preclude them from outside communications." Pet. 14. Although the district court and court of appeals correctly concluded that the warden's testimony was not false, the testimony did not describe all of the legal restrictions that could be imposed on an inmate, such as special administrative measures under 28 C.F.R. 501.3 or court orders under 18 U.S.C. 3592(c). That information (of which the warden and prosecutors were unaware) would have given the jury a more complete understanding of the legal authority to limit prisoner communications and contacts. Without the information, the jury may have held the mistaken impression that no such legal authority existed. Nonetheless, petitioner is not entitled to a new sentencing hearing: The warden and the prosecutors did not knowingly withhold the information; petitioner could have discovered it and presented it to the jury; and petitioner cannot show that the failure to present the information probably altered the jury's sentencing verdict.

a. As the district court explained in rejecting petitioner's motion for a new sentencing hearing, petitioner responded to the government's contention that he would pose a future danger while in prison by presenting an expert witness to show that "permanent placement in the control unit at the 'Supermax' Bureau of Prisons facility in Florence, Colorado ('ADX Florence')" could eliminate his future dangerousness. Pet. App. 20-21. In order to rebut the testimony of petitioner's expert, the government presented John

DOJ

15

Vanyur, the former associate warden at ADX Florence. Vanyur testified about BOP assignment practices, including the process for assignment to ADX Florence. He offered his opinion that petitioner "did not fit the profile for prisoners assigned to ADX Florence, and that inmates cannot be placed in permanent administrative detention in a control unit." _Id_. at 21. He also offered an example of a murder ordered by an ADX inmate to illustrate that even ADX could not conclusively "inhibit deadly communications by its inmates." Ibid.

Petitioner contends that Warden Vanyur falsely told the jury "that a death sentence was the only way to prevent [petitioner] from having access to a telephone, correspondence, and visitors-- the weapons he would need in order to commit crimes while in prison." Pet. 14. Petitioner argues that 18 U.S.C. 3582(d) "demonstrates the falsehood of Warden Vanyur's claim that the BOP cannot legally foreclose access to outside communication." Pet. 15. Petitioner further contends that special administrative measures imposed in certain cases under 28 C.F.R. 501.3 show that BOP "possesses the very authority that Warden Vanyur claimed it lacked," and that "Warden Vanyur was plainly wrong when he told the jury that every inmate necessarily has at least some telephone privileges at all times." Pet. 20.

b. Both the district court and the court of appeals found that Warden Vanyur's testimony was not false. See Pet. App. 11, 27, 30. That concurrent factual finding by two courts below does not warrant this Court's review. See, _e.g._, Exxon Co., U.S.A. v.

08/10/2001 17:29 FAX 202 514 9844        DOJ OSG        ☑019

16

<u>Sofec, Inc.</u>, 517 U.S. 830, 841 (1996). Moreover, lower court denials of motions for a new trial are generally reviewed only for abuse of discretion, see <u>Shotwell Mfg. Co.</u> v. <u>United States</u>, 371 U.S. 341, 354-357 (1963), and this Court has held that "it is not the province of this Court or the circuit court of appeals to review orders granting or denying motions for a new trial when such review is sought on the alleged ground that the trial court made erroneous findings of fact" on whether a witness presented false testimony. <u>United States</u> v. <u>Johnson</u>, 327 U.S. 106, 111 (1946).

As the court of appeals explained, the vast majority of Vanyur's testimony was factual: it concerned the physical capacity of Florence and its control unit, the distribution of prisoners throughout the federal system, and BOP practice and policy on prisoner assignment and conditions of confinement. See Pet. App. 9-10; Gov't C.A. Br. 26-27 & App. Vanyur's testimony centered on those issues, and, in particular, assignment policies for ADX Florence, because it directly responded to the evidence presented by the defense expert. The one time that government counsel asked Vanyur to give an opinion about BOP's legal authority, defense counsel objected. Tr. 2484. The district court overruled that objection, <u>ibid.</u>,[3] and Vanyur testified that, under 28 C.F.R. Part 541, an inmate cannot be placed in a control unit directly from a court because assignment to a control unit may not be made solely on the basis of the offense for which he is incarcerated. Tr.

_____

[3] As the court of appeals noted, petitioner has waived any claim that the testimony was inadmissible, because he declined to raise that claim in the court of appeals. Pet. App. 9.

17

2484-2485.   That testimony was not false.   See Pet. App. 10 (quoting 28 C.F.R. 541.41(b)(7)).

Vanyur also testified that "it is not permissible, by the Bureau of Prisons policy, to keep an inmate in [control-unit-type status] indefinitely." Tr. 2483; see Pet. App. 10.   Petitioner appears to interpret Vanyur's testimony to mean that a prisoner must, at some point, be transferred out of administrative segregation.   Vanyur's testimony could also mean, however, that an order of administrative detention cannot be permanent, i.e., that it cannot be imposed once and for all for an indefinite period. The latter interpretation is consistent with governing regulations, which provide for periodic review of both a prisoner's placement in a control unit and other limitations on prisoner communications and contacts.   See 28 C.F.R. 501.3(c) (120-day increments), 541.49(d) (executive panel review "at least every 60 to 90 days").   Nor is there any indication that BOP policy or practice has departed from the requirement of periodic review.   Indeed, petitioner concedes that the "Seventh Circuit was correct when it indicated that there is no guarantee that the restrictions on [extremely dangerous prisoners] will turn out to be permanent." Pet. 20 n.6.[4]

Petitioner also contends that Vanyur incorrectly "told the

---

[4]   Vanyur also offered his opinion that permanent placement in administrative segregation is not an option because courts would "more than likely" rule that such confinement is cruel and unusual punishment.   Tr. 2483.   That speculation about what courts would hold (to which petitioner did not object) cannot properly be characterized as true or false.   In any event, the relevant point is that BOP regulations require periodic review rather than permanent placement in administrative segregation or a control unit.

18

jury that _every_ inmate necessarily has access to at least some telephone privileges at all times." Pet. 20. That is not, however, what Vanyur told the jury. He testified that prisoners in an open population setting are generally permitted extensive visits and telephone calls. _Id_. at 9-10; Tr. 2477-2478. Vanyur also testified that, as a matter of practice, prisoners in the control unit have one 15-minute phone call per month, up to five visits per month, and unlimited correspondence. Tr. 2485. The government also asked if "there have been instances when you have tried to * * *, for instance at the ADX, limit the contact that an inmate, who is a gang leader would directly have with other visitors and on the telephone." Tr. 2477. Warden Vanyur replied that "[t]he only time that we would limit [an ADX inmate's] telephone access or his visiting privileges is if the inmate actually tried to violate the rule in the process of a visit or in a process of a phone call." Tr. 2478. That statement appears to describe the practice during the warden's tenure at the ADX, and petitioner has presented nothing that contradicts it.

c. Warden Vanyur was not asked, and did not testify, about the existence of legal authority to impose more severe restrictions on contacts and communications by prisoners. Such authority does exist.

A BOP regulation, 28 C.F.R. 501.3, authorizes the BOP to impose, at the direction of the Attorney General, special administrative measures (SAMs) when there is a substantial risk that a prisoner's communications or contacts would result in death

19

or serious bodily injury. Those measures "may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence." 28 C.F.R. 501.3(a). SAMs may be imposed only in 120-day increments, and they may be extended based on written notice from the Attorney General "that the circumstances identified in the original notification continue to exist." 28 C.F.R. 501.3(c). As petitioner notes (Pet. 10, 19-20), restrictive SAMs have been imposed on certain prisoners and periodically renewed.

A federal statute, 18 U.S.C. 3582(d), authorizes a court to order similar restrictions in certain circumstances. Section 3582(d) provides, in relevant part, that, in sentencing a defendant for certain racketeering and drug offenses, a court may include as part of the sentence an order "that requires that the defendant not associate or communicate with a specified person * * * upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, directs finance, or otherwise participate in an illegal enterprise." In February 1997, before petitioner's sentencing in this case, a district court in the United States District Court for the Southern District of New York sentenced Louis Felipe to life imprisonment for racketeering while a prison inmate. Relying on Section 3582(d), the court ordered

20

Felipe to be placed in solitary confinement, and barred him from communicating with anyone other than his attorney and close family members. After Vanyur's testimony in this case, the court of appeals affirmed the district court order in Felipe. United States v. Felipe, 148 F.3d 101, cert. denied, 525 U.S. 907 (1998). The court of appeals held that, in a racketeering case, Section 3582(d) does not require a sentencing court to identify and list every person with whom the defendant may not communicate where there is sufficient reason to believe that association with any member of the illegal enterprise is for the purpose of furthering the enterprise. 148 F.3d at 109-110.[5]

Petitioner argues (Pet. 15, 20) that Warden Vanyur's testimony was false because he did not discuss 28 C.F.R. 501.3 and 18 U.S.C. 3582(d). His role as a witness, however, did not include a comprehensive description of the law. He did not purport to describe the full scope of legal authority to restrict a prisoner's contacts and communications. And defense counsel did not cross-examine him concerning either Section 501.3 or Section 3582(d). Warden Vanyur's testimony was incomplete, but his failure to discuss those provisions did not make his testimony false. Cf. United States v. Reed, 986 F.2d 191, 193-194 (7th Cir. 1993) (holding that certain testimony that was "accurate but incomplete" was not false testimony that supported a motion for a new trial).

---

[5] As petitioner notes (Pet. 10-11), subsequent to Vanyur's testimony in this case, at least one other district court has imposed a similar order under Section 3582(d). See United States v. Jones, No. WMN-96-0468 (D.Md.).

21

Moreover, we have been informed by the BOP that Warden Vanyur was unaware at the time that he testified of both the legal provisions and the district court's order in Felipe. We have also been informed by the United States Attorney's Office for the Northern District of Illinois that the prosecuting attorneys were likewise unaware of the provisions and the decision.

d. Nonetheless, the existence of Section 501.3 and Section 3582(d) was relevant information for the jury. Without that information, the jury may have held the mistaken impression that no legal authority existed to limit petitioner's communications and contacts while in prison in order to curtail his future dangerousness. The failure to provide that information to the jury does not, however, entitle petitioner to a new sentencing hearing under the circumstances of this case.

i. While petitioner's question presented is broadly framed, see Pet. i, the legal basis on which petitioner seeks a new sentencing hearing is not clear from his petition. In the court of appeals, petitioner sought a new hearing based on Federal Rule of Criminal Procedure 33, which provides that a "court may grant a new trial to [the] defendant if the interests of justice so require." See, e.g., Pet. C.A. Br. 31 (citing Reed, 986 F.2d at 192-193; Larrison v. United States, 24 F.2d 82 (7th Cir. 1928)). In his petition for a writ of certiorari, however, petitioner does not cite Rule 33 or any cases that invoke that rule.

Instead, the body of the petition cites only cases applying the Constitution. See Pet. 21-24. One of those cases is Napue v.

22

*Illinois*, 360 U.S. 264 (1959). See Pet. 22. In the district court and the court of appeals, however, petitioner cited *Napue* only as an alternative ground for relief in a single footnote. Pet. Rep. to Gov't Resp. Regarding Count II of Motion to Vacate Death Penalty Phase Verdicts 11 n.6; Pet. C.A. Br. 35 n.19. It is not clear that either court below perceived that petitioner was raising a constitutional claim, and neither court identified or ruled on such a claim. In this Court, petitioner adverts to *Napue* only briefly. See Pet. 22 ("See generally *Napue* v. *Illinois*, 360 U.S. 264, 271 (1959) (defendant is entitled to new trial if false evidence presented by prosecution 'may have had an effect on the outcome')"). Assuming petitioner has properly preserved a claim based on *Napue* and intends to assert it in this Court, he cannot show a violation based on that case.

In *Napue*, this Court held that the knowing presentation of perjured testimony, or the knowing failure to correct false testimony, violates due process. 360 U.S. at 269. Here, however, petitioner has not made any contention that Warden Vanyur knowingly or intentionally presented false or misleading testimony. See Pet. C.A. Br. 32 n.17 ("The fact that false testimony was presented does not necessarily presume bad faith or malice on the part of the government or its witness. Rather, it simply means that a government witness testified in a manner that was later shown to be inaccurate."). In fact, Warden Vanyur did not knowingly fail to provide information about Section 501.3 and Section 3582(d). As we noted above, neither the warden nor the prosecutors were aware of

23

those provisions at the time of the sentencing hearing.   And, while information known to one part of "[t]he prosecutor's office" may be imputed to other persons in the same office, see Giglio v. United States, 405 U.S. 150, 154 (1972), there is no basis to believe that anyone in the United States Attorney's Office for the Northern District of Illinois was aware of Section 501.3 and Section 3582(d) as of the time of petitioner's sentencing hearing. Napue, which concerns knowing presentation of perjured testimony, is therefore inapposite.[6]

The other cases that petitioner cites also do not support a claim of constitutional error here.   In Simmons v. South Carolina, 512 U.S. 154 (1994), the Court held that "where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available is life imprisonment without possibility of parole, due process entitles the defendant to inform the jury of his parole ineligibility, either by a jury instruction or in arguments by counsel." Shafer v. South Carolina, 121 S. Ct. 1263, 1266 (2001) (internal quotation marks and brackets omitted).   In this case, unlike in Simmons, petitioner was not barred from providing information to the jury; he was free to, but did not, present information about BOP regulations and sentencing provisions that could be invoked to curtail a prisoner's

---

[6]   If petitioner could establish knowledge on the part of the prosecutor's office, which he cannot, petitioner would then have to demonstrate a "reasonable likelihood" that the absence of information about Section 501.3 and Section 3582(d) "affected the judgment of the jury." Giglio, 405 U.S. at 153. Compare pp. 27-31, infra.

24

communications.[7]

Because petitioner was not restricted from presenting any information to the jury, he also cannot show a denial of his rights under Skipper v. North Carolina, 476 U.S. 1, 4 (1986) (refusal to allow evidence of defendant's good behavior in prison violates the Eighth Amendment). See also California v. Ramos, 463 U.S. 992, 1004 (1983) (no constitutional violation in instruction accurately informing the jury of the Governor's power to commute a sentence of life imprisonment without parole to a sentence of life imprisonment with parole; the instruction "gives the jury accurate information of which both the defendant and his counsel are aware, and it does not preclude the defendant from offering any evidence or argument regarding the Governor's power to commute a life sentence").[8]

ii. Assuming that petitioner has adequately presented a claim in this Court based on Rule 33, he still is not entitled to relief. The courts of appeals have permitted defendants to seek new trials under Rule 33 based on the post-trial discovery that testimony by a government witness was perjured or false. See, e.g., United

---

[7]    The information that petitioner contends should have been presented to the jury also would not have established a legal certainty that petitioner would be confined in a manner that would have precluded his communications with the outside world.   Cf. Ramdass v. Angelone, 530 U.S. 156, 168-169 (2000) (rejecting application of Simmons except "where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison").

[8]    Contrary to petitioner's suggestion (Pet 23), Coleman v. Calderon, 210 F.3d 1047 (9th Cir. 2000), is also inapposite. That case involved an erroneous instruction on the possibility of commutation; in this case, there is no contention that the court gave erroneous instructions.

DOJ

☑02

25

States v. Williams, 233 F.3d 592 (D.C. Cir. 2000); United States v. Mazzanti, 925 F.2d 1026, 1029 (7th Cir. 1991). Most courts of appeals that have addressed the issue have analyzed such claims using the general test for a new trial motion based on newly discovered evidence.[9] Under that test, a new trial is warranted if (1) the evidence came to the defendant's knowledge only after trial; (2) the evidence could not have been discovered sooner had the defendant exercised due diligence; (3) the evidence is material; (4) the evidence would probably lead to an acquittal in the event of a retrial; and (5) the evidence is not merely cumulative or impeaching. See United States v. Robinson, 585 F.2d 274, 278 n.4 (7th Cir. 1979) (describing this test as the Berry test, named for Berry v. Georgia, 10 Ga. 511 (1851)). Some courts of appeals have applied a standard that is somewhat more favorable to the defendant in cases in which the defendant claims that the prosecution unwittingly relied on false evidence.[10] Under that standard, first articulated in Larrison v. United States, supra, a new trial is warranted if (1) the court is reasonably well satisfied that the testimony given by a material witness was false;

_____

[9] See Williams, 233 F.3d 592; United States v. Huddleston, 194 F.3d 214, 219 (1st Cir. 1999); United States v. Torres, 128 F.3d 38, 49 (2d Cir. 1997); United States v. Sinclair, 109 F.3d 1527, 1532 (10th Cir. 1997); United States v. Provost, 969 F.2d 617, 622 (8th Cir. 1992), cert. denied, 506 U.S. 1056 (1993); United States v. Krasny, 607 F.2d 840, 844-845 (9th Cir. 1979), cert. denied, 445 U.S. 942 (1980).

[10] See Reed, 986 F.2d at 192-193; United States v. Wallace, 528 F.2d 863, 866 (4th Cir. 1976); United States v. Meyers, 484 F.2d 113, 116-117 (3d Cir. 1973); see also United States v. Willis, 2001 WL 815456 (6th Cir. 2001) (recanted testimony).

DOJ

26

(2) the jury "might have" reached a different conclusion absent the false testimony; and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. 24 F.2d at 87-88.

"It is fundamental that a defendant seeking a new trial under either the Berry or Larrison rule must establish that the material asserted to be newly discovered could not have been discovered with due diligence before or during trial." Robinson, 585 F.2d at 278. Petitioner cannot make that necessary showing because his counsel could readily have discovered Section 501.3 in the Code of Federal Regulations and Section 3582(d) in the United States Code. Petitioner contends (Pet. 17 n.3) that he was hindered in raising those provisions because the issue of the BOP's ability to impose severe conditions of confinement was not highlighted until the rebuttal phase of sentencing, and he "had no opportunity to address the issue in the aftermath of Warden Vanyur's testimony." Petitioner, however, himself injected the BOP's capacity to confine inmates into the proceedings by presenting the testimony of his expert. Due diligence required petitioner to inform himself of legal authority relevant to that testimony, and nothing precluded him from raising Section 501.3 or Section 3582(d) in cross-examination of Warden Vanyur, surrebuttal testimony, or by requesting an instruction from the jury. If Warden Vanyur's testimony brought new issues to petitioner's attention that required more time for petitioner to formulate an adequate cross-

27

examination or other response, petitioner could have requested a continuance to explore those issues further. Petitioner cannot now obtain a new sentencing hearing when he failed to do so.

Petitioner also cannot make the showing of prejudice necessary to obtain a new sentencing hearing under the new trial standard applied by the majority of the courts of appeals, because he cannot establish that the jury "probably" would not sentence him to death at a new sentencing hearing if it was informed about Section 501.3 and Section 3582(d). See Williams, 233 F.3d at 594-595; Huddleston, 194 F.3d at 221. Petitioner can show neither that the jury would likely find that he did not pose a future danger nor that the jury would likely not sentence him to death if it so finds.

The existence of Section 501.3 and Section 3582(d) has only an incremental effect on the future danger that petitioner would pose in prison. As the court of appeals recognized, experience has shown that restrictions on prisoner contacts and communications cannot eliminate all risk that prisoners will commit or order acts of violence. See Pet. App. 12. For example, the court of appeals cited numerous cases involving murders committed by prisoners in control units in federal prisoners. Ibid. Furthermore, as Vanyur and the court of appeals both explained, control units cannot be made totally secure. Ibid.; Tr. 2487 (describing how prisoners, even in control units, find ingenious ways to communicate with each other, such as sending notes through the plumbing systems and signaling through windows in sign language).

28

Moreover, the existence of legal authority to impose restrictions on prisoner contacts and communications does not mean that such restrictions will be imposed or that, if imposed, they will remain in place. BOP regulations provide for periodic review and appeal of such restrictions. 28 C.F.R. 501.3(c), 541.49. Although judges have ordered such restrictions, they have also soon relaxed them. See Pet. App. 13 (noting modification of order imposed in Felipe case). As we have noted, petitioner concedes that there is no guarantee that any restrictions that might be imposed would be permanent. Pet. 20 n.6.

Petitioner therefore cannot meet his burden to show that it is probable that the jury at a new sentencing hearing would not conclude that petitioner posed a future danger if it were aware of the legal authority to limit prisoner contacts and communications. That conclusion is buttressed by the fact that the government's closing argument at sentencing did not assert that there is no legal authority to limit a prisoner's contacts and communications with the outside world. Rather, the government emphasized that no prison system can completely guarantee the preclusion of communications in which orders to commit crimes can be conveyed. See Pet. 7-8; Tr. 2593-2594, 2598, 2647-2648.

The government did briefly contend in its rebuttal argument that, pursuant to BOP regulations, petitioner would not be sent directly to the control unit at ADX Florence but rather to an open population maximum-security penitentiary. Tr. 2645-2646, 2648. Those remarks (to which petitioner did not object) could have left

29

the impression that, absent the death penalty, there was no legal authority to limit the defendant's communications. As we have acknowledged, there is in fact such authority, but there is no guarantee that those measures could actually prevent communications by the defendant, including communications ordering the commission of violent acts. The bulk of the government's argument was devoted to the latter point. See Tr. 2593 ("It doesn't matter where [petitioner] is locked up"); Tr. 2648 ("even from the control unit at the Super-Max, murders can be ordered"); ibid. ("As long as he is alive he can not be stopped from communicating"); Tr. 2594 ("despite the best efforts of everybody involved in a prison system, there is no way to completely shut somebody off in prison with communicating with somebody on the outside"); ibid. ("no matter where he is * * * no one is safe from [petitioner]").

Moreover, petitioner (even without discussing Section 501.3 and Section 3582(d)) argued that the government had the power to prevent petitioner from being a future danger. Tr. 2610-2612. And petitioner argued that, if the government decided that petitioner was not dangerous enough to confine in the control unit with severe restrictions on his communications and contacts, that decision would mean that petitioner is not dangerous enough to warrant a death sentence. Tr. 2611 ("The Bureau of Prisons, the officials who testified before you, are the ones, they make the decision where he goes. If they decide he is not dangerous, then that defeats their argument, doesn't it?"). The addition to the debate of Section 501.3 and Section 3582(d) would not make it probable

30

that the jury would not find that petitioner posed a future danger.

Even if a jury did not find that petitioner posed a future danger, petitioner cannot show that it is probable that the sentencing verdict would be different. As the government noted in its closing argument, the jury heard detailed testimony about not only petitioner's murders of Johnson and Banks but also a variety of other violent attacks that petitioner ordered. Those attacks included the murder of another gang leader, a gunshot attack on a McDonald's parking lot that resulted in two deaths, the shooting of a truck driver who had interrupted petitioner's security line of cars, and gunshot attacks on members of a rival gang, which resulted in the shooting of a 14-year old girl. Tr. 2576.

The jury found unanimously and beyond a reasonable doubt two statutory aggravating factors in connection with the Johnson murder--that petitioner caused Johnson's killing after substantial planning and premeditation; and that petitioner caused Johnson's killing in the course of engaging in a continuing criminal enterprise involving the distribution of drugs to persons under the age of 21. Pet. C.A. Br. App. 7-8; see 18 U.S.C. 3592(c)(9) and (13). The jury also found two non-statutory aggravating factors apart from future dangerousness: that petitioner ordered the killing to obstruct justice by preventing Johnson from testifying and that petitioner caused permanent harm to Johnson's family by killing him. Pet. C.A. Br. 9-10; see 18 U.S.C. 3592. In connection with the Banks murder, the jury found three statutory aggravating factors: that petitioner caused Banks' killing after

10.   . 17:    AI 2 _  14 (                    DOJ                              ☑ 0:

31

substantial planning and premeditation; that he caused the killing in the course of engaging in a continuing criminal enterprise involving the distribution of drugs to persons under the age of 21; and that petitioner had a previous state conviction for voluntary manslaughter using a firearm. Pet. C.A. Br. App. 17-18; see 18 U.S.C. 3592(c)(2), (9), and (13). Although some of the individual jurors found some of the approximately two dozen mitigating factors proposed by petitioner for each murder, only five mitigating factors were found by more than half the jurors in connection with the Johnson murder, and only one mitigating factor was found by more than half of the jurors in connection with the Banks murder. Petitioner cannot show that it is probable that, absent the aggravating factor of future dangerousness, the balance of aggravating and mitigating factors would not result in a death sentence.

e.    Petitioner also errs in contending (Pet. 14-18) that review is warranted to address differing interpretations of 18 U.S.C. 3582(d) by the court of appeals and the Second Circuit in United States v. Felipe. The court of appeals in this case did question the soundness of the interpretation of Section 3582(d) in Felipe. But the court of appeals' comments on Section 3582(d) and its criticism of Felipe were dicta. The court expressly stated that it "need not decide" whether Section 3582(d) authorizes the indefinite confinement in the control unit and restrictions on communication that the Second Circuit upheld in Felipe because petitioner did not raise Section 3582(d) in the district court.

32

Pet. App. 14. Nor need this Court resolve the issue here. If the Second Circuit's position on the meaning of Section 3582(d) is incorrect, then petitioner could not have been prejudiced by the failure to inform the jury about it. On the other hand, if the Second Circuit's construction of Section 3582(d) is correct, the failure to inform the jury of that construction does not warrant a new sentencing hearing.

Contrary to petitioner's contention (Pet. 19-20), the government did not take "mutually exclusive" litigation positions on the scope of Section 3582(d) in this case and in Felipe. The government took no position on the scope of Section 3582(d) at petitioner's trial or sentencing hearing because petitioner did not raise the statute until after the jury had rendered its sentencing verdict. In the post-trial proceedings in the district court and in the court of appeals, the government did not disagree with the interpretation of Section 3582(d) adopted by the Second Circuit in Felipe, but instead argued that Vanyur's failure to discuss that provision did not make his testimony false or misleading. See Gov't Resp. to Pet. Mem. Concerning United States v. Felipe 1-8 & n.4; Gov't C.A. Br. 40-41.

2. Petitioner next contends (Pet. 24-32) that the court of appeals erred in holding that he waived his right to self-representation. The court of appeals correctly decided that issue, and its decision does not conflict with the decision of any other court of appeals. This Court's review is therefore not warranted.

This Court has held that the Sixth Amendment right to counsel

DOJ
🖂0:

33

includes the right to self-representation. Faretta v. California, 422 U.S. 806 (1975). Because a criminal defendant needs and generally desires to proceed with counsel, the defendant must affirmatively assert his right of self-representation if he wishes to represent himself at trial. Moreover, even after a defendant has asserted his right to self-representation, he may waive that right through conduct indicating that he is either vacillating on the issue or has abandoned his request. See, e.g., Brown v. Wainwright, 665 F.2d 607, 610-611 (5th Cir. 1982) (en banc); United States v. Montgomery, 529 F.2d 1404, 1406 (10th Cir.), cert. denied, 426 U.S. 908 (1976). That principle is a specific application of the general rule that a defendant may waive a constitutional or statutory right, see New York v. Hill, 528 U.S. 110, 114 (2000); United States v. Mezzanatto, 513 U.S. 196, 200-201 (1995), and that waiver generally need not entail an affirmative statement but may be inferred from the defendant's conduct. See Hill, 528 U.S. at 118; e.g., Clark v. Stinson, 214 F.3d 315, 323 (2d Cir. 2000) (defendant's right to be present at trial waived by conduct), cert. denied, 121 S. Ct. 865 (2001).

On the particular facts of this case, the court of appeals correctly held that petitioner waived his right to self-representation when he failed to renew his motion to represent himself after his original self-representation motion was lost and not ruled on by the district court. As the court of appeals explained, in his motion, petitioner expressed his dissatisfaction with his lawyers' performance and stated that he "knows absolutely

34

nothing about the law" but nonetheless thought "he can do more for his defense than his attorney's have done so far." Pet. App. 2. Because it is highly unlikely that a rational person who knows nothing about the law would choose to represent himself in a capital case, the court of appeals viewed petitioner's motion as primarily an expression in the most dramatic fashion possible of his temporary dissatisfaction with his lawyers. Id. at 4. The court of appeals found confirmation of that view in petitioner's failure to ask the district court why it had not ruled on the motion, his failure to renew the motion, and his failure to notify his attorneys that he wanted to represent himself. Ibid. In contrast to his lack of follow-up on the self-representation motion, petitioner was vocal on other issues that mattered to him. 2/29/00 Tr. 11. Under those circumstances, the court of appeals correctly concluded that petitioner's silence following the district court's failure to rule on the self-representation motion demonstrated that petitioner did not wish to press his right to self-representation.

Petitioner mistakenly contends (Pet. 26-30) that the court of appeals' decision conflicts with decisions of other courts of appeals. Those courts have held that, if a defendant has asserted his right of self-representation and the district court has conclusively denied the request, the defendant need not renew his request for self-representation in order to preserve his right. See, e.g., Buhl v. Cooksey, 233 F.3d 783, 788, 803 (3d Cir. 2000); Wilson v. Walker, 204 F.3d 33, 35, 37 (2d Cir.) (per curiam), cert.

DOJ

⊘03

35

denied, 121 S. Ct. 218 (2000); United States v. Arlt, 41 F.3d 516, 517-518, 523 (9th Cir. 1994); Orazio v. Dugger, 876 F.2d 1508, 1512 (11th Cir. 1989). Those decisions are inapposite, however, because the district court in this case did not deny petitioner's self-representation motion. Rather, the court failed to act on the motion because it was lost.[11]

Petitioner also errs (Pet. 30-32) in asserting that the decision of the court of appeals conflicts with Faretta. In Faretta, this Court held only that the trial court erred in denying the defendant's motion for self-representation after the defendant made a "clear[] and unequivocal[]" request to represent himself. 422 U.S. at 835-836. Faretta did not address, much less decide, whether and under what circumstances a defendant may waive his right to self-representation after he has asserted it.

Also contrary to petitioner's contention (Pet. 30 n.8), this case does not present any issue concerning a district court's duty to conduct an inquiry into a defendant's motion for self-representation to determine whether the defendant's decision to represent himself is knowing and intelligent. A district court's duty to conduct a hearing on a self-representation motion comes into play only once the judge is aware of the motion. That did not

---

[11] Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc), is not to the contrary. In Schell, the Ninth Circuit held that a defendant's failure to renew a self-representation motion that was not ruled upon did not constitute a waiver where the defendant's counsel had told the defendant that the motion had probably been denied. The court stated that there was no waiver because the defendant "reasonably believed" that his motion had been denied. Id. at 1024. Here, by contrast, petitioner had no basis for believing that his self-representation motion had been denied.

08 10/2001 17:54 FAX 202 514 5044        DOJ ...        ⓩ 03.

36

occur here because petitioner's motion was lost before it reached the judge.[12]

3.  Finally, petitioner claims (Pet. 32-37) that the district court violated 18 U.S.C. 3593(b) and the version of Federal Rule of Criminal Procedure 24(c) that was in effect at the time of his trial when the court substituted an alternate for the juror who failed to show up at the start of the sentencing hearing.  The court of appeals concluded both that the district court did not commit error and that petitioner waived any claim of error because his counsel did not object to the seating of the alternate.  See Pet. App. 5-8.  Petitioner contends that this Court's review is warranted because the court of appeals erred in concluding that petitioner's counsel could waive the claim and its conclusion conflicts with decisions of other courts of appeals.

The court of appeals did not err in concluding that petitioner waived the claim through the actions of his counsel.  A defendant is generally bound by the actions of his attorney.  There are a limited number of fundamental rights that a defendant must personally waive, such as the right to counsel or the right to plead not guilty, but the defendant's attorney may waive the defendant's rights that concern strategic and tactical decisions. See New York v. Hill, 528 U.S. at 114-115; Taylor v. Illinois, 484

---

[12]  Petitioner errs in contending (Pet. 31) that this case presents the question whether a violation of a defendant's right to self-representation is subject to harmless-error analysis.  The court of appeals found no constitutional error because petitioner validly waived his right of self-representation.  Thus, no harmless-error issue is presented here.

37

U.S. 400, 417-418 (1988). Jury selection is a right that may be waived by counsel without the personal consent of the defendant. In _Peretz_ v. _United States_, 501 U.S. 923 (1991), the Court held that the defendant waived his right to have jury selection conducted by an Article III court when his attorney consented to voir dire by a magistrate judge. See also _Wainwright_ v. _Witt_, 469 U.S. 412 (1985) (defendant can forfeit, without personal consent, the right to have members of the venire excluded because of their attitudes towards capital punishment). Juror replacement or substitution is likewise a right of tactical and strategic significance that can be waived by the defendant's attorney.

Moreover, it is doubtful whether there is a conflict of continuing importance among the courts of appeals on the waiver question. Petitioner observes that some courts of appeals had required a defendant's express consent to waive the provisions concerning alternate jurors contained in the version of Rule 24(c) that was in effect at the time of petitioner's trial. See _United States_ v. _McFarland_, 34 F.3d 1508, 1513 n.4 (9th Cir. 1994), cert. denied, 515 U.S. 1107 (1995); _United States_ v. _Chatman_, 584 F.2d 1358, 1361 (4th Cir. 1978). The continued validity of those cases, however, is questionable. _McFarland_ was decided before _Hill_ and does not even cite, much less discuss, _Peretz_. _Chatman_ was decided before _Hill_, _Taylor_, and _Peretz_. And, as we explain below, Rule 24(c) has since been amended. In addition, neither _McFarland_ nor _Chatman_ involved a capital sentencing proceeding under Section 3593.

38

In any event, this Court's review is not warranted here, because resolution of the waiver issue would not affect the outcome of this case. As we have noted, the court of appeals reached the merits of petitioner's underlying claim and correctly concluded that the claim lacks merit. Even if petitioner had not waived the claim, his failure to object to the seating of the alternate juror limits review to plain error. Fed. R. Crim. P. 52(b). And petitioner cannot demonstrate that reversal is warranted under the plain error standard.

First, the district court did not err in seating the alternate, much less commit plain error. As the court of appeals correctly concluded, Section 3593(b) does not address the circumstances under which alternate jurors may be used at a capital sentencing hearing. See Pet. App. 7. The version of Federal Rule of Criminal Procedure 24(c) that applied at the time of petitioner's trial provided that alternate jurors should be discharged after the jury retired to consider its verdict. See Fed. R. Crim. P. 24(c)(3) (1998). Because the rule was not drafted with bifurcated proceedings in mind, however, it did not specify whether discharge was to occur when the jury retired to consider the verdict at the guilt phase or when it retired to consider the verdict at the sentencing phase. It makes sense that discharge of the alternates should occur at the latter stage, because otherwise there would be no possibility of using an alternate when, as in this case, an initial juror is discharged after a guilty verdict

39

but before the start of sentencing deliberations.[13] But see United States v. Webster, 162 F.3d 308, 347 (5th Cir. 1998) (concluding that plain language of Rule 24(c)(3) requires discharge of alternates when jury retires to consider its verdict on guilt but affirming because of lack of prejudice), cert. denied, 528 U.S. 829 (1999).

Second, petitioner cannot show that seating the alternate juror affected his substantial rights or impugned the fairness, integrity, or public reputation of judicial proceedings. See Webster, 162 F.3d at 347. Petitioner has not shown that the alternate juror was anything but fair. Petitioner speculates (Pet. 36) that the alternate might have feared that he missed something in the deliberations at the guilt phase and, therefore, he might have deferred to the jurors that participated in those deliberations. As the court of appeals explained, however, it is just as plausible that someone who never voted on the defendant's guilt and is therefore less committed to that finding might be more inclined to lenity than the jurors who had found the defendant guilty. Pet. App. 8. "Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights." Jones v. United States, 527 U.S. 373, 394-395 (1999).

---

[13] Instead, the court would presumably empanel an entirely new jury (assuming that would be permissible under 18 U.S.C. 3593(b)(2), which provides for a new jury for sentencing only under specified circumstances, which do not appear to include the discharge of an individual juror) or conduct the sentencing hearing with the eleven remaining members of the initial jury (in accordance with Federal Rule of Criminal Procedure 23(b)).

40

Furthermore, Rule 24(c) was amended in 1999, and it now permits the trial court to retain alternate jurors during deliberations and to replace an initial juror with an alternate during deliberations. See Fed. R. Crim. P. 24(c)(3). The procedure employed here was similar to the procedure that the Rule now expressly authorizes. The alternate did not deliberate at the guilt phase of the proceedings, and participated from the start of the sentencing phase. Because the issues at the guilt phase of the trial were different from those at the sentencing phase, the alternate did not have to participate in the guilt phase in order to participate meaningfully in the sentencing phase. He had sat through the guilt phase, which made him sufficiently familiar with the case to justify his participation at the sentencing phase. Thus, petitioner cannot establish that the procedure employed in this case in any way called into question the fairness, integrity, or public reputation of judicial proceedings.

CONCLUSION

The petition for a writ of certiorari should be denied. Respectfully submitted.

THEODORE B. OLSON
Solicitor General

MICHAEL CHERTOFF
Assistant Attorney General

THOMAS E. BOOTH
Attorney

AUGUST 2001

# EXHIBIT 86

## AFFIDAVIT OF MICHAEL L. GREGORY

Michael L. Gregory, being first duly sworn, state and depose as follows:

1.      I am an attorney, licensed to practice law in the State of Texas. My current office address is 2450 Burney Rd., Arlington, Texas 76006. I was licensed to practice law in Texas on July 1994. My first two years in practice were spent under the supervision and mentorship of Ronald Aultman (deceased), a long time attorney in Texas. His level of experience spanned over 35 years in criminal law practice. It was common for me to work on both misdemeanor and felony cases. It was during this time that I accepted and worked on Julius Robinson's Deadly Conduct Case.

2.      In February 1995, I represented Julius Robinson in the case, *State of Texas v. Julius Robinson*, Case No. 0574361D. Mr. Robinson was indicted on one count of attempted murder and another count of deadly conduct. In brief, Mr. Robinson was accused of shooting at a pickup which was occupied by Sarah Tucker on the evening of February 8, 1995. The alleged victim claimed that Robinson shot at her because she owed him $130 for drugs she had purchased from him. At the time of the alleged offense, Mr. Robinson was a high school student at Lamar High School in Arlington, Texas. Mr. Robinson's bond was originally set at $500,000. In April, 1995, Mr. Robinson's bond was reduced to $10,000 and he was released when bond was posted.

3.      It was my standard practice and routine, when taking a case, to interview the client, gather and review any and all possible evidence, including witness statements and police reports, and then discuss the merits of the case with the assigned Assistant District Attorney. Tarrant County had an open file policy, so formal discovery was not required. My recollections of the plea negotiations were that because (1) the State's primary witness was unfavorable to the State's case, (2) the forensic evidence did not attach to the client and (3) other perpetrators could have committed the crime; the State's attorney was open to reduction to Deadly Conduct. My client was concerned about the fact that he was black and did not want to be subject to a potential jury pool that might occur in Tarrant County and with a judge who was notorious for harsh sentences. Because of his concerns, I was able to negotiate a Deferred Adjudication which satisfied both parties, the State and the Client.

Attempted murder is a second degree felony in Texas with a range of punishment of confinement in the state penitentiary for a term of from two to twenty years. One who has never before been convicted of a felony is eligible for probation for a term of between two and ten years. A fine of up to $10,000 can be imposed upon conviction. Deadly conduct is a third degree felony, punishable by confinement in the state penitentiary for a term of from two to ten years. A fine of up to $10,000 can be imposed upon conviction for this offense. Probation is also available to one who has never been convicted of a felony before.

On March 11, 1996, Mr. Robinson pled guilty to deadly conduct, reducing his maximum exposure by ten years. Mr. Robinson was given a probationary term which was only three years more than the minimum. In addition to allowing Mr. Robinson to plead to the lesser offense, the

1

Court deferred adjudication of the conviction and sentence and placed Robinson on probation.

4. The negotiated plea satisfied the needs of all, taking into account the strengths and weaknesses of the prosecution evidence. The plea offer, which was ultimately accepted by Mr. Robinson, was made by the State because the evidence may not have supported a finding that there was any intent to kill Sara Tucker. Further, the credibility of the purported victim was questionable based on her mother's disclosure to law enforcement that she was involved in drug use and gang activity. The fact that a deferred probation was offered also indicates that the State did not feel that Mr. Robinson was a threat to commit further acts of violence.

Further, affiant saith naught.

Sworn to and signed this 24th day of November, 2008

Michael Gregory
SBN TEXAS 00790003

Notary Public No._____

My Commission Expires ___10|11|12___

REBECCA COMPTON
Notary Public, State of Texas
My Commission Expires
June 11, 2012

2

Ex. 86, p. 2